Cynthia Ellison

April 27, 2006

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA - NORTHERN DIVISION


CYNTHIA ELLISON,

     Plaintiff,


   vs.           CASE NO. 205CV902MHTDRB


AUBURN UNIVERSITY
MONTGOMERY,


     Defendants.
~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

CYNTHIA ELLISON

April 27, 2006
9:30 a.m.

McPhillips, shinbaum & gill, LLP
516 South Perry Street
Montgomery, Alabama

Dawn A. Goodman, Certified Shorthand Reporter and
Notary Public in and for the State of Alabama at Large

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

---

**Page 2**

```
 1              APPEARANCES
 2      .
 3    FOR THE PLAINTIFF:
 4    MCPHILLIPS, SHINBAUM & GILL, LLP
 5    KAREN S. RODGERS, ESQUIRE
 6      516 S. Perry Street
 7      Montgomery, Alabama 36101
 8      .
 9    FOR THE DEFENDANT:
10    FISHER & PHILLIPS, LLP
11    BURTON F. DODD, ESQUIRE
12      1500 Resurgens Plaza
13      945 East Paces Ferry Road
14      Atlanta, Georgia 30326-1125
15      .
16    ALSO PRESENT:
17      DEBRA FOSTER
18      .
19      .
20      .
21      .
22      .
23      .
24      .
25      .
```

---

**Page 3**

```
 1     Deposition of Cynthia Ellison
 2          April 27, 2006
 3        EXAMINATION
 4     BY-MR.DODD:
 5          MR. DODD:  Q.  What's your name?
 6     A.   Cynthia Ellison.
 7     Q.   Where do you live, Ms. Ellison?
 8     A.   I live at 1598 Sandstone Court
 9   here in Montgomery, Alabama.
10     Q.   How long have you lived there?
11     A.   About five years.
12     Q.   I understand you are divorced, is
13   that correct?
14     A.   That's correct.
15     Q.   You have one child?
16     A.   I do.
17     Q.   That's Courtnei?
18     A.   Courtnei.
19     Q.   How old is Courtnei?
20     A.   Courtnei is 22.
21     Q.   What does she do?
22     A.   She's an HR recruiter at Colonial
23   Bank.
24     Q.   Is Colonial Bank here in
25   Montgomery?
```

---

**Page 4**

```
 1     A.   It is.
 2     Q.   Is she married?
 3     A.   No.  She is not.
 4     Q.   Who is your former husband?
 5     A.   Terrell Ellison.
 6     Q.   What does he do?
 7     A.   He is a full-time pastor.
 8     Q.   Is that in Montgomery as well?
 9     A.   It is.
10     Q.   What church is he with?
11     A.   New Life Church of God and Christ.
12     Q.   Did you and Terrell only have one
13   child?
14     A.   We have one living child.  I had
15   a stillborn child.
16     Q.   Any other family?  Do you have any
17   other family in this part of Alabama?
18     A.   No.  I have no family in
19   Montgomery.
20     Q.   Do you have any family in the
21   surrounding counties of Montgomery?
22     A.   I do not.
23     Q.   We can get a few preliminaries out
24   of the way. This is the Deposition of Cynthia
25   Ellison taken pursuant to Notice and Agreement
```

---

**Page 5**

```
 1   of Counsel in the case of Ellison versus
 2   Auburn UUniversity Montgomery.
 3          Ms. Ellison, have you been deposed
 4   before?
 5     A.   I have.
 6     Q.   How many times have you been
 7   deposed?
 8     A.   Once.
 9     Q.   Was that in connection with --
10   strike that, please.
11          What was your deposition in
12   connection with?
13     A.   Dillard's Department Store.
14     Q.   Tell me a little bit about that.
15     A.   I worked part time for Dillard's
16   for about seven years as a salon coordinator.
17   I don't really know what the case was all
18   about.  I just know some clients claimed that
19   they were overcharged.  And I had to be
20   deposed because as a salon coordinator, I
21   accepted the money from the clients and
22   billets from the hairdressers.
23     Q.   Did the folks who were claiming
24   they had been overcharged blame you for the
25   overcharge?
```

Cynthia Ellison                                    April 27, 2006

Page 6

1     A.    No.
2     Q.    Did Dillard's blame you for the
3  overcharge?
4     A.    No.
5     Q.    Do you still work at Dillard's?
6     A.    No.  I left Dillard's.
7     Q.    Why did you leave?
8     A.    I took a full-time job.
9     Q.    You understand you are under oath
10  to tell the truth in this deposition?
11     A.    I do understand that.
12     Q.    If you don't understand a question
13  that I ask you, will you let me know so I
14  can try to rephrase it so that you will
15  understand it?
16     A.    I will do that.
17     Q.    If you don't hear the entire
18  question that I ask you, would you let me
19  know so that I can repeat it for you?
20     A.    I will.
21     Q.    If you need to take a break or
22  recess, just let me know and we will get to
23  a stopping point as soon as we can.  Is that
24  okay?
25     A.    Okay.

Page 7

1     Q.    During the course of the
2  deposition, which probably will go on for
3  several hours, if you remember something, say,
4  later in the deposition that means you should
5  change an answer that you previously gave in
6  order to make it truthful, will you let me
7  know that?
8     A.    Yes, I will.
9     Q.    Did you review anything to prepare
10  for this deposition?
11     A.    I talked to my attorney and prayed
12  about coming in here.
13     Q.    Did you look at any documents?
14     A.    I looked at the production
15  materials.
16     Q.    Are those the documents that your
17  lawyer sent to me, the ones you gave your
18  lawyer?
19     A.    I have no idea.
20     Q.    Give me an idea of what documents
21  they were.
22     A.    Well, my affidavit.
23     Q.    Okay.
24     A.    And the -- I believe the EEOC
25  charge.

Page 8

1     Q.    Are these documents that were in
2  your control?
3     A.    Yes.
4     Q.    Okay.  These are documents you
5  have given to your lawyer, correct?
6     A.    Correct.
7     Q.    Other than your lawyer, did you
8  talk to anyone to prepare for this
9  deposition?
10     A.    I did not.
11     Q.    Do you have any medical condition
12  that would prevent you or hinder you in
13  answering any of the questions I ask you
14  today?
15     A.    No, sir.
16     Q.    Are you involved in any community
17  activities?
18     A.    Just church-related activities.
19     Q.    Church related?
20     A.    Uh-huh.
21     Q.    What church do you attend?
22     A.    Harris Temple Church of God and
23  Christ in Elba, Alabama.
24     Q.    Are you on the vestry, or do you
25  hold an office in the church?

Page 9

1     A.    I am a member of the Board of
2  Trustees, and I am the Church Secretary.  And
3  I work with the youth and Sunday School.
4     Q.    Are there any other church-related
5  activities that you participate in?
6     A.    From time to time when something
7  comes up I may volunteer for a particular
8  activity.
9     Q.    An example of that would be
10  something like a youth outing?
11     A.    Youth outing, or we have what we
12  call District Conferences.  I would volunteer
13  to do whatever the function called for.  It
14  may be providing food.  It may be
15  transportation.  Whatever I think I can do.
16     Q.    You weren't in the military
17  service, were you?
18     A.    No, I was not.
19     Q.    Do you have any relatives currently
20  working at Auburn University Montgomery?
21     A.    No.
22     Q.    Did you have any relatives
23  previously working there?
24     A.    No.  I'm sorry.  My daughter
25  worked there.

Cynthia Ellison                                          April 27, 2006

Page 10

1    *Q.    Courtnei?*
2    *A.    Before she graduated she worked*
3    *there, yes.*
4    *Q.    What did she do there?*
5    *A.    She was a student assistant for*
6    *the Center for Business.*
7    *Q.    Was she a work study student?*
8    *A.    No.*
9    *Q.    She had a job?*
10   *A.    Uh-huh.*
11   *Q.    Who is Faye Ward?*
12   *A.    Faye Ward was the Assistant*
13   *Director of Human Resources.*
14   *Q.    Are you related to her at all?*
15   *A.    I am not.*
16   *Q.    Did Faye Ward give you any*
17   *information about this case?*
18   *A.    She did not.*
19   *Q.    Do you know if Faye Ward gave your*
20   *lawyer, or anybody else, information about*
21   *this case?*
22   *A.    She did give my lawyer an*
23   *affidavit statement.*
24   *Q.    Do you know who prepared that*
25   *affidavit?*

Page 11

1    *A.    My attorney and Faye, I guess.*
2    *Q.    Did you ask Faye to give you any*
3    *documents --*
4    *A.    I did not.*
5    *Q.    -- related to this case?*
6    *A.    No, sir.*
7    *Q.    Did Faye Ward volunteer to give*
8    *you any documents related to this case?*
9    *A.    She did not give me any documents.*
10   *Q.    Do you know if she gave anybody*
11   *any documents, other than the affidavit?*
12   *A.    I do not know.*
13   *Q.    Do you have any current medical*
14   *problems?*
15   *A.    I do.*
16   *Q.    What do you have?*
17   *A.    I have rheumatoid arthritis and*
18   *osteoarthritis.*
19   *Q.    Are you getting treatment for those*
20   *conditions?*
21   *A.    Yes, I am.*
22   *Q.    Do you have any current*
23   *psychological problems?*
24   *A.    I do not.*
25   *Q.    Do you have any current emotional*

Page 12

1    *problems?*
2    *A.    No.*
3    *Q.    Other than the rheumatoid arthritis*
4    *and osteoarthritis, do you have any other*
5    *medical conditions?*
6    *A.    Not that I know of.*
7    *Q.    Do those conditions restrict your*
8    *activities in any way?*
9    *A.    Sometimes.*
10   *Q.    Can you give me an example?*
11   *A.    Well, the condition -- the*
12   *rheumatoid is in the shoulders and the*
13   *wrists. So sometimes I am not able to pick*
14   *items up. It doesn't matter how heavy or*
15   *how light they are. The osteo, of course,*
16   *prevents me sometimes from getting up right*
17   *away in the mornings.*
18   *Q.    Forgive my ignorance. Is*
19   *osteoarthritis a back --*
20   *A.    Well, actually it's bones.*
21   *Q.    Okay. Do you attribute either of*
22   *those conditions to work-related issues?*
23   *A.    I do not. The doctors think that*
24   *the rheumatoid was contracted from the many*
25   *chemotherapy drugs that I was on for my*

Page 13

1    *cancer surgery. After my cancer surgery*
2    *because that was one of the side effects.*
3    *Q.    Your answer is "no"?*
4    *A.    No.*
5    *Q.    Have you had any psychological or*
6    *psychiatric difficulties in the past?*
7    *A.    I have not.*
8    *Q.    When did you resign from Dillard's?*
9    *A.    I believe my effective date was*
10   *February -- the last day of February because*
11   *I started my new job March 1st.*
12   *Q.    Of what year?*
13   *A.    This year.*
14   *Q.    Where was the Dillard's location*
15   *where you worked?*
16   *A.    Eastdale Mall.*
17   *Q.    East what?*
18   *A.    Eastdale, E-a-s-t-d-a-l-e, Mall.*
19   *Q.    And who was your supervisor there?*
20   *A.    We -- the last one that was there*
21   *was Amy Lyda, L-y-d-a.*
22   *Q.    Do you know the name of the HR*
23   *representative at Dillard's?*
24   *A.    I don't. I don't think they have*
25   *one on site.*

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

---

Page 14

1       Q.    Do you know who the general
2   manager of that Dillard's was?
3       A.    Chris Decote.
4       Q.    Can you help me with that?
5       A.    Of course, Chris, C-h-r-i-s.
6   Decote, D-e-c-o-t-e.
7       Q.    Did you have a set schedule at
8   Dillard's?
9       A.    Most of the time I did.
10      Q.    Were you working the same number
11  of hours -- strike that, please.
12            You worked at Dillard's while you
13  worked at AUM as well?
14      A.    That's correct.
15      Q.    What hours did you work when you
16  were also employed at AUM?
17      A.    If I recall correctly, it was
18  Monday nights, Wednesday nights, sometimes
19  Thursday, and then all day on Saturdays.
20      Q.    What hours on Monday and Wednesday
21  nights?
22      A.    Usually about 5:30 to close, which
23  would be about 9:00.
24      Q.    If somebody was in the chair,
25  though, you wait until they are finished,

---

Page 15

1   don't you?
2       A.    I don't have to wait until they
3   are finished.
4       Q.    What about Thursdays when you
5   worked those days, what were your hours?
6       A.    About the same hours.
7       Q.    The same.  Saturday would be?
8       A.    Saturday would be from 7:30 until
9   about 1:00 or 2:00.  Or if I did the
10  afternoon, it would be from 12:00 until about
11  8:00 or 9:00.
12      Q.    Now, after you left Auburn
13  University Montgomery, did your hours at
14  Dillard's change at all?
15      A.    They did.
16      Q.    How did they change?
17      A.    They were reduced.  I reduced my
18  hours.
19      Q.    Why did you do that?
20      A.    Well, because the salon started off
21  with 40 hairdressers and we ended up with
22  about five or six and they didn't need me to
23  give them as many hours.
24      Q.    How many hours were you giving
25  them?

---

Page 16

1       A.    Probably about 12.  Anywhere from
2   12 to 15 a week, if that many.  And they
3   would call me in if people were out.
4       Q.    When would you say that the change
5   in the hours occurred at Dillard's?
6       A.    I don't really remember, to be
7   honest.
8       Q.    How many hours a week were you
9   working when -- how many hours a week were
10  you working at Dillard's at the time you went
11  to Colonial?
12      A.    Probably between 11 and 12.
13      Q.    Your job at Colonial, is it full
14  time?
15      A.    It is.
16      Q.    Does that mean 40 hours a week?
17      A.    Yes, sir.
18      Q.    How were you paid at Dillard's?
19  By the hour?
20      A.    Hourly.
21      Q.    What was your rate?
22      A.    When I left it was 8.75.
23      Q.    What was your rate, if you recall,
24  at the time you left Auburn University
25  Montgomery?  Your rate at Dillard's?

---

Page 17

1       A.    I think it was 8.50.
2       Q.    What is your job at the bank?
3       A.    I am the Executive Assistant to
4   the Director for Training and Development.
5       Q.    And who is that?
6       A.    Melinda Mills.
7       Q.    I'm sorry.  What was the last
8   name?
9       A.    M-i-l-l-s.
10      Q.    Mills.  Okay.
11            And what is your salary?
12      A.    30,000 a year.
13      Q.    Congratulations.  Were you happy to
14  find that?
15      A.    I was happy to work.
16      Q.    Does Melinda know you are here
17  today?
18      A.    She does.
19      Q.    Does she know about the lawsuit?
20      A.    I did not go into detail with her.
21      Q.    You just told her you had to give
22  a deposition?
23      A.    That's right.
24      Q.    What's the address of the bank
25  where you work?

Cynthia Ellison                                    April 27, 2006

---

Page 18

1       A.   All I know is 1 Court Square,
2   Montgomery, Alabama. Colonial Bank, 1 Court
3   Square, Montgomery, Alabama.
4       Q.   Now, when you retired from AUM,
5   you drew a retirement income from the state
6   fund set up for Auburn University, is that
7   right?
8       A.   Correct.
9       Q.   How much are you getting out of
10  that?
11      A.   $1,888 a month.
12      Q.   Is that about 20,000 a year, give
13  or take?
14      A.   Give or take.
15      Q.   Other than Dillard's and Colonial
16  Bank, have you held any employment since you
17  left AUM?
18      A.   I briefly worked for my
19  rheumatologist for about three or four days.
20      Q.   For a rheumatologist?
21      A.   For my doctor, my rheumatologist.
22      Q.   What did you do there?
23      A.   She hired me to be her
24  receptionist.
25      Q.   All right. And you didn't like

---

Page 19

1   that?
2       A.   I couldn't do the work. The files
3   were too heavy for me to pick up. I
4   couldn't put them overhead.
5       Q.   I see. How long did you work
6   there?
7       A.   Probably about three days.
8       Q.   How much did you get paid?
9       A.   I think it was something like
10  $180, or something like that.
11      Q.   Are you still seeing the same
12  doctor?
13      A.   I am.
14      Q.   Have you been continuously employed
15  with either Dillard's, your physician, or the
16  bank, since your retirement from AUM?
17      A.   Just Dillard's.
18      Q.   I don't mean with each employer at
19  the same time. You have had a job of some
20  of kind ever since you left AUM, right?
21      A.   I have had a job with Dillard's
22  since I left.
23      Q.   Were there any periods of time
24  since you left AUM that you were unable to
25  work for whatever reason?

---

Page 20

1       A.   There was some days I couldn't go
2   into Dillard's.
3       Q.   Because of your conditions?
4       A.   Correct.
5       Q.   How many days do you think it
6   amounted to?
7       A.   I honestly don't remember. They
8   were few because I pushed myself to do what
9   I need to do.
10      Q.   Did you take any vacations during
11  that time?
12      A.   No, I did not.
13      Q.   When you were working at AUM, when
14  did you begin planning on retiring?
15      A.   I didn't plan to retire.
16  Retirement seminars would come to Campus and
17  those of us who were in striking distance of
18  retirement, we attended those seminars to find
19  out what was being said. And I did attend a
20  couple of retirement seminars, as I recall.
21      Q.   What do you mean by "striking
22  distance"?
23      A.   You have to have 25 years to
24  retire. And I had made the 25-year mark.
25      Q.   You made the 25 years by combining

---

Page 21

1   previous years of service at another
2   institution?
3       A.   That's correct.
4       Q.   At what institution was that?
5       A.   There were several. I worked for
6   the Board of Education in Mobile for eight
7   years. I worked for the University of South
8   Alabama for two years. I worked for the
9   University of Alabama in Huntsville for two
10  years, maybe two and a half. And then I
11  came to Auburn, AUM, and I worked there for
12  20 years.
13      Q.   You have had total about 32 years
14  of service?
15      A.   That's correct.
16      Q.   Did the eight years of Mobile, the
17  two years at South Alabama, and the two years
18  at the University of Alabama in Huntsville
19  transfer over to your account so to speak?
20      A.   What transfer? You mean the
21  monies?
22      Q.   The years of service.
23      A.   Yes. That was in the same system.
24      Q.   Do you have to pay anything for
25  those years to transfer?

Cynthia Ellison                                        April 27, 2006

---

Page 22

1    A.    No.
2    Q.    Did you ever give any thought as
3  to when you would retire?
4    A.    I think we all do, or I did.
5    Q.    Tell me about your thinking about
6  when you would retire?
7    A.    I thought about -- I could retire
8  once I was treated the way I was.  And I
9  didn't want to be in that unsafe environment
10  any more.
11    Q.    You are talking about -- you claim
12  in this lawsuit that the University forced
13  you to retire, correct?
14    A.    That's correct.
15    Q.    Up until that time, had you given
16  any thought as to when you might retire?
17    A.    I had spoken to Dr. Lawal in April
18  of 2004 when I picked he and his wife up at
19  the airport.  And I told him that I had
20  enough years to retire, but I was going to
21  stay two to three years to get him
22  transitioned into his new position.
23    Q.    Is that as definite as you ever
24  considered your plans to be with respect to
25  retiring?

Page 23

1    A.    Absolutely.
2    Q.    How many times did you and Dr.
3  Lawal discuss your retirement?
4    A.    After I initially talked with him
5  in April, we didn't talk about retirement any
6  more until February when I left.
7    Q.    Had you had any discussions with
8  Bob Elliott about when you might retire?
9    A.    Dr. Elliott -- I said to Dr.
10  Elliott when he retired, "You are you lucky.
11  I wish I could."
12    Q.    Were you not eligible at that
13  time?
14    A.    I may have been eligible, but I
15  was a single parent.  My daughter was in
16  school, so I wasn't thinking about retiring.
17    Q.    Did you ever make any remarks to
18  anyone that you were going to retire after
19  Courtnei finished school?
20    A.    I don't recall.
21    Q.    Did you have any discussions about
22  your retirement with Brad Moody?
23    A.    We discussed retirement, yes.  I
24  discussed retirement with Brad Moody because
25  Debra Foster mentioned that I should retire

Page 24

1  after I filed my complaint concerning Allison
2  Stevens.  I came back, and I reported that
3  to him.
4    Q.    You reported what to whom?
5    A.    I reported to Brad Moody that my
6  conversation with Debra Foster was about my
7  -- "you have enough time to retire, so why
8  don't you do that."
9    Q.    Have Debra -- I'm sorry.
10    A.    I'm sorry.  I am finished.
11    Q.    I don't mean to interrupt you.  Go
12  ahead.  I don't want to cut you off.
13    A.    I have completed my thought.
14    Q.    Have you ever discussed retirement
15  with Debra Foster before?
16    A.    I have not discussed retirement
17  with her.  She brought it up to me.
18    Q.    Is that the only time that that
19  subject has been brought up between the two
20  of you?
21    A.    When I was in her office that time
22  is what I recall.
23    Q.    She didn't make any remarks about
24  your retirement before that?
25    A.    I really don't remember.

Page 25

1    Q.    Do you recall ever making any
2  comments that you want to retire, but you
3  wanted to have a new job before you did?
4    A.    I don't remember making that
5  comment.
6    Q.    A retiree from AUM is not
7  penalized, is she, if she goes out and gets
8  a full-time job?  Penalized in the sense that
9  the retirement benefits are affected?
10    A.    Well, I don't know.  I know there
11  is a cap if you get a state job.
12    Q.    Let's not talk about state jobs.
13  Let's talk about private sector jobs.
14    A.    And your question was?
15    Q.    You can retire from AUM and get
16  whatever you are entitled to based on your
17  years of service or highest salary, or
18  however the formula works, right?  And go out
19  and get a job in the private sector and your
20  retirement benefits are not affected, right?
21    A.    That's correct.
22    Q.    That's a pretty good deal, isn't
23  it?
24    MS. RODGERS:  I object.
25    MR. DODD:  Q.    Did you ever hear

Cynthia Ellison                                    April 27, 2006

### Page 26

1  any of the faculty you worked with, or
2  administrators you worked with, express their
3  desire to retire and get another job?
4      A.   I have heard conversations on
5  occasion.
6      Q.   From a purely monetary standpoint,
7  an income standpoint, you are better off now
8  than when you worked at AUM, are you not?
9          MS. RODGERS:  Object.  You can
10 answer.
11         THE WITNESS:  I am not.  I don't
12 think I am better off.
13         MR. DODD:  Q.  Why aren't you
14 better off?
15     A.   I just started this job.  My
16 salary was cut in half at AUM.
17     Q.   No.  I am just talking about from
18 a purely income perspective right now.  You
19 are making more money from your retirement
20 and from your new job than you were at AUM,
21 are you not?
22         MS. RODGERS:  Objection.
23         THE WITNESS:  Well, if I sit down
24 and add up the figures, I might.  I haven't
25 sat down and added that up.

### Page 27

1          MR. DODD:  Q.  What was your
2  salary when you left AUM?
3      A.   I believe it was 40,900 and
4  something.
5      Q.   Your salary now at the bank is
6  $40,000, is it not?
7      A.   Thirty.
8      Q.   Is it 30?  I thought you told me
9  40 a minute ago.
10     A.   No.  I said 30.
11         MS. RODGERS:  30.
12         MR. DODD:  Q.  I misunderstood
13 you.  Your salary is 30.  Your retirement
14 income annually is approximately $22,650?
15     A.   If that's what you calculated.
16     Q.   Do you know what it is?
17     A.   I know that it's 1,888 a month.
18     Q.   Your current income from those two
19 sources is in excess of $52,000 a year, is
20 that right?
21     A.   If that's what you just added.
22     Q.   Do you disagree with that?
23     A.   I am going by your figures is what
24 I told you.
25     Q.   Has anything happened in the two

### Page 28

1  months that you have worked at the bank that
2  suggests to you that your employment might
3  not be permanent there?
4      A.   I am too new in the job.  I
5  really don't know.
6      Q.   As far as you know, there has been
7  no event that makes it unlikely that you
8  would continue in that job?
9      A.   I have been there six weeks.  I
10 am still on probation.  I don't know what
11 the future holds.
12     Q.   How long have you known Chris
13 Mahaffy?
14     A.   He was there when I came to AUM
15 in 1984.
16     Q.   You knew him for about 20 years?
17     A.   About 20 years.
18     Q.   Were you ever on good terms with
19 him?
20     A.   I didn't see Chris much.  He
21 taught his classes and went home until he
22 became Acting Department Head, or Chair of
23 the Physical Science Department.  That's when
24 I started to see him more.
25     Q.   When did he become Acting Chair of

### Page 29

1  the Physical Science Department?
2      A.   It had to be -- I have got to
3  think a minute here.  Let's see.
4      Q.   Take your time.
5      A.   It had to be in the late Nineties.
6  Somewhere between, I want to say, '97 and
7  2000.  I'm not real sure.
8      Q.   Somewhere in that time frame, do
9  you think?
10     A.   I think.
11     Q.   Until that time, did you really
12 even know him?
13     A.   Not really, because he never really
14 came into the Dean's office.
15     Q.   After that time that he became the
16 Acting Chair, and then I guess the Chair of
17 Physical Sciences?
18     A.   Right.
19     Q.   Were you ever on good terms with
20 him?
21     A.   We did our jobs.
22     Q.   What does that mean?
23     A.   It means that -- how do you define
24 "good terms"?
25     Q.   Well, when did you become on bad

Cynthia Ellison                                    April 27, 2006

---

Page 30

1    terms with him?
2        A.    During the first search for the
3    Dean's position.
4        Q.    When was that?
5        A.    The first search I think was
6    winter semester of 2000 -- winter or spring
7    semester of 2002.
8        Q.    Is it fair to say that up until
9    that time, that search for the Dean, that
10   there was nothing about Chris Mahaffy's
11   behavior that you complained about?
12       A.    I did complain about some of his
13   behavior.
14       Q.    Let's talk about that.  What
15   behaviors did you complain about?
16       A.    I complained about -- well, he
17   would come into the office and not say
18   anything.  He would just look and stare.  He
19   would just make inappropriate comments.
20       Q.    This is before the first Dean
21   search, right?
22       A.    Okay.  Let me get my --
23       Q.    Take your time and let's make sure
24   we get the times right.  Okay?
25       A.    Okay.  I am trying to remember

---

Page 31

1    when the first Dean search was.  Well, I
2    never really had any dealings with Chris
3    until he became Department Chair.  And I will
4    say that was -- like I said, somewhere in
5    the late Nineties or something.  And as
6    Department Chair he would come in and drop
7    off reports, or whatever, and there was just
8    really no interaction really.
9        Q.    Between you and he, right?
10       A.    Correct.
11       Q.    Okay.
12       A.    I have got to think about this.
13       Q.    If we were going to construct a
14   time line, and try as best we can to
15   pinpoint when your objections to Mahaffy's
16   conduct began, it would be sometime after he
17   became Chair of Physical Sciences, correct?
18       A.    Yes.  After he became chair.
19       Q.    Whatever that date is.  That's the
20   event you recall, right?
21       A.    Right.
22       Q.    Who was the Dean when he became
23   Chair of Physical Sciences?
24       A.    If I'm not mistaken, his interim
25   appointment as Acting Department Head was made

---

Page 32

1    by Joe Hill just before he retired.
2        Q.    And was the first Dean search that
3    you referred to, the search to find a
4    replacement for Joe Hill?
5        A.    Correct.
6        Q.    Who served as Acting or Interim
7    Dean when Joe Hill left?
8        A.    Dr. Elliott.
9        Q.    Do you recall how long he served
10   in that capacity?
11       A.    I think a little over two years
12   maybe.
13       Q.    He retired, did he not?
14       A.    He did.
15       Q.    Which again left a vacancy in the
16   Dean's office, right?
17       A.    Correct.
18       Q.    Who served after Elliott left?
19       A.    Dr. Moody.
20       Q.    Do you recall when he started
21   as --
22       A.    Dr. Elliott left December of '02.
23   And Brad's appointment started actually
24   December of '02, but he physically came up in
25   January.

---

Page 33

1        Q.    In January?
2        A.    '03.
3        Q.    How long was Brad Moody Acting
4    Dean?
5        A.    Until Bayo arrived August of '04.
6    Brad was in the office December of '02
7    because Bob left before Christmas.  So he
8    would have been there December of '02.
9        Q.    When did the search that resulted
10   in Dr. Lawal's hire begin?
11       A.    January or February '03.  I'm
12   sorry.  January -- let me get this right.
13   The search started -- I'm not sure.  But it
14   started shortly after Brad took the position,
15   I believe.  At least one of them did.
16       Q.    There were two searches for Deans,
17   correct?
18       A.    Yes.
19       Q.    Okay.  The first one was to find
20   a replacement for Joe Hill, is that right?
21       A.    Well, they didn't start that search
22   immediately.
23       Q.    They started that search at a time
24   when Bob Elliott was serving as Dean?
25       A.    Right.

Cynthia Ellison                                    April 27, 2006

---

Page 34

1    *Q.   Do you recall when that searched*
2 *started?*
3    *A.   I'm not sure. I think it was*
4 *spring of '02. No. Yes. Spring of '02.*
5    *Q.   How did that search end?*
6    *A.   It was a failed search. No one*
7 *was selected as Dean.*
8    *Q.   When did the search end?*
9    *A.   I don't remember the date it*
10 *ended.*
11   *Q.   Do you have any idea of how long*
12 *the search took?*
13   *A.   It took about three -- at least*
14 *three months or more.*
15   *Q.   Now, did the second --*
16   *A.   I'm sorry.*
17   *Q.   Did the second search start Brad*
18 *Moody serving as Dean?*
19   *A.   It did.*
20   *Q.   That was sometime after January*
21 *'03?*
22   *A.   Right.*
23   *Q.   Do you recall when Dr. Lawal*
24 *accepted the position as the Dean?*
25   *A.   I think it was sometime in -- it*

---

Page 35

1 *was May or June. I'm not sure. And it may*
2 *even be the end of April. I'm not really*
3 *sure.*
4    *Q.   Do you have any idea of the*
5 *duration of that search?*
6    *A.   The second search?*
7    *Q.   Yes.*
8    *A.   I was on the Search Committee, so*
9 *I think it was about -- at least three or*
10 *four months.*
11   *Q.   Is it likely that it started about*
12 *the first of the year in 2004?*
13   *A.   Yes, it is.*
14   *Q.   Ms. Ellison, when we are talking*
15 *about the Deans here, we are talking about*
16 *the Dean of the School of Sciences, correct?*
17   *A.   That's correct.*
18   *Q.   Your job was what?*
19   *A.   I was the Senior Administrative*
20 *Associate to the Dean of the School of*
21 *Sciences.*
22   *Q.   What was your previous title in*
23 *that role?*
24   *A.   Dean's secretary.*
25   *Q.   I'm sorry.*

---

Page 36

1    *A.   Dean's secretary.*
2    *Q.   Who did your Deans' report to?*
3    *A.   The Vice Chancellor for Academic*
4 *Affairs and Student Affairs.*
5    *Q.   Who was that?*
6    *A.   Dr. Roger Ritvo.*
7    *Q.   Was he the Vice Chancellor at all*
8 *times while Joe Hill, Bob Elliott and Bayo*
9 *Lawal were Deans?*
10   *A.   No, he was not.*
11   *Q.   When did he assume that role? If*
12 *you know.*
13   *A.   I don't know the exact date he*
14 *took the job.*
15   *Q.   Who was his predecessor?*
16   *A.   Dr. Nance.*
17   *Q.   Is that Guin Nance?*
18   *A.   Uh-huh.*
19   *Q.   You have to say "yes."*
20   *A.   Yes. I'm sorry.*
21   *Q.   Dr. Nance is now the Chancellor,*
22 *correct?*
23   *A.   Correct.*
24   *Q.   Does Roger Ritvo report to Guin*
25 *Nance?*

---

Page 37

1    *A.   He does.*
2    *Q.   Who did Guin Nance report to when*
3 *she was the Vice Chancellor?*
4    *A.   Dr. Saigo.*
5    *Q.   How many Departments are there in*
6 *the School of Sciences?*
7    *A.   Six, seven. Counting the facility*
8 *at Maxwell.*
9    *Q.   Does each Department have a Chair?*
10   *A.   Yes.*
11   *Q.   To whom do the Chairs' report?*
12   *A.   To the Dean.*
13   *Q.   How would -- strike that, please.*
14   *Tell me how would you describe*
15 *your job?*
16   *A.   As the Dean's secretary?*
17   *Q.   Yes.*
18   *A.   My job included making sure the*
19 *smooth operations of the office flows daily.*
20 *That included answering the phones, doing the*
21 *mail, doing payroll, giving assignments to the*
22 *other secretaries, receiving assignments from*
23 *the other secretaries, making sure that they*
24 *were correct. It included supervising*
25 *anywhere from five or six work study*

---

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 38

1  students. I wrote drafts of memos for the
2  Deans. Just the normal secretarial duties.
3      Q.   For the Dean, right?
4      A.   For the Dean.
5      Q.   You supported the Dean, right?
6      A.   I supported the Dean.
7      Q.   Is he your boss?
8      A.   Excuse me. I didn't hear you.
9      Q.   Is he your boss?
10     A.   He was my boss.
11     Q.   And your supervisor?
12     A.   Yes.
13     Q.   A minute ago when you were listing
14 some of your activities, you said receiving
15 assignments from secretaries. Did you mean
16 receiving work back from that you had
17 given them to make sure that it's correct?
18     A.   That's correct.
19     Q.   They weren't giving you tasks to
20 do, were they?
21     A.   Right. I gave them -- well, we
22 had routine tasks that had to be done.
23     Q.   Right.
24     A.   That I had to give out to them
25 and they returned to me to review to see

Page 39

1  whether or not it was correct.
2      Q.   That's what you were talking about,
3  right? I mean the secretaries in the School
4  of Sciences were not telling you to do
5  things, right?
6      A.   Correct. I didn't think I had
7  said that.
8      Q.   I'm sorry.
9      A.   I didn't know that I had said that
10 they did.
11     Q.   I wanted to make sure.
12     A.   Okay.
13     Q.   Now, until Chris Mahaffy became the
14 Chair, or Acting Chair of the Physical
15 Sciences, had he ever been violent with you?
16     A.   He had not been violent with me,
17 no.
18     Q.   Have you ever observed him being
19 violent with anyone?
20     A.   I observed him being upset.
21     Q.   How was he upset?
22     A.   After Department Head meetings,
23 sometimes if things didn't go his way, he
24 came out upset.
25     Q.   Let's talk about the time up until

Page 40

1  he became Chair.
2      A.   Okay.
3      Q.   Have you ever seen him become
4  violent with anyone until that time?
5      A.   There was one confrontation that
6  was reported to the Dean's office between he
7  and a student in a chemistry lab.
8      Q.   What was that confrontation?
9      A.   I don't know. It was years ago.
10 I don't remember. There was a confrontation
11 and the Dean at the time took care of it.
12     Q.   Do you know any details about that
13 confrontation?
14     A.   I don't remember.
15     Q.   Do you have any personal knowledge
16 of that confrontation?
17     A.   I was not in the lab when it took
18 place.
19     Q.   Until the time that Chris Mahaffy
20 became Chair of Physical Sciences, had he
21 ever touched you?
22     A.   No.
23     Q.   Have you ever sued anybody else
24 before?
25     A.   I have not.

Page 41

1      Q.   Have you ever been sued?
2      A.   No.
3      Q.   Have you been charged with a
4  crime?
5      A.   No.
6      Q.   Where was your office located?
7      A.   311 Goodwyn Hall, which was the
8  Dean's suite.
9      Q.   Is that on the third floor?
10     A.   Third floor of Goodwyn Hall.
11     Q.   Can you give me an idea of the
12 layout of the office?
13     A.   You would come into the office.
14 To the left there was a seating area. To
15 the right a copy machine. Then a desk for
16 the student worker. I added another desk for
17 a student worker. My cubicle. If you go to
18 the left, Dr. Owens' office. And the second
19 left was Dr. Caroline Adams. And directly in
20 front of my cubicle was the Dean's office.
21     Q.   Now, when you say "cubicle," can
22 you describe what you mean?
23     A.   Well, we just had -- it was a
24 partition between me and the students and the
25 incoming traffic to buffer.

Cynthia Ellison                                    April 27, 2006

1  Q.  And how high was the partition?
2  A.  I think we ordered them either
3  about four or five feet high.  I can't
4  remember.
5  Q.  Did you have to stand up to see
6  out of it?
7  A.  I did.
8  Q.  You mean it's a solid partition,
9  right?
10  A.  There was maybe a 12-inch glass at
11  the end, but I had to lean to look up out
12  of that glass.
13  Q.  What was your line of vision when
14  you looked through the glass?
15  A.  I could see the door opening, but
16  I couldn't see who was coming in until they
17  actually entered.
18  Q.  Could you see into the hallway?
19  A.  If I stood up and leaned forward.
20  Q.  And leaned forward?
21  A.  Well --
22  Q.  I know it's hard to describe a
23  physical layout.
24  A.  You could see the hallway from the
25  -- you could see the hallway from the glass

1  that's in there.  If you take a look you can
2  see.  And depending on how your desk is
3  turned, and my desk had been in several
4  positions.
5  Q.  So tell me how you would look into
6  the hall?  Would you have to stand up and
7  look around, or look over, or how would you
8  do it?
9  A.  Like that.
10  Q.  You are looking around the edge?
11  A.  No.
12  Q.  You are looking through the glass?
13  A.  Right.
14  Q.  Okay.  Did you spend most of your
15  day at your desk?
16  A.  It depends on what day of the week
17  it was and what I was doing.
18  Q.  What were your typical hours of
19  work there?
20  A.  8:00 to 5:00.
21  Q.  Now, did you ever have any extra
22  employment at AUM?
23  A.  I did.
24  Q.  Tell me about that.
25  A.  I worked for the Center for

1  Business doing structured interviews with
2  people from the Department of Transportation,
3  police officers in Dekalb County, Georgia.
4  And when they had other projects come up,
5  they would ask me to help.
6  Q.  Are these projects that have a
7  definite starting point and a definite
8  termination point?
9  A.  Yes.
10  Q.  How long did they typically last?
11  A.  Anywhere from two days to a week.
12  Sometimes, I think one time was a two-week
13  period.  I'm not sure.  It's been a while.
14  Q.  How would you modify your schedule,
15  or did you need to modify your schedule if
16  you had one of those assignments?
17  A.  There was a form that we called
18  HR-12.  And you had to put on that form if
19  you were taking vacation time, or if you were
20  going to make it up, or if you were using
21  comp time, and you had to put that on there.
22  Q.  When would you -- say, during a
23  typical work day, when did you perform the
24  work on these assignments?  Do you know what I
25  mean?  Was it between the hours of 8:00 to

1  5:00, or was it some other time?
2  A.  I had to physically be at another
3  location to perform the work.  I was wherever
4  the job was.
5  Q.  Right.  Did these jobs occur
6  outside of your normal working hours?
7  A.  Sometimes they did.  Sometimes they
8  didn't.
9  Q.  How would you -- when they
10  didn't --
11  A.  As I stated, there was an HR-12
12  form that we had to fill out a block on that
13  form stating how we would compensate for the
14  time that I was not at my regular job.
15  Whether it be taking vacation, comp time, or
16  making it up.
17  Q.  They are not going to pay you
18  twice, in other words, right?
19  A.  I don't understand that.
20  Q.  If you had to go to your other
21  assignment during the times that you would
22  typically be working in the Dean's office,
23  you are not going to get your normal salary
24  for working in the Dean's office for that
25  time, plus the income you make on the

Cynthia Ellison                                        April 27, 2006

Page 46

1  assignment, right?
2      A.   It depends on what you put on your
3  HR-12.
4      Q.   You can take your vacation, right?
5      A.   You could take vacation, or comp
6  time, or you can make it up. Whatever your
7  supervisor approved.
8      Q.   Did Dr. Lawal ever disapprove
9  whatever you proposed with respect to these
10  other assignments and your time?
11      A.   I never had an assignment while
12  Dr. Lawal was there with the Center for
13  Business.
14      Q.   When was your last assignment for
15  the Center for Business?
16      A.   That ended probably nine to ten
17  months before -- at least a year before I
18  left.
19      Q.   In that year before you left, you
20  didn't have any other outside employment at
21  AUM?
22      A.   Not that I remember.
23      Q.   Where did you park at AUM?
24      A.   I parked in the parking lot by the
25  gym. The parking lots are numbered. I have

Page 47

1  no idea what that parking lot number is.
2      Q.   How close to Goodwyn Hall did you
3  park?
4      A.   There was no close parking until
5  -- I parked in the handicap behind Goodwyn
6  Hall for about the last eight or nine months
7  of my employment there. Maybe not even that
8  long. Before that I parked in the gym
9  parking lot.
10      Q.   Was your handicap due to your
11  cancer?
12      A.   My rheumatoid arthritis.
13      Q.   Rheumatoid arthritis. And I assume
14  you have a state authorization for parking in
15  the handicap spaces?
16      A.   I do.
17      Q.   I am just curious as to the way
18  it works in Alabama.
19      A.   Yes, sir.
20      Q.   How far from Goodwyn Hall were the
21  handicap spaces where you parked?
22      A.   It was outside. This it -- well,
23  it was outside where the loading dock is.
24  It was just outside the loading dock at the
25  back of the building.

Page 48

1      Q.   Adjacent to the building right
2  there?
3      A.   Yes.
4      Q.   Are you familiar with the AUM
5  Campus Police Officers?
6      A.   I do know some of them. I don't
7  know all of them.
8      Q.   Do you know Nel Robinson?
9      A.   I do.
10      Q.   Do you know Craig Sparrow?
11      A.   I don't know him.
12      Q.   Do you know R.C.? That's his
13  first name. I have forgotten his last name.
14      A.   If you call his last name out I
15  might know him. But I don't know.
16      Q.   You knew Nel?
17      A.   Yes.
18      Q.   How long have you known her?
19      A.   Since she came to AUM. I don't
20  know how long that's been. I don't know how
21  long she has been there.
22      Q.   Would you say you have known her
23  for a number of years?
24      A.   Yes.
25      Q.   Do you know that she is the Chief?

Page 49

1      A.   Yes.
2      Q.   The Chief Law Enforcement Officer
3  at AUM?
4      A.   Um-hum.
5      Q.   Did you ever have occasion to call
6  Chief Robinson, or any other individual in
7  the Police Department, for assistance of any
8  kind?
9      A.   I called on occasion for student
10  matters sometimes when the need arose.
11      Q.   For student --
12      A.   For student matters when students
13  were not doing what they needed to do. And
14  I was directed to call Campus Police. If we
15  had students who were being disruptive in
16  class.
17      Q.   Misbehaving students and that sort
18  of thing?
19      A.   Yes.
20      Q.   Did you ever have to call any of
21  the police officers to come unlock a door, to
22  let you in somewhere, or let anybody else in
23  a room that's locked?
24      A.   I may have over the course of 20
25  years forgotten my key one time and called

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 50

1    them to let me in.
2        Q.    Do you recall any occasion where
3    the Police Department or the officers didn't
4    respond to a request you made of them?
5        A.    Not in the matters that I called
6    about.
7        Q.    Did you ever ask them to escort
8    you to your car?
9        A.    I asked for Campus Police security,
10   and Dr. Lawal said I had to go through Ritvo
11   to get that.
12       Q.    My question, though is, did you
13   ever ask anybody in the Police Department to
14   escort you to your car?
15       A.    No.
16       Q.    Ms. Ellison, are you familiar with
17   the AUM harassment policy?
18       A.    I have read it over the years.
19       Q.    Do you recall when you first read
20   it?
21       A.    I don't recall when I first read
22   it.
23       Q.    Do you recall when you last read
24   it?
25       A.    Yes.

Page 51

1        Q.    When did you last read it?
2        A.    I think I read it at the time
3    that Dr. Lawal's behavior changed towards me.
4    And at times that I was reporting these
5    incidents to HR.
6        Q.    Can you give me a time frame,
7    other than connecting it to somebody else's
8    behavior?
9        A.    I wasn't accustomed to just pulling
10   the book out and reading it. So the best I
11   can tell you would be the fall semester of
12   2004.
13       Q.    Was it closer to the beginning of
14   that semester, or closer to the end of the
15   semester?
16       A.    Probably closer to the end.
17       Q.    To the end.
18            Do you have an understanding of
19   the reporting procedures contained in that
20   policy?
21       A.    I don't remember the policy
22   verbatim.
23       Q.    Do you have any recollection at
24   all of the reporting procedures in that
25   policy?

Page 52

1        A.    I would have to read it to be
2    refreshed, to be honest.
3        Q.    As we sit here today, you don't
4    know what the reporting procedures are?
5        A.    I do.
6        Q.    What are they?
7        A.    As related to the harassment
8    policy, you report it to your supervisor.
9        Q.    And what is the supervisor supposed
10   to do?
11       A.    They are supposed to take action.
12       Q.    Is it your understanding that the
13   supervisor of a person who feels he or she
14   has been harassed, is the person who is
15   supposed to remedy, or take action to remedy
16   the harassment?
17       A.    Well, when I say "take action,"
18   they set in motion the rest of whatever the
19   policy prescribes. Whether it is take the
20   complaint to the HR or the EEOC person.
21   That's what I am saying.
22       Q.    Okay. I just want to make sure.
23            And your supervisor, I think you
24   said during this time, was Dr. Lawal, right?
25       A.    The last Dean I worked with was

Page 53

1    Dr. Lawal.
2        Q.    He started in August of 2004?
3        A.    Yes. Can I take a break?
4        MR. DODD:  Of course.
5        (Short recess)
6        MR. DODD: Q.  Ms. Ellison, did
7    anyone ever supervise you other than the Dean
8    of the School of Sciences, whoever that may
9    have been?
10       A.    No.
11       Q.    In his role as your supervisor, do
12   you think that Dr. Lawal had the authority to
13   discharge you?
14       A.    I think so.
15       Q.    Did Chris Mahaffy have the
16   authority to discharge you?
17       A.    No.
18       Q.    Dr. Lawal certainly had the
19   authority to assign work to you, did he not?
20       A.    Correct.
21       Q.    Did Chris Mahaffy have that
22   authority?
23       A.    Department Heads did give me work
24   to do.
25       Q.    What kind of work did Chris

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 54

1  Mahaffy give you to do?
2      A.   I assisted with what we call the
3  Jason Project. There were things that needed
4  to be done, such as arrangements for the
5  hiring of extra student workers to work
6  during that -- I believe it was a one-week
7  period. And he made the request to the Dean
8  that I find the students for him.
9      Q.   Did the Dean authorize you to do
10 that?
11     A.   Yes.
12     Q.   Do you recall if the students that
13 you found to work on the Jason Project were
14 the same students who worked in the Dean's
15 office?
16     A.   The students in the Dean's office,
17 I think there was one or two each time that
18 would work on the project.
19     Q.   On the Jason Project?
20     A.   Right.  We typically put notes up
21 in classrooms.
22     Q.   Did Dr. Lawal, in your opinion,
23 have the authorization to reprimand you if
24 the need arose?
25     A.   Yes.

Page 55

1      Q.   Did Chris Mahaffy have the
2  authority to reprimand you?
3      A.   He didn't have the authority.
4      Q.   Did Dr. Lawal ever give you a job
5  evaluation?  A performance evaluation?
6      A.   No.
7      Q.   You have had performance
8  evaluations in the past, though, have you
9  not?
10     A.   For the 20 years I was there, yes.
11     Q.   Is it true that the Dean is the
12 person who always did those performance
13 evaluations for you?
14     A.   That's correct.
15     Q.   How frequently would you say that
16 you received salary increases at AUM?
17     A.   It depended on what went on in the
18 legislature. Sometimes we got them every year.
19 Sometimes they were every two years.  It was
20 four years one time.
21     Q.   Did the Dean have the authority to
22 determine how much of a raise you would get
23 within the parameters that the legislature
24 authorized?
25     A.   Yes, he did.

Page 56

1      Q.   Nobody else had that authority, did
2  they?
3      A.   He could recommend it.  Someone
4  had the authority to strike it down.
5      Q.   Somebody above him?
6      A.   Correct.
7      Q.   Chris Mahaffy didn't have that
8  authority with respect to your salary, did
9  he?
10     A.   Not my salary, no.
11     Q.   Ms. Ellison, you have been the
12 Dean's secretary the entire time of your
13 employment?
14     A.   Yes.
15     Q.   Strike that, please.
16          You were the Dean's secretary the
17 entire time of your employment at AUM?
18     A.   That's correct.
19     Q.   You were never promoted to another
20 job?
21     A.   Actually, I got an additional
22 assignment with the Dean's secretary's job.
23     Q.   What is that?
24     A.   An advisor to students.
25     Q.   How did that come about?

Page 57

1      A.   We needed an Advising Office.  I
2  was advising students all along about courses
3  to take.  And while Dr. Moody was Acting
4  Dean, he approved the creation of a School of
5  Sciences Advising Office and he recognized my
6  ability to work with the students.  He gave
7  information to Dr. Lawal and Dr. Lawal
8  carried the recommendation through.  And I
9  was appointed Senior Administrative
10 Associate/Advisor.
11     Q.   It's additional responsibilities?
12     A.   Right.  I actually had to go to
13 the Advising Office to work several hours a
14 day.
15     Q.   And Deans Moody and Lawal are the
16 individuals who facilitated that?  Recognized
17 your skill?
18     A.   Dr. Moody started it and Dr. Lawal
19 didn't change it when he came.
20     Q.   Was anybody else involved in that
21 opportunity for you in terms of approving it?
22     A.   No.
23     Q.   It's fair to say, is it not, that
24 you have never been demoted while you were at
25 AUM?

Cynthia Ellison                                    April 27, 2006

Page 58

1    A.   That's correct.
2    Q.   Did the Dean have to authority to
3  demote you to something else?
4    A.   He was Dean.  He had that
5  authority.
6    Q.   You served at the pleasure of the
7  Dean, did you not?
8    A.   Absolutely.
9    Q.   You had no contract of employment,
10 did you?
11   A.   No.
12   Q.   Did you have any co-workers at AUM
13 whom you would consider to be good friends?
14   A.   Ruby Jenkins.
15   Q.   Ruby Jenkins.  Anybody else?
16   A.   Not good friends, no.
17   Q.   Other than the incidents involving
18 Allison Stevens and Barbara Ware, did you
19 ever have any sort of confrontation with any
20 co-workers that you would consider significant?
21   MS. RODGERS:  Object.
22   THE WITNESS:  No.  And I don't
23 consider a -- I did not have a confrontation
24 with Barbara Ware.
25   MR. DODD:  Q.  Let's just call

Page 59

1  them incidents then.  Do you recall any
2  confrontations or objectionable incidents with
3  any other co-workers?
4    A.   Not that I recall.
5    Q.   In your job in the Dean's office,
6  were you aware of the salaries of the other
7  staff people in the School of Sciences?
8    A.   Yes.  I did the payroll.
9    Q.   Were you the highest paid secretary
10 in the School of Sciences?
11   A.   I was.
12   Q.   Do you know what Title VI is?
13   A.   Title VI, I don't think so.
14   Q.   Do you recall any occasion when
15 Brad Moody secured some funds, federal funds,
16 some of which he used to enhance your salary?
17   A.   They -- I don't know where the
18 money came from.  But for the advising, the
19 additional advising responsibilities they gave
20 me an additional $2,000.
21   Q.   Is that on top of salary --
22   A.   It was included in the 40,000.
23   Q.   Do you contend, Ms. Ellison, that
24 Chris Mahaffy discriminated against you?
25   A.   I do.

Page 60

1    Q.   Do you contend that any other
2  individual at AUM discriminated against you?
3    A.   I do.
4    Q.   Who else?
5    A.   Debra Foster, Allison Stevens, Dr.
6  Ritvo.
7    Q.   Did anybody else discriminate
8  against you?
9    A.   That's what I can recall right
10 now.
11   Q.   Do you think there were others?
12   A.   I'm sorry.  Chris Mahaffy.  You
13 said Chris Mahaffy.
14   Q.   We have him.  We have Mahaffy,
15 Foster, Stevens, and Ritvo.
16   A.   And Dr. Lawal.
17   Q.   Anybody else at AUM discriminate
18 against you?
19   A.   Not that I can recall at this
20 moment.
21   Q.   Do you think there are others, and
22 you just can't recall them?
23   A.   Lots of incidents happened, and I
24 can't recall every incident.
25   Q.   Since you have filed a federal

Page 61

1  discrimination lawsuit, you think it's more or
2  less likely that you would recall who you
3  contend discriminated against you?
4    MS. RODGERS:  Objection.
5    THE WITNESS:  Those are the ones
6  that discriminated against me.
7    MR. DODD:  Q.  Now, Chris Mahaffy
8  is white, correct?
9    A.   Yes.
10   Q.   Debra Foster is black?
11   A.   Correct.
12   Q.   Allison Stevens is white?
13   A.   Yes.
14   Q.   Roger Ritvo is white?
15   A.   Yes.
16   Q.   And Bayo Lawal is black?
17   A.   Correct.
18   Q.   How did Debra Foster discriminate
19 against you?
20   A.   In filing my complaints in the
21 Human Resource Office with Debra Foster, I
22 did not receive the same treatment that
23 others received.  In particular, Chris
24 Mahaffy.  Chris was allowed a summary report.
25 I asked for one, didn't get it.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                      April 27, 2006

Page 62

1    Q.    Let's back up one second.  You
2  said when you filed your complaint.  Which
3  complaint are you talking about?
4    A.    Okay.  Let's go with the first
5  complaint.  I filed my complaint about
6  Allison Stevens, who called me a nigger.
7    Q.    When did you file your complaint?
8    A.    That complaint was filed in
9  December 2003.
10   Q.    Was it in writing?
11   A.    Yes.
12   Q.    You filed that with Debra Foster?
13   A.    Yes.
14   Q.    Do you have a copy of that
15 complaint?
16   A.    It should be with my materials.
17   Q.    You do have a copy of it?
18   A.    Yes.
19   Q.    You have got to say "yes."
20       Now, with respect to that complaint
21 about Allison Stevens that you filed in
22 December 2003, how did Debra Foster
23 discriminate against you?
24   A.    During the investigation she
25 interviewed all of the white witnesses.  She

Page 63

1  did not interview the black witness.  And I
2  should say she didn't interview the black
3  witness until I called it to their attention,
4  and Dr. Nance made her go back and do it.
5    Q.    Ultimately she did interview
6  everybody you wanted her to interview?
7    A.    Not that I wanted her to
8  interview.  Everybody that was party to the
9  incident.
10   Q.    Did you want her to interview
11 anybody other than the ones she interviewed?
12   A.    No.
13   Q.    Did Debra Foster discriminate
14 against you in any other way with respect to
15 your complaint about Allison Stevens?
16   A.    I think she did.  In that I don't
17 think the investigation was a thorough one.
18   Q.    Why was it not thorough?
19   A.    Because when she called me over --
20 I'm trying to remember the date.  When she
21 called me over and spoke with me in the
22 presence of Faye Ward, she said, "I have
23 never had a complaint like this before.  I
24 really don't know what to do.  You know
25 these people on this Campus are just crazy."

Page 64

1  But there were other investigations or
2  complaints that I'm sure had full attention
3  of HR.  I don't feel like I got due process.
4    Q.    How were you harmed by what you
5  claim Debra Foster didn't do, or were you
6  harmed?
7    A.    Well, actually, I was.  Because
8  when things -- when other things started
9  happening, I didn't have the confidence to
10 report it to HR because I knew nothing would
11 be done.  So I was affected.
12   Q.    How were you harmed, though?  Were
13 you harmed in your job in any way?
14   A.    Yes.  I was harmed because --
15 well, I had worked there for 20 years and
16 never had to encounter the type behavior that
17 was coming at me.  And that behavior was
18 coming at me because I was a black female.
19   Q.    You are talking about Allison
20 Stevens now?
21   A.    That's right.  I even asked Debra
22 to come over to the area to see what kind of
23 atmosphere I was working in.  Because I said
24 to her, "I am working in a hostile
25 environment."  She didn't give any

Page 65

1  consideration to that. She never came over or
2  anything.
3    Q.    What do you consider a hostile
4  environment?
5    A.    I consider a hostile environment
6  one in which you can't successfully do your
7  work.  One that someone has made so
8  impossible to work in that you are paying
9  attention to things around you, people around
10 you rather than the work you can get done.
11   Q.    Did Allison Stevens cause that?
12   A.    Allison and Chris Mahaffy.
13   Q.    We will get to Mahaffy in a
14 minute.  I am concerned right now about your
15 contention with respect to Debra Foster and
16 Allison Stevens.  Okay?
17   A.    Okay.
18   Q.    Now, you say Debra Foster initially
19 interviewed only the white witnesses and that
20 she didn't do a thorough investigation, right?
21   A.    That's right.
22   Q.    Did she discriminate against you in
23 any other fashion concerning the Allison
24 Stevens incident?
25   A.    What do you mean "any other

Cynthia Ellison                                    April 27, 2006

|  | Page 66 |
|---|---|

1    *fashion"?*
2      *Q.  Did she discriminate against you by*
3   *doing, or not doing else in connection with*
4   *that investigation or that incident?*
5      *A.  Right.  She did not follow through*
6   *with the investigation.  She did not do what*
7   *she was supposed to do.  I was just asking*
8   *her to do her job.*
9      *Q.  What did she not do?*
10     *MS. RODGERS:  Object to form.*
11     *MR. DODD:  Q.  What do you*
12  *contend she did not do?*
13      *A.  She didn't follow through with the*
14  *process of interviewing the witnesses.  I*
15  *complained to Dr. Nance.  Dr. Nance redirected*
16  *her.  And that's when she interviewed the*
17  *black witnesses.*
18      *Q.  Ultimately every witness was*
19  *interviewed, right?*
20     *MS. RODGERS:  Object.*
21     *THE WITNESS:  Yes.*
22     *MR. DODD:  Q.  Now, are you*
23  *contending that Debra Foster discriminated*
24  *against you because of your race?*
25      *A.  I'm contending that she*

|  | Page 67 |
|---|---|

1   *discriminated against me in treating me*
2   *differently from other cases that she had*
3   *investigated.*
4      *Q.  Do you contend that she treated*
5   *you differently for any particular reason?*
6     *MS. RODGERS:  Object to form.*
7     *THE WITNESS:  I think she treated*
8  *me differently because she just didn't like*
9  *me.  Now, I am going to be honest with you.*
10     *MR. DODD:  Q.  Did Allison Stevens*
11  *-- strike that, please.*
12     *Did Debra Foster -- do you contend*
13  *that Debra Foster discriminated against you at*
14  *any time after the Allison Stevens incident*
15  *was completed?*
16      *A.  During the second investigation*
17  *with Chris Mahaffy.*
18      *Q.  Now, which one was that?  Which*
19  *investigation was that?*
20      *A.  When I complained that Chris'*
21  *behavior had changed.  His personality had*
22  *changed to the point where I was fearful for*
23  *being in the office.*
24      *Q.  Is that the -- was that initiated*
25  *by your conversation with Roger Ritvo on*

|  | Page 68 |
|---|---|

1   *November the 30th, 2004, and your subsequent*
2   *submission of a memorandum to him?*
3      *A.  That was initiated by his behavior*
4   *at the end of the first -- at the failing of*
5   *the first Dean search and I reported it to*
6   *my supervisors.  And I talked to -- well, I*
7   *tried to talk to Debra Foster about it, but*
8   *I ended up talking to Faye Ward about it,*
9   *who referred me back to my supervisors to*
10  *follow the right chain-of-command.*
11      *Q.  Let's back up so I can make sure*
12  *I am with you here.  This was an incident*
13  *that occurred before the Allison Stevens*
14  *incident, correct?*
15      *A.  Right.*
16      *Q.  You are talking about the first*
17  *Dean search, right?*
18      *A.  The first Dean search.*
19      *Q.  Spring of 2002, I think you told*
20  *me earlier.*
21      *A.  This was the transition between the*
22  *end of the first Dean search.  It was at the*
23  *end.  It was either at the end of spring or*
24  *summer because the Dean search had failed.*
25      *Q.  In the year 2002?*

|  | Page 69 |
|---|---|

1      *A.  Let me think a minute.*
2      *Q.  Okay.*
3      *A.  Okay.  The spring search would*
4   *have started -- I mean the search would have*
5   *started winter and spring of '03.  The failed*
6   *-- at the end of that spring and the*
7   *incident with Allison was in December of '03.*
8      *Q.  The first Dean search was in 2003?*
9      *A.  The failed part of it.  I don't*
10  *remember whether it started in 2003, but I*
11  *know it ended sometime early in 2003.*
12      *Q.  The Allison Stevens incident*
13  *occurred between the first and second Dean*
14  *searches?*
15      *A.  Right.*
16      *Q.  Let's go back to the first Dean*
17  *search then.*
18      *A.  Okay.*
19      *Q.  Tell me what happened where you*
20  *think that Debra Foster discriminated against*
21  *you.*
22      *A.  Okay.  At the end of the first*
23  *Dean search when Chris didn't make the short*
24  *list, and ultimately he hadn't become Dean,*
25  *his behavior changed to the point that I*

d1403afb-e7e9-42de-b323-57812dba67e5

Page 70

1   would come to work in the mornings. He
2   would be sitting at my desk crying or just
3   sitting there. That happened several days in
4   a row saying that I should be Dean. Making
5   comments about what he could do if he were
6   Dean. He appeared to me to be unstable, so
7   I went to the -- okay. I reported it.
8       Q.   You reported it or recorded it?
9       A.   I reported it to the Dean at the
10  time.
11      Q.   Who was?
12          MS. RODGERS:  Take your time.
13          THE WITNESS:  I'm trying to get my
14  time line right with the Dean searches.
15  That's the important thing.
16          MR. DODD:  Q.  You told me
17  earlier that Brad Moody was Dean from
18  December '02 through August '04. The first
19  Dean search ended in '03, and Brad Moody was
20  the Dean, correct?
21      A.   That's right. Because Glen Ray
22  and Brad Moody spoke with Chris about his
23  behavior. But in the meantime I had said
24  something to Faye Ward in HR. She told me I
25  needed to talk to Debra Foster and my

Page 71

1   supervisors, but to report it to my
2   supervisors first.
3       Q.   And you did?
4       A.   I did.
5       Q.   Did you make this report in
6   writing?
7       A.   I put everything in writing.
8   Let's see. At this time I talked to -- I
9   had a meeting with Glen and Brad. I spoke
10  to Faye. And I did not talk to Debra during
11  that because I didn't think it would help.
12  I'm getting confused here.
13          MS. RODGERS:  You take your time
14  and answer his questions. If you can
15  remember, you remember. But don't get
16  stressed about how much time you are taking.
17          THE WITNESS:  Okay.
18          MR. DODD:  Q.  Let's back up a
19  little bit. Maybe this will help you.
20      A.   Okay.
21      Q.   Mahaffy didn't make the short list
22  for the first Dean search, and obviously he
23  was not selected?
24      A.   Right.
25      Q.   That irritated him, did it not?

Page 72

1       A.   Yes. It sent him over the top.
2       Q.   He was upset that he was not
3   selected to be Dean, right?
4       A.   He came to me and he told me that
5   he thought I had something to do it with it.
6       Q.   On occasions after that you
7   observed him sitting at your desk?
8       A.   Right.
9       Q.   And sometimes he was crying?
10      A.   Right.
11      Q.   You thought that something was
12  wrong, right?
13      A.   Something was wrong.
14      Q.   What was wrong?
15      A.   He said that he blamed me for not
16  being selected as Dean. He thought I had
17  some influence over even the first search.
18  And I wasn't even on the Committee.
19      Q.   What other behaviors did he exhibit
20  at that time that disturbed you?
21      A.   His countenance was different.
22      Q.   How so?
23      A.   He looked -- how should I say it?
24  He didn't look like he had -- his hygiene
25  was not intact.

Page 73

1       Q.   His what?
2       A.   Hygiene. He wasn't shaven. He
3   said he had come to the office. He couldn't
4   sleep at night and he had come to the office
5   at 4:00 o'clock that morning and came in.
6   He was sitting there waiting on me.
7       Q.   How many times did that occur that
8   he would be sitting at your desk?
9       A.   Two times. The first time was in
10  the dark. I unlocked my office, went in to
11  go to my desk. Flipped the light on and
12  when I got around to where I was supposed to
13  sit, there was Chris.
14      Q.   All right. Now, you reported it
15  to Brad Moody?
16      A.   I reported it to Brad Moody and to
17  Glen Ray.
18      Q.   Glen Ray was the Associate Dean,
19  was he not?
20      A.   Right.
21      Q.   He reported to Brad?
22      A.   Right.
23      Q.   You think you put it in writing
24  because you put everything in writing?
25      A.   Well, I didn't say I put

Cynthia Ellison                                    April 27, 2006

Page 74

1   *everything in writing. I say what I said*
2   *earlier. There was so many incidents that I*
3   *don't remember all of them. I do remember*
4   *that every time an incident happened I*
5   *reported it to the proper person.*
6       Q.   *But you also did not report it to*
7   *Debra Foster, correct?*
8       A.   *I reported it to HR. I did talk*
9   *to Faye Ward.*
10      Q.   *You didn't talk to Debra Foster --*
11      A.   *Not at this time.*
12      Q.   *Because you didn't think it would*
13  *help, right?*
14      A.   *I didn't.*
15      Q.   *At least with respect to that*
16  *incident, Debra Foster could not have*
17  *discriminated against you because you didn't*
18  *report it to her, right?*
19          MS. RODGERS: *Object to form.*
20          THE WITNESS: *Okay.*
21          MR. DODD: Q. *Do you agree with*
22  *that?*
23      A.   *Okay.*
24      Q.   *Is that a "yes."*
25      A.   *Yes.*

Page 75

1       Q.   *Now, you said you talked to Faye*
2   *Ward?*
3       A.   *Right.*
4       Q.   *And Faye Ward told you you needed*
5   *to go to Debra Foster?*
6       A.   *She said I needed to go back to*
7   *the chain-of-command and come back to Debra*
8   *Foster, because Debra Foster was the EEOC*
9   *person there.*
10      Q.   *And you declined to do that,*
11  *right?*
12          MS. RODGERS: *Object to form.*
13          THE WITNESS: *I declined --*
14          MR. DODD: Q. *You declined to go*
15  *to Debra Foster?*
16      A.   *I went to my supervisors, yes.*
17      Q.   *Instead?*
18      A.   *Uh-huh.*
19      Q.   *You have got to say "yes."*
20      A.   *Yes.*
21      Q.   *What did Brad Moody and Glen Ray*
22  *do with your report?*
23      A.   *At first they didn't do anything.*
24  *And when the behavior continued, I told them*
25  *that I was no longer willing to work there*

Page 76

1   *unless something was done with Chris.*
2       Q.   *How long after this incident we*
3   *have been talking about with Chris, did that*
4   *conversation take place?*
5       A.   *At least a couple of weeks. If*
6   *not more.*
7       Q.   *Do you know if Brad Moody or Glen*
8   *Ray or both of them had any meetings or*
9   *discussions with Chris Mahaffy about the*
10  *report you made?*
11      A.   *They did meet with Chris.*
12      Q.   *Were you there?*
13      A.   *I was in one of the meetings.*
14      Q.   *How many meetings did they have?*
15      A.   *I can't tell you how many they*
16  *had. They had several that I wasn't involved*
17  *in.*
18      Q.   *How many meetings did you attend?*
19  *One?*
20      A.   *One.*
21      Q.   *When was that?*
22      A.   *It was about -- about four weeks*
23  *later, they called me in the office with*
24  *Chris. It was Chris, me -- Dr. Mahaffy, me,*
25  *Glen and Brad. And they told me that Chris*

Page 77

1   *had agreed that he needed to see somebody.*
2   *Glen was going to find somebody for him to*
3   *see. And Glen assured me that he would not*
4   *let him go alone. That he would go with*
5   *him.*
6       Q.   *Do you know Glen's training?*
7       A.   *He is a psychologist.*
8       Q.   *Do you know what he meant --*
9   *strike that.*
10          *Did he tell you what he meant when*
11  *he said that Chris would see somebody?*
12      A.   *Yes, he did.*
13      Q.   *What did he say?*
14      A.   *Chris was not present. After the*
15  *meeting was over Glen told me that his wife*
16  *is also in counseling. I don't know what*
17  *she does exactly, but that he was going to*
18  *ask his wife to recommend somebody that Chris*
19  *could see. And that he was going to be sure*
20  *that Chris saw that person.*
21      Q.   *Did you have any understanding of*
22  *what Glen was talking about?*
23      A.   *Yes.*
24      Q.   *What was your understanding?*
25      A.   *That he was going to see a*

Cynthia Ellison                                    April 27, 2006

Page 78

1    psychiatrist, or psychologist, or whoever. I
2    don't know.
3        Q.    Did you believe that Glen thought
4    that Mahaffy had psychiatric or psychological
5    problems?
6        A.    He told me so. He told me that
7    he thought he had.
8        Q.    Did he tell you what condition he
9    thought Mahaffy suffered from?
10       A.    He did not.
11       Q.    Did you ever have an opinion of
12   what condition Mahaffy suffered from?
13       A.    Ever?
14           MS. RODGERS:  Object to form.
15           THE WITNESS:  I have no idea. I
16   don't know the names of the conditions. I
17   just knew he made me afraid.
18           MR. DODD:  Q.  Do you believe
19   that he did have a psychological or
20   psychiatric condition of some kind?
21       A.    Based on what Glen said, yes.
22       Q.    What about based on your own
23   observation?
24       A.    Based on my observation I could
25   tell something was wrong. I am not a

Page 79

1    doctor, so I don't know that for a fact.
2    But based on what I observed.
3        Q.    Did that conclusion -- did that
4    result satisfy you?
5            MS. RODGERS:  Objection.
6            THE WITNESS:  It satisfied me for
7    the moment that he said he was going to take
8    him to see somebody, but his behavior didn't
9    stop.
10           MR. DODD:  Q.  Do you know if
11   he, in fact, took Chris Mahaffy to see
12   somebody?
13       A.    I do not know that for a fact.
14       Q.    Ms. Ellison, do you contend that
15   Debra Foster discriminated against you with
16   respect to any other investigation or any
17   other complaint you raised?
18       A.    Not that I raised.
19       Q.    Do you contend that she
20   discriminated against you with respect to a
21   complaint that anyone raised?
22       A.    Well, I do actually.
23       Q.    Tell me about it.
24       A.    Jessie Clayton, who was a black
25   student, applied for the -- to be the School

Page 80

1    of Sciences Computing Center Director because
2    the job had become vacant. And I told him
3    to go over to see Debra to see about
4    applying for the job. And he did apply for
5    the job, as well as several others, including
6    Bo Holt, H-o-l-t, who now has the job. And
7    Debra -- well, during the course of the
8    applications and everything that you do for
9    the jobs in selecting the person to be
10   interviewed, Jessie was told by Debra not to
11   make waves because he wasn't being interviewed
12   for the job. To just go back and don't
13   worry about it. And -- well, I talked to
14   Debra about it. And I believe -- well, I
15   believe in every subsequent thing that I had
16   to say or do, she didn't want to hear
17   anything else I had to say. Nothing. Whether
18   it dealt with payroll, or any other personnel
19   matters. Anything.
20       Q.    You kind of lost me here. Let's
21   back up and see if I can understand it.
22   Okay.
23           When did Jessie Clayton apply for
24   this job?
25       A.    I don't remember.

Page 81

1        Q.    Do you remember the year?
2        A.    It had to be 2002, I believe, or
3    '03.
4        Q.    And Bo Holt is a student?
5        A.    2003. He was a student, yes. He
6    was a student worker in one of the other
7    schools.
8        Q.    Is he white or black?
9        A.    He is white.
10       Q.    I'm sorry.
11       A.    He is white.
12       Q.    He got the job, right?
13       A.    He did.
14       Q.    Do you think there is something
15   sinister about that?
16           MS. RODGERS:  Object to form.
17           MR. DODD:  Q.  Do you think there
18   is something discriminatory about that?
19       A.    We changed the job description to
20   fit his credentials. We took off the
21   requirement for a Bachelor's Degree at the
22   request of Debra Foster.
23       Q.    Are you suggesting or contending
24   that Jessie Clayton was more qualified for
25   that job than Bo Holt?

Cynthia Ellison                                      April 27, 2006

Page 82

1      A.   In my opinion he was.
2      Q.   How did that affect you, though?
3      A.   My conversation with Debra about
4  how I thought Jessie had been treated, I
5  think that affected her attitude towards me.
6      Q.   And that affected the way she
7  dealt with you on issues that came up
8  subsequently?
9      A.   That's right.
10     Q.   Do you think Debra Foster's
11 attitude toward you that you have described
12 has anything to do with the fact that you
13 are black, or is it more likely that, as you
14 said earlier, she just doesn't like you?
15     MS. RODGERS:  Object to the form.
16     THE WITNESS:  I don't know how to
17 answer that. I guess only she can answer
18 that.
19     MR. DODD:  Q.  Do you think that
20 Debra Foster took any action, or refused to
21 take any action that needed to be taken about
22 anything, because you are black?
23     MS. RODGERS:  Object to form.
24     THE WITNESS:  I can't answer that
25 either.

Page 83

1      MR. DODD:  Q.  Why can't you
2  answer that?
3      A.   Because what action she takes
4  depends on what she thinks, not on what I
5  think.
6      Q.   I am just asking if you believe
7  that.
8      A.   Repeat your question.
9      Q.   Yes.  Do you think that Debra
10 Foster took any action, or refused to take
11 any action that she should have taken about
12 anything, because you are black?
13     MS. RODGERS:  Object to form.
14     THE WITNESS:  Not because I am
15 black per se, no.
16     MR. DODD:  Q.  Ms. Ellison, are
17 there any other events, complaints,
18 investigations or incidents involving yourself
19 and Debra Foster where you think she
20 mistreated you, or discriminated against you,
21 other than the ones we have discussed?
22     A.   I think she mistreated me during
23 the Barbara Ware incident.
24     Q.   Okay.  Tell me about the Barbara
25 Ware incident, what you recall?

Page 84

1      A.   Well, I don't know much about it
2  myself.  I do know that it arose because
3  Barbara was -- I didn't know until later.
4  She was off Campus, and I was getting
5  materials together for payroll.  I had to do
6  payroll that next day.  I called her office
7  several times.  Actually, I think I called
8  the first time looking for Chris, and I
9  didn't get an answer.  And I called the
10 second time because I was doing payroll.
11     Barbara had turned in her time
12 sheet, and she had left Friday on that
13 particular time sheet blank.  So I was trying
14 to get in touch with Barbara to find out
15 whether it was going to be leave, or whether
16 she was working, whatever the situation was
17 going to be.  Chris informed me the next day
18 that Barbara had taken leave. He had given
19 Barbara permission to leave that afternoon. I
20 was just calling to be sure she wasn't going
21 to be docked for a day's work.
22     That next day, if I recall
23 correctly, Bayo called me into his office and
24 said that Barbara had filed a complaint with
25 Debra Foster about my calling her office.

Page 85

1  And that's all I knew.
2      He says, "All I can tell you is I
3  have gone over, and I have spoken with Debra.
4  I read the complaint.  The complaint is three
5  pages long."
6      He says, "We are going to talk to
7  Barbara, and nothing will come of it."
8      I said, "What do you mean nothing
9  will come of it?"
10     He said, "Debra and I both read
11 the complaint, and we feel like it's been
12 embellished by Chris Mahaffy."
13     Because Barbara had only been there
14 for several months.  I never saw the
15 complaint.  I never fully understood why she
16 complained.  Debra Foster and Bayo Lawal
17 immediately met with me in the conference
18 room in the Dean's office and said -- I had
19 something in writing to give to them to tell
20 them what occurred.  They didn't want it.
21     They said, "Don't worry about this.
22 This is frivolous.  This is something that
23 Chris has done.  She wasn't here long enough
24 to even know what she had written about in
25 the complaint."  I asked them again at that

Cynthia Ellison

April 27, 2006

Page 86

```
 1    time if I could see the complaint. They
 2    refused.
 3           After that she said, "If you will
 4    just tell me that you will be mindful of
 5    Barbara's feelings and everything will be
 6    fine."
 7           I said, "Well, I will be mindful
 8    of her feelings, but I don't know what's
 9    happening." And that's the way the meeting
10    ended.
11           Later that afternoon, I believe it
12    was a student worker from Debra's office,
13    delivered a letter to Dr. Lawal. I asked
14    Dr. Lawal was it concerning our meeting. He
15    said, "Yes." That Debra had sent him a
16    letter and Barbara a letter. I complained --
17    or I asked him, "Why did you and Barbara get
18    a letter, and I didn't get a letter?" I
19    wrote a memo to that effect to Dr. Lawal
20    copying Debra Foster. That's all I know
21    about Barbara Ware's complaint. I was
22    involved in it, but I really don't know what
23    the complaint said.
24       Q.    Have you ever seen it?
25       A.    I have never seen it.
```

Page 87

```
 1       Q.    Have you had any disagreements with
 2    Barbara Ware?
 3       A.    I haven't had any disagreements
 4    with her. The only thing that I can recall
 5    that we may have discussed was that Barbara
 6    wanted to take lunch between 1:00 and 2:00
 7    and 2:00 and 3:00. And because I needed to
 8    know where all the secretaries were, because
 9    the Deans required that, I told her that when
10    she takes late lunches, she needed to let me
11    know or transfer her calls to my office.
12    She didn't like it, and she complained to
13    Chris.
14       Q.    Do you have any idea why she did
15    not like that?
16       A.    No.
17       Q.    Do you know if Chris Mahaffy had
18    given her any different allowances regarding
19    her lunchtime?
20       A.    Neither Chris nor Barbara
21    communicated anything to me.
22       Q.    And tell me now why this is an
23    issue with Debra Foster because she wouldn't
24    show you a copy of the letter?
25       A.    Because I was mistreated. I was
```

Page 88

```
 1    lied to. She told me that "This was nothing
 2    and don't worry about it." Then all of a
 3    sudden it became a big deal.
 4       Q.    Do you have any other complaint
 5    about the manner in which Debra Foster
 6    treated you, investigated the complaint, or
 7    handled anything official?
 8       A.    I don't think she did her job in
 9    respect to my complaints, as I observed it.
10    I had to go back, as I said, to Dr. Nance,
11    at least once, maybe twice, to get her to
12    investigate the Allison Stevens situation.
13       Q.    We talked about that already.
14       A.    Right.
15       Q.    I am talking about anything new.
16       A.    Not Debra Foster that I can
17    recall.
18       Q.    Now, Allison Stevens was a
19    co-worker of yours, was she not?
20       A.    That's correct.
21       Q.    She was the secretary for Physical
22    Sciences?
23       A.    Right.
24       Q.    She was not a supervisor, right?
25       A.    No.
```

Page 89

```
 1       Q.    A part of that controversy -- or
 2    the entire controversy had to do with Allison
 3    Stevens using a racial slur with you, right?
 4       A.    That's what it escalated into, yes.
 5       Q.    I believe from some of the
 6    documents I have seen that you said she did
 7    not really say the "N" word, but she came
 8    close to saying it.
 9       A.    She said it enough for me to know
10    what she said.
11       Q.    There is really no difference
12    between saying it or saying part of it,
13    right?
14       A.    She said it. I heard what she
15    said.
16       Q.    I'm not going to argue phonetics
17    with you here.
18       A.    Right.
19       Q.    In your mind, you are certain that
20    she either said it, intended to say it, but
21    the meaning was clear, right?
22       A.    The meaning was clear.
23       Q.    That happened on December the 23rd,
24    right, 2003?
25       A.    It happened in the early part of
```

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                          April 27, 2006

Page 90

1    the first week of December, yes.
2        Q.    Brad Moody was the Dean?
3        A.    Yes.
4        Q.    Your Dean?
5        A.    Yes.
6        Q.    Glen Ray was the Associate Dean?
7        A.    Correct.
8        Q.    And Chris Mahaffy was Allison
9    Steele's supervisor?
10        A.    Stevens.
11        Q.    Stevens, sorry.
12            And this event happened, did it
13    not, when none of those three was in the
14    office?
15        A.    Correct.
16        Q.    Perhaps at lunchtime or
17    thereabouts?
18        A.    No. It was -- I'm certain it was
19    around 10:00 or 10:30 that morning. Randy
20    Richardson and two students came in and asked
21    me why Allison's door was closed with a do
22    not disturb sign on it.
23        Q.    And you went to see?
24        A.    Right.
25        Q.    Tell me what happened.

Page 91

1        A.    I remember that Randy and the two
2    students that were with him stayed in my
3    office. There was a student worker there for
4    me. She was at her desk.
5            You can gain entry to Allison's
6    area through our conference room. So rather
7    than go all of the way down the hallway, I
8    went through the conference room. I opened
9    the back side of the door to where Allison
10    is seated.
11            And I said, "Randy is in the
12    office with a couple of students and he needs
13    to talk to you, but he said there is a do
14    not disturb sign on the door." I said, "Can
15    you tell me what's going on?"
16            She says, "Well, I am putting in
17    the banner numbers." We have a banner system
18    for registration, and each secretary would
19    take their turn entering their numbers for
20    their particular courses.
21            I said, "Well, I don't think we
22    can close the door like this in the middle
23    of the morning." I said, "If you need time
24    to do it, you need to either let me know
25    what's going on and transfer your calls."

Page 92

1    Then she turned around and she stood up, and
2    she just screamed at me.
3        Q.    How long did this last?
4        A.    Not more than two or three
5    minutes.
6        Q.    In addition to the slur, what
7    other things did she say?
8        A.    She was saying, "You make me sick.
9    You make me sick. Why don't you retire?
10    Everybody wants you to retire anyway." She
11    said a lot of things. At the end of those
12    things, she said, "You nigger."
13            And I said, "What did you say?"
14    And that's just the way I said it. I said,
15    "What did you say?" And I said, "Allison, I
16    am through with this."
17            So I went back to my office and I
18    told Randy. I said "She is working in
19    banner." I said, "But I have taken the sign
20    off the door. If you need assistance, you
21    can go back to Allison."
22            Shortly thereafter Mahaffy came in
23    the office. And I told him what happened and
24    I told him the things that Allison said and
25    that she called me a nigger.

Page 93

1        Q.    Now, what happened that afternoon
2    with respect to Brad?
3        A.    That afternoon there was a meeting
4    with me, Brad, as I recall Glen and Allison.
5        Q.    Was Chris in the meeting?
6        A.    Yes. Chris was in the meeting.
7    And Allison admitted to saying mean and ugly
8    things. Brad took it to mean -- well, and
9    then I said, "You called me" and Brad stopped
10    me in mid sentence and said, "I am not going
11    to let you and Allison turn this meeting into
12    going back and forth at each other." He
13    said, "Allison, you have to work with
14    Cynthia. Cynthia, you have to work with
15    Allison. Chris, you need to let Cynthia know
16    when you have given Allison permission to
17    close her door and do whatever." That's
18    pretty much the gist of the meeting that I
19    recall.
20        Q.    Who called the meeting?
21        A.    I believe Brad called it.
22        Q.    How did Brad find out about the
23    confrontation?
24        A.    I assume Chris told him. I didn't
25    tell Brad then. Or Glen might have told

Cynthia Ellison

April 27, 2006

Page 94

1  him. I really don't remember. I know we
2  had a meeting about it.
3      Q.    Until the meeting occurred, Mahaffy
4  was the only person you had told, correct?
5      A.    That was her supervisor.
6      Q.    But that's the only person you
7  told, right?
8      A.    That's right.
9      Q.    Were you satisfied with Brad
10  Moody's handling of the meeting?
11      MS. RODGERS:  Object to form.
12      THE WITNESS:  I wasn't satisfied.
13  Brad was trying to make peace. He wasn't
14  addressing the issue. Because I still raised
15  issue that I had been called a name. If you
16  believe that she said these other things, why
17  can't you believe she said that. I not only
18  had issue with Brad with that, I also had
19  issue with Glen with that. I told them that
20  I wasn't satisfied.
21      MR. DODD:  Q.   Other than the
22  fact that Allison Stevens said ugly things,
23  do you know of any reason why they should
24  believe you that she used the racial slur
25  over her when she said she didn't?

Page 95

1      MS. RODGERS:  Object to form.
2      THE WITNESS:  Well, I don't know
3  believe me over her. This wasn't the first
4  time that Allison had to be told that she
5  was supposed to adhere to directives and
6  requests from the Dean's office.
7      We had the same problem with her
8  when Bobby Elliott was Dean. Bob called a
9  meeting. At Allison's request, because
10  Allison wanted to know if I was her
11  supervisor. And Bob told her that "Yes,
12  Cynthia is your supervisor." In that I don't
13  have to evaluate her. "But she is your
14  supervisor in that she has directives from
15  me. When she gives those directives, I
16  expect them to be done." She said to Bob,
17  "If she is my supervisor, I am going to
18  quit." She didn't quit.
19      MR. DODD:  Q.  Is it fair to say
20  that after the meeting that afternoon on
21  December the 3rd, 2003, you weren't satisfied
22  with how it had been handled?
23      MS. RODGERS:  Object to form.
24      THE WITNESS:  It's fair to say
25  that I wasn't satisfied.

Page 96

1      MR. DODD:  Q.  What did you do,
2  or did you follow up on the meeting? Did
3  you file a complaint about it? What did you
4  do?
5      A.    I filed a complaint later.
6      Q.    When?
7      A.    I think my complaint was dated
8  either the end of February or the 1st of
9  March. Sometime the 1st of March.
10      Q.    And to whom did the complaint go?
11  Strike that.
12      To whom did you send the
13  complaint?
14      A.    Well, I initially contacted Guin
15  Nance.
16      Q.    Initially?
17      A.    I think so, but I didn't -- okay.
18  After our meetings. I'm trying to remember
19  this. Because the investigation didn't come
20  until later because I know that Guin
21  requested that I ask Debra to investigate.
22  And that was either early March or late
23  February.
24      Q.    Let me see if I understand. You
25  contacted Guin Nance?

Page 97

1      A.    I did.
2      Q.    About the Allison Stevens incident?
3      A.    Well, I contacted Guin Nance
4  because -- okay. After the meetings with me,
5  Glen, Chris and Allison and Brad, Glen said
6  to Allison, "I want you to come to me once a
7  week and tell me how Cynthia is treating
8  you." And I thought that was unfair.
9      They also set it up that if I
10  asked for any work to be done, I made a
11  request to Allison, but either another faculty
12  member or Chris would show up and put the
13  work in the Dean's office and leave.
14      I went in, spoke to Brad, told him
15  what was happening. At that time I found
16  out that they, Glen, Brad and Chris had
17  decided that it would be best for Allison not
18  to interact with me and have some member of
19  the faculty, or Chris run interference. And
20  I -- of course, I was upset.
21      Q.    Why did that upset you?
22      MS. RODGERS:  Object to form.
23      THE WITNESS:  Because I saw that
24  as being mistreated. I saw that as them not
25  believing that she had called me a nigger.

Cynthia Ellison                                   April 27, 2006

Page 98

1   But all of that -- after all of that
2   happened, and I think Allison actually went
3   to see Glen once a week, I really don't
4   know. I didn't follow up on that. I just
5   wanted to do my work.
6       There came a day that -- and I
7   have never seen the letter or whatever.
8   There was talk that there was a letter on
9   Campus that went to Dr. Nance that said the
10  Dean's secretary in the School of Sciences,
11  another secretary had used the racial slur
12  toward her. Dr. Nance had an open door
13  policy.
14      Over the years I have talked to
15  Dr. Nance about many things, not only Dr.
16  Nance, but other Vice Chancellors or whatever.
17  I didn't want my name to be associated with
18  something that I had not written.
19      So I contacted Guin Nance to let
20  her know that I was not the author of
21  whatever this document was. And that if I
22  had a problem, I would, like I had done in
23  the past, come to her directly.
24      She responded to me in writing and
25  said that she appreciated it, but she thought

Page 99

1   that I needed to have Debra investigate.
2       I responded back to her that I
3   didn't really want to talk to Debra because
4   Debra didn't do anything. She asked me to
5   have Debra investigate anyway. That's when I
6   put it in writing, I believe. But those are
7   the sequence of events.
8       Now, the dates would be in that
9   December to March window.
10      MR. DODD: Q. Okay. Up until
11  then, that window, December to March 2004, I
12  think from what you told me before, the only
13  interaction you had had with Debra Foster
14  concerning a complaint of some kind was the
15  one concerning Jessie Clayton. Were there
16  any other ones?
17      A. If I told you that, that was a
18  mistake.
19      Q. You mentioned the first Dean
20  search. You told me you didn't go to her
21  because you didn't think it would help.
22      A. But I did report it to HR.
23      Q. Why, with respect to the Allison
24  Stevens issue, did you tell Guin Nance that
25  you didn't think it would do any good to

Page 100

1   report it to Debra Foster?
2       A. Because it was known around Campus
3   that Debra started fires. She didn't put
4   them out.
5       Q. Can you explain that to me?
6       A. People who had gone up to Debra,
7   they didn't see or get results.
8       Q. Are you saying you wrote that
9   message to Guin Nance about, "It won't do any
10  good to go to HR"?
11      A. I met with her personally.
12      Q. Did you tell her that in your
13  meeting?
14      A. I told her exactly that. I told
15  her that people thought Debra was starting
16  fires instead of putting them out.
17      Q. Now, did you tell Guin Nance that
18  based on what others at the University had
19  said about starting fires and not putting
20  them out, or did you tell Guin Nance that
21  based on your own experiences with Debra
22  Foster?
23      A. You know, I really believe it was
24  both. I think I cited some examples to Guin
25  Nance. And it was a combination of what

Page 101

1   others had said. All University people talk.
2       Q. Did you want the Allison Stevens
3   incident investigated, or did Guin Nance want
4   it investigated, or both?
5       A. It was both. After I had my
6   meeting with Guin, it was both of us.
7   Because I had been mistreated.
8       Q. What prompted you to write to Guin
9   and meet with her? Was it your feeling that
10  you had been mistreated, or was it the fact
11  that this anonymous letter had appeared?
12      A. It was both.
13      Q. Why did you wait so long before
14  going to her?
15      MS. RODGERS: Object to form.
16  Sorry.
17      MR. DODD: Q. Why did you wait
18  close to three months before you went to Guin
19  Nance?
20      A. I don't know that it was three
21  months, but I took immediate action on what
22  had happened to me.
23      Q. How did you take immediate action?
24      A. I told her supervisor. We met
25  with the Dean, the Associate Dean.

Cynthia Ellison

April 27, 2006

Page 102

1    Q.    That was that day, right?
2    A.    It was that day or the day after.
3    It was within -- yes.
4    Q.    You didn't tell your supervisor
5    that Allison Stevens had used a racial slur,
6    did you?
7         MS. RODGERS:  Object to form.
8         THE WITNESS:  Not that day.  No,
9    not at that time.
10         MR. DODD:  Q.  Did you ever tell
11   Brad Moody that Allison Stevens had used a
12   racial slur?
13   A.    I did.
14   Q.    When?
15   A.    It might have been a couple of
16   weeks later.  I'm not sure.
17   Q.    What was the context of that
18   conversation?
19   A.    That was when -- well, he found
20   out that day because we had that meeting.
21   He knew she had called me a nigger.
22   Q.    How do you know that Brad Moody
23   knew that?
24         MS. RODGERS:  Object to form.
25         THE WITNESS:  Well, I told him in

Page 103

1    the meeting.
2         MR. DODD:  Q.  Let me get this
3    straight.  In the meeting on December 3rd,
4    you told Brad Moody that Allison Stevens had
5    used the racial slur?
6    A.    Okay.  I told Chris.
7    Q.    I understand that.  Okay.
8    A.    And it may have been a couple of
9    weeks later when I told Brad.  Because, as I
10   stated earlier, Brad would not listen to
11   everything that had been said.  He said he
12   didn't want to hear it.
13   Q.    Because he wanted to make peace,
14   as you said?
15   A.    Right.
16   Q.    Tell me when you told him that
17   Allison Stevens had used the racial slur?
18   A.    I really don't remember.
19   Q.    Did you tell him orally, or did
20   you put it in writing?
21   A.    I told him orally.  I did not put
22   it in writing.
23   Q.    Was anybody else present when you
24   told him?
25   A.    I don't remember.

Page 104

1    Q.    Where did you tell him?
2    A.    I'm sure it was in the Dean's
3    suite.  We very rarely met outside of the
4    Dean's suite.
5    Q.    What did he say in response?
6    A.    I really don't recall.  I think
7    that's probably why I felt like nothing would
8    be done.  Because they were running
9    interference between me and Allison.
10   Q.    Did you object to that?
11        MS. RODGERS:  Object to form.
12        THE WITNESS:  I said I did.
13        MR. DODD:  Q.  Because you felt
14   you were being mistreated?
15   A.    Right.  And not believed.
16   Q.    Isn't it also true that that
17   prevented Allison from verbally attacking you
18   again?
19   A.    Allison had free course to do
20   whatever she wanted to do.
21   Q.    Did she ever verbally attack you
22   again?
23   A.    I don't recall us having any
24   incident after that.
25   Q.    Ms. Ellison, did you contact Guin

Page 105

1    Nance because you got wind of this anonymous
2    letter or because you wanted an investigation
3    performed?
4         MS. RODGERS:  Object.  Asked and
5    answered.
6         THE WITNESS:  I have already
7    answered that.
8         MR. DODD:  Q.  Help me out.  I
9    am just feeble.  Did you say both?
10   A.    I did.
11   Q.    Why after the passage of that much
12   time, did you want an investigation at that
13   time?
14        MS. RODGERS:  Object to form.
15        THE WITNESS:  Because nothing had
16   been done.
17        MR. DODD:  Q.  What did you want
18   done?
19        MS. RODGERS:  Object.
20        MR. DODD:  Do you want to take a
21   break?
22   A.    My leg.  I can stand here.  I
23   just need to stand up a minute.
24   Q.    What did you want done?
25   A.    I wanted the University to know

Cynthia Ellison

April 27, 2006

Page 106

1  that I had been mistreated, and I wanted them
2  to investigate it. I had no preconceived
3  idea of what the end of the investigation
4  would be.
5      Q.   Now, Brad Moody did investigate the
6  incident, did he not?
7      A.   Yes.
8      Q.   And Debra Foster also investigated
9  the incident, did she not?
10     A.   Yes.
11     Q.   Do you know what Brad Moody's
12 conclusions were?
13         MS. RODGERS:  Object to form.
14         THE WITNESS:  Do I know what his
15 conclusions were?
16         MR. DODD:  Q.  Yes.
17     A.   I think his conclusions were the
18 same as to what they thought in the
19 beginning.  That I didn't call her her a
20 nigger.
21         THE COURT REPORTER:  You just said
22 that you didn't call her.
23         THE WITNESS:  I mean, she didn't
24 call me a nigger.  I'm sorry.  Thank you.
25         MR. DODD:  Q.  What were Debra

Page 107

1  Foster's conclusions?
2          MS. RODGERS:  Object to form.
3          MR. DODD:  Q.  If you know.
4      A.   Well, when I talked to her and she
5  took my statement.  She pretty much told me
6  what her conclusion would be.
7      Q.   Do you know what her ultimate
8  conclusions were?
9          MS. RODGERS:  Object to form.
10         THE WITNESS:  She sent me a letter
11 and Allison a a letter saying that we should
12 respect each other.  Basically, that's what it
13 said.  It was a two or three sentence
14 letter.
15         MR. DODD:  Q.  Were you aware if
16 anybody investigating the Allison Stevens
17 incident was able to corroborate what you
18 said about Allison calling you --
19     A.   I wasn't in any other meeting, so
20 I don't know.
21     Q.   I am just saying if you were
22 aware.  If you are not aware, you are not
23 aware.
24     A.   I am not aware.
25     Q.   Do you know if all of the

Page 108

1  potential witnesses to the incident were
2  interviewed?
3      A.   Well, as I stated earlier, Nikki
4  was not.  She was my student worker.
5      Q.   Do you know if she was ultimately
6  interviewed?
7      A.   Ultimately.
8      Q.   That's what I mean.  By the end
9  of the investigation, do you know if there
10 was any witness who had not gone
11 uninterviewed?
12     A.   Well, actually the investigation
13 had ended as she interviewed Nikki after the
14 investigation.
15     Q.   Do you know if Nikki's interview
16 changed the result?
17     A.   It did not.
18     Q.   How did Roger Ritvo discriminate
19 against you?
20         Do you want to take a break?
21         THE WITNESS:  I think I need to.
22         MR. DODD:  Let's take a break.
23         (Whereupon, the luncheon recess was
24 taken from 12:05 o'clock p.m. to 1:00 o'clock
25 p.m.)

Page 109

1          AFTERNOON SESSION
2          MR. DODD:  Q.  Ms. Ellison, who
3  is Mack Jenkins?
4      A.   He is Ruby Jenkins' husband.
5      Q.   His name and Ruby Jenkins' name
6  appear on a list of individuals as part of
7  the initial disclosures that we have to file
8  with the court.
9      A.   Okay.
10     Q.   Do you know why -- strike that.
11         What information do you think Ms.
12 Jenkins has concerning your case?
13     A.   Well, the day after I was escorted
14 off Campus, Mack came to Campus that next day
15 because of what was happening in the office
16 and he took me to lunch.  And I discussed
17 with him what was happening with me and Dr.
18 Lawal.  With me and Chris.  And he gave me
19 some advice.  He is a minister.
20     Q.   What advice did he give you?
21     A.   He told me to be sure that I had
22 documented everything.  All of the treatments,
23 the mistreatment that I thought I had
24 received.  He told me to pray about it. He,
25 in fact, also said to be sure you get

Cynthia Ellison                                    April 27, 2006

Page 110

1    security.
2         Q.    You get what? I'm sorry.
3         A.    Security.
4         Q.    Security where?
5         A.    For my work area.
6         Q.    Tell me again what day this was?
7    You lost me there.
8         A.    Our meeting with Mr. Ritvo was
9    January 31st. So this was the day after,
10   which would have been February 1st. It had
11   to be the 1st or 2nd.
12        Q.    When you said that you were
13   escorted off Campus, what did you mean by
14   that?
15        A.    Dr. Lawal informed me when I
16   arrived to work on January 31st that Dr.
17   Ritvo thought it was advisable for him to
18   take me off Campus while they were meeting
19   with Chris.
20        Q.    Dr. Lawal is the person you say
21   was the person who escorted you off Campus?
22        A.    Right.
23        Q.    Did y'all go to lunch?
24        A.    Yes.
25        Q.    Was it Ritvo or Lawal who said you

Page 111

1    guys need to leave Campus and go to lunch
2    together?
3         A.    He told me that the request had
4    come from Dr. Lawal. Dr. Lawal told me that
5    Dr. Ritvo had made the request for him to
6    take me off Campus.
7         Q.    Did he say why?
8         A.    His terminology was that it was
9    advisable for me to leave Campus.
10        Q.    You met with Mack Jenkins the next
11   day?
12        A.    The next day, or the day after.
13   It was shortly after that.
14        Q.    And you went to lunch with him?
15        A.    I went to lunch with he and his
16   wife.
17        Q.    Ruby?
18        A.    Uh-huh.
19        Q.    I assume that you told Mack
20   Jenkins about your circumstances at AUM?
21        A.    I told him as much as I could
22   tell him at the lunch hour.
23        Q.    Do you believe that the extent of
24   his knowledge about your circumstances at AUM
25   is limited to what you told him?

Page 112

1         A.    Yes.
2         Q.    Do you know if he has any
3    firsthand knowledge of anything that was going
4    on at AUM?
5         A.    He is not an employee at AUM, so
6    he would not have firsthand knowledge.
7         Q.    Did he suggest that you seek any
8    sort of assistance, whether it be spiritual,
9    legal, medical, psychological?
10        A.    He was providing the spiritual
11   assistance.
12        Q.    How many times did you see him for
13   spiritual assistance?
14        A.    Well, I saw him that day.
15        Q.    Did you see him any other times
16   for spiritual assistance?
17        A.    What do you mean?
18        Q.    About your circumstances at AUM.
19        A.    No.
20        Q.    Just that one time?
21        A.    Uh-huh.
22        Q.    You have got to say "yes."
23        A.    Yes. I'm sorry.
24        Q.    Now, why is Ruby Jenkins on your
25   list?

Page 113

1         A.    Ruby is on my list because every
2    single incident after it happened I shared it
3    with her. I didn't share it with her in
4    writing. I was upset, and I needed to talk.
5    And I was afraid and I didn't know what to
6    do. She had been there for 20 years. I
7    told her.
8         Q.    Do you believe that she has any
9    firsthand knowledge of any of the
10   circumstances you are complaining about?
11        A.    She has firsthand knowledge of
12   Chris' behavior.
13        Q.    Which particular behaviors, do you
14   know?
15        A.    The behaviors of coming into the
16   office before day in the morning waiting for
17   me.
18        Q.    Where is Ruby's office?
19        A.    She is on the second floor.
20        Q.    How would she know if Chris
21   Mahaffy was sitting at your desk on the third
22   floor in the wee hours of the morning?
23        A.    Okay. I thought the question was
24   the behavior pattern. He actually had Campus
25   security open her office before morning when

Cynthia Ellison                                                    April 27, 2006

## Page 114

1  she was on the Search Committee and he left
2  flowers on her desk. So when I told her
3  about what happened to me, there is no way
4  she should question what happened.
5  Because --
6      Q.    Something similar had happened to
7  her?
8      A.    That's right.
9      Q.    Her knowledge of the incident you
10 just described with him sitting at your desk,
11 comes from what you told her?
12     A.    Right.
13     Q.    What other conduct of Mahaffy do
14 you think she has firsthand knowledge of?
15     A.    You would have to ask her. I'm
16 really sure she could tell you fully herself.
17 Because I would be telling you what she told
18 me.
19     Q.    Is that the extent of -- what we
20 have just described, the extent your knowledge
21 about what she knows?
22     A.    It's not the extent of my
23 knowledge. But what I know would be hearsay,
24 I guess. I don't know.
25     Q.    Now, Keith Ellison was on your

## Page 115

1  list?
2      A.    Yes.
3      Q.    Why is he on your list?
4      A.    He is my pastor.
5      Q.    What information do you think he
6  has about this case?
7      A.    I have discussed in depth with him
8  on Sundays after service what's been happening
9  to me at AUM.
10     Q.    Were you seeking some sort of
11 assistance from him?
12     A.    Spiritual guidance.
13     Q.    Are you still seeking that from
14 him?
15     A.    Every Sunday I go to church.
16     Q.    Are you still seeking spiritual
17 guidance from him concerning this lawsuit?
18     A.    I have talked to him about it,
19 yes.
20     Q.    How many times have you talked to
21 him about it?
22     A.    Numerous times. I don't have a
23 number.
24     Q.    You don't keep records of stuff
25 like that?

## Page 116

1      A.    No. I'm not sitting there taking
2  notes when I talk to him about my situation.
3      Q.    Where is his church located?
4      A.    Elba, Alabama.
5      Q.    Is there a street address?
6      A.    There is, but we use the P.O. Box
7  159, 36323.
8      Q.    That's your church, right?
9      A.    36323.
10     Q.    That's your church, right?
11     A.    Yes, it is.
12     Q.    You told me what it was earlier in
13 the deposition, didn't you?
14     A.    Yes, I did.
15     Q.    What advice did he give you? What
16 guidance did he give you?
17     MS. RODGERS:  Object to form.
18     MR. DODD:  Q.  What guidance did
19 he give you?
20     A.    Our Christian belief is to pray.
21 He told me to be watchful. Report what was
22 happening to me. And he knew I couldn't
23 quit my job because I needed to work. So we
24 discussed having to remain in an environment
25 that had become conducive to every time my

## Page 117

1  door opened I thought it was Chris. When I
2  went to the restroom, I am looking around
3  because I am looking for Chris. So he
4  basically told me to pray and be safe.
5      Q.    When did you first talk to him
6  about your circumstances?
7      A.    Probably the first -- I don't
8  remember exactly the first time. But the
9  first time that really concerned me to the
10 point where I need to be talking to somebody
11 about this is when I arrived to work, and
12 this man is in the dark behind my desk
13 crying.
14     Q.    Have you spoken to Keith Ellison
15 about the circumstances of your case since
16 your departure from AUM?
17     A.    "Circumstances" meaning what?
18     Q.    Anything about your lawsuit.
19     A.    Well, certainly he asked me what I
20 did and I told him I did file. Periodically
21 he has asked me what's going on and we talk.
22     Q.    Why is Courtnei on your list?
23     A.    Courtnei is my daughter. She can
24 attest to the mental anguish that I went
25 through at home in the evenings. In fact,

Cynthia Ellison

April 27, 2006

Page 118

1  the night of January 31st after the meeting
2  with Ritvo, Lawal, Faye Ward and myself, when
3  I asked for security and was refused
4  security, I went home that afternoon. My
5  lights went out at home and I was afraid to
6  the point where I called Courtnei, and her
7  boyfriend, to come home because I was afraid
8  it was Chris. There was no storm. There
9  was nothing. The lights went out.
10      Q.  Why did the lights go out?
11      A.  I have no idea. There was no
12  accident on the street. All I could think
13  of was Chris, because earlier that day he had
14  come to my cubicle looking for me.
15      Q.  You didn't see Chris outside your
16  house?
17      A.  Of course I didn't. I didn't go
18  outside my house.
19      Q.  Now, you said you asked for
20  security and your request was denied?
21      A.  Yes.
22      Q.  Who did you ask for security?
23      A.  I asked for security in the
24  meeting on the 31st.
25      Q.  Who did you ask to provide the

Page 119

1  security?
2      A.  I asked Dr. Ritvo.
3      Q.  What kind of security did you ask
4  for?
5      A.  I asked for Campus Police to
6  secure my area in Goodwyn Hall on the third
7  floor where I worked.
8      Q.  What does that mean? What does to
9  "secure your area" mean?
10      A.  I wanted them to be in the area.
11      Q.  Constantly?
12      A.  I didn't say constantly. My
13  request was for Campus security to secure the
14  area. That's the term we use on Campus.
15  Campus Police knows their business. They
16  know what to do.
17      Q.  I don't know what that means.
18  Tell me what it means to secure your area?
19      MS. RODGERS: Object the form.
20  Whatever it means to you.
21      THE WITNESS: It means that Dr.
22  Ritvo would have alerted Campus Police that
23  Chris' behavior that day was of such that
24  they needed to come to my area, 311 Goodwyn
25  Hall, to make sure that this man was not

Page 120

1  there to do me harm. And for several days,
2  or however it took thereafter, until something
3  happened to resolve the situation.
4      MR. DODD: Q. What, in your
5  mind, does it mean to "secure the area"?
6  Does that mean to have an officer stationed
7  there with you or what?
8      A.  It means that someone at some
9  interval, whatever they determined was
10  necessary, because they knew the capabilities
11  of Chris. They were to determine. Do you
12  patrol every 15 minutes, or do you patrol
13  every two hours, four hours, five hours. It
14  really doesn't matter at this point because I
15  didn't get it.
16      Q.  And nothing happened either, did
17  it?
18      MS. RODGERS: Object to form.
19  Argumentative.
20      THE WITNESS: Yes. Something
21  happened. Chris came back staring at me.
22      MR. DODD: Q. Is that all he
23  did, stare at you?
24      A.  Well, you had to see his face.
25      Q.  Describe it?

Page 121

1      A.  His misdemeanor was such that how
2  dare you report me? How dare you? It was
3  that kind of -- it was retaliatory. That's
4  the word I am looking for. It was a
5  retaliatory situation.
6      Q.  Did he say anything?
7      A.  He didn't have to. His eyes said
8  it.
9      Q.  He said nothing, right?
10      A.  He said nothing.
11      Q.  This happened one time?
12      A.  There was several times that he
13  came into the office and just stood and
14  stared at me.
15      Q.  Give me some dates?
16      A.  On January the 18th after I had
17  filed the complaint by Dr. Ritvo's request in
18  December, I met with Debra Foster, Faye Ward
19  and myself. Debra informed me that Ritvo
20  asked her to talk to me about the complaint.
21  I immediately said, "Is Bayo's complaint going
22  to be considered?"
23      She says, "Ritvo and I have
24  talked. We are not going to consider his
25  complaint." Bayo had said to me and to

Cynthia Ellison

Page 122

1  *Debra Foster that because of the things that*
2  *were going on he wanted both our complaints*
3  *considered together.*
4  *Give me a minute. All right.*
5  *During that meeting Debra asked about the*
6  *complaint I had written to Dr. Ritvo. She*
7  *asked whatever questions, and I answered them.*
8  *After they met with me, and in that meeting*
9  *she told me that the only thing Chris had*
10 *admitted to saying was that blacks shouldn't*
11 *hold responsible positions. And I told her --*
12 *and she seemed to me, she seemed to think*
13 *that that was all right to say. I expressed*
14 *to her that she should be offended because*
15 *she was holding a very responsible position.*
16 *After that meeting she met with*
17 *others in the school and that meeting with me*
18 *was, I think, either December the 16th or*
19 *December the 14th. In that meeting she told*
20 *me she would be meeting with Chris. She*
21 *would be meeting with Brad, Bob Elliott and*
22 *Judd Katz to ask them about Chris' behavior*
23 *and whether or not they -- well, just what*
24 *they thought about Chris. I don't know what*
25 *all she was going to ask.*

Page 123

1  *I think I got off track. What*
2  *was your question?*
3  Q.  *We were talking about the dates*
4  *when Chris Mahaffy showed up in your office*
5  *and have harmed you. You started out by*
6  *saying January the 18th?*
7  A.  *Right. Previous to that all these*
8  *meeting had taken place and on January the*
9  *18th I'm sitting at my desk. I feel or*
10 *sense a presence in the office. I look up,*
11 *Chris has on an overcoat, a skull cap and he*
12 *has his hands in the pocket of his overcoat*
13 *and he is standing over me. I asked him*
14 *could I help you. He asked for Dr. Lawal*
15 *and he just -- it appears to me that he*
16 *wasn't there. I don't know how else to say*
17 *it. Then he left my office.*
18 Q.  *Who wasn't there?*
19 A.  *Chris Mahaffy. I mean he was just*
20 *-- that's the kind of demeanor he had. He*
21 *was just standing trying to intimidate me*
22 *because I had filed a complaint.*
23 Q.  *He asked for the Dean, didn't he?*
24 A.  *He asked for the Dean, but he*
25 *walked out. Why would you walk up on*

Page 124

1  *somebody with your hands in your overcoat, a*
2  *skull cap on, and not say anything. It was*
3  *intimidation. It was retaliation because I*
4  *had filed a complaint, and he knew I had*
5  *filed a complaint.*
6  *Now, how he knows -- how would he*
7  *know that it was me unless Debra Foster or*
8  *somebody told him.*
9  Q.  *What other dates did he appear and*
10 *stare at you?*
11 A.  *After February the 23rd when Dr.*
12 *Lawal showed me a letter that he had received*
13 *from Dr. Ritvo. He says, "Chris is not to*
14 *bother you any more." Chris came by the*
15 *office. Then he came in, and he just stood.*
16 *He stared again. He didn't ask for anybody.*
17 *He didn't do anything. But it was*
18 *intimidating to me. It was in my office.*
19 Q.  *On February the 3rd?*
20 A.  *That was February the 3rd or 4th.*
21 *After Dr. Lawal had the meeting with Ritvo,*
22 *and I believe Debra. I'm not sure who he had*
23 *the meeting with. It might have been Faye*
24 *Ward.*
25 Q.  *How long was he in the office?*

Page 125

1  A.  *He wasn't in there more than a*
2  *couple of minutes. It's the appearance.*
3  *It's the appearance. It's a cliche, but you*
4  *had to be there.*
5  Q.  *Did he say anything?*
6  A.  *He didn't have to say anything.*
7  Q.  *Now, what in your estimation would*
8  *securing the area have done to deal with*
9  *those incidents?*
10 A.  *Campus Police, had they been*
11 *informed about Chris and his behavior, and*
12 *the fact that it was directed toward me. A*
13 *good Campus Policeman would have just said,*
14 *"Hey, how are you doing?" Just to see what*
15 *was going on. Because he would have been*
16 *informed, look out for Chris in the Dean's*
17 *office. I'm assuming they would have been*
18 *professional. I'm assuming they would just*
19 *approach them and say, "Are you standing*
20 *there staring at Cynthia because she filed a*
21 *complaint."*
22 Q.  *Did you want them to confront*
23 *them?*
24 MS. RODGERS: Object to form.
25 THE WITNESS: *I have said time and*

Cynthia Ellison                                    April 27, 2006

Page 126

1  time again I had wanted them to secure my
2  area.
3       MR. DODD:  Q.  Is three
4  walk-throughs a day securing your area?
5       MS. RODGERS:  Object to form.
6       THE WITNESS:  As I stated earlier,
7  that would have been up to Campus Police and
8  Dr. Ritvo and Dr. Lawal because they knew the
9  nature of what was going on with Chris.  I
10  didn't know completely what was going on.
11       MR. DODD:  Q.  Do you even know,
12  Ms. Ellison, whether they considered the
13  police walk-through of Goodwyn Hall to be
14  adequate for your concerns?
15       MS. RODGERS:  Object.
16       THE WITNESS:  I think I have
17  answered that.  I mean, if they didn't talk
18  to them, I don't know what they could have
19  considered if they didn't even talk to them.
20       However, they did give Debra
21  security the same day of the meeting.  She
22  was escorted to her car by Campus Police, not
23  for just that day, but for the whole week.
24       MR. DODD:  Q.  How do you know
25  that?

Page 127

1       A.  Well, again, I'm in a University
2  environment and people talk.
3       Q.  You don't know of that your
4  personal knowledge?
5       A.  I don't know that they did.
6       Q.  Who told you that?
7       MS. RODGERS:  Object to form.
8       THE WITNESS:  People were talking.
9  I don't remember exactly who.
10       MR. DODD:  Q.  Do you have an
11  idea who?
12       MS. RODGERS:  Object to form.
13       THE WITNESS:  People were talking.
14  I'm trying to remember.  I don't have an
15  idea.  Not right now.  I'm sure Campus
16  Police has a record.  I don't know of who
17  all knew.  I had no idea.
18       MR. DODD:  Q.  Isn't it just as
19  likely that Debra Foster bumped into one of
20  the police officers on her way to her car
21  and they walked together?
22       MS. RODGERS:  Object to form.
23       THE WITNESS:  I don't think that
24  that was likely, sir.
25       MR. DODD:  Q.  You don't have any

Page 128

1  personal knowledge to refute that, do you?
2       MS. RODGERS:  Object to form.
3  That's argumentative.  If you know, whether
4  the hypothetical situation he just gave you
5  about what could have happened.
6       THE WITNESS:  I mean, there is no
7  real answer to that.  I mean, I have no
8  idea.
9       MR. DODD:  Q.  I just want to
10  make sure that you don't show up later in
11  this case and say, "I have personal knowledge
12  that security escorted Debra Foster to her
13  car."  If you don't know of your own
14  knowledge, your own observation, that's
15  the case.  That's all I want you to tell me.
16       A.  I was not there when she was being
17  escorted.
18       Q.  Your knowledge is based on what
19  somebody else told you?
20       A.  I was not there when she was being
21  escorted.
22       Q.  Is your lack of knowledge based on
23  what somebody else -- strike that, please.
24       Is your belief that she was
25  escorted based on what somebody else has told

Page 129

1  you?
2       A.  My belief is based on what someone
3  else -- what others were saying.
4       Q.  As we sit here today, you don't
5  recall who told you that?
6       A.  I really don't.
7       Q.  That's fine.
8       Why is Kay Johnson on your list?
9       A.  Kay Johnson is on my list because
10  after I filed my complaint, Dr. Lawal's
11  treatment became retaliatory towards me.
12       Q.  After you filed your complaint, are
13  you talking about the one on December the
14  3rd?
15       A.  My lawsuit.  What happened --
16       Q.  Do you mean your EEOC charge?
17       A.  Yes.  Well, when I came to see an
18  attorney, that's the way I know to put it.
19  I came to see an attorney.  They sent
20  correspondence to Dr. Lawal.  Dr. Lawal
21  called me in his office, became furious and
22  said as he was hitting his chest, "You have
23  done this to me.  We should have both waited
24  until summer and filed suits together and
25  walked away with a fistful of money, and now

Cynthia Ellison

April 27, 2006

Page 130

1    you have spoiled my plans."
2        He asked me to get out of his
3    office. Not to speak with him any more.
4    And if I had anything to say to him, send it
5    in an e-mail. He just became indignant.
6        I am the only person other than
7    work study students in the office. At that
8    point I was fearful of what he was going to
9    do. So I view it, and it was retaliating
10   against me, because I filed charges or I had
11   gone to see an attorney.
12       Q.    When were your charges filed?
13       A.    I came to this office on or about
14   -- it had to be the end of the first week
15   or the beginning of the first week of
16   February. And that next day -- or it seems
17   the day after, he received a letter. That's
18   when he became very angry.
19       Q.    Was that the letter from Julian
20   McPhillips?
21       A.    Yes. Julian, yes.
22       Q.    Do you know what day he received
23   it?
24       A.    It was either the 9th, 10th or the
25   11th, something like that.

Page 131

1        Q.    And Dr. Lawal retaliated against
2    you in what fashion?
3        MS. RODGERS:  Object to form.
4        THE WITNESS:  As I just said, he
5    became very angry. He hit his chest and
6    said that this action had been taken not just
7    against AUM, but against him. I had spoiled
8    his plans of filing suit that summer. Every
9    routine thing I do in the office became an
10   issue.
11       I saw him going through my trash
12   can. The shredding that I did that Friday,
13   I normally do shredding on Fridays, either
14   once, twice, sometimes even once a month.
15   Every document just about that came in that
16   office had Social Security numbers on it.
17   Time sheets, payrolls, grade sheets. We were
18   the hub for that. Periodically, I would shred
19   those to make room for more documents. Him
20   seeing me shredding was nothing new since he
21   had been in there since August, I was
22   shredding the same kinds of documents many
23   times.
24       MR. DODD:  Q.  Did he become
25   angry with you before or after the shredding

Page 132

1    incident?
2        A.    Before and after.
3        Q.    Okay.
4        A.    He became angry with me when he
5    received the correspondence, as I said, from
6    Julian McPhillips.
7        Q.    Had he been angry with you before
8    that?
9        A.    No, sir. He had been in line
10   with me. In fact, he let me read the first
11   page of his complaint to Dr. Ritvo and he
12   told me to be sure that I got mine over to
13   Dr. Ritvo that day. That he was going to
14   let Dr. Ritvo know his would be coming in
15   the next few days because he had so much to
16   add about how we were being treated by Chris.
17       Q.    That was back in December, right?
18       A.    Yes. That was in December.
19       Q.    So Lawal was angry with you -- it
20   first became apparent when he received a
21   letter from Julian McPhillips?
22       A.    It first became apparent after the
23   meeting with Dr. Ritvo, Faye Ward, myself and
24   Dr. Lawal. At that meeting Dr. Ritvo
25   informed Dr. Lawal. In that meeting, Dr.

Page 133

1    Ritvo informed Dr. Lawal that he would not be
2    the person taking action against Chris, rather
3    that he was not going to allow Dr. Lawal to
4    take any action against Chris. That he Dr.
5    Ritvo would be the one taking action. Dr.
6    Ritvo stated at that time, "If you don't do
7    something, I will file civil litigation
8    myself."
9        Q.    Dr. Ritvo said that?
10       A.    I'm sorry. Dr. Lawal said that to
11   Dr. Ritvo while we were in that meeting.
12   When we returned to the office -- because in
13   the meeting, I asked questions. I asked
14   about my security. I asked to get a summary
15   of the meeting proceedings that I was in.
16   Dr. Ritvo refused. He said the only thing I
17   could know is that they would do something to
18   Chris and not to worry about it.
19       Dr. Lawal took exception to that
20   in the meeting. But when we got back to the
21   office, Dr. Lawal said to me, "I'm upset with
22   you." And I asked him, "Why?" He said,
23   "You don't talk back to men." I said, "We
24   are living in the 21st century."
25       I was afraid. I needed to know

Cynthia Ellison

April 27, 2006

### Page 134

1  what was going to happen me. I could care
2  less what was going to happen to Chris.
3  That was the beginning of my seeing a change
4  in his behavior.
5      Q.    When he became angry with you
6  because you talked back to men --
7      A.    He said I talked back to Dr.
8  Ritvo.
9      Q.    Did that have anything to do with
10 your race?
11     A.    It has everything to do with being
12 retaliated against for reporting what they
13 asked me to report.
14     Q.    We are talking about Lawal now
15 retaliating against you, right?
16     A.    That's what you asked, right?
17     Q.    Yes.
18     A.    Okay. That's what I am trying to
19 deliver.
20     Q.    Lawal also complained about
21 Mahaffy, right?
22     A.    Yes, sir, he did, until he got the
23 lawsuit. Until he got the paperwork from
24 McPhillips' office.
25     Q.    That's what I am trying to

### Page 135

1  determine when his displeasure with you began.
2  It started about this meeting.
3      A.    It started after that meeting. I
4  did not know it was going to be so direct
5  until he received the paperwork from Julian
6  McPhillips towards me. I thought he was just
7  angry because Ritvo wasn't letting him use
8  his authority. Because Ritvo said he was
9  going to take care of Chris and not let
10 Lawal do it. He was angry.
11         Now, whether he was taking his
12 anger out on me because he was angry at
13 Ritvo, you have to ask him that. I don't
14 know. All I know is, I, again, became the
15 victim.
16     Q.    Because he said you talked back to
17 Ritvo?
18         MS. RODGERS: Object to form.
19 Asked and answered over and over again.
20         MR. DODD: I am just following up
21 on her answers.
22         MS. RODGERS: Over and over again
23 following up. Keep on going, Cynthia.
24         MR. DODD: Q. When was that
25 meeting? Was that February 3rd or 4th?

### Page 136

1      A.    The meeting with Dr. Ritvo was on
2  January 31st.
3      Q.    Sometime between January 31st and
4  the day you left, February 14th, is when Dr.
5  Lawal began retaliating against you?
6          MS. RODGERS: Objection.
7          THE WITNESS: Yes.
8          MR. DODD: Q. Can you point to
9  any event between the meeting and Dr. Lawal's
10 receipt of the letter from the lawyers --
11         MS. RODGERS: Object to form.
12         MR. DODD: Q. -- that prompted
13 any danger toward you by Lawal?
14     A.    Anger concerning what?
15     Q.    Anything.
16     A.    He just changed.
17     Q.    How did he change?
18         MS. RODGERS: Object to form.
19 Just keep on answering. Again, he is asking
20 you the same thing. State exactly what
21 happened. That's what you give him.
22         THE WITNESS: Well, then after the
23 meeting he made that comment that I told you
24 he made.
25         MR. DODD: Q. After he made that

### Page 137

1  comment, did anything occur between his
2  receipt of the letter from the lawyers that
3  prompted any anger on his part toward you?
4      A.    He was angry that he was having to
5  go through this, and it was directed at me.
6  I asked him why. I don't know why.
7      Q.    When you say "go through this,"
8  are you talking about Mahaffy?
9      A.    The Mahaffy complaints or rights.
10 The whole situation with the complaints.
11     Q.    You are saying he blamed you
12 because the procedure was underway?
13     A.    I didn't say that.
14     Q.    He was angry at you because of
15 procedure?
16         MS. RODGERS: Object to form.
17 Let's take a break. Object to form. Can
18 you hold this question?
19         MR. DODD: Let me finish my
20 question. We are going to finish the
21 question before you take a break.
22         MS. RODGERS: Ask the question.
23 You don't have to do an answer.
24         MR. DODD: I am going to ask you
25 when you come back about conversations you

Cynthia Ellison

April 27, 2006

Page 138

1  have had during the break. You may want to
2  reconsider whether you want to go consult
3  with your lawyer before you answer a question
4  that's pending.
5        MS. RODGERS:  Let the record
6  reflect I don't want no one to assume that I
7  am going to talk to my client about a
8  question he is going to ask.
9        MR. DODD:  No assumption.
10       MS. RODGERS:  Also, I don't want
11 you to threaten.  It seems as though he is
12 trying to intimidate my client in this
13 deposition.  I am taking a break for her
14 sake.  Because as it appears to me, I feel
15 as though she is getting frustrated.  She
16 needs to take a break.  I don't know how she
17 is doing.  I am telling her to take a break.
18 Not to try to go outside to try to discuss a
19 potential answer for her.  Because I have not
20 done that during lunch time, nor have I done
21 it for any statement where counsel is getting
22 a record.  Nor am I trying to assist her
23 during any part of this deposition how she
24 answers her questions.
25       Let the record also reflect that I

Page 139

1  have not written any notes, I have not bumped
2  her, I have not done any type of couching
3  whatsoever to assist my client in any type of
4  questioning or way she should answer her
5  question.  The only thing I told her is tell
6  the truth.
7        THE WITNESS:  May I take a break,
8  please?
9        MR. DODD:  Go ahead.
10       (Multi-page document, first page
11 undated, entitled Charge of Discrimination,
12 marked as Defendant's Exhibit-1)
13       MR. DODD:  Q.  Ms. Ellison, here
14 is Defendant's Exhibit 1.  If you can take a
15 look at that and see if you can identify it
16 for me, please.
17    A.    Yes.  Let me finish and make sure.
18 Yes, I recognize it.
19    Q.    What is it?
20    A.    It's my affidavit statement that I
21 gave to my attorney.  It's my memo from me
22 to Dr. Ritvo on December the 3rd supplying
23 his requested statement.  A letter to Dr.
24 Mahaffy from Dr. Ritvo.  A letter from me to
25 Debra Foster with copies to Dr. Lawal, Ms.

Page 140

1  Ward, Dr. Ritvo, Dr. Nance and Lee Armstrong.
2  And my memo about my retirement.
3     Q.    Together these documents you have
4  identified constitute your EEOC charge, do
5  they not?
6     A.    That's the cover sheet, yes.
7     Q.    The EEOC charge is dated February
8  10th, 2005, down at the bottom left corner?
9     A.    Where?  Bottom left, yes.
10 February the 10th.
11    Q.    Now, do you know when Mr.
12 McPhillips mailed this to Bayo Lawal?
13       MS. RODGERS:  Object to form.
14       THE WITNESS:  I don't know if he
15 mailed this to Bayo Lawal.  I know that Dr.
16 Lawal got a letter from him. I don't know
17 about this.
18       MR. DODD:  Q.  Look at your
19 affidavit for a second.  Who wrote the
20 affidavit?
21    A.    Who wrote it?
22    Q.    Yes.
23    A.    It's information that I gave my
24 attorney.
25    Q.    Your lawyer composed the affidavit?

Page 141

1        MS. RODGERS:  Object to form.
2        MR. DODD:  Q.  Let me ask you
3  this.  Did you write the affidavit?
4     A.    When you say "composed," that means
5  did he write it?
6     Q.    Yes.
7     A.    I gave the information as it is
8  here.  I guess I gave him the information.
9     Q.    They put it together and you
10 signed it, right?
11    A.    They put it together and I signed
12 it.  Are you asking me if I typed this
13 document?
14    Q.    No.  I am asking you if you
15 prepared it.
16    A.    I provided the information that is
17 within this document.
18    Q.    When did you provide that
19 information to your lawyers?
20    A.    It says on the 10th day of
21 February, 2005.
22    Q.    Did your lawyers prepare this
23 affidavit on the same day that you gave them
24 the information?
25       MS. RODGERS:  Object to form.

Cynthia Ellison

April 27, 2006

Page 142

1      THE WITNESS:  It was prepared on
2  the day I signed it.
3      MR. DODD:  Q.  When did you give
4  them the information that appears in the form
5  in the affidavit?
6      A.   This was during my visit.  Let's
7  see.  I had an initial visit here, and this
8  was done on my second visit.
9      Q.   When was your initial visit?
10     A.   It had to be early --
11     MS. RODGERS:  Object to form.  Go
12  ahead and answer.
13     THE WITNESS:  It had to be early
14  February.  It was like the week before this
15  week.
16     MR. DODD:  Q.  Approximately
17  February the 3rd?
18     A.   No.  I don't know.  They have
19  their calendars, you can ask them.  I have
20  no idea.
21     MS. RODGERS:  Object to form.
22     MR. DODD:  Q.  You had two
23  meetings with your lawyer before this was
24  completed, the EEOC charge?
25     A.   Correct.  I met with them twice.

Page 143

1      Q.   Look at Paragraph 3, please.
2      A.   Okay.  On the first page?
3      Q.   Yes.  You are referring to Chris
4  Mahaffy saying that he had never seen a black
5  person before he came to the United States of
6  America?
7      A.   Yes.
8      Q.   Did he make that statement to you?
9      A.   He did.
10     Q.   When was that statement?
11     A.   This was during the time that Bob
12  Elliott was Dean.
13     Q.   Is that statement offensive to you?
14     A.   It was offensive to me because of
15  what he had done earlier.  He had come into
16  my office and he had -- it looked like a
17  magazine.  And he was far enough away that I
18  couldn't really tell what it was, but close
19  enough that I could see the image.  He says,
20  "What is this on here?"  And I said, "A
21  monkey."  And he walked over to my desk and
22  laid it down and it was a black man.  So,
23  yes, this was offensive to me.
24     Q.   Let me make sure I understand what
25  you just said, because I don't think I did.

Page 144

1  I think I must have missed something.
2      A.   Okay.
3      Q.   He held up a magazine and asked
4  you what it was?
5      A.   Yes.  Say, he was from --
6      Q.   Right.  You said "it looks like a
7  monkey."
8      A.   That's what I said.
9      Q.   He brought it over and put it on
10  your desk, and it was a picture of a black
11  man?
12     A.   Yes.  He laughed, and he left.
13     Q.   Is that all he said?
14     A.   He laughed and he left.
15     Q.   He said nothing else?
16     A.   (Witness nods head)
17     Q.   How long before this comment in
18  your affidavit did he do that?
19     A.   As I said, this was during the
20  time when Dr. Elliott was Dean.  That's all
21  I could tell you.  In fact, as I said, Dr.
22  Elliott was there.  In this same time we
23  were talking about student enrollment trends.
24  The population of black versus white census
25  on Campus had changed to a greater number of

Page 145

1  blacks.  We were -- well, not we.  I was
2  sitting at my desk and they were discussing
3  the trends, he and Dr. Elliott.  He made the
4  comment that some blacks didn't seem as smart
5  as whites.  I took offense to that.  After he
6  left, I went into Bob's office and I
7  discussed it with him.  He said, "Chris is
8  crazy."  Nothing was done beyond that.
9  "Every Dean has had a problem with Chris."
10     Q.   Did you ask Elliott to take any
11  particular action?
12     A.   He just said, "Chris is crazy."
13  That's all I remember him saying.  There was
14  no action taken.  I guess he didn't think
15  there was any action needed.
16     Q.   My question is, did you ask him to
17  take any action?
18     A.   I did not ask him to take action.
19  But I did voice my concern about the
20  statements.
21     Q.   When he was having that
22  conversation with Elliott, was he talking
23  about citizens or students?
24     A.   Well, I think I said they were
25  talking about the difference in the student

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

Page 146

1  population.
2      Q.    Right.
3      A.    Then it turned to blacks didn't
4  seem as smart as whites, which I felt he
5  thought because the population had changed,
6  the content of their conversation whatever it
7  was, meant it was because of the blacks.
8  The number of blacks rising instead of
9  falling or whatever.
10     Q.    Have you ever seen an Irishman
11  before?
12     A.    No.  Are you telling me Chris
13  isn't Irish?
14     Q.    No.
15     A.    Okay.
16     Q.    Look at Paragraph 6, please.  You
17  are referring to Glen Ray.
18     A.    Yes, sir.
19     Q.    Did you ever determine what remarks
20  Glen Ray referred to?
21     A.    I asked him and his comment to me
22  -- he said, "They were so bad he couldn't
23  repeat them."  That's all I can tell you.
24     Q.    Look at Paragraph 9, please.  Is
25  that the incident we have already talked

Page 147

1  about?
2      A.    That's correct.
3      Q.    Now, look at 10.  The memorandum
4  instructs Mahaffy to avoid retaliatory behavior
5  toward you?
6      A.    Uh-huh.
7      Q.    You say he has not done so?
8      A.    Uh-huh.
9      Q.    What conduct is that referring to?
10     A.    Going back to No. 9.
11     Q.    Same thing?
12     A.    Uh-huh.  And the fact that he was
13  standing with me with his overcoat on with
14  his hands in his pocket on January 18th.
15  That was after the complaint had been filed.
16     Q.    But that was before AUM issued the
17  February 3rd memorandum, correct?
18     A.    Okay.
19     Q.    Yes?
20     A.    Yes.
21     Q.    Look at Exhibit B, if you would,
22  please.  Okay.
23          Now, you weren't an original
24  recipient of this memorandum, were you?
25     A.    No.  My name is not on there.

Page 148

1      Q.    How did you get a copy of this?
2      A.    Dr. Lawal gave it to me.
3      Q.    Did you tell him you were going to
4  make a copy it?
5      A.    He said to do what I had to do
6  concerning Chris.
7      Q.    Did you interpret that to mean I
8  can take this document and copy it and go
9  outside with it?
10     A.    Yes, sir.  That's what he told me
11  to do at that time.
12     Q.    Well, he didn't literally tell you
13  to copy this document and take it outside?
14     A.    I am telling you what I
15  interpreted it to mean.
16     Q.    Did you tell him you had made a
17  copy of it?
18     A.    Yes.  And he said that he didn't
19  -- what did he say?  He said, "I didn't
20  intend for you to do that because we need to
21  save the documentation if we file suit in the
22  summer."  I told him that I couldn't wait
23  until the summer because I was being
24  retaliated against and in a workplace where I
25  just really couldn't stay.

Page 149

1      Q.    When did you first see what's
2  marked as Exhibit B to your affidavit?
3      A.    We were in -- Dr. Lawal and I
4  were in the lobby of Goodwyn Hall.  He asked
5  me to go down there with him.  He opened the
6  letter.  He read it, and he gave it to me.
7  He didn't keep it to put it in a
8  confidential file in his office.  He gave me
9  the letter.  We walked back up to the
10  office.  And I had the letter in my hand
11  when we went back to the office.
12     Q.    Did you and he discuss it?
13     A.    Well, we did because I told him I
14  was going to use it.
15     Q.    You hadn't seen it before being
16  with him in the lobby?
17     A.    Dr. Lawal showed it to me.
18     Q.    You had not seen it before then?
19     A.    Uh-huh.  In fact, I pointed out to
20  him that the very first statement on this
21  letter, in my meeting with Dr. Ritvo I asked
22  for a summary of my meeting.  He said there
23  were no summaries going to be given out.
24  Yet, this memo starts, "It serves as a
25  summary."  Chris got a summary of his

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 150

1    meeting, but I didn't get a summary.
2        Q.    Nobody was seeking to discipline
3    you, were they?
4        MS. RODGERS:  Object to form.
5        THE WITNESS:  Well, I was
6    retaliated against.  I was subjected to a
7    hostile environment.
8        MR. DODD:  Q.  Had anybody filed
9    a complaint against you in which you ended up
10   being disciplined?
11       A.    Well, Barbara Ware.
12       Q.    With respect to the Mahaffy
13   incident?
14       A.    No.
15       Q.    In fact, you were somebody who was
16   complaining against Mahaffy, were you not?
17       A.    I wasn't complaining.  I was
18   letting the University know that I was in a
19   situation that needed attention.  That's
20   different from complaining.
21       Q.    Would you consider your December
22   the 3rd memorandum a complaint or not?
23       A.    It says that it's a complaint, I
24   believe.
25       Q.    I am asking you what it is.  You

Page 151

1    wrote it.
2        MS. RODGERS:  Object.
3    Argumentative.  Just look at it.
4        THE WITNESS:  It's the complaint
5    that Dr. Ritvo asked me to write.
6        MR. DODD:  Q.  Are you the
7    complaining party in this complaint?
8        MS. RODGERS:  Object to form.
9        THE WITNESS:  I am the author of
10   that memo.
11       MR. DODD:  Q.  Now, Ms. Ellison,
12   by the time you signed your affidavit and
13   signed your EEOC charge, you had already
14   given the University notice of your
15   retirement, correct?  In fact, that's the
16   fourth exhibit to your EEOC charge, isn't it?
17       A.    And if I'm not mistaken, that's
18   probably the date that Dr. Lawal received the
19   communication from Julian  McPhillips.
20       Q.    What date?
21       A.    February the 9th, 2005.
22       Q.    Do you believe that to be the
23   case?
24       A.    I don't know.  I don't have it
25   with me to look at it.

Page 152

1        Q.    My question is, by the time you
2    had signed your affidavit and signed your
3    EEOC charge, you had already given the
4    University notice of your retirement, right?
5        A.    I was in such a state that I had
6    no recourse.  I had nothing else to do.
7        Q.    I am only asking you if you had
8    given notice of your retirement before you
9    signed the affidavit and before you signed
10   the EEOC charge?
11       A.    I don't remember.
12       Q.    Well, let's look.  What is the
13   date on your notice to Bayo Lawal of your
14   retirement?
15       A.    February the 9th, 2005.
16       Q.    What is the date of your signature
17   on your affidavit?
18       A.    February 10th.
19       Q.    And on your EEOC charge?
20       A.    February the 10th.
21       Q.    Your resignation did precede the
22   completion of your EEOC charge?
23       A.    Because I explained to my attorneys
24   what was happening to me and they advised me
25   to leave.

Page 153

1        MS. RODGERS:  Object to form.
2        MR. DODD:  That's fine.  I'm just
3    trying to establish a sequence.  I didn't ask
4    you why.
5        MS. RODGERS:  You don't have to
6    argue or even comment on that.  Let him
7    argue.  You answer the questions.  When you
8    finish answering your questions, you are
9    finished until the next question is asked and
10   not argued.
11       MR. DODD:  Q.  Who is Debra
12   Carter?
13       A.    She is my ex sister-in-law.
14       Q.    Why is she on your list?
15       A.    Because she comes to the church
16   that I go at least twice a month and I
17   shared with her some of the events that were
18   happening to me on the job.
19       Q.    Do you know if she has any
20   firsthand knowledge of what was happening to
21   you on the job?
22       A.    Only what I told you.
23       Q.    Is she a parishioner at your
24   church, or does she have any other function
25   there?

Cynthia Ellison

---

Page 154

1      A.    She is a member at the church.
Is that the same as a parishioner?
3      Q.    I intended it in that fashion.
4      A.    Okay.
5      Q.    Did you look to her for any sort
of spiritual guidance?
7      A.    I looked to her really for advice.
8  Because she was a woman.  I was being
9  retaliated against.  I was in an
10  uncomfortable situation, and I needed to talk.
11      Q.    What advice did she give you?
12      A.    She advised me to document
13  everything and to report everything to my
14  supervisors and the chain-of-command.
15      Q.    Did she give you any other advice?
16      A.    Such as what?
17      Q.    I'm sorry.
18      A.    Such as what?  What other advice?
19      Q.    Any other advice.
20      A.    She was a listening ear.
21      Q.    Is that a "no"?
22      A.    Was there a question?
23      Q.    Yes.
24      A.    What was the question?
25      Q.    I asked you what other advice, if

---

Page 155

1  she gave you any other advice?
2      A.    She didn't give me any other
3  advice.
4            Do you mind if I get some water?
5      Q.    Go ahead.  Ms. Ellison, I want to
6  ask you some questions about the complaint
7  you filed in Federal Court, right?
8      A.    Okay.
9      Q.    That's different than the EEOC
10  charge.  Are you with me?
11      A.    Okay.
12      Q.    In your complaint you refer to
13  four distinct claims.  One is for race
14  discrimination; one is for retaliation; one is
15  for harassment; one is for a constructive
16  discharge.  I want to ask you a little bit
17  about those claims.
18      A.    Okay.
19      Q.    You say that you were forced to
20  retire, right?
21      A.    Right.
22      Q.    Now, was that forced retirement a
23  result of the race discrimination, the
24  retaliation and the harassment?
25      A.    And the hostile work environment.

---

Page 156

1      Q.    Hostile work environment.  When I
2  say "harassment," I will try to remember to
3  include hostile work environment, but I am
4  referring to both.
5      A.    Okay.
6      Q.    Did you suffer any tangible job
7  detriment, other than being forced to retire
8  on account of any of the kinds of
9  discrimination you are claiming?
10      A.    Job detriment at AUM?
11      Q.    Yes.
12      A.    I couldn't do my job.  After the
13  complaint was filed, it was almost impossible
14  to do work.
15      Q.    The complaint you are referring to
16  is December 3rd?
17      A.    December 3rd, 2004.
18      Q.    Right.  Well, did you suffer a
19  loss in salary as a result of that?
20      A.    No.
21      Q.    Did the University deny you any
22  leave as a result of that?
23      A.    No.
24      Q.    Do you know if the University took
25  any sort of tangible action that affected

---

Page 157

1  your job adversely?
2      A.    I was affected adversely because I
3  was not given security.
4      Q.    We talked about that already.
5      A.    Right.
6      Q.    Okay.  Did you feel compelled to
7  retire because of the race discrimination you
8  felt?
9      A.    I felt compelled to retire because
10  of all of it.  Race, all of it.  In fact,
11  even after the conclusion of the first
12  investigation with the Allison Stevens
13  incident, Debra Foster sent me her letter and
14  Allison her letter.  Both our names was on
15  the letter.  The day after that she sent me
16  an e-mail to the Hyundai site and called me
17  and said she sent it to me because I was
18  eligible to retire, and she thought she would
19  send that to me.
20      Q.    Did you ever talk with anyone
21  about applying for a job out there?
22      A.    No, I did not.
23      Q.    You didn't talk to Bob Elliott
24  about that?
25      A.    I didn't.  I talked to him about

---

Cynthia Ellison

April 27, 2006

Page 158

1  my daughter applying for a job out there.
2      Q.    Other than the remarks you refer
3  to in the third paragraph of your affidavit
4  that Chris Mahaffy made --
5      A.    Yes, sir.
6      Q.    -- did he make any other racially
7  insensitive remarks to you?
8      A.    Well, as I told them as I was
9  doing this, there were so many I couldn't
10 remember them all.  I gave you the one about
11 the magazine with the man and the monkey.
12 This was just something that Chris did.  I
13 mean, I didn't know to write down every
14 single one.
15     Q.    Can you recall any others other
16 than those three?
17     A.    Not at this time.
18     Q.    Is there anywhere you would go to
19 refresh your recollection as to how many
20 times he made comments that you found
21 insensitive?
22     A.    What you say where I would go, do
23 you mean to AUM, to my house, to what?
24     Q.    You said you can't recall.  I'm
25 just trying to see if there was some way we

Page 159

1  can assist your recollection.
2      A.    I don't know how you can assist
3  me.
4      Q.    You don't have a written record
5  somewhere of bad things that Chris Mahaffy
6  said?
7      A.    No.  I don't have that.
8      Q.    You have given all the records
9  about your allegations to your lawyer, right?
10     A.    I have.
11     Q.    Did Roger Ritvo ever make any
12 racially insensitive remarks to you?
13     A.    He did not.
14     Q.    Did Bayo Lawal make any racially
15 insensitive remarks to you?
16     A.    Well, he did.
17     Q.    What were they?
18     A.    He said that -- well, he didn't
19 particularly care for Glen Ray as the
20 Associate Dean because he said he didn't keep
21 any of the matters they discussed
22 confidential.  He wanted me to suggest to him
23 who he could have take his place at the end
24 of his tenure as Associate Dean that coming
25 summer.  Because it was a two-year

Page 160

1  appointment.  I suggested Rosine Hall.  He
2  says, "No, I don't want her."  I said, "What
3  about me?  I know the school."  He says, "I
4  don't want a woman assistant, black or
5  white."  That was the only racial thing that
6  I can remember right now.
7      Q.    We have talked about Mahaffy's
8  remarks, right.  We have talked about his
9  conduct.  Showing up in your office and that
10 sort of thing.  We talked about Allison
11 Stevens.
12     A.    Yes.
13     Q.    Are there any other incidents of
14 racial discrimination or harassment that you
15 are aware of?
16     A.    Towards me?
17     Q.    Yes.  Toward you.
18     A.    I can't recall right now.  There
19 is one more that I thought of.
20     Q.    All right.
21     A.    I'm sorry.
22     Q.    It's all right.
23     A.    I am hesitating because I am
24 thinking about the date.
25     Q.    You know I am going to ask you

Page 161

1  that.
2      A.    Yes.  I am more than certain that
3  it was after the overcoat incident, which was
4  on or about January the 18th or 19th.
5  Several days later Chris came into my office
6  and there was a student worker at the other
7  desk.  He came into my office and stood in
8  front of me.  I was busy doing something.
9  He got my attention.  He says, "I want you
10 to read my shirt."  And I looked up and the
11 shirt said something like, "I am a redneck."
12 He said, "What do you think about that?"  I
13 said, "I am offended."  He laughed and left.
14 I went into Dr. Lawal's office and reported
15 it.
16     Q.    What did Lawal say?
17     A.    He didn't say anything really.  I
18 just wanted to be sure I reported it.
19     Q.    Who was the student worker?
20     A.    Nikki Gibson.  And this was the
21 time when I had hired five student workers.
22 So I think Nikki -- because I had to staff
23 the Advising Office and the Dean's office and
24 their schedules -- I believe it was Nikki
25 Gibson and Marquita Snow.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                      April 27, 2006

Page 162

1      Q.    They were both in there?
2      A.    Yes, sir.
3      Q.    Tell me why you were offended by a
4   T-shirt that says, "I am a redneck"?
5      A.    Because I feel like "redneck" means
6   you are looking down on the minority. That's
7   the person who feels like minorities are
8   lower class.
9      Q.    Have you ever heard any other
10  definition of "redneck"?
11     A.    I can't say that I have, sir.
12     Q.    Would you be surprised to know
13  there are others?
14     A.    I wouldn't be surprised.
15     Q.    If you think of other incidents,
16  just interrupt me and let me know. Okay.
17     A.    I will.
18     Q.    I asked some questions earlier
19  about Mahaffy before he became Chair of
20  Physical Sciences.
21     A.    Okay.
22     Q.    I am going to ask you some
23  questions about him after he became Chair.
24     A.    Okay.
25     Q.    Okay. Did he ever touch you?

Page 163

1      A.    You asked me that, and I said
2   "no."
3      Q.    I thought I was referring to the
4   previous time. He has never touched you then?
5      A.    No.
6      Q.    He has never made any physical
7   oral threats to you, has he?
8      A.    You said "physical" and "oral."
9   Which one did you --
10     Q.    Oral threats of physical -- strike
11  that.
12        Has he ever made a statement to
13  you that you found threatening?
14     A.    Yes, sir.
15     Q.    What did he say?
16     A.    He said that he was going to get
17  me because I was on the second Dean search,
18  and he was not selected to the short list to
19  be interviewed.
20     Q.    When did he say that?
21     A.    It was -- I can tell you exactly
22  because he was interviewing for the position
23  that Barbara now has. So it was about mid
24  July, 2005. Because I think Barbara was
25  hired in July. It was around the time she

Page 164

1   was hired.
2      Q.    Who are you referring to?
3      A.    Chris Mahaffy.
4      Q.    Barbara?
5      A.    Barbara Ware. I'm sorry.
6      Q.    2004 maybe.
7      A.    No. Okay. I was on the second
8   Dean search which ended about April or May of
9   2005. I'm sorry. Yes, I am behind. 2004.
10     Q.    Okay. It was approximately mid
11  2004 that he made that statement
12     A.    In July. It was whenever Barbara
13  Ware was hired.
14     Q.    He said he was going to get you?
15     A.    That's what he said.
16     Q.    Did he say anything else?
17     A.    That's pretty much what he said at
18  that time.
19     Q.    You interpreted that as a threat?
20     A.    I did.
21     Q.    Who did you report it to?
22     A.    Brad Moody.
23     Q.    What did Brad do?
24     A.    I believe Brad, if I'm not
25  mistaken, talked to Chris.

Page 165

1      Q.    Why do you think he talked to
2   Chris?
3      A.    Because we were going through some
4   more issues with Chris. I mean, I can't
5   tell you every single thing because they
6   didn't tell me. Glen would share with me
7   that Chris was a problem. He would share
8   that almost every single day of the week.
9   He really went over the edge when he did not
10  get to be Dean. He continued to harass me
11  because he thought for some reason, and I am
12  sure the reason was because he thought I
13  could influence the Committee because I was
14  the only black on the Committee, and maybe he
15  thought I knew him and I was going to say
16  things good about him. In fact, he came to
17  me with an e-mail address and said, "No one
18  will know if you send me information about
19  the Committee's work, Search Committee's work
20  to this e-mail address." I reported that to
21  Brad. I reported it to Glen, and I also
22  reported it to Judd Katz. And at that
23  time I told Chris it was inappropriate and I
24  would not do it.
25     Q.    Do you think that Mahaffy was mad

Cynthia Ellison                                    April 27, 2006

Page 166

1  at you because you didn't support him to be
2  Dean?
3      A.    He said he was.
4      Q.    Do you believe that?
5      A.    He was convincing to me.
6      Q.    I believe you told me that Dr.
7  Lawal is the individual you contend retaliated
8  against you?
9      A.    He wasn't the only one.
10     Q.    Who else?
11     A.    I believe Debra Foster retaliated.
12     Q.    When did Debra Foster retaliate?
13     A.    In sending me that e-mail and
14  saying, "You know, you have got enough time
15  to retire. Here is a site, Hyundai. Why
16  don't you look into getting a job." That
17  was at the end of the complaint with Allison.
18     Q.    That was back in spring of 2004?
19     A.    If that's the date on her report,
20  yes. I think it was about then.
21     Q.    Did Debra Foster retaliate against
22  you in any other way?
23     A.    Yes.
24     Q.    How?
25     A.    She called me to her office after

Page 167

1  -- and forgive me if I don't know which one,
2  EEOC, affidavit whatever. Whatever had been
3  filed she had been in contact with, she told
4  me the University attorneys. That they had
5  given her some information to give me. She
6  needed to see me. Actually, there were two
7  occasions that this happened.
8          The first occasion she just said,
9  "We are working on it. We are looking into
10  it."
11         The second time she called me over
12  there she said, "The University attorney
13  called, and they said to tell you that" --
14  and this is the first time I ever heard of
15  the phrase "constructive discharge." That you
16  are not getting constructive discharge. They
17  want to know what you want."
18         I said Debra, "I simply want you
19  to do your job." We were sitting in Faye
20  Ward's office. Debra and I were sitting at
21  the table. Faye was sitting behind her desk.
22  She said, "What do you want?" And I said,
23  "I really want you to do your job." And I
24  asked a simple question. I said, "Debra, do
25  you believe that I have been mistreated? I'm

Page 168

1  not asking you to take sides." I said, "But
2  you know what has happened to me." Well,
3  whatever the periods of times before that I
4  had been here. "I am simply asking you do
5  you believe I have been mistreated?" Debra
6  stormed out of the room. Came back. No, she
7  sent a student back. Handed me a piece of
8  paper. No, it was Debra. Debra came back,
9  handed me a piece of paper and she said, "If
10  you have anything else to say, say it to our
11  attorneys." When I looked at the paper it
12  said Tom Rebel, whatever his information is.
13  That's when I came to Julian McPhillips.
14         I had no intention of coming here,
15  but when I saw that the University wasn't
16  going to do anything because she told me she
17  was representing the attorneys. So she ended
18  it with, "Do what you have to do." So I
19  did what I had to do given that she handed
20  me the information to do it with and said,
21  "The next conversation, let it be through the
22  attorneys."
23     Q.    What did she hand you?
24     A.    A piece of paper that had a
25  typewritten name and address of somebody named

Page 169

1  Rebel, and I gave that information to Mr.
2  McPhillips.
3      Q.    Early February you think?
4      A.    It had to be.
5      Q.    How did the topic of constructive
6  discharge come up?
7      A.    Debra brought it up.
8      Q.    Had you said or written before
9  that time that you felt like the University
10  was forcing you out?
11     A.    Absolutely.
12     Q.    Other than Debra Foster and Dr.
13  Lawal, did anybody else retaliate against you?
14     A.    I have said I think Dr. Ritvo
15  retaliated.
16     Q.    Tell me how he did that.
17     A.    The no security issue. I think he
18  treated Chris differently than he treated me.
19  The letter that Bayo shared with me that was
20  written to Chris states that Chris had a
21  month to decide what he wanted to do. Then
22  he had until the end of the summer to
23  complete whatever he decided he wanted to do.
24  Yet, they had taken me off Campus that day
25  because they knew he was a threat.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                          April 27, 2006

Page 170

1    Q.   Now, what makes you think that
2    Ritvo did those things because you had
3    complained at his request?
4        A.   I think I viewed it as
5    retaliation.  Now, I don't know how else to
6    explain it.
7        Q.   Okay.  Let's try it this way.
8    What is your definition of retaliation?
9        A.   Getting back at someone or --
10   well, let me just leave it like that.
11   Getting back at someone or something like
12   that.
13       Q.   You felt that Roger Ritvo was
14   getting back at you for doing what?
15       A.   I felt in general Ritvo, the
16   University, everybody's name that I gave on
17   that list was retaliating against me because
18   I filed these complaints.
19       Q.   Now, Roger Ritvo, though, solicited
20   that complaint from you, did he not?
21       A.   He did.  But he didn't do what he
22   said he was going to do.  He said he was
23   going to put it with Bayo and send it to
24   Debra.  That's the first thing that didn't
25   happen.

Page 171

1        Q.   Why is that significant?
2        A.   Because I feel like if you tell me
3    something that you are going to do, and I am
4    saying that I am being mistreated and
5    retaliated against, and you are being
6    mistreated and retaliated against, you take
7    one and put it in the file and you take the
8    other, send it up and then you tell the
9    person, "Cynthia filed a complaint."  I
10   become the target.  That's the way I felt.
11       Q.   How do you know that Roger Ritvo
12   ignored Bayo's complaint?
13       A.   Because Bayo told me.  He didn't
14   say he ignored it.  He said that he, Bayo,
15   and Debra Foster and Ritvo had talked.  They
16   said they were going to view his complaint as
17   a management style problem.  But he, Bayo,
18   told me that he said to Debra Foster and to
19   Dr. Ritvo, "This is not management."  This is
20   harassment."  And he wanted his complaint
21   considered with mine.
22       Q.   You haven't seen his complaint,
23   have you?
24       A.   I have not seen his complaint.
25       Q.   Other than the conduct we talked

Page 172

1    about at some length --
2        A.   What conduct?
3        Q.   -- concerning Chris Mahaffy.
4        A.   Yes.
5        Q.   -- is there anything else you want
6    to add about how he retaliated against you?
7        A.   Chris?
8        Q.   Yes.  We talked about coming to
9    your office and looking in the window and
10   standing at your desk.  Anything else?
11       A.   Well, I think the remark that he
12   is going to get me.  That was retaliation
13   for not being selected for the short list on
14   the Dean's search.
15       Q.   I understand that.  Is that all
16   you can think of?
17       A.   I think that the incident with
18   the, "I am a redneck" T-shirt.
19       Q.   We talked about that.
20       A.   Uh-huh.  I am going to stand for
21   a moment.
22       Q.   Do you want to walk down the hall?
23       A.   I'm fine.  I just need to stretch
24   my leg.
25       Q.   Ms. Ellison, do you think that the

Page 173

1    folks we have talked about, Ritvo, Mahaffy,
2    Bayo, did the things they did after you filed
3    your complaint in order to force you out?
4        A.   That's my belief.
5        Q.   Do you believe that that was -- I
6    mean, that was their goal, right?
7        A.   I can't speak for them.
8        Q.   What would you point to, if
9    anything, to show that they took action
10   deliberately to force you out?
11       MS. RODGERS:  Object to form.
12       THE WITNESS:  In particular, the
13   treatment the last week and a half that I
14   received from Bayo, and the treatment I
15   received all along from Chris, and again the
16   e-mail from Debra.  I think she wanted to
17   see me go.
18       MR. DODD:  Q.  That was the year
19   before, wasn't it?
20       A.   It still happened.
21       Q.   Let's talk about your environment
22   from the time you filed your complaint on
23   December 3rd until you left on February 14th.
24       A.   Okay.
25       Q.   Your office was the same, wasn't

Cynthia Ellison                                    April 27, 2006

|                                         Page 174 |
| --- |

1   *it?*
2      *A.    Did you say "office"?*
3      *Q.    Yes.*
4      *A.    Yes, sir.*
5      *Q.    The same office. Your hours of*
6   *work were the same?*
7      *A.    That's correct.*
8      *Q.    You had the same student help,*
9   *didn't you?*
10     *A.    I did.*
11     *Q.    Did you receive any negative*
12  *evaluations of any kind concerning your work?*
13     *A.    It wasn't time for evaluations.*
14     *Q.    Did you receive any negative*
15  *comments at all concerning your job*
16  *competency?*
17     *A.    Well, Bayo commented that he didn't*
18  *seem to think I was getting things done fast*
19  *enough.*
20     *Q.    When was that comment made?*
21     *A.    This was after our meeting on the*
22  *31st of January with Ritvo.*
23     *Q.    What was he referring to?*
24     *A.    I don't remember exactly what I*
25  *was working on. But he just -- as I said*

|                                         Page 175 |
| --- |

1   *earlier, he just changed. Nothing I did*
2   *pleased him. I couldn't do it right, and I*
3   *had been doing the same things before.*
4      *Q.    Well, were you behind on whatever*
5   *you were working on?*
6      *A.    I wasn't behind. As I stated*
7   *earlier, he told me, "Don't open the mail any*
8   *more. Don't talk to me any more. If you*
9   *want to talk to me, send me an e-mail." When*
10  *two people are working in the office it is*
11  *not feasible to send e-mails to get the job.*
12     *Q.    He told you that as a result of*
13  *the shredding incident, didn't he?*
14     *A.    You asked me what changed between*
15  *December and the time I left. That was in*
16  *that period.*
17     *Q.    Now, I am trying to pinpoint.*
18  *That was after the shredding incident, wasn't*
19  *it?*
20     *A.    Yes.*
21     *Q.    Did any of your job duties change?*
22     *A.    I think they changed because he*
23  *wouldn't let me do them.*
24     *Q.    What wouldn't they let you do?*
25     *A.    He wouldn't let me do the routine*

|                                         Page 176 |
| --- |

1   *things in the office.*
2      *Q.    Open the mail?*
3      *A.    Open the mail, communicate with him*
4   *about who is on the phone, who needed to see*
5   *him. It was virtually shut down. So, in my*
6   *opinion, I felt like he forced me to leave.*
7   *I'm not going to sit there and work for*
8   *nobody when he is saying -- and he said to*
9   *me, "You have done this to me because of*
10  *that suit." He just completely changed.*
11     *Q.    This was after, I guess, he had*
12  *gotten the letter then?*
13     *A.    After the letter?*
14     *Q.    From the lawyer.*
15     *A.    From the lawyer and after I used*
16  *Chris' letter. He told me that I had*
17  *compromised the integrity of the office. He*
18  *didn't trust me any more. He didn't want me*
19  *to do anything. And I reminded him that he*
20  *gave me the letter and told me to do with it*
21  *what I thought I needed to do.*
22     *Q.    He learned that you had given the*
23  *letter to the lawyer how? Strike that,*
24  *please.*
25         *How do you think he learned that*

|                                         Page 177 |
| --- |

1   *you had given the letter to the lawyer?*
2      *A.    I guess in the correspondence from*
3   *the lawyer. I really don't know.*
4      *Q.    During that time you didn't take*
5   *any leave of absence, did you?*
6      *A.    During what time?*
7      *Q.    December the 3rd through February*
8   *14th.*
9      *A.    I took funeral leave.*
10     *Q.    Funeral leave?*
11     *A.    Uh-huh.*
12     *Q.    That was for your father?*
13     *A.    Yes. And I also took -- I may*
14  *have had two or three vacation days in there*
15  *because I was going to the Cancer Center for*
16  *treatment for my condition.*
17     *Q.    Those were voluntary things on your*
18  *part?*
19     *A.    Right.*
20     *Q.    Other than those treatments, you*
21  *didn't seek any kind of medical or*
22  *psychological assistance during that time?*
23     *A.    Just with my pastor.*
24     *Q.    You didn't receive any reprimands,*
25  *did you?*

d1403afb-e7e9-42de-b323-57812dba67e5

|  | Page 178 |
|---|---|

1    *A.    From Dr. Lawal or at all?*
2    *Q.    From anyone.*
3    *A.    Not that I recall.*
4    *Q.    Your pay didn't change, right?*
5    *A.    That's correct.*
6    *Q.    Chris Mahaffy didn't make any*
7    *racially-related remarks to you after December*
8    *3rd, did he?*
9    *A.    Not any racial remarks, but he*
10   *intimidated me by coming to my office.*
11   *Q.    I think you wrote somewhere that*
12   *other staff members or faculty stopped talking*
13   *to you.*
14   *A.    Yes.*
15   *Q.    Do you recall that?*
16   *A.    I do.*
17   *Q.    When did that occur?*
18   *A.    It occurred after the -- I think*
19   *that was after the incident with Allison.*
20   *Q.    That was back in 2004?*
21   *A.    Right.*
22   *Q.    Did that ever change?*
23   *A.    Dr. Thomas and Ms. Findley pretty*
24   *much spoke to me and talked to me, but the*
25   *rest of them didn't.*

|  | Page 179 |
|---|---|

1    *Q.    How many others were there?*
2    *A.    Dr. Arnold, Mr. Russell, Jill*
3    *Rollins. It's been some time, so bear with*
4    *me.*
5    *Q.    I understand.*
6    *A.    Arnold, Russell, Jill Rollins and*
7    *there was Thomas and Findley. That was the*
8    *staff.*
9    *Q.    Do you believe that somebody*
10   *encouraged them to stop communicating with*
11   *you?*
12   *A.    Well, I know that they had a*
13   *Departmental meeting because Bayo told me, and*
14   *they discussed me in the meeting. That's*
15   *when I noticed the change in the behavior of*
16   *some of them.*
17   *Q.    What did Bayo tell them?*
18   *A.    Bayo didn't tell them anything.*
19   *He said that Chris had a meeting with them.*
20   *Q.    What did Chris tell them?*
21   *A.    I wasn't in the meeting.*
22   *Q.    You don't know?*
23   *A.    No. I wasn't in the meeting.*
24   *Q.    Do you know if anyone else --*
25   *A.    I'm sorry. I made a mistake.*

|  | Page 180 |
|---|---|

1    *That wasn't Bayo. That was Brad because that*
2    *was after.*
3    *Q.    Brad told you that Mahaffy had had*
4    *a meeting?*
5    *A.    It was either Brad or Bob. After*
6    *the Allison incident and Brad was in the*
7    *Dean's chair. It was Brad and not Bayo.*
8    *Q.    Did anyone else in the School of*
9    *Sciences have complaints about Mahaffy?*
10   *A.    Just about everybody in the School*
11   *of Sciences.*
12   *Q.    What kind of complaints did the*
13   *other folks have about him?*
14   *A.    I can only tell you what they*
15   *expressed to me.*
16   *Q.    That's fine.*
17   *A.    Rosine Hall called me, or she was*
18   *in the office making copies and she said that*
19   *Chris had come to her office and spent an*
20   *hour venting about what had happened. When I*
21   *say, "what had happened," I am talking with*
22   *the situation with him being taken down as*
23   *Department head. She said for me to be*
24   *careful because he was really upset, and he*
25   *was nuts.*

|  | Page 181 |
|---|---|

1    *Dr. Elliott referred to -- they*
2    *basically all made the comment that he was*
3    *crazy. Something was wrong with him. The*
4    *Department heads had a problem with him in*
5    *the Department head's meeting. It was just a*
6    *combination of student complaints, faculty*
7    *complaints. Everybody just about.*
8    *Q.    Do you know if anyone ever*
9    *complained about the types of -- strike that.*
10   *Do you know if anybody complained*
11   *about any sort of physical activity of*
12   *Mahaffy?*
13   *A.    Just that one incident that I*
14   *remember that I told you about earlier. He*
15   *and a student got into it in one of the*
16   *labs.*
17   *Q.    Do you know if anyone else*
18   *complained about Mahaffy?*
19   *A.    I thought we just answered that.*
20   *What was the question previous to this?*
21   *Q.    Well, maybe it was my misuse of*
22   *language. I asked you if anybody had*
23   *complaints about him. The second question*
24   *was, did anyone actually complain about him*
25   *to Debra, to the Dean?*

Cynthia Ellison                                              April 27, 2006

Page 182

1      A.    *Debra will have to answer that*
2  *question.  We did have complaints to each*
3  *Dean.  We had complaints to Brad.  We had*
4  *complaints to Bob.  We even had complaints to*
5  *Joe Hill about Chris Mahaffy.*
6      Q.    *Coming from all different people?*
7      A.    *Different people, yes.  In*
8  *particular, I can give you an example.*
9      Q.    *Okay.*
10     A.    *I think this is when Brad was the*
11 *Dean.  Chris told a student that he was too*
12 *old to get into pharmacy school and the*
13 *student complained to us.  It went all the*
14 *way to the Vice Chancellor's office.  I don't*
15 *know what the follow up was.  I do know that*
16 *several times they had to go downtown*
17 *somewhere.*
18     Q.    *Do you know if anything was ever*
19 *done by the University in response to the*
20 *complaints about Mahaffy up until 2005, of*
21 *course?*
22     A.    *Define "done."  What do you mean*
23 *by "done."*
24     Q.    *Any action taken against him for*
25 *his behavior?*

Page 183

1      A.    *Nobody really wanted to take*
2  *action.  They just let him keep going.  In*
3  *fact, it was a joke.  He was being passed*
4  *from one Dean to the other.*
5      Q.    *Do you know if anyone else*
6  *resigned because of Mahaffy's behavior?*
7      A.    *I have no firsthand knowledge of*
8  *that.*
9      Q.    *Have you heard of anyone resigning*
10 *because of Mahaffy's behavior?*
11     A.    *Give me a minute.  I'm going back*
12 *over 20 years.  Not that I recall.*
13     Q.    *Now, you resigned or retired on*
14 *February the 9th, 2005, right?*
15     A.    *I turned that memo into Dr. Lawal*
16 *then, yes.*
17     Q.    *Then you agreed to stay on until*
18 *February 25, right?*
19     A.    *Right.  In that agreement, I said*
20 *with the stipulation that I get security.*
21     Q.    *You had planned to stay on until*
22 *February 25, had you not, until the shredding*
23 *incident came along?*
24     A.    *I had planned to stay another two*
25 *or three years.  I had committed to Dr.*

Page 184

1  *Lawal that I would be there.*
2      Q.    *I am referring now to the*
3  *retirement notice you handed in on February*
4  *9th?*
5      A.    *Okay.*
6      Q.    *And you committed to staying on*
7  *through February 25th and then that changed*
8  *on February the 14th, right?*
9      A.    *It did change on February the*
10 *14th.  February the 25th.*
11     Q.    *Isn't it true that you did tell*
12 *Lawal that you would stay on through the 25th*
13 *if security would assure you they would do a*
14 *walk-through at least once a day?*
15     A.    *Yes.  He asked me to stay, and I*
16 *said "with security."*
17     Q.    *If they did a walk-through once a*
18 *day?*
19     A.    *I didn't say that.*
20     Q.    *You did agree to stay through the*
21 *25th if there was security?*
22     A.    *Right.  And he told me that that*
23 *wasn't up to him.  It was up to Dr. Ritvo.*
24     Q.    *Until the fall out from the*
25 *shredding incident, you had planned to stay*

Page 185

1  *through February 25th, had you not?*
2      A.    *Well, I had gone to him, and*
3  *that's what I put in writing.  When I asked*
4  *him about security nothing was done.*
5      Q.    *I'm sorry.  I didn't hear you.*
6      A.    *Nothing was done when I asked*
7  *about getting security.*
8      Q.    *Is that why you left on the 14th?*
9      A.    *I left because it was an*
10 *impossible situation to work.*
11     Q.    *You had a big fight with Lawal on*
12 *the 14th, didn't you?*
13     A.    *I did not.*
14         MS. RODGERS:  Object to form.
15         THE WITNESS:  No, sir, I did not.
16         MR. DODD:  Q.  *Would you have*
17 *stayed through the 25th if the shredding*
18 *incident had not occurred?*
19         MS. RODGERS:  Object to form.
20         THE WITNESS:  Given the fact that
21 *he had given me the letter concerning Chris,*
22 *I had planned to keep my two-year commitment*
23 *not to just February the 25th.*
24         MR. DODD:  Q.  *I understand that.*
25 *I am asking you now about your retirement*

d1403afb-e7e9-42de-b323-57812dba67e5

Page 186

1  notice you handed in on February the 9th,
2  right?
3      A.    Right.
4      Q.    After you did that you told him
5  you would stay through the 25th if you had
6  security?
7      A.    Right.
8      Q.    Right?
9      A.    Uh-huh.
10     Q.    But you didn't, did you?
11     A.    Because events changed and it
12 wasn't just the shredding.
13     Q.    Didn't you make up your mind to
14 leave on Monday February 14th?
15         MS. RODGERS:  Object to form.
16         THE WITNESS:  I was forced to
17 leave on February the 14th.
18         MR. DODD:  Q.  For whatever reason
19 you decided to leave on February 14th, right?
20     A.    Yes.  I left because I was forced
21 to leave.
22     Q.    What happened on February 14th that
23 forced you to leave?
24     A.    Dr. Lawal was indignant.  He
25 called me in his office and said that he had

Page 187

1  been working out there on Saturday, and he
2  saw the shredding bags where I normally put
3  shredding bags.  And that I had not gotten
4  his permission to shred.  And that he had
5  called Ritvo at home that Saturday and asked
6  him what he should do.  He said that Ritvo
7  told him to collect the shredding bags and
8  bring them to his office.  I don't know who
9  took them over there.  That's what he told
10 me.  But when I got ready to go out of Dr.
11 Lawal's office, the shredding bags were
12 stuffed up under the couch in his office.  I
13 said, "Is this some of the shredding?  Do
14 you want to look in it to make sure that
15 it's what I told you it was?"  It was the
16 time -- they were old time sheets, pay
17 schedules, you know, grade sheets and so
18 forth.  He said "no."  And then again he
19 asked me to leave his office and I did.
20     Q.    Then you sent him a note and said
21 you are leaving at 1:00 o'clock that
22 afternoon, right?
23     A.    Right.  I did not sit down
24 immediately and say, "I am leaving at 1:00
25 o'clock."

Page 188

1      Q.    Is it true that the confrontation
2  you had with Lawal that morning, February
3  14th, is what led you to leave AUM at 1:00
4  o'clock that afternoon?
5          MS. RODGERS:  Object to form.
6          THE WITNESS:  As I stated earlier,
7  there was no confrontation.  He stated to me
8  how he felt.  I think I also told you
9  earlier that he said he did not trust me.  He
10 didn't want me to do anything in the office.
11 I was just to sit there really.  Don't open
12 anything.  Don't do anything.  And that was
13 retaliatory because of my complaint I had
14 filed.
15         It was also retaliatory in nature
16 to me because he wanted to file a complaint
17 that summer, and he told me that now he
18 would not be able to do it.  The environment
19 I was in, that just worsened the environment.
20 I was sitting in a hostile environment.
21         MR. DODD:  Q.  What you just
22 described occurred that Monday morning, did it
23 not?
24     A.    Yes.  But it was not a
25 confrontation.  I didn't raise my voice.  He

Page 189

1  didn't raise his voice.
2      Q.    We will call it a conversation.
3  Okay?
4      A.    You can call it a conversation.
5      Q.    As a result of the conversation on
6  Monday morning, you left at 1:00 o'clock that
7  afternoon?
8      A.    As a result of that and my not
9  getting security and my being subjected to an
10 unsafe environment, I was forced to leave.
11     Q.    What security issues did you have
12 that Monday morning?
13     A.    Actually, that Monday morning
14 security showed up.  Officer Cox came in my
15 office and said he had been sent over to
16 secure my area.  He said, "Cynthia, if I had
17 known it was you, I would have been here
18 earlier."  He told me that he was the one
19 stationed outside of Ritvo's office and -- on
20 the 31st when all of these meetings occurred,
21 and that he witnessed that when Chris came
22 out of the meeting that -- and these are his
23 words, not mine.  He looked like he was off
24 of his meds.  He said no one ever told him
25 to come over and secure my area.

Cynthia Ellison                                April 27, 2006

Page 190

1    Q.    When you left work on Friday the
2    11th of February --
3    A.    Uh-huh.
4    Q.    You didn't intend to leave work on
5    Monday afternoon, did you?
6    A.    Leave work?
7    Q.    Leave AUM.
8    A.    I spoke to my attorney, and I was
9    advised to leave an unsafe environment where
10   nothing was being done for me.
11   Q.    I understand that.  I am asking
12   you when you went home from work on that
13   Friday, February 11th, you still intended to
14   work through February 25th, did you not?
15   A.    If I arrived and conditions were
16   conducive to my being able to work until the
17   25th.
18   Q.    The condition you had specified was
19   security, wasn't it?
20   A.    That's right.
21   Q.    Monday there was security, was
22   there not?
23   A.    There was security.
24   Q.    Okay.  What changed between the
25   time you went home on Friday afternoon and

Page 191

1    the time you left Monday afternoon never to
2    return?
3    A.    Dr. Lawal told me essentially there
4    wasn't anything for me to do in the office
5    any more.
6    Q.    It was the conversation that Monday
7    morning, right?
8    A.    It was a combination of everything.
9    There is no other way I can tell you.  I
10   mean, it was a combination of everything.
11   Q.    Why didn't that combination of
12   everything force you to leave on Friday and
13   never return?
14   MS. RODGERS:  Object to form.
15   THE WITNESS:  Because Dr. Lawal,
16   even in his being ugly to me, I was trying
17   to get some work done.  I was working.  I
18   mean, I wasn't working thinking I am going to
19   leave at 1:00 o'clock on Monday.  I didn't
20   come in Monday morning saying, "I am going to
21   leave at 1:00 o'clock."  It was a combination
22   of everything.
23   MR. DODD:  Q.  Is it fair to say
24   that what Lawal said to you that Monday
25   morning was the catalyst that made you leave

Page 192

1    Monday afternoon?
2    MS. RODGERS:  Object to form.
3    THE WITNESS:  Not having security
4    was the key issue and what I had been
5    subjected to.
6    MR. DODD:  Q.  Had Lawal
7    previously ever tried to talk you out of
8    retiring?
9    A.    No, sir.  Because he knew I wasn't
10   going to retire.
11   Q.    I'm sorry.
12   A.    He knew I wasn't planning to
13   retire.
14   Q.    How did he know that?
15   A.    Because several people in the
16   school asked me if I was going to retire and
17   I said, "No."  They asked me if Dr. Lawal
18   was planning to leave.  And this I understand
19   started, and I can't tell you who started it,
20   but I can tell you who they say started it.
21   Chris was going around on the third and
22   second floor saying that I was going to
23   retire, and Dr. Lawal was leaving taking
24   another job.  Dr. Lawal sent an e-mail to the
25   entire school saying Ms. Ellison has not

Page 193

1    discussed any plans with me to retire, nor am
2    I looking for another job.  Yet, he decided
3    after I left to put in his letter that I had
4    said I was, but I did not tell him that
5    because he sent the e-mail saying we had not
6    discussed it.
7    Q.    Did you ask the four work study
8    students to prepare statements about what went
9    on February 14th?
10   A.    I did.
11   Q.    Why did you do that?
12   A.    Because it was my pattern.  I
13   think every situation I have written something
14   down.  I have documented what happened.  And
15   I knew, especially at that point,
16   documentation was key.
17   Q.    Ms. Ellison, do you know any white
18   employees at AUM who were not fired after
19   complaining about discrimination?
20   A.    White employees who were not fired
21   after complaining about discrimination.  I
22   don't know that I would have privileges to
23   that kind of information.  I don't know.
24   Q.    Do you know of any white employees
25   who were fired after complaining about

Cynthia Ellison                                          April 27, 2006

Page 194

1   discrimination?
2       A.    I do not know.
3           (Short recess)
4           MR. DODD:  Q.  Ms. Ellison, do
5   you know if Faye Ward has any unhappiness
6   with Auburn University Montgomery?
7       A.    I wouldn't know that.
8       Q.    Have you talked to her about
9   assisting you in this case?
10      A.    I asked her if she would talk to
11  my attorney.
12      Q.    And she did, right?
13      A.    As far as I know, yes.
14      Q.    Have you seen the affidavit that
15  she gave?
16      A.    No.  I haven't seen her affidavit.
17      Q.    When did you apply for disability
18  insurance or disability benefits?
19      A.    I don't remember the exact date.
20  But it was pretty much around the time when
21  I tried to work for my rheumatologist and I
22  couldn't do it.
23      Q.    Were those SSI disability benefits?
24  Social Security Disability benefits?
25      A.    Yes.

Page 195

1       Q.    What was the outcome of your
2   application?
3       A.    I have got to request for a
4   hearing.  I have got to send back information
5   to request for a hearing date.
6       Q.    Who is representing you in that
7   case?
8       A.    I don't have a representative.
9       Q.    You represent yourself?
10      A.    Yes.
11      Q.    Have you been denied Social
12  Security benefits and is this an appeal?
13      A.    Right.
14      Q.    Did you claim in your application
15  for disability benefits that you were unable
16  to work?
17      A.    As I recall, there were 100
18  questions that asked you what you can and
19  cannot do and to what extent you can or
20  cannot do that.
21      Q.    Do you have -- strike that.
22          Do you keep all of those records?
23      A.    I should have those records.
24      Q.    Donna Paul is your rheumatologist?
25      A.    Yes.  Dr. Paul.

Page 196

1       Q.    Let me show you a document that
2   your lawyer gave to me and just ask you if
3   you ever seen that before.
4       A.    No.  May I read it?  I haven't
5   seen it before.
6       Q.    If you are curious, you can read
7   it.  Your lawyer has a copy.  She can show
8   it to you.
9       A.    What is it?
10      Q.    It looks like some notes from Faye
11  Ward to my partner that somehow left AUM.
12      A.    Okay.
13          (Three-page document, dated February
14  25, 2004, e-mail from Cynthia Ellison to Joe
15  Hill, marked as Defendant's Exhibit-2)
16          MR. DODD:  Q.  Ms. Ellison, here
17  is Defendant's Exhibit 2.  Take a look at
18  that and see if you can identify it for me,
19  please.
20      A.    This is an e-mail I sent Joe Hill.
21      Q.    Do you recognize that?
22      A.    Yes.
23      Q.    You see about halfway down the
24  message on the first page you refer to the
25  anonymous letter?

Page 197

1       A.    I do.
2       Q.    Have you seen that letter to date?
3       A.    I have not.
4       Q.    Who was one of the individuals you
5   spoke to who apparently composed that letter?
6       A.    I don't know who composed the
7   letter.
8       Q.    Who in the letter are you
9   referring to where you say, "the ladies heard
10  about the incident and I spoke with one of
11  them, not knowing she had in mind doing what
12  she did."
13      A.    Let me get to that point.
14      Q.    Okay.
15      A.    Where is it?  Okay.  Let me just
16  read it.  These were the women in Upward
17  Bound.
18      Q.    Who did you speak to, though?
19      A.    I spoke to -- actually, I spoke to
20  all of three of them there together.
21      Q.    What are their names?
22      A.    It was Lucy.  We called her Ms.
23  Lucy.  Lucy.  Debra may know their names.
24  Lucy.  It was Alice Boggs.  Alice Boggs, Abena
25  and Lucy.  That's all I know.

Cynthia Ellison                                      April 27, 2006

Page 198

1   Q.   How did you learn that an
2   anonymous letter existed and that it referred
3   to you?
4   A.   How did I learn about what?
5   Q.   That an anonymous letter existed
6   and that the letter referred to you.
7   A.   They were talking about it in the
8   School of Sciences.  They said it referred to
9   the Dean's secretary in the School of
10  Sciences.
11  Q.   Who is "they?"  These three women?
12  A.   Yes.
13  Q.   Were they involved in the School
14  of Sciences?
15  A.   They were housed in the School of
16  Sciences.
17  Q.   Read down about ten more lines
18  from there.  It says, "The HR director wasn't
19  willing to speak with me at the time."
20  A.   Right.
21  Q.   What are you referring to there?
22  A.   Debra.
23  Q.   When was she not willing to speak
24  with you?
25  A.   Wait a minute.  Let me come to

Page 199

1   where you were and read it.
2   Q.   Okay.
3   A.   I have to say it was referring to
4   Debra.  And I think I said at one time it
5   was Debra.  Then I changed it.  So I guess
6   it was Debra.  Because this would have been
7   more up to date than what I remember now,
8   since it's been so long.
9   Q.   Isn't it true that you called
10  Debra Foster about a week before you sent
11  this e-mail and asked her how to file a
12  complaint about the Allison Stevens incident?
13  A.   Asked her how to file a complaint?
14  Q.   Yes.
15  A.   I may have called Debra.  I don't
16  remember.
17  Q.   Isn't it true that you also told
18  Debra that you did not want to put anything
19  in writing?
20  A.   I did.  And that's when Guin
21  insisted that she wanted me to.
22  Q.   That happened later, didn't it?
23  A.   I wrote the memo to Guin, yes.
24  When I informed Guin about the situation.
25  Q.   Why were you unwilling to put

Page 200

1   anything in writing to Debra Foster about the
2   Allison Stevens incident?
3   A.   Because Debra was known not to
4   help anybody.  When I went to her, her first
5   statement was, "I don't know what to do with
6   this.  It's going to be he said, she said."
7   Q.   That's what happened later.  I am
8   asking you now why you weren't willing to
9   follow the procedures that were in place?
10  A.   I don't view that as not my being
11  not willing to follow procedures.  As I said
12  earlier, I really felt like I was going to
13  be retaliated against because of the situation
14  with Jessie Clayton.
15  Q.   You expected Debra to retaliate
16  against you?
17  A.   I had no idea what to expect
18  because of what I had heard.
19  Q.   Look over at the bottom of the
20  next page, please.  The last four lines.
21  You say, "I said earlier in an e-mail to you
22  that I'm looking at retiring if I can find
23  something else, but I don't want to leave
24  with a cloud over my head."  Do you see
25  that?

Page 201

1   A.   I see it.
2   Q.   Were you looking at retiring as of
3   February 2004?
4   A.   We were always looking at
5   retirement.  I told you that we had seminars
6   that we went to.
7   Q.   This doesn't talk about a seminar.
8   It talks about you.
9   A.   I know what it talks about.  I am
10  telling you now that discussion of retirement
11  came up periodically, not just with me, but
12  with everybody.  Especially when they invoked
13  the DROP situation.
14  Q.   In 2004, were you looking to find
15  another job so you could retire?
16  A.   I was not looking for a job in
17  2004.
18  Q.   The statement you made there
19  that --
20  A.   Let me read this.
21  MR. DODD:  Here is No. 3.
22  (One-page letter, dated March 1,
23  2004, letter from Cynthia Ellison to Guin
24  Nance, marked as Defendant's Exhibit-3)
25  MR. DODD:  Q.  Take a look at

Cynthia Ellison                                          April 27, 2006

Page 202

1    that and see if you can identify it.
2        A.    Okay.
3        Q.    Can you identify that document?
4        A.    I wrote it.
5        Q.    It's your letter?
6        A.    Yes.
7        Q.    Look in the first paragraph, if
8    you would, at the last sentence.  Which
9    reads, "Until now, however, none have involved
10   name calling, personal verbal attacks, and the
11   development of a potential hostile working
12   environment."
13       A.    Uh-huh.
14       Q.    Is this your statement that March
15   1, 2004, is the beginning of a hostile
16   working environment?
17       A.    My reference until now is to the
18   incident when it occurred in December '03.
19       Q.    December 3rd, 2003, is the
20   beginning of the hostile working environment
21   for you?
22       A.    And the racial slur.  That was the
23   first time that I had ever encountered
24   something like that.
25       Q.    I understand that.  What you wrote

Page 203

1    here is the truth, right?
2        A.    Yes.
3        Q.    If you look at December the 3rd,
4    2003 letter, it's the beginning of what you
5    consider to be a hostile working environment?
6        A.    In relation to this incident that
7    I was referring to.
8        Q.    Well, the first paragraph refers to
9    your tenure at Auburn University Montgomery
10   for the last 20 years, doesn't it?
11       A.    Right.
12       Q.    December 3, 2003, is the beginning
13   of what you consider to be a hostile working
14   environment, right?
15             MS. RODGERS:  Object to form.
16             THE WITNESS:  No, sir.  That's not
17   what my intent was.
18             MR. DODD:  Q.  What was your
19   intent?
20       A.    My intent was to communicate to
21   Dr. Nance, as I said earlier, that I was not
22   the author of the anonymous letter.  And that
23   it was me who the slur was directed at.  And
24   that, like it says, I was subjected to a
25   hostile work environment.

Page 204

1        Q.    The sentence preceding the last one
2    says, "Over the years, there have been
3    misunderstandings and personality conflicts
4    with each of these groups.  Until now,
5    however, none have involved name calling,
6    personal verbal attacks, and the development
7    of a potential hostile working environment,"
8    right?  Is that the truth?
9             MS. RODGERS:  Object.  Asked and
10   answered.
11            THE WITNESS:  This recap events
12   that I was trying to relate to Dr. Nance
13   that occurred in December '03.
14            MR. DODD:  Q.  December '03 is
15   when the development of a potential hostile
16   working environment began, right?
17            MS. RODGERS:  Object again.
18            THE WITNESS:  I should have
19   probably put it in writing when it was
20   continued.
21            MR. DODD:  Q.  This letter is not
22   true then, right?
23            MS. RODGERS:  Object to form.
24            THE WITNESS:  Yes, it's true.
25            MR. DODD:  You can't have it both

Page 205

1    ways.
2             THE WITNESS:  It is true.
3             MS. RODGERS:  Stop.  On the
4    record, I would like the record to reflect
5    that it seems like opposing Counsel has
6    become argumentative and also attempting to be
7    intimidating to my client.  If he wants to
8    ask her a question, which I will say was in
9    a unprofessional manner, he can do that.  If
10   he cannot do that at this point, then we can
11   just close the deposition and let the judge
12   take it up on this matter on what we should
13   do in the midst of these depositions.
14            MR. DODD:  It's cross-examination,
15   Counsel.
16            MS. RODGERS:  Well, whatever you
17   call it.  You call it whatever.  Whatever
18   you may want to call it.  You call it cross,
19   I call it intimidation.
20            MR. DODD:  It's a search for the
21   truth.
22            MS. RODGERS:  This search for your
23   truth.  This is Ms. Ellison's case.  You are
24   the lawyer.  You have not been the victim.
25            MR. DODD:  Search for the truth.

Cynthia Ellison                                          April 27, 2006

## Page 206

1      MS. RODGERS:  Search for your
2 truth.
3      MR. DODD:  We are going to stay
4 on it until I get it.
5      MS. RODGERS:  I am going to stay
6 on it until I get it.  No reaper shall
7 prosper, and every tone that rises up in
8 judgment shall be condemned.  And for the
9 record --
10     MR. DODD:  Don't preach to me.
11     MS. RODGERS:  I don't preach.  I
12 am not preaching to you.  But I am putting
13 it on the record so that it can be perfectly
14 clear.  That it can be perfectly clear that
15 you are not going to intimidate me either.
16     Now, I am trying to have my client
17 here to answer your questions.  You are
18 taking it as a personal vendetta for a search
19 for your truth.  I have her here available
20 to answer your questions according to what
21 she has provided in her complaint.  That's
22 what we are trying to attempt to do.  But
23 you are trying to search for truth.
24     MR. DODD:  She is noticed to be
25 here.

## Page 207

1      MS. RODGERS:  She may be noticed
2 to be here.  And by law, the only reason is
3 because she has to be here, and because she
4 has filed a complaint.
5     MR. DODD:  That's true.  That's
6 her obligation of filing a lawsuit.
7     MS. RODGERS:  It's our obligation
8 to for having her here.  You can ask
9 questions.  If you want to be put into an
10 argument, let the games begin.  And we can
11 let the judge decide that.
12     MR. DODD:  Q.  Mrs. Ellison, is
13 the document that's been identified as
14 Defendant's No. 3 truthful?
15     MS. RODGERS:  Object to form.
16     THE WITNESS:  Yes, sir.  It is
17 truthful.
18     MR. DODD:  Thank you.
19     (One-page letter, dated March 2,
20 2004, from Guin A. Nance to Ms. Cynthia
21 Ellison, marked as Defendant's Exhibit-4)
22     MR. DODD:  Q.  Ms. Ellison, here
23 is No. 4.  See if you can identify that.
24     A.   Yes.
25     Q.   What is it?

## Page 208

1     A.   It's a letter that I wrote to Dr.
2 Nance.
3     Q.   That's the letter you received from
4 Dr. Nance?
5     A.   Uh-huh.
6     Q.   Is it in response to the letter
7 that was marked as Defendant's No. 3?
8     A.   The letter you had, yes.
9     Q.   Look at the last paragraph, would
10 you, please. Chancellor Nance writes, "My
11 understanding from Ms. Foster is that you
12 have been reluctant to provide a written
13 statement." Do you see her remark there?
14     A.   Yes.
15     Q.   Is that an accurate statement?
16     A.   Yes.
17     Q.   She goes on to say that she hopes
18 you will share all relevant information on
19 this issue with her, right?
20     A.   That's correct.
21     Q.   You did that after you received
22 this letter, did you not?
23     A.   Right.  This was after our meeting
24 by sitting down in her office telling her
25 that Debra starts fires and not puts them

## Page 209

1 out.
2     (One-page letter, dated March 22,
3 2004, from Debra S. Foster to Ms. Cynthia
4 Ellison and Allison Stevens, marked as
5 Defendant's Exhibit-5)
6     MR. DODD:  Q.  Here is No. 5.
7 See if you can identify that.
8     A.   Yes.
9     Q.   What is it?
10     A.   A letter to me and Allison Stevens
11 from Debra Foster.
12     Q.   Did you receive this letter?
13     A.   I did.
14     Q.   Now, you see where Debra Foster
15 writes that she didn't find evidence to
16 substantiate if the racial slur was used by
17 Ms. Stevens, right?
18     A.   Yes.
19     Q.   But she does go on to say that if
20 Allison Stevens uses the word again she is
21 going to be fired.  Do you see that?
22     A.   Yes.
23     Q.   She also said that if Ms. Stevens
24 uses abusive and threatening language she is
25 going to be fired.  Do you see that in the

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                                April 27, 2006

Page 210

1  second numbered paragraph?
2      A.   Yes.
3      Q.   What was your reaction to what
4  Debra Foster wrote with respect to
5  expectations for Allison Stevens, if you had
6  one?
7      A.   Well, I think it's written here in
8  Number Two that she asked her not to use
9  abusive and threatening language any more.
10  And if she called me a nigger again she
11  would be terminated.
12      Q.   Were you satisfied with this
13  result?
14      A.   I was satisfied to the point that
15  I knew nothing else would be done.  The next
16  day I received her e-mail inviting me to
17  apply for a job at Hyundai, or the day
18  after.
19      Q.   Do you have that e-mail, by the
20  way?
21      A.   I believe I gave it to my
22  attorney.
23      Q.   Now, you've stated in other --
24  strike that, please.
25          Your desire was not to get Allison

Page 211

1  Stevens fired over the incident you had with
2  her, was it?
3      A.   No.
4      Q.   Do you know of anything that Debra
5  Foster could have done short -- strike that,
6  please.
7          In your opinion, what could Debra
8  Foster have done short of firing Allison
9  Stevens that the warnings in Defendant's No.
10  5 do?
11      A.   Well, it took her two times to do
12  the investigation.
13      Q.   I understand that it took some
14  time.  In terms of the conclusion that she
15  reached?
16      A.   I don't know.  I may have written
17  a memo to her about this.  I'm not sure.
18      Q.   In your mind, short of firing Ms.
19  Stevens, is there anything she could have
20  done other than say, if you do it, you will
21  be fired?
22      A.   She is an EEO and HR person.
23  That would have been her call.
24          (Five-page document, dated March
25  31, 2004, from Cynthia Ellison to Dr. Guin

Page 212

1  Nance, marked as Defendant's Exhibit-6)
2          MR. DODD:  Q.  Here is No. 6.
3  Take a look at that, please, and tell me
4  what it is.
5      A.   This is what I wrote to Dr. Nance.
6      Q.   Did you write to -- strike that.
7          What prompted you to write this
8  letter to Dr. Nance?
9      A.   I didn't believe that I had been
10  given due process in the investigation part
11  of my complaint.
12      Q.   Explain to me what you mean by
13  that, please?
14      A.   First of all, when I gave Debra my
15  initial statement and she sent it to me, I
16  had to pretty much redo it because she didn't
17  recap what I had told her.  She didn't want
18  to do an investigation, and that's when I
19  went to Dr. Nance and told Dr. Nance that I
20  was reluctant.  And then Dr. Nance instructed
21  her to go ahead and talk to the people.
22  That is what I was writing in here.  That's
23  the reason that I felt the EEO person and
24  the EEO personnel and the HR Director should
25  be separate. It says it in this memo.

Page 213

1      Q.   You said that Debra Foster didn't
2  want to do an investigation, right?
3      A.   She had never had this before she
4  said, he said, she said.
5      Q.   Is that the same as saying she
6  didn't want to do it?
7      A.   When she didn't, that told me she
8  didn't want to do it.  I had to go back to
9  Dr. Nance to ask her to go ahead and do it.
10      Q.   Isn't it true that actually Dr.
11  Nance instructed to you give a written
12  statement because you had refused to it?
13          MS. RODGERS:  Object to form.
14          THE WITNESS:  She instructed me to
15  talk to Debra Foster.
16          MR. DODD:  Q.  Did she say put
17  it in writing?
18          Guin Nance writes on Defendant's
19  Exhibit 7 that Ms. Ellison is reluctant to
20  provide a written statement and share all
21  relevant issues.
22      A.   I went over to Debra and shared
23  with her, and Debra typed up the statement
24  while I was there.
25      Q.   Isn't it true that you had refused

Cynthia Ellison                                          April 27, 2006

Page 214

1   to give a written statement, and it took Guin
2   Nance to convince you to do it?
3       MS. RODGERS:  Object to form.
4       THE WITNESS:  Because I knew
5   nothing would be done.  It took Guin Nance
6   to do it.
7       MR. DODD:  Q.  It took Guin Nance
8   to get you to give a written statement,
9   right?
10      MS. RODGERS:  Object to form.
11      THE WITNESS:  It took Guin Nance
12  to get me to go see Debra, that's correct,
13  and file my complaint.
14      (One-page letter, dated April 5,
15  2004, from Guin A. Nance to Ms. Cynthia
16  Ellison, marked as Defendant's Exhibit-7)
17      MR. DODD:  Q.  Ms. Ellison, here
18  is No. 7.  See if you can identify that.
19      A.    Yes, I wrote it.
20      Q.    What is it?
21      A.    It's a letter from Dr. Nance
22  saying that she received the previous exhibit
23  you showed me.
24      Q.    In your estimation, is she
25  addressing the primary issues you raised in

Page 215

1   your letter?
2       A.    She is addressing the issue and
3   directing Debra to interview Nikki Gibson.
4       Q.    That was one of your concerns, was
5   it not?
6       A.    (Witness nods head)
7       Q.    Has Guin Nance ever been
8   unresponsive to any of your concerns?
9       A.    No.
10      (One-page letter, dated April 29,
11  2004, from Debra S. Foster to Cynthia
12  Ellison, marked as Defendant's Exhibit-8)
13      MR. DODD:  Q.  Here is No. 8.
14  Let me know if you can identify that.
15      A.    Yes.  This is a letter to me from
16  Debra after, I guess, she did the additional
17  investigation with the witness.
18      Q.    At this point, April 29, 2004,
19  were you satisfied that all potential
20  witnesses had been interviewed in connection
21  with the Allison Stevens incident?
22      A.    All witnesses, yes.
23      Q.    Did that satisfy one of your major
24  concerns about the investigation?
25      A.    It did.

Page 216

1       (One-page memorandum, dated December
2   2, 2004, from Debra S. Foster to Cynthia
3   Ellison, marked as Defendant's Exhibit-9)
4       MR. DODD:  Q.  Here is No. 9.
5   See if you recognize that, please.
6       A.    Yes.  This is a letter Debra sent
7   me after she met with me and Dr. Lawal.
8       Q.    Does it accurately reflect what you
9   and she discussed and agreed to?
10      A.    It reflected what was discussed and
11  agreed to without my knowing what the
12  complaint was.
13      Q.    But being mindful of your feelings
14  when conversing with her, and her agreeing to
15  treat you with respect and dignity, are just
16  common decency, wouldn't you say?
17      MS. RODGERS:  Object to form.
18      THE WITNESS:  It's common decency,
19  but she and Dr. Lawal assured me that the
20  complaint was frivolous and not to worry
21  about it.  They said this is what they were
22  going to do.  I didn't worry about it.  This
23  is what I received after I complained that I
24  didn't get a letter.  And Barbara got a
25  letter.  This letter came after this letter.

Page 217

1       MR. DODD:  Q.  Do you think that
2   Barbara Ware got a copy of this letter to
3   you, No. 9?
4       A.    I have no idea.
5       Q.    Do you suspect that she did?
6       MS. RODGERS:  Object to form.
7       THE WITNESS:  I just know that she
8   and Dr. Lawal got a letter and I didn't, and
9   I asked for one.
10      MR. DODD:  This is No. 10.
11      (One-page memorandum, dated December
12  7, 2004, from Cynthia Ellison to Dr. Bayo
13  Lawal, marked as Defendant's Exhibit-10)
14      MR. DODD:  Q.  Can you tell me
15  what that is?
16      A.    This is -- yes.  This is a letter
17  I wrote to Dr. Lawal, and I would have
18  copied it to Debra Foster concerning the
19  Barbara Ware incident.
20      Q.    Is your primary concern the fact
21  that you didn't get a copy of what Barbara
22  received?
23      A.    Well, that and the fact that I say
24  in here that I was surprised that any
25  correspondence was written since, as I stated

Page 218

1  to you earlier, they told me that nothing
2  would be done.  Essentially that was the end
3  of it.
4        Q.    Was that your preferred course of
5  action that no conclusion or confirmation be
6  sent?
7        MS. RODGERS:  Object to form.  You
8  can answer.
9        THE WITNESS:  I can just tell you
10 that I was called into a meeting with Barbara
11 and Lawal.  They told me Barbara filed a
12 complaint.  They felt like it was embellished
13 by Chris and not to worry about it.
14       MR. DODD:  Q.  Now, did receiving
15 Defendant's Exhibit No. 9 make you worry
16 about it?
17       A.    Make me worry about it?
18       Q.    Yes.
19       A.    Worry what what?
20       Q.    The Ware complaint.
21       A.    Worry that I didn't get to see the
22 complaint or worry in what respect?
23       Q.    In any respect about the resolution
24 of the complaint she filed?
25       A.    I thought the resolution ended in

Page 219

1  the conference room when we finished the
2  meeting.
3        Q.    Is what's contained in Defendant's
4  No. 9 any different than what was discussed
5  in the conference room in terms of
6  resolution?
7        MS. RODGERS:  Object to form.
8        THE WITNESS:  No.
9        MR. DODD:  Q.  Do you know if
10 Dr. Lawal sought assistance or suggested from
11 the School of Sciences faculty about what the
12 school can do on account of the death of
13 your father?
14       MS. RODGERS:  Object to form.
15       THE WITNESS:  I wasn't there, so I
16 wouldn't know.
17       MR. DODD:  Q.  Has anyone told
18 you that he sought school-wide suggestions
19 about what could be done?
20       A.    Nobody told me that.
21       Q.    Do you know what he did?
22       A.    When my father died?
23       Q.    Yes.
24       A.    He sent a flower arrangement.  I
25 believe he sent a flower arrangement.

Page 220

1        Q.    And the funeral was January 29th?
2        A.    No.  Was it the 29th?  I was
3  back at work on the 31st.  He died on the
4  21st or 22nd.  It would have been -- it was
5  towards the end of January.
6        Q.    When had your mother died?
7        A.    She died four months earlier.
8        Q.    What did Dr. Lawal do on that
9  occasion?
10       A.    Dr. Lawal came to my home with
11 Ruby Jenkins, and Ruby handed me an envelope
12 that had some money if it. I'm not certain,
13 but I think she said it was from Dr. Lawal
14 or the people in School of Sciences.
15       Q.    Did he also send flowers?
16       A.    He did.
17       Q.    How much money was in the
18 envelope?
19       A.    I really don't recall.
20       Q.    Now, you also lost a sibling, did
21 you not?
22       A.    My sister died six days before my
23 mother.
24       Q.    What did Dr. Lawal do then?
25       A.    Okay.  I have got to remember.

Page 221

1  Because there were two funerals.  One in
2  Indiana and one in Alabama.  If I'm not
3  mistaken, I think they either took up money
4  and sent flowers or they did both.
5        (One-page letter, dated February 4,
6  2005, from Debra S. Foster to Ms. Cynthia
7  Ellison, marked as Defendant's Exhibit-11)
8        MR. DODD:  Q.  Ms. Ellison, here
9  is No. 11.  If you can identify that,
10 please.
11       A.    Yes.  This is a letter Debra sent
12 me regarding Chris' investigation.
13       Q.    What was your reaction when you
14 received that?
15       A.    I felt like again the investigation
16 was geared more towards resolving the
17 situation for the person who had inflicted
18 harm and ill upon me.
19       Q.    What led you to that conclusion?
20       A.    Because Dr. Lawal had shared the
21 summary letter that was sent to Chris and
22 Chris was given the opportunity to have a
23 month to decide what he wanted to do and
24 then until the end of the summer to do it.
25 I had asked for a summary of my proceedings

Cynthia Ellison                                    April 27, 2006

Page 222

1    of the meeting that I had with Lawal, Ritvo
2    and Faye and was denied.
3         And again, the security issue.
4    She says nothing in here about providing
5    security.
6         Q.    Take a look at No. 1 again, if
7    you would, please, at your Exhibit B.
8         A.    Yes.
9         Q.    Is this the summary he said you
10   should have received?
11        A.    No. I asked for a summary of the
12   meeting that took place with me, Faye, Ritvo
13   and Lawal. Because in that meeting Ritvo
14   stated that he would not give me security.
15   That I was to call them if Chris arrived in
16   that meeting. Bayo Lawal stated that he
17   would file civil litigation if nothing was
18   done to Chris in that meeting. That's the
19   summary I wanted. I wanted a summary.
20        Q.    Please finish.
21        A.    I wanted a summary of what was
22   being said because I wasn't being provided
23   security and I wanted him to write that for
24   me, and he said he would not.
25        Q.    Does such a summary exist anywhere?

Page 223

1         A.    I have no idea. I didn't get a
2    copy if it does exist. I asked for a copy.
3         Q.    Do you know if anybody got a copy
4    of any such summary?
5         A.    Chris received a summary of his
6    meeting.
7         Q.    Is that what you are referring to?
8         A.    Exhibit B.
9         Q.    That's your Exhibit B.
10        A.    Well, B, Chris received a summary
11   of what happened in their meeting. I was
12   simply asking for a summary of what happened
13   in my meeting.
14        Q.    Nobody took any adverse action
15   against you in that meeting, did they?
16        MS. RODGERS: Object to form.
17        THE WITNESS: I wanted on record
18   that I was refused security. I wanted on
19   record that Bayo threatened to file civil
20   litigation.
21        MR. DODD: Q. Look at Exhibit B
22   to Defendant's Exhibit 1 there.
23        A.    Okay.
24        Q.    That's where sanctions are imposed
25   against Chris Mahaffy by AUM, correct?

Page 224

1         A.    Yes. This has nothing to do with
2    what I wanted from them.
3         Q.    It's completely different, isn't
4    it?
5         A.    I told them what I wanted was a
6    summary of my meeting.
7         Q.    They simply refused to do it,
8    right?
9         A.    Absolutely.
10        Q.    Did they give a summary to anybody
11   else?
12        MS. RODGERS: Object to form.
13        THE WITNESS: They were only
14   concerned with me and Chris. So as far as
15   I'm concerned, the summaries would go to
16   Chris and to me because I filed the
17   complaint.
18        MR. DODD: Q. Neither Chris nor
19   you got a summary?
20        MS. RODGERS: Object to form.
21        THE WITNESS: Chris got this
22   summary. I did not get one.
23        MR. DODD: Q. This is a summary
24   where he loses his Department Chair, right?
25        A.    Yes.

Page 225

1         Q.    And he loses three months of an
2    annual 12-month contract?
3         A.    Right.
4         Q.    Diversity training, right?
5         A.    I don't know if he went. That's
6    what this says.
7         Q.    There are seven provisions,
8    punitive provisions in this summary, correct?
9         MS. RODGERS: Object to form.
10        THE WITNESS: I'm not talking
11   about the content for the summary. I wasn't
12   concerned with Chris' summary. I was concerned
13   with my summary.
14        MR. DODD: Q. Did anybody get a
15   summary of the kind that you wanted?
16        MS. RODGERS: Object to form.
17        THE WITNESS: Chris Mahaffy.
18        MR. DODD: Q. You are referring
19   to Exhibit 1?
20        A.    I am referring to a written
21   statement of what happened in a document.
22        Q.    You just wanted a document, is
23   that right?
24        MS. RODGERS: Object to form.
25        THE WITNESS: I wanted a summary

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                                        April 27, 2006

Page 226

1  document of my meeting.
2       MR. DODD:  Q.  You didn't want to
3  be punished, did you?
4       MS. RODGERS:  Object to form.
5       THE WITNESS:  Punished for what?
6       MR. DODD:  Exactly.
7       MS. RODGERS:  Object to form.  You
8  don't have to answer that.
9       MR. DODD:  Q.  Chris Mahaffy is
10  being appeased, isn't he?
11       MS. RODGERS:  Object to form.
12       THE WITNESS:  By the University
13  because of his behavior.
14       MR. DODD:  That is correct.
15       Q.    That is the behavior that you
16  complained about?
17       A.    Partially.
18       (Two-page letter, dated February 9,
19  2005, Roger A. Ritvo, Ph.D. to Ms. Cynthia
20  Ellison, marked as Defendant's Exhibit-12)
21       MR. DODD:  Ms. Ellison, here is
22  No. 12.  See if you can identify that,
23  please.
24       A.    Yes.
25       Q.    What is it?

Page 227

1       A.    It's a letter to me from Dr. Roger
2  Ritvo.
3       Q.    Do you recall receiving this?
4       A.    Yes, I do.
5       Q.    What was your reaction to it?
6       A.    I thought that, again, I was the
7  person that was being mistreated.  In my
8  letter -- and I go back to the same thing.
9  I asked for a summary.  In this letter he
10  says, I believe that -- let me look here for
11  just a minute.  It recaps some of the issues
12  I had raised in my letter about no security,
13  my being sent off Campus because they knew
14  Chris was going to be upset after they talked
15  with him.  Well, do you want me to read the
16  letter?
17       Q.    You don't need to read it.  I am
18  asking what your reaction was.
19       A.    Well, my reaction was that I was
20  still subjected to retaliation and an unsafe
21  environment.
22       Q.    You considered this letter to be
23  retaliatory?
24       A.    Not this -- well, let me see.
25  This letter, I believe and I felt, was sent

Page 228

1  to me because, if I'm not mistaken, things
2  crossed in the mail.  My information that I
3  had seen an attorney or Bayo had told them
4  something and Ritvo wrote this letter saying
5  that Campus Police goes through Goodwyn Hall
6  three times a day, or something like that.
7  If that's in this one, I know that they
8  don't.  They come when we call them for a
9  situation. I felt like this was another
10  attempt to appease me.
11       Q.    That was written in your response
12  to your February 11th letter, wasn't it?
13       A.    It was.
14       Q.    Were you not interested in having
15  an escort to your vehicle?
16       MS. RODGERS:  Object to form.
17       THE WITNESS:  I was interested in
18  an escort to my vehicle.  Let me read this.
19  Can I just make my points as I go down
20  through this letter?
21       MR. DODD:  Q.  Sure.
22       A.    I still believed that Chris Mahaffy
23  posed a physical threat.
24       Q.    Do you recognize the possibility of
25  a disagreement on that issue?

Page 229

1       A.    Certainly there is a possibility of
2  disagreement on any issue.  While it may be
3  my word against the University's word, or
4  Debra Foster, it is not customary to have a
5  Campus Police Officer stand outside a door
6  when you are having a meeting when they are
7  having Disciplinary Committee Meetings with
8  students who might act out.  When you are
9  just asking about a regular meeting, that's
10  not customary.
11       Q.    Are you saying that Mahaffy was
12  not a physical threat?
13       MS. RODGERS:  Object to form.
14       THE WITNESS:  I am saying he is
15  -- I am saying because they put Campus Police
16  outside of Ritvo's office for a supposed get
17  together meeting to talk to Chris,  it was
18  not customary.  They wanted to make me
19  believe that every meeting they had it was
20  customary for the Campus Police to be outside
21  the offices and that was not the case.
22       MR. DODD:  Q.  Let me ask you
23  what the source of your knowledge is?
24       A.    I have been there for 20 years.
25  I have talked to different people.  I know

## Page 230

1  that. Like I said, Officer Cox told me that
2  he was the one that asked to be stationed
3  outside that door that day.
4      Q.   How long has Ritvo been in that
5  position?
6      A.   I couldn't tell you the exact
7  number of years.
8      Q.   Do you know how many disciplinary
9  meetings he has had an officer outside?
10     MS. RODGERS:  Object to form.
11     THE WITNESS:  Usually, the
12  disciplinary meetings are in Chancellor's
13  Office. If they changed that, then they
14  changed it.
15     MR. DODD:  Q.  Wherever the
16  location.
17     A.   I have no idea about it, but we
18  are not talking about Ritvo's area. We were
19  talking about security from my area. He was
20  saying that Campus Police patrolled Goodwyn
21  Hall three times, and they did not.
22     Q.   You have knowledge of that as
23  well?
24     A.   Well, I was at work over those
25  years.

## Page 231

1      Q.   You were on the 3rd floor, right?
2      A.   Right. They were patrolling.
3      Q.   You weren't on the second floor,
4  were you?
5      A.   No.
6      MS. RODGERS:  Object to form.
7      THE WITNESS:  No.
8      MR. DODD:  Q.  You weren't on the
9  first floor?
10     A.   I was on the third floor. I
11  might add this was also the time that Debra
12  handed me -- during this period Debra had
13  handed me a letter saying talk to Ritvo.
14     Q.   Okay. Had you made any demands at
15  that point?
16     MS. RODGERS:  Object to form.
17     THE WITNESS:  As I said, at the
18  same time that Debra said that the attorneys
19  wanted to know what I wanted, and I told her
20  at the time that I wanted mental anguish and
21  $250,000. That's when she got up and left.
22  She came back and said, "I don't have
23  anything else to say to you."
24     MR. DODD:  Q.  Do you have any
25  further comments about this letter?

## Page 232

1      A.   Should I have?
2      Q.   You said you were going to go down
3  through. I am just wondering if you had
4  finished or not.
5      A.   I think my earlier comments cover
6  it.
7      Q.   I'm sorry.
8      A.   I think my earlier comments covers
9  it.
10     (One-page letter, dated February 9,
11  2005, from Bayo H. Lawal, Ph.D. to Ms.
12  Cynthia Ellison, marked as Defendant's Exhibit-
13  13)
14     MR. DODD:  This is Exhibit 13.
15     Q.   Ms. Ellison, look at Exhibit D to
16  your affidavit, please.
17     A.   Yes, sir.
18     Q.   You say, "I am no longer willing
19  to subject myself to an environment that is
20  potentially unsafe to me and others around
21  me."
22     A.   Yes.
23     Q.   Who are the "others" you are
24  referring?
25     A.   My student workers and other people

## Page 233

1  who came in and out of the Dean's office.
2      Q.   To your knowledge, had any of them
3  been threatened by Mahaffy?
4      A.   I really think they had.
5      Q.   Do you know that for a fact?
6      A.   I think a couple of them said
7  something a couple of times. I don't
8  remember exactly what they said.
9      Q.   You said, "I would also like to
10  discuss my plans concerning leave." What is
11  that referring to?
12     A.   Yes. I put my retirement date
13  April 1st, 2005.
14     Q.   Right.
15     A.   Because I looked in the system and
16  I had enough vacation leave to take it to
17  April 1st.
18     Q.   You just get a paycheck until
19  April 1st?
20     A.   Uh-huh.
21     MR. DODD:  Q.  Here is No. 13.
22     A.   I received this from Dr. Lawal.
23     Q.   You see in the first paragraph he
24  writes, "I know you have discussed your
25  intention to retire from AUM with me several

Cynthia Ellison                                                    April 27, 2006

Page 234

1   times within the last five months, but each
2   time, I have tried to talk you out of it."
3       A.    Yes, I do.
4       Q.    I assume from your previous
5   testimony you feel that is not an accurate
6   statement?
7       A.    It is not an accurate statement.
8       Q.    Ms. Ellison, did you plan to give
9   Lawal -- strike that, please.
10      When did you decide that you were
11  going to retire effective April 1st?
12      A.    Well, I mean, like I told you
13  earlier, it was a combination of everything
14  that was going on.
15      Q.    When?
16      A.    When?
17      Q.    When.
18      A.    I think my letter is in here.
19      Q.    The notice is dated February 9th.
20  My question is, when did you decide to give
21  him that notice on February 9th?
22      A.    When he received the correspondence
23  from Julian McPhillips and he was beating on
24  his chest.  He said that I had done this to
25  him.  That I had destroyed his plans for

Page 235

1   filing a suit in the summer.  And I should
2   wait.  He started to change and retaliated
3   against me.  It was everything that was going
4   on.
5       Q.    If I were to tell you, or suggest
6   to you that he did not receive any
7   correspondence from Julian McPhillips until
8   after February the 10th, would that make you
9   want to rethink that answer?
10      A.    Well, I have said to you that my
11  dates were not exact.  I'm not sure.
12      Q.    I am trying to straighten it out
13  now, is what I am trying --
14      A.    Well, could you show me the
15  correspondence that he received from Julian
16  McPhillips and then I can answer the
17  question?
18      Q.    I don't have the letter, but I
19  have got what was in it.
20      A.    Well, I think I told you earlier
21  that when I spoke to Mr. McPhillips and
22  explained to him what was going on, he
23  advised me to leave AUM.  Now, I did what he
24  told me to do.  And if it were the 9th, I
25  took his advice.

Page 236

1       Q.    When did you get that advice?
2       MS. RODGERS:  Object to form.
3       MR. DODD:  Q.  The first meeting
4   you had with him?
5       A.    I think it was -- well, I tell
6   you it was -- it wasn't the first meeting
7   because the first meeting is when I explained
8   to him what was happening to me.  It had to
9   be the second meeting.
10      Q.    Which was the day after you
11  resigned, right?
12      MS. RODGERS:  Object to form.
13      THE WITNESS:  I have no idea.
14      MR. DODD:  Q.  Would it be
15  accurate to say that you had decided to
16  retire, made up your mind to retire sometime
17  prior to February 9th when you returned and
18  gave Bayo Lawal the notice?
19      MS. RODGERS:  Object to form.
20      THE WITNESS:  It's fair to say
21  that after I sought Counsel and I sought
22  their advice, that's when I decided to
23  retire.
24      MR. DODD:  Q.  Was that before
25  February 9th?

Page 237

1       MS. RODGERS:  Object to form.
2       THE WITNESS:  I don't have a
3   calendar to refer to.  I really don't know.
4       MR. DODD:  Okay.
5       (Two-page e-mail, dated February
6   11, 2005, from Cynthia Ellison to Bayo Lawal,
7   marked as Defendant's Exhibit-14)
8       THE WITNESS:  Yes, sir.
9       MR. DODD:  Q.  What is that?
10      A.    This is my e-mail to Dr. Lawal, as
11  we discussed earlier, saying that I would
12  work through the 25th if I got -- if I was
13  provided Campus Police security.
14      Q.    You say if Campus security
15  patrolled at least once a day?
16      A.    Right.
17      Q.    Now, did you receive any
18  confirmation that the Campus Police would do
19  that?
20      A.    There were e-mails from Bayo to
21  Ritvo.  I believe they requested that they
22  walk-through.
23      MR. DODD:  Exhibit 15.
24      (Two-page document, dated February
25  7, 2005, entitled Application for Retirement,

Page 238

1  marked as Defendant's Exhibit-15)
2       MR. DODD:  Q.  Can you tell me
3  what that is?
4       A.    Application for Retirement.  It's
5  my Application for Retirement.
6       Q.    Do you remember when you completed
7  that?
8       A.    It's dated on 2-7-05.
9       Q.    That's your direct deposit
10  authorization for the Retirement Systems of
11  Alabama?
12       A.    Uh-huh.
13       Q.    Does that refresh your recollection
14  at all as to when you decided to go ahead
15  and retire?
16       A.    Not completely.  Because I was in
17  contact with HR because I really didn't know
18  what to do about paperwork or anything.  I
19  would have to know when I talked to Mr.
20  McPhillips.  If I talked to Mr. McPhillips
21  around that time, I don't know.
22       Q.    Do you know of any reason why you
23  would authorize a direct deposit for your
24  retirement income as of February 7th if you
25  hadn't decided to retire?

Page 239

1       A.    I was acting off of the advice of
2  my Counsel. He is the one that told me.
3       Q.    To retire?
4       A.    Yes.
5       MR. DODD:  Here is No. 16.
6       (One-page e-mail, dated February
7  12, 2005, from Bayo Lawal to Cynthia Ellison,
8  marked as Defendant's Exhibit-16)
9       MR. DODD:  Q.  Take a look,
10  please.
11       A.    Yes.
12       Q.    What is that?
13       A.    This is the e-mail from Dr. Lawal
14  concerning the shredding.
15       Q.    He sent it to you on Saturday
16  morning, February 12th, right?
17       A.    Yes.
18       Q.    Okay.  You see his last sentence
19  where he says, "I hope you kept a list of
20  all the shredded documents and that this list
21  was approved prior to shredding by the
22  University Archivist Jason Kneip."
23       A.    Kneip, yes.
24       Q.    Do you know Jason Kneip?
25       A.    No, but I e-mailed him that Monday

Page 240

1  morning.
2       Q.    Have you ever had any communication
3  with him?
4       A.    No.
5       Q.    Have you ever inventoried items you
6  shredded?
7       A.    I have not.
8       Q.    And you had never sought his prior
9  approval before shredding, have you?
10       A.    No, I had not.
11       Q.    You responded to this e-mail, did
12  you not?
13       A.    I did.
14       MR. DODD:  Here is 17.
15       (Two-page e-mail, dated February
16  14, 2005, from Cynthia Ellison to Bayo Lawal,
17  marked as Defendant's Exhibit-17)
18       MR. DODD:  Q.  See if you can
19  identify that.
20       A.    Yes, I recognize this.  It's an
21  e-mail I sent to Dr. Lawal in response to
22  his e-mail to me about the shredding.
23       Q.    You sent it Monday morning at 8:07
24  a.m.?
25       A.    Yes.  That's what's on there.

Page 241

1       Q.    You seem to question whether he
2  thinks you are trustworthy or not, is that
3  right?
4       A.    Yes.
5       Q.    Why do you raise that issue?
6       A.    Because he had never questioned
7  anything that I had done.
8       Q.    Had he ever been confronted with
9  the quantity of shredding that you and your
10  helpers had done the previous Friday?
11       A.    Had I been confronted by him?
12       Q.    Did he --
13       A.    Had he, Dr. Lawal, been confronted
14  by whom?
15       Q.    Had he ever observed shredding of
16  the magnitude that you and the student
17  workers had done the previous Friday?
18       MS. RODGERS:  Object to form.
19       MR. DODD:  Q.  To your knowledge.
20       A.    I don't know.  There was quite a
21  few time sheets and payroll files that were
22  shredded.
23       Q.    Did you know that you were
24  supposed to seek prior approval and make
25  inventories of that stuff?

Cynthia Ellison                                              April 27, 2006

Page 242

1          A.    We probably received that.  I know
2    I did probably receive that, but I had never
3    done it before.
4          Q.    Why did you suggest that Monday,
5    February 14th should be your last day?
6          MS. RODGERS:  Object to form
7    again.
8          THE WITNESS:  I think we have
9    already gone over what happened on the 14th.
10   Dr. Lawal's behavior and I was being
11   continually subjected to an unsafe environment.
12         MR. DODD:  Q.  In this e-mail you
13   refer to lack of trust, right, as a reason
14   why you shouldn't stay any longer?
15         MS. RODGERS:  Object to form.
16         THE WITNESS:  That was part of the
17   reason.
18         MR. DODD:  Q.  Is there any other
19   reason expressed in No. 17?
20         A.    Not in this letter e-mail.
21         MR. DODD:  Here is No. 18.
22         (One-page e-mail, dated February
23   14, 2004, from Cynthia Ellison to Jason Kneip
24   and Bayo Lawal, marked as Defendant's Exhibit-
25   18)

Page 243

1          MR. DODD:  Q.  Tell me what that
2    is, if you can, please.
3          A.    This is an e-mail to Jason Kneip
4    about the shredding that I had done.  Dr.
5    Lawal requested that I send him an e-mail and
6    let him know what I had shredded.
7          Q.    Did Dr. Lawal tell you that
8    orally?
9          A.    Yes.
10         Q.    Is this the same day where he said
11   that he only wanted to communicate with you
12   by e-mail?
13         A.    Right.
14         MR. DODD:  Here is 19.
15         (One-page e-mail, dated February
16   14, 2005, from Jason Kneip to Cynthia Ellison
17   and Bayo Lawal, marked as Defendant's Exhibit-
18   19)
19         MR. DODD:  Q.  Tell me what that
20   is, please.
21         A.    Yes.  This is from Jason Kneip
22   telling me that if I shred anything to submit
23   a list.
24         Q.    Did you understand that was the
25   policy of the University once you received

Page 244

1    this e-mail?
2          A.    Yes.  I do think I will stand for
3    a minute.
4          MR. DODD:  Q.  Here is No. 20.
5          (One-page document, dated February
6    14, 2005, from Roger A. Ritvo, Ph.D. to
7    Cynthia Ellison, with carbon copies, marked as
8    Defendant's Exhibit-20)
9          MR. DODD:  Q.  Ms. Ellison, do
10   you recognize that?
11         A.    Yes, I received the request about
12   Campus Police.  He said that "They do indeed
13   go through Goodwyn Hall on a regular basis,
14   hopefully three times a day."  And I received
15   that on the 14th.
16         Q.    Had you sought confirmation from
17   Bayo Lawal or Roger Ritvo about the frequency
18   with which the police go through Goodwyn
19   Hall?
20         A.    I just asked for security.  I
21   didn't get into that.
22         Q.    You did say, though, that would
23   stay on and they would go through once a
24   day?
25         A.    I think that was in an e-mail.  I

Page 245

1    would like to say that it took them from the
2    time I requested it through February 14th to
3    comply.
4          (One-page memorandum, dated February
5    14, 2005, from Cynthia Ellison to Bayo Lawal,
6    marked as Defendant's Exhibit-21)
7          MR. DODD:  Q.  Exhibit 21.
8          A.    Yes.  This is an e-mail I left
9    with the attachment for Bayo for my leave
10   that would pay me up through the end of
11   March.
12         Q.    The leave slips and time sheets
13   referred to are yours going forward, right?
14         A.    That's correct.
15         Q.    You concluded by saying, "I can no
16   longer handle the retaliation that I am under
17   from Chris, others, and now you."
18         A.    Right.
19         Q.    Who are the "others"?
20         A.    I was referring to Debra Foster,
21   Chris Mahaffy, Ritvo.  The ones I felt had
22   retaliated against me.
23         Q.    For filing a complaint?
24         A.    Yes.
25         (One-page document, dated February

Cynthia Ellison

April 27, 2006

Page 246

```
1    15, 2005, from Ms. Cynthia Ellison to Bayo
2    Lawal, marked as Defendant's Exhibit-22)
3          MR. DODD:  Here is 22.
4    Q.    Can you identify that?
5    A.    Yes.
6    Q.    Did you receive that?
7    A.    I did.
8    Q.    Did you ever return the three tape
9    recorded Chair meetings -- strike that,
10   please.
11         Did you ever submit the tapes of
12   the three Chairs meetings?
13   A.    I never -- it never left the
14   office.
15   Q.    It's still there?
16   A.    As far as I know.
17   Q.    Has Auburn University Montgomery
18   discriminated against you in any fashion other
19   than what we have discussed today?
20   A.    No.
21   Q.    Have you understood all of my
22   questions today that you have answered?
23   A.    Yes.  I think to the best of my
24   knowledge.
25   Q.    And to the best of your ability,
```

Page 247

```
1    you answered my questions fully?
2    A.    To the best of my ability.
3    Q.    Do you wish to change anything?
4    A.    I can't remember back to 8:00
5    o'clock or 9:00 o'clock this morning.  Right
6    now at this time, no.
7    Q.    Do you wish to add anything, or
8    tell me anything you think I should know
9    about this case?
10   A.    No.  I can't think of anything
11   else right now.
12         MR. DODD:  Thank you for your
13   time.
14         THE WITNESS:  Thank you.
15         (Whereupon, the proceedings
16   adjourned at 4:45 o'clock p.m.)
17   .
18   .
19   .
20   .
21   .
22   .
23   .
24   .
25   .
```

Page 248

```
1          DESCRIPTION OF DEFENDANTS EXHIBITS
2    EXHIBIT DESCRIPTION
3    1    Multi-page document, first page undated,
4         entitled Charge of Discrimination
5    2    Three-page document, dated February 25,
6         2004, e-mail from Cynthia Ellison to
7         Joe Hill
8    3    One-page letter, dated March 1, 2004,
9         letter from Cynthia Ellison to Guin
10        Nance
11   4    One-page letter, dated March 2, 2004,
12        from Guin A. Nance to Ms. Cynthia
13        Ellison
14   5    One-page letter, dated March 22, 2004,
15        from Debra S. Foster to Ms. Cynthia
16        Ellison and Allison Stevens
17   6    Five-page document, dated March 31,
18        2004, from Cynthia Ellison to Dr. Guin
19        Nance
20   7    One-page letter, dated April 5, 2004,
21        from Guin A. Nance to Ms. Cynthia
22        Ellison
23   8    One-page letter, dated April 29, 2004,
24        from Debra S. Foster to Cynthia Ellison
25   .
```

Page 249

```
1          DESCRIPTION OF DEFENDANTS EXHIBITS (CONT.)
2    EXHIBIT DESCRIPTION
3    9    One-page memorandum, dated December 2,
4         2004, from Debra S. Foster to Cynthia
5         Ellison
6    10   One-page memorandum, dated December 7,
7         2004, from Cynthia Ellison to Dr. Bayo
8         Lawal
9    11   One-page letter, dated February 4, 2005,
10        from Debra S. Foster to Ms. Cynthia
11        Ellison
12   12   Two-page letter, dated February 9, 2005,
13        Roger A. Ritvo, Ph.D. to Ms. Cynthia
14        Ellison
15   13   One-page letter, dated February 9, 2005,
16        from Bayo H. Lawal, Ph.D. to Ms.
17        Cynthia Ellison
18   14   Two-page e-mail, dated February 11,
19        2005, from Cynthia Ellison to Bayo
20        Lawal
21   15   Two-page document, dated February 7,
22        2005, entitled Application for
23        Retirement
24   .
25   .
```

Cynthia Ellison

April 27, 2006

## Page 250

|    | DESCRIPTION OF DEFENDANTS EXHIBITS (CONT.) |
|----|--------------------------------------------|
| 1  | *DESCRIPTION OF DEFENDANTS EXHIBITS (CONT.)* |
| 2  | *EXHIBIT DESCRIPTION* |
| 3  | 16   One-page e-mail, dated February 12, |
| 4  | 2005, from Bayo Lawal to Cynthia |
| 5  | Ellison |
| 6  | 17   Two-page e-mail, dated February 14, |
| 7  | 2005, from Cynthia Ellison to Bayo |
| 8  | Lawal |
| 9  | 18   One-page e-mail, dated February 14, |
| 10 | 2004, from Cynthia Ellison to Jason |
| 11 | Kneip and Bayo Lawal |
| 12 | 19   One-page e-mail, dated February 14, |
| 13 | 2005, from Jason Kneip to Cynthia |
| 14 | Ellison and Bayo Lawal |
| 15 | 20   One-page document, dated February 14, |
| 16 | 2005, from Roger A. Ritvo, Ph.D. to |
| 17 | Cynthia Ellison, with carbon copies |
| 18 | 21   One-page memorandum, dated February 14, |
| 19 | 2005, from Cynthia Ellison to Bayo |
| 20 | Lawal |
| 21 | 22   One-page document, dated February 15, |
| 22 | 2005, from Ms. Cynthia Ellison to Bayo |
| 23 | Lawal |
| 24 | . |
| 25 | . |

## Page 252

| 1  | CAPTION |
|----|---------|
| 2  | *The Deposition of Cynthia Ellison,* |
| 3  | *taken in the matter, on the date, and at the* |
| 4  | *time and place set out on the title page* |
| 5  | *hereof.* |
| 6  | *It was requested that the deposition* |
| 7  | *be taken by the reporter and that same be* |
| 8  | *reduced to typewritten form.* |
| 9  | *It was agreed by and between counsel* |
| 10 | *and the parties that the Deponent will read* |
| 11 | *and sign the transcript of said deposition.* |
| 12 | . |
| 13 | . |
| 14 | . |
| 15 | . |
| 16 | . |
| 17 | . |
| 18 | . |
| 19 | . |
| 20 | . |
| 21 | . |
| 22 | . |
| 23 | . |
| 24 | . |
| 25 | . |

## Page 251

| 1  | CERTIFICATE OF COURT REPORTER. |
|----|-------------------------------|
| 2  | *I, DAWN A. GOODMAN, do hereby* |
| 3  | *certify;* |
| 4  | *That I am a Certified Shorthand* |
| 5  | *Reporter of the State of Alabama;* |
| 6  | *That the foregoing pages are a* |
| 7  | *true and correct transcript of the Deposition* |
| 8  | *of Cynthia Ellison;* |
| 9  | *I further certify that I am not* |
| 10 | *interested in the outcome of said matter nor* |
| 11 | *connected with or related to any of the* |
| 12 | *parties of said matter or to their respective* |
| 13 | *Counsel.* |
| 14 | *Dated this 8th day of May, 2006,* |
| 15 | *at Prattville, Alabama.* |
| 16 | . |
| 17 | _____ |
| 18 | *DAWN A. GOODMAN, CSR* |
| 19 | *State of Alabama* |
| 20 | . |
| 21 | . |
| 22 | . |
| 23 | . |
| 24 | . |
| 25 | . |

## Page 253

| 1  | CERTIFICATE |
|----|-------------|
| 2  | *STATE OF          :* |
| 3  | *COUNTY/CITY OF          :* |
| 4  | *Before me, this day, personally* |
| 5  | *appeared, Cynthia Ellison, who, being duly* |
| 6  | *sworn, states that the foregoing transcript* |
| 7  | *of his/her Deposition, taken in the matter,* |
| 8  | *on the date, and at the time and place set* |
| 9  | *out on the title page hereof, constitutes a* |
| 10 | *true and accurate transcript of said* |
| 11 | *deposition.* |
| 12 | |
| 13 | *Cynthia Ellison* |
| 14 | |
| 15 | *SUBSCRIBED and SWORN to before me this* |
| 16 | *day of          , 2006 in the* |
| 17 | *jurisdiction aforesaid.* |
| 18 | |
| 19 | *My Commission Expires   Notary Public* |
| 20 | . |
| 21 | *No changes made to the Errata Sheet;* |
| 22 | *therefore, I am returning only this signed,* |
| 23 | *notarized certificate.* |
| 24 | *I am returning this signed, notarized* |
| 25 | *certificate and Errata Sheet with changes noted.* |

Cynthia Ellison                                    April 27, 2006

Page 254

*DEPOSITION ERRATA SHEET*

1

2

3    *RE:     Alexander Gallo & Associates*

4    *File No.   13898*

5    *Case Caption:   Cynthia Ellison vs. Auburn*

6    *University Montgomery*

7

8    *Deponent:  Cynthia Ellison*

9    *Deposition Date: April 27, 2006*

10    .

11    *To the Reporter:*

12    *I have read the entire transcript of my*

13    *Deposition taken in the captioned matter or*

14    *the same has been read to me.  I request*

15    *that the following changes be entered upon*

16    *the record for the reasons indicated.  I*

17    *have signed my name to the Errata Sheet and*

18    *the appropriate Certificate and authorize you*

19    *to attach both to the original transcript.*

20    .

21    *Page No.    Line No.    Change to:*

22

23    *Reason for change:*

24    *Page No.    Line No.    Change to:*

25

Page 255

1    *Reason for change:*

2    *Page No.    Line No.    Change to:*

3

4    *Reason for change:*

5    *Page No.    Line No.    Change to:*

6

7    *Reason for change:*

8    *Page No.    Line No.    Change to:*

9

10    *Reason for change:*

11    *Deposition of Cynthia Ellison*

12    .

13    *Page No.    Line No.    Change to:*

14

15    *Reason for change:*

16    *Page No.    Line No.    Change to:*

17

18    *Reason for change:*

19    *Page No.    Line No.    Change to:*

20

21    *Reason for change:*

22    *Page No.    Line No.    Change to:*

23

24    *Reason for change:*

25    *Page No.    Line No.    Change to:*

Page 256

1

2    *Reason for change:*

3    *Page No.    Line No.    Change to:*

4

5    *Reason for change:*

6    .

7    .

8    *SIGNATURE:_____DATE:_____*

9    *Cynthia Ellison*

d1403afb-e7e9-42de-b323-57812dba67e5