# CONDENSED TRANSCRIPT

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CYNTHIA ELLISON,

     Plaintiff,

vs.

    Civil Action No:
    2:05CV902-MHT-DRB

AUBURN UNIVERSITY
MONTGOMERY,

     Defendant.



**DEPOSITION OF**

**FAYE WARD**

June 14, 2006
9:38 a.m.

Auburn University
Human Resources Building
7430 East Drive
Montgomery, Alabama

Bonnie L. Smith, RPR, CCR-B-2432



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA    WASHINGTON, DC    CHICAGO, ILLINOIS    NEW YORK, NEW YORK

Telephone (404) 495-0777
Facsimile (404) 495-0766
Toll Free (877) 495-0777

Complimentary Conference Rooms
Throughout Georgia And
Major Cities Nationwide

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

www.galloreporting.com

**1**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CYNTHIA ELLISON,

      Plaintiff,

vs.          Civil Action No:
          2:05CV902-MHT-DRB

AUBURN UNIVERSITY MONTGOMERY,

      Defendant.
~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF
FAYE WARD

June 14, 2006
9:38 a.m.

Auburn University
Human Resources Building
7430 East Drive
Montgomery, Alabama

Bonnie L. Smith, RPR, CCR-B-2432

---

**2**

          APPEARANCES OF COUNSEL

On behalf of the Plaintiff:
KAREN SAMPSON RODGERS, ATTORNEY AT LAW
McPhillips, Shinbaum & Gill, LLP
  516 South Perry Street
  Montgomery, Alabama 36104
  (334) 262-1911
  (334) 263-2321 (facsimile)

On behalf of the Defendant:
BURTON F. DODD, ESQUIRE
Fisher & Phillips, LLP
  1500 Resurgens Plaza
  945 East Paces Ferry Road
  Atlanta, Georgia 30326
  (404) 231-1400
  (404) 240-4249 (facsimile)
  bdodd@laborlawyers.com

ALSO PRESENT: Cynthia Ellison, Plaintiff
      Debra Foster, HR Director

---

**3**

1      Deposition of Faye Ward
2      June 14, 2006
3
4    MR. DODD:  This is the deposition of
5  Faye Ward taken by subpoena and notice
6  pursuant to Rules 45 and 30 of the
7  Federal Rules of Civil Procedure for all
8  purposes permitted by those rules.
9
10    FAYE WARD, having first been duly sworn,
11  was examined and testified as follows:
12  EXAMINATION
13  BY-MR.DODD:
14    Q.  Ms. Ward, we met briefly.  I'm
15  Burton Dodd.  I represent Auburn University at
16  Montgomery.  The purpose of this deposition is
17  to ask you some questions about your
18  involvement in the lawsuit that Cynthia
19  Ellison has brought against AUM.
20    A.  Okay.
21    Q.  You've been sworn and do you
22  understand that you're under oath to tell the
23  truth during this deposition?
24    A.  Absolutely.
25    Q.  If you don't understand a question

---

**4**

1  that I ask you, will you let me know so I can
2  try to make it understandable for you?
3    A.  I certainly will, sir.
4    Q.  And if you don't hear the entire
5  question that I ask also, please let me know
6  so I can repeat it --
7    A.  Okay.
8    Q.  -- so you can hear it.  If you need
9  to take a break or have a recess of some kind,
10  just let me know and we'll accommodate you.
11  Do you have any medical condition that might
12  interfere with your ability to answer my
13  questions today?
14    A.  No, I don't.
15    Q.  Did you review anything to prepare
16  for this deposition?
17    A.  Just my affidavit that I signed.  I
18  looked it over.
19    Q.  You've only given one affidavit in
20  this case?
21    A.  Right.
22    Q.  Did you talk with anyone to prepare
23  for this deposition?
24    A.  No, I did not.
25    Q.  Okay.  Where do you live?



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA    WASHINGTON, DC    CHICAGO, ILLINOIS    NEW YORK, NEW YORK

Telephone (404) 495-0777    Complimentary Conference Rooms    2700 Centennial Tower
Facsimile (404) 495-0766    Throughout Georgia And    101 Marietta Street
Toll Free (877) 495-0777    Major Cities Nationwide    Atlanta, Georgia 30303

www.galloreporting.com

## 5

1    A.  I live -- I reside at 5307 Roland
2  Drive, Montgomery, Alabama.
3    Q.  You've lived there for some time,
4  have you not?
5    A.  I have.
6    Q.  How many years?
7    A.  Oh, I guess maybe about 30 years.
8  I've retired.  I worked here for 18 and I've
9  been at that address.
10    Q.  And you are divorced, are you not?
11    A.  I am.  That's correct.
12    Q.  What is -- what is your former
13  husband's name?
14    A.  Anthony R. Ward.
15    Q.  Does he live in --
16    A.  He lives in Cincinnati, Ohio.
17  Uh-huh.
18    Q.  All right.  And you have three
19  children, do you not?
20    A.  I do.  Three sons.  Absolutely.
21    Q.  And do they live in this area, the
22  Montgomery area?
23    A.  One does.  The other one lives in --
24  he just took a job with a company out of
25  Louisville, Kentucky, and he's there.  He's a

## 6

1  pilot there.  My son in Houston, he is a
2  nurse.
3    Q.  And what is the name of the son who
4  lives in Montgomery?
5    A.  His name is Kory, with a K.
6    Q.  Okay.  And what does Kory do?
7    A.  Kory works at Maxwell Air Force Base
8  in the fitness center and he also works at ASU
9  as a part-time radio announcer.
10    Q.  Is he married?
11    A.  No, he's not.
12    Q.  Okay.
13    A.  None of them are.
14    Q.  How old is Kory?
15    A.  Kory is 31.
16    Q.  Other than your -- other than Kory,
17  do you have any other family in the Montgomery
18  area?
19    A.  Certainly.  My parents, thank God.
20  They're still living, both my mother and my
21  father.
22    Q.  And what is your mother's name?
23    A.  Her name is Lucy Johnson Jenkins.
24    Q.  And your father?
25    A.  My father is Ganzell, G-A-N-Z-E-L-L,

## 7

1  Jenkins.
2    Q.  Do either of them work?
3    A.  They're retired.
4    Q.  Do you have any brothers and sisters
5  in the Montgomery area?
6    A.  I do.  No, not in the Montgomery
7  area.  I have one brother.
8    Q.  And where does he live?
9    A.  He lives -- resides in Cincinnati,
10  Ohio.
11    Q.  Other than your parents, do you have
12  any other family in the Montgomery area?
13    A.  Well, you know, cousins, you know,
14  aunts and uncles, but no one close other than
15  that.  Why is that necessary?
16    Q.  It has to do with jury selection if
17  we ever get to it.
18    A.  Oh, I see.  Okay.  Thank you.
19    Q.  I want to know if you have any
20  family members or a witness has family members
21  that might appear on the --
22    A.  Thank you for clarifying it.
23    Q.  Certainly.  What are the -- if you
24  know, what are the last names of your aunts
25  and uncles?

## 8

1    A.  My uncle's name is Johnson, Julius
2  Johnson and Marie Johnson.  Cousins are
3  Bruces.  Samuel Bruce and Wilma German.
4    Q.  Okay.  Any other?
5    A.  Jenkins, which would be my maiden
6  name.
7    Q.  Right.
8    A.  Uh-huh.
9    Q.  And I assume you have nieces and
10  nephews?
11    A.  Well, I have nephews that live in
12  Cincinnati, Ohio.  I have one in Cincinnati
13  and one in Columbus.
14    Q.  Okay.  Any other family members in
15  the Montgomery area?
16    A.  Huh-uh.
17    Q.  You've got to say no.
18    A.  Oh.  No.  I'm sorry.
19    Q.  She can't pick up -- you have to
20  audiblize your --
21    A.  Well, no.
22    Q.  Thank you.  Do you go to church?
23    A.  I do.
24    Q.  What church do you attend?
25    A.  I'm Catholic.  I go to Saint Jude's.



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS

ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA        WASHINGTON, DC        CHICAGO, ILLINOIS        NEW YORK, NEW YORK

Telephone (404) 495-0777                Complimentary Conference Rooms              2700 Centennial Tower
Facsimile (404) 495-0766                  Throughout Georgia And                       101 Marietta Street
Toll Free (877) 495-0777                   Major Cities Nationwide                     Atlanta, Georgia 30303

www.galloreporting.com

9

1    Q.   Does Saint Jude run the school you
2    attended as a child?
3        A.   They do.
4        Q.   Are you involved in any community
5    activities?
6        A.   I am.  I belong to South Lawn
7    Community Organization.
8        Q.   What does that do?
9        A.   We are very viable in our community
10   and making sure that if there are complaints
11   we report them to the proper authorities for
12   that.  We have cleanups out there.  We have
13   activities in the park for the children.  I
14   also have coordinated and coordinate a tennis
15   program that I wrote a grant for about four
16   years ago and through bonds, they -- and the
17   mayor's office, they contributed money to me
18   to finance some children to take tennis
19   lessons.  Every child can't play football or
20   basketball.  I saw the need for that and we
21   have a course out there.  So I'm involved in
22   that.  My church, I'm involved in
23   organizations there also.
24       Q.   Do you hold any positions in the
25   church?

10

1        A.   I am the correspondence secretary
2    for the Ladies of Charity organization.
3        Q.   Now, you said you -- you process
4    complaints with respect to your community?
5        A.   Right.  Say, for example, if there
6    are cars parked in driveways that are not
7    being used, we call the proper authorities and
8    they will come out and remove those cars, that
9    kind of thing.
10       Q.   I gotcha.
11       A.   Okay.
12       Q.   Other than your church and that
13   community activity, are you involved in any
14   other organizations in Montgomery?
15       A.   No, not really.  I did some
16   campaigning.  I worked for the legislature
17   part time this year and I also did some
18   campaigning for one of the elected officials.
19       Q.   Which official?
20       A.   Representative Evan Holms.
21       Q.   Do you have any relatives who are
22   currently employed at AUM?
23       A.   No.  Well, Ruby Jenkins.  Ruby
24   Jenkins is a distant relative of mine.
25       Q.   What is the relationship between you

11

1    and Ruby?
2        A.   Well, I mean, we don't have a
3    non-favorable relationship.  We just don't get
4    to see each other that often.  But she's fine.
5    What do you mean?
6        Q.   Are you cousins?
7        A.   Yeah, we're cousins.
8        Q.   Okay.  Other than Ruby, do you have
9    any relatives who are employed or who were
10   formerly employed --
11       A.   At AUM?  No, I do not.
12       Q.   Have you talked to Ruby about
13   Ms. Ellison's lawsuit?
14       A.   Absolutely not.
15       Q.   Now, you gave an affidavit to --
16   strike that, please.  To whom did you give the
17   affidavit that you referred to earlier?
18       A.   I gave an affidavit to Mrs. Rodgers,
19   Mrs. Ellison's attorney.
20       Q.   Does Ms. Rodgers represent you in
21   any capacity?
22       A.   No, she doesn't.
23       Q.   How did it -- how did you learn of
24   the opportunity to provide an affidavit?
25       A.   Mrs. Ellison asked me if I would

12

1    give one and I told her I would.
2        Q.   And then did you go visit
3    Ms. Rodgers --
4        A.   I did.
5        Q.   -- in her office?
6        A.   I did.  I gave her the information
7    and she typed it.
8        Q.   And then you signed it?
9        A.   I signed it.
10       Q.   Have you had any further involvement
11   with Ms. Rodgers or her law firm --
12       A.   No, I have not.
13       Q.   -- since giving that affidavit?
14       A.   No, I have not.
15       Q.   Did you provide Ms. Ellison or
16   Ms. Rodgers with any documents from AUM?
17       A.   No, I did not.  There was
18   information from -- that I wrote to Mr. Tom
19   Rebel and I have that in my possession.
20       Q.   Now, tell me about how you wrote
21   that.
22       A.   Okay.  I talked with him.  I was
23   about to go out for surgery.  And he called me
24   one day shortly before then.  In fact, it was
25   the last day before I left to go.  And he



Alexander Gallo Associates, LLC
COURT REPORTING &amp; VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADER IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA        WASHINGTON, DC        CHICAGO, ILLINOIS        NEW YORK, NEW YORK

Telephone (404) 495-0777                Complimentary Conference Rooms              2700 Centennial Tower
Facsimile (404) 495-0766                 Throughout Georgia And                       101 Marietta Street
Toll Free (877) 495-0777                 Major Cities Nationwide                      Atlanta, Georgia 30303

www.galloreporting.com

---

### 13

1  asked me if I would put information in
2  writing. And I told him sure. I had no
3  problem with that because I knew I would not
4  be there. I would not be here at the
5  university. In fact, in that last sentence, I
6  told him if he had any questions or any
7  follow-up to that, I would be more than happy
8  to supply him with it. He told me to get that
9  information to Dr. Roger Ritvoe and I told him
10  that I would.
11      Q.  And did you do that?
12      A.  I gave it to my clerk to do because
13  the next day I was supposed to be leaving
14  going to the hospital. So I gave it to her.
15  She emphatically -- and I believe she did --
16  took it and gave it to Roger.
17      Q.  And you maintained a copy in your
18  possession; correct?
19      A.  I did. I did. Because I didn't
20  know if he might call me or he might need to
21  talk with me about it and I wanted to make
22  sure that I had the information in front of me
23  that I had supplied to him. Sure, I kept a
24  copy.
25      Q.  Is that the only reason you kept a

### 14

1  copy?
2      A.  That's the only reason I kept a
3  copy.
4      Q.  When he asked you to provide him
5  with this document --
6      A.  Uh-huh.
7      Q.  -- you were employed by AUM as the
8  assistant director of human resources?
9      A.  Absolutely. Absolutely.
10      Q.  And did you know that Tom Rebel was
11  involved in any sort of investigation at AUM
12  concerning any faculty member or employees
13  here?
14      A.  Well, he did not -- I mean, I
15  understood that because Debra Foster had been
16  in touch with him. So I knew. And, of
17  course, I know Mr. Rebel from the past and
18  working with the university. Sure.
19      Q.  And you knew he was representing the
20  university in its investigation; right?
21      A.  Right. Right.
22      Q.  Okay. How did you come to give that
23  document to Ms. Ellison or her lawyer?
24      A.  Because when I went to do my
25  affidavit, I showed that to her.

### 15

1      Q.  And gave her a copy of it at that
2  point?
3      A.  I did.
4          MR. DODD: Can you mark this one?
5          (Defendant's Exhibit-1 was marked
6      for identification.)
7      Q.  (By Mr. Dodd) Ms. Ward, here's
8  what's been marked as defendant's exhibit one.
9  I hand it to you and see if you can recognize
10  it, please.
11      A.  I do.
12      Q.  What is it?
13      A.  This is the letter that I sent to
14  Mr. Rebel -- that Mr. Rebel requested and I
15  sent it to Dr. Ritvoe.
16      Q.  Did you know that Dr. Ritvoe would
17  forward this to Tom Rebel?
18      A.  I didn't have any reason to believe
19  he wouldn't.
20      Q.  All right. Was February 18th, 2005,
21  your last day of employment -- last day of
22  full work at AUM?
23      A.  It was. I went to the hospital the
24  next day. I was preparing to go to the
25  hospital.

### 16

1      Q.  So you remained an employee for some
2  time after that, but you never returned to
3  work after that; right?
4      A.  Say what? I'm sorry. See, I went
5  on leave and then I came back in July.
6      Q.  Okay. And then you left --
7      A.  I had a knee replacement.
8      Q.  And you left when?
9      A.  My last day was August 31st. I
10  retired effective September 1st.
11      Q.  To be able to retire on September
12  1st, you had to give notice, did you not, of
13  at least 30 days prior to that time?
14      A.  At least 30 to 60 days. Right.
15      Q.  So your decision to retire was made
16  at least by July 31st?
17      A.  It was.
18      Q.  Okay. Ms. Ward, when you left on
19  February 18th for your surgery --
20      A.  28th.
21      Q.  I'm sorry?
22      A.  I left the 28th. I dated this on
23  the 28th of February.
24      Q.  I'm just reading this as February
25  18th. Is that incorrect?

**Alexander Gallo & Associates, LLC**
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA        WASHINGTON, DC        CHICAGO, ILLINOIS        NEW YORK, NEW YORK

Telephone (404) 495-0777                Complimentary Conference Rooms                2700 Centennial Tower
Facsimile (404) 495-0766                    Throughout Georgia And                        101 Marietta Street
Toll Free (877) 495-0777                     Major Cities Nationwide                       Atlanta, Georgia 30303

www.galloreporting.com

17

1    A.  It should have been -- I thought it
2 was -- anyway, the last day -- the last
3 day I was here.  Maybe it was the 18th.  I
4 don't know.
5    Q.  Okay.
6    A.  But I went to the hospital.  I was
7 supposed to go in the hospital later that
8 month, by the end of the first of March.
9    Q.  Is this the only document you took
10 with you when you left?
11    A.  That's the only document that I took
12 when I left here.
13    Q.  Okay.  Now -- and you returned in
14 July?
15    A.  Uh-huh.  I returned the Monday after
16 the 4th -- after we came back from the
17 holiday.
18    Q.  Now, between the time you came back
19 and the time you retired on September 1st, did
20 you take any documents?
21    A.  No, I did not.
22    Q.  So defendant's exhibit one is the
23 only document you took with you?
24    A.  That's the only document.  And as I
25 stated in my last paragraph, that's the reason

18

1 I told him that if he needed to know anything,
2 although I would be hospitalized, he could
3 call me.
4    Q.  Did you feel that you were
5 authorized to share outside of AUM a document
6 you prepared for AUM's lawyer at his request
7 that you prepared in your capacity as the
8 director of human resources?
9    A.  I was no longer employed here and I
10 certainly didn't see where that was any
11 problem.  I gave my affidavit in September.
12    Q.  Have you worked since you retired
13 from AUM?
14    A.  I did.  I did that past year.  I
15 worked for the Alabama State Legislature part
16 time.
17    Q.  You told me that.
18    A.  From January until April.
19    Q.  Is that their legislative session?
20    A.  Yes, sir.  Uh-huh.
21    Q.  Have you had any other employment?
22    A.  No.
23        MR. DODD:  Mark this one, please,
24    Bonnie.
25        (Defendant's Exhibit-2 was marked

19

1    for identification.)
2    Q.  (By Mr. Dodd) Ms. Ward, here's
3 defendant's exhibit two.  See if you can
4 identify that, please.
5    A.  Okay.  I can.
6    Q.  What is it?
7    A.  In item three --
8    Q.  Tell me what it is first.  Let's get
9 it identified first.
10    A.  Oh.  Okay.  Sure.  I do.
11    Q.  Tell us what it is.
12    A.  I do.  It's an affidavit that's
13 signed by me, Faye E. Ward.  I signed it on
14 September 20th, 2005.
15    Q.  Okay.  Now, this is the affidavit
16 you referred to earlier?
17    A.  Yes, sir.
18    Q.  I want to ask you a few questions
19 about it.
20    A.  Sure.
21    Q.  At the time you gave this affidavit,
22 did you know that Cynthia Ellison had filed an
23 EEOC charge against AUM?
24    A.  Yes, I did.
25    Q.  What was the source of that

20

1 knowledge?
2    A.  Well, I just knew she had filed one.
3    Q.  How did you know that?
4    A.  Because I worked in the office of
5 human resources.  Debra Foster had told me she
6 had filed one.
7    Q.  Do you know if at that time she had
8 filed a complaint in Federal Court?
9    A.  No, I did not.
10    Q.  Do you know if she or her lawyers
11 had threatened to file a complaint in Federal
12 Court?
13    A.  No, I did not.
14    Q.  Did you know that --
15    A.  In fact --
16    Q.  I'm sorry?
17    A.  That's okay.
18    Q.  Did you give your affidavit in order
19 to assist Cynthia Ellison and her claims
20 against AUM?
21    A.  I did.  Because I felt that she had
22 been discriminated against.
23    Q.  Is the affidavit complete with
24 respect to your knowledge of Cynthia Ellison's
25 difficulties at AUM?



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA TECHNOLOGIES

ATLANTA, GEORGIA        WASHINGTON, DC        CHICAGO, ILLINOIS        NEW YORK, NEW YORK

Telephone (404) 495-0777        Complimentary Conference Rooms        2700 Centennial Tower
Facsimile (404) 495-0766        Throughout Georgia And        101 Marietta Street
Toll Free (877) 495-0777        Major Cities Nationwide        Atlanta, Georgia 30303

www.galloreporting.com

21

1     A.   Well, I'm certain there was some
2  other factors involved, but I gave it in as
3  narrative of a form that I could in order to
4  make sure that the points were brought out.  I
5  don't know if that's what you mean.
6     Q.   Well, you mentioned all the major
7  points that you considered important --
8     A.   Yes, sir.  Uh-huh.
9     Q.   -- with respect to Cynthia Ellison's
10 difficulties at AUM, did you not?
11    A.   Right.  I did.
12    Q.   And if you felt that anything else
13 was equally as important, you would have
14 included this in your affidavit, would you
15 not?
16    A.   Possibly.
17    Q.   I'm sorry?
18    A.   Yes.
19    Q.   Okay.  Let's go through it.
20 Paragraph two, you say you were the assistant
21 director of human resources?
22    A.   Slash employment manager.  Because
23 before I left, titles changed and, of course,
24 the title that I was assigned then was
25 employment manager, which I think no longer is

22

1  the assistant director of human resource to my
2  knowledge.
3     Q.   You go on to say you were in that
4  role from 1988 to August 31st, 2005.
5     A.   Well, I came to work at AUM in 1988.
6  However, when I came here, I was a secretary.
7  I applied for a secretarial position.  My
8  boss, she promoted me within a year's time.
9  And I was assistant director of human
10 resources.
11    Q.   After a year as a secretary?
12    A.   Uh-huh.
13    Q.   Okay.  You've got to say yes.
14    A.   Yes.
15    Q.   And you were the assistant director
16 of human resources for 17 years.  Is that
17 about right?
18    A.   Right.  That's correct.
19         (Defendant's Exhibit-3 was marked
20    for identification.)
21    Q.   (By Mr. Dodd) Ms. Ward, here's
22 what's been marked as defendant's exhibit
23 number three.  See if you can identify that
24 for me, please.
25    A.   Yes.  It's an application when I

23

1  first came here to apply for a position.
2     Q.   Is that your signature on the third
3  page?
4     A.   Yes, it is.
5     Q.   Now, you said you applied to be a
6  secretary; right?
7     A.   Uh-huh.
8     Q.   You've got to say yes.
9     A.   But that was the position that was
10 available.  Secretary.  Yes.
11    Q.   Was that a posted position?
12    A.   Yes, it was.
13    Q.   Is that how you found out about it?
14    A.   Well, I really was not looking for a
15 position over here.  I was recommended.  And I
16 came over and, of course, I was working when I
17 came here.  So when I saw the position, I
18 applied for it as a secretary.  I felt that I
19 could move on up into an area of expertise
20 where I had worked and had previous
21 experience.  So --
22    Q.   What previous experience qualified
23 you to move up as you say?
24    A.   I worked for the Department of Human
25 Resources in Cincinnati, Ohio, for about 11

24

1  years prior to coming here to Alabama.
2     Q.   Is that the Hamilton County Welfare
3  Department?
4     A.   That's true.
5     Q.   And you call that the human
6  resources department?
7     A.   Well, it was human resources
8  included in that.
9     Q.   Was that your job as a human
10 resource manager?
11    A.   No.  I was a social caseworker
12 there.  But, I mean, we dealt with cases and
13 situations similar.  I mean, it all goes
14 together.  Human resources, working with
15 people, all of that aligns itself together.
16 So I guess the director thought that my
17 experience there would help me to qualify to
18 apply for this job, yes.
19    Q.   Now, which director?
20    A.   The previous director.  The lady
21 that hired me.
22    Q.   You guess that she thought your
23 experience --
24    A.   Well, she did.  I mean, she went
25 through this apparently.



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC      CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777          Complimentary Conference Rooms          2700 Centennial Tower
Facsimile (404) 495-0766          Throughout Georgia And          101 Marietta Street
Toll Free (877) 495-0777          Major Cities Nationwide          Atlanta, Georgia 30303

www.galloreporting.com

25

1    Q.  Well, that's a guess on your part,
2  is it not?  I mean, that's what you said.
3    A.  Well, it's a fact that she hired me
4  because of my experience.
5    Q.  But you had many other
6  experiences -- employment experiences rather
7  than -- other than with the Hamilton County
8  Welfare Department, did you not?
9    A.  I did.  I did.
10   Q.  Let's go through them.
11   A.  All right.
12      MS. RODGERS:  Question.  The resume
13   that you're -- is this still part of the
14   application for employment packet or is
15   it a different exhibit?
16      MR. DODD:  It's one document.
17      MS. RODGERS:  Okay.
18   Q.  (By Mr. Dodd) Let me ask you a
19  little bit about your schooling first,
20  Ms. Ward.
21   A.  Sure.
22   Q.  And you received your undergraduate
23  degree from Alabama University --
24   A.  I did.
25   Q.  -- in 1967 --

26

1    A.  I did.
2    Q.  -- with a bachelor of science degree
3  in business administration?
4    A.  In economics.  Exactly.
5    Q.  And a minor in economics; right?
6    A.  Right.
7    Q.  Now at Alabama State, did you take
8  any courses in human resources management?
9    A.  I had some social work classes,
10  sure.
11   Q.  Well, did you take any courses in
12  human resource management?
13   A.  No, I didn't.
14   Q.  By the time you graduated from
15  Alabama State, did you have any experience
16  whatsoever in human resources management?
17   A.  No, I didn't.
18   Q.  Did you have any training in equal
19  employment opportunity?
20   A.  No, I didn't.  That's why I didn't
21  apply for the position when it was posted.
22   Q.  Now, which position are you
23  referring to now?
24   A.  The one that Ms. Foster applied for
25  and received.

27

1    Q.  In 2001?
2    A.  Because I was asked if I wanted to
3  apply for the position.  And I said no.
4    Q.  And you said no because you didn't
5  consider yourself qualified?
6    A.  No.  It wasn't because I wasn't
7  qualified.  When the interim -- I served as
8  interim director when the director left.  It
9  wasn't because I doubted my capabilities of
10  doing the job that I was doing.  Not at all.
11   I just -- I was going to look at
12  retiring in a few years, maybe four or five
13  years up the road.  I thought maybe bringing
14  someone new in that would help to bring better
15  and newer -- well, newer ideas to the table
16  would also help me to work with Ms. Foster in
17  bringing about some changes and doing some
18  things here that I wanted to do.
19   No, I don't think for a minute that
20  I was not unqualified to do the job that I was
21  doing.  No, I do not.
22   Q.  But, nonetheless, you elected not to
23  apply for that job?
24   A.  I didn't.  No, I didn't.
25   Q.  And you said earlier that your lack

28

1  of training in equal employment opportunity
2  was one reason you did not apply?
3    A.  The position is a dual position.
4  It's a director of human resources/EEO
5  affirmative action person.  And at that time,
6  the chancellor said that she could not afford
7  to divide the position and that it would have
8  to be -- it would have to go as director and
9  EEO.  I don't have any experience at EEO,
10  affirmative action.  So that was my main
11  reason why I didn't apply for the job, not
12  because I didn't think I was capable to do it.
13  I'd had some very good training since I've
14  been here and think I did a pretty good job.
15   Q.  Okay.  All right.  Let's look at
16  your work history.
17   A.  Sure.
18   Q.  It looks like you worked from 1968
19  to 1977 at the Hamilton County Welfare
20  Department.
21   A.  I did.
22   Q.  Right.
23   A.  In Cincinnati, Ohio.
24   Q.  And what was your primary duty
25  there?



ALEXANDER GALLO & ASSOCIATES, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS

ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC          CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777                    Complimentary Conference Rooms                    2700 Centennial Tower
Facsimile (404) 495-0766                       Throughout Georgia And                            101 Marietta Street
Toll Free (877) 495-0777                       Major Cities Nationwide                         Atlanta, Georgia 30303

www.galloreporting.com

## 29

1   A. I was a social caseworker. I went
2   out. I visited families. Sometimes I had
3   to -- I worked with ADC mothers. I had to
4   abide by the laws and the rules and
5   regulations that the state of Ohio had
6   interjected. I had to go out and make people
7   eligible for food stamps, if they were
8   eligible for that. I had meetings to go to,
9   sometimes we had to get judgments where we had
10  to go into homes and take people's children.
11  So there were a multitude of things that we
12  did.
13      Q. Did you have any human resources
14  responsibilities with respect to other
15  employees in the Hamilton County Welfare
16  Department?
17      A. No, I did not.
18      Q. All right. Now, after that job, you
19  worked from 1979 to --
20      A. I moved to Alabama and I worked for
21  the Montgomery Police Department.
22      Q. And what was your job there?
23      A. I was a complaint clerk. I worked
24  on the desk.
25      Q. And what were your primary

## 30

1   responsibilities?
2       A. If anyone called in with a
3   complaint, I had to code a card, send it to
4   the dispatcher, be very diplomatic about it,
5   be very calm about it. Because there was
6   oftentimes a robbery or something in process.
7   So that gave me a lot of experience. In fact,
8   they wanted me to stay there because I was
9   able to deal with the public.
10      Q. Did you have any human resources
11  responsibilities with respect to employees of
12  the Montgomery Police Department in that job?
13      A. No, I didn't.
14      Q. The job after that was with W.J.
15  Rhodes Construction Company?
16      A. Right.
17      Q. From April 1980 to February 1981?
18      A. Yes. I was an office manager there.
19      Q. What did you do as an office
20  manager?
21      A. I maintained the office. I answered
22  the phone. I did payroll. I did -- I went to
23  attend business lettings for him in the
24  office-type manager. They were held once a
25  month. People from all over the state, we

## 31

1   met. And, of course, they talked about the
2   different concerns and opportunities and
3   biddings for his company.
4       Q. Did you have any human resources
5   responsibilities as the office manager in that
6   job?
7       A. No, I didn't.
8       Q. Now, after that, it looks like you
9   worked for the house of representatives --
10      A. I did.
11      Q. -- in Montgomery?
12      A. I did.
13      Q. Is it fair to say off and on for
14  several sessions?
15      A. Several. Yeah, I did. For about
16  five or six years.
17      Q. What was your job there?
18      A. My job was to assist the
19  representatives by pulling bills, going out to
20  the house, making sure that information that
21  was going to be discussed on a calendar for
22  that day was put in place, to help the
23  children that came to work for us as clerks,
24  to go out there and to make sure that they
25  were following the guidelines for what they

## 32

1   were supposed to do as far as assisting
2   representatives upon their request.
3       Q. And your resume describes your job
4   title as a clerk/typist receptionist?
5       A. Right.
6       Q. Is that accurate?
7       A. That's accurate.
8       Q. In your job in the house of
9   representatives, did you have any human
10  resources responsibilities?
11      A. No, I didn't.
12      Q. Okay. Now, your job after that was
13  with --
14      A. Was Striping Construction.
15      Q. From 1984 to 1985 with Quality
16  Striping and Construction?
17      A. Uh-huh. It was still
18  construction-type office manager there.
19      Q. Your job title and your resume shows
20  secretary/office manager?
21      A. That's right.
22      Q. What did you do in that position?
23      A. Basically the same thing. Kept the
24  office, did payroll, answered the phone, took
25  messages, went to meetings in the absence of

**Alexander Gallo & Associates, LLC**
COURT REPORTING • VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC     CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777         Complimentary Conference Rooms          2700 Centennial Tower
Facsimile (404) 495-0766            Throughout Georgia And                101 Marietta Street
Toll Free (877) 495-0777            Major Cities Nationwide                Atlanta, Georgia 30303

www.galloreporting.com

---

33

1 the manager.
2    Q.  Did you have any human resources
3 responsibilities?
4    A.  No, I didn't.
5    Q.  And after that job, you worked for
6 about a year at --
7    A.  Alabama State.
8    Q.  -- Alabama State as a secretary?
9    A.  I did.  To the dean in the College
10 of Education.
11    Q.  And then after that, you worked for
12 the Montgomery --
13    A.  Montgomery County Commission.  Then
14 I came here.
15    Q.  Now, what was your job --
16    A.  Probate -- I was a clerk there.  I
17 worked there in the probate office.
18    Q.  Did you have any human resources
19 responsibilities there?
20    A.  I didn't.
21    Q.  Now, attached to your application
22 for employment in defendant's exhibit three is
23 what appears to be your resume.  Is that
24 accurate?
25    A.  At that time, yes.  It's changed

---

34

1 since then, but this is it.
2    Q.  All right.  The resume you submitted
3 to AUM in 1987?
4    A.  Right.
5    Q.  And everything on that resume is
6 correct, is it not?
7    A.  It is.  What's the big difference in
8 human resources experience and the experience
9 that I've had here?  Human resources is
10 knowing how to deal with people.  You read
11 guidelines and you try to abide by them.
12 What's the difference?
13    Q.  Is there anything else -- is there
14 anything else involved in human resources
15 other than reaching out to people?
16    A.  Sure, it is.  It's to make sure that
17 things are properly -- situations are properly
18 handled and carried out.
19    Q.  Is there anything else involved?
20    A.  There's a lot more involved.
21 Ms. Foster can tell you that.
22    Q.  Let's talk about the job duties that
23 are identified in your affidavit.
24    A.  Okay.
25    Q.  You got five subparts in paragraph

---

35

1 two that talk about your job duties; right?
2    A.  Right.
3    Q.  Are those your main -- the main
4 duties you had in your job as assistant
5 director?
6    A.  They were.
7    Q.  And was that as of --
8    A.  The time I left.
9    Q.  All right.  In your affidavit, have
10 you left out any significant job duties for
11 which you had responsibility?
12    A.  Well, no, I think this just about
13 covers everything that I did.
14    Q.  The reason I ask that is because in
15 paragraph two you say part of my job duties
16 included, but is not limited to, the
17 following.  And I'm concerned -- or, I'm
18 interested in what job duties you may not have
19 included there.
20    A.  Well, you can strike the part of.
21 Those were my job duties.
22    Q.  Okay.
23    A.  And others as assigned.  But, of
24 course, mine was just basically what I've got
25 listed here is what I did.

---

36

1    Q.  What you've got listed in paragraph
2 two is an accurate and complete category of --
3 categorization of your job duties?
4    A.  Of what I did, yes.
5    Q.  All right.  Let's look at
6 subparagraph A.  You say your job duties
7 included to manage the recruitment and
8 employment process for AUM.  All right.  What
9 does that mean?
10    A.  That means that I was in charge of
11 interviewing applicants for positions after
12 there were postings for a job.  We had to post
13 the position when it became available.  My
14 clerk would post it.  It would be open for a
15 number of days.  After that, we referred
16 applicants to the respective department.
17    And, of course, I had an applicant
18 flow tracking which gave a breakdown and that
19 was basically done for the EEO officer.  I had
20 to send a breakdown of the people that applied
21 for a position by sex and race.  And that
22 was -- that was part of that process.
23    And after the position was filled,
24 after we made the referrals, then I met with
25 the person or individual that was hired and I

---



**Alexander Gallo & Associates, LLC**
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA TECHNOLOGIES

ATLANTA, GEORGIA     WASHINGTON, DC     CHICAGO, ILLINOIS     NEW YORK, NEW YORK

Telephone (404) 495-0777
Facsimile (404) 495-0766
Toll Free (877) 495-0777

Complimentary Conference Rooms
Throughout Georgia And
Major Cities Nationwide

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

www.galloreporting.com

---

37

1  did a benefit interview with them.
2     Q.  Okay.  We're down in subparagraph B
3  now, aren't we?
4     A.  Yeah.  Uh-huh.  Uh-huh.
5     Q.  Okay.  So subparagraph A talks about
6  the --
7     A.  The screening.
8     Q.  -- filling of positions at AUM?
9     A.  And interviewing if there was an
10  applicant that came in.  Most of the time I
11  tried to always talk to applicants who were
12  applying.  But, of course, there was just so
13  many sometimes because of the vast number of
14  applicants who applied, I just did not have
15  the time to go into that.  But I tried to do
16  that as often as I could.  And then we would
17  refer them to the respective department that
18  was hiring.
19     Q.  It sounds to me like you're talking
20  about there are certain procedures in place
21  here that you have to follow in terms of
22  posting positions, bringing people in, filling
23  positions, getting them interviewed and that
24  sort of thing.
25     A.  There was always a process that we

---

38

1  used, sir.
2     Q.  Okay.
3     A.  It was hard not to.
4     Q.  And you tried to follow that process
5  as best you can; right?
6     A.  I do.  I did.
7     Q.  All right.  Let's look at B.
8     A.  Okay.
9     Q.  Subparagraph B.
10     A.  Okay.
11     Q.  Met individually with all new hires
12  for explanation of payroll and benefit
13  information.
14     A.  Okay.
15     Q.  Tell me what that means.
16     A.  Okay.  When anyone was hired, they
17  had to come to my office and I would do a
18  process of benefits.  I made a packet of
19  information for them.  I explained the
20  benefits to them.  They signed up for those
21  they wished to have, those that they didn't
22  want to, like the health insurance, the dental
23  insurance.  We all had to participate in
24  teachers' retirement.  There was no option to
25  that.  We had to do that.  And they would take

---

39

1  out five percent, of course, of our gross
2  income that went into the retirement system of
3  Alabama.  We had other -- like a voluntary
4  retirement that they could join which was
5  optional.  The mandatory retirement was not.
6  So that took every bit of 30 to 45 minutes for
7  me to complete an interview with the
8  individuals.
9     Q.  For each person?
10     A.  For each person, yes.  And I also
11  did for faculty and staff.
12     Q.  I imagine you had to explain a lot
13  of that to them, did you not?
14     A.  I did.  I did.  Absolutely.  I could
15  not afford to push a packet in front of them
16  and tell them to go for it.  I had to sit
17  there and go through it with them because that
18  helped me to get them on.  Because it gave
19  them a better understanding.
20     Q.  Now, is this the opportunity where
21  they had to make their income tax withholding
22  elections and that sort of thing as well?
23     A.  They did.  They did.  They did that.
24  That was handled before it got to me.  They
25  did the I-9 and the taxes and that was -- then

---

40

1  the clerk would bring that in to me for me to
2  actually have my interview with the person.
3     Q.  Okay.  Now, did you have primary
4  responsibility for meeting with the new
5  employees and going over this with them?
6     A.  I did.  I did.  That was almost
7  always my job since I was in that position.
8     Q.  And you had the primary
9  responsibility for managing the recruitment
10  employment process, too, as well?
11     A.  Well, yes, because every time we
12  posted a job, we had to get it out to the
13  proper places.  We had to list it with the
14  State employment service.  We put it on the
15  job line.  And it was my responsibility, but,
16  of course, I could delegate that to my clerk
17  to make sure that she did that and it was done
18  in a timely manner.
19     Q.  Look at subparagraph three.
20     A.  Okay.
21     Q.  It looks like this talks about
22  explaining the various policies that AUM had
23  in place for its employees beyond payroll and
24  benefits; right?
25     A.  Uh-huh.



Alexander Gallo & Associates, LLC
COURT REPORTING · VIDEO SERVICES
TRIAL PRESENTATIONS

ATLANTA, GEORGIA        WASHINGTON, DC        CHICAGO, ILLINOIS        NEW YORK, NEW YORK

Telephone (404) 495-0777              Complimentary Conference Rooms              2700 Centennial Tower
Facsimile (404) 495-0766                    Throughout Georgia And                      101 Marietta Street
Toll Free (877) 495-0777                      Major Cities Nationwide                   Atlanta, Georgia 30303

www.galloreporting.com

41

1    Q.  You've got to say yes.
2    A.  Yes.  Yes.  Yes.
3    Q.  Okay.  Would you have -- how would
4  you fulfill that obligation?  You say you
5  provided information and assistance.  Did you
6  give them a packet of information?
7    A.  Okay.  On-the-job injuries, we
8  had -- we had -- we had a program.  And, of
9  course, if people called and they wanted
10  information, we just gave them the forms.
11    And, of course, before I left, they
12  started a new procedure that -- there was a
13  procedure for like on-the-job injuries.  They
14  would call.  We now give them a number to call
15  and they talk to the person there to report an
16  on-the-job injury.
17    Q.  Okay.  What I'm trying to find out,
18  though, is this something that you did at the
19  beginning of somebody's employment?
20    A.  No, no.
21    Q.  Or was this your responsibility
22  throughout their employment whenever they had
23  a question?
24    A.  No.  If someone -- I mean, we told
25  them about it.  If you have, you know, an

42

1  on-the-job injury, you need to let HR know
2  about that.
3    Q.  Right.
4    A.  That was discussed in the initial
5  interview --
6    Q.  Did you --
7    A.  -- where we signed them up for
8  benefits.
9    Q.  Okay.  But throughout an employee's
10  term of employment at AUM, were you primarily
11  responsible for answering questions they might
12  have about FMLA, sick leave, vacation, that
13  sort of thing?
14    A.  Yeah.  Debra Foster, as the
15  director, could or I could.  She had a list of
16  guidelines that we -- of names that -- we had
17  different jobs to do, so that was one of my
18  duties to do.
19    Q.  Okay.  Were you -- would you say you
20  were primarily responsible for that -- for
21  that obligation?
22    A.  Well -- well, I guess I could have
23  been.  But primarily -- I would say yes, along
24  with Debra.
25    Q.  Okay.  Look at subparagraph D,

43

1  planned and conducted/coordinated various
2  employee programs ranging from --
3    A.  New employee orientation.
4    Q.  -- to driver education training.
5  Tell me a little bit about what that means.
6    A.  Okay.  The driver education means
7  that everyone that drove a State vehicle had
8  to go through a driver education program.
9  Which I would get in touch with the public
10  safety department.  They would send out a
11  representative from that office, basically
12  someone in education that would teach.  I
13  would send out an e-mail campus-wide and
14  employees who had any need to drive the State
15  vehicles would have to go through that
16  training.  I maintained a log of that and I
17  had to send it over to risk management at
18  Auburn University once it went through
19  Ms. Wanda Blake's office.  She was the one
20  that looked at it.  So we kind of coordinated
21  that together.
22    Q.  And you also mentioned the annual
23  retirees' reunion.
24    A.  Right.
25    Q.  What is that?

44

1    A.  Okay.  The retirees' reunion, that
2  was a service that I provided to employees in
3  talking to Mr. Don Yancey from the State
4  retirement system to come out and talk with
5  employees, not those who were about to retire,
6  but anyone who wanted to know about retirement
7  and how it worked.  So I had those -- I tried
8  to have those about twice a year.
9    Q.  Okay.
10    A.  So I coordinated that.
11    Q.  Now, look at subparagraph E.
12    A.  Uh-huh.
13    Q.  Let me back up.  You were primarily
14  responsible for the various employee programs?
15    A.  I was.
16    Q.  You put them together?
17    A.  I put them together.
18    Q.  And coordinated them?
19    A.  Coordinated them.  I did.
20    Q.  Look at subparagraph E were you say
21  you assisted and handled employee relations
22  situations.  What does that mean?
23    A.  Okay.  If an employee would call, a
24  disgruntled employee or someone who had a
25  problem, then I would either talk to that



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA        WASHINGTON, DC        CHICAGO, ILLINOIS        NEW YORK, NEW YORK

Telephone (404) 495-0777                Complimentary Conference Rooms                2700 Centennial Tower
Facsimile (404) 495-0766                  Throughout Georgia And                        101 Marietta Street
Toll Free (877) 495-0777                   Major Cities Nationwide                       Atlanta, Georgia 30303

www.galloreporting.com

---

45

1  person or send them to Debra Foster. It all
2  depended on the magnitude of it.
3      Q.  When you say it all depended on the
4  magnitude --
5      A.  Well, if it was something that was a
6  discrimination case or hostile environment or
7  whatever that was. That was an EEO situation.
8      Q.  And what was --
9      A.  Some supervisors would call me and
10 ask me, well, I need to discipline this
11 employee. Then there was a process for that
12 that they had to follow and they could do a
13 first or second or third warning.
14     Q.  Are you saying that if the problem
15 that somebody called you about sounded more
16 like an EEO-type problem, you would send it to
17 Debra Foster?
18     A.  In fact, most of them I informed her
19 about them or referred her -- referred them to
20 her. I'm not an EEO officer.
21     Q.  Okay. You don't have any EEO
22 training; right?
23     A.  No, I don't.
24     Q.  Okay. So you would normally refer
25 those type of issues to Debra Foster?

---

46

1      A.  Absolutely. Absolutely.
2      Q.  But you knew enough about the
3  disciplinary --
4      A.  Process.
5      Q.  -- process that you could handle
6  those type of --
7      A.  Right. I could tell them what they
8  needed to do.
9      Q.  Okay. And would that include what
10 process they needed to follow if they had a
11 complaint of discrimination?
12     A.  Yes.
13     Q.  Okay. Or what they needed to do
14 under the disciplinary policy?
15     A.  Right.
16     Q.  But you weren't primarily
17 responsible for those activities, were you?
18     A.  No, I wasn't.
19     Q.  You were an assistant in that role,
20 were you not?
21     A.  Right. Right.
22     Q.  An assistant to Debra Foster?
23     A.  Right.
24     Q.  Let's look at paragraph three.
25     A.  Okay. And before we go further in

---

47

1  that paragraph three, that January 2005 should
2  have been 2004.
3      Q.  Well, is it 2005 or 2004?
4      A.  I just said it should have been
5  2004.
6      Q.  Oh, it should have been?
7      A.  Yes.
8      Q.  I thought you said it could have
9  been.
10     A.  No.
11     Q.  So that's probably a typist error?
12     A.  Yes, sir.
13     Q.  Okay.
14     A.  That was really when we met with
15 Mr. --
16     Q.  Do you want to make any other
17 corrections to your affidavit?
18     A.  No, sir. That's the only one.
19     Q.  Okay. So in January 2005, Cynthia
20 Ellison came to the human resources office to
21 report concerns she had with Chris Mahaffy?
22     A.  Yes, sir.
23     Q.  Did Cynthia Ellison come to your
24 office?
25     A.  She did. In fact, she had called me

---

48

1  because she was very upset. And this started
2  around 2003, 2004. Because she thought that
3  she was put in a hostile environment because
4  of the way Chris Mahaffy was acting toward
5  her.
6      Q.  All right. What -- she called you
7  and then you met with her; right?
8      A.  Yes. Yes, sir.
9      Q.  What detail did she give you when
10 she called you?
11     A.  She just said I am just so nervous.
12 Chris is frightening me with his behavior.
13 And I asked her then -- I said have you spoken
14 with your superior. My recommendation always
15 when anyone came, not only Cynthia, but if
16 anyone would come, I would send them back to
17 their supervisor to talk with their supervisor
18 before --
19     Q.  That's what the policy says, isn't
20 it?
21     A.  Uh-huh. And, you know, then she
22 came over and she talked with me. And, you
23 know, I said, well, go back and talk with
24 them. She went back and talked with them as
25 far as I know.



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS

ATLANTA'S TECHNOLOGICAL LEADER IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA    WASHINGTON, DC    CHICAGO, ILLINOIS    NEW YORK, NEW YORK

Telephone (404) 495-0777          Complimentary Conference Rooms          2700 Centennial Tower
Facsimile (404) 495-0766              Throughout Georgia And                101 Marietta Street
Toll Free (877) 495-0777              Major Cities Nationwide              Atlanta, Georgia 30303

www.galloreporting.com

49

1   Q. With who?
2   A. With at that time Dr. Bob Elliott.
3   Q. Okay. Let's back up. When you
4   talked to her on the telephone, you told her
5   to go talk to her supervisor because that's
6   what the policy requires; right?
7   A. Uh-huh. Right.
8   Q. Do you know if she did that after
9   you and she talked on the telephone?
10  A. She did. She did. Because she said
11  to no avail.
12  Q. She talked to Bob Elliott?
13  A. At that time. At that time it was
14  to no avail. And she came over later maybe in
15  about another week or so and we talked about
16  it.
17  Q. Now, if an employee such as Cynthia
18  Ellison does not get any satisfaction in
19  complaining to her immediate supervisor, at
20  that point she's free to come to HR and
21  complain?
22  A. Yes, sir.
23  Q. Is that how you interpreted her
24  conduct at that point?
25  A. I would. And I would have referred

50

1   her to the director of human resources --
2   Q. And did you do that?
3   A. -- since she's the EEO officer.
4   Q. You referred her to Debra Foster?
5   A. I told her she was going to need to
6   talk to Debra Foster.
7   Q. Okay. Was that the end of your
8   involvement in that reporting of her
9   behaviors?
10  A. Well, no. Because nothing had
11  happened. So she came back to me again and
12  she called me. And she came back to me
13  several times.
14  Q. Several times?
15  A. Uh-huh.
16  Q. Did you keep a record of these
17  visits?
18  A. Not necessarily. I didn't. Huh-uh.
19  I just know that she was upset. She was a
20  nervous wreck. She appeared to be. I said,
21  well, you're going to have to do something.
22  At that time, I think, in a conversation later
23  with Dr. Glen Ray who they were also -- this
24  was during a search for the dean's position.
25  We had a search for the Dean in 2003, 2004,

51

1   dean of sciences. At that time, I think
2   Dr. Mahaffy was apparently exhibiting these
3   attitudes toward Ms. Ellison because she was
4   on the search committee.
5       I also during a meeting that
6   Mrs. Foster and I later had with Dr. Glen Ray,
7   Dr. Moody -- and, of course, there were some
8   other people in the department she talked to,
9   but I was not involved in that -- they said --
10  they noticed his behavior was of such a
11  magnitude that they referred him to a
12  psychologist -- psychiatrist.
13      So, you know, she was back and forth
14  and feeling she was in a hostile environment
15  because nobody was doing anything. Then later
16  in around November/December 2004, she came
17  back to our office and that's -- I said you've
18  got to talk to Debra.
19  Q. Let's stay in January 2004 for right
20  now.
21  A. Okay. Okay. All right. That's
22  fine.
23  Q. We'll get to that. Don't worry
24  about it.
25  A. Okay. Okay.

52

1   Q. She said she called you. Do you
2   remember what date she called you the first
3   time?
4   A. Well, it was probably -- it was in
5   January. Sometime in January. I don't know.
6   Early January, December/January.
7   Q. Okay.
8   A. I don't remember exactly to be
9   honest.
10  Q. Well -- so when you say January 2004
11  in your affidavit, it could very well be
12  December 2003?
13  A. No, it could have been -- it was
14  January 2004.
15  Q. Now, she called you in January?
16  A. But, now, she had complaints about
17  this from 2003.
18  Q. That she mentioned to you when she
19  called you?
20  A. Uh-huh.
21  Q. Okay. We are going to get to that.
22  A. She said this has been going on for
23  a long time.
24  Q. When she called you in
25  January 2004 --



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA        WASHINGTON, DC        CHICAGO, ILLINOIS        NEW YORK, NEW YORK

Telephone (404) 495-0777            Complimentary Conference Rooms            2700 Centennial Tower
Facsimile (404) 495-0766              Throughout Georgia And                   101 Marietta Street
Toll Free (877) 495-0777              Major Cities Nationwide                  Atlanta, Georgia 30303

www.galloreporting.com

53

1    A. Uh-huh. Yes.
2    Q. -- now, this is the first complaint
3 she made to you -- Cynthia Ellison has made to
4 you about Chris Mahaffy?
5    A. Right.
6    Q. Okay. List for me the things that
7 she complained about.
8    A. She said that he would come and
9 stare in her office. He would stare at her.
10 He wouldn't say anything to her. He would
11 stand in her doorway and stare at her. She
12 went to work one morning. I guess she would
13 go into the office early, maybe seven o'clock,
14 to catch up on some work. She said he would
15 sit there. He was sitting there one morning
16 crying --
17    Q. Okay.
18    A. -- and dressed in an overcoat, had a
19 backpack that she had no idea what was in it.
20 And those are some of the things I remember
21 she mentioned to me.
22    Q. Do you recall any other events or
23 behaviors that Cynthia Ellison mentioned to
24 you in January 2004 about Chris Mahaffy's
25 behavior that she found offensive?

54

1    A. No.
2    Q. When she mentioned these behaviors
3 to you, did she tell you when each of the --
4 each of them occurred?
5    A. No. We didn't go into that.
6    Q. Did you ask her?
7    A. I didn't.
8    Q. Okay. And these are the events that
9 you say made her nervous and were frightening
10 her?
11    A. Right. Because he would just stare
12 at her. She said he would just sit there,
13 stand up and just stare at her. And, I mean,
14 it would make me uncomfortable.
15    Q. Did Cynthia Ellison ever tell you
16 that Mahaffy touched her?
17    A. No.
18    Q. Did Cynthia Ellison ever tell you
19 that Mahaffy said anything threatening or
20 intimidating to her?
21    A. He said that blacks should not be in
22 responsible positions.
23    Q. Okay. That's another event. You
24 didn't mentioned that to me a minute ago. You
25 just recalled that?

55

1    A. Well, I recalled it when you put it
2 the way you did.
3    Q. Okay. When did that occur?
4    A. That occurred I believe in 2004.
5 2004, 2005. I don't know.
6    Q. Sometime in those two years?
7    A. I don't remember. Right. I
8 don't -- I don't want to get into specific
9 dates with you because I really don't remember
10 them.
11    Q. Is that something you heard or is
12 that something that Cynthia Ellison told you?
13    A. Well, that's what I heard from one
14 of the -- the managers in her department say.
15 And Cynthia Ellison told me he said it also.
16 And one of the faculty members said he said
17 that.
18    Q. All right. Which manager told you?
19    A. Dr. -- Dr. Glen Ray in an interview
20 that Ms. Foster and I had with him.
21    Q. When was that?
22    A. That was in December 2004.
23    Q. All right. And when did -- strike
24 that. Who else told you that Mahaffy made
25 that remark?

56

1    A. Well, Ms. Ellison said that he made
2 that remark to her. In fact, Debra Foster
3 said that Mahaffy said in a meeting that
4 Ms. Ellison and I had with Ms. Foster, she
5 said that Chris Mahaffy said that blacks
6 should not be in responsible positions.
7 Ms. Ellison said, well, then, Ms. Foster, you
8 should feel offended. I know I was as an
9 African American.
10    Q. When did Cynthia Ellison tell you
11 that Mahaffy made the remarks about blacks
12 being in power?
13    A. That was in December.
14    Q. Of?
15    A. '04.
16    Q. '04. Okay. So if you refer back to
17 your affidavit, you're talking about
18 January 2004. That remark did not come up at
19 that time; right?
20    A. No, it didn't.
21    Q. That's what I was trying to get at.
22    A. Oh. Okay. No, it didn't.
23    Q. I'm just trying to put things in
24 order here.
25    A. Okay. That's fine.



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC          CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777          Complimentary Conference Rooms          2700 Centennial Tower
Facsimile (404) 495-0766          Throughout Georgia And          101 Marietta Street
Toll Free (877) 495-0777          Major Cities Nationwide          Atlanta, Georgia 30303

www.galloreporting.com

57

1  Q.   Now, when she called you in
2  January 2004, you told her to go talk to her
3  supervisor?
4  A.   I did always.
5  Q.   Which was Dean Bob Elliott?
6  A.   Bob Elliott at the time.  Then after
7  Bob Elliott left -- I don't remember exactly
8  when he retired, but it was shortly thereafter
9  I believe.  And then Brad Moody was the
10 interim dean before Lawal got there.
11 Q.   Now, do you know if Cynthia Ellison
12 went to talk to Bob Elliott about the behavior
13 she complained to you about?
14 A.   I don't know it, but I firmly
15 believe that she did.
16 Q.   Did she tell you she did?
17 A.   She did.
18 Q.   All right.  And she told you that --
19 I think your words were it was to no avail.
20 A.   Right.
21 Q.   What else did she tell you about her
22 meeting with Bob Elliott?
23 A.   She said nobody was doing anything
24 at that particular time.  But later I found
25 out that Bob -- that he had -- Mahaffy had

58

1  been referred for psychiatric training.
2  Q.   Okay.
3  A.   And I know that he also had -- he
4  had made a statement, I think, saying that a
5  student was too young to be admitted to
6  pharmacy school and that, of course -- we
7  brought some training from one of the local
8  law firms that came out and did some training
9  that was supposed to be a help factor, I
10 guess, with him then.  I don't really know.
11 Q.   Now, when Cynthia Ellison reported
12 to you that her meeting or conversation with
13 Bob Elliott did not produce any results, what
14 was your reaction, your response?
15 A.   Well, my response to her is but
16 surely they're going to help you.
17 Q.   Who is they?
18 A.   The dean.
19 Q.   You're talking about Bob Elliott?
20 A.   Dean Bob Elliott.  Right.  Bob
21 Elliott and Glen Ray who was the associate
22 director I believe.
23 Q.   Wasn't Glen Ray Brad Moody's
24 associate dean?
25 A.   Right.  Right.

59

1  Q.   Was he also Bob Elliott's associate
2  dean?
3  A.   I think he was.
4  Q.   Now, did Cynthia Elliott tell you in
5  person or on the telephone that her meeting
6  with Bob Elliott was to no avail?
7  A.   No.  In person.  She came over to
8  the HR office.
9  Q.   Okay.  And then you referred her to
10 Debra Foster; is that correct?
11 A.   And I told her if she did not have
12 any response from her department head, her
13 next step would be to go to Debra Foster, the
14 EEO officer, and lodge a complaint.
15 Q.   And when you say department head,
16 you're referring to Dean Elliott?
17 A.   Right.
18 Q.   And your referral of Cynthia Ellison
19 to Debra Foster was consistent with --
20 A.   The policy and procedure.
21 Q.   -- right -- for reporting this type
22 of --
23 A.   Exactly.  She was reluctant about
24 going to Mrs. Foster and I said why.  And she
25 said because she hasn't done anything for me

60

1  in the past.  There was an Allison Stevenson's
2  case when Ms. Stevenson called her a nigger.
3  And, of course, it was -- at that time,
4  Ms. Foster said she didn't have -- she had
5  never had a case like that before.  She wasn't
6  quite sure how she should handle it.  So I
7  think in between that time, that's probably
8  why she was even reluctant about going to
9  Ms. Foster.  But I knew that I was not the EEO
10 officer and I could not handle the situation.
11 Q.   In your affidavit in paragraph
12 three, the events you're referring to there
13 occurred after the Allison Stevenson --
14 Allison Stevens incident; is that right?
15 A.   I don't remember when that Allison
16 Stevenson situation happened.  I know it
17 happened, but as far as the timeframe on it, I
18 would just be remiss from giving you a date
19 that I'm not sure of.
20 Q.   I understand, but what you're
21 talking about in paragraph three is Cynthia
22 Ellison coming to you about Mahaffy's -- about
23 Mahaffy?
24 A.   Yes, sir.
25 Q.   And not about Allison Stevens?



Alexander Gallo & Associates, LLC
COURT REPORTING   VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC        CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777        Complimentary Conference Rooms        2700 Centennial Tower
Facsimile (404) 495-0766              Throughout Georgia And                101 Marietta Street
Toll Free (877) 495-0777             Major Cities Nationwide             Atlanta, Georgia 30303

www.galloreporting.com

61

1    A.  No.  But I'm just telling you why
2 maybe.  Because I don't think at that
3 particular time she went straight to
4 Ms. Foster about the situation.
5    Q.  You don't think she did?
6    A.  Not at that particular time, no.
7 Because I think she -- her feeling was that
8 she wasn't going to do anything for her any
9 way.
10   Q.  As a result of what happened with
11 Allison Stevens?
12   A.  Yes, sir.  Or whatever had happened.
13 Plus there was another situation that had
14 happened with a student -- an employee in the
15 sciences -- in the sciences department who had
16 applied for a position.  And his name was
17 Jesse Clayton.  And I know that he was -- he
18 came with a complaint to us and he said that
19 Ms. Foster told him go back over there and
20 don't make waves; they weren't going to do
21 anything for him.  So that was a situation
22 that Ms. Ellison was very well aware of.  And
23 I guess because of that, she did not go to
24 Ms. Foster.
25   Q.  If Cynthia Ellison or any employee

62

1 refused to go to, you know, the director of
2 human resources, what other recourse do they
3 have under the policies that exist here?
4    A.  Well, they could always go to the
5 chancellor and, you know, I think in one
6 situation she did.  But she eventually went to
7 Ms. Foster.
8    Q.  Okay.
9    A.  She eventually went to her.
10   Q.  Okay.  With reluctance; right?
11   A.  I would say so, because she -- she
12 didn't think she was going to do anything to
13 help her I guess.
14   Q.  And is it your testimony that you
15 didn't take any notes about any of these
16 meetings or conversations with Cynthia
17 Ellison?
18   A.  I didn't with Cynthia.  I did --
19 well, when she met with Debra -- when she met
20 with Debra, we met together.  Because we
21 had -- once the investigation was launched,
22 there were several meetings.
23   Q.  Okay.  Well, I'm not there yet.
24   A.  Okay.
25   Q.  We'll get there.  Would you agree

63

1 with me that that was the end of 2004 and
2 beginning of 2005?
3    A.  Uh-huh.  Yes, sir.
4    Q.  Let's stick with 2004 for a few
5 minutes.
6    A.  Okay.
7    Q.  I know you didn't mention in your
8 affidavit, but let's talk about the Allison
9 Stevens event for a moment.
10   A.  Okay.
11   Q.  And, first, tell me what your
12 involvement in that was.
13   A.  I really had little involvement.
14 Debra told me about the situation.  Cynthia
15 told me about it.  She said I've had this
16 confrontation.  I didn't make any notes to
17 this either.  I am a lot of times a sounding
18 board and was for a lot of employees, although
19 I know how important it is to document.
20   But I said what happened.  She said,
21 well, she called me a nigger.  And I said oh,
22 well, that's another thing she needed to do
23 was talk to Debra about that.  You know, that
24 was important enough to bring to the immediate
25 attention of the EEO officer.

64

1    So I really don't know.  I remember
2 Debra telling me about it.  She said that
3 Cynthia -- that Allison had called Cynthia, so
4 she heard, a nigger.  But it would probably be
5 a he-said-she-said case.  She had never had a
6 case like that before.  She didn't know how to
7 deal with it.  So that was about the end of my
8 involvement with that.
9    Q.  Okay.  You did sit in on one
10 meeting, though, involving the investigation
11 concerning the Allison Stevens incidents, did
12 you not?
13   A.  I think maybe I did.  I really don't
14 remember.  I really don't remember.
15   Q.  Do you recall --
16   A.  Because Debra and I talked about it.
17 But as far as a formal meeting, I don't
18 remember.  If Allison walked in right now, I
19 don't think I'd recognize her.
20   Q.  Do you recall if you sat in any
21 meeting because Cynthia Ellison wanted a third
22 person?
23   A.  Me to be there, yes.
24   Q.  That's your recollection?
25   A.  Some of her meetings she did.  In



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS

ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC          CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777          Complimentary Conference Rooms          2700 Centennial Tower
Facsimile (404) 495-0766          Throughout Georgia And          101 Marietta Street
Toll Free (877) 495-0777          Major Cities Nationwide          Atlanta, Georgia 30303

www.galloreporting.com

65

1 fact, most of them.
2     Q.   But you don't have any firsthand
3 knowledge about the Allison Stevens incident,
4 do you?
5     A.   No, I don't.  I wasn't there.
6     Q.   Okay.  Now, in paragraph four of
7 your affidavit --
8     A.   Yes, sir.
9     Q.   -- at the bottom, you say that
10 Mahaffy, through his conduct, placed her in a
11 hostile environment.
12     A.   Uh-huh.
13     Q.   Is that -- is that what she reported
14 to you or is that the conclusion you reached
15 based on what she said?
16     A.   Well, that was the conclusion that I
17 reached.
18     Q.   Did she -- did Cynthia Ellison use
19 those words hostile environment?
20     A.   Yes, she did.  She did.
21     Q.   Did she tell you what she meant by
22 that phrase?
23     A.   Well, I knew what it meant.  It
24 meant that she was frightened and that it was
25 an uncomfortable setting for her.

66

1     Q.   Does it mean anything else to you?
2     A.   I don't think so.
3     Q.   Okay.  And you go on to say,
4 unfortunately, she was a nervous wreck.
5     A.   She was.  I could just tell it in
6 her voice.  I mean, I've known Cynthia since I
7 came to work at AUM in 1988.  She has had
8 composure.  She has been a professional.  She
9 has done her job.  And she has been very
10 cognizant about her surroundings and things of
11 that nature.  And for her to come to me -- I
12 mean, there are things you know when you know
13 employees and I would -- I'm not perfect, but
14 human resources meant knowing and working with
15 people.  And, of course, the guidelines and
16 the laws, we knew we had to know those too.
17         But I knew when I spoke with her
18 that she was not a person that was not feeling
19 that she was without -- or out of harm's way.
20 I could feel that.  I could certainly feel it
21 and tell it in her voice.
22         When I saw her, she was like this.
23 I said what is wrong with you.  She said I'm
24 about to go out of my mind.  She said he just
25 comes and sits in my office, Faye; somebody

67

1 has got to do something to help me with this
2 person.  I can't do my work.  So, I mean, all
3 I had to go on was her -- what I saw and what
4 I heard.
5     Q.   Okay.  Other than the behaviors you
6 told me about -- and you've got them in
7 paragraph four here, too -- did Cynthia
8 Ellison tell you why she thought Mahaffy was
9 behaving in that fashion?
10     A.   Because she thought he thought she
11 had some pull in the search committee.  She
12 was on the search committee for the dean's
13 position.
14     Q.   Right.
15     A.   He thought that she could pull a
16 string, I guess, to get him into that position
17 or to make it so that he would have been a
18 viable candidate for that position.  And my
19 knowledge and understanding was that he wasn't,
20 was never.  But he held that over her and I
21 think the demeanor -- his entire demeanor
22 towards her changed during that time.
23     Q.   And do you think that he conducted
24 himself the way you describe because he blamed
25 her for not assisting him in the dean search?

68

1     A.   Yes, sir.  I absolutely,
2 unequivocally do.
3     Q.   Okay.  Do you know of any other
4 reason why he would have behaved in that
5 fashion?
6     A.   I wouldn't know any other reason.
7     Q.   All right.  Let me ask you a little
8 bit about your working relationship and
9 knowledge of Debra Foster.
10     A.   Okay.  Debra came to work in the HR
11 office in 2000, 2001 I believe --
12     Q.   Okay.
13     A.   -- when she first came to campus.
14 And I wanted to stay on because once she was
15 hired, I really felt we're going to do wonders
16 for this campus.  I wanted to get an employee
17 assistance program going.  She came from a
18 university.  I thought she could bring new
19 knowledge into the area and we could work
20 together.
21         When she came to work with us, I
22 took her to her office and I told her that I
23 would be the best assistant director to her
24 that I could possibly be.  I don't know what
25 happened down the line.  Because, you know,



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA TECHNOLOGIES

ATLANTA, GEORGIA          WASHINGTON, DC        CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777              Complimentary Conference Rooms              2700 Centennial Tower
Facsimile (404) 495-0766                  Throughout Georgia And                    101 Marietta Street
Toll Free (877) 495-0777                   Major Cities Nationwide                  Atlanta, Georgia 30303

www.galloreporting.com

---

**69**

1  there were times when I -- you know, when I
2  would have thought she would have come to me
3  to talk to me about some things. She went to
4  a clerk that I had at that time, which was --
5  subsequently she was fired the day before I
6  came back to work. But --
7      Q.  What's the clerk's name?
8      A.  Susan McNeal. She worked and
9  reported to me. And, of course, you know,
10 there were some good things that Debra has
11 done for the HR office. But I left the HR
12 office because I could not stand the lack of
13 integrity there nor the nonprofessionalism.
14 That's why I left.
15     Q.  Okay. Let's talk about --
16     A.  I have nothing personal against
17 Ms. Foster, but I just -- some of the
18 things -- talking about employees. They're
19 stupid. Cynthia Ellison would call. What
20 does she want now; when is she going to
21 retire. Those were unprofessional -- to me
22 that was very unprofessional behavior.
23     Q.  Can you give me some examples of
24 what you considered to be the lack of
25 integrity in the human resources office?

---

**70**

1      A.  Well, when you -- when you're
2  talking loud, if there's a case -- and I
3  remember I worked very closely and wanted to
4  learn the EEO that I was not formerly trained
5  for. There were times I had to get up and
6  close the office door because Ms. Foster was
7  talking so loud about things I called and
8  thought were personal in nature when an
9  employee would come to complain about
10 something. That was unprofessional.
11         The integrity, if you go and talk
12 about that to your employees -- there were
13 things that I didn't need to know in that
14 office as assistant director when it came to
15 certain things. With her being the
16 affirmative action EEO officer, there were
17 things that I didn't need to know. But, yet,
18 still there were things that were talked about
19 that certainly should not -- they were
20 inappropriate.
21         When I left this campus, sir, I sent
22 out an e-mail telling people that I was
23 retiring. I've got e-mails that people sent
24 to me saying the lack of integrity. And it's
25 nothing personal against Ms. Foster. When she

---

**71**

1  came, I welcomed her. I told her that I would
2  be the best assistant director to her that I
3  could be. And I don't know. And then she
4  said, well, what am I supposed to do. I said,
5  well, you can start by reading this
6  information that your predecessor left for
7  you.
8          I mean, I'm not perfect, but I
9  believe in professionalism. And I've tried
10 to -- I love this university and would have
11 been here until I reached full retirement.
12 I'll be 65 years old next year and I could
13 easily have stayed and it hurt me to leave.
14 I'm sorry. Maybe I got away from you. What
15 else do you want to know?
16     Q.  Well, I mean, I don't -- are those
17 the reasons you retired?
18     A.  Yes.
19     Q.  Are there any other reasons?
20     A.  No, sir.
21     Q.  And it had mainly to do with the way
22 Debra Foster conducted herself in the office?
23     A.  I could not -- exactly. A second --
24 my clerk -- which that was okay. She
25 wasn't -- there were some issues that Debra

---

**72**

1  had that she really needed to do what she did
2  to a point. But it's the way we do anything.
3  I was coming back to work next day. She
4  could have at least given me the opportunity
5  to come and talk about it.
6          I didn't have anything -- when she
7  said she had terminated her, fine. You know,
8  you did that. But why didn't you wait until I
9  got back? But then I heard that she said I
10 was too protective. Well, my goodness, if I
11 can't respect and be protective to people who
12 are loyal to me, who can I be?
13     Q.  Well, are you saying Susan McNeal
14 was loyal to you?
15     A.  She was loyal to the whole office,
16 this university. She was my --
17     Q.  Debra Foster certainly had the
18 authority to discharge her, did she not?
19     A.  Yes, she did.
20     Q.  And your concern is that she did not
21 consult with you prior to doing that?
22     A.  No, she didn't. She fired her. She
23 called me at home. I was still on leave. She
24 said I had to let Susie go. I said okay.
25 Couldn't you have waited until I got back;

---

Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA       WASHINGTON, DC       CHICAGO, ILLINOIS       NEW YORK, NEW YORK

Telephone (404) 495-0777          Complimentary Conference Rooms          2700 Centennial Tower
Facsimile (404) 495-0766               Throughout Georgia And                101 Marietta Street
Toll Free (877) 495-0777                 Major Cities Nationwide              Atlanta, Georgia 30303

www.galloreporting.com

---

**73**

1  I'll be back on Tuesday. And she said no.
2  She was told that she had to do it, so I don't
3  know.
4        Q.   Do you know the details behind all
5  that?
6        A.   Well, Susan was -- Susan had ways
7  where she really didn't show Debra the
8  respect. And to me, neither one of them did.
9  Because when we would have meetings, I would
10  say, Debra, you've created a monster out here
11  because the secretary -- Debra's secretary and
12  my clerk, they were pitted against each other.
13  Susie didn't like her, but there were things
14  as a manager that we can do.
15        And to me, human resources is more
16  than just doing affirmative action and EEOs.
17  There were things that we could have done to
18  make those employees -- try to help them, not
19  start fires, but put them out. And that's
20  what I wanted to see happen.
21        But Susie had -- she had a mouth.
22  She would talk. She would talk back to Debra
23  sometimes. So I'm not denying that. She was
24  not perfect. But she did her job and she and
25  Debra stayed into it all the time about one

---

**74**

1  thing or the other.
2        Q.   Do you know the reason for her
3  dismissal?
4        A.   Let me see. They said an employee
5  had called -- an applicant had called about a
6  position. Susie thinks it was a setup. This
7  applicant had called about a position. He
8  said that Susan did not speak to him in a
9  professional manner. And he went through the
10  chancellor's office and reported, although
11  Dr. Nance wasn't here at the time. He talked
12  with the secretary down there. And he called
13  upstairs and talked to Ms. Foster, said that
14  Susie was not professional with him. She was
15  trying to help him. Because he said that his
16  application was there on time. We had
17  deadlines for applicants to apply for
18  positions, sir. If they didn't make that
19  deadline, so be it. I did not refer them. I
20  said we have guidelines and I went by the book
21  as much as I could.
22        And she said that she told him your
23  application isn't here. He said, yes, it is.
24  But later found out that that application came
25  in after the deadline date. And he was -- he

---

**75**

1  was then referred for a position.
2        But, anyway, they had
3  confrontations. Debra came in, employed
4  Susan. Susan and Debra had some words and I
5  guess that was -- I don't know. I wasn't
6  there. But that's what I'm told.
7        There was an investigation. There
8  was a grievance filed behind that, though.
9  And the grievance procedure was followed and I
10  think there was -- and I came out for that
11  because I was called in as a witness. I gave
12  testimony. I don't know what happened. I
13  later found out it was tape-recorded, not like
14  she's doing. But then I heard the tapes came
15  up missing. So I don't know.
16        But, anyway, you know, she -- she
17  didn't -- she threatened to sue and she did
18  not sue, but she -- and my concern for her,
19  she had worked here in the system for 22 years
20  in the retirement system of Alabama. So I was
21  helping her to try to find a job so she could
22  stay in the system and not lose her time. So
23  thank God, she has a job now. She's working
24  with the DOT. But that was -- that was just
25  awful.

---

**76**

1        Q.   But you don't know how her
2  grievance -- the result of her grievance?
3        A.   Well, it went all the way up and
4  they decided that they would not bring her
5  back. You know, that was concluded.
6  Dr. Nance made that final decision, which it
7  had to go to her.
8        Q.   Ms. Ward, have you ever said any
9  negative things about Debra Foster to Cynthia
10  Ellison?
11        A.   No, I have not.
12        Q.   Have you ever said any negative
13  things about Debra Foster to Ms. Rodgers?
14        A.   No, I haven't.
15        Q.   Have you ever said any negative
16  things about Debra Foster to Courtnei Ellison?
17        A.   No, I have not.
18        Q.   Have you ever said any negative
19  things about Debra Foster to anybody?
20        A.   No, I haven't.
21        Q.   Okay.
22        A.   I mean, most people knew, I think,
23  why I left. I'm too professional for that and
24  I would hope Ms. Ellison -- Ms. Foster would
25  be also.

---

**Alexander Gallo & Associates, LLC**
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA        WASHINGTON, DC        CHICAGO, ILLINOIS        NEW YORK, NEW YORK

Telephone (404) 495-0777              Complimentary Conference Rooms                    2700 Centennial Tower
Facsimile (404) 495-0766                 Throughout Georgia And                          101 Marietta Street
Toll Free (877) 495-0777                  Major Cities Nationwide                        Atlanta, Georgia 30303

www.galloreporting.com

77

1    Q.   Let's look down -- go back to your
2  affidavit if you would, please.
3    A.   Okay.
4    Q.   And let's look at paragraph number
5  five.
6    A.   Yes, sir.
7    Q.   We're in January 2005 now; right?
8    A.   Uh-huh.  Uh-huh.
9    Q.   It says that Debra Foster scheduled
10  a meeting with Mahaffy.
11    A.   Right.
12    Q.   And you attended that meeting?
13    A.   Yes, sir.
14    Q.   Was it just you, Debra Foster and
15  Mahaffy in that meeting?
16    A.   Yes, sir.
17    Q.   And it was on January 10th; correct?
18    A.   Uh-huh.  Yes.
19    Q.   You say that was after Cynthia
20  Ellison reported the discrimination; right?
21  What are you referring to there?
22    A.   Well, see -- well, see, this was
23  after.  Well, she had reported discrimination
24  back in 2004 as I told you.  All right?  And
25  then later when she came and talked with

78

1  Debra -- or, no, Debra got a letter from
2  Dr. Ritvoe, because Cynthia had written a
3  letter.  He told her to put it in writing.
4    She had sent the letter to
5  Dr. Ritvoe and because of the nature of the
6  letter and Debra being the EEO officer, he
7  sent that letter up to HR.  Okay.  At that
8  time, I'm not sure if Cynthia had talked with
9  Debra by then -- if she had spoken with Debra
10  by then, but I know that Debra started the
11  investigation.
12    Q.   Okay.  When did your involvement in
13  that investigation begin?
14    A.   In December.
15    Q.   What did you do?
16    A.   And I don't know why because I kept
17  telling Dr. Ritvoe and those I'm not the EEO
18  officer; why should I have to go to these
19  meetings.  It was never that way in the past.
20  But, anyway, he wanted me to go to the
21  meeting.
22    But, anyway, in December of '04, we
23  talked to Glen Ray, Brad Moody.  And I was
24  asked to sit in on all those meetings and I
25  asked him why.  And he said, well, because we

79

1  trust you.  And I looked at him and I said,
2  well, I'm not the EEO officer.  But Dr. Ritvoe
3  and Debra also wanted me to attend those
4  meetings.
5    Q.   Do you feel like Cynthia Ellison
6  followed the correct procedure in reporting
7  the discrimination that you're referring to in
8  paragraph five?
9    A.   I think she did.
10    Q.   It got to HR, didn't it?
11    A.   It did.  It did.
12    Q.   Do you know if she also complained
13  to the dean, who would be her immediate
14  supervisor?
15    A.   You mean the last dean, Dr. Lawal?
16    Q.   Yes.  Dr. Lawal.
17    A.   Yes.  Because he had the same
18  complaint that Mrs. Ellison had.  He thought
19  that Mahaffy was being discriminatory toward
20  him.  In fact, when he came to see Ms. Foster
21  and myself, he said that he wanted his case
22  aligned with Ms. Ellison's case.  And
23  Ms. Foster said, well, you're faculty.  You
24  know, we don't need to do your case.  I'm not
25  doing your case.  And I said, well, after all,

80

1  you're the EEO officer for the whole campus,
2  be it the faculty or staff.  So Dr. Lawal
3  knew.  Oh, yeah, he knew Cynthia's complaint.
4    Q.   Okay.  So in terms of getting the
5  complaint to the right people, you feel like
6  the procedures were followed.
7    A.   I do.
8    Q.   Right?
9    A.   I do in the final analysis.
10    Q.   And that was in December 2004.
11    A.   Uh-huh.
12    Q.   Right?
13    A.   That's right.  Because we had our
14  first -- our first interview, I think, was in
15  December with -- because before Chris was
16  called in, there was an interview with Glen
17  Ray -- Dr. Glen Ray, Dr. Brad Moody and
18  Ms. Foster talked by phone to Dr. Elliott.  I
19  was not involved in that one.  And she spoke
20  with Mr. Judd -- Dr. Judd Katz in his office.
21  I was not involved in those.
22    Q.   Okay.  Do you feel like the correct
23  people were interviewed in a part of this --
24  as part of this investigation?
25    A.   Yes, sir.  I do.



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA TECHNOLOGIES

ATLANTA, GEORGIA        WASHINGTON, DC        CHICAGO, ILLINOIS        NEW YORK, NEW YORK

Telephone (404) 495-0777            Complimentary Conference Rooms            2700 Centennial Tower
Facsimile (404) 495-0766                Throughout Georgia And                101 Marietta Street
Toll Free (877) 495-0777                Major Cities Nationwide                Atlanta, Georgia 30303

www.galloreporting.com

---

81

1   Q.  Do you believe that there was anyone
2  who was not interviewed who should have been
3  interviewed?
4   A.  No.  I think because Dr. Glen Ray --
5  he was in the position where, you know, he
6  worked closely with Dr. Mahaffy.  Of course,
7  Dr. Moody was the interim dean at that time.
8  Dr. Bayo, who came -- Lawal, who came later,
9  he was ultimately the dean of the School of
10  Sciences.  And I don't know.
11   Q.  Okay.  Do you know what Cynthia
12  Ellison's complaints of discrimination were at
13  that time?
14   A.  Well, that she was just being
15  treated differently, maybe because she was
16  African American.  I don't know.  But her real
17  concern was she was being placed in a hostile
18  environment because of Dr. Mahaffy's behavior.
19   Q.  Did you stay involved -- I'm sorry.
20   A.  And that's why I didn't understand
21  about Dr. Lawal.  Because -- well, maybe you
22  haven't gotten to that point yet.  But I'll
23  wait.
24   Q.  Did you stay involved in the
25  investigation that originated with Cynthia

---

82

1  Ellison's complaint to the end?
2   A.  I did.  I did.  As far as to the end
3  of the meetings and until I left, you know.
4  And then up until -- in fact, I came back in
5  July, yes, and then Ms. Ellison left in
6  February.  Uh-huh.
7   Q.  Let's go through the investigation.
8  I think you told me that you had meetings in
9  December --
10   A.  Yes, sir.
11   Q.  -- 2004 and you were in some and not
12  in others.
13   A.  Right.
14   Q.  Right?
15   A.  Yes, sir.
16   Q.  Okay.  Now, you're referring in
17  paragraph five to a meeting on January 10th.
18   A.  January 10th.  Uh-huh.
19   Q.  With --
20   A.  With Mahaffy.
21   Q.  Chris Mahaffy?
22   A.  Yes, sir.
23   Q.  Tell me about that meeting.  Tell me
24  what went on.
25   A.  Okay.  He came to our office and, of

---

83

1  course, as I said, Debra had asked me to sit
2  in and Dr. Ritvoe wanted me to sit in also.
3  So when he came to the office of human
4  resources, we escorted him down the hall to --
5  the special services department have a
6  conference room.  We did not have one in HR.
7   So as we went down, he asked -- he
8  said is this about Allison Stevenson.  And so
9  Debra said no.  And he said, well, I thought
10  that had been over -- taken care of.  So I
11  said, yes, you know, as far as I know, that's
12  been taken care of.
13   So he said what is this about.  So
14  as we entered into the conference room, Debra
15  said to him, well, come on in, Chris; this
16  isn't about anything too much.  Cynthia
17  Ellison just placed -- filed a complaint to
18  Roger Ritvoe and he sent it up to me.  And
19  because of the nature of it, I have to
20  investigate.
21   And Debra started asking him
22  questions about whether or not he, you know,
23  was discriminatory toward Cynthia and he
24  talked about that and, no, he didn't do this,
25  that or the other for whatever she was asking.

---

84

1  I asked him one question.  I said on a scale
2  of one to ten, how do you work with Dr. Lawal
3  and Cynthia.  He said I don't.
4   So -- and he said that he would be
5  taking over and people were not going to -- to
6  follow his direction.  So, you know, Dr. Lawal
7  had the same concern that Ms. Ellison had
8  about him being discriminatory toward him.
9  And he said that blacks -- he said he did not
10  say that blacks are in power.
11   Q.  Did you follow up your question to
12  him about why he didn't work with the dean's
13  office?
14   A.  No, I didn't.  I didn't follow that
15  up because Debra -- at that time, she was
16  interviewing him.  I just wanted to know.
17   Q.  Was it your conclusion that he still
18  felt bitter over the selection process and
19  that's why he didn't react well with that
20  office or react at all with the office?
21   A.  I do.  I do.  In fact, it was
22  later -- and we'll probably get to that -- it
23  was later also discussed in the conversation
24  with Dr. Ray and Dr. Moody that he did show
25  and change his attitude toward Ms. Ellison

Alexander Gallo & Associates, LLC
COURT REPORTING  VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA     WASHINGTON, DC     CHICAGO, ILLINOIS     NEW YORK, NEW YORK

Telephone (404) 495-0777          Complimentary Conference Rooms          2700 Centennial Tower
Facsimile (404) 495-0766              Throughout Georgia And                101 Marietta Street
Toll Free (877) 495-0777               Major Cities Nationwide              Atlanta, Georgia 30303

www.galloreporting.com

85

1  during those search committees. There were
2  two search committees, you know. There were
3  two searches.
4      Q.  After the meeting with -- strike
5  that, please.  Was it consistent, do you
6  think, with AUM's policies to meet with
7  Mahaffy as a person who was being accused of
8  making these -- having these difficulties?
9      A.  Absolutely, sir.  Anytime an
10  investigation would come about, we would get
11  on an investigation within -- if it's the
12  sexual harassment or if it was something of
13  that -- discriminatory, that would be handled
14  immediately by calling in the person and the
15  person who was being accused of.  That was
16  done immediately.  And then, if not, at least
17  within 24 to 48 hours.  You call in those
18  individuals and you start getting --
19  collecting your information.  And then you
20  move.  It was nothing that ever sat around for
21  any definite period.
22      Q.  Okay.
23      A.  I remember that because, of course,
24  I may not have been that directly involved in
25  those investigations, but if I had

86

1  information, I was asked from the director,
2  well, give me what information you have about
3  the situation.  I would present it to her and
4  that was it because, as I said, I'm not an EEO
5  affirmative action officer.
6      Q.  Right.  And, of course, during the
7  time of these meetings regarding Mahaffy, AUM
8  was on holiday break and in between semesters,
9  was it not?
10      A.  Well, no.  What happened was the
11  meetings we had in December were prior to
12  holiday.
13      Q.  Okay.
14      A.  And that was with the ones -- the
15  people that I told you about, Moody and Ray.
16  And we could have called him in probably, but
17  Debra said, well, I'm not going to mess up my
18  holiday.  We'll call him in later.  So that's
19  how he got kicked over into January.
20      Q.  Okay.  What was the time period when
21  the university was -- it was a university
22  holiday for everybody who worked here, for
23  staff as opposed to students?
24      A.  Well, the students always get out a
25  little bit before we get out.  And we got

87

1  out -- we normally have a two-week period.  So
2  I guess anywhere from December whatever to
3  after the holiday, after January 1st was our
4  normal holiday.
5      Q.  And in 2005, didn't Ed Richardson
6  also add a couple of days to the break?
7      A.  Yeah.  And that would happen
8  oftentimes.
9      Q.  That's because LSU -- that's because
10  Auburn was in the Sugar Bowl; right?
11      A.  That's right.  Always.  I'm not sure
12  they won that year, but he would generally
13  give us an extra day if they did, whoever
14  was --
15      Q.  They won.
16      A.  -- chancellor.
17      Q.  They won.
18      A.  Okay.  Good.
19      Q.  Okay.  So you had the meeting with
20  Mahaffy on January the 10th?
21      A.  Yes, sir.
22      Q.  And if you refer to paragraph six of
23  your affidavit, you said that you were present
24  at another meeting when Roger Ritvoe was
25  involved?

88

1      A.  Right.
2      Q.  Do you remember when that meeting
3  occurred?
4      A.  This meeting was later in January,
5  maybe -- let me see -- the 25th we met with
6  Dr. Nance.  It had to be maybe around the 18th
7  or 19th.  I'm not sure.  Because after that
8  meeting, he wanted Dr. Ritvoe to go in to talk
9  to Dr. Nance and plead his case.
10      Q.  Mahaffy wanted Ritvoe?
11      A.  Yes, sir.  Because he had been
12  stripped of his position.
13      Q.  You say he was stripped of his
14  position.  You mean his -- as a deputy chair?
15      A.  Yes, sir.
16      Q.  And he lost that title?
17      A.  Uh-huh.
18      Q.  You've got to say yes.
19      A.  Oh, I'm sorry.  Yes.
20      Q.  Okay.  What else -- what other
21  punishment did Mahaffy receive?
22      A.  He was supposed to attend some
23  training sessions.  Now, whether or not that
24  ever came to be, I have no idea.
25      Q.  Okay.



ATLANTA, GEORGIA          WASHINGTON, DC          CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777                    Complimentary Conference Rooms                    2700 Centennial Tower
Facsimile (404) 495-0766                          Throughout Georgia And                          101 Marietta Street
Toll Free (877) 495-0777                            Major Cities Nationwide                          Atlanta, Georgia 30303

www.galloreporting.com

89

1    A.  Personally I don't think he did.
2    Q.  You were gone by that time on your
3  medical leave, weren't you?
4    A.  I was -- I left shortly after that.
5  But I don't know.  He was supposed to go, but
6  then when I came back, Debra had said to me
7  that he had taken a lot of time off using his
8  sick leave.  And then I know he came and he --
9  ultimately he retired.  I'm not sure.  It had
10  nothing to do with Cynthia Ellison's case,
11  though.
12    Q.  Do you know what else the
13  university -- what other conditions the
14  university imposed on Chris Mahaffy?
15    A.  I think his salary was changed.
16    Q.  Lowered?
17    A.  Uh-huh.  Yes.
18    Q.  Do you know of anything else that
19  the university imposed on him?
20    A.  Not to my knowledge.
21    Q.  Okay.  Now, you mentioned a meeting,
22  I believe, with Guin Nance before the meeting
23  between -- among Ritvoe and yourself and
24  Mahaffy; right?
25    A.  We had a meeting on the -- I think

90

1  it was on the 25th.  That was after we met
2  with him.
3    Q.  Okay.  What was the topic of that
4  meeting?
5    A.  Endowment.  That meeting was --
6  Debra Foster was there.  I was there.  Roger
7  was there.  That was sort of to bring
8  Dr. Nance up to what was going on with the
9  case, to apprise her of what was going on.
10    Q.  Wasn't that -- in that meeting
11  wasn't it decided what the university was
12  going to do to Mahaffy as a result of the
13  complaints?
14    A.  No.  That was decided prior to that
15  I believe.
16      And then after we went back to
17  Dr. Nance, at that time she said legal counsel
18  would be brought in at that time.
19      Of course, we had a meeting with
20  Ms. Ellison also and Dr. Lawal.  And he said
21  that -- at that time, of course, we had also
22  met with the staff from physical sciences.
23  Dr. Ritvoe apprised them of what had happened
24  to Dr. Mahaffy.
25      And, of course, we met with

91

1  Ms. Ellison and Dr. Lawal who -- he was under
2  the impression, I think, Dr. Ritvoe was going
3  to allow him to speak to the staff to tell
4  them what was going on.  But he said no.  He
5  would be the one to do it.  And he said if
6  they didn't do something, if they continued to
7  do that, that he was going to file civil
8  litigation.
9    Q.  Is that what he told you?
10    A.  That's what he told us in that
11  meeting.  Dr. Ritvoe was there and I was there
12  also.  And after that, we went back to see
13  Dr. Nance and we discussed with her some of
14  the findings and some of the things that had
15  happened.  That's my memory of it now.
16    Q.  Okay.  And Dr. Nance is Guin Nance,
17  the chancellor of AUM?
18    A.  Right.  Right.
19    Q.  So these complaints rose to the
20  highest level at -- highest administrative
21  level at AUM; right?
22    A.  Yeah.  Well, we had to keep her
23  apprised of what was going on.  It was only
24  the right thing to do.
25    Q.  Do you feel that AUM followed the

92

1  correct procedure with Mahaffy and the
2  complaints that Cynthia Ellison raised?
3    A.  I feel that they did as far as
4  disciplining him.  I don't think that they did
5  enough to take Ms. Ellison out of her
6  environment she was in.  They didn't give her
7  security.
8      I asked in a meeting -- I asked -- I
9  said what happens if he retaliates.  Because
10  he knew that she was the person that had
11  lodged the complaint.
12      So my thing is -- which oftentimes
13  since I've been at this university, if there
14  is a -- if there's a belief that a person may
15  be in jeopardy of being, you know, jumped on,
16  bothered with in going to a car, we would call
17  security.  We would either go out as a group.
18  They didn't even provide security for her.
19  And I asked why don't -- why don't y'all
20  provide some security for Dr. Lawal and for
21  her at the time.
22    Q.  Let's talk about that.  What do you
23  mean by provide security?
24    A.  Call campus police and have someone
25  escort them to the car.

Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS

ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC          CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777                     Complimentary Conference Rooms                     2700 Centennial Tower
Facsimile (404) 495-0766                         Throughout Georgia And                             101 Marietta Street
Toll Free (877) 495-0777                           Major Cities Nationwide                           Atlanta, Georgia 30303

www.galloreporting.com

93

1    Q.  Did anyone do that?
2    A.  No.
3    Q.  Did Cynthia Ellison call the campus
4    police?
5    A.  Cynthia Ellison told her boss.  Most
6    times it went through your supervisor.
7    Q.  No, no.  Did Cynthia Ellison call
8    the campus police?
9    A.  I don't know.  I believe she did.
10   Q.  Do you know if the campus police
11   ever said to Cynthia Ellison, no, we are not
12   going to escort you to your car?
13   A.  I don't know.  You'd have to ask
14   Ms. Ellison that.
15   Q.  Okay.
16   A.  I know that I --
17   Q.  Do you know -- I'm sorry?
18   A.  I know that I requested it.  And I
19   said suppose Mahaffy retaliates against
20   Dr. Lawal and Cynthia.  We'll get security.
21   And I told that to Dr. Ritvoe.
22       The only time that I'm aware that
23   they provided some security for her was later
24   in February when they thought she was messing
25   with university documents.

94

1    Q.  Did -- are you saying, Ms. Ward,
2    that you called campus security -- the campus
3    police in order to get security for Cynthia
4    Ellison and they refused?
5    A.  I talked to -- I talked to Chief
6    Robinson.  I said, you know, Ms. Ellison and
7    Dr. Lawal need some security over there.  She
8    said I'll have to call Dr. Ritvoe.  I said
9    call Dr. Ritvoe and ask him if that's what you
10   have to do.
11       Because Debra called and got
12   security.  They had security in the hallway
13   when we were down there with Chris
14   interviewing him.  So why couldn't they,
15   especially when they knew that she was the
16   complainant?
17   Q.  Do you know if AUM has ever had
18   security present during a disciplinary
19   session?
20   A.  I certainly do.  Absolutely.  They
21   have.
22   Q.  Now, what kind of security did you
23   have in mind for Dean Lawal and Cynthia
24   Ellison?
25   A.  Sir, the only security that any of

95

1    us could get is a police escort to escort us
2    to our car.
3    Q.  And I believe you told me that you
4    don't know if Cynthia Ellison ever requested
5    that.
6    A.  I don't know.
7    Q.  And you also don't know whether
8    campus police ever declined to escort her to
9    her car; right?
10   A.  I don't know if they did or not.
11   But I believe that she asked them.  I asked.
12   So certainly she should have asked for
13   herself.
14   Q.  Ms. Ward, did you ever ask for
15   security going to your car?
16   A.  No, I didn't.
17   Q.  In your 18 years here, you never
18   asked for that?
19   A.  We have.  The director and I have.
20   There was a case where we needed security
21   because this lady was going all over campus,
22   even to the post office, putting up
23   distasteful things about the human resources
24   office.  So, in fact, she thought that we all
25   should have had it.  It was basically against

96

1    her, but we all went out together as a group.
2    Q.  Did you have security escort you?
3    A.  Uh-huh.  We did.  We did.
4    Q.  On that occasion, when you asked for
5    it, you received it?
6    A.  Well, she asked for it, the
7    director.
8    Q.  Okay.
9    A.  She asked for it.  Even when I was
10   out and needed to come back and needed a
11   handicapped sticker in my car because I
12   couldn't walk, she would call campus police
13   and get that for me.
14   Q.  Who is she?
15   A.  Rose Shook, my previous director.
16   Q.  Okay.
17   A.  So it wasn't uncustomary that the
18   supervisor -- and I know she told her
19   supervisor she needed it.  She told me that.
20   Q.  There's nothing that prevented
21   Cynthia Ellison from calling Chief Robinson
22   either, is there?
23   A.  Maybe she did.  I don't know.
24   Q.  Do you know of any policy that makes
25   it a requirement that a supervisor call --



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC        CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777        Complimentary Conference Rooms        2700 Centennial Tower
Facsimile (404) 495-0766          Throughout Georgia And               101 Marietta Street
Toll Free (877) 495-0777           Major Cities Nationwide             Atlanta, Georgia 30303

www.galloreporting.com

97

1    A.  No.
2    Q.  -- campus police?
3    A.  There's not a policy.  But there's
4  procedure.
5    Q.  There's procedure for that?
6    A.  As far as I know out of human
7  resources.
8    Q.  Is it in writing?
9    A.  No, it's not, not to my knowledge.
10   Q.  And at least the procedure in human
11 resources is that the supervisor calls campus
12 security for escorts; right?
13   A.  Well, I don't know.  Debra called.
14 I've never called for security to my car.
15 I've called them to help me with other things.
16   Q.  When did Debra Foster call for an
17 escort to her car?
18   A.  I believe that was during the same
19 time we had -- Chris was stripped.
20   Q.  You mean of his title?
21   A.  Yes.
22   Q.  Now, did you hear Debra Foster call
23 over there?
24   A.  Debra said she was going to call,
25 yes.

98

1    Q.  So you heard her make the call --
2    A.  Yeah.
3    Q.  -- to the police?
4    A.  I heard she was going to call over
5  there.
6    Q.  Which officer did she talk to over
7  there?
8    A.  I don't know who she talked to.  But
9  Nellie Robinson -- she could have picked up
10 the phone and talked to anyone and they
11 probably said let me talk to the chief.
12   Q.  I just want to make sure you
13 listened to the telephone call she made to
14 campus police.
15   A.  She told me she was going to call.
16   Q.  So you don't know if she did or not?
17   A.  No, I don't.  But I assume she did.
18 She got it.
19   Q.  Did you see the campus police escort
20 Debra Foster to her car?
21   A.  Yes, yes, yes.
22   Q.  And where did they pick her up?
23   A.  She walked downstairs out of the
24 library tower and most of the time they would
25 meet her down there.

99

1    Q.  Is that where they met her on this
2  occasion?
3    A.  I don't know if they came up to the
4  office or if they met her downstairs.
5    Q.  Okay.  Where did you first see them
6  escorting her?
7    A.  Going across the campus down the --
8  down the sidewalk.
9    Q.  And where were you?
10   A.  I was upstairs in the office.
11   Q.  Were you looking out the window at
12 her to see if she was getting escorted?
13   A.  I was looking out the window.
14   Q.  And did you follow them all the way
15 to her car?
16   A.  No, I did not.
17   Q.  How far did you follow them?
18   A.  I just looked halfway down.  I
19 didn't have time to stand up and watch her
20 being escorted or anybody else being escorted
21 to their car.
22   Q.  How long do you think you watched?
23   A.  Maybe about two or three seconds.
24   Q.  Okay.  Did you recognize the officer
25 who was with Debra Foster?

100

1    A.  No, I didn't.
2    Q.  Did you recognize whether the
3  officer was male or female?
4    A.  I think it was a male.
5    Q.  Did you recognize whether the
6  officer was black or white?
7    A.  Black.
8    Q.  Now, you refer in paragraph six to a
9  remark that Mahaffy made after the meeting in
10 which he lost his title when he said he was
11 going to go home and get drunk.
12   A.  Right.
13   Q.  What's the significance of quoting
14 him in your affidavit?
15   A.  Well, you know, he was not described
16 as a very stable person anyway.  And, of
17 course, when they stripped him of his title
18 and, of course, he said -- well, Dr. --
19 Dr. Ritvoe said I hope this is over soon.  And
20 he said, well, it may be over sooner than you
21 think.
22       But he also said that he would not
23 be fired from the university.  In fact, he
24 said that in a meeting with Dr. Lawal and
25 Ms. Ellison.  But the only reason I mention



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC      CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777        Complimentary Conference Rooms        2700 Centennial Tower
Facsimile (404) 495-0766           Throughout Georgia And               101 Marietta Street
Toll Free (877) 495-0777            Major Cities Nationwide             Atlanta, Georgia 30303

www.galloreporting.com

101

1  that is that he said he was going home and he
2  was going to get drunk.
3      Q.  Did you attach any significance to
4  that remark?
5      A.  Not really, that he might -- yeah,
6  he may go home and hurt himself.
7      Q.  By getting drunk?
8      A.  Or doing something else could lead
9  from getting drunk.
10     Q.  Ms. Ward, look in paragraph six
11 again.
12     A.  Okay.
13     Q.  And you talk about during the
14 meeting Ritvoe addressed the allegations
15 that -- I assume you're referring to Cynthia
16 Ellison's allegations?
17     A.  Yes.
18     Q.  And the investigation that had been
19 completed and the university's
20 recommendations.  What do you mean by the
21 university's recommendations?
22     A.  The university had recommended that
23 he go for some training.  He had to tell them
24 what he was going to do.  And he was going to
25 go for some training in order to help him deal

102

1  with some issues which would be, I guess
2  discrimination.
3      Q.  So they weren't recommendations,
4  were they?  They were orders?
5      A.  Right.  More or less.
6      Q.  Well, they were orders, weren't
7  they?
8      A.  Uh-huh.
9      Q.  Were they not?
10     A.  Uh-huh.
11     Q.  Yes?
12     A.  Yes.
13     Q.  Mahaffy had to fulfill the terms
14 of --
15     A.  He was supposed to.
16     Q.  Did you see the letter that Roger
17 Ritvoe provided to him after the meeting which
18 set out the obligations that Mahaffy had to
19 fulfill?
20     A.  I think I did.  I don't remember.
21     Q.  There was more to it than simply
22 getting some training.
23     A.  Oh, yeah.  Oh, yes.  But I don't
24 remember.  This was a lengthy letter.
25     Q.  Okay.

103

1      A.  I don't know if he ever got them --
2  if he ever complied, though.  I doubt it.
3      Q.  Why do you doubt it?
4      A.  Because when he was -- when I came
5  back to work, Ms. Foster said he wasn't here
6  at the office.  He was taking leave most of
7  the time.  And I think he was retaliating.  He
8  didn't -- he probably didn't think he needed
9  to.
10     Q.  Do you know why he was on leave?
11     A.  Well, just being -- just going
12 against policy to want to do.  He didn't want
13 to come back and work since he was no longer
14 head of that department, the chair of that.
15     Q.  Are you suggesting that his medical
16 leave was bogus?
17     A.  Somewhat.
18     Q.  Do you have any factual
19 substantiation of that?
20     A.  No, I don't.  I don't.
21     Q.  All right.  Now, in paragraph seven,
22 you refer to the complaints that Cynthia
23 Ellison had made previously against
24 Dr. Mahaffy in 2003 and 2004.  Do you see
25 that?

104

1      A.  Uh-huh.  I do.  Yes.
2      Q.  Are those the complaints we talked
3  about earlier having to do with paragraph
4  four?
5      A.  About describing Chris Mahaffy and
6  what he was -- the complaints regarding him.
7      Q.  Well, I'm trying to figure out what
8  you're referring to in paragraph seven.  Are
9  those complaints that you and I have already
10 discussed in this deposition or are they
11 different ones?
12     A.  They are.  They basically -- they
13 are the ones that we discussed.
14     Q.  That we talked about earlier?
15     A.  But there was another situation,
16 too, that included a Barbara Ware.
17     Q.  Okay.
18     A.  There was some discussion with
19 Barbara Ware which, you know, she was a
20 secretary to Mahaffy, as Allison Stevens was.
21 Well, there was a rift between Ms. Ellison and
22 her.  And even Debra and them think that
23 Mahaffy instigated that.  And she said that
24 Ms. Ellison was just trying to do her job.
25 That's what Ms. Ellison told me.  And that was

Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC     CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777        Complimentary Conference Rooms          2700 Centennial Tower
Facsimile (404) 495-0766            Throughout Georgia And                101 Marietta Street
Toll Free (877) 495-0777            Major Cities Nationwide              Atlanta, Georgia 30303

www.galloreporting.com

105

1  another factor. But I think it was soon
2  solved.
3      Q.  Were you involved at all in that
4  tempest?
5      A.  No. Thank God.
6      Q.  You don't have any personal
7  knowledge about that, do you?
8      A.  Just what Debra told me.
9      Q.  Okay. Other than the Barbara Ware
10  incident, are there any other difficulties or
11  complaints that you're referring to in
12  paragraph seven that we haven't already spoken
13  about?
14      A.  No.
15      Q.  Okay. Did you know Barbara Ware?
16      A.  No more than just --
17      Q.  You knew who she was?
18      A.  Yes. Uh-huh.
19      Q.  She was Cynthia Ellison's co-worker,
20  was she not?
21      A.  Right. She worked in the School of
22  Sciences and she was the secretary to
23  Mr. Mahaffy -- Dr. Mahaffy and Cynthia worked
24  with all of them.
25      Q.  And Allison Stevens also had been

106

1  Mahaffy's secretary?
2      A.  Also had. Yes, sir. Yes, sir.
3      Q.  So Allison Stevens and --
4      A.  Barbara Ware.
5      Q.  -- Cynthia Ellison were, again,
6  co-workers?
7      A.  Yes.
8      Q.  In other words, Allison Stevens
9  didn't supervise Cynthia Ellison?
10      A.  No. No. Cynthia was the dean's
11  secretary. So all the other secretaries sort
12  of had a reporting structure, you know --
13      Q.  To her?
14      A.  -- up the line. Yes, sir. In fact,
15  she did most of their payroll information and
16  helped them as she did with others throughout
17  the campus.
18      Q.  What's the difference between a
19  formal complaint as you refer to it in your
20  affidavit and any other complaint?
21      A.  Well, a complaint just might be
22  someone coming in to say, well, I'm just
23  lodging a complaint and it's without real
24  cause or something. I don't know. But I
25  think when it's formal it's more that, you

107

1  know, this is the way it is. This is all --
2  this -- I mean, there's got to be a
3  difference, informal and formal. And the
4  formal means that this is a formal complaint
5  that I'm lodging. This isn't just something
6  that I'm just saying.
7      Q.  Do you think it has more to do with
8  just the apparent seriousness of --
9      A.  I do. I do. I do.
10      Q.  You mean griping on one hand, you
11  wouldn't consider that to be a formal
12  complaint?
13      A.  No. And especially if you get
14  people that you know are always running to the
15  office. But you can't take anything lightly.
16  But by the same token, you've got to be able
17  to differentiate, you know, if this is someone
18  who's just wanting to come over.
19          I used to have employees just come
20  tell me, Ms. Ward, I just want you to listen
21  to me. I'd close the door. They'd sit and
22  they'd gripe for about 30 minutes. And then
23  they'd get up and say thank you for listening.
24      Q.  That's not a formal complaint?
25      A.  No, sir.

108

1      Q.  Okay. And you treat them
2  differently, do you not?
3      A.  Well, I don't treat anybody
4  differently. I listen to everyone.
5      Q.  No, no. I'm sorry.
6      A.  What do you mean?
7      Q.  The complaint itself.
8      A.  Yes, sir.
9      Q.  You wouldn't necessarily trigger the
10  procedures for investigating griping, would
11  you?
12      A.  I wouldn't.
13      Q.  To a certain extent, you have to use
14  your discretion to determine --
15      A.  Yes, sir.
16      Q.  -- differentiate among the types of
17  complaints people are making?
18      A.  Yes, sir. I would.
19      Q.  Okay.
20      A.  I know there were some people that
21  would come in and they would just want to talk
22  in confidentiality and they said I just want
23  you to listen to this. And, of course, the
24  former director, she would say, well, what did
25  that person talk about. I would say they came

Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA TECHNOLOGIES

ATLANTA, GEORGIA      WASHINGTON, DC      CHICAGO, ILLINOIS      NEW YORK, NEW YORK

Telephone (404) 495-0777          Complimentary Conference Rooms          2700 Centennial Tower
Facsimile (404) 495-0766          Throughout Georgia And          101 Marietta Street
Toll Free (877) 495-0777          Major Cities Nationwide          Atlanta, Georgia 30303

www.galloreporting.com

| 109 |
|---|
| 1  to me in confidence. I can't disclose it. We |
| 2  respected each other to that point that I |
| 3  didn't. |
| 4      Q.  Look at paragraph eight of your |
| 5  affidavit, please. |
| 6      A.  Yes, sir. |
| 7      Q.  You say that Ms. Ellison retired |
| 8  with a wonderful work record and honor. |
| 9      A.  Yes, sir. |
| 10     Q.  Can you tell me what you mean by |
| 11  that? |
| 12     A.  You know, her work record was |
| 13  impeccable on this campus because other |
| 14  secretaries looked up to her so much. I would |
| 15  talk with some of them and they'd say, well, |
| 16  wait a minute -- especially when -- and I |
| 17  didn't get a lot into a lot of the HR payroll |
| 18  entry and all of that. To be honest, I didn't |
| 19  deal with that. |
| 20     Q.  Right. |
| 21     A.  But they would call and say I'm |
| 22  going to call Cynthia Ellison because I trust |
| 23  her and I want to know what she's doing if |
| 24  they had a new system or something. And as |
| 25  far as I know, her reputation has been |

| 110 |
|---|
| 1  impeccable. |
| 2      Q.  Okay. So when you say that she had |
| 3  a wonderful work record and honor, are you |
| 4  basing that on what you think other |
| 5  secretaries thought of her and what they told |
| 6  you and that sort of thing? |
| 7      A.  Well, some of what I know. Because |
| 8  I worked -- in my position, there were -- I |
| 9  had to monitor faculty positions. I kept |
| 10  information as far as EEO that I could pass on |
| 11  to Debra when she would have to do her |
| 12  affirmative action report. |
| 13          I would have to call Ms. Ellison as |
| 14  I would in the normal course of my job. I |
| 15  would have to call other secretaries and ask |
| 16  them things and if deans had to sign off on |
| 17  information. So sometimes she would follow |
| 18  that up for me. |
| 19     Q.  Okay. |
| 20     A.  Those kind of things. |
| 21     Q.  Can you identify the secretaries who |
| 22  you're referring to? |
| 23     A.  Okay. Jan Hargrove would be one. |
| 24  She is over the School of Science. |
| 25     Q.  Anybody else? |

| 111 |
|---|
| 1      A.  Adrianne Giles. |
| 2      Q.  I'm sorry? |
| 3      A.  Adrianne Giles. |
| 4      Q.  And where does she work? |
| 5      A.  She works over in Liberal Arts, I |
| 6  believe. She's the dean over -- the second to |
| 7  the dean over there. And let me see. I don't |
| 8  know. But a lot of the secretaries. |
| 9      Q.  Can you think of any other |
| 10  identities other than those two? |
| 11     A.  Let me see. Janice Strane is gone |
| 12  now. Janice -- Janice, she retired, too. |
| 13  So -- those two I know would speak highly of |
| 14  Cynthia. |
| 15     Q.  Okay. Look at paragraph nine -- |
| 16     A.  Uh-huh. |
| 17     Q.  -- talking about her -- that she was |
| 18  subjected to a racially hostile environment. |
| 19  What do you mean by that? |
| 20     A.  I believe that because of the |
| 21  fact -- by that I mean she was placed over |
| 22  there. She was over there and Chris Mahaffy |
| 23  was doing all these things and it went on for |
| 24  at least a year, year and a half. And nothing |
| 25  was done about that. |

| 112 |
|---|
| 1          So in all this time, she had to be |
| 2  under duress. She -- I mean, from what she |
| 3  explained to me. It wasn't that she wasn't |
| 4  performing her job, but it was under stress. |
| 5          And she had to be because she was in |
| 6  that hostile environment with him walking |
| 7  around, not knowing what he was going to do, |
| 8  if he was going to go off, if he was going to |
| 9  attack her. |
| 10          To me, that's what a hostile |
| 11  environment situation would be. |
| 12     Q.  I understand that. Do you call it a |
| 13  racially hostile environment because he's |
| 14  white and she's black? |
| 15     A.  He's white and she's black plus his |
| 16  secretary called her a nigger. |
| 17     Q.  Do you think he had anything to do |
| 18  with that? |
| 19     A.  Yes. |
| 20     Q.  Why? |
| 21     A.  Because of the way he would act |
| 22  toward Cynthia. I think, in fact, he had |
| 23  something to do with the fallout between the |
| 24  both of them, Barbara Ware and Allison |
| 25  Stevenson. |



Alexander Gallo & Associates, LLC
COURT REPORTING / VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC          CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777                Complimentary Conference Rooms              2700 Centennial Tower
Facsimile (404) 495-0766                     Throughout Georgia And                   101 Marietta Street
Toll Free (877) 495-0777                     Major Cities Nationwide                 Atlanta, Georgia 30303

www.galloreporting.com

---

**113**

1    Q.  Let's stick with Allison for a
2  second.
3    A.  Okay.
4    Q.  Do you think that Chris Mahaffy
5  instructed Allison Stevens --
6    A.  Oh, no. I don't think he instructed
7  her, no. I don't think he instructed her to
8  call her a nigger. I think that was maybe
9  just her demeanor.
10       But I don't think Chris Mahaffy --
11  once he found out that there was some
12  bickering between the two of them, I don't
13  think he did anything to help deter it.
14    Q.  Okay. Do you know what the -- in HR
15  terms, do you know what the standard is for --
16  for establishing that a hostile environment
17  exists?
18    A.  Well, whether it's HR terms or not,
19  I think the hostile environment would be any
20  situation that someone is put in that they are
21  feared, that they are being ridiculed against,
22  and to me, that would create a hostile
23  environment, whether it's in HR terms or not,
24  sir.
25    Q.  Okay. I asked you that earlier and

---

**114**

1  I apologize for repeating myself.
2    A.  That's all right.
3    Q.  I have that infirmity sometimes.
4  And you say in paragraph nine that hostile
5  environment resulted in her early retirement.
6    A.  Well, yes. It did. Because at that
7  point, by that time, Ms. Ellison had also
8  shared with me that Dr. Lawal had did a
9  380-degree turn on her and they were -- when
10  he first came to talk to Ms. Foster and I, he
11  wanted his complaint aligned with
12  Ms. Ellison's.
13       Then after our meeting with
14  Dr. Ritvoe, he, Ms. Ellison and Dr. Ritvoe and
15  I, we met. And after, I guess, they had
16  worked with this solution with Dr. Mahaffy --
17  because he had planned to retire -- I mean, to
18  leave. I'm surprised he's still here if he
19  is. Because when he spoke with us, he was so
20  emphatic about their going together.
21       And I know when he came and was
22  hired, sir, in 2004, that Ms. Ellison said
23  that she was going to stay with him. She
24  drove he and his wife around looking for a
25  home. She was very loyal to him.

---

**115**

1       And she wanted to stay with him for
2  another two years before she retired. Because
3  I would ask her. I would say, well, when are
4  you retiring. You've been here for a long
5  time now. Are you thinking about it? She
6  said not now, but I want to maybe in about a
7  couple of years. I don't want to leave
8  Dr. Lawal, you know, alone. I want to stay
9  until he gets settled in.
10       Well, I don't know what happened
11  there. But what I knew the next thing, sir,
12  it was a phone -- Debra came into my office.
13  It was around the 14th of February. And she
14  said to me that Dr. -- that they had accused
15  Cynthia, I believe, of shredding information.
16  And I said that's not true. I said she would
17  not stoop so low.
18       So then after that -- I mean, I was
19  busy at my desk. And Debra had sent me an
20  e-mail to the effect -- well, she knew I
21  didn't read my e-mail a lot of times right
22  away because I was busy doing other things
23  when I entered my office. But I did. You
24  know, we talked about it.
25       So the next thing I knew, that was

---

**116**

1  when Cynthia -- that was the first time they
2  provided, sir, some security for her. Because
3  the chief of police came by my office that
4  same day. And I said did y'all -- ever get
5  security for Cynthia and she said no. She
6  said but we were called today. And I said
7  really. She said I kept asking why, but
8  nobody ever told me why. I said, well, why do
9  you need to know it, just -- you know, just
10  because a person needs security. We've always
11  called, said I need security and in the past,
12  y'all have given it to us. She said because
13  we have to do a statement to say what it's
14  for. And I said, oh, when did that start
15  happening.
16       So, anyway, I left it alone. And
17  she said but we gave -- we went over there
18  today. And by then, word was out that Dr.
19  Bayo Lawal had accused Ms. Ellison of
20  shredding documents. Well, you know, I shred
21  my applications after a year or two, but there
22  is information within the schools that I'm
23  sure they can shred.
24       So then at that point, Dr. Lawal had
25  started. She had told me about him. He had

---

**Alexander Gallo & Associates, LLC**
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA TECHNOLOGIES

ATLANTA, GEORGIA    WASHINGTON, DC    CHICAGO, ILLINOIS    NEW YORK, NEW YORK

Telephone (404) 495-0777     Complimentary Conference Rooms     2700 Centennial Tower
Facsimile (404) 495-0766     Throughout Georgia And     101 Marietta Street
Toll Free (877) 495-0777     Major Cities Nationwide     Atlanta, Georgia 30303

www.galloreporting.com

## 117

1  started treating her differently, told her not
2  to come in his office, not to read his mail.
3  So I don't know what happened there. But the
4  final analysis to that was that he didn't want
5  her around. And, of course, after they
6  accused her of shredding the documents, I
7  guess she felt that she had no other -- she
8  left.
9      Q.  So --
10     A.  So she was still in a hostile
11 environment.
12     Q.  And that hostile environment was
13 created by Bayo Lawal?
14     A.  Well, he just added to it.
15     Q.  And that environment was hostile
16 because he had accused her of shredding the
17 documents?
18     A.  Well, I think that there are other
19 factors, sir, that I'm not at all sure what
20 they were, but I know she started having some
21 problems with him too after that meeting that
22 we had with Dr. Ritvoe. And he was apparently
23 somewhat satisfied because of what had
24 happened to Dr. Mahaffy at that point.
25 Because he was no longer head of that -- chair

## 118

1  of that department. And I guess he had --
2  his -- he was satisfied and that maybe had
3  been his resolve for that. I don't know.
4      Q.  Did Cynthia Ellison ever criticize
5  you for asking her when she intended to
6  retire?
7      A.  No. No. That wasn't -- I mean, I
8  asked a lot of people that. We were all -- of
9  course, I didn't have the years, but I had the
10 age. Cynthia had the years. And, you know,
11 like I said, I would have stayed a little bit
12 longer myself. I would have loved to have
13 stayed until I reached full retirement age,
14 but, you know, so be it.
15     Q.  It's not an uncommon question around
16 here to ask when are you going to retire?
17     A.  Oh, no, sir. No, sir. Well, it
18 would be if people would just -- you know, I
19 mean, we didn't do it all the time, you know,
20 like Ms. Foster would say sometimes when
21 somebody would call and she felt that they
22 were going to be a headache, well, when are
23 they leaving, when are they going to retire,
24 you know, something like that.
25     But it was just when I would have

## 119

1  seminars and people would come out and, you
2  know, I would say are you thinking about
3  retiring now. Sometimes I would; sometimes I
4  wouldn't.
5      Q.  Okay.
6      A.  It's only uncommon if you use it in
7  certain ways.
8      Q.  And you wouldn't take -- you didn't
9  take offense at those kind of questions to
10 you, did you?
11     A.  It all depends on the circumstances.
12     Q.  I mean the ones you just referred to
13 when people would ask you.
14     A.  No, when someone just asked me if I
15 had a problem and I thought it was going to be
16 a problem and they said, well, when are you
17 retiring, yeah, that would be offensive.
18     Q.  So I guess it depends on how you
19 interpret the question, right, as to whether
20 it's offensive or not?
21     A.  It all depends on the circumstances
22 around the question.
23     Q.  Now, Ms. Ward, is it your testimony
24 that from fall of 2004 --
25     A.  Yes, sir.

## 120

1      Q.  -- when Cynthia Ellison started
2  escorting Bayo Lawal and his wife around and
3  helping him get situated, from that date until
4  February 14th, you didn't have any discussions
5  with Cynthia Ellison about retirement or when
6  she intended to retire?
7      A.  No.
8      Q.  That's not your testimony?
9      A.  No.  Why would it be?
10     Q.  I'm trying to clarify. That's what
11 I understood it to be.
12     A.  About her retiring? She didn't have
13 any -- no, she said to me -- because she was
14 thinking about retiring at a later date. And
15 she said, but I'm not going to retire anytime
16 soon, Faye, because I want to stay here and
17 work with Dr. Lawal.
18     Q.  That's what she told you in the fall
19 of 2004; right?
20     A.  She told me that from the time he
21 came.
22     Q.  When did he come?
23     A.  I think he came in in August of
24 2004, I believe. I don't know. Debra
25 probably knows.

Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA        WASHINGTON, DC      CHICAGO, ILLINOIS      NEW YORK, NEW YORK

Telephone (404) 495-0777         Complimentary Conference Rooms         2700 Centennial Tower
Facsimile (404) 495-0766           Throughout Georgia And                101 Marietta Street
Toll Free (877) 495-0777             Major Cities Nationwide             Atlanta, Georgia 30303

www.galloreporting.com

---

121

1     Q.  From August 2004, that's what
2  Cynthia Ellison was telling you about her
3  retirement time?
4     A.  Well, she didn't -- it wasn't just
5  an in-depth conversation about it.
6     Q.  I understand.
7     A.  She just said that she wanted to
8  stay with him until he became acclimated to
9  the School of Sciences and the duties and
10  everything so she as a secretary to him could
11  perform in the manner to help him.
12     Q.  Okay.  And from that time until she
13  came to you on February 14th, you believed
14  that she still intended to remain a couple of
15  years --
16     A.  Yes.
17     Q.  -- until --
18     A.  Absolutely.  Absolutely.
19     Q.  Okay.  You know Don Yancey, don't
20  you?
21     A.  I do.
22     Q.  How long have you known him?
23     A.  Well, I met him in about 1989 when I
24  came to work.
25     Q.  What is his job?

---

122

1     A.  He's a retiree.  Alabama teacher's
2  retiree rep.  I know he is.  He's a big name
3  down there.
4     Q.  And you've contacted him on
5  different occasions to have him calculate
6  retirement benefits for employees if they --
7  beginning on a certain date based on their
8  years of service and age, haven't you?
9     A.  Okay.  Sir, what I've done as far as
10  my contact with Mr. Yancey about other
11  employees, I refer them to him.
12        Now, when I was ready to retire, I
13  went down personally to talk with him.  I
14  would recommend to employees if you need to
15  know, go talk to Mr. Yancey.
16        The process, they go talk to him
17  first.  They come back to HR.  I give them --
18  I do a two-part interview.  I give them a
19  sheet to take to their bank and they have
20  to -- need to do that processing within 60
21  days because we need to get information to
22  Auburn University payroll office in a timely
23  manner.
24        So, therefore, I would conduct
25  two -- a two-part interview.  Give them the

---

123

1  form, take down to their bank, come back, do
2  the application, and I would notarize it and
3  send it with the payroll information.
4     Q.  Okay.  And that's what you did with
5  Cynthia Ellison when she retired?
6     A.  Retired, yes, sir.
7     Q.  Now, did you contact Don Yancey in
8  September 2004 to find out what Cynthia
9  Ellison's retirement benefits would be if she
10  retired on December 1st, 2004, and what they
11  would be if she retired on July 1st, 2005?
12     A.  Why I would do that?  That wasn't my
13  business.
14     Q.  Well, I'm just asking you if you did
15  it.
16     A.  No, sir.  No.  I didn't do anybody
17  that way.  I would refer them to take care of
18  their own business.
19     Q.  Did you contact Don Yancey on
20  January 4th, 2005, to see what Cynthia
21  Ellison's retirement benefits would be if she
22  retired on April 1st, 2005?
23     A.  No, sir.  No, sir.
24     Q.  So, if Don Yancey testified to that,
25  he would be incorrect?

---

124

1     A.  Well, I didn't.  I didn't contact
2  Don Yancey about anyone.  In most cases, I
3  would refer the person to Don Yancey and they
4  would do what they have to do.
5     Q.  Okay.
6     A.  And if they had leave time, they
7  would use their leave time to take them
8  through.
9     Q.  So you had no contact with -- you've
10  never had any contact with Don Yancey about
11  Cynthia Ellison's retirement benefits?
12     A.  Not to my recollection.  No, indeed.
13  Not to my recollection.  I don't know why I
14  would have had to.
15     Q.  Do you recall when you signed off on
16  Cynthia Ellison's retirement papers?
17     A.  No, I don't remember the specific
18  date, but I know I did.
19     Q.  Do you remember if it was before
20  February 14th or after?
21     A.  Well, if she left -- it might have
22  been before.  Like I said, I don't want to get
23  into giving you a specific date because I
24  don't remember.  I know I gave her the form to
25  take to her bank and she brought that back and

---

Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC          CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777                Complimentary Conference Rooms                2700 Centennial Tower
Facsimile (404) 495-0766                   Throughout Georgia And                      101 Marietta Street
Toll Free (877) 495-0777                   Major Cities Nationwide                   Atlanta, Georgia 30303

www.galloreporting.com

125

1    I know that I did the application. And I had
2    to sign off on it.
3        Q.   Let me show you a document that's
4    been introduced in this case --
5        A.   Okay.
6        Q.   -- identified in this case already
7    called the Teachers's Retirement System of
8    Alabama application for retirement?
9        A.   Uh-huh.
10       Q.   And is this your signature on it?
11       A.   Yes, it is.
12       Q.   Is this Cynthia Ellison's
13   application for retirement?
14       A.   It is.
15       Q.   And did you notarize that document?
16       A.   I did. My name is on it.
17       Q.   What's the date of your notary
18   public?
19       A.   March 7th. That's -- my commission
20   expires on this date and I notarized it on the
21   11th day of February.
22       Q.   So did Cynthia Ellison come to you
23   on February 11th to complete this paperwork?
24       A.   She had to. We don't notarize it
25   unless the person is present.

127

1        Q.   Did he tell you what his complaint
2    was?
3        A.   Well, he did -- Lawal wasn't --
4    Chris was not giving him respect. I don't
5    know if he was threatening him, but I know
6    that he had very little control. He was going
7    around I believe talking about Dr. Lawal, that
8    he would not be a good leader, that he didn't
9    believe in him, and that the faculty was not
10   going to follow him. And that was said by
11   Dr. Glen Ray in a statement he made. In fact,
12   he was described by Dr. Moody as being a
13   bigot.
14       Q.   Other than the complaints you may be
15   aware of from Cynthia Ellison and Bayo Lawal
16   --
17       A.   Yes, sir.
18       Q.   -- do you know of any complaints
19   from anyone at AUM concerning Chris Mahaffy
20   threatening to strike anyone?
21       A.   No, sir. I don't.
22       Q.   Do you know of any complaints from
23   anyone at AUM about Chris Mahaffy threatening
24   physical violence?
25       A.   No, sir. I don't.

126

1        Q.   Do you know if Cynthia Ellison had
2    given notice of her retirement any earlier
3    than February 11th to her dean?
4        A.   I don't know.
5        Q.   I know you told me that you weren't
6    directly involved with the Allison Stevens
7    incident.
8        A.   Yes, sir.
9        Q.   But do you know if Allison Stevens
10   had ever been accused of using racially
11   insensitive language or exhibiting racially
12   insensitive behavior at AUM before that point?
13       A.   No, I don't.
14       Q.   Do you know if anyone other than
15   Cynthia Ellison has accused Chris Mahaffy of
16   engaging in any type of racially insensitive
17   behavior or using racially insensitive
18   language?
19       A.   Well, Dr. Lawal. He had the same
20   complaint as Cynthia had.
21       Q.   That's your understanding?
22       A.   Uh-huh. He had a complaint. When
23   it started out, he said he wanted his
24   complaint to be aligned with Cynthia for
25   whatever it was.

128

1        Q.   How about intimidating anyone?
2        A.   I don't.
3        Q.   Do you know if there are any
4    complaints other than -- strike that, please.
5    Do you know of any complaints about Chris
6    Mahaffy verbally threatening anyone?
7        A.   No, I don't.
8        Q.   Do you know if Chris Mahaffy has a
9    history of any physical violence?
10       A.   No, I'm not aware.
11       Q.   Do you know if he's ever been
12   accused of any sort of inappropriate touching?
13       A.   I don't know, but when he was let
14   go, it wasn't because of -- from my
15   understanding, it had nothing to do with
16   Cynthia Ellison's allegation. I think it had
17   something to do with improper conduct on Chris
18   Mahaffy's part that even reached the heights
19   to Auburn University. That's my
20   understanding. I don't know now.
21       Q.   That was after Cynthia Ellison had
22   retired, was it not?
23       A.   Right. Right.
24       Q.   Has anyone ever asked you to provide
25   them with any sort of security because of fear

Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC     CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777            Complimentary Conference Rooms              2700 Centennial Tower
Facsimile (404) 495-0766              Throughout Georgia And                    101 Marietta Street
Toll Free (877) 495-0777               Major Cities Nationwide                Atlanta, Georgia 30303

www.galloreporting.com

---

129

1   of Chris Mahaffy?
2      A.   Mrs. Ellison.
3      Q.   Other than Cynthia Ellison.  We've
4   talked about that.
5      A.   No.  No.
6      Q.   Have you been involved in any other
7   internal claims of harassment at AUM during
8   the time you were in the human resources
9   office?
10     A.   No.  Like I said, that was -- the
11  director always handled those.  In fact, we
12  didn't have a lot of cases during that time
13  anyway.  We put fires out.
14     Q.   I'm sorry?
15     A.   We didn't have a lot of cases during
16  that -- during that reign because we put fires
17  out as much as we could.
18     Q.   Instead of starting them?
19     A.   Yes, sir.
20     Q.   Is that your saying?
21     A.   That's my belief.  That's what I
22  know.
23     Q.   I've heard that several times in
24  this lawsuit.
25     A.   It costs the university money.

---

130

1      Q.   Do you have any complaints about the
2   manner in which AUM investigated Cynthia
3   Ellison's complaints against Mahaffy beginning
4   in December 2004?
5      A.   Do I have what, sir?
6      Q.   Any complaints about the manner in
7   which the university investigated her
8   complaints.
9      A.   Well, I looked at the time factor
10  when Ms. Ellison first started complaining,
11  sir, and I thought that that timeframe was
12  extensive, when it could have been -- now,
13  that's what I'm saying to you.  That's my
14  personal observation.  It could have been
15  handled a little bit quicker.  I think they
16  could have gotten to the investigation a
17  little bit faster.
18     Q.   Are you talking about in December
19  2004?
20     A.   In December and January.  Yes, sir.
21     Q.   Other than the duration of the
22  investigation, do you have any complaints
23  about it?
24     A.   Well, I think that she -- you know,
25  you mean the investigation itself and how it

---

131

1   went?
2      Q.   Yeah.
3      A.   Well, I think that if things would
4   have been handled in some ways -- like, she
5   only wanted to know the status of her
6   investigation.  They were letting Chris
7   Mahaffy at a point know.
8          And, of course, at the time -- and I
9   think she came to our office in January, and
10  she wanted to know where we were with it.  And
11  we had a meeting with Ms. Foster in my
12  office.  And she said she wanted to know from
13  Ms. Foster if she believed that she was
14  telling the truth.  She wanted to know.
15         Ms. Foster came in and told her she
16  wasn't going to get the attorney, and I guess
17  was Tom Rebel -- that she was not going to get
18  any constructive discharge pay and all that.
19  And I thought -- because Mr. Rebel had said
20  for Cynthia to call over to the office.
21  Ms. Foster said she wasn't calling over there.
22  She said I don't want to talk to her.
23         So I said, well, you've got to do
24  what the attorneys say for you to do.  You
25  need to call over and talk to her.  She said

---

132

1   I'm going to send her two paragraphs and let
2   her know.  Well, she came over and met in my
3   office and when she asked her what -- did she
4   believe her, Ms. Foster got up and walked out
5   of the room, said you can call the attorney
6   and ask him whatever you want to know.  She
7   gave her Tom Rebel's phone number.  That was
8   inappropriate to me.  At that time, she wasn't
9   even going to seek an attorney.
10     Q.   The investigation wasn't over at
11  that point, was it?
12     A.   The investigation had started
13  because we had talked to several people.
14     Q.   Right.  But it wasn't over?
15     A.   And at that point -- no, it was not
16  over, but there was enough information.
17         Sometimes when you -- I feel --
18  well, that's not important what I feel.  But
19  in handling HR cases or any kind of cases when
20  you're dealing with the people, you have to
21  find a happy medium to pacify people before
22  they take it to the max degree.
23         And in this -- at this point, I
24  think if we had just been able to supply her
25  with something to tell her -- I could have

**Alexander Gallo & Associates, LLC**
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC          CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777         Complimentary Conference Rooms         2700 Centennial Tower
Facsimile (404) 495-0766              Throughout Georgia And              101 Marietta Street
Toll Free (877) 495-0777            Major Cities Nationwide             Atlanta, Georgia 30303

www.galloreporting.com

133

1  very easily said to her, you know, maybe I
2  believe you, maybe I don't, but we're doing
3  what we can to rectify this situation.
4      Q.   You wouldn't -- in an investigation,
5  you typically wouldn't want to make a
6  credibility determination until the
7  investigation was over, would you?
8      A.   Well, you might not want to do that
9  too, but you'd find some comfort zone that you
10 can put that employee in.  Because I think if
11 that had been provided to her, she would
12 not -- we wouldn't be here today.
13     Q.   Is that the only criticism you have
14 in the manner in which the investigation was
15 conducted?
16     A.   That's all I have.
17     Q.   And so the only thing you would have
18 done differently was to try to respond to that
19 inquiry?
20     A.   I would have tried to handle it a
21 different way in order to try to work with the
22 employee to let them do -- I would have
23 investigated.  I would have done it in a much
24 faster manner and I wouldn't have said, well,
25 she makes me sick, what's she want now, when

134

1  is she retiring.
2      Q.   Have you ever been involved in any
3  lawsuits?
4      A.   No, I haven't.
5      Q.   You've never been to jail, have you?
6      A.   Huh-uh.
7      Q.   Ever been arrested?
8      A.   No, I haven't.
9          MR. DODD:  Bonnie, can we mark this?
10         (Defendant's Exhibit-4 was marked
11     for identification.)
12     Q.   (By Mr. Dodd) Ms. Ward, here's
13 defendant's exhibit four.  See if you can
14 identify that for me, please.
15     A.   Oh.  It's a job description.
16     Q.   For your position?
17     A.   Yes.
18     Q.   And that's your signature at the
19 bottom dated May 17th, 2001?
20     A.   It is.
21     Q.   Are you pretty familiar with this
22 job description, fairly familiar with it?
23     A.   I am.
24     Q.   Do you know of anything that's.
25 inconsistent between this job description and

135

1  the duties contained in it and the duties that
2  you outline for us in your affidavit?  I mean,
3  anything that jumps off the page at you?
4      A.   In what way?
5      Q.   In any way.  I think they're
6  consistent.
7      A.   No.  Huh-uh.  It's accurate.
8          MR. DODD:  Ms. Ward, I have no
9      further questions for you and I thank you
10     for your time today.
11         THE WITNESS:  Okay.  Thank you, sir.
12         MS. RODGERS:  I have no questions.
13         (Whereupon, the deposition was
14 concluded at 11:55 a.m.)

136

1              DESCRIPTION OF EXHIBITS
2
3  EXHIBIT   IDENTIFICATION
4    1       Letter to Dr. Ritvoe
5    2       Affidavit
6    3       Employment Application
7    4       Job Description
8
9
10         (Original exhibits attached to the
11 Original transcript.)



ATLANTA, GEORGIA        WASHINGTON, DC      CHICAGO, ILLINOIS            NEW YORK, NEW YORK

Telephone (404) 495-0777          Complimentary Conference Rooms           2700 Centennial Tower
Facsimile (404) 495-0766              Throughout Georgia And                  101 Marietta Street
Toll Free (877) 495-0777               Major Cities Nationwide                Atlanta, Georgia 30303

www.galloreporting.com

### 137

1  STATE OF GEORGIA:
2  COUNTY OF FULTON:
3      I hereby certify that the foregoing
4  transcript was reported, as stated in the
5  caption, and the questions and answers
6  thereto were reduced to typewriting under my
7  direction; that the foregoing pages represent
8  a true, complete, and correct transcript of
9  the evidence given upon said hearing, and I
10 further certify that I am not of kin or
11 counsel to the parties in the case; am not
12 in the employ of counsel for any of said
13 parties; nor am I in any way interested in
14 the result of said case.
15
16
17
18
19
20
21
22
23
24
25

### 139

1                    CAPTION
2      The Deposition of FAYE WARD, taken
3  in the matter, on the date, and at the time and
4  place set out on the title page hereof.
5      It was requested that the deposition be taken
6  by the reporter and that same be reduced to
7  typewritten form.
8      It was agreed by and between counsel and the
9  parties that the Deponent will read and sign the
10 transcript of said deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### 138

1      Disclosure Pursuant to Article
2  8(B) of the Rules and Regulations of the
3  Board of Court Reporting of the Judicial
4  Council of Georgia, I make the following
5  disclosure:
6      I am a Georgia Certified Court
7  Reporter, here as a representative of
8  Alexander Gallo & Associates, L.L.C.,
9  to report the foregoing matter.  Alexander
10 Gallo & Associates, L.L.C., is not taking
11 this deposition under any contract that is
12 prohibited by O.C.G.A. 5-14-37 (a) and
13 (b).
14      Alexander Gallo & Associates,
15 L.L.C., will be charging its usual and
16 customary rates for this transcript.
17
18
19
20
21      BONNIE L. SMITH, RPR CCR-B-2432
22
23
24
25

### 140

1                    CERTIFICATE
2  STATE OF                    :
3  COUNTY/CITY OF              :
4      Before me, this day, personally appeared,
5  FAYE WARD, who, being duly sworn, states that the
6  foregoing transcript of his/her Deposition, taken in the
7  matter, on the date, and at the time and place set out
8  on the title page hereof, constitutes a true and accurate
9  transcript of said deposition.
10    _____
11         FAYE WARD
12
13    SUBSCRIBED and SWORN to before me this
14 _____day of_____, 2006 in the
15 jurisdiction aforesaid.
16
17 _____    _____
18 My Commission Expires   Notary Public
19
20 *If no changes need to be made on the following two pages,
21 place a check here _____, and return only this signed page.*
22
23
24
25



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS

ATLANTA, GEORGIA        WASHINGTON, DC        CHICAGO, ILLINOIS        NEW YORK, NEW YORK

Telephone (404) 495-0777        Complimentary Conference Rooms        2700 Centennial Tower
Facsimile (404) 495-0766        Throughout Georgia And        101 Marietta Street
Toll Free (877) 495-0777        Major Cities Nationwide        Atlanta, Georgia 30303

www.galloreporting.com

141

1          DEPOSITION ERRATA SHEET
2    RE:    Alexander Gallo & Associates, L.L.C.
3    File No.  13898
4    Case Caption:  CYNTHIA ELLISON
5    vs.  AUBURN UNIVERSITY MONTGOMERY
6    Deponent:  FAYE WARD
7    Deposition Date: June 14, 2006
8    To the Reporter:
9    I have read the entire transcript of my Deposition taken
10   in the captioned matter or the same has been read to me.
11   I request that the following changes be entered upon the
12   record for the reasons indicated.  I have signed my name to
13   the Errata Sheet and the appropriate Certificate and
14   authorize you to attach both to the original transcript.
15
16   Page No._____Line No._____Change to:_____
17   _____
18   Reason for change:_____
19   Page No._____Line No._____Change to:_____
20   _____
21   Reason for change:_____
22   Page No._____Line No._____Change to:_____
23   _____
24   Reason for change:_____
25

142

1    Deposition of FAYE WARD
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21
22
23
24   SIGNATURE:_____DATE:_____
25          FAYE WARD



Alexander Gallo & Associates, LLC
COURT REPORTING & VIDEO SERVICES
TRIAL PRESENTATIONS
ATLANTA'S TECHNOLOGICAL LEADERS IN LITIGATION SUPPORT & MULTIMEDIA PRESENTATIONS

ATLANTA, GEORGIA          WASHINGTON, DC          CHICAGO, ILLINOIS          NEW YORK, NEW YORK

Telephone (404) 495-0777          Complimentary Conference Rooms          2700 Centennial Tower
Facsimile (404) 495-0766          Throughout Georgia And          101 Marietta Street
Toll Free (877) 495-0777          Major Cities Nationwide          Atlanta, Georgia 30303

www.galloreporting.com