**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**

**NORTHERN DIVISION**

| | | |
|---|---|---|
| **CYNTHIA ELLISON,** | ) | |
| Plaintiff | ) | |
| v. | ) | **Civil Action No.** |
| | ) | 2:05-CV-00902-MHT-DRB |
| **AUBURN UNIVERSITY** | ) | |
| **MONTGOMERY,** | ) | |
| | ) | |
| Defendant | ) | |

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF SECOND MOTION FOR SUMMARY JUDGMENT**

Defendant Auburn University Montgomery (AUM) submits this

Memorandum of Law in Support of its Second Motion for Summary Judgment.

**FACTUAL AND LEGAL SYNOPSIS**

Plaintiff, a secretary to the Dean of the School of Sciences at AUM,

complained internally on December 3, 2004 that a Department Chairman, Chris

Mahaffy, had behaved inappropriately toward her after AUM did not select him

as Dean.  Plaintiff had served on the selection committee that recommended

another candidate, Dr. Bayo Lawal, for Dean.  Although Plaintiff and Mahaffy

had worked together for almost two decades, his behavior toward her changed

after the selection committee did not interview him for the position.  AUM

investigated Plaintiff's complaint in December 2004 and January 2005,

determined that Mahaffy had engaged in inappropriate behavior, and acted promptly on January 31 to strip Mahaffy of his department chairmanship and to impose other disciplinary measures on him.  On February 9, Plaintiff gave notice of her retirement from AUM, and on February 11 she filed the EEOC Charge that prompted this case.

Also on February 11, Plaintiff shredded several bags' worth of student documents.  The Dean of the School of Sciences wrote to her in an e-mail, saying he was "shocked" at this breach of AUM's protocol, which, in accordance with Alabama law, requires approval from the University archivist for shredding. Plaintiff, asserting that the Dean no longer trusted her, decided to make her departure via retirement from AUM immediate, and she left on February 14 and never returned.

Plaintiff's myriad Title VII claims fail for various factual and legal shortcomings, and they are ready for summary disposition for the common reason that Plaintiff cannot prove one or more required elements of each claim. Her failure on any essential element of a cause of action renders all other facts immaterial and warrants summary judgment.

AUM presents substantial evidence confirming its law-abiding relationship and conduct with Plaintiff, which Plaintiff's perfunctory and

conclusory assertions cannot overcome.  Under these circumstances, this Court

has not hesitated to grant summary judgment to the institution.  *Johnson v.*

*Auburn Univ.*, 403 F. Supp. 2d 1101 (M.D. Ala. 2005).

## ARGUMENT

### I.    Plaintiff's Title VII Claims Are Ripe for Summary Disposition

Summary judgment procedure under Fed. R. Civ. P. 56 is a tool by which

"factually insufficient claims or defenses [can] be isolated and prevented from

going to trial with the attendant unwarranted consumption of public and private

resources."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Supreme Court

instructs that summary judgment is required and "should be granted [when] 'the

pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact.'"  *Id.* at 322.  A genuine issue of material fact does not exist unless

"the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1396

(11th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

An issue is not genuine if it is unsupported by evidence, or if it is created

by evidence that is "merely colorable" or is "not significantly probative."

*Anderson*, 477 U.S. at 250; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th

3

Cir. 1990). Likewise, a fact is not material unless it is identified by the controlling substantive law as an essential element of the non-moving party's case. *Anderson*, 477 U.S. at 248; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Accordingly, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of every element material to his case so as to create a genuine issue for trial. *See Celotex*, 477 U.S. at 323; *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988).

Because Plaintiff is unable to prove every element of each Title VII claim she asserts, her proof fails as a matter of law, entitling AUM to summary judgment.

## II. The Title VII Statute of Limitations Bars Plaintiff's Claims Arising Before August 15, 2004

Most of the encounters at AUM which Plaintiff either points to as evidence of racial bias or asserts constitute unlawful employment practices occurred far beyond the temporal reach of Title VII. Section 706(e)(1) of Title VII establishes the prerequisite that Plaintiff must satisfy before filing a valid civil action under Title VII. *Sanders v. City of Montgomery*, 319 F. Supp. 2d 1296, 1309 (M.D. Ala. 2004). That provision requires:

> A charge under this section *shall be filed* within one hundred and eighty days after the alleged unlawful employment practice occurred. . . .

42 U.S.C. § 2000e – 5(e)(1) (emphasis added).  This is an internal statute of limitations that bars Plaintiff's claims arising more than 180 days before she filed her EEOC charge on February 11, 2005.  *Zipes v. Trans World Airlines*, 455 U.S. 385, 393-94 (1982).  Thus, Title VII bars forever Plaintiffs' claims and assertions existing before August 15, 2004[1]

### A.    *Plaintiff's Co-Worker Confrontation with Allison Stevens is Untimely as a Title VII Claim*

Plaintiff's encounter with secretary Allison Stevens occurred in December 2003.  Plaintiff alleges that, following a dispute between the two women,  Stevens "came close" to saying "the 'N' word."  (Plaintiff's Dep., p. 89).  Plaintiff avers that Stevens "said it enough for me to know what she said."  (*Id.*)  This single

---

[1] The Court has explained that "strict adherence" to this procedural requirement "is the best guarantee of evenhanded administration of the law."  Mohasco Corp. v. Silver, 447 U.S. 807, 825 (1980).  By choosing this relatively short deadline, "Congress clearly intended to encourage the prompt processing of all charges of employment discrimination."  Id.  Indeed, this procedural rule is not a mere technicality, but an integral part of Congress' statutory scheme that should not "be disregarded by courts out of a vague sympathy for particular litigants." Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152 (1994).  Thus, if a plaintiff fails to file an EEOC charge before the 180-day limitations period, the plaintiff's subsequent lawsuit is barred and must be dismissed for failure to exhaust administrative remedies.

stray remark (even if it actually occurred) would not have been sufficient to state a claim of any kind.  But even if it had been, Plaintiff did not make it the subject of a timely EEOC Charge.  Plaintiff filed her EEOC charge on February 11, 2005, fourteen months after this alleged remark by Stevens, and therefore the alleged remark is not appropriately considered for purposes of this lawsuit.

### B.    *Mahaffy's Alleged Inappropriate Remarks are Untimely as Title VII Claims*

Plaintiff also alleges that Mahaffy, an Irishman, told her that he had never seen a black person before he came to the United States of America.  She further alleges that Mahaffy once came to her office with a magazine, "far enough away that I couldn't really tell what it was, but close enough that I could see the image."  Mahaffy asked her what the picture was, and she replied, "a monkey."  She testified, "And he walked over to my desk and laid it down and it was a black man.  So, yes, this was offensive to me."  (Plaintiff's Dep., p. 143).

Plaintiff alleges that Mahaffy made the statement about not seeing a black person until he came to the United States "during the time that Bob Elliott was Dean." (*Id.*)  Elliott left AUM in December 2002.  The incident with the magazine happened even before Mahaffy's alleged remark about not seeing a black person

6

until he came to the United States, which means it occurred more than two years before she filed her EEOC Charge. (*Id.* at 143).

To the extent Plaintiff's Complaint alleges harassment based on her confrontation with Stevens (and AUM's investigation of the incident), the arguably innocuous remark by Mahaffy that he had never seen a black person before coming to the United States, and the exchange with Mahaffy about the magazine photo, her claim fails on its merits. But Plaintiff cannot proceed on the merits, because the alleged incidents occurred too far in the past, too long before she filed her EEOC Charge. Her failure to timely file her EEOC Charge means that these claims must be rejected for failure to fulfill a condition precedent to filing a lawsuit, entitling AUM to summary judgment. *Fouche v. Jekyll Island State Park Authority,* 713 F.2d 1518, 1524 (11th Cir. 1983).

## III.    Plaintiff Fails to Prove that AUM Treated Her Disparately or in any Fashion Differently Due to Her Race

To establish disparate treatment under Title VII on the basis of race a plaintiff must show the following: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated individual outside of her protected class. *Maynard v. Board of Regents,* 342 F.3d 1281, 1289 (11th Cir. 2003).

A plaintiff cannot survive summary judgment without proof of each element, and a failure of factual proof of any element renders all other facts immaterial.

Plaintiff cannot establish a single situation in which she was treated differently than another person based on her race. She complained about the University's handling of her confrontation with Stevens,[2] but she has not established that any white person was treated better than she or even differently under similar circumstances. In fact, AUM took the only reasonable course of action it could take under the circumstances. There was a fact dispute as to what actually happened, with Plaintiff contending that Stevens said "the N-word," and Stevens adamantly contending that she did not. Three witnesses agreed that Stevens had been loud and disrespectful, but all said they did not hear her use a racial slur. Confronted with these facts, AUM gave Stevens a stern warning that she would be fired if anything similar happened again.

Plaintiff next complains that, when the University investigated Barbara Ware's complaint against her, and her own complaint against Mahaffy, she did not receive the same letters that Ware and Mahaffy received at the conclusion of

---

[2] As shown in Section II above, any complaints about AUM's handling of the Stevens incident are time-barred, and AUM illustrates them here only to further demonstrate the overall failure of Plaintiff's disparate treatment claim, while

those investigations.  She asserts no factual or legal basis for claiming entitlement to AUM's communications with other employees, and in fact Plaintiff was not entitled to these documents.  The University handled these complaints with an appropriate level of confidentiality, and it determined that Plaintiff should not be allowed to review what AUM wrote to other employees, in the interests of their privacy.   AUM assured Plaintiff that the issues raised had been appropriately resolved.  The salient point here, however, is that Plaintiff has not shown that any similarly-situated white employee was treated preferentially or differently under similar circumstances.  Thus, no inference of bias arises.

Plaintiff nonetheless argues that Ware and Mahaffy received documents that she did not receive in the course of AUM's investigations.  In each instance, though, Plaintiff was not similarly situated to these persons.  Ware complained about Plaintiff, and Plaintiff complained about Mahaffy.  In each situation Plaintiff was, by definition, *not* similarly situated to the other person involved. In neither the Ware complaint nor Plaintiff's complaint against Mahaffy did AUM give the respective parties copies of the disciplinary or other documents provided to the other.  That is identical--not dissimilar--treatment.  And Plaintiff,

---

expressly continuing to assert the defense that Plaintiff did not exhaust her administrative remedies as to these untimely allegations.

as the complaining party with respect to Mahaffy, received no less than Ware received as the complaining employee with respect to her.

Moreover, there are significant differences both between the two circumstances and within the Mahaffy investigation that make Plaintiff's purported comparison foolish. The Ware gripe was not much more than a squabble between two secretaries that AUM quickly fixed, with each secretary promising to act nicely toward the other.

In contrast, the Mahaffy investigation involved serious allegations of improper conduct lodged against a tenured faculty member and department chairman by a subordinate employee; the investigation reached all the way to the Chancellor's Office; and it resulted in the imposition of meaningful and significant discipline against the tenured faculty member.

Thus, any seeming similarities between Ware as a complaining employee and Plaintiff as a complaining employee disappear. In fact, they were both minority employees, and they instigated vastly different proceedings. They are not similarly situated.

In order for an employee to be similarly situated to Plaintiff, the employee must be "similarly situated in all relevant respects." *Knight v. Baptist Hosp. of Miami, Inc.,* 330 F.3d 1313, 1316 (11th Cir. 2003). Additionally, the comparator

employee must have "very similar job-related characteristics" to Plaintiff, and be "in a similar situation" to Plaintiff. *MacPherson v. University of Montevallo,* 922 F.2d 766, 774 (11th Cir. 1991). Plaintiff has established no situation where AUM treated a white employee better or even differently than AUM treated her in the course of a disciplinary investigation. Her claim of discrimination thus fails as a matter of law for lack or proof of any disparate treatment.

## IV.    Plaintiff Fails to Prove Retaliation

### A.    *Plaintiff Did Not Engage in Any Statutorily-Protected Activity Prior to the Time She Filed Her EEOC Charge on February 11, 2005*

Under the Participation Clause of Title VII's anti-retaliation provision, found in Section 704, an employee is protected from discrimination if she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

The Participation Clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *EEOC v. Total Sys. Servs., Inc.,* 221 F.3d 1171, 1174 (11th Cir. 2000). "At a minimum, some employee must

11

file a charge with the EEOC (or its designated representative) or otherwise instigate proceedings under the statute for the conduct to come under the Participation Clause." *Id.* at 1174 n.2. Activities invoking the jurisdiction of the federal government through the EEOC are entitled to expansive protection. *Id.* at 1175-76.

Here, Plaintiff did not file her EEOC Charge until February 11, after (sometimes long after) the various events below that she has identified as retaliatory, as well as after deciding to retire  and giving notice of her retirement on February 9. She cannot state a case for retaliation under the Participation Clause for anything that happened prior to February 11, 2005, which was a Friday.  The only thing of significance that happened after February 11 was Dean Lawal's discovery on Saturday that Plaintiff had shredded documents, and it turned out that she had shredded them improperly.  She then claimed that he did not trust her, and she left in a huff at about noon on Monday, February 14, never to return.

Under the Opposition Clause of Title VII's anti-retaliation provision, an employee is protected from discrimination if she " opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).  A plaintiff can establish a prima facie case of retaliation under the Opposition

Clause if she shows that she had a "good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Technologies,* 103 F.3d 956, 960 (11th Cir. 1997). In order to satisfy this standard:

> A plaintiff must not only show that [she] subjectively (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was objectively reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that [her] belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.*

"The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1351 (11th Cir. 1999). As this Court explained in *Williams v. Russell Corp,* 218 F. Supp. 2d 1283 (M. D. Ala. 2002), "[a]lthough the conduct opposed need not actually be [race] discrimination, it must be close enough to support an objectively reasonable belief that it is." *Id.* at 1296.

Opposition Clause acts are viewed in the context of the ordinary business environment, and, thus, are given less protection than Participation Clause acts. *Anduze v. Florida Atl. Univ.,* 151 Fed. Appx. 875, 878 (11th Cir. 2005), *cert. denied,* 2006 U.S. LEXIS 4548 (U.S., June 12, 2006).

13

In viewing the complaints Plaintiff made about Mahaffy to AUM officials, it is obvious that her current race claims are both objectively unreasonable and subjectively untrue. Plaintiff cannot show that she was engaged in protected activity for purposes of establishing a *prima facie* claim of retaliation. No reasonable person would believe that Plaintiff was complaining to AUM officials about *racial* harassment, as opposed to harassment because Mahaffy was not selected as Dean. Faye Ward, the Assistant Human Resources Director who assisted with the investigation into Plaintiff's Complaint, but who appears on Plaintiff's witness list, testified in her deposition:

> He thought that she could pull a string, I guess, to get him into that position or to make it so that he would have been a viable candidate for that position. And my knowledge and understanding is that he wasn't, was never. But he held that over her and I think the demeanor – his entire demeanor towards her changed during that time.

(Ward Dep., p. 67).

Ward was asked, "And do you think that he conducted himself the way you describe because he blamed her for not assisting him in the dean search?" She replied, "Yes, sir. I absolutely, unequivocally do." (*Id.*)

Plaintiff herself wrote in her EEOC Affidavit, "Unfortunately, due to Mr. Mahaffy's initial belief that I did not support him for the deanship, and in

14

response to the complaint I filed on December 3, 2004, Mr. Mahaffy targeted me for intense retaliation." (Plaintiff's Dep. Ex. 1). Plaintiff's own words establish even if she could prove Mahaffy "targeted her," his motive was the missed deanship opportunity, not her race. Plaintiff's current race retaliation claims are not objectively reasonable, and AUM should be granted summary judgment on those grounds.

### B.     Plaintiff Did Not Suffer an Adverse Employment Action

To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1454 (11th Cir. 1998). Although, as shown above, AUM believes that Plaintiff's complaints were not reasonable, Plaintiff contends that her complaints to the University about Stevens and Mahaffy were statutorily protected expression. She has not shown, however, that she suffered any adverse employment action, and therefore she necessarily cannot establish the causation prong of a valid claim.

The Supreme Court of the United States recently addressed this issue in *Burlington Northern and Santa Fe Railway Co. v. White,* No. 05-259, 2006 U.S. LEXIS 4895 (June 22, 2006). The Court observed that the "anti-retaliation provision

15

protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at *26. The Court wrote, "We speak of *material* adversity because we believe it is important to separate significant from trivial harms." *Id.* at *27. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

AUM never demoted Plaintiff, and she never suffered a loss in pay. To the contrary, AUM promoted her from time to time, and she regularly earned raises in pay. She retired from her job, and as shown in Section VII below, the conditions under which she resigned do not constitute constructive discharge.

The things Plaintiff claims constitute retaliation are vague and petty. She claims that Lawal "changed" after the meeting with Mahaffy on January 31, 2005. Asked to explain, she said, "He just changed. . . . He was angry that he was having to go through this, and it was directed at me." (Plaintiff's Dep., p. 136-37). The meeting with Mahaffy, however, happened on a Monday. Plaintiff submitted her retirement notice to Lawal on February 9, a Wednesday. Plaintiff had only six working days to be in Lawal's presence during which he could have displayed this alleged "anger" at her. She does not state what Lawal did or said that could possibly have constituted retaliation.

16

Plaintiff was asked in her deposition who she felt had retaliated against her. She responded, "I was referring to Debra Foster, Chris Mahaffy, Ritvo." (Plaintiff's Dep., p. 245). She testified that she felt these persons had retaliated against her for filing a complaint. (*Id.*) Her own testimony, however, established that she merely disapproved of the way AUM chose to discipline Mahaffy. She said she believed Vice Chancellor Roger Ritvo "treated Chris differently than he treated me. The letter that Bayo shared with me that was written to Chris states that Chris has a month to decide what he wanted to do.[3] Then he had until the end of the summer to complete whatever he decided he wanted to do." (Plaintiff's Dep., p. 169). It is obvious that Plaintiff believes Mahaffy should not have been allowed to decide what diversity programs he wanted to enroll in, and that he should not have been given a few months in which to complete them. But this is not retaliation against Plaintiff. It is merely AUM management's way of choosing how to deal with Mahaffy, and the fact that Plaintiff did not believe it was severe enough does not mean it was designed to retaliate against her.

As for Mahaffy himself, Plaintiff contended that he came to her office and stood in front of her desk for a moment, and that he wore a t-shirt that read, "I

---

[3] Among other things, Mahaffy had been directed to choose two diversity programs, and complete them before the end of the summer term.

am a redneck." She said, "I think the remark that he is going to get me. That was retaliation for not being selected for the short list on the Dean's search." Plaintiff's own words make clear that the latter statement is *not* retaliation for filing a complaint. Mahaffy's statements about not being selected for the deanship, while inappropriate, do not implicate Title VII in any way. The first two incidents are vague and innocuous. There is simply no way to twist one moment of standing at a person's desk and one wearing of a t-shirt into a retaliation claim. Plaintiff's contentions in this regard are frivolous.

Finally, Plaintiff claims that the Director of Human Resources, Debra Foster, retaliated against her, and she bases this claim on a conversation she had with Foster. Plaintiff testified:

> [S]he said, "The University attorney called, and they said to tell you that" – and this is the first time I ever heard of the phrase "constructive discharge." That you are not getting constructive discharge. They want to know what you want.
>
> I said "Debra, I simply want you to do your job. . . . I am simply asking you do you believe I have been mistreated?" Debra stormed out of the room. . . . Debra came back, handed me a piece of paper and she said, "If you have anything else to say, say it to our attorneys."

(Plaintiff's Dep., p. 167-68).

Plaintiff acknowledged later in her deposition, however, that she said one more thing before Foster left the room to get the card with the University's attorney's name and address:

> As I said, at the same time that Debra said that the attorneys wanted to know what I wanted, and I told her at that time I wanted mental anguish and $250,000. That's when she got up and left. She came back and said, "I don't have anything else to say to you."

(Plaintiff's Dep., p. 231).

Foster did not "retaliate" against Plaintiff. She simply took the most prudent course of action, which was to decline to speak with a represented party who was clearly no longer just asking Foster about the progress of her complaint and the University's investigation of it. Plaintiff was making legal demands for compensation, and Foster elected to have AUM's attorneys continue that conversation. The choice to be represented by counsel in such a discussion is not retaliation, and Plaintiff's claim therefore fails as a matter of law.

C.    **Even if Lawal's Frustration with Plaintiff Could Constitute Adverse Job Action, There is No Causal Connection to Any Protected Activity**

The Supreme Court acknowledged in *White* that a change in work assignments might constitute an adverse job action for purposes of a retaliation claim. 2006 U.S. LEXIS 4895 at *28-29. Plaintiff contends that, on February 14, Dr. Lawal "said that he did not trust me. He didn't want me to do anything in the office. I was just to sit there really. Don't open anything. Don't do anything." (Plaintiff's Dep., p. 188). Plaintiff contends that Lawal's instructions were in retaliation for her filing a complaint against Mahaffy. However, her own resignation letter stated that she believed Lawal had lost confidence in her.

Plaintiff filed her complaint against Mahaffy on December 3, 2004. For several weeks after that, Lawal did nothing that she found offensive. At her deposition, Plaintiff was asked, "What changed between the time you went home on Friday afternoon [February 11] and the time you left Monday afternoon [February 14] never to return?" She replied, "Dr. Lawal told me essentially there wasn't anything for me to do in the office any more." (*Id.* at 191).

This completely negates any causal relationship between Plaintiff's complaint against Mahaffy and Lawal's alleged snubbing of her. Lawal had no problem with Plaintiff, and Plaintiff had no problem with him, until February 14

20

– the first working day after he found the shredded documents in his office.

Even if Plaintiff suffered an adverse job action, its cause was clearly Lawal's

discovery of the shredded papers.  Her own conduct indicates that Lawal's

behavior was acceptable enough until February 14, the first work day after his

discovery that she had violated University policy and Alabama law by shredding

documents without permission.  Document shredding of the kind Plaintiff

engaged in is not protected activity, and "retaliation" because of such shredding

is not actionable.

## V.     Plaintiff Proof Fails as a Matter of Law to Suggest, Much Less Establish, a Hostile Work Environment

To establish a hostile work environment, Plaintiff must demonstrate that

(1) she belongs to a protected group; (2) she has been subjected to unwelcome

harassment; (3) the harassment was based on the protected characteristic, here

race; (4) the harassment was sufficiently severe or pervasive to alter the terms

and conditions of employment and thus create a discriminatorily abusive work

environment; and (5) the employer is responsible for that environment under a

theory of either direct or vicarious liability. *Miller v. Kenworth of Dothan,* 277 F.3d

1269, 1275 (11th Cir. 2002).  As demonstrated below, Plaintiff cannot meet the

third, fourth or fifth prima facie elements.

21

**A.    The Conduct Plaintiff Complained of Was Not, by Her Own Acknowledgement, "because of" Her Race**

In a race-based case, harassing statements and conduct must be of a racial nature before they can be considered in determining whether the severe or pervasive requirement is met. *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 586 (11th Cir. 2000) (sexual harassment decision). Accordingly, "innocuous or boorish statements or other behavior that does not relate to the race of the actor or the employee do not count." *Laosebikan v. Coca-Cola Co.,* 167 Fed. Appx. 758, 765 (11th Cir. 2006). In evaluating a harassment case, the Court must distinguish between harassment and discriminatory harassment. *See Bowman v. Shawnee State Univ.,* 220 F.3d 456, 462 (6th Cir. 2000). Thus, an employee must demonstrate that the allegedly harassing conduct was motivated by a bias towards the employee's protected class. *Bryant v. Martinez,* 46 Fed. Appx. 293, 296 (6th Cir. 2002).

Victims of racial harassment "must always prove that the conduct at issue was not merely tinged with offensive [racial] connotations, but actually constituted discrimination *because of [race]*." *Ashmore v. J.P. Thayer Co.,* 303 F. Supp. 2d 1359, 1368 (M.D. Ga., 2004). This requires a plaintiff to demonstrate that, "but for the fact of her [race], she would not have been the object of

22

harassment." *Colon v. Environmental Technologies, Inc.,* 184 F. Supp. 2d 1210, 1216 (M.D. Fla. 2001).

Here, there is no evidence that the alleged conduct was undertaken "because" of Plaintiff's race. She herself stated in her deposition that she believed Mahaffy "retaliated" against her because he was not "selected for the short list on the Dean's search." (Plaintiff's Dep., p. 172). She stated, "[Mahaffy] said that he was going to get me because I was on the second Dean search, and he was not selected to the short list to be interviewed." (*Id.* at 163). "He said that he blamed me for not being selected as Dean." (*Id.* at 72).

Moreover, Plaintiff testified that Mahaffy's offbeat behavior was not directed solely at her. She testified, "Dr. Elliott referred to – they basically all made the comment that [Mahaffy] was crazy. Something was wrong with him. The Department heads had a problem with him in the Department head's meeting. It was just a combination of student complaints, faculty complaints. Everybody just about." (*Id.* at 181). If "everybody just about" had complaints about Mahaffy, it is axiomatic that any offensive behavior he exhibited toward Plaintiff was not "because of" her race.

Similarly, Plaintiff was asked, "Do you think that Debra Foster took any action, or refused to take any action that should have [been] taken about

anything, because you are black?"[4]  Plaintiff responded, "Not because I am black

per se, no. . . . I think she treated me differently because she just didn't like me."

(*Id.* at 83, 66-67).

Although Plaintiff and Foster may have had a personality conflict,

numerous courts have held that even harassing behavior, if based merely on

"inter-departmental politics and personality conflicts," is not actionable.  *Tademe*

*v. St. Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003); *accord, McConnell v.*

*Westpoint Stevens, Inc.*, No. 2:04-cv-694, 2005 U.S. Dist. LEXIS 32996 at *21 (Sept. 6,

2005) ("animosity is not the equivalent of . . . discrimination. . . . The plaintiff

cannot turn a personal feud into a . . . discrimination case");  *see Hounton v. Gallup*

*Indep. Co.*, 113 Fed. Appx. 329, 333 (10th Cir. 2004)("employee personality

conflicts are not business of federal courts"); *Crawford v. Medina Gen. Hosp.,* 96

F.3d 830, 836 (6th Cir. 1996) (holding that the plaintiff's evidence of hostility and

abusiveness in the workplace was not related to age-based animus but rather to a

"simple clash of personalities" where only two comments objectively indicated

age-based bias); *McCollum v. Bolger,* 794 F.2d 602, 610 (11th Cir. 1986) ("[P]ersonal

animosity is not the equivalent of [racial] discrimination and is not proscribed by

---

[4] Foster is also African-American.

24

Title VII. The plaintiff cannot turn a personal feud into a [race] discrimination case.")

Plaintiff stated that she did not believe Foster investigated her complaints properly, and that "it was known around Campus that Debra started fires. She didn't put them out." (Plaintiff's Dep., p. 100). This establishes merely that Plaintiff and Foster did not get along. Their personality conflict was utterly unrelated to race.

### B.     The Conduct Plaintiff Alleges Was Neither Severe Nor Pervasive

To prove that the alleged harassment affected a "term, condition or privilege" of her employment, Plaintiff must show that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive environment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). Whether an environment is hostile or abusive depends on a "totality of circumstances." *Gupta,* 212 F.3d at 586. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

"In order to be actionable . . . a [racially] objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher,* 524 U.S. at 787. To determine whether an allegedly hostile work environment satisfies the objective component, courts examine the totality of the circumstances, including the alleged conduct's frequency and severity; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with the plaintiff's work performance. *Mendoza,* 195 F.3d at 1246.

The standards the Supreme Court has set forth for evaluating a hostile work environment claim are "intended to be sufficiently demanding to ensure that Title VII does not become a general civility code." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998). Properly applied, this standard should filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing." *Id.* Courts of this Circuit have specifically recognized that "an employer's mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not fall within the proscription of Title VII." *Robertson v. Georgia Dep't of Corrections,* 725 F. Supp. 533, 538 (S.D. Ga.

26

1989).  "The Eleventh Circuit has held that racial slurs must be so commonplace, overt and denigrating that they create an atmosphere charged with racial hostility."  *Mitchell v. Carrier Corp.,* 954 F. Supp. 1568, 1578 (M.D. Ga. 1995).

This Court has found a lack of severity and pervasiveness where "eight potentially hostile acts . . . occurred over approximately 20 months."  *Shelby v. Am. Colloid Co.,* No. 2:04-cv-489, 2005 U.S. Dist. LEXIS 40679 at *21 (M. D. Ala., March 1, 2005);  *see Portera v. State of Ala. Dep't of Finance,* 322 F. Supp. 2d 1285, 1290 (M. D. Ala. 2004)(four non-severe incidents over a six-month period were not frequent enough to create a hostile working environment).

Going back four years, Plaintiff alleges only six incidents that she believes were based on race.  As shown in Section II above, the confrontation with Stevens, Mahaffy's remark that he had never seen a black person before he came to the United States, and her conversation with Mahaffy about the magazine photo are all clearly time-barred.  Plaintiff also alleges that Mahaffy (who is a native Irishman) told her that black citizens do not seem to be as smart as white citizens in the United States, and that with two blacks in the office it was going to be an "uphill battle."  She alleges that he once wore a t-shirt which read, "I'm a redneck" and asked her what she thought about the shirt.  (Complaint, ¶ 8).

Thus it appears that three remarks or incidents may arguably have happened within even a year prior to Plaintiff retiring from her position.  As a matter of law, these remarks were not severe or pervasive enough to state a hostile work environment claim.  One incident, Mahaffy's wearing of the t-shirt that said, "I'm a redneck," is actually innocuous.  It even falls short of the kind of "sporadic use of abusive language, [race]-related jokes, and occasional teasing" that the Supreme Court has determined are "ordinary tribulations of the workplace."

Plaintiff's allegations, even taken as true, fall well short of actionable harassment.  *See Bainbridge v. Loffredo Gardens, Inc.,* 378 F.3d 756, 759-80 (8th Cir. 2004) (affirming summary judgment for the employer although its managers had used terms like "spic," "wetback," "monkey," and "nigger"); *Hartsall v. Duplex Prods.,* 123 F.3d 766, 771, 773 (4th Cir. 1997) (defendant's statement that "we've made every female in this office cry like a baby" and isolated references to plaintiff as a slave and comments about buxom magazine pictures were "mildly offensive (and unactionable) utterances"); *Taylor v. Virginia Dep't of Corrections,* 177 F. Supp. 2d 497, 502-03 (E.D. Va. 2001)(supervisor's "base" behavior during the course of a year, including a handful of derogatory remarks about African Americans and comments that "blacks have too many special rights" and could

28

not be fired, was not sufficiently frequent or severe to create a hostile work environment).

Foster's investigation did lead her to write a memo stating, "[a]fter a thorough investigation of Cynthia Ellison alleging a hostile work environment by Dr. Chris Mahaffy, I conclude that he did make inappropriate comments and created a hostile work environment for her." (Fos Dec. ¶ 12 & Ex. F). Foster's memo, however, does not establish that a hostile work environment existed as a legal matter under the law of this Circuit. Foster is a lay person, and her memo was the manifestation of AUM's prompt, remedial action regarding Mahaffy's conduct. AUM agrees that Mahaffy's behavior was inappropriate and needed to be corrected, but it did not create a hostile environment in law.

AUM did exactly what an employer in its position is supposed to do -- it acted immediately to stop complained-of behavior. Foster's memo indicates just how seriously AUM took Plaintiff's complaints. The memo reflects a lay person's conclusion that Mahaffy's behavior must improve immediately. This was a wise course of action. It did not, however, establish the elements of a hostile work environment as a matter of law.

### C.    *AUM Took Prompt, Effective Remedial Action to End the Complained-of Conduct*

"The mere existence of a hostile work environment is not dispositive of employer liability."  *Rutledge v. Macy's East, Inc.,* No. 01-12-P-H, 2001 U.S. Dist. LEXIS 18684 at * 29 (D. Maine, Sept. 17, 2001).  Under the affirmative defense the Supreme Court has established to hostile work environment claims, an employer can avoid liability by showing two things.  The first prong requires the employer to show that it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior."  *Faragher,* 524 U.S. at 807.  The second prong requires that the employer show the employee failed to "take advantage of any preventive or corrective opportunities provided by the employer."  *Id.*

Here, Plaintiff acknowledged that she at first refused to report problems to Foster, the Senior Director of Human Resources.  As the Eleventh Circuit Court of Appeals has explained, "Federal law has now attempted to correct the problem of workplace discrimination, but it cannot be done without the cooperation of the victims. . . ."  *Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1366 (11th Cir. 1999).  When an employer has taken steps to prevent harassment, "an employee must provide adequate notice that the employer's directives have been breached so that the employer has the opportunity to correct the problem."  *Id.*

Plaintiff, ignoring the avenue that AUM had provided for reporting employee complaints, instead wrote to the Chancellor of the University (in the Stevens incident), and to the Vice Chancellor of the University (in the Mahaffy incident). The HR Department, in both cases, promptly interviewed witnesses, treating both incidents with the appropriate degree of seriousness and confidentiality. In both cases where Plaintiff complained, the alleged offender (first Stevens and then Mahaffy) was counseled sternly to avoid further inappropriate behavior. Plaintiff's complaint now is simply that she didn't like the results. She does not allege that Stevens ever did or said anything else that she considered harassing. She admits that, after she made her complaint on December 3, Mahaffy never made any racial remarks to her again. (Plaintiff's Dep., p. 178). By definition, AUM's remedial actions were effective. Plaintiff apparently believes AUM's treatment of Stevens and Mahaffy was not sufficiently harsh.

With regard to the Stevens incident, AUM could hardly have done more, as it interviewed all six witnesses or alleged witnesses and was unable to corroborate Plaintiff's assertion that Stevens used a racial slur. This Court addressed a similar situation in *Williams*, where a female plaintiff had accused her male coworker of harassing her:

31

> Once [the plaintiff] complained, her supervisors took immediate action to investigate her complaint.  Although the supervisors could not substantiate her allegation, they spoke to the parties involved, told [the plaintiff] to report any further problems, and thoroughly documented the incident and investigation.  The human resources manager even took the proactive step of warning the accused male employee not to confront [the plaintiff], an appropriate step given that [the plaintiff] had already confronted and accused him.

218 F. Supp. 2d at 1294.

Here, AUM took considerably stronger action against Mahaffy, because it determined that Plaintiff's complaints could be substantiated.  With respect to element (4) of a hostile environment claim, the basis for imposing liability is that, after having acquired actual or constructive knowledge of the allegedly harassing conduct, the employer took no remedial action to correct it.  *Mikels v. City of Durham,* 183 F.3d 323, 329 (4th Cir. 1999).  "[W]hen presented with the existence of illegal conduct, employers can be required to respond promptly and effectively, but when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well."  *Spicer v. Virginia,* 66 F.3d 705, 711 (4th Cir. 1995).

As this Court observed in *Williams,* "[t}hat [the plaintiff] believes the [employer] should have done more is immaterial. . . . [The Eleventh Circuit has] never stated . . . that a complainant in a discrimination action has a right to the

remedy of her choice." 218 F. Supp. 2d at 1294 (quoting *Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548, 1555 (11th Cir. 1997)).

The employer need not discharge an offender in order to have acted promptly and effectively. In *Lee v. North Carolina Dep't of Transp.,* 2000 U.S. Dist. LEXIS 7170 (E.D.N.C. 2000), the court determined that an employer was not liable for sexual harassment because its response eliminated the complained-of conduct. The plaintiff there was not satisfied because she believed the offender had not been "penalized in any meaningful way," but the court wrote, "the fact remains that her supervisor spoke with the offender and the harassment stopped." *Id.* at *16. Under those circumstances, the court wrote, there was no basis for imputing liability to the employer. This same analysis applies here.

"Under the framework established by the Court in *Faragher* and *Burlington Industries,* a prompt response by an authorized agent to halt reported harassment is sufficient to relieve the employer of liability under Title VII in cases where the harassment has not culminated in a tangible employment action." *Brown v. Henderson,* 155 F. Supp. 2d 502, 512 (M.D.N.C. 2000)(citation omitted). AUM did exactly what the law requires and what was necessary to address Plaintiff's complaints. Plaintiff cannot prove prong (4) of a hostile environment claim, and AUM cannot be held liable.

33

**VI.    Plaintiff Voluntarily Retired From Employment with AUM; She Fails to
Prove "Constructive Discharge" as a Matter of Law**

"To establish constructive discharge Plaintiff must prove that her

"working conditions were so intolerable that a reasonable person in [her]

position would be compelled to resign." *Kilgore v. Thompson & Brock Mgmt., Inc.,*

93 F.3d 752, 754 (11th Cir. 1996); *Cross v. Southwest Recreational Indus.,* 17 F.

Supp.2d 1362, 1376 (N.D. Ga. 1998).  "The plaintiff must do more than merely

show that she was subjected to actionable  harassment," and merely offensive

behavior does not support a constructive discharge claim. *Walton v. Johnson &*

*Johnson Servs.,* No. 02-12520, 2003 U.S. App. LEXIS 21208 at *25 (11th Cir. Oct. 20,

2003).  The "standard for proving constructive discharge is higher than the

standard for proving a hostile work environment." *Hipp v. Liberty Nat'l Life Ins.,*

252 F.3d 1208, 1231 (11th Cir. 2001).

"It is well established that, "[b]efore finding constructive discharge, [the

Eleventh Circuit] has traditionally required a high degree of deterioration in an

employee's working conditions. . . ." *Hill v. Winn-Dixie Stores, Inc.,* 934 F.2d 1519,

1527 (11th Cir. 1991).  Moreover, Plaintiff "has the responsibility to act reasonably

before choosing to resign, and then labeling that resignation as a constructive

discharge." *Mason v. City of Tampa*, 134 F. Supp. 2d 1309, 1317 (M.D. Fla.

34

2000)(citing *Garner v. Wal-Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir. 1987));

s*ee Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316-18 (11th Cir.

1989)(affirming district court's conclusion that Title VII plaintiffs were subjected

to hostile work environment, but were not constructively discharged); *Huddleston*

*v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 905-06 (11th Cir. 1998) (same).  "[H]urt

feelings are insufficient as proof of constructive discharge." *Hellums v. Webster*

*Indus.,* 97 F. Supp. 2d 1287, 1297 (M.D. Ala. 2000).

Plaintiff claims to feel quite strongly that her working conditions at AUM

were unbearable, in part because AUM did not provide her with constant

personal security, and in part because it appeared that Dr. Lawal no longer

trusted her.  But in assessing constructive discharge claims, the Court is not to

consider a plaintiff's subjective feelings about her employer's actions. Rather, the

Court must solely determine whether a reasonable person in the plaintiff's

position would be compelled to resign. *Brantley v. City of Macon,* 390 F. Supp. 2d

1314 (M.D. Ga. 2005) (*citing Doe v. DeKalb County Sch. Dist.,* 145 F.3d 1441, 1450

(11th Cir. 1998)).

Plaintiff couched her decision to leave AUM as a retirement, and in fact

she had been employed by the State of Alabama for more than 32 years.

(Plaintiff's Dep., p. 20-21).  Dr. Lawal wrote to her on February 9, 2005, "I know that you have discussed your intention to retire from AUM with me *several times in the last five months*, but each time, I have tried to talk you out of it."  (Law Dec. ¶ 4 & Ex. B) (emphasis added).  In February of 2004, a year before Plaintiff submitted her notice of retirement, she had written to a friend, "I said earlier in an email to you that I'm looking at retiring if I can find something else. . . ." (Plaintiff's Dep. Ex. 13).  Ward notarized Plaintiff's application for retirement benefits on February 11, 2005, three days before she abruptly left the workplace. (Ward Dep., p. 125).  The reasonable conclusion to be made is that Plaintiff had been planning to retire long before she made her announcement in February 2005.

Of course, Plaintiff contends that she did not intend to retire, and that AUM intentionally forced her out and essentially discharged her.  Real life belies her contention in this lawsuit.[5]  The question then becomes whether a reasonable person in her position would be compelled to resign.  Plaintiff contends that she

_____

[5] In her January 31, 2006 application for employment with Colonial Bank, Plaintiff certified upon penalty of discharge that she had never been asked to resign or been discharged from employment.  She represented that she left AUM due to retirement.  (Emp. App.)  Presumably based at least in part on Plaintiff's representation, Colonial Bank hired her at a salary of $30,000 per year (Plaintiff's

feared for her safety after AUM investigated her complaints against Mahaffy and stripped him of his department chairmanship.  Mahaffy, however, had never touched Plaintiff.  (Plaintiff's Dep., p. 163).   He did not have the power to adjust her salary, give her assignments, reprimand her, or change the terms and conditions of her employment in any way.  (*Id.* at 53-56).

The facts indicate not that Plaintiff believed the situation with Mahaffy was uncontrolled, but that she did not approve of the way AUM chose to discipline Mahaffy.  Ritvo and Ward met with Mahaffy on January 31, 2005, and stripped him of his department chairmanship.  They also directed him to complete at least two diversity programs within six months, and informed him that if he again engaged in inappropriate behavior, the University would take further action.  After this meeting, Plaintiff had no further contact with Mahaffy before she wrote to Foster on February 7 that she was "tired of being uncomfortable in my workspace because *I don't know what Chris and now others will do or say*."  (Fos Dec. ¶ 15 & Ex. H).

As the court observed in *Brantley*:  "Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An

---

Dep., p. 17), thereby supplementing her $22,000+ retirement income (*Id.*, p. 18) and exceeding her last salary at AUM by in excess of $10,000 per year.

employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress." 390 F. Supp. 2d 1314.

While the situation with Mahaffy may have been stressful to Plaintiff, there is no indication that she in fact was in danger, or had reasonable belief that Mahaffy would harm her. He did not have the power to affect the terms and conditions of her employment, and therefore she did not have good cause to resign. Plaintiff apparently believes Mahaffy should have been fired or she should have been provided round-the-clock security. The facts did not warrant these extreme measures, and a reasonable person in her position would not have resigned simply because she did not get her way. Indeed, despite her profession of insecurity, Plaintiff never once sought assistance or security from the AUM Police force, which nonetheless gave her area increased coverage after the Mahaffy meeting. There was no reasonable basis for concern. This is a false and illusory representation.

Finally, Plaintiff was asked, "What happened on February 14th that forced you to leave?" She responded:

> Dr. Lawal was indignant.  He called me into his office and said that
> he had been working out there on Saturday, and he saw the
> shredding bags where I normally put shredding bags.  And that I
> had not gotten his permission to shred.  And that he had called
> Ritvo at home that Saturday and asked him what he should do.

(Plaintiff's Dep., p. 187).

Plaintiff acknowledged, however, that there was "no confrontation.  He

stated to me how he felt. . . . I didn't raise my voice.  He didn't raise his voice."

(*Id.* at 188-89).  Plaintiff said Lawal "said he did not trust me.  He didn't want me

to do anything in the office. . . . The environment I was in, that just worsened the

environment."  (*Id.* at 188).

To the extent that Lawal was "indignant," Plaintiff plainly acknowledged

that it was because of his discovery of the shredding bags.  While Plaintiff

attempted to downplay this incident, she acknowledged that she had "probably"

received instructions from the University to seek approval before shredding and

to make inventories of what was shredded.  She testified, "We probably received

that.  I know I did probably receive that, but I had never done it before."  (*Id.* at

242).

Indeed, the University's archivist, Jason Kneip, informed Plaintiff in an e-

mail that the University is "required by the state of Alabama to maintain records

of what is destroyed, and to ensure that the records are not disposed before they

are supposed to be." (Plaintiff's Dep. Ex. 19). Kneip's e-mail confirms that Dr. Lawal's "indignation" was justified, and that his distrust of Plaintiff was warranted. To the extent that his alleged indignation and distrust made Plaintiff uncomfortable, they were based on legitimate business concerns, not race or retaliation.

Finally and perhaps most important, even if Plaintiff could show the existence of conditions so intolerable that any reasonable person would feel compelled to resign, those conditions must have a nexus with Title VII. In other words, AUM must have subjected Plaintiff to these conditions because of her race[6] or in retaliation for protected activity. *Morgan v. Ford*, 6 F.3d 750 (11th Cir. 1993). As with the underlying obligation of factual proof, that legal connection fails to exist here.

- Plaintiff and her witness Faye Ward both testified unequivocally that Mahaffy's conduct was motivated by his bitterness over the failed Dean opportunity. That is not protected by Title VII.

---

[6] Contradicting Plaintiff, two of the student workers whom Plaintiff supervised testified that Dean Lawal did not respect women, including Plaintiff, and they attributed that to his African or Nigerian national origin or culture. They also testified that Plaintiff left abruptly on February 14 because she was tired of the way Dr. Lawal treated her *as a woman*. (Sno Dec. ¶¶ 4-6; Hol Dec. ¶¶ 4-6).

40

- Plaintiff says Debra Foster retaliated against her by telling Plaintiff to deal with AUM's lawyers.  That is not protected by Title VII.

- Plaintiff says Dean Lawal retaliated against her by becoming angry one morning over her admitted violation of AUM document maintenance protocol.  That is not protected by Title VII.

- And Plaintiff says Vice Chancellor Ritvo and AUM retaliated against her by failing to protect her security, which is simply and blatantly false, and which, in any event, is similarly not protected by Title VII.

Plaintiff thus fails to demonstrate as a factual matter that AUM employed her after December 3, 2004 in conditions so intolerable any reasonable person would resign, and Plaintiff additionally fails to link her supposed intolerable conditions with any criterion protected by Title VII.  Her constructive discharge claim fails for either or both reasons.

"Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  *Williams v. Russell Corp.*, 218 F. Supp. 2d 1283, 1299 (M.D. Ala. 2002).  Title VII is simply not implicated here; Plaintiff was not constructively discharged.

## <u>CONCLUSION</u>

For the preceding reasons, AUM requests that the Court grant its motion

for summary judgment as to all of Plaintiff's Title VII claims.

**AUBURN UNIVERSITY MONTGOMERY**

<u>s/Burton F. Dodd</u>
Burton F. Dodd

Georgia Bar No. 223880
*bdodd@laborlawyers.com*


FISHER & PHILLIPS LLP
945 East Paces Ferry Road
Suite 1500
Atlanta, Georgia 30326
(404) 231-1400 (Voice)
(404) 240-4249 (Facsimile)