# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA

# NORTHERN DIVISION

| | |
|---|---|
| **CYNTHIA ELLISON,** ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | **Civil Action No.** |
| ) | 2:05-CV-00902-MHT-DRB |
| **AUBURN UNIVERSITY** ) | |
| **MONTGOMERY,** ) | |
| ) | |
| Defendant ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Defendant Auburn University Montgomery (AUM) submits its Statement of Material Facts as to Which There is No Genuine Issue to Be Tried.

## BACKGROUND

1. At the time of her resignation, Plaintiff had worked for AUM for 20 years. (Plaintiff's Dep. p. 21).

2. Plaintiff (who is black) worked as the secretary to the Dean of the School of Sciences, and her job included answering phones, opening mail, giving assignments to other secretaries, and supervising five or six work-study students. (*Id.* at 37).

3. Plaintiff had known Professor Chris Mahaffy (who is Irish and white) for about 20 years, and she never had a problem with him until he was not selected as Dean of the School of Sciences. (*Id.* at 28-30).

### PLAINTIFF'S CONFRONTATION WITH ALLISON STEVENS

4. In December 2003, Plaintiff reported to her supervisor, Dr. Brad Moody, Acting Dean of the School of Sciences, and later in 2004 to AUM's Chancellor, Guin Nance, that Allison Stevens, a secretary in the School of Sciences had used a racial slur against her. (Fos Dec. ¶ 4).

5. Ms. Stevens admitted yelling at Plaintiff, but denied using a racial slur. (Fos Dec. ¶ 5).

6. Dr. Nance encouraged Plaintiff to cooperate with Debra Foster, the Senior Director of Human Resources, but Plaintiff initially refused and later agreed only begrudgingly to cooperate in the investigation. (Fos Dec. ¶¶ 4, 5).

7. Ms. Foster interviewed Plaintiff, Ms. Stevens, Dr. Mahaffy and all other witnesses, but she concluded that she was unable to determine who was telling the truth because there were no corroborating witnesses. (Fos Dec. ¶ 6).

8. Ms. Foster concluded the investigation on April 29, 2004, reporting that additional witnesses provided no new information; that she found no corroboration of Plaintiff's assertion, and that Ms. Stevens has been put on notice that the use of a racial slur will result in dismissal. (Fos Dec. ¶¶ 6, 7).

9. Ms. Foster's letter to Plaintiff dated April 29, 2004, was the last communication among those involved with this matter, and it concluded the investigation. (Fos. Dec. ¶ 7). Plaintiff did not file an EEOC charge related to the Stevens incident or its investigation within 180 days of April 29, 2004.

### BARBARA WARE'S 2004 COMPLAINT ABOUT PLAINTIFF

10. On November 30, 2004, Barbara Ware, a minority secretary in the Department of Physical Sciences, complained to Ms. Foster that Plaintiff had talked to her "with a harsh voice" about her varying lunch schedule and her various errands which took her around campus. (Fos Dec. ¶ 8 & Ex. C).

11. Ms. Foster met with Ms. Ware, Dr. Bayo Lawal, Dean of the School of Sciences, and Plaintiff in early December 2004. After the meetings, Ms. Foster wrote separate letters to Ms. Ware and to Plaintiff concluding the investigation and essentially asking them to be civil and nice to each other. (Fos Dec. ¶ 8 & Ex. D, E).

12. On December 7, 2004, Plaintiff complained to Ms. Foster that she believed she should have received the same correspondence as Ms. Ware. (Fos Dec. ¶ 8).

13. Plaintiff was not disciplined as a result of Ms. Ware's complaint, and she was assured that it was "nothing and don't worry about it." (Plaintiff's Dep.,

p. 83, 87-88, 217). This was a squabble between secretaries and it ended promptly with Ms. Foster's involvement. (Fos Dec. ¶ 8).

## SEARCHES FOR NEW DEANS

14.  AUM began the first of two Dean searches for the School of Sciences when Dean Joe Hill retired. (Plaintiff's Dep., p 32). Dr. Bob Elliott served as Acting Dean for approximately two years, then retired in December of 2002. Dr. Brad Moody then served as Acting Dean from January 2003 until August 2004. Dr. Bayo Lawal was selected as Dean and began work in August of 2004. (Plaintiff's Dep., p 32-34).

15.  Dr. Elliott and Dr. Moody both served as interim Deans because AUM had undertaken two searches for a Dean for the School of Sciences, and the first was unsuccessful. After approximately three months, the first search failed. The second search began sometime after January 2003, and Plaintiff served on the Search Committee. (*Id.* at 34-35).

16.  At the time, Dr. Mahaffy was Department Chair for Physical Sciences. (*Id.* at 31). Although Plaintiff interacted with Mahaffy, he was not her supervisor. She reported directly to the Dean of the School of Sciences, who had sole authority to control her salary, performance reviews, and other terms and conditions of employment. (*Id.* at 31, 53-56).

17. The second search committee, on which Plaintiff served, ultimately selected Dr. Bayo Lawal (who is black) as Dean. (*Id.* at 72)

18. Mahaffy was very disappointed, sometimes crying when he talked to Plaintiff, and telling her that "he blamed me for not being selected as Dean. He thought I had some influence over even the first search." (*Id.* at 72-73).

19. On two occasions Plaintiff went to her office in the morning to find Mahaffy sitting at her desk. He was "saying that [he] should be Dean. Making comments about what he could do if he were Dean." (*Id.* at 69-70, 73).

20. Plaintiff went to Faye Ward, Assistant Director of Human Resources for AUM. Ms. Ward "told me I needed to talk to Debra Foster and my supervisors," Plaintiff said. Plaintiff, still irritated at Ms. Foster because of her handling of the Stevens incident, initially refused to talk with her. (*Id.* at 70-71, 74).

21. Although Plaintiff initially refused to report her concerns to Ms. Foster, Dr. Ray and Dr. Moody both spoke with Dr. Mahaffy about his conduct, including Plaintiff in one of their meetings. They also had several meetings with Dr. Mahaffy where Plaintiff was not present. (*Id.* at 76-78).

**PLAINTIFF'S COMPLAINT AND AUM'S INVESTIGATION**

22. On December 3, 2004, at the request of Roger Ritvo, Vice Chancellor for Academic and Student Affairs, Plaintiff gave a written statement about Dr.

Mahaffy. Plaintiff said after the second dean search ended in August of 2004 with Dr. Lawal's selection, Dr. Mahaffy was "very upset that he was not interviewed" and "told me repeatedly that he was unhappy. . . . During this time there was a drastic change in his behavior. He repeatedly told me he could not sleep at night and would arrive to the office at 3:00 a.m. and wait for me to get in to talk about his not being dean." (Rit Dec. ¶ 3 & Ex. A, B; Fos Dec. ¶ 9).

23. Dr. Mahaffy, Plaintiff wrote to Dr. Ritvo, "made it very clear that I would pay for not helping him. I told him he really needed to get over his not being selected as dean – he then said he would get the others who had served on the committee." (*Id.*)

24. Ms. Foster interviewed all identified witnesses and concluded that Dr. Mahaffy made inappropriate comments to Plaintiff. Ms. Foster recommended to Chancellor Nance that Dr. Mahaffy attend sensitivity training, and that Dr. Ritvo speak to Dr. Mahaffy regarding his inappropriate behavior. (Fos Dec. ¶¶ 9-12 & Ex. F).

25. Ms. Ward, who also participated in witness interviews and meetings, concluded that Dr. Mahaffy felt bitter about the selection process, and "he did show and change his attitude toward Ms. Ellison during those search committees." (Ward Dep., p. 67-68, 84-85).

26. Acting on Chancellor Nance's authority, Dr. Ritvo stripped Dr. Mahaffy of his Department Chair status. In a letter to Dr. Mahaffy dated February 3, 2005 (confirming a January 31 meeting), Dr. Ritvo instructed Mahaffy to "submit to Human Resources and to me a plan (by the end of February) to complete at least two diversity program activities." Once approved by the University, he said, Dr. Mahaffy would be required to complete the two programs by the end of summer session 2005. Failure to complete the programs or further violations of the University's policies would result in further action, he wrote. Dr. Ritvo admonished Dr. Mahaffy that he should not retaliate against "those you know or suspect may have been involved in this complaint," and directed him to "refrain from any negative or stereotypical comments related to an individual's race, color, age, national origin, religion, veteran's status, disability or other legally protected characteristic." (Ritvo Dec. ¶ 8 & Ex. E).

27. Ms. Foster wrote to Plaintiff to tell her that "We have concluded our investigation and have taken appropriate and effective remedial action. Please let me know should you experience any perceived retaliation or violation of University policy in the future in connection with this matter." (Fos Dec. ¶ 14 & Ex. G).

28. Plaintiff complained to Ms. Foster on February 7, 2005 that Mahaffy had "received a summary of his meeting," but that she had not received a copy

of the letter to him. She said she had done her part "in reporting problems when there was a need to do so – with no results," and said she was being "forced into retirement." (Fos Dec. ¶ 15 & Ex. H).

29.   Dr. Ritvo wrote to Plaintiff on February 9, 2005, stating that the University did not believe "that Chris Mahaffy represents a physical threat to you, Dean Bayo Lawal or others at the university." He noted that "in our meeting with you on January 31st, Faye Ward suggested that if you were concerned about your safety, you could at any time ask the campus police to escort you to your vehicle. My recollection is that you rejected that option at that time." (Fos Dec. ¶ 15 & Ex. I; Plaintiff's Dep. Ex. 12).

30.   Dr. Ritvo's letter pointed out that the "disciplinary action we took in stripping Dr. Mahaffy of his administrative position as Department Chair was an action that was not to be taken lightly. It was a serious measure intended to ensure that the problem would be properly handled." Dr. Ritvo concluded by saying that he "strongly disagree[d] with your conclusion that you are being 'forced' into retirement. The university stands ready to work with you to ensure that you have a workplace free from harassment and retaliation and to eliminate any reasonable concerns that you may have about your safety." (*Id.*)

## **PLAINTIFF'S NOTICE OF RESIGNATION AND SHREDDING OF DOCUMENTS**

31.  Plaintiff submitted her notice of retirement to Dr. Lawal on Wednesday, February 9, 2005.  She stated that the effective date of her retirement would be April 1, 2005 (Law Dec. ¶ 4 & Ex. A, B), and she agreed to work through February 25 and use her accrued leave to bridge the time from then until April 1.  (Plaintiff's Dep. Ex. 14).

32.  Plaintiff filed her EEOC charge on Friday, February 11, 2005.  (Plaintiff's Dep., p. 152).

33.  Ms. Ward notarized Plaintiff's retirement application on Friday, February 11, 2005.  (Ward Dep., p. 125; Plaintiff's Dep. Ex. 15).

34.  On Friday, February 11, 2005, Plaintiff wrote to Dr. Lawal, stating that she would "assist you in the office provided campus police can make a walk through of Goodwyn at least once a day through February 25, 2005.  If this is not possible, then I shall start my leave."  (Plaintiff's Dep. Ex. 14).

35.  Dr. Ritvo wrote to Plaintiff on Monday, February 14, saying, "I received your request about Campus Police.  They do indeed go through Goodwyn Hall on a regular basis, hopefully three times a day."  (Rit Dec. ¶ 10 & Ex. F; Rob Dec. ¶ 9; Cox Dec. ¶ 5).

36.  The AUM Campus Police was available and willing to assist Plaintiff with personal escorts to her car, or to respond to any situations that made

Plaintiff uncomfortable. (Rob Dec. ¶¶ 4, 5; Cox Dec. ¶¶ 3, 4). The Campus Police responds to every request. (Spa Dec. ¶ 3). She never asked for any assistance, although it is clear that she knew how to request assistance, and that she was personally acquainted with the Police Chief and various officers. (Rob Dec. ¶¶ 3, 4; Cox Dec. ¶¶ 2, 4).

37.  After the disciplining conference between AUM and Chris Mahaffy, AUM ensured that the Campus Police had an immediate visible and regular presence in Goodwyn Hall (the location of the office of the School of Sciences), and that they patrol Goodwyn Hall regularly thereafter. (Rob Dec. ¶¶ 7, 8). No one complained about Chris Mahaffy's behavior after January 31, 2005, including Cynthia Ellison, and the AUM Police did not believe that Dr. Mahaffy posed a physical threat to Ms. Ellison. (Rob Dec. ¶ 10).

38.  On Saturday, February 12, 2005, Dr. Lawal arrived in the office to discover several bags of shredded documents in Plaintiff's office. He sent her an e-mail saying he was "shocked this morning to find three bags containing shredded documents of the school. These documents were shredded without a written or verbal permission from me. I hope you kept a list of all the shredded documents and that this list was approved prior to shredding by the university archivist Jason Kneip." (Law Dec. ¶¶ 5, 6).

39.     Plaintiff wrote back to Dr. Lawal on Monday, February 14 that she was "shocked as well," and that "no information of any sort relative to the smooth operation of the Dean's Office was shredded. If you have a question about whether I am being trustworthy, perhaps I shouldn't stay any longer than today." (Law Dec. ¶ 8 & Ex. D; Plaintiff's Dep. Ex. 16 & 17).

40.     Plaintiff also e-mailed Mr. Kneip, telling him that the documents were time sheets and grade sheets of former students, and that they were "shredded because they had social security numbers on them." (Plaintiff's Dep. Ex. 18).

41.     Mr. Kneip wrote back to Plaintiff that, in the future, she should "complete a Records Disposition Form *before* shredding or destroying any University-related documents." He also requested that she give him a "rough estimate of how much (*i.e.*, half a box, full box) was destroyed and what the dates were." (Plaintiff's Dep. Ex. 19).

42.     Plaintiff stated in her deposition that Dr. Lawal was "indignant" about the shredding. She said she asked him, "'Do you want to look in it to make sure that it's what I told you it was?'" He replied, "'No.' And then again he asked me to leave his office and I did." (Plaintiff's Dep., p. 187).

43.	Plaintiff left Dr. Lawal's office and drafted a memo stating that she felt it "best that I leave immediately." (Law Dec. ¶ 8 & Ex. D; Plaintiff's Dep. Ex. 21).

44.	On January 31, 2006, Plaintiff completed an employment application with Colonial Bank and represented to the Bank that she had never been asked to resign and had never been discharged from employment. (Emp. App.) Plaintiff certified that her representation was true, and she understood that misrepresentations, omissions of fact, or incomplete information could result in her dismissal from employment with Colonial Bank. (*Id.*)

45.	Colonial Bank hired Plaintiff, and she began work on March 1, 2006 at a salary of $30,000 per year. (Plaintiff's Dep., p. 17).

                **AUBURN UNIVERSITY MONTGOMERY**

                s/Burton F. Dodd
                Burton F. Dodd

                Georgia Bar No. 223880
                *bdodd@laborlawyers.com*

                FISHER & PHILLIPS LLP
                945 East Paces Ferry Road
                Suite 1500
                Atlanta, Georgia 30326
                (404) 231-1400 (Voice)
                (404) 240-4249 (Facsimile)