# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA

## NORTHERN DIVISION

| | |
|---|---|
| CYNTHIA ELLISON, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )    **Civil Action No.** |
| | )    2:05-CV-00902-MHT-DRB |
| AUBURN UNIVERSITY | ) |
| MONTGOMERY, | ) |
| | ) |
| Defendant | ) |

## <u>DECLARATION OF DEBRA S. FOSTER, SPHR</u>

1.      I am Debra S. Foster, SPHR.  I am over 18 years old; I have no mental disability; and I make this declaration on personal knowledge.

2.      I am employed by Auburn University Montgomery as Senior Director of Human Resources/Affirmative Action.  I began my employment in 2001.  Until 2005, AUM employed Faye Ward as my assistant.

3.      AUM is an equal opportunity employer.  I attach AUM's Equal Opportunity Policy as Exhibit A.  AUM also maintains a Harassment Policy that prohibits harassing behavior and establishes a procedure for employees to use if they have a complaint.  I attach a copy of AUM's Harassment Policy as Exhibit B.

4.      In early 2004, I learned that Cynthia Ellison had complained to the AUM Chancellor that a coworker had used a racial epithet with her during an

argument in December 2003. Until the Chancellor encouraged her to utilize the processes of AUM's Human Resources Department, including the Harassment Policy, Ms. Ellison refused to cooperate with me in an investigation of her complaint.

5.    Ms. Ellison ultimately but begrudgingly cooperated with me in my investigation of her complaint. I interviewed every person identified by Ms. Ellison as a potential witness to her confrontation with her coworker, Alison Stevens, but no one could corroborate Ms. Ellison's assertion that Ms. Stevens had used a racial epithet. Ms. Stevens denied it.

6.    Because there was no corroboration of Ms. Ellison's complaint, and because Ms. Stevens denied it, there was no way to conclude that Ms. Stevens had used a racial epithet. Nonetheless, I warned Ms. Stevens that the use of a racial remark in the future would result in her dismissal from employment.

7.    I concluded the investigation of this incident on April 29, 2004, and there were no further complaints from Ms. Ellison or anyone else regarding Ms. Stevens.

8.    In late November 2004, Barbara Ware, a minority secretary and co-employee of Ms. Ellison, complained that Ms. Ellison had abused her. I attach a copy of her complaint as Exhibit C. I again investigated the complaint and encouraged each of the individuals to be civil to the other. This was not much

2

more than a squabble between secretaries. There were no further ramifications from this incident, although Ms. Ellison seemed irritated that I did not share with her the written response I prepared for Ms. Ware. But, I did not share with Ms. Ware the written response that I prepared for Ms. Ellison, either. I attach as Exhibits D and E the responses I gave to Ms. Ware and to Ms. Ellison, respectively.

9.    In early December 2004, I learned that Ms. Ellison and the Dean of the School of Sciences, Bayo Lawal, had submitted written complaints about a tenured faculty member and department chairman, Chris Mahaffy, to AUM's Vice Chancellor, Roger Ritvo. Dr. Ritvo instructed me to investigate the complaints against Dr. Mahaffy.

10.    After studying the complaints from Ms. Ellison and Dr. Lawal, I began AUM's investigation, which continued through our semester break, the Christmas and New Years faculty and staff holidays, and the special "Sugar Bowl" extension of the break.

- On December 14, 2004, I interviewed Ms. Ellison and Dr. Lawal and solicited names of additional witnesses from them. I interviewed everyone they identified.

- I interviewed former Associate Dean of the School of Sciences, Glen Ray, in December or January 2005.

3

- I interviewed Dr. Mahaffy on January 10, 2005.

- I interviewed former Dean of the School of Sciences, Brad Moody, in January 2005.

- I interviewed Dr. Judd Katz in December or January 2005.

- I interviewed former Dean of the School of Sciences, Bob Elliot, in January 2005.

11.     After my investigation had been completed, I met with AUM's Chancellor, Guin Nance, AUM's Vice Chancellor, Roger Ritvo, and my assistant Faye Ward. My conclusions are contained within a file memorandum from Dr. Ritvo dated January 26, 2005.

12.     On January 27, I sent a written recommendation to Chancellor Nance, and in it I concluded that Dr. Mahaffy had made inappropriate comments and had created a hostile work environment for Ms. Ellison. What I meant by this is that Dr. Mahaffy had interfered with Ms. Ellison's ability to perform her work comfortably because of his bitterness over the fact that he had not been selected as Dean of the School of Sciences. I found no credible evidence that his behavior was racially-based, although there was some evidence that he made sporadic and inappropriate comments about race in general. I discovered no racial remark directed at Ms. Ellison by Dr. Mahaffy. I attach a copy of my recommendation as Exhibit F.

4

13.    I did not attend the disciplinary meeting among Dr. Mahaffy, Dr. Ritvo, and Ms. Ward on January 31. Dr. Ritvo confirmed the decisions made regarding Dr. Mahaffy and the conditions imposed on Dr. Mahaffy in a letter to him dated February 3.

14.    On February 4, I wrote Ms. Ellison that AUM had completed its investigation of her complaint against Dr. Mahaffy and had "taken appropriate and effective remedial action." I attach a copy of my letter to her as Exhibit G.

15.    Ms. Ellison apparently was not happy or satisfied either with my assurance that AUM had taken appropriate action regarding her complaint, or with AUM's decision not to share with her Dr. Mahaffy's letter regarding the discipline AUM administered to him, and she wrote a critical letter to me on February 7. I attach a copy of her letter as Exhibit H. AUM typically does not share the specific results of a disciplinary investigation with anyone other than the individual investigated and his or her supervisors. Dr. Ritvo replied to her on February 9, and I received a copy of his response. I attach a copy of Dr. Ritvo's letter as Exhibit I.

16.    Ms. Ellison had talked often for the preceding several years about her plans to retire from AUM, and on February 9 she announced her retirement, effective April 1, although she intended to leave campus before then and use her accumulated paid leave time to bridge the pay periods until April 1.

5

I declare under penalty of perjury that this Declaration is true and correct.

_Date_

Debra S. Foster
Senior Director of Human
Resources/Affirmative Action

6

# EXHIBIT A

## 1.2. Introduction

Auburn University at Montgomery is an equal opportunity employer and welcomes you as a member of its staff. This handbook has been designed to answer many of the questions you may have regarding employment practices, benefits, and facilities at AUM. In addition, it addresses your responsibilities as an employee.

## 1.3. Equal Employment Opportunity Policy

Auburn University at Montgomery is committed to a program of affirmative action, including the following principles and procedures regarding equal employment opportunity:

1. Recruiting, hiring, training and promoting persons in all job classifications, without regard to race, color, religion, sex, age, handicapped/disabled veteran/Vietnam-era veteran status, or national origin, except where sex, age or handicap is a bona fide occupational qualification;

2. Basing decisions on employment so as to further the principle of equal employment opportunity;

3. Insuring that promotion decisions are in accord with principles of equal employment opportunity by imposing only valid requirements for promotional opportunities;

4. Insuring that all personnel actions such as recruitment, selection, assignment, classification, benefits, transfers, promotions, demotions, layoff and recall, termination, determination of compensation, selection for training, and leave policies will be administered without regard to race, color, religion, sex, age, handicapped/disabled veteran/Vietnam-era veteran status, or national origin.

5. Insuring that harassment of employees by other employees or non-employees will not be tolerated. This refers to any form of harassment related to an employee's race, color, sex, religion, national origin, age, physical or mental handicap, or veteran's status.

The Personnel Director is the Equal Employment Officer for Auburn University at Montgomery and is responsible for supervision of AUM's program and for monitoring its effectiveness.

Please become familiar with the policies and procedures at AUM. As your knowledge about AUM increases, so does your contribution and effectiveness as a valued member of our staff. AUM wants your experience as an employee to be pleasant, and this handbook should help to make you feel a part of the Auburn University system.

The information contained in this booklet regarding policies only summarizes the actual policies that are contained in the Staff Personnel Policy Manual, a copy of which is available in each department or unit. Therefore, this handbook is to be used only as a guide or reference. In all cases, please refer to the Staff Personnel Policy Manual for the official statement of AUM policy.

If you have any questions that are not answered in this booklet or want more information, do not hesitate to contact your immediate supervisor, your department head, or the Personnel Office.

# EXHIBIT B

## Auburn University at Montgomery
### HARASSMENT POLICY

Auburn University at Montgomery will not tolerate harassment of its employees or students. Any form of harassment related to race, color, sex, religion, national origin, age, physical or mental disability, or veteran status is a violation of this policy and will be treated as a disciplinary matter. For these purposes, the term "harassment" includes, but is not necessarily limited to:

> Slurs, jokes or other verbal, graphic, or physical conduct relating to an individual's race, color, sex, religion, national origin, age, physical or mental disability, or veteran status. Harassment also includes unwelcome sexual advances, request for sexual favors, and other verbal, graphic, or physical conduct of a sexual nature.

Sexual harassment in an academic setting and in the employment arena where students are involved is also defined as unwelcome sexual advances, requests for sexual favors, and other verbal, graphic, or physical conduct of a sexual nature when:

1. Submission to such conduct may be explicitly or implicitly a term or condition of a student's academic success or employment; or

2. Submission to or rejection of such conduct may be used as the basis for employment or academic decisions affecting the student and the student's total educational and/ or work experience; or

3. Such conduct has the purpose or effect of substantially interfering with a student's employment or academic performance or creates an intimidating, hostile or offensive work or educational environment.

Violation of this policy by an employee will result in disciplinary action, up to and including discharge of the offending employee.

If an employee feels that he or she is being harassed by any other employee because of race, color, sex, religion, national origin, age, physical or mental disability, or veteran status, the employee should act at once to make this known to his or her immediate supervisor. The supervisor will promptly notify the University's Affirmative Action/Equal Employment Opportunity Officer in the Office of Human Resources at 244-3638, who will see that the matter is investigated, and that, where appropriate, disciplinary action is taken. If the employee does not feel the matter can be discussed with the supervisor, the employee should arrange for a conference with the Affirmative Action/Equal Employment Opportunity Officer to discuss the complaint.

Harassment of university employees in connection with their work by non-employees may also be a violation of this policy. Any employee who becomes aware of any harassment of an employee by non-employee should report such harassment to his or her supervisor or to the Affirmative Action/Equal Employment Opportunity Officer, who is responsible for investigating all such incidents. Appropriate action will be taken against violation of this policy by any non-employee.

Retaliation against any individual for filing a harassment or discrimination complaint, or for assisting or participating in the investigation of such a complaint is illegal and will not be tolerated by the University.

**REVISED 08/03**

# EXHIBIT C

**AUM**

## Auburn University Montgomery

### School of Sciences
*Physical Sciences*

November 30, 2004

Mrs. Debra Foster
Senior Director, Department of Human Resources
Auburn University at Montgomery
Montgomery, Alabama   36124

Dear Mrs. Foster,

I am writing today to explain a situation that occurred yesterday, November 29, 2004, and to express some of my feelings regarding it. Ms. Cynthia Ellison, Senior Administrative Associate for the Dean of the School of Sciences, sent Marquetta, a student worker to my office to return my last completed time sheet, and to request that I complete a sick leave application for two hours. I had taken two hours off on the previous Friday afternoon (November 19, 2004) due to an upset stomach. I informed Dr. Chris Mahaffy, Professor and Head of my Department, of my need to leave on the Friday. I was feeling quite ill and completing the application that afternoon didn't occur to me to be such a pressing issue.

Upon returning to work on Monday morning following the holidays, I went to the Dean's office and greeted Ms. Ellison with a "Good morning", and gave her my time sheet, and explained to her that Dr. Mahaffy was currently at a doctor's appointment and that as soon as he returned, I would have him sign the sick leave application. Ms. Ellison then inspected my time sheet and said with a harsh voice, " You need to start taking your lunch at the same time every day." I replied that it is difficult to do that because I might be assisting a student or I could be doing something for a member of the Department, therefore, I might have to take a lunch break at a later time.

I proceeded to explain to Ms. Ellison that Dr. Mahaffy had never told me that I was not allowed to take a lunch break at differing times during the day and further suggested that she should converse with my Department Head if she found fault with the manner in which I was doing my daily routine. At this, Ms. Ellison retorted , "If I have a problem, I don't go to Chris or Bayo (Dean, School of Sciences); I go to the source!" Ms. Ellison went further and said, "You are over there in your little corner and I need you to be there when I need you."

Ms. Ellison then mentioned that she had gotten some complaints from some students that they have been unable to locate me in my office, and further said that I had been simply walking around campus and that she had seen me herself. After listening to her, I explained to Ms. Ellison that it is part of my job to walk around campus as I have Departmental business to take care of at various locations around campus. There

are times that I have to go to the Purchasing Department, Accounts Payable, the Bookstore, the Cashiers Office, or other locations to conduct Departmental transactions. I am also frequently at the copy machine located on the second floor of Goodwyn Hall rather than in my office on the third floor. Dr. Mahaffy is always aware of my whereabouts should he require my assistance, and as you know, we have two-way communications should Dr. Mahaffy need to contact me. Ms. Ellison then responded by saying she can rarely find Dr. Mahaffy, "so how would I know where to find you." The student worker, Marquetta was present in the Dean's office during this entire confrontation.

It is my contention that because Ms. Ellison, or indeed anyone, sees me walking around campus does not indicate that I am not completing a task for my Department. I am a responsible professional and I do not conduct my duties in a quarrelsome manner. If I felt the need to respond to a problem, I would be professional enough to direct my concerns to the proper person or persons, not verbally attack one in the presence of a student.

At this point in the confrontation, I began to walk away and replied to Ms. Ellison that when I was hired, I was told that Dr. Mahaffy was my supervisor and I further suggested that if she had any complaints or problems with or about me or my performance of my duties, that she should speak with my supervisor. At this, Ms. Ellison told me to have Dr. Mahaffy call her to which I responded that I am the secretary for the Department of Physical Sciences and not her secretary.

I returned to my office and immediately called Dr. Mahaffy on his cell phone because I was very upset by the confrontation and the harshness dealt me by Ms. Ellison. I, nearly in tears, explained to Dr. Mahaffy what had just occurred. Not only did Ms. Ellison show me the utmost disrespect, but she embarrassed me by doing it with Marquetta as her audience. It is my policy to treat everyone with dignity and respect, but I also expect the same in return. I further feel that Ms. Ellison lied about me in regards to students complaining to her that they are unable to locate me. It is my belief that the students would go to the Department Head first, or perhaps even the Dean, rather than the Dean's secretary.

The same morning of the confrontation, Dr. Glen Ray, Associate Dean of the School of Sciences came into my office, along with Dr. Mahaffy. We discussed the situation and confrontation that had occurred between Ms. Ellison and myself. It was my understanding that Dr. Ray would speak with Ms. Ellison regarding her behavior towards me. Apparently, either he did not or it did not have an effect as later in the morning, Randy Richardson, our Laboratory Coordinator was in my office, and another of the student workers from the Dean's office, Nicky, came in. She told me that she needed envelopes for each course that our Department was teaching this current semester. I asked Nicky several times if she needed anything with the envelopes, such as course numbers, instructors names, lists of any kind, and such things. She told me that she only needed envelopes because they had everything else on their computer. Following my having to go to the bookstore, I once again saw Nicky and asked about other materials needed for the envelopes and was told the same thing, so I get them for her and include a note with the names of the instructors and the courses.

Very soon, I received a telephone call from Ms. Ellison in which she instructed me that she needed a list of information on the courses and the instructors teaching them; that I "cannot turn in just the envelopes." I responded by telling Ms. Ellison that I had repeatedly asked Nicky if I should include any additional materials. Ms. Ellison then told me that she "didn't care what Nicky told me. If you have any questions, you need to ask me." As calmly as I could, I told her that I had asked Nicky because she was the one asking for the envelopes. The response I received was, "I sent Nicky. You ask me!" By this time I was quite frustrated and told Ms. Ellison that I am still kind of new to this position and am still learning some of the procedures and documents required. Once I was informed of what documentation was required, I promptly assembled them and took them to the Dean's office.

This was not the first time that Ms. Ellison has approached me in this manner. I recall an event during my first week of employment when I failed to answer a telephone call properly. I had previously called Ms. Ellison with a question regarding banner and was told by her that she would call me back. When she did, I answered the phone "yes ma'am" and was reprimanded for not answering "Department of Physical Sciences ... ", even though I could see who was calling on our Caller ID feature. I have also been approached in a negative fashion on several other occasions by Ms. Ellison.

The reason that I have taken this current action regarding the present situation is that I feel we should have a peaceful and professional work environment; one in which we can all work together for the good of AUM. I can easily work with any other department or any other individual on campus, given approval by my own Department, but I find it difficult to work without being respected and treated professionally.

It is my desire that Ms. Ellison simply be informed that if she has complaints regarding my performance of duties, that she direct her correspondence to Dr. Mahaffy directly. Further, I would like her to understand that due to extraneous circumstances, lunch breaks at various times throughout the day may be required to expedite the registration and other matters concerning our students as well as other Department matters. It was my understanding that according to you, Mrs. Foster, as long as Dr. Mahaffy doesn't mind my taking my lunch break at differing times, it becomes irrelevant what time such break is taken. It is my hope that it was acceptable that I requested to Ms. Ellison that she direct her concerns regarding me to Dr. Mahaffy

I sincerely wish to complete the tasks of my job in a professional and expedient manner and to do my part to make this Department and all of AUM both an exceptional institution for employment and an excellent university for our students. It is my hope that my feelings regarding the present matter be understood and I want to thank you for providing me the opportunity to voice these feelings.

Sincerely,

*Barbara Ware*

Barbara Ware
Administrative Associate
Department of Physical Sciences

**EXHIBIT D**

**AUM**

Auburn University Montgomery

Human Resources

## Internal Memorandum

**To:**  Barbara Ware
Administrative Associate
Physical Sciences

**From:**  Debra S. Foster, SPHR
Director of Human Resources/Affirmative Action

**Date:**  December 2, 2004

**Subject:**  Summary of conversation and response

Below is a summary of the conversation that took place on December 2, 2004, between you, Dr. Bayo Lawal, and myself, Debra S. Foster, regarding your letter to me dated November 30, 2004.

  a.  You stated you wanted to be treated with respect and dignity.
  b.  Dr. Lawal talked to Cynthia Ellison, while I was present,  regarding your concerns; she stated that she would be more mindful of your feelings in the future.
  c.  Dr. Lawal assured you the tone of voice, which concerned you, will not be tolerated.
  d.  Dr. Lawal also ask you to forgive Ms Ellison.
  e.  As the Dean of the School of Sciences, Dr. Lawal apologized for your concerns.
  f.  Dr. Lawal also requested that you leave a note on the door when you go to lunch at an irregular time.

After the meeting with Dr. Lawal, you stated you were satisfied with the outcome.  If you have any questions, feel free to contact Debra S. Foster at 244.3638.

pc:   Dr. Roger Ritvo
Dr. Bayo Lawal
Dr. Chris Mahaffy

# EXHIBIT E

**AUM**

Auburn University Montgomery

Human Resources

Internal Memorandum

## MEMORANDUM

**To:**       Cynthia Ellison

**From:**     Debra S. Foster, SPHR
             Director of Human Resources/Affirmative Action

**Date:**     December 2, 2004

**Subject:**  Summary of conversation

Based on our conversation on December 2, 2004, you agreed to be mindful of Barbara Ware's feelings when conversing with her. She also agreed to treat you with respect and dignity. She also will post notes on the door when she leaves for lunch at an irregular time. If you have any questions, please call me at 244.3638.

pc:    Dr. Bayo Lawal

**EXHIBIT F**

Auburn University Montgomery

Human Resources

Internal Memorandum

# MEMORANDUM

**To:**      Dr. Guin Nance
             Chancellor

**From:**    Debra S. Foster, SPHR
             Director of Human Resources/Affirmative Action

**Date:**    January 27, 2005

**Subject:** Recommendation

After a thorough investigation of Cynthia Ellison alleging a hostile work environment by Dr. Chris Mahaffy, I conclude that he did make inappropriate comments and created a hostile work environment for her. He denied or does not remember any of the allegations in the memorandum she submitted to Dr. Roger Ritvo on December 3, 2004, except a general comment about black people. This recommendation is based on interviews and corroboration with Dr. Bayo Lawal, Dr. Judd Katz, Dr. Glenn Ray, Dr. Brad Moody, and Dr. Robert Elliott (retired). Faye Ward, Assistant Director, attended all of the interviews except for the ones with Dr. Katz and Dr. Elliott.

I recommend:

➜ Dr. Mahaffy attends sensitivity training as recommended by Dr. Ritvo within the next two months.

➜ Dr. Ritvo speaks to Dr. Mahaffy regarding his behavior and document the conversation for the investigation file. Faye Ward should be present at the meeting.

➜ Dr. Ritvo speak to Ms. Ellison and Dr. Lawal regarding this investigation and also document this conversation for the investigation file. Faye Ward should be present at this meeting also.

Feel free to call me if you have any questions.

pc:    Dr. Roger Ritvo

# EXHIBIT G

**AUM**

## Auburn University Montgomery

Human Resources

## Internal Memorandum

February 4, 2005

Ms. Cynthia Ellison
AUM School of Sciences
Montgomery AL  36124

Cynthia:

Dear Cynthia,

I would like to update you on the status of our investigation of your complaint regarding Dr. Mahaffy.  We have concluded our investigation and have taken appropriate and effective remedial action.

Please let me know should you experience any perceived retaliation or violation of University policy in the future in connection with this matter.

Sincerely,

Debra S. Foster, SPHR
Director of Human Resources/Affirmative Action

# EXHIBIT H

**AUM**

### Auburn University Montgomery

School of Sciences
*Office of the Dean*

February 7, 2005

Ms. Debra Foster
Auburn University Montgomery
Director of Human Resources/Affirmative Action
P. O. Box 244023
Montgomery, Alabama   36124-4023

Dear Ms. Foster:

I am in receipt of your letter to me regarding my complaint that was requested by Dr. Ritvo concerning Dr. Mahaffy and forwarded to you. I appreciate the fact that you did, this time, conduct an investigation and have taken "appropriate and effective remedial action." I, however, would like to point out the following:

1.   On Friday, February 4, 2005, Dr. Lawal shared with me the correspondence that was sent to Chris. I find it unusual that Chris has until the end of the month to decide what he will do, and then not have to do it until the end of the Summer.  In the mean time, I sit in a cold and hostile work environment wondering every time the door opens whether it will be Chris and what will happen. I find myself looking over my shoulder whenever I am moving around campus or going to the ladies room and my car. Yes, Chris is not suppose to retaliate "against those you know or suspect may have been involved in this complaint or in the investigation of this complaint," – Debra, you told me directly in your office that you told Chris I was the complainant but did not include Dr. Lawal, I find this unsettling and believe Chris will use it to my detriment; especially given the fact that you also told me that Chris said "blacks should not be in responsible positions," and that Chris was to have no contact with me.

I shared the following incidents in the meeting with Dr. Lawal, Dr. Ritvo, and Ms. Faye Ward on Monday, January 31, 2005: (1) After Dr. Ritvo and Faye met with Chris he came to the dean's office suite and came directly to my work area, looked and said nothing to the two students who were there – lucky for me that Bayo insisted I go to lunch with him. I understand this was at your request. Who do you suppose Chris was looking for?  (2) On January 18, 2005 while sitting at my desk, Chris appears standing behind me in an overcoat and hat – saying nothing. I asked if I could help him and he starred at me for a moment and then asked for the dean. I also shared with Dr. Ritvo who stated that this was not a racial issue that indeed it was, given the fact that Chris said "blacks should not be in responsible positions" - As I stated to Dr. Ritvo you can't get more responsible than being the dean of one of the largest Schools on campus and my serving as his Senior Administrative Associate.

I find it strange that I was told that it would be advisable for me to leave campus while they spoke with Chris.  Why was I singled out?  No one else who was interviewed was asked to leave.  What am I suppose to think? How am I suppose to have a normal day at work again?

R1

2.      By virtue of your having campus police escort you to your vehicle and having campus police stationed outside of the chancellor and vice chancellor offices indicates to me that you think this individual poses a threat. At no time did anyone from campus security or your office offer any such assistance to me. In fact, Dr. Ritvo said it was unfortunate that I find myself in this position, but there was really nothing that could be done. I was told if Chris does something to call campus police – calling campus police after he does something may be too late!

I asked that I receive a summary of the meeting proceedings. Dr. Ritvo said I would not get a copy. However, Chris received a summary of his meeting. He said the only thing I would get in writing is the two sentence letter I received from you.   I explained that I didn't want details about actions that would be taken, just a summary of the meeting. He replied that the only thing he could say was that Chris would not be fired. Honestly, I wasn't really thinking about what would be done to Chris – but my own safety. I believe I have been mistreated again.

3.      The situation with Chris has already had an effect on others in the School as far as their treatment toward me. He has called several faculty members in his department and he has spoken with Glen Ray who shared with me that Chris says he is not happy and this is not the end of this. (See attachment #1)

As I stated in my statement to Dr. Ritvo, I am tired of being uncomfortable in my workspace because I don't know what Chris and now others will do or say. And, I note that this particular situation was reported the beginning of December and now it appears it will go through summer. Dr. Ritvo said Chris has rights – I agree, so do I. But once again it appears to me the University protects the one who is causing harm rather than the one who is receiving harm.

As we all know, retaliation comes in many ways; it is not always blatant. The work conditions I am in have existed for about two years. I did my part in reporting problems when there was a need to do so – with no results. All too often no one believes or if they do, they "don't recall." I suppose this is the point at which I take the advice of the Human Resource Director/EEOC Officer and Dr. Ritvo and 'do whatever you have to do." I am no longer willing to subject myself to an environment that is potentially unsafe to me and others around me. Though my future earnings with the University will be cut short, I find I am being forced into retirement. I will make an appointment with Ms. Ward on this issue. I shall discuss other issues with you when I deliver this letter. Thank you for your time.

Sincerely,

Cynthia Ellison

Cynthia Ellison


cc:     Dr. Lawal
        Ms. Ward
        Dr. Ritvo
        Dr. Nance
        Mr. Lee Armstrong

R1

# EXHIBIT I

**AUM**

Auburn University Montgomery

Academic and Student Affairs

February 9, 2005

Ms. Cynthia Ellison
School of Sciences
Auburn University Montgomery
CAMPUS MAIL

Dear Ms. Ellison:

I received a copy of your February 7, 2005 letter to Debra Foster and I believe it is important to reply to some of the matters raised in your letter. While I do not want to be argumentative, and therefore do not intend to discuss every item in your letter which I might disagree with, I am concerned that you have misunderstood our position and our intentions with respect to your situation.

Since the welfare of each and every AUM employee is our concern and since we take our legal obligations seriously, I wanted to take the time to convey what I believe are some important principles and facts to you.

First and foremost, we would never do anything that would intentionally place an employee's health or safety in jeopardy. Moreover, we do not believe, as your letter suggests, that Chris Mahaffy represents a physical threat to you, Dean Bayo Lawal or others at the university. It is true that I asked a member of our Campus Police force to be stationed outside our offices while I met with Dr. Mahaffy, but this is not an unusual procedure when we hold disciplinary meetings. Of course, you might not be aware of that because we do not publicize that fact. Moreover, I am not aware of anyone asking campus police to escort them to their vehicle. I do recall that in our meeting with you on January 31st, Faye Ward suggested that if you were concerned about your safety, you could at any time ask the campus police to escort you to your vehicle. My recollection is that you rejected that option at that time.

Even though I do not believe that there is a threat presented by Dr. Mahaffy, this does not mean that we intend to ignore or treat your concerns as not being genuine. Therefore, we want to work with you in every way possible to make sure that you are able to do your job without being concerned about your safety. In addition, of course we will strive to create a working environment where employees are able to do their job without unwelcome interference. Again, we will do everything we can to make sure that you remain an effective and efficient employee. This includes interfacing with individuals whose interactions with you do not exhibit the collegiality and cooperativeness that we generally expect here on our campus.

Incidentally, you were not singled out and asked to leave the campus the day I met with Dr. Mahaffy. Because I was meeting with Chris Mahaffy that day, I felt that

P.O. Box 244023 Montgomery, Alabama 36124-4023 • 334.244.3600 Fax 334.244.3947

Cynthia Ellison
February 9, 2005
Page 2

after our meeting Chris might well visit the Dean's Office. Because such a visit might be an uncomfortable situation for you and the Dean, I merely suggested that you both might be more comfortable having lunch off campus that day rather than seeing Chris Mahaffy immediately after he had been stripped of his Chairmanship. I saw no reason to invite any kind of verbal exchange at that moment and again, I do not see this as a safety issue, but simply one of avoiding a possible verbal confrontation.

I regret that you feel that we did not act swiftly enough on this matter for you. I recognize that you formally complained in the beginning of December and we ultimately took action less than 2 months later. However, this period included the Christmas Holidays and Semester break. In any investigation, we strive to be thorough and fair to all parties. Moreover, the disciplinary action we took in stripping Dr. Mahaffy of his administrative position as Department Chair was an action that was not to be taken lightly. It was a serious measure intended to ensure that the problem would be properly handled.

I also regret that you apparently misunderstood the intent of my remark with respect to what action you might take. In our meeting, you made the statement that you might take this beyond the university, implying that you would seek out a lawyer or pursue further action through some administrative agency or court. My response was that you had a right to do what you felt you should do. This was not meant to suggest that we were not addressing the situation. It was simply a statement of your rights as a citizen to take advantage of whatever avenues are open to you. Nevertheless, I feel that the university has and will continue to address this in a way which will be effective.

In summary, without addressing every point in your letter, I strongly disagree with your conclusion that you are being "forced" into retirement. The university stands ready to work with you to ensure that you have a workplace free from harassment and retaliation and to eliminate any reasonable concerns that you may have about your safety. I hope that you will take this letter in the spirit in which it is written and work with us going forward.

Sincerely,

Roger A. Ritvo, Ph.D.

Cc:     Guin A. Nance, Chancellor
        Bayo Lawal, Dean
        Debra Foster, Senior Director of Human Resources
        Faye Ward, Assistant Director
        Lee Armstrong, University Counsel