# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA

## NORTHERN DIVISION

| | | |
|---|---|---|
| CYNTHIA ELLISON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **Civil Action No.** |
| | ) | 2:05CV902-MHT-DRB |
| AUBURN UNIVERSITY | ) | |
| MONTGOMERY, | ) | |
| | ) | |
| Defendant | ) | |

## DECLARATION OF ROGER RITVO, Ph.D.

1.     I am Roger Ritvo, Ph.D.; I am over 18 years old; I have no mental disabilities; and I make this declaration on personal knowledge

2.     I am a faculty member at Auburn University Montgomery, and from May 1997 until October 2005 I served as Vice Chancellor for Academic and Student Affairs at AUM.

3.     I have known Cynthia Ellison since 1997.  After I became Vice Chancellor she occasionally approached me about things that troubled her.  On November 30, 2004, Ms. Ellison informed me that she and Dean Bayo Lawal were having some difficulties with Dr. Chris Mahaffy.  Although she said she wanted to approach me "off the record," I told her that might not be possible depending on what she had to say.

4.    I instructed Ms. Ellison and Dean Lawal to send me a report about whatever difficulties they were having with Dr. Mahaffy, and I alerted Debra Foster, AUM's Director of Human Resources, about the situation and let her know the reports were coming.  I received their reports on December 3, and I immediately transmitted them to Ms. Foster for investigation.  I attach copies of Ms. Ellison's and Dean Lawal's reports as Exhibits A and B, respectively.

5.    I did not participate in the investigation, but I know it occurred over the next several weeks, over Christmas and New Year's Day Holidays, the special Sugar Bowl break, and semester break.

6.    I held a meeting on January 25, 2005 with Chancellor Nance, Debra Foster, and her assistant Faye Ward to confirm the conclusions reached during the investigation.  I attach my "Memo for Record" outlining those conclusions as Exhibit C.

7.    I received Debra Foster's recommendation on January 27, 2005.  I attach a copy of her recommendation as Exhibit D.

8.    Chancellor Nance made the decision as to the appropriate results and consequences of the investigation of the allegations against Dr. Mahaffy, and Ms. Ward and I met with him on January 31 and presented AUM's decisions. AUM's decisions are contained in my Memorandum of February 3, 2005 to Dr. Mahaffy and include stripping him of his departmental chair (with resulting

2

salary loss), mandatory diversity training, warnings against retaliation, and other conditions. I attach a copy of my memorandum on discipline as Exhibit E.

9.      I believe AUM's investigation and response were prompt and reasonable, and I received no further complaint about Dr. Mahaffy's behavior.

10.      Due to Ms. Ellison's subsequent inquiry, I confirmed that AUM's Police force makes frequent trips through Goodwyn Hall on a regular daily basis, and I communicated that fact to her and to Dean Lawal. I attach a copy of my message to Ms. Ellison and Dean Lawal, which Dean Lawal also forwarded to Ms. Ellison, as Exhibit F.

11.      As I said, Ms. Ellison initiated the investigation of Dr. Mahaffy through me as Vice Chancellor, and after AUM completed it, she never complained to me that she thought our investigation and remedial action were inadequate in any way.


I declare under penalty of perjury that this Declaration is true and correct.


7/20/06
Date

Roger Ritvo, Ph.D.

# EXHIBIT A

**AUM**

Auburn University Montgomery

School of Sciences
*Office of the Dean*

# MEMORANDUM

**TO:**      Dr. Roger Ritvo, Vice Chancellor for Academic and Student Affairs

**FROM:**   Cynthia Ellison

**DATE:**    December 3, 2004

**RE:**       Requested Statement

---

The following represents comments that I would like to submit per your request:

Dr. Mahaffy's behavior toward me has been different since he applied and was not selected for the dean's position. After the first search ended for the dean's position, Chris approached me with negative comments about the committee members. He said that Ruby Jenkins kept him from being selected as dean. He continued to come to me and say that he was not happy with the outcome. He even sent a campus wide email expressing his displeasure with the process. Each time he approached me, I asked him to let it go. He said he thought I had some influence with the committee. Of course, I did not, yet each day he would have something to say to me about the process. I felt as though I was being harassed. I would be sitting at my desk and look up and there's Chris talking about what he could do if he were dean.

His attitude and personality changed. He would make inappropriate comments such as "Do you know I've never seen a black person until I came to the United States?" And, "that some people don't see them as being as smart as others." I asked him if he realized I was black. I told him his comment was out of line. I expressed my concern to Bob Elliott, the former dean.

A few months later an incident arose with me and the Physical Science secretary, Allison Stevens. The proceedings of this incident is on record in Human Resources. As a result of this incident, Chris and the entire Physical Science faculty have treated me differently. Before Allison left, Chris instructed her not to speak to me, but to call him and let him handle all transactions with me, and he also asked Allison to meet with Glen Ray once a week to let him know how I was treating her. Further, when I see his faculty members in the hallway, they do not speak and if I start down the hall they will turn and go another direction. If I make a request for information for the dean's office, it is essentially ignored. I feel their actions have been of a retaliatory nature because of statements made by Chris.

MEMO: Dr. Ritvo
Page 2
December 3, 2004

At the beginning of the second search for dean, Chris found out I had been selected as one of the committee members. Chris asked that I speak with him; he offered to give me an email address that no one would know about to send him information about the transactions of the search committee. I refused and told him this would be inappropriate. He approached me several times before I convinced him that I was not going to compromise the work of the committee. As the search progressed and ended, Chris was very upset that he was not interviewed, not once but twice, and told me repeatedly that he was unhappy. I told him he had to deal with it and let it go. During this time there was a drastic change in his behavior. He repeatedly told me he could not sleep at night and would arrive to the office at 3:00 a.m. and wait for me to get in to talk about his not being dean. I was very uncomfortable with his behavior and demeanor. I expressed my concerns to both Brad Moody and Glen Ray.

During this period Allison Stevens resigned. The Physical Science Department needed to hire a new secretary. He came to me with the applications and asked if I knew any of the candidates. I was acquainted with one person and he asked if he should interview her. I told Chris that this was his choice. He did interview her with the others. He came to me several times during the process, I told him I did not want to get involved. He said that if he hired Barbara, she could speak Spanish and could talk to the doctors in Spain and keep up with the condition of his mother. After he hired Barbara he called me to his office and said to me that the young lady did not get the job because I did not do what I needed to do on the search committee. He made it very clear that I would pay for not helping him. I told him he really needed to get over his not being selected as dean – he then said he would get the others who had served on the committee. He went as far as to tell me that Sue Thomson had asked about the production of lab manuals, but he refused to help her because she was also on the committee.

After Bayo was hired, Chris came to me several times and said that Bayo would have a tough time being dean because he is black and no one will be able to understand him. He also said that we "both being black" would not get the cooperation of the faculty. Shortly after Bayo started in the position of dean, Chris called me to his office; he said he didn't want to come to the dean's office and that it was very important. He made several statements about Bayo. He said Bayo didn't listen to anybody and that I should tell him if he wants to succeed, he should change the way he was doing things. Chris has sent several emails to department heads trying to undermine the authority of the dean's office.

At the request of the dean, I asked a member of the Physical Science department to schedule an appointment with Bayo, and his comment was he didn't have time. To this day, he has not been in to see the dean. I believe this is due to the lack of respect exhibited by their department Chair.

MEMO: Dr. Ritvo
Page 3
December 3, 2004

Just recently, according to Glen Ray, Chris made disparaging remarks about me that he considers so ugly that they cannot be repeated. This has created an almost impossible working environment as it relates to Chris and the Physical Science faculty.

The above is just a few examples of how Chris has changed over the past two years. He has created a hostile work environment for me and the new dean. I am tired of being uncomfortable in my workspace because I don't know what Chris will do or say next because he was not selected as dean.

Thank you for your time.

# EXHIBIT B

TO:        Dr. Roger Ritvo, VCAA
From:      Dr. Bayo Lawal, Dean, School of Sciences
Date:      December 3, 2004
Subject:   Comments requested by you

The following are my comments and report as requested in your e-mail of November 30, 2004.

Ever since I assumed the position of the Dean of the School of Sciences, Dr Chris Mahaffy, the Chair of the Physical Sciences Department (PHS) has consistently and deliberately trying to completely undermine my authority and ability to perform my job as dean of the school. I have enumerated some of the events I could below.

1. Sometime in September after our first or second Heads/Chairs meetings, Dr Mahaffy clandestinely called Ms. Cynthia Ellison up to his office to discuss and I quote 'matters that he does not want me to hear about', unquote. His meeting turned out to be complaints and making disparaging remarks about me. Some issues raised with Cynthia are:

   • That meetings were too short (our meetings last on average 1 hr: 25 mins) and he would prefer a longer period for our meetings.

   • I do not listen to him. (others will disagree with him on this)

   • I am in accessible in my office (a fact that can not be supported by other staff, faculty and chairs).

   I consider, a chair inviting my secretary behind me to tell her things about me is most unprofessional and it was an attempt to turn the secretary against me, and thus encouraging insorbordination.

2. I have asked all chairs at our meeting of September 4th, that I would like them each to schedule a faculty meeting and should be so kind to invite me to this meeting so that we can get to know each other better at each departmental level.

   While Biology, Mathematics, Public Administration and Political Science, Psychology, and Justice and Public Safety chairs did not object to this, Dr. Mahaffy's immediate conversation with me a day after the meeting was that it would be very difficult for him to schedule such a meeting and that however, whenever he does schedule it, I will be invited (clearly an open-ended scenario).

   I met with Biology, Mathematics and Public Administration and Political Science in September, and Psychology in mid October. I asked Cynthia to remind both chairs in JPS and Physical Sciences that I was yet to meet with them. Dr Mahaffy came to my office there after to raise a lot of issues. At this time, I mentioned the issue of him inviting my secretary to his office to talk about me and I hope that he fully understands the implications of such an action. It was then that he told me that the Jason project will not be continued this year.

   At the chairs meeting that day (October 4, 2004), we all discussed the Jason Project and it was agreed that we should explore the possibility of getting money to run this and we all agreed that we should give the Dean till Thursday (10/7/04) to see if we can get some additional funding (I had volunteered to even fund a substantial part of the needed money if it will help run the project this year) and that Dr Mahaffy should leave that option open. We also suggested based on his argument that we could at least run a smaller version of it if all participating schools could not be brought on board at this hour. I also informed the meeting of my mentioning and re minding funding for this project to Vice Chancellors Jackie Roberts and Roger Ritvo the previous Friday after the new faculty and staff orientation meeting to which Jackie had promised to get back to me by Wednesday or Thursday the following week.

   It was obvious at the meeting that Dr Mahaffy had no intention of giving the running of the project a chance because the second day, he came in to tell me that there is no way they 'the committee' could do this as Randy could not get the schools on phone. I went to Randy's office that afternoon on an unrelated issue and it was obvious to me that Dr Mahaffy did not want the event to take place this year.

The Wednesday of that week, I was off campus all morning and when I came back on Thursday, Dr Mahaffy came to my office at about 7:45 a.m. to inform me that he had talked to Jackie Roberts and she had mentioned that Dr Nance has available about $2500.0 to be shared by several competing community outreach programs on campus. At this time, I asked why he could not wait for me to give him a feed back on an issue that the dean is currently pursuing via a memorandum. That protocol suggests that he not undercuts the dean, to which I was then barraged with lectures on how AUM has been operating for the past twenty or so years and that previous deans have not objected to this procedure. I had reminded him of our three previous chairs' meetings at which we have discussed procedures to follow when something is in process with the upper administration through the dean. Of course he was not satisfied with this approach and he eventually came on Friday that they could not run the Jason project to which I asked him to put it in writing for transmittal to Dr Ritvo.

3. As a consequence of our discussion on procedures in the last paragraph, he sent me and copied all chairs and all secretaries a memo on October 26 requesting for an item to be included on the next heads/chairs meeting. (see attachment I). I honestly do not know why an item for inclusion on our agenda being sent to Cynthia should be copied to all chairs and departmental secretaries. The motive was clear and at the meeting on November 1, it turned out that every body except Dr Mahaffy was well aware of the procedure in place which we have previously talked about at two of our previous meetings.

I realized after this incident that Dr Mahaffy was trying to engineer dissention, not only among the chairs but also among the secretaries who of course will in turn share information with faculty and staff.

4. Dr Mahaffy finally called a departmental meeting for Friday November 5 to which I was invited. At the meeting, we discussed issues relating to weekend college, research and publication as well as looking for opportunities for instrumentation grants from the NSF or similar foundations. Of course, the faculty led by Dr Mahaffy was not receptive to any of my suggestions and I suggested at the end of my meeting that we certainly need to talk more on these at a future date.

On the following Monday, Dr Mahaffy came into my office and his first words were 'He and the entire department faculty and staff were terribly disappointed in me' based on our conversation on Friday. He was as usual doing all the talking and started his usual lecture and when I asked him if I could respond or if at least he could give me the opportunity to say a few things, he retorted loudly (people outside my office could clearly hear him) 'That I just do not listen to people'. At this point, I have to tell him that the only time he considers me listening to him is if I allow him alone to do all the talking. He further retorted, "Dr Thomas for instance does not need to publish as he is not looking for promotion", so why do I think they are or would be interested in research?

Dr Mahaffy was very rude, condescending and I had to advise him whether he knows that since I have assumed this position, he has never seen any good that I have done and that he has been creating an hostile environment for me to work effectively and that he is threading a fine line. It was after this that he seemed to back down and I had to end the conversation because I had another appointment.

5. After going through the registration booklet for Spring 2005 for the School, I observed that General Chemistry I (a core course for all students in Chemistry, Biology and all pre-professional programs in the School) has only one section and it is being taught as a weekend college course, and even more so as an overload. Further the class will meet on Sundays from 12 noon to 8 p.m. and also as a nine week course. I feel that the students

- Have no choice but to register for this only section of the course
- That it is being taught between 12 noon and 8 p.m. on Sunday
- It is a nine week class (do students have any choice?)
- Why offer three section of General Chemistry II and only one of General Chemistry I since the former feeds from the latter. (registration now shows that the third weekend class should not have been scheduled as it has only 6 students registered to date)

2

- Finally, it is going to be taught as an overload by a faculty

Why I could not do anything about all the above for Spring 2005, I felt it was my responsibility that this again does not happen in Fall 2005. This prompted my memorandum to Dr Mahaffy on November 19 (see Attachment II)-where I raised some of these issues regarding the submitted proposed schedule for Fall 2005 from the department. The latter part of this memo has requested the chair to feel free to come and discuss the issues raised in this memo with the dean. The memo was copied to Dr Ritvo.

Later that afternoon, I had come back to pick my umbrella after I realized that it was drizzling outside (I was going for the Planning and Budget Meeting at 1:30 p.m.) when I saw Dr Mahaffy and Dr Jill Rawlings in my office wanting to see me regarding the issues raised in the memo. I told them that I was already late for a meeting and that if they would like to see me that afternoon, I would be back by 3 p.m. or it could wait until Monday. At first, I was told that 3 p.m. might not be suitable for Dr. Rawlings and I suggested Monday would be fine too. I said that in any case, I would be back by 3 p.m. To my surprise, when I came back from the meeting at about 3:15 p.m., I was told by Dr Glen Ray that Dr Mahaffy was very angry with me because I did not fulfill my 2 p.m. appointment to which I responded that I did not have a 2 p.m. but a 3 p.m. appointment but unfortunately, the meeting went beyond 3 p.m. and that Chris had gone home and wanted an apology from me. To which I responded, 'apology for what'?. I could not have given a 2 p.m. appointment because I know from experience that the 1:30 p.m. meeting will last at least one hour.

On Monday, I came to the office and opened my e-mail, and the first thing I saw was the e-mail to me and Dr Ritvo titled "Your memo/questions/comments on the PHS Fall 2005 Schedule" which he not only copied to all the chairs of the departments in the School but also to the entire faculty and staff of the school. The tone of the memo was not only uncivil but outrightly confrontational (see Attachment III). After reading the e-mail from Dr Ritvo and another from Dean Alan Hackel regarding weekend classes, I realized that there would not be a strong support for me on these issues to effect the changes I would like. Consequently, I invited Dr Mahaffy to my office on that Monday, November 22 for a meeting. At that meeting, also attended by Dr Rawlings, Dr Mahaffy brought a tape recorder and requested if he could tape our conversation to which I said no. After discussing the genesis of my initial memo and Dr Rawlings' explanation as to why she needs to schedule 12 week classes (in her written memo to me, attachment IV), I asked that the department could continue with their proposed schedule for Fall 2005. I further asked Dr Mahaffy why he would write his letter in such tone to which he apologized.

On knowingly to me, Dr Mahaffy got to his office the second day, November 23, sent an e-mail to all chairs (Attachment V) to declare 'victory'. This time he did not copy me because he obviously did not want me to know about it. The intention of this e-mail was quite clear.

## My Observations.

- Dr Mahaffy seems bitter that I am in this position

- He certainly does not want me to succeed as he goes about to discredit me

- He keeps creating hostile environment for me

- He polarizes situations and marshals others to intimidate me (case in point, Dean of Continuing Education sending me a note and coming over to discuss issues relating to weekend college)

- He deliberately undermines me with all the chairs, the secretaries and faculty, especially those in his department except Dr Rawlings.

- He breaches the spirit of confidentiality

- It is increasingly clear that Dr Mahaffy does not want to work with me and if I am going to succeed in this job, and I intend to, I would have to take some actions to curtail this destructive and polarizing atmosphere that currently exists.

3

I have summarized some of the encounters above but I could not in any way summarize the agonizing effect, pains and mental abuse that his incessant assault upon me has caused. More so with his abusive and 'code language' in his writings and discussions.

I hope this will not happen again, but if it does, I will have no other avenue open to me than to exercise the authority of the office of the dean of the school.

4

# EXHIBIT C

## Memo for Record

Meeting on January 25, 2005 with Chancellor Guin Nance, Debra Foster, Faye Ward, and Roger Ritvo

1.    Lee Armstrong:  Reviewed material on Dr. Chris Mahaffy and Dr. Nance spoke to Lee.

2.    Key is to get to that point of dismissal.

3.    Racial comments need to be addressed.

4.    "Creates hostile environment."  AUM has an obligation to deal with it.

5.    Redress the problem – Formal investigation occurred; Debra Foster and Faye Ward interviewed people to reach conclusions.

6.    Debra or Faye with Dr. Ritvo will meet with Chris (scheduled for on Monday, January 31st at 11:30 a.m.

7.    Summarize in a letter – no retaliation.

8.    No further comments or "termination for cause."

9.    Retire NOW – is that an option?

10.   Effective immediately.

11.   "Reviews substantiated that your behavior continues to create a hostile environment."

12.   Must participate in Diversity Program activities as part of condition to remain at AUM as a faculty member.

13.   Ask Chris to submit a Plan-of-Action.

Signed: _Roger Ritvo_

Date: _1/26/05_

**EXHIBIT D**

Auburn University Montgomery

Human Resources

Internal Memorandum

# MEMORANDUM

**To:**       Dr. Guin Nance
              Chancellor

**From:**     Debra S. Foster, SPHR
              Director of Human Resources/Affirmative Action

**Date:**     January 27, 2005

**Subject:**  Recommendation

After a thorough investigation of Cynthia Ellison alleging a hostile work environment by Dr. Chris Mahaffy, I conclude that he did make inappropriate comments and created a hostile work environment for her.  He denied or does not remember any of the allegations in the memorandum she submitted to Dr. Roger Ritvo on December 3, 2004, except a general comment about black people.  This recommendation is based on interviews and corroboration with Dr. Bayo Lawal, Dr. Judd Katz, Dr. Glenn Ray, Dr. Brad Moody, and Dr. Robert Elliott (retired).  Faye Ward, Assistant Director, attended all of the interviews except for the ones with Dr. Katz and Dr. Elliott.

I recommend:

➜ Dr. Mahaffy attends sensitivity training as recommended by Dr. Ritvo within the next two months.

➜ Dr. Ritvo speaks to Dr. Mahaffy regarding his behavior and document the conversation for the investigation file.  Faye Ward should be present at the meeting.

➜ Dr. Ritvo speak to Ms. Ellison and Dr. Lawal regarding this investigation and also document this conversation for the investigation file. Faye Ward should be present at this meeting also.

Feel free to call me if you have any questions.

pc:    Dr. Roger Ritvo

**EXHIBIT E**

**AUM**

Auburn University Montgomery

Academic and Student Affairs

# M E M O R A N D U M

To:    Chris Mahaffy

From:  Roger A. Ritvo *Roger A. Ritvo*
       Vice Chancellor for Academic & Student Affairs

Re:    Meeting Summary

Date:  February 3, 2005

This memorandum serves as a summary of the meeting on January 31, 2005 in my conference room.

ATTENDING: Chris Mahaffy, Roger Ritvo and Faye Ward.

Upon receiving a written complaint of a possible violation of our harassment policy, Senior Director of Human Resources Debra Foster conducted a formal and thorough investigation. Her findings and recommendations were reviewed by appropriate administrators. Our meeting served to present these findings and recommended actions to you, and to communicate to you the institution's decision regarding appropriate actions it would take in response.

We have concluded that the investigation, including taking into account your responses, reveals that your actions have been disruptive of the functioning of the School of Sciences and that some of your comments have violated University Policy. As a result of this finding, the following actions will be taken:

1. Effective at noon on January 31, 2005, you are no longer to serve as Department Chair.

2. You must be sure to conduct yourself in a manner that avoids any retaliation against those you know or suspect may have been involved in this complaint or in the investigation of this complaint.

3. You should refrain from any negative or stereotypical comments related to an individual's race, color, age, national origin, religion, veteran's status, disability or other legally protected characteristic.

4. You have agreed to submit to Human Resources and to me a plan (by the end of February) to complete at least two diversity program activities. There are numerous opportunities and a wide range of options here including but not limited to formal course

work at a college or university, professional training programs, structured readings, and private consultations with mentors. I leave it to you to decide what efforts you think may be appropriate.

5. When agreed to, these programs must be completed by the end of summer session 2005.

6. Any documented behaviors that violate items 2 or 3 above, or if you do not successfully complete the plan when we agree on its content will result in further action by the University.

7. We discussed the possibility of submitting your concerns in writing. It is your right to do so.

As you transition to the role of faculty member, please coordinate with the next department chair to help distinguish your personal and professional files from the administrative ones. The files related to the role of department chair should remain in the office.

Either Debra Foster or I shall get back to you once we receive your proposed plan of action.


cc:    Guin A. Nance, Chancellor
       Bayo Lawal, Dean
       Debra Foster, Senior Director of Human Resources

# EXHIBIT F

From  Bayo Lawal <blawal@mail.aum.edu>

Sent  Monday, February 14, 2005 9:54 am

To  'Cynthia Ellison' <cellison@mail.aum.edu>

Cc

Bcc

Subject  FW: Campus Police


-----Original Message-----
From: rritvo@mail.aum.edu [rritvo@mail.aum.edu]
Sent: Monday, February 14, 2005 9:00 AM
To: cellison@mail.aum.edu]
Cc: jroberts@mail.aum.edu; blawal@mail.aum.edu; armstlf@auburn.edu;
jyoung@mail.aum.edu
Subject: Campus Police


Hello;

I received your request about Campus Police.  They do indeed go
through Goodwyn Hall on a regular basis, hopefully three times a
day.

Let me know if there are other problems or concerns.



Roger A. Ritvo, Ph.D.
Vice Chancellor
Auburn University Montgomery
P.O. Box 244023
Montgomery, AL  36124
tel = 334.244.3600
fax = 334.244.3947
rritvo@mail.aum.edu