IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA - NORTHERN DIVISION


CYNTHIA ELLISON,


       Plaintiff,


    vs.            CASE NO. 205CV902MHTDRB


AUBURN UNIVERSITY
MONTGOMERY,


       Defendants.
~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

CYNTHIA ELLISON

April 27, 2006
9:30 a.m.

McPhillips, shinbaum & gill, LLP
516 South Perry Street
Montgomery, Alabama

Dawn A. Goodman, Certified Shorthand Reporter and
Notary Public in and for the State of Alabama at Large

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 2

1                                          APPEARANCES

2                    .

3              FOR THE PLAINTIFF:

4              MCPHILLIPS, SHINBAUM & GILL, LLP

5              KAREN S. RODGERS, ESQUIRE

6                  516 S. Perry Street

7                  Montgomery, Alabama 36101

8                    .

9              FOR THE DEFENDANT:

10             FISHER & PHILLIPS, LLP

11             BURTON F. DODD, ESQUIRE

12                 1500 Resurgens Plaza

13                 945 East Paces Ferry Road

14                 Atlanta, Georgia 30326-1125

15                   .

16             ALSO PRESENT:

17                 DEBRA FOSTER

18                   .

19                   .

20                   .

21                   .

22                   .

23                   .

24                   .

25                   .

Cynthia Ellison                                         April 27, 2006

Page 3

1              Deposition of Cynthia Ellison

2                     April 27, 2006

3              EXAMINATION

4              BY-MR.DODD:

5                     MR. DODD:  Q.  What's your name?

6              A.      Cynthia Ellison.

7              Q.      Where do you live, Ms. Ellison?

8              A.      I live at 1598 Sandstone Court

9         here in Montgomery, Alabama.

10              Q.      How long have you lived there?

11              A.      About five years.

12              Q.      I understand you are divorced, is

13         that correct?

14              A.      That's correct.

15              Q.      You have one child?

16              A.      I do.

17              Q.      That's Courtnei?

18              A.      Courtnei.

19              Q.      How old is Courtnei?

20              A.      Courtnei is 22.

21              Q.      What does she do?

22              A.      She's an HR recruiter at Colonial

23         Bank.

24              Q.      Is Colonial Bank here in

25         Montgomery?

Cynthia Ellison                                   April 27, 2006

1          A.      It is.

2          Q.      Is she married?

3          A.      No.  She is not.

4          Q.      Who is your former husband?

5          A.      Terrell Ellison.

6          Q.      What does he do?

7          A.      He is a full-time pastor.

8          Q.      Is that in Montgomery as well?

9          A.      It is.

10         Q.      What church is he with?

11         A.      New Life Church of God and Christ.

12         Q.      Did you and Terrell only have one

13    child?

14         A.      We have one living child.  I had

15    a stillborn child.

16         Q.      Any other family?  Do you have any

17    other family in this part of Alabama?

18         A.      No.  I have no family in

19    Montgomery.

20         Q.      Do you have any family in the

21    surrounding counties of Montgomery?

22         A.      I do not.

23         Q.      We can get a few preliminaries out

24    of the way. This is the Deposition of Cynthia

25    Ellison taken pursuant to Notice and Agreement

Cynthia Ellison                                      April 27, 2006

1          of Counsel in the case of Ellison versus

2          Auburn UUniversity Montgomery.

3                    Ms. Ellison, have you been deposed

4          before?

5               A.     I have.

6               Q.     How many times have you been

7          deposed?

8               A.     Once.

9               Q.     Was that in connection with --

10         strike that, please.

11                    What was your deposition in

12         connection with?

13              A.     Dillard's Department Store.

14              Q.     Tell me a little bit about that.

15              A.     I worked part time for Dillard's

16         for about seven years as a salon coordinator.

17         I don't really know what the case was all

18         about.  I just know some clients claimed that

19         they were overcharged.  And I had to be

20         deposed because as a salon coordinator, I

21         accepted the money from the clients and

22         billets from the hairdressers.

23              Q.     Did the folks who were claiming

24         they had been overcharged blame you for the

25         overcharge?

Cynthia Ellison                                    April 27, 2006

1         A.      No.

2         Q.      Did Dillard's blame you for the

3    overcharge?

4         A.      No.

5         Q.      Do you still work at Dillard's?

6         A.      No.  I left Dillard's.

7         Q.      Why did you leave?

8         A.      I took a full-time job.

9         Q.      You understand you are under oath

10    to tell the truth in this deposition?

11         A.      I do understand that.

12         Q.      If you don't understand a question

13    that I ask you, will you let me know so I

14    can try to rephrase it so that you will

15    understand it?

16         A.      I will do that.

17         Q.      If you don't hear the entire

18    question that I ask you, would you let me

19    know so that I can repeat it for you?

20         A.      I will.

21         Q.      If you need to take a break or

22    recess, just let me know and we will get to

23    a stopping point as soon as we can.  Is that

24    okay?

25         A.      Okay.

Cynthia Ellison                                    April 27, 2006

Page 7

1          Q.     During the course of the

2     deposition, which probably will go on for

3     several hours, if you remember something, say,

4     later in the deposition that means you should

5     change an answer that you previously gave in

6     order to make it truthful, will you let me

7     know that?

8          A.     Yes, I will.

9          Q.     Did you review anything to prepare

10    for this deposition?

11         A.     I talked to my attorney and prayed

12    about coming in here.

13         Q.     Did you look at any documents?

14         A.     I looked at the production

15    materials.

16         Q.     Are those the documents that your

17    lawyer sent to me, the ones you gave your

18    lawyer?

19         A.     I have no idea.

20         Q.     Give me an idea of what documents

21    they were.

22         A.     Well, my affidavit.

23         Q.     Okay.

24         A.     And the -- I believe the EEOC

25    charge.

Cynthia Ellison                                    April 27, 2006

1       Q.      Are these documents that were in

2    your control?

3       A.      Yes.

4       Q.      Okay.  These are documents you

5    have given to your lawyer, correct?

6       A.      Correct.

7       Q.      Other than your lawyer, did you

8    talk to anyone to prepare for this

9    deposition?

10      A.      I did not.

11      Q.      Do you have any medical condition

12   that would prevent you or hinder you in

13   answering any of the questions I ask you

14   today?

15      A.      No, sir.

16      Q.      Are you involved in any community

17   activities?

18      A.      Just church-related activities.

19      Q.      Church related?

20      A.      Uh-huh.

21      Q.      What church do you attend?

22      A.      Harris Temple Church of God and

23   Christ in Elba, Alabama.

24      Q.      Are you on the vestry, or do you

25   hold an office in the church?

Cynthia Ellison                                    April 27, 2006

Page 9

1      A.    I am a member of the Board of
2  Trustees, and I am the Church Secretary.  And
3  I work with the youth and Sunday School.
4      Q.    Are there any other church-related
5  activities that you participate in?
6      A.    From time to time when something
7  comes up I may volunteer for a particular
8  activity.
9      Q.    An example of that would be
10 something like a youth outing?
11     A.    Youth outing, or we have what we
12 call District Conferences.  I would volunteer
13 to do whatever the function called for.  It
14 may be providing food.  It may be
15 transportation.  Whatever I think I can do.
16     Q.    You weren't in the military
17 service, were you?
18     A.    No, I was not.
19     Q.    Do you have any relatives currently
20 working at Auburn University Montgomery?
21     A.    No.
22     Q.    Did you have any relatives
23 previously working there?
24     A.    No.  I'm sorry.  My daughter
25 worked there.

Cynthia Ellison                                    April 27, 2006

1    Q.    Courtnei?

2    A.    Before she graduated she worked

3    there, yes.

4    Q.    What did she do there?

5    A.    She was a student assistant for

6    the Center for Business.

7    Q.    Was she a work study student?

8    A.    No.

9    Q.    She had a job?

10    A.    Uh-huh.

11    Q.    Who is Faye Ward?

12    A.    Faye Ward was the Assistant

13    Director of Human Resources:

14    Q.    Are you related to her at all?

15    A.    I am not.

16    Q.    Did Faye Ward give you any

17    information about this case?

18    A.    She did not.

19    Q.    Do you know if Faye Ward gave your

20    lawyer, or anybody else, information about

21    this case?

22    A.    She did give my lawyer an

23    affidavit statement.

24    Q.    Do you know who prepared that

25    affidavit?

Cynthia Ellison                                    April 27, 2006

Page 11

1          A.     My attorney and Faye, I guess.

2          Q.     Did you ask Faye to give you any

3     documents --

4          A.     I did not.

5          Q.     -- related to this case?

6          A.     No, sir.

7          Q.     Did Faye Ward volunteer to give

8     you any documents related to this case?

9          A.     She did not give me any documents.

10          Q.     Do you know if she gave anybody

11     any documents, other than the affidavit?

12          A.     I do not know.

13          Q.     Do you have any current medical

14     problems?

15          A.     I do.

16          Q.     What do you have?

17          A.     I have rheumatoid arthritis and

18     osteoarthritis.

19          Q.     Are you getting treatment for those

20     conditions?

21          A.     Yes, I am.

22          Q.     Do you have any current

23     psychological problems?

24          A.     I do not.

25          Q.     Do you have any current emotional

Cynthia Ellison                                    April 27, 2006

1      problems?

2          A.     No.

3          Q.     Other than the rheumatoid arthritis

4      and osteoarthritis, do you have any other

5      medical conditions?

6          A.     Not that I know of.

7          Q.     Do those conditions restrict your

8      activities in any way?

9          A.     Sometimes.

10         Q.     Can you give me an example?

11         A.     Well, the condition -- the

12     rheumatoid is in the shoulders and the

13     wrists.  So sometimes I am not able to pick

14     items up.  It doesn't matter how heavy or

15     how light they are.  The osteo, of course,

16     prevents me sometimes from getting up right

17     away in the mornings.

18         Q.     Forgive my ignorance.  Is

19     osteoarthritis a back --

20         A.     Well, actually it's bones.

21         Q.     Okay.  Do you attribute either of

22     those conditions to work-related issues?

23         A.     I do not.  The doctors think that

24     the rheumatoid was contracted from the many

25     chemotherapy drugs that I was on for my

Cynthia Ellison                                    April 27, 2006

Page 13

1          cancer surgery.  After my cancer surgery

2          because that was one of the side effects.

3               Q.     Your answer is "no"?

4               A.     No.

5               Q.     Have you had any psychological or

6          psychiatric difficulties in the past?

7               A.     I have not.

8               Q.     When did you resign from Dillard's?

9               A.     I believe my effective date was

10         February -- the last day of February because

11         I started my new job March 1st.

12              Q.     Of what year?

13              A.     This year.

14              Q.     Where was the Dillard's location

15         where you worked?

16              A.     Eastdale Mall.

17              Q.     East what?

18              A.     Eastdale, E-a-s-t-d-a-l-e, Mall.

19              Q.     And who was your supervisor there?

20              A.     We -- the last one that was there

21         was Amy Lyda, L-y-d-a.

22              Q.     Do you know the name of the HR

23         representative at Dillard's?

24              A.     I don't.  I don't think they have

25         one on site.

Cynthia Ellison                                    April 27, 2006

1        Q.      Do you know who the general

2    manager of that Dillard's was?

3        A.      Chris Decote.

4        Q.      Can you help me with that?

5        A.      Of course, Chris, C-h-r-i-s.

6    Decote, D-e-c-o-t-e.

7        Q.      Did you have a set schedule at

8    Dillard's?

9        A.      Most of the time I did.

10       Q.      Were you working the same number

11   of hours -- strike that, please.

12               You worked at Dillard's while you

13   worked at AUM as well?                    `

14       A.      That's correct.

15       Q.      What hours did you work when you

16   were also employed at AUM?

17       A.      If I recall correctly, it was

18   Monday nights, Wednesday nights, sometimes

19   Thursday, and then all day on Saturdays.

20       Q.      What hours on Monday and Wednesday

21   nights?

22       A.      Usually about 5:30 to close, which

23   would be about 9:00.

24       Q.      If somebody was in the chair,

25   though, you wait until they are finished,

Cynthia Ellison                                         April 27, 2006

1       don't you?

2           A.      I don't have to wait until they

3       are finished.

4           Q.      What about Thursdays when you

5       worked those days, what were your hours?

6           A.      About the same hours.

7           Q.      The same.  Saturday would be?

8           A.      Saturday would be from 7:30 until

9       about 1:00 or 2:00.  Or if I did the

10      afternoon, it would be from 12:00 until about

11      8:00 or 9:00.

12          Q.      Now, after you left Auburn

13      University Montgomery, did your hours at

14      Dillard's change at all?

15          A.      They did.

16          Q.      How did they change?

17          A.      They were reduced.  I reduced my

18      hours.

19          Q.      Why did you do that?

20          A.      Well, because the salon started off

21      with 40 hairdressers and we ended up with

22      about five or six and they didn't need me to

23      give them as many hours.

24          Q.      How many hours were you giving

25      them?

Cynthia Ellison                                    April 27, 2006

1       A.      Probably about 12.  Anywhere from

2       12 to 15 a week, if that many.  And they

3       would call me in if people were out.

4       Q.      When would you say that the change

5       in the hours occurred at Dillard's?

6       A.      I don't really remember, to be

7       honest.

8       Q.      How many hours a week were you

9       working when -- how many hours a week were

10      you working at Dillard's at the time you went

11      to Colonial?

12      A.      Probably between 11 and 12.

13      Q.      Your job at Colonial, is it full

14      time?

15      A.      It is.

16      Q.      Does that mean 40 hours a week?

17      A.      Yes, sir.

18      Q.      How were you paid at Dillard's?

19      By the hour?

20      A.      Hourly.

21      Q.      What was your rate?

22      A.      When I left it was 8.75.

23      Q.      What was your rate, if you recall,

24      at the time you left Auburn University

25      Montgomery?  Your rate at Dillard's?

Cynthia Ellison                                        April 27, 2006

Page 17

1          A.     I think it was 8.50.

2          Q.     What is your job at the bank?

3          A.     I am the Executive Assistant to

4     the Director for Training and Development.

5          Q.     And who is that?

6          A.     Melinda Mills.

7          Q.     I'm sorry.  What was the last

8     name?

9          A.     M-i-l-l-s.

10         Q.     Mills.  Okay.

11                And what is your salary?

12         A.     30,000 a year.

13         Q.     Congratulations. `Were you happy to

14    find that?

15         A.     I was happy to work.

16         Q.     Does Melinda know you are here

17    today?

18         A.     She does.

19         Q.     Does she know about the lawsuit?

20         A.     I did not go into detail with her.

21         Q.     You just told her you had to give

22    a deposition?

23         A.     That's right.

24         Q.     What's the address of the bank

25    where you work?

Cynthia Ellison                                    April 27, 2006

1          A.     All I know is 1 Court Square,

2     Montgomery, Alabama.  Colonial Bank, 1 Court

3     Square, Montgomery, Alabama.

4          Q.     Now, when you retired from AUM,

5     you drew a retirement income from the state

6     fund set up for Auburn University, is that

7     right?

8          A.     Correct.

9          Q.     How much are you getting out of

10    that?

11         A.     $1,888 a month.

12         Q.     Is that about 20,000 a year, give

13    or take?

14         A.     Give or take.

15         Q.     Other than Dillard's and Colonial

16    Bank, have you held any employment since you

17    left AUM?

18         A.     I briefly worked for my

19    rheumatologist for about three or four days.

20         Q.     For a rheumatologist?

21         A.     For my doctor, my rheumatologist.

22         Q.     What did you do there?

23         A.     She hired me to be her

24    receptionist.

25         Q.     All right.  And you didn't like

Cynthia Ellison                                    April 27, 2006

1       that?

2           A.      I couldn't do the work.  The files

3       were too heavy for me to pick up.  I

4       couldn't put them overhead.

5           Q.      I see.  How long did you work

6       there?

7           A.      Probably about three days.

8           Q.      How much did you get paid?

9           A.      I think it was something like

10      $180, or something like that.

11          Q.      Are you still seeing the same

12      doctor?

13          A.      I am.

14          Q.      Have you been continuously employed

15      with either Dillard's, your physician, or the

16      bank, since your retirement from AUM?

17          A.      Just Dillard's.

18          Q.      I don't mean with each employer at

19      the same time.  You have had a job of some

20      of kind ever since you left AUM, right?

21          A.      I have had a job with Dillard's

22      since I left.

23          Q.      Were there any periods of time

24      since you left AUM that you were unable to

25      work for whatever reason?

Cynthia Ellison                          April 27, 2006

1        A.      There was some days I couldn't go

2    into Dillard's.

3        Q.      Because of your conditions?

4        A.      Correct.

5        Q.      How many days do you think it

6    amounted to?

7        A.      I honestly don't remember.  They

8    were few because I pushed myself to do what

9    I need to do.

10       Q.      Did you take any vacations during

11   that time?

12       A.      No, I did not.

13       Q.      When you were working at AUM, when

14   did you begin planning on retiring?

15       A.      I didn't plan to retire.

16   Retirement seminars would come to Campus and

17   those of us who were in striking distance of

18   retirement, we attended those seminars to find

19   out what was being said.  And I did attend a

20   couple of retirement seminars, as I recall.

21       Q.      What do you mean by "striking

22   distance"?

23       A.      You have to have 25 years to

24   retire.  And I had made the 25-year mark.

25       Q.      You made the 25 years by combining

Cynthia Ellison                                    April 27, 2006

1    previous years of service at another

2    institution?

3        A.    That's correct.

4        Q.    At what institution was that?

5        A.    There were several.  I worked for

6    the Board of Education in Mobile for eight

7    years.  I worked for the University of South

8    Alabama for two years.  I worked for the

9    University of Alabama in Huntsville for two

10   years, maybe two and a half.  And then I

11   came to Auburn, AUM, and I worked there for

12   20 years.

13       Q.    You have had total about 32 years

14   of service?

15       A.    That's correct.

16       Q.    Did the eight years of Mobile, the

17   two years at South Alabama, and the two years

18   at the University of Alabama in Huntsville

19   transfer over to your account so to speak?

20       A.    What transfer?  You mean the

21   monies?

22       Q.    The years of service.

23       A.    Yes.  That was in the same system.

24       Q.    Do you have to pay anything for

25   those years to transfer?

Cynthia Ellison                                    April 27, 2006

1          A.      No.

2          Q.      Did you ever give any thought as

3      to when you would retire?

4          A.      I think we all do, or I did.

5          Q.      Tell me about your thinking about

6      when you would retire?

7          A.      I thought about -- I could retire

8      once I was treated the way I was.  And I

9      didn't want to be in that unsafe environment

10     any more.

11         Q.      You are talking about -- you claim

12     in this lawsuit that the University forced

13     you to retire, correct?            `

14         A.      That's correct.

15         Q.      Up until that time, had you given

16     any thought as to when you might retire?

17         A.      I had spoken to Dr. Lawal in April

18     of 2004 when I picked he and his wife up at

19     the airport.  And I told him that I had

20     enough years to retire, but I was going to

21     stay two to three years to get him

22     transitioned into his new position.

23         Q.      Is that as definite as you ever

24     considered your plans to be with respect to

25     retiring?

Cynthia Ellison                                    April 27, 2006

Page 23

1          A.      Absolutely.

2          Q.      How many times did you and Dr.

3    Lawal discuss your retirement?

4          A.      After I initially talked with him

5    in April, we didn't talk about retirement any

6    more until February when I left.

7          Q.      Had you had any discussions with

8    Bob Elliott about when you might retire?

9          A.      Dr. Elliott -- I said to Dr.

10   Elliott when he retired, "You are you lucky.

11   I wish I could."

12         Q.      Were you not eligible at that

13   time?

14         A.      I may have been eligible, but I

15   was a single parent.  My daughter was in

16   school, so I wasn't thinking about retiring.

17         Q.      Did you ever make any remarks to

18   anyone that you were going to retire after

19   Courtnei finished school?

20         A.      I don't recall.

21         Q.      Did you have any discussions about

22   your retirement with Brad Moody?

23         A.      We discussed retirement, yes.  I

24   discussed retirement with Brad Moody because

25   Debra Foster mentioned that I should retire

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 24

1    after I filed my complaint concerning Allison

2    Stevens.  I came back, and I reported that

3    to him.

4         Q.    You reported what to whom?

5         A.    I reported to Brad Moody that my

6    conversation with Debra Foster was about my

7    -- "you have enough time to retire, so why

8    don't you do that."

9         Q.    Have Debra -- I'm sorry.

10        A.    I'm sorry.  I am finished.

11        Q.    I don't mean to interrupt you.  Go

12   ahead.  I don't want to cut you off.

13        A.    I have completed my thought.

14        Q.    Have you ever discussed retirement

15   with Debra Foster before?

16        A.    I have not discussed retirement

17   with her.  She brought it up to me.

18        Q.    Is that the only time that that

19   subject has been brought up between the two

20   of you?

21        A.    When I was in her office that time

22   is what I recall.

23        Q.    She didn't make any remarks about

24   your retirement before that?

25        A.    I really don't remember.

Cynthia Ellison                                    April 27, 2006

1        Q.    Do you recall ever making any

2    comments that you want to retire, but you

3    wanted to have a new job before you did?

4        A.    I don't remember making that

5    comment.

6        Q.    A retiree from AUM is not

7    penalized, is she, if she goes out and gets

8    a full-time job?  Penalized in the sense that

9    the retirement benefits are affected?

10        A.    Well, I don't know.  I know there

11    is a cap if you get a state job.

12        Q.    Let's not talk about state jobs.

13    Let's talk about private sector jobs.

14        A.    And your question was?

15        Q.    You can retire from AUM and get

16    whatever you are entitled to based on your

17    years of service or highest salary, or

18    however the formula works, right?  And go out

19    and get a job in the private sector and your

20    retirement benefits are not affected, right?

21        A.    That's correct.

22        Q.    That's a pretty good deal, isn't

23    it?

24            MS. RODGERS:  I object.

25            MR. DODD:  Q.  Did you ever hear

Cynthia Ellison                                    April 27, 2006

Page 26

1    any of the faculty you worked with, or

2    administrators you worked with, express their

3    desire to retire and get another job?

4        A.    I have heard conversations on

5    occasion.

6        Q.    From a purely monetary standpoint,

7    an income standpoint, you are better off now

8    than when you worked at AUM, are you not?

9              MS. RODGERS:  Object.  You can

10   answer.

11             THE WITNESS:  I am not.  I don't

12   think I am better off.

13             MR. DODD:  Q.  Why aren't you

14   better off?

15       A.    I just started this job.  My

16   salary was cut in half at AUM.

17       Q.    No.  I am just talking about from

18   a purely income perspective right now.  You

19   are making more money from your retirement

20   and from your new job than you were at AUM,

21   are you not?

22             MS. RODGERS:  Objection.

23             THE WITNESS:  Well, if I sit down

24   and add up the figures, I might.  I haven't

25   sat down and added that up.

Cynthia Ellison                                    April 27, 2006

Page 27

1          MR. DODD:  Q.  What was your
2     salary when you left AUM?
3          A.     I believe it was 40,900 and
4     something.
5          Q.     Your salary now at the bank is
6     $40,000, is it not?
7          A.     Thirty.
8          Q.     Is it 30?  I thought you told me
9     40 a minute ago.
10         A.     No.  I said 30.
11         MS. RODGERS:  30.
12         MR. DODD:  Q.  I misunderstood
13    you.  Your salary is 30.  Your retirement
14    income annually is approximately $22,650?
15         A.     If that's what you calculated.
16         Q.     Do you know what it is?
17         A.     I know that it's 1,888 a month.
18         Q.     Your current income from those two
19    sources is in excess of $52,000 a year, is
20    that right?
21         A.     If that's what you just added.
22         Q.     Do you disagree with that?
23         A.     I am going by your figures is what
24    I told you.
25         Q.     Has anything happened in the two

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

1          months that you have worked at the bank that

2          suggests to you that your employment might

3          not be permanent there?

4          A.      I am too new in the job.  I

5          really don't know.

6          Q.      As far as you know, there has been

7          no event that makes it unlikely that you

8          would continue in that job?

9          A.      I have been there six weeks.  I

10         am still on probation.  I don't know what

11         the future holds.

12         Q.      How long have you known Chris

13         Mahaffy?

14         A.      He was there when I came to AUM

15         in 1984.

16         Q.      You knew him for about 20 years?

17         A.      About 20 years.

18         Q.      Were you ever on good terms with

19         him?

20         A.      I didn't see Chris much.  He

21         taught his classes and went home until he

22         became Acting Department Head, or Chair of

23         the Physical Science Department.  That's when

24         I started to see him more.

25         Q.      When did he become Acting Chair of

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

1       the Physical Science Department?

2          A.     It had to be -- I have got to

3       think a minute here.  Let's see.

4          Q.     Take your time.

5          A.     It had to be in the late Nineties.

6       Somewhere between, I want to say, '97 and

7       2000.  I'm not real sure.

8          Q.     Somewhere in that time frame, do

9       you think?

10         A.     I think.

11         Q.     Until that time, did you really

12      even know him?

13         A.     Not really, because he never really

14      came into the Dean's office.

15         Q.     After that time that he became the

16      Acting Chair, and then I guess the Chair of

17      Physical Sciences?

18         A.     Right.

19         Q.     Were you ever on good terms with

20      him?

21         A.     We did our jobs.

22         Q.     What does that mean?

23         A.     It means that -- how do you define

24      "good terms"?

25         Q.     Well, when did you become on bad

Cynthia Ellison                                    April 27, 2006

1       terms with him?

2              A.      During the first search for the

3       Dean's position.

4              Q.      When was that?

5              A.      The first search I think was

6       winter semester of 2000 -- winter or spring

7       semester of 2002.

8              Q.      Is it fair to say that up until

9       that time, that search for the Dean, that

10      there was nothing about Chris Mahaffy's

11      behavior that you complained about?

12             A.      I did complain about some of his

13      behavior.

14             Q.      Let's talk about that.  What

15      behaviors did you complain about?

16             A.      I complained about -- well, he

17      would come into the office and not say

18      anything.  He would just look and stare.  He

19      would just make inappropriate comments.

20             Q.      This is before the first Dean

21      search, right?

22             A.      Okay.  Let me get my --

23             Q.      Take your time and let's make sure

24      we get the times right.  Okay?

25             A.      Okay.  I am trying to remember

Cynthia Ellison                                    April 27, 2006

1      when the first Dean search was.  Well, I

2      never really had any dealings with Chris

3      until he became Department Chair.  And I will

4      say that was -- like I said, somewhere in

5      the late Nineties or something.  And as

6      Department Chair he would come in and drop

7      off reports, or whatever, and there was just

8      really no interaction really.

9           Q.    Between you and he, right?

10          A.    Correct.

11          Q.    Okay.

12          A.    I have got to think about this.

13          Q.    If we were going to construct a

14     time line, and try as best we can to

15     pinpoint when your objections to Mahaffy's

16     conduct began, it would be sometime after he

17     became Chair of Physical Sciences, correct?

18          A.    Yes.  After he became chair.

19          Q.    Whatever that date is.  That's the

20     event you recall, right?

21          A.    Right.

22          Q.    Who was the Dean when he became

23     Chair of Physical Sciences?

24          A.    If I'm not mistaken, his interim

25     appointment as Acting Department Head was made

Cynthia Ellison                                April 27, 2006

                                                    Page 32

1           by Joe Hill just before he retired.

2               Q.     And was the first Dean search that

3           you referred to, the search to find a

4           replacement for Joe Hill?

5               A.     Correct.

6               Q.     Who served as Acting or Interim

7           Dean when Joe Hill left?

8               A.     Dr. Elliott.

9               Q.     Do you recall how long he served

10          in that capacity?

11              A.     I think a little over two years

12          maybe.

13              Q.     He retired, did he not?

14              A.     He did.

15              Q.     Which again left a vacancy in the

16          Dean's office, right?

17              A.     Correct.

18              Q.     Who served after Elliott left?

19              A.     Dr. Moody.

20              Q.     Do you recall when he started

21          as --

22              A.     Dr. Elliott left December of '02.

23          And Brad's appointment started actually

24          December of '02, but he physically came up in

25          January.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 33

1          Q.      In January?

2          A.      '03.

3          Q.      How long was Brad Moody Acting

4     Dean?

5          A.      Until Bayo arrived August of '04.

6     Brad was in the office December of '02

7     because Bob left before Christmas.  So he

8     would have been there December of '02.

9          Q.      When did the search that resulted

10    in Dr. Lawal's hire begin?

11         A.      January or February '03.  I'm

12    sorry.  January -- let me get this right.

13    The search started -- I'm not sure.  But it

14    started shortly after Brad took the position,

15    I believe.  At least one of them did.

16         Q.      There were two searches for Deans,

17    correct?

18         A.      Yes.

19         Q.      Okay.  The first one was to find

20    a replacement for Joe Hill, is that right?

21         A.      Well, they didn't start that search

22    immediately.

23         Q.      They started that search at a time

24    when Bob Elliott was serving as Dean?

25         A.      Right.

Cynthia Ellison                                          April 27, 2006

Page 34

1      Q.    Do you recall when that searched
2   started?
3      A.    I'm not sure.  I think it was
4   spring of '02. No.  Yes.  Spring of '02.
5      Q.    How did that search end?
6      A.    It was a failed search.  No one
7   was selected as Dean.
8      Q.    When did the search end?
9      A.    I don't remember the date it
10  ended.
11     Q.    Do you have any idea of how long
12  the search took?
13     A.    It took about three -- at least
14  three months or more.
15     Q.    Now, did the second --
16     A.    I'm sorry.
17     Q.    Did the second search start Brad
18  Moody serving as Dean?
19     A.    It did.
20     Q.    That was sometime after January
21  '03?
22     A.    Right.
23     Q.    Do you recall when Dr. Lawal
24  accepted the position as the Dean?
25     A.    I think it was sometime in -- it

Cynthia Ellison                                    April 27, 2006

1     was May or June.  I'm not sure.  And it may

2     even be the end of April.  I'm not really

3     sure.

4          Q.     Do you have any idea of the

5     duration of that search?

6          A.     The second search?

7          Q.     Yes.

8          A.     I was on the Search Committee, so

9     I think it was about -- at least three or

10    four months.

11         Q.     Is it likely that it started about

12    the first of the year in 2004?

13         A.     Yes, it is.

14         Q.     Ms. Ellison, when we are talking

15    about the Deans here, we are talking about

16    the Dean of the School of Sciences, correct?

17         A.     That's correct.

18         Q.     Your job was what?

19         A.     I was the Senior Administrative

20    Associate to the Dean of the School of

21    Sciences.

22         Q.     What was your previous title in

23    that role?

24         A.     Dean's secretary.

25         Q.     I'm sorry.

Cynthia Ellison                                        April 27, 2006

1        A.      Dean's secretary.

2        Q.      Who did your Deans' report to?

3        A.      The Vice Chancellor for Academic

4    Affairs and Student Affairs.

5        Q.      Who was that?

6        A.      Dr. Roger Ritvo.

7        Q.      Was he the Vice Chancellor at all

8    times while Joe Hill, Bob Elliott and Bayo

9    Lawal were Deans?

10       A.      No, he was not.

11       Q.      When did he assume that role?  If

12   you know.

13       A.      I don't know the exact date he

14   took the job.

15       Q.      Who was his predecessor?

16       A.      Dr. Nance.

17       Q.      Is that Guin Nance?

18       A.      Uh-huh.

19       Q.      You have to say "yes."

20       A.      Yes.  I'm sorry.

21       Q.      Dr. Nance is now the Chancellor,

22   correct?

23       A.      Correct.

24       Q.      Does Roger Ritvo report to Guin

25   Nance?

Cynthia Ellison                                April 27, 2006

1          A.      He does.

2          Q.      Who did Guin Nance report to when

3      she was the Vice Chancellor?

4          A.      Dr. Saigo.

5          Q.      How many Departments are there in

6      the School of Sciences?

7          A.      Six, seven.  Counting the facility

8      at Maxwell.

9          Q.      Does each Department have a Chair?

10         A.      Yes.

11         Q.      To whom do the Chairs' report?

12         A.      To the Dean.

13         Q.      How would -- strike that, please.

14                 Tell me how would you describe

15     your job?

16         A.      As the Dean's secretary?

17         Q.      Yes.

18         A.      My job included making sure the

19     smooth operations of the office flows daily.

20     That included answering the phones, doing the

21     mail, doing payroll, giving assignments to the

22     other secretaries, receiving assignments from

23     the other secretaries, making sure that they

24     were correct.  It included supervising

25     anywhere from five or six work study

Cynthia Ellison                                    April 27, 2006

Page 38

1     students.  I wrote drafts of memos for the

2     Deans.  Just the normal secretarial duties.

3         Q.    For the Dean, right?

4         A.    For the Dean.

5         Q.    You supported the Dean, right?

6         A.    I supported the Dean.

7         Q.    Is he your boss?

8         A.    Excuse me.  I didn't hear you.

9         Q.    Is he your boss?

10        A.    He was my boss.

11        Q.    And your supervisor?

12        A.    Yes.

13        Q.    A minute ago when you were listing

14    some of your activities, you said receiving

15    assignments from secretaries.  Did you mean

16    receiving work back from them that you had

17    given them to make sure that it's correct?

18        A.    That's correct.

19        Q.    They weren't giving you tasks to

20    do, were they?

21        A.    Right.  I gave them -- well, we

22    had routine tasks that had to be done.

23        Q.    Right.

24        A.    That I had to give out to them

25    and they returned to me to review to see

Cynthia Ellison                                    April 27, 2006

1          whether or not it was correct.

2               Q.      That's what you were talking about,

3          right?   I mean the secretaries in the School

4          of Sciences were not telling you to do

5          things, right?

6               A.      Correct.   I didn't think I had

7          said that.

8               Q.      I'm sorry.

9               A.      I didn't know that I had said that

10         they did.

11              Q.      I wanted to make sure.

12              A.      Okay.

13              Q.      Now, until Chris Mahaffy became the

14         Chair, or Acting Chair of the Physical

15         Sciences, had he ever been violent with you?

16              A.      He had not been violent with me,

17         no.

18              Q.      Have you ever observed him being

19         violent with anyone?

20              A.      I observed him being upset.

21              Q.      How was he upset?

22              A.      After Department Head meetings,

23         sometimes if things didn't go his way, he

24         came out upset.

25              Q.      Let's talk about the time up until

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                              April 27, 2006

Page 40

1       he became Chair.

2            A.      Okay.

3            Q.      Have you ever seen him become

4       violent with anyone until that time?

5            A.      There was one confrontation that

6       was reported to the Dean's office between he

7       and a student in a chemistry lab.

8            Q.      What was that confrontation?

9            A.      I don't know.  It was years ago.

10      I don't remember.  There was a confrontation

11      and the Dean at the time took care of it.

12           Q.      Do you know any details about that

13      confrontation?

14           A.      I don't remember.

15           Q.      Do you have any personal knowledge

16      of that confrontation?

17           A.      I was not in the lab when it took

18      place.

19           Q.      Until the time that Chris Mahaffy

20      became Chair of Physical Sciences, had he

21      ever touched you?

22           A.      No.

23           Q.      Have you ever sued anybody else

24      before?

25           A.      I have not.

Cynthia Ellison                                        April 27, 2006

1          Q.       Have you ever been sued?

2          A.       No.

3          Q.       Have you been charged with a

4     crime?

5          A.       No.

6          Q.       Where was your office located?

7          A.       311 Goodwyn Hall, which was the

8     Dean's suite.

9          Q.       Is that on the third floor?

10          A.       Third floor of Goodwyn Hall.

11          Q.       Can you give me an idea of the

12     layout of the office?

13          A.       You would come into the office.

14     To the left there was a seating area.  To

15     the right a copy machine. Then a desk for

16     the student worker.  I added another desk for

17     a student worker.  My cubicle.  If you go to

18     the left, Dr. Owens' office.  And the second

19     left was Dr. Caroline Adams.  And directly in

20     front of my cubicle was the Dean's office.

21          Q.       Now, when you say "cubicle," can

22     you describe what you mean?

23          A.       Well, we just had -- it was a

24     partition between me and the students and the

25     incoming traffic to buffer.

Cynthia Ellison                                    April 27, 2006

Page 42

1    Q.    And how high was the partition?

2    A.    I think we ordered them either

3    about four or five feet high.  I can't

4    remember.

5    Q.    Did you have to stand up to see

6    out of it?

7    A.    I did.

8    Q.    You mean it's a solid partition,

9    right?

10   A.    There was maybe a 12-inch glass at

11   the end, but I had to lean to look up out

12   of that glass.

13   Q.    What was your line of vision when

14   you looked through the glass?

15   A.    I could see the door opening, but

16   I couldn't see who was coming in until they

17   actually entered.

18   Q.    Could you see into the hallway?

19   A.    If I stood up and leaned forward.

20   Q.    And leaned forward?

21   A.    Well --

22   Q.    I know it's hard to describe a

23   physical layout.

24   A.    You could see the hallway from the

25   -- you could see the hallway from the glass

Cynthia Ellison                                        April 27, 2006

1    that's in there.  If you take a look you can

2    see.  And depending on how your desk is

3    turned, and my desk had been in several

4    positions.

5       Q.    So tell me how you would look into

6    the hall? Would you have to stand up and

7    look around, or look over, or how would you

8    do it?

9       A.    Like that.

10      Q.    You are looking around the edge?

11      A.    No.

12      Q.    You are looking through the glass?

13      A.    Right.

14      Q.    Okay.  Did you spend most of your

15   day at your desk?

16      A.    It depends on what day of the week

17   it was and what I was doing.

18      Q.    What were your typical hours of

19   work there?

20      A.    8:00 to 5:00.

21      Q.    Now, did you ever have any extra

22   employment at AUM?

23      A.    I did.

24      Q.    Tell me about that.

25      A.    I worked for the Center for

Cynthia Ellison                                          April 27, 2006

Page 44

1    Business doing structured interviews with

2    people from the Department of Transportation,

3    police officers in Dekalb County, Georgia.

4    And when they had other projects come up,

5    they would ask me to help.

6         Q.    Are these projects that have a

7    definite starting point and a definite

8    termination point?

9         A.    Yes.

10        Q.    How long did they typically last?

11        A.    Anywhere from two days to a week.

12   Sometimes, I think one time was a two-week

13   period.  I'm not sure. It's been a while.

14        Q.    How would you modify your schedule,

15   or did you need to modify your schedule if

16   you had one of those assignments?

17        A.    There was a form that we called

18   HR-12.  And you had to put on that form if

19   you were taking vacation time, or if you were

20   going to make it up, or if you were using

21   comp time, and you had to put that on there.

22        Q.    When would you -- say, during a

23   typical work day, when did you perform the

24   work on these assignments? Do you know what I

25   mean?  Was it between the hours of 8:00 to

Cynthia Ellison                                    April 27, 2006

1    5:00, or was it some other time?

2        A.    I had to physically be at another

3    location to perform the work.  I was wherever

4    the job was.

5        Q.    Right.  Did these jobs occur

6    outside of your normal working hours?

7        A.    Sometimes they did.  Sometimes they

8    didn't.

9        Q.    How would you -- when they

10   didn't --

11       A.    As I stated, there was an HR-12

12   form that we had to fill out a block on that

13   form stating how we would compensate for the

14   time that I was not at my regular job.

15   Whether it be taking vacation, comp time, or

16   making it up.

17       Q.    They are not going to pay you

18   twice, in other words, right?

19       A.    I don't understand that.

20       Q.    If you had to go to your other

21   assignment during the times that you would

22   typically be working in the Dean's office,

23   you are not going to get your normal salary

24   for working in the Dean's office for that

25   time, plus the income you make on the

Cynthia Ellison                                    April 27, 2006

Page 46

1      assignment, right?

2            A.     It depends on what you put on your

3      HR-12.

4            Q.     You can take your vacation, right?

5            A.     You could take vacation, or comp

6      time, or you can make it up.  Whatever your

7      supervisor approved.

8            Q.     Did Dr. Lawal ever disapprove

9      whatever you proposed with respect to these

10     other assignments and your time?

11           A.     I never had an assignment while

12     Dr. Lawal was there with the Center for

13     Business.

14           Q.     When was your last assignment for

15     the Center for Business?

16           A.     That ended probably nine to ten

17     months before -- at least a year before I

18     left.

19           Q.     In that year before you left, you

20     didn't have any other outside employment at

21     AUM?

22           A.     Not that I remember.

23           Q.     Where did you park at AUM?

24           A.     I parked in the parking lot by the

25     gym.  The parking lots are numbered.  I have

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 47

1        no idea what that parking lot number is.

2            Q.    How close to Goodwyn Hall did you

3        park?

4            A.    There was no close parking until

5        -- I parked in the handicap behind Goodwyn

6        Hall for about the last eight or nine months

7        of my employment there.  Maybe not even that

8        long.  Before that I parked in the gym

9        parking lot.

10           Q.    Was your handicap due to your

11       cancer?

12           A.    My rheumatoid arthritis.

13           Q.    Rheumatoid arthritis.  And I assume

14       you have a state authorization for parking in

15       the handicap spaces?

16           A.    I do.

17           Q.    I am just curious as to the way

18       it works in Alabama.

19           A.    Yes, sir.

20           Q.    How far from Goodwyn Hall were the

21       handicap spaces where you parked?

22           A.    It was outside.  This it -- well,

23       it was outside where the loading dock is.

24       It was just outside the loading dock at the

25       back of the building.

Cynthia Ellison                                    April 27, 2006

1       Q.     Adjacent to the building right

2   there?

3       A.     Yes.

4       Q.     Are you familiar with the AUM

5   Campus Police Officers?

6       A.     I do know some of them.  I don't

7   know all of them.

8       Q.     Do you know Nel Robinson?

9       A.     I do.

10       Q.     Do you know Craig Sparrow?

11       A.     I don't know him.

12       Q.     Do you know R.C.?  That's his

13   first name.  I have forgotten his last name.

14       A.     If you call his last name out I

15   might know him. But I don't know.

16       Q.     You knew Nel?

17       A.     Yes.

18       Q.     How long have you known her?

19       A.     Since she came to AUM.  I don't

20   know how long that's been.  I don't know how

21   long she has been there.

22       Q.     Would you say you have known her

23   for a number of years?

24       A.     Yes.

25       Q.     Do you know that she is the Chief?

1         A.      Yes.

2         Q.      The Chief Law Enforcement Officer

3    at AUM?

4         A.      Um-hum.

5         Q.      Did you ever have occasion to call

6    Chief Robinson, or any other individual in

7    the Police Department, for assistance of any

8    kind?

9         A.      I called on occasion for student

10   matters sometimes when the need arose.

11        Q.      For student --

12        A.      For student matters when students

13   were not doing what they needed to do.  And

14   I was directed to call Campus Police.  If we

15   had students who were being disruptive in

16   class.

17        Q.      Misbehaving students and that sort

18   of thing?

19        A.      Yes.

20        Q.      Did you ever have to call any of

21   the police officers to come unlock a door, to

22   let you in somewhere, or let anybody else in

23   a room that's locked?

24        A.      I may have over the course of 20

25   years forgotten my key one time and called

Cynthia Ellison                                        April 27, 2006

1      them to let me in.

2          Q.     Do you recall any occasion where

3      the Police Department or the officers didn't

4      respond to a request you made of them?

5          A.     Not in the matters that I called

6      about.

7          Q.     Did you ever ask them to escort

8      you to your car?

9          A.     I asked for Campus Police security,

10     and Dr. Lawal said I had to go through Ritvo

11     to get that.

12         Q.     My question, though is, did you

13     ever ask anybody in the Police Department to

14     escort you to your car?

15         A.     No.

16         Q.     Ms. Ellison, are you familiar with

17     the AUM harassment policy?

18         A.     I have read it over the years.

19         Q.     Do you recall when you first read

20     it?

21         A.     I don't recall when I first read

22     it.

23         Q.     Do you recall when you last read

24     it?

25         A.     Yes.

Cynthia Ellison                                    April 27, 2006

1       Q.      When did you last read it?

2       A.      I think I read it at the time

3       that Dr. Lawal's behavior changed towards me.

4       And at times that I was reporting these

5       incidents to HR.

6       Q.      Can you give me a time frame,

7       other than connecting it to somebody else's

8       behavior?

9       A.      I wasn't accustomed to just pulling

10      the book out and reading it.  So the best I

11      can tell you would be the fall semester of

12      2004.

13      Q.      Was it closer to the beginning of

14      that semester, or closer to the end of the

15      semester?

16      A.      Probably closer to the end.

17      Q.      To the end.

18              Do you have an understanding of

19      the reporting procedures contained in that

20      policy?

21      A.      I don't remember the policy

22      verbatim.

23      Q.      Do you have any recollection at

24      all of the reporting procedures in that

25      policy?

Cynthia Ellison                                April 27, 2006

1       A.      I would have to read it to be
2   refreshed, to be honest.
3       Q.      As we sit here today, you don't
4   know what the reporting procedures are?
5       A.      I do.
6       Q.      What are they?
7       A.      As related to the harassment
8   policy, you report it to your supervisor.
9       Q.      And what is the supervisor supposed
10  to do?
11      A.      They are supposed to take action.
12      Q.      Is it your understanding that the
13  supervisor of a person who feels he or she
14  has been harassed, is the person who is
15  supposed to remedy, or take action to remedy
16  the harassment?
17      A.      Well, when I say "take action,"
18  they set in motion the rest of whatever the
19  policy prescribes. Whether it is take the
20  complaint to the HR or the EEOC person.
21  That's what I am saying.
22      Q.      Okay.  I just want to make sure.
23              And your supervisor, I think you
24  said during this time, was Dr. Lawal, right?
25      A.      The last Dean I worked with was

Cynthia Ellison                                        April 27, 2006

1        Dr. Lawal.

2            Q.    He started in August of 2004?

3            A.    Yes.  Can I take a break?

4                  MR. DODD:  Of course.

5                  (Short recess)

6                  MR. DODD:  Q.  Ms. Ellison, did

7        anyone ever supervise you other than the Dean

8        of the School of Sciences, whoever that may

9        have been?

10           A.    No.

11           Q.    In his role as your supervisor, do

12       you think that Dr. Lawal had the authority to

13       discharge you?

14           A.    I think so.

15           Q.    Did Chris Mahaffy have the

16       authority to discharge you?

17           A.    No.

18           Q.    Dr. Lawal certainly had the

19       authority to assign work to you, did he not?

20           A.    Correct.

21           Q.    Did Chris Mahaffy have that

22       authority?

23           A.    Department Heads did give me work

24       to do.

25           Q.    What kind of work did Chris

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 54

1       Mahaffy give you to do?

2           A.      I assisted with what we call the

3       Jason Project. There were things that needed

4       to be done, such as arrangements for the

5       hiring of extra student workers to work

6       during that -- I believe it was a one-week

7       period. And he made the request to the Dean

8       that I find the students for him.

9           Q.      Did the Dean authorize you to do

10      that?

11          A.      Yes.

12          Q.      Do you recall if the students that

13      you found to work on the Jason Project were

14      the same students who worked in the Dean's

15      office?

16          A.      The students in the Dean's office,

17      I think there was one or two each time that

18      would work on the project.

19          Q.      On the Jason Project?

20          A.      Right.  We typically put notes up

21      in classrooms.

22          Q.      Did Dr. Lawal, in your opinion,

23      have the authorization to reprimand you if

24      the need arose?

25          A.      Yes.

Cynthia Ellison                                    April 27, 2006

1      Q.     Did Chris Mahaffy have the
2  authority to reprimand you?
3      A.     He didn't have the authority.
4      Q.     Did Dr. Lawal ever give you a job
5  evaluation?  A performance evaluation?
6      A.     No.
7      Q.     You have had performance
8  evaluations in the past, though, have you
9  not?
10     A.     For the 20 years I was there, yes.
11     Q.     Is it true that the Dean is the
12  person who always did those performance
13  evaluations for you?
14     A.     That's correct.
15     Q.     How frequently would you say that
16  you received salary increases at AUM?
17     A.     It depended on what went on in the
18  legislature. Sometimes we got them every year.
19  Sometimes they were every two years.  It was
20  four years one time.
21     Q.     Did the Dean have the authority to
22  determine how much of a raise you would get
23  within the parameters that the legislature
24  authorized?
25     A.     Yes, he did.

Cynthia Ellison                                    April 27, 2006

Page 56

1    Q.    Nobody else had that authority, did

2  they?

3    A.    He could recommend it.  Someone

4  had the authority to strike it down.

5    Q.    Somebody above him?

6    A.    Correct.

7    Q.    Chris Mahaffy didn't have that

8  authority with respect to your salary, did

9  he?

10    A.    Not my salary, no.

11    Q.    Ms. Ellison, you have been the

12  Dean's secretary the entire time of your

13  employment?

14    A.    Yes.

15    Q.    Strike that, please.

16        You were the Dean's secretary the

17  entire time of your employment at AUM?

18    A.    That's correct.

19    Q.    You were never promoted to another

20  job?

21    A.    Actually, I got an additional

22  assignment with the Dean's secretary's job.

23    Q.    What is that?

24    A.    An advisor to students.

25    Q.    How did that come about?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 57

1          A.      We needed an Advising Office.  I

2     was advising students all along about courses

3     to take.  And while Dr. Moody was Acting

4     Dean, he approved the creation of a School of

5     Sciences Advising Office and he recognized my

6     ability to work with the students.  He gave

7     information to Dr. Lawal and Dr. Lawal

8     carried the recommendation through.  And I

9     was appointed Senior Administrative

10    Associate/Advisor.

11         Q.      It's additional responsibilities?

12         A.      Right.  I actually had to go to

13    the Advising Office to work several hours a

14    day.

15         Q.      And Deans Moody and Lawal are the

16    individuals who facilitated that?  Recognized

17    your skill?

18         A.      Dr. Moody started it and Dr. Lawal

19    didn't change it when he came.

20         Q.      Was anybody else involved in that

21    opportunity for you in terms of approving it?

22         A.      No.

23         Q.      It's fair to say, is it not, that

24    you have never been demoted while you were at

25    AUM?

Cynthia Ellison                                    April 27, 2006

1        A.      That's correct.

2        Q.      Did the Dean have to authority to

3   demote you to something else?

4        A.      He was Dean.  He had that

5   authority.

6        Q.      You served at the pleasure of the

7   Dean, did you not?

8        A.      Absolutely.

9        Q.      You had no contract of employment,

10  did you?

11       A.      No.

12       Q.      Did you have any co-workers at AUM

13  whom you would consider to be good friends?

14       A.      Ruby Jenkins.

15       Q.      Ruby Jenkins.  Anybody else?

16       A.      Not good friends, no.

17       Q.      Other than the incidents involving

18  Allison Stevens and Barbara Ware, did you

19  ever have any sort of confrontation with any

20  co-workers that you would consider significant?

21             MS. RODGERS:  Object.

22             THE WITNESS:  No.  And I don't

23  consider a -- I did not have a confrontation

24  with Barbara Ware.

25             MR. DODD:  Q.  Let's just call

Cynthia Ellison                                April 27, 2006

1    them incidents then.  Do you recall any

2    confrontations or objectionable incidents with

3    any other co-workers?

4        A.    Not that I recall.

5        Q.    In your job in the Dean's office,

6    were you aware of the salaries of the other

7    staff people in the School of Sciences?

8        A.    Yes.  I did the payroll.

9        Q.    Were you the highest paid secretary

10   in the School of Sciences?

11       A.    I was.

12       Q.    Do you know what Title VI is?

13       A.    Title VI, I don't think so.

14       Q.    Do you recall any occasion when

15   Brad Moody secured some funds, federal funds,

16   some of which he used to enhance your salary?

17       A.    They -- I don't know where the

18   money came from. But for the advising, the

19   additional advising responsibilities they gave

20   me an additional $2,000.

21       Q.    Is that on top of salary --

22       A.    It was included in the 40,000.

23       Q.    Do you contend, Ms. Ellison, that

24   Chris Mahaffy discriminated against you?

25       A.    I do.

Cynthia Ellison                                April 27, 2006

Page 60

1      Q.    Do you contend that any other
2      individual at AUM discriminated against you?
3      A.    I do.
4      Q.    Who else?
5      A.    Debra Foster, Allison Stevens, Dr.
6      Ritvo.
7      Q.    Did anybody else discriminate
8      against you?
9      A.    That's what I can recall right
10     now.
11     Q.    Do you think there were others?
12     A.    I'm sorry.  Chris Mahaffy.  You
13     said Chris Mahaffy.                    `
14     Q.    We have him.  We have Mahaffy,
15     Foster, Stevens, and Ritvo.
16     A.    And Dr. Lawal.
17     Q.    Anybody else at AUM discriminate
18     against you?
19     A.    Not that I can recall at this
20     moment.
21     Q.    Do you think there are others, and
22     you just can't recall them?
23     A.    Lots of incidents happened, and I
24     can't recall every incident.
25     Q.    Since you have filed a federal

Cynthia Ellison                                    April 27, 2006

1          discrimination lawsuit, you think it's more or

2          less likely that you would recall who you

3          contend discriminated against you?

4                    MS. RODGERS:  Objection.

5                    THE WITNESS:  Those are the ones

6          that discriminated against me.

7                    MR. DODD:  Q.  Now, Chris Mahaffy

8          is white, correct?

9               A.    Yes.

10              Q.    Debra Foster is black?

11              A.    Correct.

12              Q.    Allison Stevens is white?

13              A.    Yes.

14              Q.    Roger Ritvo is white?

15              A.    Yes.

16              Q.    And Bayo Lawal is black?

17              A.    Correct.

18              Q.    How did Debra Foster discriminate

19          against you?

20              A.    In filing my complaints in the

21          Human Resource Office with Debra Foster, I

22          did not receive the same treatment that

23          others received.  In particular, Chris

24          Mahaffy.  Chris was allowed a summary report.

25          I asked for one, didn't get it.

Cynthia Ellison                                April 27, 2006

Page 62

1          Q.    Let's back up one second.  You
2     said when you filed your complaint.  Which
3     complaint are you talking about?
4          A.    Okay.  Let's go with the first
5     complaint.  I filed my complaint about
6     Allison Stevens, who called me a nigger.
7          Q.    When did you file your complaint?
8          A.    That complaint was filed in
9     December 2003.
10         Q.    Was it in writing?
11         A.    Yes.
12         Q.    You filed that with Debra Foster?
13         A.    Yes.
14         Q.    Do you have a copy of that
15     complaint?
16         A.    It should be with my materials.
17         Q.    You do have a copy of it?
18         A.    Yes.
19         Q.    You have got to say "yes."
20               Now, with respect to that complaint
21     about Allison Stevens that you filed in
22     December 2003, how did Debra Foster
23     discriminate against you?
24         A.    During the investigation she
25     interviewed all of the white witnesses.  She

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

1      did not interview the black witness.  And I

2      should say she didn't interview the black

3      witness until I called it to their attention,

4      and Dr. Nance made her go back and do it.

5          Q.    Ultimately she did interview

6      everybody you wanted her to interview?

7          A.    Not that I wanted her to

8      interview.  Everybody that was party to the

9      incident.

10          Q.    Did you want her to interview

11      anybody other than the ones she interviewed?

12          A.    No.

13          Q.    Did Debra Foster discriminate

14      against you in any other way with respect to

15      your complaint about Allison Stevens?

16          A.    I think she did.  In that I don't

17      think the investigation was a thorough one.

18          Q.    Why was it not thorough?

19          A.    Because when she called me over --

20      I'm trying to remember the date.  When she

21      called me over and spoke with me in the

22      presence of Faye Ward, she said, "I have

23      never had a complaint like this before.  I

24      really don't know what to do.  You know

25      these people on this Campus are just crazy."

Cynthia Ellison                                   April 27, 2006

1    But there were other investigations or

2    complaints that I'm sure had full attention

3    of HR.  I don't feel like I got due process.

4         Q.    How were you harmed by what you

5    claim Debra Foster didn't do, or were you

6    harmed?

7         A.    Well, actually, I was.  Because

8    when things -- when other things started

9    happening, I didn't have the confidence to

10   report it to HR because I knew nothing would

11   be done.  So I was affected.

12        Q.    How were you harmed, though?  Were

13   you harmed in your job in any way?

14        A.    Yes.  I was harmed because --

15   well, I had worked there for 20 years and

16   never had to encounter the type behavior that

17   was coming at me.  And that behavior was

18   coming at me because I was a black female.

19        Q.    You are talking about Allison

20   Stevens now?

21        A.    That's right.  I even asked Debra

22   to come over to the area to see what kind of

23   atmosphere I was working in.  Because I said

24   to her, "I am working in a hostile

25   environment."  She didn't give any

Cynthia Ellison                                    April 27, 2006

1    consideration to that. She never came over or
2    anything.
3        Q.    What do you consider a hostile
4    environment?
5        A.    I consider a hostile environment
6    one in which you can't successfully do your
7    work.  One that someone has made so
8    impossible to work in that you are paying
9    attention to things around you, people around
10   you rather than the work you can get done.
11       Q.    Did Allison Stevens cause that?
12       A.    Allison and Chris Mahaffy.
13       Q.    We will get to Mahaffy in a
14   minute.  I am concerned right now about your
15   contention with respect to Debra Foster and
16   Allison Stevens.  Okay?
17       A.    Okay.
18       Q.    Now, you say Debra Foster initially
19   interviewed only the white witnesses and that
20   she didn't do a thorough investigation, right?
21       A.    That's right.
22       Q.    Did she discriminate against you in
23   any other fashion concerning the Allison
24   Stevens incident?
25       A.    What do you mean "any other

Cynthia Ellison                          April 27, 2006

Page 66

1     fashion"?

2          Q.    Did she discriminate against you by

3     doing, or not doing else in connection with

4     that investigation or that incident?

5          A.    Right.  She did not follow through

6     with the investigation.  She did not do what

7     she was supposed to do.  I was just asking

8     her to do her job.

9          Q.    What did she not do?

10          MS. RODGERS:  Object to form.

11          MR. DODD:  Q.  What do you

12     contend she did not do?

13          A.    She didn't follow·through with the

14     process of interviewing the witnesses.  I

15     complained to Dr. Nance. Dr. Nance redirected

16     her.  And that's when she interviewed the

17     black witnesses.

18          Q.    Ultimately every witness was

19     interviewed, right?

20          MS. RODGERS:  Object.

21          THE WITNESS:  Yes.

22          MR. DODD:  Q.  Now, are you

23     contending that Debra Foster discriminated

24     against you because of your race?

25          A.    I'm contending that she

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 67

1      discriminated against me in treating me

2      differently from other cases that she had

3      investigated.

4           Q.    Do you contend that she treated

5      you differently for any particular reason?

6                 MS. RODGERS:  Object to form.

7                 THE WITNESS:  I think she treated

8      me differently because she just didn't like

9      me.  Now, I am going to be honest with you.

10                MR. DODD:  Q.  Did Allison Stevens

11     -- strike that, please.

12                Did Debra Foster -- do you contend

13     that Debra Foster discriminated against you at

14     any time after the Allison Stevens incident

15     was completed?

16          A.    During the second investigation

17     with Chris Mahaffy.

18          Q.    Now, which one was that?  Which

19     investigation was that?

20          A.    When I complained that Chris'

21     behavior had changed.  His personality had

22     changed to the point where I was fearful for

23     being in the office.

24          Q.    Is that the -- was that initiated

25     by your conversation with Roger Ritvo on

Cynthia Ellison                                    April 27, 2006

Page 68

1    November the 30th, 2004, and your subsequent

2    submission of a memorandum to him?

3         A.    That was initiated by his behavior

4    at the end of the first -- at the failing of

5    the first Dean search and I reported it to

6    my supervisors.  And I talked to -- well, I

7    tried to talk to Debra Foster about it, but

8    I ended up talking to Faye Ward about it,

9    who referred me back to my supervisors to

10   follow the right chain-of-command.

11        Q.    Let's back up so I can make sure

12   I am with you here.  This was an incident

13   that occurred before the Allison Stevens

14   incident, correct?

15        A.    Right.

16        Q.    You are talking about the first

17   Dean search, right?

18        A.    The first Dean search.

19        Q.    Spring of 2002, I think you told

20   me earlier.

21        A.    This was the transition between the

22   end of the first Dean search.  It was at the

23   end.  It was either at the end of spring or

24   summer because the Dean search had failed.

25        Q.    In the year 2002?

Cynthia Ellison                                April 27, 2006

Page 69

1          A.     Let me think a minute.

2          Q.     Okay.

3          A.     Okay.  The spring search would

4     have started -- I mean the search would have

5     started winter and spring of '03.  The failed

6     -- at the end of that spring and the

7     incident with Allison was in December of '03.

8          Q.     The first Dean search was in 2003?

9          A.     The failed part of it.  I don't

10    remember whether it started in 2003, but I

11    know it ended sometime early in 2003.

12         Q.     The Allison Stevens incident

13    occurred between the first and second Dean

14    searches?

15         A.     Right.

16         Q.     Let's go back to the first Dean

17    search then.

18         A.     Okay.

19         Q.     Tell me what happened where you

20    think that Debra Foster discriminated against

21    you.

22         A.     Okay.  At the end of the first

23    Dean search when Chris didn't make the short

24    list, and ultimately he hadn't become Dean,

25    his behavior changed to the point that I

Cynthia Ellison                                    April 27, 2006

Page 70

1        would come to work in the mornings.  He

2        would be sitting at my desk crying or just

3        sitting there.  That happened several days in

4        a row saying that I should be Dean.  Making

5        comments about what he could do if he were

6        Dean.  He appeared to me to be unstable, so

7        I went to the -- okay.  I reported it.

8            Q.    You reported it or recorded it?

9            A.    I reported it to the Dean at the

10       time.

11           Q.    Who was?

12                 MS. RODGERS:  Take your time.

13                 THE WITNESS:  I'm·trying to get my

14       time line right with the Dean searches.

15       That's the important thing.

16                 MR. DODD:  Q.  You told me

17       earlier that Brad Moody was Dean from

18       December '02 through August '04.  The first

19       Dean search ended in '03, and Brad Moody was

20       the Dean, correct?

21           A.    That's right.  Because Glen Ray

22       and Brad Moody spoke with Chris about his

23       behavior.  But in the meantime I had said

24       something to Faye Ward in HR.  She told me I

25       needed to talk to Debra Foster and my

Cynthia Ellison                                April 27, 2006

Page 71

1        supervisors, but to report it to my

2        supervisors first.

3            Q.    And you did?

4            A.    I did.

5            Q.    Did you make this report in

6        writing?

7            A.    I put everything in writing.

8        Let's see.  At this time I talked to -- I

9        had a meeting with Glen and Brad.  I spoke

10       to Faye.  And I did not talk to Debra during

11       that because I didn't think it would help.

12       I'm getting confused here.

13               MS. RODGERS:  You take your time

14       and answer his questions.  If you can

15       remember, you remember.  But don't get

16       stressed about how much time you are taking.

17               THE WITNESS:  Okay.

18               MR. DODD:  Q.  Let's back up a

19       little bit. Maybe this will help you.

20           A.    Okay.

21           Q.    Mahaffy didn't make the short list

22       for the first Dean search, and obviously he

23       was not selected?

24           A.    Right.

25           Q.    That irritated him, did it not?

Cynthia Ellison                                  April 27, 2006

1          A.      Yes.  It sent him over the top.

2          Q.      He was upset that he was not

3      selected to be Dean, right?

4          A.      He came to me and he told me that

5      he thought I had something to do it with it.

6          Q.      On occasions after that you

7      observed him sitting at your desk?

8          A.      Right.

9          Q.      And sometimes he was crying?

10          A.      Right.

11          Q.      You thought that something was

12      wrong, right?

13          A.      Something was wrong.

14          Q.      What was wrong?

15          A.      He said that he blamed me for not

16      being selected as Dean.  He thought I had

17      some influence over even the first search.

18      And I wasn't even on the Committee.

19          Q.      What other behaviors did he exhibit

20      at that time that disturbed you?

21          A.      His countenance was different.

22          Q.      How so?

23          A.      He looked -- how should I say it?

24      He didn't look like he had -- his hygiene

25      was not intact.

Cynthia Ellison                                    April 27, 2006

Page 73

1          Q.     His what?

2          A.     Hygiene.  He wasn't shaven.  He

3    said he had come to the office.  He couldn't

4    sleep at night and he had come to the office

5    at 4:00 o'clock that morning and came in.

6    He was sitting there waiting on me.

7          Q.     How many times did that occur that

8    he would be sitting at your desk?

9          A.     Two times.  The first time was in

10   the dark.  I unlocked my office, went in to

11   go to my desk.  Flipped the light on and

12   when I got around to where I was supposed to

13   sit, there was Chris.

14         Q.     All right.  Now, you reported it

15   to Brad Moody?

16         A.     I reported it to Brad Moody and to

17   Glen Ray.

18         Q.     Glen Ray was the Associate Dean,

19   was he not?

20         A.     Right.

21         Q.     He reported to Brad?

22         A.     Right.

23         Q.     You think you put it in writing

24   because you put everything in writing?

25         A.     Well, I didn't say I put

Cynthia Ellison                                    April 27, 2006

1    everything in writing. I say what I said

2    earlier.  There was so many incidents that I

3    don't remember all of them.  I do remember

4    that every time an incident happened I

5    reported it to the proper person.

6         Q.    But you also did not report it to

7    Debra Foster, correct?

8         A.    I reported it to HR.  I did talk

9    to Faye Ward.

10        Q.    You didn't talk to Debra Foster --

11        A.    Not at this time.

12        Q.    Because you didn't think it would

13   help, right?

14        A.    I didn't.

15        Q.    At least with respect to that

16   incident, Debra Foster could not have

17   discriminated against you because you didn't

18   report it to her, right?

19             MS. RODGERS:  Object to form.

20             THE WITNESS:  Okay.

21             MR. DODD:  Q.  Do you agree with

22   that?

23        A.    Okay.

24        Q.    Is that a "yes."

25        A.    Yes.

Cynthia Ellison                                    April 27, 2006

1          Q.      Now, you said you talked to Faye

2     Ward?

3          A.      Right.

4          Q.      And Faye Ward told you you needed

5     to go to Debra Foster?

6          A.      She said I needed to go back to

7     the chain-of-command and come back to Debra

8     Foster, because Debra Foster was the EEOC

9     person there.

10         Q.      And you declined to do that,

11    right?

12                 MS. RODGERS:  Object to form.

13                 THE WITNESS:  I declined --

14                 MR. DODD:  Q.  You declined to go

15    to Debra Foster?

16         A.      I went to my supervisors, yes.

17         Q.      Instead?

18         A.      Uh-huh.

19         Q.      You have got to say "yes."

20         A.      Yes.

21         Q.      What did Brad Moody and Glen Ray

22    do with your report?

23         A.      At first they didn't do anything.

24    And when the behavior continued, I told them

25    that I was no longer willing to work there

Cynthia Ellison                                    April 27, 2006

1      unless something was done with Chris.

2          Q.      How long after this incident we

3      have been talking about with Chris, did that

4      conversation take place?

5          A.      At least a couple of weeks.  If

6      not more.

7          Q.      Do you know if Brad Moody or Glen

8      Ray or both of them had any meetings or

9      discussions with Chris Mahaffy about the

10     report you made?

11         A.      They did meet with Chris.

12         Q.      Were you there?

13         A.      I was in one of the meetings.

14         Q.      How many meetings did they have?

15         A.      I can't tell you how many they

16     had.  They had several that I wasn't involved

17     in.

18         Q.      How many meetings did you attend?

19     One?

20         A.      One.

21         Q.      When was that?

22         A.      It was about -- about four weeks

23     later, they called me in the office with

24     Chris.  It was Chris, me -- Dr. Mahaffy, me,

25     Glen and Brad.  And they told me that Chris

Cynthia Ellison                                    April 27, 2006

1          had agreed that he needed to see somebody.

2          Glen was going to find somebody for him to

3          see.  And Glen assured me that he would not

4          let him go alone.  That he would go with

5          him.

6               Q.    Do you know Glen's training?

7               A.    He is a psychologist.

8               Q.    Do you know what he meant --

9          strike that.

10               Did he tell you what he meant when

11          he said that Chris would see somebody?

12               A.    Yes, he did.

13               Q.    What did he say? `

14               A.    Chris was not present.  After the

15          meeting was over Glen told me that his wife

16          is also in counseling.  I don't know what

17          she does exactly, but that he was going to

18          ask his wife to recommend somebody that Chris

19          could see.  And that he was going to be sure

20          that Chris saw that person.

21               Q.    Did you have any understanding of

22          what Glen was talking about?

23               A.    Yes.

24               Q.    What was your understanding?

25               A.    That he was going to see a

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 78

1    psychiatrist, or psychologist, or whoever.  I

2    don't know.

3       Q.    Did you believe that Glen thought

4    that Mahaffy had psychiatric or psychological

5    problems?

6       A.    He told me so.  He told me that

7    he thought he had.

8       Q.    Did he tell you what condition he

9    thought Mahaffy suffered from?

10      A.    He did not.

11      Q.    Did you ever have an opinion of

12   what condition Mahaffy suffered from?

13      A.    Ever?

14            MS. RODGERS:  Object to form.

15            THE WITNESS:  I have no idea.  I

16   don't know the names of the conditions.  I

17   just knew he made me afraid.

18            MR. DODD:  Q.  Do you believe

19   that he did have a psychological or

20   psychiatric condition of some kind?

21      A.    Based on what Glen said, yes.

22      Q.    What about based on your own

23   observation?

24      A.    Based on my observation I could

25   tell something was wrong.  I am not a

Cynthia Ellison                                    April 27, 2006

1          doctor, so I don't know that for a fact.

2          But based on what I observed.

3              Q.     Did that conclusion -- did that

4          result satisfy you?

5                     MS. RODGERS:  Objection.

6                     THE WITNESS:  It satisfied me for

7          the moment that he said he was going to take

8          him to see somebody, but his behavior didn't

9          stop.

10                    MR. DODD:  Q.  Do you know if

11         he, in fact, took Chris Mahaffy to see

12         somebody?

13             A.     I do not know that for a fact.

14             Q.     Ms. Ellison, do you contend that

15         Debra Foster discriminated against you with

16         respect to any other investigation or any

17         other complaint you raised?

18             A.     Not that I raised.

19             Q.     Do you contend that she

20         discriminated against you with respect to a

21         complaint that anyone raised?

22             A.     Well, I do actually.

23             Q.     Tell me about it.

24             A.     Jessie Clayton, who was a black

25         student, applied for the -- to be the School

Cynthia Ellison                                    April 27, 2006

Page 80

1    of Sciences Computing Center Director because

2    the job had become vacant.  And I told him

3    to go over to see Debra to see about

4    applying for the job.  And he did apply for

5    the job, as well as several others, including

6    Bo Holt, H-o-l-t, who now has the job. And

7    Debra -- well, during the course of the

8    applications and everything that you do for

9    the jobs in selecting the person to be

10   interviewed, Jessie was told by Debra not to

11   make waves because he wasn't being interviewed

12   for the job.  To just go back and don't

13   worry about it.  And -- well, I talked to

14   Debra about it.  And I believe -- well, I

15   believe in every subsequent thing that I had

16   to say or do, she didn't want to hear

17   anything else I had to say. Nothing.  Whether

18   it dealt with payroll, or any other personnel

19   matters.  Anything.

20        Q.    You kind of lost me here.  Let's

21   back up and see if I can understand it.

22   Okay.

23             When did Jessie Clayton apply for

24   this job?

25        A.    I don't remember.

Cynthia Ellison                                    April 27, 2006

1       Q.      Do you remember the year?

2       A.      It had to be 2002, I believe, or

3       '03.

4       Q.      And Bo Holt is a student?

5       A.      2003.  He was a student, yes.  He

6       was a student worker in one of the other

7       schools.

8       Q.      Is he white or black?

9       A.      He is white.

10      Q.      I'm sorry.

11      A.      He is white.

12      Q.      He got the job, right?

13      A.      He did.                `

14      Q.      Do you think there is something

15      sinister about that?

16              MS. RODGERS:  Object to form.

17              MR. DODD:  Q.  Do you think there

18      is something discriminatory about that?

19      A.      We changed the job description to

20      fit his credentials.  We took off the

21      requirement for a Bachelor's Degree at the

22      request of Debra Foster.

23      Q.      Are you suggesting or contending

24      that Jessie Clayton was more qualified for

25      that job than Bo Holt?

Cynthia Ellison                                    April 27, 2006

Page 82

1          A.      In my opinion he was.

2          Q.      How did that affect you, though?

3          A.      My conversation with Debra about

4     how I thought Jessie had been treated, I

5     think that affected her attitude towards me.

6          Q.      And that affected the way she

7     dealt with you on issues that came up

8     subsequently?

9          A.      That's right.

10         Q.      Do you think Debra Foster's

11    attitude toward you that you have described

12    has anything to do with the fact that you

13    are black, or is it more likely that, as you

14    said earlier, she just doesn't like you?

15             MS. RODGERS:  Object to the form.

16             THE WITNESS:  I don't know how to

17    answer that. I guess only she can answer

18    that.

19             MR. DODD:  Q.  Do you think that

20    Debra Foster took any action, or refused to

21    take any action that needed to be taken about

22    anything, because you are black?

23             MS. RODGERS:  Object to form.

24             THE WITNESS:  I can't answer that

25    either.

Cynthia Ellison                                    April 27, 2006

Page 83

1              MR. DODD:  Q.  Why can't you

2      answer that?

3          A.     Because what action she takes

4      depends on what she thinks, not on what I

5      think.

6          Q.     I am just asking if you believe

7      that.

8          A.     Repeat your question.

9          Q.     Yes.  Do you think that Debra

10     Foster took any action, or refused to take

11     any action that she should have taken about

12     anything, because you are black?

13              MS. RODGERS:  Object to form.

14              THE WITNESS:  Not because I am

15     black per se, no.

16              MR. DODD:  Q.  Ms. Ellison, are

17     there any other events, complaints,

18     investigations or incidents involving yourself

19     and Debra Foster where you think she

20     mistreated you, or discriminated against you,

21     other than the ones we have discussed?

22          A.     I think she mistreated me during

23     the Barbara Ware incident.

24          Q.     Okay.  Tell me about the Barbara

25     Ware incident, what you recall?

Cynthia Ellison                                April 27, 2006

1    A.    Well, I don't know much about it
2    myself.  I do know that it arose because
3    Barbara was -- I didn't know until later.
4    She was off Campus, and I was getting
5    materials together for payroll.  I had to do
6    payroll that next day.  I called her office
7    several times.  Actually, I think I called
8    the first time looking for Chris, and I
9    didn't get an answer.  And I called the
10    second time because I was doing payroll.
11        Barbara had turned in her time
12    sheet, and she had left Friday on that
13    particular time sheet blank:  So I was trying
14    to get in touch with Barbara to find out
15    whether it was going to be leave, or whether
16    she was working, whatever the situation was
17    going to be.  Chris informed me the next day
18    that Barbara had taken leave. He had given
19    Barbara permission to leave that afternoon. I
20    was just calling to be sure she wasn't going
21    to be docked for a day's work.
22        That next day, if I recall
23    correctly, Bayo called me into his office and
24    said that Barbara had filed a complaint with
25    Debra Foster about my calling her office.

Cynthia Ellison                                    April 27, 2006

Page 85

1          And that's all I knew.

2                    He says, "All I can tell you is I

3          have gone over, and I have spoken with Debra.

4          I read the complaint.  The complaint is three

5          pages long."

6                    He says, "We are going to talk to

7          Barbara, and nothing will come of it."

8                    I said, "What do you mean nothing

9          will come of it?"

10                   He said, "Debra and I both read

11         the complaint, and we feel like it's been

12         embellished by Chris Mahaffy."

13                   Because Barbara had only been there

14         for several months.  I never saw the

15         complaint.  I never fully understood why she

16         complained.  Debra Foster and Bayo Lawal

17         immediately met with me in the conference

18         room in the Dean's office and said -- I had

19         something in writing to give to them to tell

20         them what occurred.  They didn't want it.

21                   They said, "Don't worry about this.

22         This is frivolous.  This is something that

23         Chris has done.  She wasn't here long enough

24         to even know what she had written about in

25         the complaint."  I asked them again at that

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 86

1    time if I could see the complaint.  They

2    refused.

3              After that she said, "If you will

4    just tell me that you will be mindful of

5    Barbara's feelings and everything will be

6    fine."

7              I said, "Well, I will be mindful

8    of her feelings, but I don't know what's

9    happening."  And that's the way the meeting

10   ended.

11             Later that afternoon, I believe it

12   was a student worker from Debra's office,

13   delivered a letter to Dr. Lawal.  I asked

14   Dr. Lawal was it concerning our meeting. He

15   said, "Yes."  That Debra had sent him a

16   letter and Barbara a letter.  I complained --

17   or I asked him, "Why did you and Barbara get

18   a letter, and I didn't get a letter?"  I

19   wrote a memo to that effect to Dr. Lawal

20   copying Debra Foster.  That's all I know

21   about Barbara Ware's complaint.  I was

22   involved in it, but I really don't know what

23   the complaint said.

24        Q.    Have you ever seen it?

25        A.    I have never seen it.

Cynthia Ellison                                    April 27, 2006

Page 87

1      Q.    Have you had any disagreements with
2   Barbara Ware?
3      A.    I haven't had any disagreements
4   with her.  The only thing that I can recall
5   that we may have discussed was that Barbara
6   wanted to take lunch between 1:00 and 2:00
7   and 2:00 and 3:00.  And because I needed to
8   know where all the secretaries were, because
9   the Deans required that, I told her that when
10  she takes late lunches, she needed to let me
11  know or transfer her calls to my office.
12  She didn't like it, and she complained to
13  Chris.
14     Q.    Do you have any idea why she did
15  not like that?
16     A.    No.
17     Q.    Do you know if Chris Mahaffy had
18  given her any different allowances regarding
19  her lunchtime?
20     A.    Neither Chris nor Barbara
21  communicated anything to me.
22     Q.    And tell me now why this is an
23  issue with Debra Foster because she wouldn't
24  show you a copy of the letter?
25     A.    Because I was mistreated.  I was

Cynthia Ellison                                    April 27, 2006

1    lied to.  She told me that "This was nothing

2    and don't worry about it." Then all of a

3    sudden it became a big deal.

4        Q.    Do you have any other complaint

5    about the manner in which Debra Foster

6    treated you, investigated the complaint, or

7    handled anything official?

8        A.    I don't think she did her job in

9    respect to my complaints, as I observed it.

10   I had to go back, as I said, to Dr. Nance,

11   at least once, maybe twice, to get her to

12   investigate the Allison Stevens situation.

13       Q.    We talked about that already.

14       A.    Right.

15       Q.    I am talking about anything new.

16       A.    Not Debra Foster that I can

17   recall.

18       Q.    Now, Allison Stevens was a

19   co-worker of yours, was she not?

20       A.    That's correct.

21       Q.    She was the secretary for Physical

22   Sciences?

23       A.    Right.

24       Q.    She was not a supervisor, right?

25       A.    No.

Cynthia Ellison                                    April 27, 2006

Page 89

1          Q.      A part of that controversy -- or
2     the entire controversy had to do with Allison
3     Stevens using a racial slur with you, right?
4          A.      That's what it escalated into, yes.
5          Q.      I believe from some of the
6     documents I have seen that you said she did
7     not really say the "N" word, but she came
8     close to saying it.
9          A.      She said it enough for me to know
10    what she said.
11         Q.      There is really no difference
12    between saying it or saying part of it,
13    right?
14         A.      She said it.  I heard what she
15    said.
16         Q.      I'm not going to argue phonetics
17    with you here.
18         A.      Right.
19         Q.      In your mind, you are certain that
20    she either said it, intended to say it, but
21    the meaning was clear, right?
22         A.      The meaning was clear.
23         Q.      That happened on December the 23rd,
24    right, 2003?
25         A.      It happened in the early part of

Cynthia Ellison                                    April 27, 2006

1          the first week of December, yes.

2              Q.    Brad Moody was the Dean?

3              A.    Yes.

4              Q.    Your Dean?

5              A.    Yes.

6              Q.    Glen Ray was the Associate Dean?

7              A.    Correct.

8              Q.    And Chris Mahaffy was Allison

9          Steele's supervisor?

10             A.    Stevens.

11             Q.    Stevens, sorry.

12                   And this event happened, did it

13         not, when none of those three was in the

14         office?

15             A.    Correct.

16             Q.    Perhaps at lunchtime or

17         thereabouts?

18             A.    No.  It was -- I'm certain it was

19         around 10:00 or 10:30 that morning.  Randy

20         Richardson and two students came in and asked

21         me why Allison's door was closed with a do

22         not disturb sign on it.

23             Q.    And you went to see?

24             A.    Right.

25             Q.    Tell me what happened.

Cynthia Ellison                              April 27, 2006

1        A.      I remember that Randy and the two

2    students that were with him stayed in my

3    office.  There was a student worker there for

4    me.  She was at her desk.

5                You can gain entry to Allison's

6    area through our conference room.  So rather

7    than go all of the way down the hallway, I

8    went through the conference room.  I opened

9    the back side of the door to where Allison

10   is seated.

11               And I said, "Randy is in the

12   office with a couple of students and he needs

13   to talk to you, but he said·there is a do

14   not disturb sign on the door."  I said, "Can

15   you tell me what's going on?"

16               She says, "Well, I am putting in

17   the banner numbers."  We have a banner system

18   for registration, and each secretary would

19   take their turn entering their numbers for

20   their particular courses.

21               I said, "Well, I don't think we

22   can close the door like this in the middle

23   of the morning."  I said, "If you need time

24   to do it, you need to either let me know

25   what's going on and transfer your calls."

Cynthia Ellison                                April 27, 2006

Page 92

1        Then she turned around and she stood up, and

2        she just screamed at me.

3            Q.      How long did this last?

4            A.      Not more than two or three

5        minutes.

6            Q.      In addition to the slur, what

7        other things did she say?

8            A.      She was saying, "You make me sick.

9        You make me sick.  Why don't you retire?

10       Everybody wants you to retire anyway."  She

11       said a lot of things.  At the end of those

12       things, she said, "You nigger."

13               And I said, "What did you say?"

14       And that's just the way I said it.  I said,

15       "What did you say?"  And I said, "Allison, I

16       am through with this."

17               So I went back to my office and I

18       told Randy.  I said "She is working in

19       banner."  I said, "But I have taken the sign

20       off the door.  If you need assistance, you

21       can go back to Allison."

22               Shortly thereafter Mahaffy came in

23       the office. And I told him what happened and

24       I told him the things that Allison said and

25       that she called me a nigger.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                      April 27, 2006

Page 93

1    Q.    Now, what happened that afternoon
2    with respect to Brad?
3    A.    That afternoon there was a meeting
4    with me, Brad, as I recall Glen and Allison.
5    Q.    Was Chris in the meeting?
6    A.    Yes.  Chris was in the meeting.
7    And Allison admitted to saying mean and ugly
8    things.  Brad took it to mean -- well, and
9    then I said, "You called me" and Brad stopped
10   me in mid sentence and said, "I am not going
11   to let you and Allison turn this meeting into
12   going back and forth at each other."  He
13   said, "Allison, you have to work with
14   Cynthia.  Cynthia, you have to work with
15   Allison.  Chris, you need to let Cynthia know
16   when you have given Allison permission to
17   close her door and do whatever."  That's
18   pretty much the gist of the meeting that I
19   recall.
20   Q.    Who called the meeting?
21   A.    I believe Brad called it.
22   Q.    How did Brad find out about the
23   confrontation?
24   A.    I assume Chris told him.  I didn't
25   tell Brad then.  Or Glen might have told

Cynthia Ellison                                    April 27, 2006

Page 94

1            him.  I really don't remember.  I know we

2            had a meeting about it.

3                Q.    Until the meeting occurred, Mahaffy

4            was the only person you had told, correct?

5                A.    That was her supervisor.

6                Q.    But that's the only person you

7            told, right?

8                A.    That's right.

9                Q.    Were you satisfied with Brad

10           Moody's handling of the meeting?

11                    MS. RODGERS:  Object to form.

12                    THE WITNESS:  I wasn't satisfied.

13           Brad was trying to make peace.  He wasn't

14           addressing the issue. Because I still raised

15           issue that I had been called a name.  If you

16           believe that she said these other things, why

17           can't you believe she said that.  I not only

18           had issue with Brad with that, I also had

19           issue with Glen with that.  I told them that

20           I wasn't satisfied.

21                    MR. DODD:  Q.  Other than the

22           fact that Allison Stevens said ugly things,

23           do you know of any reason why they should

24           believe you that she used the racial slur

25           over her when she said she didn't?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 95

1                    MS. RODGERS:  Object to form.

2                    THE WITNESS:  Well, I don't know

3        believe me over her.  This wasn't the first

4        time that Allison had to be told that she

5        was supposed to adhere to directives and

6        requests from the Dean's office.

7                    We had the same problem with her

8        when Bobby Elliott was Dean.  Bob called a

9        meeting.  At Allison's request, because

10       Allison wanted to know if I was her

11       supervisor.  And Bob told her that "Yes,

12       Cynthia is your supervisor."  In that I don't

13       have to evaluate her. "But she is your

14       supervisor in that she has directives from

15       me.  When she gives those directives, I

16       expect them to be done."  She said to Bob,

17       "If she is my supervisor, I am going to

18       quit."  She didn't quit.

19                   MR. DODD:  Q.  Is it fair to say

20       that after the meeting that afternoon on

21       December the 3rd, 2003, you weren't satisfied

22       with how it had been handled?

23                   MS. RODGERS:  Object to form.

24                   THE WITNESS:  It's fair to say

25       that I wasn't satisfied.

Cynthia Ellison                                April 27, 2006

1              MR. DODD:  Q.  What did you do,

2      or did you follow up on the meeting?  Did

3      you file a complaint about it?  What did you

4      do?

5          A.     I filed a complaint later.

6          Q.     When?

7          A.     I think my complaint was dated

8      either the end of February or the 1st of

9      March.  Sometime the 1st of March.

10         Q.     And to whom did the complaint go?

11     Strike that.

12             To whom did you send the

13     complaint?

14         A.     Well, I initially contacted Guin

15     Nance.

16         Q.     Initially?

17         A.     I think so, but I didn't -- okay.

18     After our meetings.  I'm trying to remember

19     this.  Because the investigation didn't come

20     until later because I know that Guin

21     requested that I ask Debra to investigate.

22     And that was either early March or late

23     February.

24         Q.     Let me see if I understand.  You

25     contacted Guin Nance?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                        April 27, 2006

Page 97

1          A.     I did.

2          Q.     About the Allison Stevens incident?

3          A.     Well, I contacted Guin Nance

4    because -- okay. After the meetings with me,

5    Glen, Chris and Allison and Brad, Glen said

6    to Allison, "I want you to come to me once a

7    week and tell me how Cynthia is treating

8    you." And I thought that was unfair.

9               They also set it up that if I

10   asked for any work to be done, I made a

11   request to Allison, but either another faculty

12   member or Chris would show up and put the

13   work in the Dean's office and leave.

14               I went in, spoke to Brad, told him

15   what was happening.  At that time I found

16   out that they, Glen, Brad and Chris had

17   decided that it would be best for Allison not

18   to interact with me and have some member of

19   the faculty, or Chris run interference.  And

20   I -- of course, I was upset.

21          Q.     Why did that upset you?

22               MS. RODGERS:  Object to form.

23               THE WITNESS:  Because I saw that

24   as being mistreated.  I saw that as them not

25   believing that she had called me a nigger.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 98

1     But all of that -- after all of that
2     happened, and I think Allison actually went
3     to see Glen once a week, I really don't
4     know.  I didn't follow up on that.  I just
5     wanted to do my work.
6            There came a day that -- and I
7     have never seen the letter or whatever.
8     There was talk that there was a letter on
9     Campus that went to Dr. Nance that said the
10    Dean's secretary in the School of Sciences,
11    another secretary had used the racial slur
12    toward her.  Dr. Nance had an open door
13    policy.
14           Over the years I have talked to
15    Dr. Nance about many things, not only Dr.
16    Nance, but other Vice Chancellors or whatever.
17    I didn't want my name to be associated with
18    something that I had not written.
19           So I contacted Guin Nance to let
20    her know that I was not the author of
21    whatever this document was.  And that if I
22    had a problem, I would, like I had done in
23    the past, come to her directly.
24           She responded to me in writing and
25    said that she appreciated it, but she thought

Cynthia Ellison                                      April 27, 2006

Page 99

1      that I needed to have Debra investigate.

2               I responded back to her that I

3      didn't really want to talk to Debra because

4      Debra didn't do anything. She asked me to

5      have Debra investigate anyway.  That's when I

6      put it in writing, I believe.  But those are

7      the sequence of events.

8               Now, the dates would be in that

9      December to March window.

10               MR. DODD:  Q.  Okay.  Up until

11     then, that window, December to March 2004, I

12     think from what you told me before, the only

13     interaction you had had with Debra Foster

14     concerning a complaint of some kind was the

15     one concerning Jessie Clayton.  Were there

16     any other others?

17         A.    If I told you that, that was a

18     mistake.

19         Q.    You mentioned the first Dean

20     search.  You told me you didn't go to her

21     because you didn't think it would help.

22         A.    But I did report it to HR.

23         Q.    Why, with respect to the Allison

24     Stevens issue, did you tell Guin Nance that

25     you didn't think it would do any good to

Cynthia Ellison                                    April 27, 2006

1          report it to Debra Foster?

2               A.     Because it was known around Campus

3          that Debra started fires.  She didn't put

4          them out.

5               Q.     Can you explain that to me?

6               A.     People who had gone up to Debra,

7          they didn't see or get results.

8               Q.     Are you saying you wrote that

9          message to Guin Nance about, "It won't do any

10         good to go to HR"?

11              A.     I met with her personally.

12              Q.     Did you tell her that in your

13         meeting?

14              A.     I told her exactly that.  I told

15         her that people thought Debra was starting

16         fires instead of putting them out.

17              Q.     Now, did you tell Guin Nance that

18         based on what others at the University had

19         said about starting fires and not putting

20         them out, or did you tell Guin Nance that

21         based on your own experiences with Debra

22         Foster?

23              A.     You know, I really believe it was

24         both.  I think I cited some examples to Guin

25         Nance.  And it was a combination of what

Cynthia Ellison                                            April 27, 2006

Page 101

1    others had said.  All University people talk.

2        Q.    Did you want the Allison Stevens

3    incident investigated, or did Guin Nance want

4    it investigated, or both?

5        A.    It was both.  After I had my

6    meeting with Guin, it was both of us.

7    Because I had been mistreated.

8        Q.    What prompted you to write to Guin

9    and meet with her?  Was it your feeling that

10   you had been mistreated, or was it the fact

11   that this anonymous letter had appeared?

12       A.    It was both.

13       Q.    Why did you wait so long before

14   going to her?

15            MS. RODGERS:  Object to form.

16   Sorry.

17            MR. DODD:  Q.  Why did you wait

18   close to three months before you went to Guin

19   Nance?

20       A.    I don't know that it was three

21   months, but I took immediate action on what

22   had happened to me.

23       Q.    How did you take immediate action?

24       A.    I told her supervisor.  We met

25   with the Dean, the Associate Dean.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 102

1        Q.      That was that day, right?

2        A.      It was that day or the day after.

3   It was within -- yes.

4        Q.      You didn't tell your supervisor

5   that Allison Stevens had used a racial slur,

6   did you?

7               MS. RODGERS:  Object to form.

8               THE WITNESS:  Not that day.  No,

9   not at that time.

10              MR. DODD:  Q.  Did you ever tell

11  Brad Moody that Allison Stevens had used a

12  racial slur?

13       A.      I did.

14       Q.      When?

15       A.      It might have been a couple of

16  weeks later.  I'm not sure.

17       Q.      What was the context of that

18  conversation?

19       A.      That was when -- well, he found

20  out that day because we had that meeting.

21  He knew she had called me a nigger.

22       Q.      How do you know that Brad Moody

23  knew that?

24              MS. RODGERS:  Object to form.

25              THE WITNESS:  Well, I told him in

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 103

1        the meeting.

2                MR. DODD:  Q.  Let me get this

3        straight.  In the meeting on December 3rd,

4        you told Brad Moody that Allison Stevens had

5        used the racial slur?

6            A.    Okay.  I told Chris.

7            Q.    I understand that.  Okay.

8            A.    And it may have been a couple of

9        weeks later when I told Brad.  Because, as I

10       stated earlier, Brad would not listen to

11       everything that had been said.  He said he

12       didn't want to hear it.

13           Q.    Because he wanted to make peace,

14       as you said?

15           A.    Right.

16           Q.    Tell me when you told him that

17       Allison Stevens had used the racial slur?

18           A.    I really don't remember.

19           Q.    Did you tell him orally, or did

20       you put it in writing?

21           A.    I told him orally.  I did not put

22       it in writing.

23           Q.    Was anybody else present when you

24       told him?

25           A.    I don't remember.

Cynthia Ellison                                April 27, 2006

1      Q.      Where did you tell him?

2      A.      I'm sure it was in the Dean's

3  suite.  We very rarely met outside of the

4  Dean's suite.

5      Q.      What did he say in response?

6      A.      I really don't recall.  I think

7  that's probably why I felt like nothing would

8  be done.  Because they were running

9  interference between me and Allison.

10     Q.      Did you object to that?

11             MS. RODGERS:  Object to form.

12             THE WITNESS:  I said I did.

13             MR. DODD:  Q.  Because you felt

14  you were being mistreated?

15     A.      Right.  And not believed.

16     Q.      Isn't it also true that that

17  prevented Allison from verbally attacking you

18  again?

19     A.      Allison had free course to do

20  whatever she wanted to do.

21     Q.      Did she ever verbally attack you

22  again?

23     A.      I don't recall us having any

24  incident after that.

25     Q.      Ms. Ellison, did you contact Guin

Cynthia Ellison                                    April 27, 2006

Page 105

1          Nance because you got wind of this anonymous

2          letter or because you wanted an investigation

3          performed?

4                    MS. RODGERS:  Object.  Asked and

5          answered.

6                    THE WITNESS:  I have already

7          answered that.

8                    MR. DODD:  Q.  Help me out.  I

9          am just feeble. Did you say both?

10         A.    I did.

11         Q.    Why after the passage of that much

12         time, did you want an investigation at that

13         time?

14                   MS. RODGERS:  Object to form.

15                   THE WITNESS:  Because nothing had

16         been done.

17                   MR. DODD:  Q.  What did you want

18         done?

19                   MS. RODGERS:  Object.

20                   MR. DODD:  Do you want to take a

21         break?

22         A.    My leg.  I can stand here.  I

23         just need to stand up a minute.

24         Q.    What did you want done?

25         A.    I wanted the University to know

Cynthia Ellison                                    April 27, 2006

Page 106

1    that I had been mistreated, and I wanted them

2    to investigate it.  I had no preconceived

3    idea of what the end of the investigation

4    would be.

5        Q.    Now, Brad Moody did investigate the

6    incident, did he not?

7        A.    Yes.

8        Q.    And Debra Foster also investigated

9    the incident, did she not?

10        A.    Yes.

11        Q.    Do you know what Brad Moody's

12    conclusions were?

13            MS. RODGERS:  Object to form.

14            THE WITNESS:  Do I know what his

15    conclusions were?

16            MR. DODD:  Q.  Yes.

17        A.    I think his conclusions were the

18    same as to what they thought in the

19    beginning.  That I didn't call her her a

20    nigger.

21            THE COURT REPORTER:  You just said

22    that you didn't call her.

23            THE WITNESS:  I mean, she didn't

24    call me a nigger.  I'm sorry.  Thank you.

25            MR. DODD:  Q.  What were Debra

Cynthia Ellison                                    April 27, 2006

Page 107

1          Foster's conclusions?

2                    MS. RODGERS:  Object to form.

3                    MR. DODD:  Q.  If you know.

4          A.     Well, when I talked to her and she

5     took my statement.  She pretty much told me

6     what her conclusion would be.

7          Q.     Do you know what her ultimate

8     conclusions were?

9                    MS. RODGERS:  Object to form.

10                   THE WITNESS:  She sent me a letter

11    and Allison a a letter saying that we should

12    respect each other. Basically, that's what it

13    said.  It was a two or three sentence

14    letter.

15                   MR. DODD:  Q.  Were you aware if

16    anybody investigating the Allison Stevens

17    incident was able to corroborate what you

18    said about Allison calling you --

19         A.     I wasn't in any other meeting, so

20    I don't know.

21         Q.     I am just saying if you were

22    aware.  If you are not aware, you are not

23    aware.

24         A.     I am not aware.

25         Q.     Do you know if all of the

Cynthia Ellison                                    April 27, 2006

Page 108

1       potential witnesses to the incident were

2       interviewed?

3           A.    Well, as I stated earlier, Nikki

4       was not.  She was my student worker.

5           Q.    Do you know if she was ultimately

6       interviewed?

7           A.    Ultimately.

8           Q.    That's what I mean.  By the end

9       of the investigation, do you know if there

10      was any witness who had not gone

11      uninterviewed?

12          A.    Well, actually the investigation

13      had ended as she interviewed Nikki after the

14      investigation.

15          Q.    Do you know if Nikki's interview

16      changed the result?

17          A.    It did not.

18          Q.    How did Roger Ritvo discriminate

19      against you?

20                Do you want to take a break?

21                THE WITNESS:  I think I need to.

22                MR. DODD:  Let's take a break.

23                (Whereupon, the luncheon recess was

24      taken from 12:05 o'clock p.m. to 1:00 o'clock

25      p.m.)

Cynthia Ellison                                    April 27, 2006

                                                        Page 109

1                    AFTERNOON SESSION

2                    MR. DODD:   Q.   Ms. Ellison, who

3        is Mack Jenkins?

4              A.     He is Ruby Jenkins' husband.

5              Q.     His name and Ruby Jenkins' name

6        appear on a list of individuals as part of

7        the initial disclosures that we have to file

8        with the court.

9              A.     Okay.

10             Q.     Do you know why -- strike that.

11                    What information do you think Ms.

12       Jenkins has concerning your case?

13             A.     Well, the day after I was escorted

14       off Campus, Mack came to Campus that next day

15       because of what was happening in the office

16       and he took me to lunch.  And I discussed

17       with him what was happening with me and Dr.

18       Lawal.  With me and Chris.  And he gave me

19       some advice. He is a minister.

20             Q.     What advice did he give you?

21             A.     He told me to be sure that I had

22       documented everything.  All of the treatments,

23       the mistreatment that I thought I had

24       received.  He told me to pray about it. He,

25       in fact, also said to be sure you get

Cynthia Ellison                                    April 27, 2006

1       security.

2              Q.      You get what?  I'm sorry.

3              A.      Security.

4              Q.      Security where?

5              A.      For my work area.

6              Q.      Tell me again what day this was?

7       You lost me there.

8              A.      Our meeting with Mr. Ritvo was

9       January 31st.  So this was the day after,

10      which would have been February 1st.  It had

11      to be the 1st or 2nd.

12             Q.      When you said that you were

13      escorted off Campus, what did you mean by

14      that?

15             A.      Dr. Lawal informed me when I

16      arrived to work on January 31st that Dr.

17      Ritvo thought it was advisable for him to

18      take me off Campus while they were meeting

19      with Chris.

20             Q.      Dr. Lawal is the person you say

21      was the person who escorted you off Campus?

22             A.      Right.

23             Q.      Did y'all go to lunch?

24             A.      Yes.

25             Q.      Was it Ritvo or Lawal who said you

Cynthia Ellison                                    April 27, 2006

Page 111

1    guys need to leave Campus and go to lunch

2    together?

3         A.    He told me that the request had

4    come from Dr. Lawal.  Dr. Lawal told me that

5    Dr. Ritvo had made the request for him to

6    take me off Campus.

7         Q.    Did he say why?

8         A.    His terminology was that it was

9    advisable for me to leave Campus.

10        Q.    You met with Mack Jenkins the next

11   day?

12        A.    The next day, or the day after.

13   It was shortly after that. `

14        Q.    And you went to lunch with him?

15        A.    I went to lunch with he and his

16   wife.

17        Q.    Ruby?

18        A.    Uh-huh.

19        Q.    I assume that you told Mack

20   Jenkins about your circumstances at AUM?

21        A.    I told him as much as I could

22   tell him at the lunch hour.

23        Q.    Do you believe that the extent of

24   his knowledge about your circumstances at AUM

25   is limited to what you told him?

Cynthia Ellison                                    April 27, 2006

Page 112

1      A.      Yes.

2      Q.      Do you know if he has any

3  firsthand knowledge of anything that was going

4  on at AUM?

5      A.      He is not an employee at AUM, so

6  he would not have firsthand knowledge.

7      Q.      Did he suggest that you seek any

8  sort of assistance, whether it be spiritual,

9  legal, medical, psychological?

10     A.      He was providing the spiritual

11 assistance.

12     Q.      How many times did you see him for

13 spiritual assistance?

14     A.      Well, I saw him that day.

15     Q.      Did you see him any other times

16 for spiritual assistance?

17     A.      What do you mean?

18     Q.      About your circumstances at AUM.

19     A.      No.

20     Q.      Just that one time?

21     A.      Uh-huh.

22     Q.      You have got to say "yes."

23     A.      Yes.  I'm sorry.

24     Q.      Now, why is Ruby Jenkins on your

25 list?

Cynthia Ellison                                    April 27, 2006

Page 113

1          A.      Ruby is on my list because every

2     single incident after it happened I shared it

3     with her.  I didn't share it with her in

4     writing.  I was upset, and I needed to talk.

5     And I was afraid and I didn't know what to

6     do.  She had been there for 20 years.  I

7     told her.

8          Q.      Do you believe that she has any

9     firsthand knowledge of any of the

10    circumstances you are complaining about?

11         A.      She has firsthand knowledge of

12    Chris' behavior.

13         Q.      Which particular behaviors, do you

14    know?

15         A.      The behaviors of coming into the

16    office before day in the morning waiting for

17    me.

18         Q.      Where is Ruby's office?

19         A.      She is on the second floor.

20         Q.      How would she know if Chris

21    Mahaffy was sitting at your desk on the third

22    floor in the wee hours of the morning?

23         A.      Okay.  I thought the question was

24    the behavior pattern.  He actually had Campus

25    security open her office before morning when

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                  April 27, 2006

Page 114

1      she was on the Search Committee and he left

2      flowers on her desk.  So when I told her

3      about what happened to me, there is no way

4      she should question what happened.

5      Because --

6          Q.     Something similar had happened to

7      her?

8          A.     That's right.

9          Q.     Her knowledge of the incident you

10     just described with him sitting at your desk,

11     comes from what you told her?

12         A.     Right.

13         Q.     What other conduct of Mahaffy do

14     you think she has firsthand knowledge of?

15         A.     You would have to ask her.  I'm

16     really sure she could tell you fully herself.

17     Because I would be telling you what she told

18     me.

19         Q.     Is that the extent of -- what we

20     have just described, the extent your knowledge

21     about what she knows?

22         A.     It's not the extent of my

23     knowledge.  But what I know would be hearsay,

24     I guess.  I don't know.

25         Q.     Now, Keith Ellison was on your

Cynthia Ellison                                        April 27, 2006

Page 115

1      list?

2          A.      Yes.

3          Q.      Why is he on your list?

4          A.      He is my pastor.

5          Q.      What information do you think he

6      has about this case?

7          A.      I have discussed in depth with him

8      on Sundays after service what's been happening

9      to me at AUM.

10         Q.      Were you seeking some sort of

11     assistance from him?

12         A.      Spiritual guidance.

13         Q.      Are you still seeking that from

14     him?

15         A.      Every Sunday I go to church.

16         Q.      Are you still seeking spiritual

17     guidance from him concerning this lawsuit?

18         A.      I have talked to him about it,

19     yes.

20         Q.      How many times have you talked to

21     him about it?

22         A.      Numerous times.  I don't have a

23     number.

24         Q.      You don't keep records of stuff

25     like that?

Cynthia Ellison                                    April 27, 2006

Page 116

1       A.    No.  I'm not sitting there taking
2   notes when I talk to him about my situation.
3       Q.    Where is his church located?
4       A.    Elba, Alabama.
5       Q.    Is there a street address?
6       A.    There is, but we use the P.O. Box
7   159, 36323.
8       Q.    That's your church, right?
9       A.    36323.
10       Q.    That's your church, right?
11       A.    Yes, it is.
12       Q.    You told me what it was earlier in
13   the deposition, didn't you?`
14       A.    Yes, I did.
15       Q.    What advice did he give you?  What
16   guidance did he give you?
17           MS. RODGERS:  Object to form.
18           MR. DODD:  Q.  What guidance did
19   he give you?
20       A.    Our Christian belief is to pray.
21   He told me to be watchful.  Report what was
22   happening to me.  And he knew I couldn't
23   quit my job because I needed to work.  So we
24   discussed having to remain in an environment
25   that had become conducive to every time my

d1403afb-e7e9-42de-b323-57812dba67e5

1    door opened I thought it was Chris.  When I
2    went to the restroom, I am looking around
3    because I am looking for Chris.  So he
4    basically told me to pray and be safe.
5       Q.    When did you first talk to him
6    about your circumstances?
7       A.    Probably the first -- I don't
8    remember exactly the first time.  But the
9    first time that really concerned me to the
10   point where I need to be talking to somebody
11   about this is when I arrived to work, and
12   this man is in the dark behind my desk
13   crying.
14      Q.    Have you spoken to Keith Ellison
15   about the circumstances of your case since
16   your departure from AUM?
17      A.    "Circumstances" meaning what?
18      Q.    Anything about your lawsuit.
19      A.    Well, certainly he asked me what I
20   did and I told him I did file.  Periodically
21   he has asked me what's going on and we talk.
22      Q.    Why is Courtnei on your list?
23      A.    Courtnei is my daughter.  She can
24   attest to the mental anguish that I went
25   through at home in the evenings.  In fact,

Cynthia Ellison                                    April 27, 2006

Page 118

1       the night of January 31st after the meeting

2       with Ritvo, Lawal, Faye Ward and myself, when

3       I asked for security and was refused

4       security, I went home that afternoon.  My

5       lights went out at home and I was afraid to

6       the point where I called Courtnei, and her

7       boyfriend, to come home because I was afraid

8       it was Chris.  There was no storm.  There

9       was nothing.  The lights went out.

10           Q.    Why did the lights go out?

11           A.    I have no idea.  There was no

12      accident on the street.  All I could think

13      of was Chris, because earlier that day he had

14      come to my cubicle looking for me.

15           Q.    You didn't see Chris outside your

16      house?

17           A.    Of course I didn't.  I didn't go

18      outside my house.

19           Q.    Now, you said you asked for

20      security and your request was denied?

21           A.    Yes.

22           Q.    Who did you ask for security?

23           A.    I asked for security in the

24      meeting on the 31st.

25           Q.    Who did you ask to provide the

Cynthia Ellison                                      April 27, 2006

Page 119

1       security?

2            A.    I asked Dr. Ritvo.

3            Q.    What kind of security did you ask

4       for?

5            A.    I asked for Campus Police to

6       secure my area in Goodwyn Hall on the third

7       floor where I worked.

8            Q.    What does that mean?  What does to

9       "secure your area" mean?

10           A.    I wanted them to be in the area.

11           Q.    Constantly?

12           A.    I didn't say constantly.  My

13      request was for Campus security to secure the

14      area.  That's the term we use on Campus.

15      Campus Police knows their business.  They

16      know what to do.

17           Q.    I don't know what that means.

18      Tell me what it means to secure your area?

19                 MS. RODGERS:  Object the form.

20      Whatever it means to you.

21                 THE WITNESS:  It means that Dr.

22      Ritvo would have alerted Campus Police that

23      Chris' behavior that day was of such that

24      they needed to come to my area, 311 Goodwyn

25      Hall, to make sure that this man was not

Cynthia Ellison                                    April 27, 2006

Page 120

1          there to do me harm.  And for several days,

2          or however it took thereafter, until something

3          happened to resolve the situation.

4                    MR. DODD:  Q.  What, in your

5          mind, does it mean to "secure the area"?

6          Does that mean to have an officer stationed

7          there with you or what?

8              A.      It means that someone at some

9          interval, whatever they determined was

10         necessary, because they knew the capabilities

11         of Chris.  They were to determine.  Do you

12         patrol every 15 minutes, or do you patrol

13         every two hours, four hours; five hours.  It

14         really doesn't matter at this point because I

15         didn't get it.

16             Q.      And nothing happened either, did

17         it?

18                    MS. RODGERS:  Object to form.

19         Argumentative.

20                    THE WITNESS:  Yes.  Something

21         happened.  Chris came back staring at me.

22                    MR. DODD:  Q.  Is that all he

23         did, stare at you?

24             A.      Well, you had to see his face.

25             Q.      Describe it?

Cynthia Ellison                                    April 27, 2006

Page 121

1          A.      His misdemeanor was such that how

2    dare you report me?  How dare you?  It was

3    that kind of -- it was retaliatory.  That's

4    the word I am looking for.  It was a

5    retaliatory situation.

6          Q.      Did he say anything?

7          A.      He didn't have to.  His eyes said

8    it.

9          Q.      He said nothing, right?

10         A.      He said nothing.

11         Q.      This happened one time?

12         A.      There was several times that he

13   came into the office and just stood and

14   stared at me.

15         Q.      Give me some dates?

16         A.      On January the 18th after I had

17   filed the complaint by Dr. Ritvo's request in

18   December, I met with Debra Foster, Faye Ward

19   and myself.  Debra informed me that Ritvo

20   asked her to talk to me about the complaint.

21   I immediately said, "Is Bayo's complaint going

22   to be considered?"

23              She says, "Ritvo and I have

24   talked.  We are not going to consider his

25   complaint."  Bayo had said to me and to

Cynthia Ellison                                        April 27, 2006

Page 122

1    Debra Foster that because of the things that

2    were going on he wanted both our complaints

3    considered together.

4              Give me a minute.  All right.

5    During that meeting Debra asked about the

6    complaint I had written to Dr. Ritvo.  She

7    asked whatever questions, and I answered them.

8    After they met with me, and in that meeting

9    she told me that the only thing Chris had

10   admitted to saying was that blacks shouldn't

11   hold responsible positions. And I told her --

12   and she seemed to me, she seemed to think

13   that that was all right to say.  I expressed

14   to her that she should be offended because

15   she was holding a very responsible position.

16             After that meeting she met with

17   others in the school and that meeting with me

18   was, I think, either December the 16th or

19   December the 14th.  In that meeting she told

20   me she would be meeting with Chris.  She

21   would be meeting with Brad, Bob Elliott and

22   Judd Katz to ask them about Chris' behavior

23   and whether or not they -- well, just what

24   they thought about Chris.  I don't know what

25   all she was going to ask.

Cynthia Ellison                                    April 27, 2006

Page 123

1           I think I got off track.  What

2     was your question?

3        Q.    We were talking about the dates

4     when Chris Mahaffy showed up in your office

5     and have harmed you. You started out by

6     saying January the 18th?

7        A.    Right.  Previous to that all these

8     meeting had taken place and on January the

9     18th I'm sitting at my desk.  I feel or

10    sense a presence in the office.  I look up,

11    Chris has on an overcoat, a skull cap and he

12    has his hands in the pocket of his overcoat

13    and he is standing over me.  I asked him

14    could I help you.  He asked for Dr. Lawal

15    and he just -- it appears to me that he

16    wasn't there.  I don't know how else to say

17    it.  Then he left my office.

18        Q.    Who wasn't there?

19        A.    Chris Mahaffy.  I mean he was just

20    -- that's the kind of demeanor he had.  He

21    was just standing trying to intimidate me

22    because I had filed a complaint.

23        Q.    He asked for the Dean, didn't he?

24        A.    He asked for the Dean, but he

25    walked out.  Why would you walk up on

Cynthia Ellison                          April 27, 2006

Page 124

1    somebody with your hands in your overcoat, a
2    skull cap on, and not say anything.  It was
3    intimidation.  It was retaliation because I
4    had filed a complaint, and he knew I had
5    filed a complaint.
6            Now, how he knows -- how would he
7    know that it was me unless Debra Foster or
8    somebody told him.
9        Q.    What other dates did he appear and
10   stare at you?
11       A.    After February the 23rd when Dr.
12   Lawal showed me a letter that he had received
13   from Dr. Ritvo.  He says, "Chris is not to
14   bother you any more."  Chris came by the
15   office.  Then he came in, and he just stood.
16   He stared again.  He didn't ask for anybody.
17   He didn't do anything.  But it was
18   intimidating to me.  It was in my office.
19       Q.    On February the 3rd?
20       A.    That was February the 3rd or 4th.
21   After Dr. Lawal had the meeting with Ritvo,
22   and I believe Debra. I'm not sure who he had
23   the meeting with.  It might have been Faye
24   Ward.
25       Q.    How long was he in the office?

Cynthia Ellison                                    April 27, 2006

Page 125

1        A.    He wasn't in there more than a

2   couple of minutes.  It's the appearance.

3   It's the appearance. It's a cliche, but you

4   had to be there.

5        Q.    Did he say anything?

6        A.    He didn't have to say anything.

7        Q.    Now, what in your estimation would

8   securing the area have done to deal with

9   those incidents?

10       A.    Campus Police, had they been

11  informed about Chris and his behavior, and

12  the fact that it was directed toward me.  A

13  good Campus Policeman would·have just said,

14  "Hey, how are you doing?"  Just to see what

15  was going on. Because he would have been

16  informed, look out for Chris in the Dean's

17  office.  I'm assuming they would have been

18  professional.  I'm assuming they wouldn't just

19  approach them and say, "Are you standing

20  there staring at Cynthia because she filed a

21  complaint."

22       Q.    Did you want them to confront

23  them?

24             MS. RODGERS:  Object to form.

25             THE WITNESS:  I have said time and

Cynthia Ellison                                  April 27, 2006

                                                      Page 126

1          time again I had wanted them to secure my
2          area.
3                    MR. DODD:  Q.  Is three
4          walk-throughs a day securing your area?
5                    MS. RODGERS:  Object to form.
6                    THE WITNESS:  As I stated earlier,
7          that would have been up to Campus Police and
8          Dr. Ritvo and Dr. Lawal because they knew the
9          nature of what was going on with Chris.  I
10         didn't know completely what was going on.
11                   MR. DODD:  Q.  Do you even know,
12         Ms. Ellison, whether they considered the
13         police walk-through of Goodwyn Hall to be
14         adequate for your concerns?
15                   MS. RODGERS:  Object.
16                   THE WITNESS:  I think I have
17         answered that.  I mean, if they didn't talk
18         to them, I don't know what they could have
19         considered if they didn't even talk to them.
20                   However, they did give Debra
21         security the same day of the meeting.  She
22         was escorted to her car by Campus Police, not
23         for just that day, but for the whole week.
24                   MR. DODD:  Q.  How do you know
25         that?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                        April 27, 2006

Page 127

1          A.     Well, again, I'm in a University
2    environment and people talk.
3          Q.     You don't know of that your
4    personal knowledge?
5          A.     I don't know that they did.
6          Q.     Who told you that?
7                 MS. RODGERS:  Object to form.
8                 THE WITNESS:  People were talking.
9    I don't remember exactly who.
10                MR. DODD:  Q.  Do you have an
11   idea who?
12                MS. RODGERS:  Object to form.
13                THE WITNESS:  People were talking.
14   I'm trying to remember.  I don't have an
15   idea.  Not right now.  I'm sure Campus
16   Police has a record.  I don't know of who
17   all knew.  I had no idea.
18                MR. DODD:  Q.  Isn't it just as
19   likely that Debra Foster bumped into one of
20   the police officers on her way to her car
21   and they walked together?
22                MS. RODGERS:  Object to form.
23                THE WITNESS:  I don't think that
24   that was likely, sir.
25                MR. DODD:  Q.  You don't have any

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 128

1      personal knowledge to refute that, do you?

2              MS. RODGERS:  Object to form.

3      That's argumentative.  If you know, whether

4      the hypothetical situation he just gave you

5      about what could have happened.

6              THE WITNESS:  I mean, there is no

7      real answer to that.  I mean, I have no

8      idea.

9              MR. DODD:  Q.  I just want to

10     make sure that you don't show up later in

11     this case and say, "I have personal knowledge

12     that security escorted Debra Foster to her

13     car."  If you don't know of your own

14     knowledge, your own observation, that that's

15     the case.  That's all I want you to tell me.

16     A.     I was not there when she was being

17     escorted.

18     Q.     Your knowledge is based on what

19     somebody else told you?

20     A.     I was not there when she was being

21     escorted.

22     Q.     Is your lack of knowledge based on

23     what somebody else -- strike that, please.

24              Is your belief that she was

25     escorted based on what somebody else has told

Cynthia Ellison                                    April 27, 2006

                                                          Page 129

1          you?

2              A.     My belief is based on what someone

3          else -- what others were saying.

4              Q.     As we sit here today, you don't

5          recall who told you that?

6              A.     I really don't.

7              Q.     That's fine.

8                     Why is Kay Johnson on your list?

9              A.     Kay Johnson is on my list because

10         after I filed my complaint, Dr. Lawal's

11         treatment became retaliatory towards me.

12             Q.     After you filed your complaint, are

13         you talking about the one on December the

14         3rd?

15             A.     My lawsuit.  What happened --

16             Q.     Do you mean your EEOC charge?

17             A.     Yes.  Well, when I came to see an

18         attorney, that's the way I know to put it.

19         I came to see an attorney.  They sent

20         correspondence to Dr. Lawal.  Dr. Lawal

21         called me in his office, became furious and

22         said as he was hitting his chest, "You have

23         done this to me.  We should have both waited

24         until summer and filed suits together and

25         walked away with a fistful of money, and now

Cynthia Ellison                                    April 27, 2006

Page 130

1       you have spoiled my plans."

2                    He asked me to get out of his

3       office.  Not to speak with him any more.

4       And if I had anything to say to him, send it

5       in an e-mail.  He just became indignant.

6                    I am the only person other than

7       work study students in the office.  At that

8       point I was fearful of what he was going to

9       do.  So I view it, and it was retaliating

10      against me, because I filed charges or I had

11      gone to see an attorney.

12          Q.    When were your charges filed?

13          A.    I came to this office on or about

14      -- it had to be the end of the first week

15      or the beginning of the first week of

16      February.  And that next day -- or it seems

17      the day after, he received a letter.  That's

18      when he became very angry.

19          Q.    Was that the letter from Julian

20      McPhillips?

21          A.    Yes.  Julian, yes.

22          Q.    Do you know what day he received

23      it?

24          A.    It was either the 9th, 10th or the

25      11th, something like that.

Cynthia Ellison                                    April 27, 2006

Page 131

1          Q.    And Dr. Lawal retaliated against

2      you in what fashion?

3              MS. RODGERS:  Object to form.

4              THE WITNESS:  As I just said, he

5      became very angry.  He hit his chest and

6      said that this action had been taken not just

7      against AUM, but against him.  I had spoiled

8      his plans of filing suit that summer.  Every

9      routine thing I do in the office became an

10     issue.

11             I saw him going through my trash

12     can.  The shredding that I did that Friday,

13     I normally do shredding on Fridays, either

14     once, twice, sometimes even once a month.

15     Every document just about that came in that

16     office had Social Security numbers on it.

17     Time sheets, payrolls, grade sheets.  We were

18     the hub for that. Periodically, I would shred

19     those to make room for more documents.  Him

20     seeing me shredding was nothing new since he

21     had been in there since August, I was

22     shredding the same kinds of documents many

23     times.

24             MR. DODD:  Q.  Did he become

25     angry with you before or after the shredding

Cynthia Ellison                                    April 27, 2006

Page 132

1          incident?

2              A.      Before and after.

3              Q.      Okay.

4              A.      He became angry with me when he

5          received the correspondence, as I said, from

6          Julian McPhillips.

7              Q.      Had he been angry with you before

8          that?

9              A.      No, sir.  He had been in line

10         with me.  In fact, he let me read the first

11         page of his complaint to Dr. Ritvo and he

12         told me to be sure that I got mine over to

13         Dr. Ritvo that day.  That he was going to

14         let Dr. Ritvo know his would be coming in

15         the next few days because he had so much to

16         add about how we were being treated by Chris.

17             Q.      That was back in December, right?

18             A.      Yes.  That was in December.

19             Q.      So Lawal was angry with you -- it

20         first became apparent when he received a

21         letter from Julian McPhillips?

22             A.      It first became apparent after the

23         meeting with Dr. Ritvo, Faye Ward, myself and

24         Dr. Lawal.  At that meeting Dr. Ritvo

25         informed Dr. Lawal.  In that meeting, Dr.

Cynthia Ellison                                April 27, 2006

Page 133

1      Ritvo informed Dr. Lawal that he would not be

2      the person taking action against Chris, rather

3      that he was not going to allow Dr. Lawal to

4      take any action against Chris.  That he Dr.

5      Ritvo would be the one taking action. Dr.

6      Ritvo stated at that time, "If you don't do

7      something, I will file civil litigation

8      myself."

9          Q.    Dr. Ritvo said that?

10         A.    I'm sorry.  Dr. Lawal said that to

11     Dr. Ritvo while we were in that meeting.

12     When we returned to the office -- because in

13     the meeting, I asked questions.  I asked

14     about my security.  I asked to get a summary

15     of the meeting proceedings that I was in.

16     Dr. Ritvo refused. He said the only thing I

17     could know is that they would do something to

18     Chris and not to worry about it.

19             Dr. Lawal took exception to that

20     in the meeting.  But when we got back to the

21     office, Dr. Lawal said to me, "I'm upset with

22     you."  And I asked him, "Why?"  He said,

23     "You don't talk back to men."  I said, "We

24     are living in the 21st century."

25             I was afraid.  I needed to know

Cynthia Ellison                                    April 27, 2006

1    what was going to happen me.  I could care
2    less what was going to happen to Chris.
3    That was the beginning of my seeing a change
4    in his behavior.
5        Q.    When he became angry with you
6    because you talked back to men --
7        A.    He said I talked back to Dr.
8    Ritvo.
9        Q.    Did that have anything to do with
10   your race?
11       A.    It has everything to do with being
12   retaliated against for reporting what they
13   asked me to report.
14       Q.    We are talking about Lawal now
15   retaliating against you, right?
16       A.    That's what you asked, right?
17       Q.    Yes.
18       A.    Okay.  That's what I am trying to
19   deliver.
20       Q.    Lawal also complained about
21   Mahaffy, right?
22       A.    Yes, sir, he did, until he got the
23   lawsuit. Until he got the paperwork from
24   McPhillips' office.
25       Q.    That's what I am trying to

Cynthia Ellison                                April 27, 2006

Page 135

1    determine when his displeasure with you began.

2    It started about this meeting.

3        A.    It started after that meeting.  I

4    did not know it was going to be so direct

5    until he received the paperwork from Julian

6    McPhillips towards me.  I thought he was just

7    angry because Ritvo wasn't letting him use

8    his authority.  Because Ritvo said he was

9    going to take care of Chris and not let

10   Lawal do it.  He was angry.

11           Now, whether he was taking his

12   anger out on me because he was angry at

13   Ritvo, you have to ask him that. I don't

14   know.  All I know is, I, again, became the

15   victim.

16       Q.    Because he said you talked back to

17   Ritvo?

18           MS. RODGERS:  Object to form.

19   Asked and answered over and over again.

20           MR. DODD:  I am just following up

21   on her answers.

22           MS. RODGERS:  Over and over again

23   following up. Keep on going, Cynthia.

24           MR. DODD:  Q.  When was that

25   meeting?  Was that February 3rd or 4th?

Cynthia Ellison                                        April 27, 2006

Page 136

1        A.     The meeting with Dr. Ritvo was on

2    January 31st.

3        Q.     Sometime between January 31st and

4    the day you left, February 14th, is when Dr.

5    Lawal began retaliating against you?

6             MS. RODGERS:  Objection.

7             THE WITNESS:  Yes.

8             MR. DODD:  Q.  Can you point to

9    any event between the meeting and Dr. Lawal's

10   receipt of the letter from the lawyers --

11            MS. RODGERS:  Object to form.

12            MR. DODD:  Q.  -- that prompted

13   any danger toward you by Lawal?

14       A.     Anger concerning what?

15       Q.     Anything.

16       A.     He just changed.

17       Q.     How did he change?

18            MS. RODGERS:  Object to form.

19   Just keep on answering.  Again, he is asking

20   you the same thing. State exactly what

21   happened.  That's what you give him.

22            THE WITNESS:  Well, then after the

23   meeting he made that comment that I told you

24   he made.

25            MR. DODD:  Q.  After he made that

Cynthia Ellison                          April 27, 2006

Page 137

1    comment, did anything occur between his

2    receipt of the letter from the lawyers that

3    prompted any anger on his part toward you?

4        A.    He was angry that he was having to

5    go through this, and it was directed at me.

6    I asked him why.  I don't know why.

7        Q.    When you say "go through this,"

8    are you talking about Mahaffy?

9        A.    The Mahaffy complaints or rights.

10   The whole situation with the complaints.

11       Q.    You are saying he blamed you

12   because the procedure was underway?

13       A.    I didn't say that:

14       Q.    He was angry at you because of

15   procedure?

16            MS. RODGERS:  Object to form.

17   Let's take a break.  Object to form.  Can

18   you hold this question?

19            MR. DODD:  Let me finish my

20   question.  We are going to finish the

21   question before you take a break.

22            MS. RODGERS:  Ask the question.

23   You don't have to do an answer.

24            MR. DODD:  I am going to ask you

25   when you come back about conversations you

Cynthia Ellison                                    April 27, 2006

1      have had during the break. You may want to

2      reconsider whether you want to go consult

3      with your lawyer before you answer a question

4      that's pending.

5               MS. RODGERS:  Let the record

6      reflect I don't want no one to assume that I

7      am going to talk to my client about a

8      question he is going to ask.

9               MR. DODD:  No assumption.

10              MS. RODGERS:  Also, I don't want

11     you to threaten.  It seems as though he is

12     trying to intimidate my client in this

13     deposition.  I am taking a break for her

14     sake.  Because as it appears to me, I feel

15     as though she is getting frustrated.  She

16     needs to take a break.  I don't know how she

17     is doing.  I am telling her to take a break.

18     Not to try to go outside to try to discuss a

19     potential answer for her.  Because I have not

20     done that during lunch time, nor have I done

21     it for any statement where counsel is getting

22     a record.  Nor am I trying to assist her

23     during any part of this deposition how she

24     answers her questions.

25               Let the record also reflect that I

Cynthia Ellison                                    April 27, 2006

1   have not written any notes, I have not bumped

2   her, I have not done any type of couching

3   whatsoever to assist my client in any type of

4   questioning or way she should answer her

5   question.  The only thing I told her is tell

6   the truth.

7            THE WITNESS:  May I take a break,

8   please?

9            MR. DODD:  Go ahead.

10            (Multi-page document, first page

11   undated, entitled Charge of Discrimination,

12   marked as Defendant's Exhibit-1)

13            MR. DODD:  Q.  Ms: Ellison, here

14   is Defendant's Exhibit 1.  If you can take a

15   look at that and see if you can identify it

16   for me, please.

17       A.    Yes.  Let me finish and make sure.

18   Yes, I recognize it.

19       Q.    What is it?

20       A.    It's my affidavit statement that I

21   gave to my attorney.  It's my memo from me

22   to Dr. Ritvo on December the 3rd supplying

23   his requested statement.  A letter to Dr.

24   Mahaffy from Dr. Ritvo.  A letter from me to

25   Debra Foster with copies to Dr. Lawal, Ms.

Cynthia Ellison                                    April 27, 2006

Page 140

1       Ward, Dr. Ritvo, Dr. Nance and Lee Armstrong.

2       And my memo about my retirement.

3          Q.     Together these documents you have

4       identified constitute your EEOC charge, do

5       they not?

6          A.     That's the cover sheet, yes.

7          Q.     The EEOC charge is dated February

8       10th, 2005, down at the bottom left corner?

9          A.     Where?  Bottom left, yes.

10      February the 10th.

11         Q.     Now, do you know when Mr.

12      McPhillips mailed this to Bayo Lawal?

13             MS. RODGERS:  Object to form.

14             THE WITNESS:  I don't know if he

15      mailed this to Bayo Lawal.  I know that Dr.

16      Lawal got a letter from him. I don't know

17      about this.

18             MR. DODD:  Q.  Look at your

19      affidavit for a second.  Who wrote the

20      affidavit?

21         A.     Who wrote it?

22         Q.     Yes.

23         A.     It's information that I gave my

24      attorney.

25         Q.     Your lawyer composed the affidavit?

Cynthia Ellison                              April 27, 2006

Page 141

1          MS. RODGERS:  Object to form.

2          MR. DODD:  Q.  Let me ask you

3     this.  Did you write the affidavit?

4          A.    When you say "composed," that means

5     did he write it?

6          Q.    Yes.

7          A.    I gave the information as it is

8     here.  I guess I gave him the information.

9          Q.    They put it together and you

10    signed it, right?

11         A.    They put it together and I signed

12    it.  Are you asking me if I typed this

13    document?

14         Q.    No.  I am asking you if you

15    prepared it.

16         A.    I provided the information that is

17    within this document.

18         Q.    When did you provide that

19    information to your lawyers?

20         A.    It says on the 10th day of

21    February, 2005.

22         Q.    Did your lawyers prepare this

23    affidavit on the same day that you gave them

24    the information?

25         MS. RODGERS:  Object to form.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 142

1       THE WITNESS:  It was prepared on
2    the day I signed it.
3       MR. DODD:  Q.  When did you give
4    them the information that appears in the form
5    in the affidavit?
6       A.    This was during my visit.  Let's
7    see.  I had an initial visit here, and this
8    was done on my second visit.
9       Q.    When was your initial visit?
10      A.    It had to be early --
11      MS. RODGERS:  Object to form.  Go
12   ahead and answer.
13      THE WITNESS:  It had to be early
14   February.  It was like the week before this
15   week.
16      MR. DODD:  Q.  Approximately
17   February the 3rd?
18      A.    No.  I don't know.  They have
19   their calendars, you can ask them.  I have
20   no idea.
21      MS. RODGERS:  Object to form.
22      MR. DODD:  Q.  You had two
23   meetings with your lawyer before this was
24   completed, the EEOC charge?
25      A.    Correct.  I met with them twice.

Cynthia Ellison                                    April 27, 2006

Page 143

1        Q.      Look at Paragraph 3, please.

2        A.      Okay.  On the first page?

3        Q.      Yes.  You are referring to Chris

4    Mahaffy saying that he had never seen a black

5    person before he came to the United States of

6    America?

7        A.      Yes.

8        Q.      Did he make that statement to you?

9        A.      He did.

10        Q.      When was that statement?

11        A.      This was during the time that Bob

12    Elliott was Dean.

13        Q.      Is that statement offensive to you?

14        A.      It was offensive to me because of

15    what he had done earlier.  He had come into

16    my office and he had -- it looked like a

17    magazine.  And he was far enough away that I

18    couldn't really tell what it was, but close

19    enough that I could see the image.  He says,

20    "What is this on here?"  And I said, "A

21    monkey."  And he walked over to my desk and

22    laid it down and it was a black man.  So,

23    yes, this was offensive to me.

24        Q.      Let me make sure I understand what

25    you just said, because I don't think I did.

Cynthia Ellison                                    April 27, 2006

Page 144

1          I think I must have missed something.

2          A.      Okay.

3          Q.      He held up a magazine and asked

4     you what it was?

5          A.      Yes.  Say, he was from --

6          Q.      Right.  You said "it looks like a

7     monkey."

8          A.      That's what I said.

9          Q.      He brought it over and put it on

10    your desk, and it was a picture of a black

11    man?

12         A.      Yes.  He laughed, and he left.

13         Q.      Is that all he said?

14         A.      He laughed and he left.

15         Q.      He said nothing else?

16         A.      (Witness nods head)

17         Q.      How long before this comment in

18    your affidavit did he do that?

19         A.      As I said, this was during the

20    time when Dr. Elliott was Dean.  That's all

21    I could tell you.  In fact, as I said, Dr.

22    Elliott was there.  In this same time we

23    were talking about student enrollment trends.

24    The population of black versus white census

25    on Campus had changed to a greater number of

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 145

1    blacks.  We were -- well, not we.  I was

2    sitting at my desk and they were discussing

3    the trends, he and Dr. Elliott.  He made the

4    comment that some blacks didn't seem as smart

5    as whites.  I took offense to that.  After he

6    left, I went into Bob's office and I

7    discussed it with him.  He said, "Chris is

8    crazy."  Nothing was done beyond that.

9    "Every Dean has had a problem with Chris."

10       Q.    Did you ask Elliott to take any

11   particular action?

12       A.    He just said, "Chris is crazy."

13   That's all I remember him saying.  There was

14   no action taken.  I guess he didn't think

15   there was any action needed.

16       Q.    My question is, did you ask him to

17   take any action?

18       A.    I did not ask him to take action.

19   But I did voice my concern about the

20   statements.

21       Q.    When he was having that

22   conversation with Elliott, was he talking

23   about citizens or students?

24       A.    Well, I think I said they were

25   talking about the difference in the student

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                           April 27, 2006

Page 146

1    population.

2         Q.     Right.

3         A.     Then it turned to blacks didn't

4    seem as smart as whites, which I felt he

5    thought because the population had changed,

6    the content of their conversation whatever it

7    was, meant it was because of the blacks.

8    The number of blacks rising instead of

9    falling or whatever.

10        Q.     Have you ever seen an Irishman

11   before?

12        A.     No.  Are you telling me Chris

13   isn't Irish?

14        Q.     No.

15        A.     Okay.

16        Q.     Look at Paragraph 6, please.  You

17   are referring to Glen Ray.

18        A.     Yes, sir.

19        Q.     Did you ever determine what remarks

20   Glen Ray referred to?

21        A.     I asked him and his comment to me

22   -- he said, "They were so bad he couldn't

23   repeat them."  That's all I can tell you.

24        Q.     Look at Paragraph 9, please.  Is

25   that the incident we have already talked

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 147

1       about?

2            A.      That's correct.

3            Q.      Now, look at 10.  The memorandum

4       instructs Mahaffy to avoid retaliatory behavior

5       toward you?

6            A.      Uh-huh.

7            Q.      You say he has not done so?

8            A.      Uh-huh.

9            Q.      What conduct is that referring to?

10           A.      Going back to No. 9.

11           Q.      Same thing?

12           A.      Uh-huh.  And the fact that he was

13      standing with me with his overcoat on with

14      his hands in his pocket on January 18th.

15      That was after the complaint had been filed.

16           Q.      But that was before AUM issued the

17      February 3rd memorandum, correct?

18           A.      Okay.

19           Q.      Yes?

20           A.      Yes.

21           Q.      Look at Exhibit B, if you would,

22      please.  Okay.

23                   Now, you weren't an original

24      recipient of this memorandum, were you?

25           A.      No.  My name is not on there.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

1      Q.      How did you get a copy of this?

2      A.      Dr. Lawal gave it to me.

3      Q.      Did you tell him you were going to

4   make a copy it?

5      A.      He said to do what I had to do

6   concerning Chris.

7      Q.      Did you interpret that to mean I

8   can take this document and copy it and go

9   outside with it?

10     A.      Yes, sir.  That's what he told me

11  to do at that time.

12     Q.      Well, he didn't literally tell you

13  to copy this document and take it outside?

14     A.      I am telling you what I

15  interpreted it to mean.

16     Q.      Did you tell him you had made a

17  copy of it?

18     A.      Yes.  And he said that he didn't

19  -- what did he say?  He said, "I didn't

20  intend for you to do that because we need to

21  save the documentation if we file suit in the

22  summer."  I told him that I couldn't wait

23  until the summer because I was being

24  retaliated against and in a workplace where I

25  just really couldn't stay.

Cynthia Ellison                                    April 27, 2006

Page 149

1      Q.      When did you first see what's

2   marked as Exhibit B to your affidavit?

3      A.      We were in -- Dr. Lawal and I

4   were in the lobby of Goodwyn Hall.  He asked

5   me to go down there with him. He opened the

6   letter.  He read it, and he gave it to me.

7   He didn't keep it to put it in a

8   confidential file in his office.  He gave me

9   the letter.  We walked back up to the

10  office.  And I had the letter in my hand

11  when we went back to the office.

12     Q.      Did you and he discuss it?

13     A.      Well, we did because I told him I

14  was going to use it.

15     Q.      You hadn't seen it before being

16  with him in the lobby?

17     A.      Dr. Lawal showed it me.

18     Q.      You had not seen it before then?

19     A.      Uh-huh.  In fact, I pointed out to

20  him that the very first statement on this

21  letter, in my meeting with Dr. Ritvo I asked

22  for a summary of my meeting.  He said there

23  were no summaries going to be given out.

24  Yet, this memo starts, "It serves as a

25  summary."  Chris got a summary of his

Cynthia Ellison                                    April 27, 2006

Page 150

1        meeting, but I didn't get a summary.

2            Q.      Nobody was seeking to discipline

3        you, were they?

4                    MS. RODGERS:  Object to form.

5                    THE WITNESS:  Well, I was

6        retaliated against.  I was subjected to a

7        hostile environment.

8                    MR. DODD:  Q.  Had anybody filed

9        a complaint against you in which you ended up

10       being disciplined?

11           A.      Well, Barbara Ware.

12           Q.      With respect to the Mahaffy

13       incident?

14           A.      No.

15           Q.      In fact, you were somebody who was

16       complaining against Mahaffy, were you not?

17           A.      I wasn't complaining.  I was

18       letting the University know that I was in a

19       situation that needed attention.  That's

20       different from complaining.

21           Q.      Would you consider your December

22       the 3rd memorandum a complaint or not?

23           A.      It says that it's a complaint, I

24       believe.

25           Q.      I am asking you what it is.  You

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 151

1         wrote it.

2                    MS. RODGERS:  Object.

3         Argumentative.  Just look at it.

4                    THE WITNESS:  It's the complaint

5         that Dr. Ritvo asked me to write.

6                    MR. DODD:  Q.  Are you the

7         complaining party in this complaint?

8                    MS. RODGERS:  Object to form.

9                    THE WITNESS:  I am the author of

10        that memo.

11                   MR. DODD:  Q.  Now, Ms. Ellison,

12        by the time you signed your affidavit and

13        signed your EEOC charge, you had already

14        given the University notice of your

15        retirement, correct?  In fact, that's the

16        fourth exhibit to your EEOC charge, isn't it?

17             A.    And if I'm not mistaken, that's

18        probably the date that Dr. Lawal received the

19        communication from Julian  McPhillips.

20             Q.    What date?

21             A.    February the 9th, 2005.

22             Q.    Do you believe that to be the

23        case?

24             A.    I don't know.  I don't have it

25        with me to look at it.

Cynthia Ellison                                    April 27, 2006

Page 152

1      Q.    My question is, by the time you

2    had signed your affidavit and signed your

3    EEOC charge, you had already given the

4    University notice of your retirement, right?

5      A.    I was in such a state that I had

6    no recourse.  I had nothing else to do.

7      Q.    I am only asking you if you had

8    given notice of your retirement before you

9    signed the affidavit and before you signed

10   the EEOC charge?

11     A.    I don't remember.

12     Q.    Well, let's look.  What is the

13   date on your notice to Bayo Lawal of your

14   retirement?

15     A.    February the 9th, 2005.

16     Q.    What is the date of your signature

17   on your affidavit?

18     A.    February 10th.

19     Q.    And on your EEOC charge?

20     A.    February the 10th.

21     Q.    Your resignation did precede the

22   completion of your EEOC charge?

23     A.    Because I explained to my attorneys

24   what was happening to me and they advised me

25   to leave.

1              MS. RODGERS:  Object to form.

2              MR. DODD:  That's fine.  I'm just

3    trying to establish a sequence.  I didn't ask

4    you why.

5              MS. RODGERS:  You don't have to

6    argue or even comment on that.  Let him

7    argue.  You answer the questions.  When you

8    finish answering your questions, you are

9    finished until the next question is asked and

10   not argued.

11             MR. DODD:  Q.  Who is Debra

12   Carter?

13        A.    She is my ex sister-in-law.

14        Q.    Why is she on your list?

15        A.    Because she comes to the church

16   that I go at least twice a month and I

17   shared with her some of the events that were

18   happening to me on the job.

19        Q.    Do you know if she has any

20   firsthand knowledge of what was happening to

21   you on the job?

22        A.    Only what I told you.

23        Q.    Is she a parishioner at your

24   church, or does she have any other function

25   there?

Cynthia Ellison                                        April 27, 2006

                                                      Page 154

1           A.      She is a member at the church.

2      Is that the same as a parishioner?

3           Q.      I intended it in that fashion.

4           A.      Okay.

5           Q.      Did you look to her for any sort

6      of spiritual guidance?

7           A.      I looked to her really for advice.

8      Because she was a woman.  I was being

9      retaliated against.  I was in an

10     uncomfortable situation, and I needed to talk.

11          Q.      What advice did she give you?

12          A.      She advised me to document

13     everything and to report everything to my

14     supervisors and the chain-of-command.

15          Q.      Did she give you any other advice?

16          A.      Such as what?

17          Q.      I'm sorry.

18          A.      Such as what?  What other advice?

19          Q.      Any other advice.

20          A.      She was a listening ear.

21          Q.      Is that a "no"?

22          A.      Was there a question?

23          Q.      Yes.

24          A.      What was the question?

25          Q.      I asked you what other advice, if

Cynthia Ellison                                    April 27, 2006

Page 155

1          she gave you any other advice?

2              A.    She didn't give me any other

3          advice.

4                    Do you mind if I get some water?

5              Q.    Go ahead.  Ms. Ellison, I want to

6          ask you some questions about the complaint

7          you filed in Federal Court, right?

8              A.    Okay.

9              Q.    That's different than the EEOC

10         charge.  Are you with me?

11             A.    Okay.

12             Q.    In your complaint you refer to

13         four distinct claims.  One is for race

14         discrimination; one is for retaliation; one is

15         for harassment; one is for a constructive

16         discharge.  I want to ask you a little bit

17         about those claims.

18             A.    Okay.

19             Q.    You say that you were forced to

20         retire, right?

21             A.    Right.

22             Q.    Now, was that forced retirement a

23         result of the race discrimination, the

24         retaliation and the harassment?

25             A.    And the hostile work environment.

Cynthia Ellison                                    April 27, 2006

1          Q.      Hostile work environment.  When I

2      say "harassment," I will try to remember to

3      include hostile work environment, but I am

4      referring to both.

5          A.      Okay.

6          Q.      Did you suffer any tangible job

7      detriment, other than being forced to retire

8      on account of any of the kinds of

9      discrimination you are claiming?

10         A.      Job detriment at AUM?

11         Q.      Yes.

12         A.      I couldn't do my job.  After the

13     complaint was filed, it was almost impossible

14     to do work.

15         Q.      The complaint you are referring to

16     is December 3rd?

17         A.      December 3rd, 2004.

18         Q.      Right.  Well, did you suffer a

19     loss in salary as a result of that?

20         A.      No.

21         Q.      Did the University deny you any

22     leave as a result of that?

23         A.      No.

24         Q.      Do you know if the University took

25     any sort of tangible action that affected

Cynthia Ellison                                    April 27, 2006

Page 157

1      your job adversely?

2           A.     I was affected adversely because I

3      was not given security.

4           Q.     We talked about that already.

5           A.     Right.

6           Q.     Okay.  Did you feel compelled to

7      retire because of the race discrimination you

8      felt?

9           A.     I felt compelled to retire because

10     of all of it. Race, all of it.  In fact,

11     even after the conclusion of the first

12     investigation with the Allison Stevens

13     incident, Debra Foster sent me her letter and

14     Allison her letter.  Both our names was on

15     the letter.  The day after that she sent me

16     an e-mail to the Hyundai site and called me

17     and said she sent it to me because I was

18     eligible to retire, and she thought she would

19     send that to me.

20          Q.     Did you ever talk with anyone

21     about applying for a job out there?

22          A.     No, I did not.

23          Q.     You didn't talk to Bob Elliott

24     about that?

25          A.     I didn't.  I talked to him about

1    my daughter applying for a job out there.

2         Q.    Other than the remarks you refer

3    to in the third paragraph of your affidavit

4    that Chris Mahaffy made --

5         A.    Yes, sir.

6         Q.    -- did he make any other racially

7    insensitive remarks to you?

8         A.    Well, as I told them as I was

9    doing this, there were so many I couldn't

10   remember them all.  I gave you the one about

11   the magazine with the man and the monkey.

12   This was just something that Chris did.  I

13   mean, I didn't know to write down every

14   single one.

15        Q.    Can you recall any others other

16   than those three?

17        A.    Not at this time.

18        Q.    Is there anywhere you would go to

19   refresh your recollection as to how many

20   times he made comments that you found

21   insensitive?

22        A.    What you say where I would go, do

23   you mean to AUM, to my house, to what?

24        Q.    You said you can't recall.  I'm

25   just trying to see if there was some way we

Cynthia Ellison                                    April 27, 2006

                                                        Page 159

1           can assist your recollection.
2                A.     I don't know how you can assist
3           me.
4                Q.     You don't have a written record
5           somewhere of bad things that Chris Mahaffy
6           said?
7                A.     No.  I don't have that.
8                Q.     You have given all the records
9           about your allegations to your lawyer, right?
10               A.     I have.
11               Q.     Did Roger Ritvo ever make any
12          racially insensitive remarks to you?
13               A.     He did not.
14               Q.     Did Bayo Lawal make any racially
15          insensitive remarks to you?
16               A.     Well, he did.
17               Q.     What were they?
18               A.     He said that -- well, he didn't
19          particularly care for Glen Ray as the
20          Associate Dean because he said he didn't keep
21          any of the matters they discussed
22          confidential.  He wanted me to suggest to him
23          who he could have take his place at the end
24          of his tenure as Associate Dean that coming
25          summer.  Because it was a two-year

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                      April 27, 2006

Page 160

 1          appointment.  I suggested Rosine Hall.  He

 2          says, "No, I don't want her."  I said, "What

 3          about me?  I know the school."  He says, "I

 4          don't want a woman assistant, black or

 5          white."  That was the only racial thing that

 6          I can remember right now.

 7              Q.    We have talked about Mahaffy's

 8          remarks, right. We have talked about his

 9          conduct.  Showing up in your office and that

10          sort of thing.  We talked about Allison

11          Stevens.

12              A.    Yes.

13              Q.    Are there any other incidents of

14          racial discrimination or harassment that you

15          are aware of?

16              A.    Towards me?

17              Q.    Yes.  Toward you.

18              A.    I can't recall right now.  There

19          is one more that I thought of.

20              Q.    All right.

21              A.    I'm sorry.

22              Q.    It's all right.

23              A.    I am hesitating because I am

24          thinking about the date.

25              Q.    You know I am going to ask you

Cynthia Ellison                                    April 27, 2006

Page 161

1      that.

2          A.      Yes.  I am more than certain that

3      it was after the overcoat incident, which was

4      on or about January the 18th or 19th.

5      Several days later Chris came into my office

6      and there was a student worker at the other

7      desk. He came into my office and stood in

8      front of me.  I was busy doing something.

9      He got my attention.  He says, "I want you

10     to read my shirt."  And I looked up and the

11     shirt said something like, "I am a redneck."

12     He said, "What do you think about that?"  I

13     said, "I am offended." He laughed and left.

14     I went into Dr. Lawal's office and reported

15     it.

16         Q.      What did Lawal say?

17         A.      He didn't say anything really.  I

18     just wanted to be sure I reported it.

19         Q.      Who was the student worker?

20         A.      Nikki Gibson.  And this was the

21     time when I had hired five student workers.

22     So I think Nikki -- because I had to staff

23     the Advising Office and the Dean's office and

24     their schedules -- I believe it was Nikki

25     Gibson and Marquita Snow.

Cynthia Ellison                                    April 27, 2006

Page 162

1          Q.      They were both in there?

2          A.      Yes, sir.

3          Q.      Tell me why you were offended by a

4     T-shirt that says, "I am a redneck"?

5          A.      Because I feel like "redneck" means

6     you are looking down on the minority.  That's

7     the person who feels like minorities are

8     lower class.

9          Q.      Have you ever heard any other

10    definition of "redneck"?

11         A.      I can't say that I have, sir.

12         Q.      Would you be surprised to know

13    there are others?

14         A.      I wouldn't be surprised.

15         Q.      If you think of other incidents,

16    just interrupt me and let me know.  Okay.

17         A.      I will.

18         Q.      I asked some questions earlier

19    about Mahaffy before he became Chair of

20    Physical Sciences.

21         A.      Okay.

22         Q.      I am going to ask you some

23    questions about him after he became Chair.

24         A.      Okay.

25         Q.      Okay.  Did he ever touch you?

Cynthia Ellison                                    April 27, 2006

                                                        Page 163

1            A.      You asked me that, and I said
2       "no."
3            Q.      I thought I was referring to the
4       previous time. He has never touched you then?
5            A.      No.
6            Q.      He has never made any physical
7       oral threats to you, has he?
8            A.      You said "physical" and "oral."
9       Which one did you --
10           Q.      Oral threats of physical -- strike
11      that.
12              Has he ever made a statement to
13      you that you found threatening?
14           A.      Yes, sir.
15           Q.      What did he say?
16           A.      He said that he was going to get
17      me because I was on the second Dean search,
18      and he was not selected to the short list to
19      be interviewed.
20           Q.      When did he say that?
21           A.      It was -- I can tell you exactly
22      because he was interviewing for the position
23      that Barbara now has.  So it was about mid
24      July, 2005.  Because I think Barbara was
25      hired in July.  It was around the time she

Cynthia Ellison                                        April 27, 2006

Page 164

1          was hired.

2              Q.    Who are you referring to?

3              A.    Chris Mahaffy.

4              Q.    Barbara?

5              A.    Barbara Ware.  I'm sorry.

6              Q.    2004 maybe.

7              A.    No.  Okay.  I was on the second

8          Dean search which ended about April or May of

9          2005.  I'm sorry.  Yes, I am behind.  2004.

10             Q.    Okay.  It was approximately mid

11         2004 that he made that statement

12             A.    In July.  It was whenever Barbara

13         Ware was hired.

14             Q.    He said he was going to get you?

15             A.    That's what he said.

16             Q.    Did he say anything else?

17             A.    That's pretty much what he said at

18         that time.

19             Q.    You interpreted that as a threat?

20             A.    I did.

21             Q.    Who did you report it to?

22             A.    Brad Moody.

23             Q.    What did Brad do?

24             A.    I believe Brad, if I'm not

25         mistaken, talked to Chris.

Cynthia Ellison                                    April 27, 2006

Page 165

1       Q.      Why do you think he talked to

2   Chris?

3       A.      Because we were going through some

4   more issues with Chris.  I mean, I can't

5   tell you every single thing because they

6   didn't tell me.  Glen would share with me

7   that Chris was a problem.  He would share

8   that almost every single day of the week.

9   He really went over the edge when he did not

10  get to be Dean.  He continued to harass me

11  because he thought for some reason, and I am

12  sure the reason was because he thought I

13  could influence the Committee because I was

14  the only black on the Committee, and maybe he

15  thought I knew him and I was going to say

16  things good about him.  In fact, he came to

17  me with an e-mail address and said, "No one

18  will know if you send me information about

19  the Committee's work, Search Committee's work

20  to this e-mail address."  I reported that to

21  Brad.  I reported it to Glen, and I also

22  reported that to Judd Katz.  And at that

23  time I told Chris it was inappropriate and I

24  would not do it.

25      Q.      Do you think that Mahaffy was mad

Cynthia Ellison                                    April 27, 2006

Page 166

1    at you because you didn't support him to be

2    Dean?

3        A.    He said he was.

4        Q.    Do you believe that?

5        A.    He was convincing to me.

6        Q.    I believe you told me that Dr.

7    Lawal is the individual you contend retaliated

8    against you?

9        A.    He wasn't the only one.

10       Q.    Who else?

11       A.    I believe Debra Foster retaliated.

12       Q.    When did Debra Foster retaliate?

13       A.    In sending me that e-mail and

14   saying, "You know, you have got enough time

15   to retire.  Here is a site, Hyundai.  Why

16   don't you look into getting a job."  That

17   was at the end of the complaint with Allison.

18       Q.    That was back in spring of 2004?

19       A.    If that's the date on her report,

20   yes.  I think it was about then.

21       Q.    Did Debra Foster retaliate against

22   you in any other way?

23       A.    Yes.

24       Q.    How?

25       A.    She called me to her office after

Cynthia Ellison                                    April 27, 2006

Page 167

1      -- and forgive me if I don't know which one,

2      EEOC, affidavit whatever. Whatever had been

3      filed she had been in contact with, she told

4      me the University attorneys.  That they had

5      given her some information to give me.  She

6      needed to see me. Actually, there were two

7      occasions that this happened.

8              The first occasion she just said,

9      "We are working on it.  We are looking into

10     it."

11             The second time she called me over

12     there she said, "The University attorney

13     called, and they said to tell you that" --

14     and this is the first time I ever heard of

15     the phrase "constructive discharge."  That you

16     are not getting constructive discharge.  They

17     want to know what you want."

18             I said Debra, "I simply want you

19     to do your job."  We were sitting in Faye

20     Ward's office.  Debra and I were sitting at

21     the table.  Faye was sitting behind her desk.

22     She said, "What do you want?"  And I said,

23     "I really want you to do your job."  And I

24     asked a simple question.  I said, "Debra, do

25     you believe that I have been mistreated?  I'm

Cynthia Ellison                                    April 27, 2006

Page 168

1    not asking you to take sides."  I said, "But
2    you know what has happened to me."  Well,
3    whatever the periods of times before that I
4    had been here.  "I am simply asking you do
5    you believe I have been mistreated?" Debra
6    stormed out of the room.  Came back. No, she
7    sent a student back.  Handed me a piece of
8    paper. No, it was Debra.  Debra came back,
9    handed me a piece of paper and she said, "If
10   you have anything else to say, say it to our
11   attorneys."  When I looked at the paper it
12   said Tom Rebel, whatever his information is.
13   That's when I came to Julian McPhillips.
14        I had no intention of coming here,
15   but when I saw that the University wasn't
16   going to do anything because she told me she
17   was representing the attorneys. So she ended
18   it with, "Do what you have to do."  So I
19   did what I had to do given that she handed
20   me the information to do it with and said,
21   "The next conversation, let it be through the
22   attorneys."
23        Q.    What did she hand you?
24        A.    A piece of paper that had a
25   typewritten name and address of somebody named

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 169

1          Rebel, and I gave that information to Mr.

2          McPhillips.

3               Q.     Early February you think?

4               A.     It had to be.

5               Q.     How did the topic of constructive

6          discharge come up?

7               A.     Debra brought it up.

8               Q.     Had you said or written before

9          that time that you felt like the University

10         was forcing you out?

11              A.     Absolutely.

12              Q.     Other than Debra Foster and Dr.

13         Lawal, did anybody else retaliate against you?

14              A.     I have said I think Dr. Ritvo

15         retaliated.

16              Q.     Tell me how he did that.

17              A.     The no security issue.  I think he

18         treated Chris differently than he treated me.

19         The letter that Bayo shared with me that was

20         written to Chris states that Chris had a

21         month to decide what he wanted to do.  Then

22         he had until the end of the summer to

23         complete whatever he decided he wanted to do.

24         Yet, they had taken me off Campus that day

25         because they knew he was a threat.

Cynthia Ellison                                      April 27, 2006

Page 170

1          Q.     Now, what makes you think that
2    Ritvo did those things because you had
3    complained at his request?
4          A.     I think I viewed it as
5    retaliation.  Now, I don't know how else to
6    explain it.
7          Q.     Okay.  Let's try it this way.
8    What is your definition of retaliation?
9          A.     Getting back at someone or --
10   well, let me just leave it like that.
11   Getting back at someone or something like
12   that.
13         Q.     You felt that Roger Ritvo was
14   getting back at you for doing what?
15         A.     I felt in general Ritvo, the
16   University, everybody's name that I gave on
17   that list was retaliating against me because
18   I filed these complaints.
19         Q.     Now, Roger Ritvo, though, solicited
20   that complaint from you, did he not?
21         A.     He did.  But he didn't do what he
22   said he was going to do.  He said he was
23   going to put it with Bayo and send it to
24   Debra.  That's the first thing that didn't
25   happen.

1       Q.      Why is that significant?

2       A.      Because I feel like if you tell me

3    something that you are going to do, and I am

4    saying that I am being mistreated and

5    retaliated against, and you are being

6    mistreated and retaliated against, you take

7    one and put it in the file and you take the

8    other, send it up and then you tell the

9    person, "Cynthia filed a complaint."  I

10   become the target.  That's the way I felt.

11      Q.      How do you know that Roger Ritvo

12   ignored Bayo's complaint?

13      A.      Because Bayo told me.  He didn't

14   say he ignored it.  He said that he, Bayo,

15   and Debra Foster and Ritvo had talked.  They

16   said they were going to view his complaint as

17   a management style problem.  But he, Bayo,

18   told me that he said to Debra Foster and to

19   Dr. Ritvo, "This is not management."  This is

20   harassment."  And he wanted his complaint

21   considered with mine.

22      Q.      You haven't seen his complaint,

23   have you?

24      A.      I have not seen his complaint.

25      Q.      Other than the conduct we talked

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                        April 27, 2006

Page 172

1          about at some length --

2              A.     What conduct?

3              Q.     -- concerning Chris Mahaffy.

4              A.     Yes.

5              Q.     -- is there anything else you want

6          to add about how he retaliated against you?

7              A.     Chris?

8              Q.     Yes.  We talked about coming to

9          your office and looking in the window and

10         standing at your desk. Anything else?

11             A.     Well, I think the remark that he

12         is going to get me.  That was retaliation

13         for not being selected for the short list on

14         the Dean's search.

15             Q.     I understand that.  Is that all

16         you can think of?

17             A.     I think that the incident with

18         the, "I am a redneck" T-shirt.

19             Q.     We talked about that.

20             A.     Uh-huh.  I am going to stand for

21         a moment.

22             Q.     Do you want to walk down the hall?

23             A.     I'm fine.  I just need to stretch

24         my leg.

25             Q.     Ms. Ellison, do you think that the

Cynthia Ellison                          April 27, 2006

Page 173

1     folks we have talked about, Ritvo, Mahaffy,

2     Bayo, did the things they did after you filed

3     your complaint in order to force you out?

4        A.    That's my belief.

5        Q.    Do you believe that that was -- I

6     mean, that was their goal, right?

7        A.    I can't speak for them.

8        Q.    What would you point to, if

9     anything, to show that they took action

10    deliberately to force you out?

11               MS. RODGERS:  Object to form.

12               THE WITNESS:  In particular, the

13    treatment the last week and a half that I

14    received from Bayo, and the treatment I

15    received all along from Chris, and again the

16    e-mail from Debra.  I think she wanted to

17    see me go.

18               MR. DODD:  Q.  That was the year

19    before, wasn't it?

20       A.    It still happened.

21       Q.    Let's talk about your environment

22    from the time you filed the complaint on

23    December 3rd until you left on February 14th.

24       A.    Okay.

25       Q.    Your office was the same, wasn't

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 174

1          it?

2               A.     Did you say "office"?

3               Q.     Yes.

4               A.     Yes, sir.

5               Q.     The same office.  Your hours of

6     work were the same?

7               A.     That's correct.

8               Q.     You had the same student help,

9     didn't you?

10              A.     I did.

11              Q.     Did you receive any negative

12    evaluations of any kind concerning your work?

13              A.     It wasn't time for evaluations.

14              Q.     Did you receive any negative

15    comments at all concerning your job

16    competency?

17              A.     Well, Bayo commented that he didn't

18    seem to think I was getting things done fast

19    enough.

20              Q.     When was that comment made?

21              A.     This was after our meeting on the

22    31st of January with Ritvo.

23              Q.     What was he referring to?

24              A.     I don't remember exactly what I

25    was working on. But he just -- as I said

Cynthia Ellison                              April 27, 2006

Page 175

1    earlier, he just changed. Nothing I did

2    pleased him.  I couldn't do it right, and I

3    had been doing the same things before.

4        Q.    Well, were you behind on whatever

5    you were working on?

6        A.    I wasn't behind.  As I stated

7    earlier, he told me, "Don't open the mail any

8    more.  Don't talk to me any more.  If you

9    want to talk to me, send me an e-mail." When

10   two people are working in the office it is

11   not feasible to send e-mails to get the job.

12       Q.    He told you that as a result of

13   the shredding incident, didn't he?

14       A.    You asked me what changed between

15   December and the time I left.  That was in

16   that period.

17       Q.    Now, I am trying to pinpoint.

18   That was after the shredding incident, wasn't

19   it?

20       A.    Yes.

21       Q.    Did any of your job duties change?

22       A.    I think they changed because he

23   wouldn't let me do them.

24       Q.    What wouldn't they let you do?

25       A.    He wouldn't let me do the routine

Cynthia Ellison                                      April 27, 2006

Page 176

1      things in the office.

2           Q.    Open the mail?

3           A.    Open the mail, communicate with him

4      about who is on the phone, who needed to see

5      him.  It was virtually shut down.  So, in my

6      opinion, I felt like he forced me to leave.

7      I'm not going to sit there and work for

8      nobody when he is saying -- and he said to

9      me, "You have done this to me because of

10     that suit."  He just completely changed.

11          Q.    This was after, I guess, he had

12     gotten the letter then?

13          A.    After the letter?`

14          Q.    From the lawyer.

15          A.    From the lawyer and after I used

16     Chris' letter. He told me that I had

17     compromised the integrity of the office.  He

18     didn't trust me any more.  He didn't want me

19     to do anything.  And I reminded him that he

20     gave me the letter and told me to do with it

21     what I thought I needed to do.

22          Q.    He learned that you had given the

23     letter to the lawyer how?  Strike that,

24     please.

25               How do you think he learned that

Cynthia Ellison                                      April 27, 2006

Page 177

1       you had given the letter to the lawyer?

2            A.     I guess in the correspondence from

3       the lawyer. I really don't know.

4            Q.     During that time you didn't take

5       any leave of absence, did you?

6            A.     During what time?

7            Q.     December the 3rd through February

8       14th.

9            A.     I took funeral leave.

10           Q.     Funeral leave?

11           A.     Uh-huh.

12           Q.     That was for your father?

13           A.     Yes.  And I also took -- I may

14      have had two or three vacation days in there

15      because I was going to the Cancer Center for

16      treatment for my condition.

17           Q.     Those were voluntary things on your

18      part?

19           A.     Right.

20           Q.     Other than those treatments, you

21      didn't seek any kind of medical or

22      psychological assistance during that time?

23           A.     Just with my pastor.

24           Q.     You didn't receive any reprimands,

25      did you?

Cynthia Ellison                                        April 27, 2006

Page 178

1        A.    From Dr. Lawal or at all?

2        Q.    From anyone.

3        A.    Not that I recall.

4        Q.    Your pay didn't change, right?

5        A.    That's correct.

6        Q.    Chris Mahaffy didn't make any

7    racially-related remarks to you after December

8    3rd, did he?

9        A.    Not any racial remarks, but he

10   intimidated me by coming to my office.

11       Q.    I think you wrote somewhere that

12   other staff members or faculty stopped talking

13   to you.

14       A.    Yes.

15       Q.    Do you recall that?

16       A.    I do.

17       Q.    When did that occur?

18       A.    It occurred after the -- I think

19   that was after the incident with Allison.

20       Q.    That was back in 2004?

21       A.    Right.

22       Q.    Did that ever change?

23       A.    Dr. Thomas and Ms. Findley pretty

24   much spoke to me and talked to me, but the

25   rest of them didn't.

Cynthia Ellison                                    April 27, 2006

Page 179

1          Q.    How many others were there?

2          A.    Dr. Arnold, Mr. Russell, Jill

3    Rollins.  It's been some time, so bear with

4    me.

5          Q.    I understand.

6          A.    Arnold, Russell, Jill Rollins and

7    there was Thomas and Findley.  That was the

8    staff.

9          Q.    Do you believe that somebody

10   encouraged them to stop communicating with

11   you?

12         A.    Well, I know that they had a

13   Departmental meeting because Bayo told me, and

14   they discussed me in the meeting.  That's

15   when I noticed the change in the behavior of

16   some of them.

17         Q.    What did Bayo tell them?

18         A.    Bayo didn't tell them anything.

19   He said that Chris had a meeting with them.

20         Q.    What did Chris tell them?

21         A.    I wasn't in the meeting.

22         Q.    You don't know?

23         A.    No.  I wasn't in the meeting.

24         Q.    Do you know if anyone else --

25         A.    I'm sorry.  I made a mistake.

Cynthia Ellison                                April 27, 2006

Page 180

1    That wasn't Bayo. That was Brad because that
2    was after.
3        Q.    Brad told you that Mahaffy had had
4    a meeting?
5        A.    It was either Brad or Bob.  After
6    the Allison incident and Brad was in the
7    Dean's chair.  It was Brad and not Bayo.
8        Q.    Did anyone else in the School of
9    Sciences have complaints about Mahaffy?
10       A.    Just about everybody in the School
11   of Sciences.
12       Q.    What kind of complaints did the
13   other folks have about him?`
14       A.    I can only tell you what they
15   expressed to me.
16       Q.    That's fine.
17       A.    Rosine Hall called me, or she was
18   in the office making copies and she said that
19   Chris had come to her office and spent an
20   hour venting about what had happened. When I
21   say, "what had happened," I am talking with
22   the situation with him being taken down as
23   Department head. She said for me to be
24   careful because he was really upset, and he
25   was nuts.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 181

1        Dr. Elliott referred to -- they

2   basically all made the comment that he was

3   crazy.  Something was wrong with him.  The

4   Department heads had a problem with him in

5   the Department head's meeting.  It was just a

6   combination of student complaints, faculty

7   complaints.  Everybody just about.

8        Q.    Do you know if anyone ever

9   complained about the types of -- strike that.

10       Do you know if anybody complained

11   about any sort of physical activity of

12   Mahaffy?

13       A.    Just that one incident that I

14   remember that I told you about earlier.  He

15   and a student got into it in one of the

16   labs.

17       Q.    Do you know if anyone else

18   complained about Mahaffy?

19       A.    I thought we just answered that.

20   What was the question previous to this?

21       Q.    Well, maybe it was my misuse of

22   language.  I asked you if anybody had

23   complaints about him.  The second question

24   was, did anyone actually complain about him

25   to Debra, to the Dean?

Cynthia Ellison                                    April 27, 2006

Page 182

1           A.      Debra will have to answer that
2    question.   We did have complaints to each
3    Dean.   We had complaints to Brad. We had
4    complaints to Bob.   We even had complaints to
5    Joe Hill about Chris Mahaffy.
6           Q.      Coming from all different people?
7           A.      Different people, yes.   In
8    particular, I can give you an example.
9           Q.      Okay.
10          A.      I think this is when Brad was the
11   Dean.   Chris told a student that he was too
12   old to get into pharmacy school and the
13   student complained to us.   It went all the
14   way to the Vice Chancellor's office.   I don't
15   know what the follow up was.   I do know that
16   several times they had to go downtown
17   somewhere.
18          Q.      Do you know if anything was ever
19   done by the University in response to the
20   complaints about Mahaffy up until 2005, of
21   course?
22          A.      Define "done."   What do you mean
23   by "done."
24          Q.      Any action taken against him for
25   his behavior?

Cynthia Ellison                                    April 27, 2006

Page 183

1           A.      Nobody really wanted to take

2      action.  They just let him keep going.  In

3      fact, it was a joke.  He was being passed

4      from one Dean to the other.

5           Q.      Do you know if anyone else

6      resigned because of Mahaffy's behavior?

7           A.      I have no firsthand knowledge of

8      that.

9           Q.      Have you heard of anyone resigning

10     because of Mahaffy's behavior?

11          A.      Give me a minute.  I'm going back

12     over 20 years. Not that I recall.

13          Q.      Now, you resigned or retired on

14     February the 9th, 2005, right?

15          A.      I turned that memo into Dr. Lawal

16     then, yes.

17          Q.      Then you agreed to stay on until

18     February 25, right?

19          A.      Right.  In that agreement, I said

20     with the stipulation that I get security.

21          Q.      You had planned to stay on until

22     February 25, had you not, until the shredding

23     incident came along?

24          A.      I had planned to stay another two

25     or three years.  I had committed to Dr.

Cynthia Ellison                                April 27, 2006

Page 184

1   Lawal that I would be there.

2        Q.    I am referring now to the

3   retirement notice you handed in on February

4   9th?

5        A.    Okay.

6        Q.    And you committed to staying on

7   through February 25th and then that changed

8   on February the 14th, right?

9        A.    It did change on February the

10  14th.  February the 25th.

11       Q.    Isn't it true that you did tell

12  Lawal that you would stay on through the 25th

13  if security would assure you they would do a

14  walk-through at least once a day?

15       A.    Yes.  He asked me to stay, and I

16  said "with security."

17       Q.    If they did a walk-through once a

18  day?

19       A.    I didn't say that.

20       Q.    You did agree to stay through the

21  25th if there was security?

22       A.    Right.  And he told me that that

23  wasn't up to him.  It was up to Dr. Ritvo.

24       Q.    Until the fall out from the

25  shredding incident, you had planned to stay

Cynthia Ellison                                    April 27, 2006

Page 185

1          through February 25th, had you not?

2          A.      Well, I had gone to him, and

3          that's what I put in writing.  When I asked

4          him about security nothing was done.

5          Q.      I'm sorry.  I didn't hear you.

6          A.      Nothing was done when I asked

7          about getting security.

8          Q.      Is that why you left on the 14th?

9          A.      I left because it was an

10         impossible situation to work.

11         Q.      You had a big fight with Lawal on

12         the 14th, didn't you?

13         A.      I did not.

14         MS. RODGERS:  Object to form.

15         THE WITNESS:  No, sir, I did not.

16         MR. DODD:  Q.  Would you have

17         stayed through the 25th if the shredding

18         incident had not occurred?

19         MS. RODGERS:  Object to form.

20         THE WITNESS:  Given the fact that

21         he had given me the letter concerning Chris,

22         I had planned to keep my two-year commitment

23         not to just February the 25th.

24         MR. DODD:  Q.  I understand that.

25         I am asking you now about your retirement

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 186

1      notice you handed in on February the 9th,

2      right?

3          A.      Right.

4          Q.      After you did that you told him

5      you would stay through the 25th if you had

6      security?

7          A.      Right.

8          Q.      Right?

9          A.      Uh-huh.

10         Q.      But you didn't, did you?

11         A.      Because events changed and it

12     wasn't just the shredding.

13         Q.      Didn't you make up your mind to

14     leave on Monday February 14th?

15             MS. RODGERS:  Object to form.

16             THE WITNESS:  I was forced to

17     leave on February the 14th.

18             MR. DODD:  Q.  For whatever reason

19     you decided to leave on February 14th, right?

20         A.      Yes.  I left because I was forced

21     to leave.

22         Q.      What happened on February 14th that

23     forced you to leave?

24         A.      Dr. Lawal was indignant.  He

25     called me in his office and said that he had

Cynthia Ellison                                    April 27, 2006

Page 187

1      been working out there on Saturday, and he
2      saw the shredding bags where I normally put
3      shredding bags.  And that I had not gotten
4      his permission to shred.  And that he had
5      called Ritvo at home that Saturday and asked
6      him what he should do.  He said that Ritvo
7      told him to collect the shredding bags and
8      bring them to his office.  I don't know who
9      took them over there.  That's what he told
10     me.  But when I got ready to go out of Dr.
11     Lawal's office, the shredding bags were
12     stuffed up under the couch in his office.  I
13     said, "Is this some of the shredding?  Do
14     you want to look in it to make sure that
15     it's what I told you it was?"  It was the
16     time -- they were old time sheets, pay
17     schedules, you know, grade sheets and so
18     forth.  He said "no."  And then again he
19     asked me to leave his office and I did.
20        Q.     Then you sent him a note and said
21     you are leaving at 1:00 o'clock that
22     afternoon, right?
23        A.     Right.  I did not sit down
24     immediately and say, "I am leaving at 1:00
25     o'clock."

Cynthia Ellison                                    April 27, 2006

Page 188

1      Q.     Is it true that the confrontation

2   you had with Lawal that morning, February

3   14th, is what led you to leave AUM at 1:00

4   o'clock that afternoon?

5              MS. RODGERS:  Object to form.

6              THE WITNESS:  As I stated earlier,

7   there was no confrontation.  He stated to me

8   how he felt.  I think I also told you

9   earlier that he said he did not trust me. He

10  didn't want me to do anything in the office.

11  I was just to sit there really.  Don't open

12  anything.  Don't do anything.  And that was

13  retaliatory because of my complaint I had

14  filed.

15             It was also retaliatory in nature

16  to me because he wanted to file a complaint

17  that summer, and he told me that now he

18  would not be able to do it.  The environment

19  I was in, that just worsened the environment.

20  I was sitting in a hostile environment.

21             MR. DODD:  Q.  What you just

22  described occurred that Monday morning, did it

23  not?

24      A.     Yes.  But it was not a

25  confrontation.  I didn't raise my voice.  He

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                      April 27, 2006

Page 189

1    didn't raise his voice.

2         Q.    We will call it a conversation.

3    Okay?

4         A.    You can call it a conversation.

5         Q.    As a result of the conversation on

6    Monday morning, you left at 1:00 o'clock that

7    afternoon?

8         A.    As a result of that and my not

9    getting security and my being subjected to an

10   unsafe environment, I was forced to leave.

11        Q.    What security issues did you have

12   that Monday morning?

13        A.    Actually, that Monday morning

14   security showed up.  Officer Cox came in my

15   office and said he had been sent over to

16   secure my area.  He said, "Cynthia, if I had

17   known it was you, I would have been here

18   earlier."  He told me that he was the one

19   stationed outside of Ritvo's office and -- on

20   the 31st when all of these meetings occurred,

21   and that he witnessed that when Chris came

22   out of the meeting that -- and these are his

23   words, not mine. He looked like he was off

24   of his meds.  He said no one ever told him

25   to come over and secure my area.

Cynthia Ellison                                    April 27, 2006

Page 190

1      Q.      When you left work on Friday the
2    11th of February --
3      A.      Uh-huh.
4      Q.      You didn't intend to leave work on
5    Monday afternoon, did you?
6      A.      Leave work?
7      Q.      Leave AUM.
8      A.      I spoke to my attorney, and I was
9    advised to leave an unsafe environment where
10   nothing was being done for me.
11     Q.      I understand that.  I am asking
12   you when you went home from work on that
13   Friday, February 11th, you still intended to
14   work through February 25th, did you not?
15     A.      If I arrived and conditions were
16   conducive to my being able to work until the
17   25th.
18     Q.      The condition you had specified was
19   security, wasn't it?
20     A.      That's right.
21     Q.      Monday there was security, was
22   there not?
23     A.      There was security.
24     Q.      Okay.  What changed between the
25   time you went home on Friday afternoon and

Cynthia Ellison                                    April 27, 2006

Page 191

1    the time you left Monday afternoon never to

2    return?

3        A.    Dr. Lawal told me essentially there

4    wasn't anything for me to do in the office

5    any more.

6        Q.    It was the conversation that Monday

7    morning, right?

8        A.    It was a combination of everything.

9    There is no other way I can tell you.  I

10   mean, it was a combination of everything.

11       Q.    Why didn't that combination of

12   everything force you to leave on Friday and

13   never return?

14            MS. RODGERS:  Object to form.

15            THE WITNESS:  Because Dr. Lawal,

16   even in his being ugly to me, I was trying

17   to get some work done.  I was working.  I

18   mean, I wasn't working thinking I am going to

19   leave at 1:00 o'clock on Monday.  I didn't

20   come in Monday morning saying, "I am going to

21   leave at 1:00 o'clock."  It was a combination

22   of everything.

23            MR. DODD:  Q.  Is it fair to say

24   that what Lawal said to you that Monday

25   morning was the catalyst that made you leave

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 192

1        Monday afternoon?

2                MS. RODGERS:  Object to form.

3                THE WITNESS:  Not having security

4        was the key issue and what I had been

5        subjected to.

6                MR. DODD:  Q.  Had Lawal

7        previously ever tried to talk you out of

8        retiring?

9            A.    No, sir.  Because he knew I wasn't

10       going to retire.

11           Q.    I'm sorry.

12           A.    He knew I wasn't planning to

13       retire.

14           Q.    How did he know that?

15           A.    Because several people in the

16       school asked me if I was going to retire and

17       I said, "No."  They asked me if Dr. Lawal

18       was planning to leave.  And this I understand

19       started, and I can't tell you who started it,

20       but I can tell you who they say started it.

21       Chris was going around on the third and

22       second floor saying that I was going to

23       retire, and Dr. Lawal was leaving taking

24       another job.  Dr. Lawal sent an e-mail to the

25       entire school saying Ms. Ellison has not

Cynthia Ellison                                April 27, 2006

Page 193

1    discussed any plans with me to retire, nor am
2    I looking for another job.  Yet, he decided
3    after I left to put in his letter that I had
4    said I was, but I did not tell him that
5    because he sent the e-mail saying we had not
6    discussed it.
7         Q.    Did you ask the four work study
8    students to prepare statements about what went
9    on February 14th?
10        A.    I did.
11        Q.    Why did you do that?
12        A.    Because it was my pattern.  I
13   think every situation I have written something
14   down.  I have documented what happened.  And
15   I knew, especially at that point,
16   documentation was key.
17        Q.    Ms. Ellison, do you know any white
18   employees at AUM who were not fired after
19   complaining about discrimination?
20        A.    White employees who were not fired
21   after complaining about discrimination.  I
22   don't know that I would have privileges to
23   that kind of information.  I don't know.
24        Q.    Do you know of any white employees
25   who were fired after complaining about

Cynthia Ellison                                    April 27, 2006

Page 194

1    discrimination?

2         A.      I do not know.

3                 (Short recess)

4                 MR. DODD:  Q.  Ms. Ellison, do

5    you know if Faye Ward has any unhappiness

6    with Auburn University Montgomery?

7         A.      I wouldn't know that.

8         Q.      Have you talked to her about

9    assisting you in this case?

10        A.      I asked her if she would talk to

11   my attorney.

12        Q.      And she did, right?

13        A.      As far as I know, yes.

14        Q.      Have you seen the affidavit that

15   she gave?

16        A.      No.  I haven't seen her affidavit.

17        Q.      When did you apply for disability

18   insurance or disability benefits?

19        A.      I don't remember the exact date.

20   But it was pretty much around the time when

21   I tried to work for my rheumatologist and I

22   couldn't do it.

23        Q.      Were those SSI disability benefits?

24   Social Security Disability benefits?

25        A.      Yes.

Cynthia Ellison                                    April 27, 2006

Page 195

1          Q.      What was the outcome of your
2     application?
3          A.      I have got to request for a
4     hearing.  I have got to send back information
5     to request for a hearing date.
6          Q.      Who is representing you in that
7     case?
8          A.      I don't have a representative.
9          Q.      You represent yourself?
10         A.      Yes.
11         Q.      Have you been denied Social
12    Security benefits and is this an appeal?
13         A.      Right.
14         Q.      Did you claim in your application
15    for disability benefits that you were unable
16    to work?
17         A.      As I recall, there were 100
18    questions that asked you what you can and
19    cannot do and to what extent you can or
20    cannot do that.
21         Q.      Do you have -- strike that.
22                 Do you keep all of those records?
23         A.      I should have those records.
24         Q.      Donna Paul is your rheumatologist?
25         A.      Yes.  Dr. Paul.

Cynthia Ellison                                    April 27, 2006

                                                         Page 196

1          Q.     Let me show you a document that

2      your lawyer gave to me and just ask you if

3      you ever seen that before.

4          A.     No.   May I read it?   I haven't

5      seen it before.

6          Q.     If you are curious, you can read

7      it.  Your lawyer has a copy.  She can show

8      it to you.

9          A.     What is it?

10         Q.     It looks like some notes from Faye

11     Ward to my partner that somehow left AUM.

12         A.     Okay.

13                (Three-page document, dated February

14     25, 2004, e-mail from Cynthia Ellison to Joe

15     Hill, marked as Defendant's Exhibit-2)

16                MR. DODD:  Q.  Ms. Ellison, here

17     is Defendant's Exhibit 2.  Take a look at

18     that and see if you can identify it for me,

19     please.

20         A.     This is an e-mail I sent Joe Hill.

21         Q.     Do you recognize that?

22         A.     Yes.

23         Q.     You see about halfway down the

24     message on the first page you refer to the

25     anonymous letter?

Cynthia Ellison                           April 27, 2006

Page 197

1     A.     I do.

2     Q.     Have you seen that letter to date?

3     A.     I have not.

4     Q.     Who was one of the individuals you

5  spoke to who apparently composed that letter?

6     A.     I don't know who composed the

7  letter.

8     Q.     Who in the letter are you

9  referring to where you say, "the ladies heard

10  about the incident and I spoke with one of

11  them, not knowing she had in mind doing what

12  she did."

13     A.     Let me get to that point.

14     Q.     Okay.

15     A.     Where is it?  Okay.  Let me just

16  read it.  These were the women in Upward

17  Bound.

18     Q.     Who did you speak to, though?

19     A.     I spoke to -- actually, I spoke to

20  all of three of them there together.

21     Q.     What are their names?

22     A.     It was Lucy.  We called her Ms.

23  Lucy.  Lucy. Debra may know their names.

24  Lucy.  It was Alice Boggs. Alice Boggs, Abena

25  and Lucy.  That's all I know.

Cynthia Ellison                                    April 27, 2006

Page 198

1          Q.     How did you learn that an

2     anonymous letter existed and that it referred

3     to you?

4          A.     How did I learn about what?

5          Q.     That an anonymous letter existed

6     and that the letter referred to you.

7          A.     They were talking about it in the

8     School of Sciences.  They said it referred to

9     the Dean's secretary in the School of

10    Sciences.

11         Q.     Who is "they?"  These three women?

12         A.     Yes.

13         Q.     Were they involved in the School

14    of Sciences?

15         A.     They were housed in the School of

16    Sciences.

17         Q.     Read down about ten more lines

18    from there.  It says, "The HR director wasn't

19    willing to speak with me at the time."

20         A.     Right.

21         Q.     What are you referring to there?

22         A.     Debra.

23         Q.     When was she not willing to speak

24    with you?

25         A.     Wait a minute.  Let me come to

Cynthia Ellison                                    April 27, 2006

1          where you were and read it.

2              Q.     Okay.

3              A.     I have to say it was referring to

4          Debra.  And I think I said at one time it

5          was Debra.  Then I changed it.  So I guess

6          it was Debra.  Because this would have been

7          more up to date than what I remember now,

8          since it's been so long.

9              Q.     Isn't it true that you called

10         Debra Foster about a week before you sent

11         this e-mail and asked her how to file a

12         complaint about the Allison Stevens incident?

13             A.     Asked her how to file a complaint?

14             Q.     Yes.

15             A.     I may have called Debra.  I don't

16         remember.

17             Q.     Isn't it true that you also told

18         Debra that you did not want to put anything

19         in writing?

20             A.     I did.  And that's when Guin

21         insisted that she wanted me to.

22             Q.     That happened later, didn't it?

23             A.     I wrote the memo to Guin, yes.

24         When I informed Guin about the situation.

25             Q.     Why were you unwilling to put

Cynthia Ellison                                    April 27, 2006

Page 200

1    anything in writing to Debra Foster about the

2    Allison Stevens incident?

3        A.    Because Debra was known not to

4    help anybody. When I went to her, her first

5    statement was, "I don't know what to do with

6    this.  It's going to be he said, she said."

7        Q.    That's what happened later.  I am

8    asking you now why you weren't willing to

9    follow the procedures that were in place?

10       A.    I don't view that as not my being

11   not willing to follow procedures.  As I said

12   earlier, I really felt like I was going to

13   be retaliated against because of the situation

14   with Jessie Clayton.

15       Q.    You expected Debra to retaliate

16   against you?

17       A.    I had no idea what to expect

18   because of what I had heard.

19       Q.    Look over at the bottom of the

20   next page, please.  The last four lines.

21   You say, "I said earlier in an e-mail to you

22   that I'm looking at retiring if I can find

23   something else, but I don't want to leave

24   with a cloud over my head."  Do you see

25   that?

Cynthia Ellison                                    April 27, 2006

Page 201

1          A.     I see it.

2          Q.     Were you looking at retiring as of

3    February 2004?

4          A.     We were always looking at

5    retirement.  I told you that we had seminars

6    that we went to.

7          Q.     This doesn't talk about a seminar.

8    It talks about you.

9          A.     I know what it talks about.  I am

10   telling you now that discussion of retirement

11   came up periodically, not just with me, but

12   with everybody.  Especially when they invoked

13   the DROP situation.

14         Q.     In 2004, were you looking to find

15   another job so you could retire?

16         A.     I was not looking for a job in

17   2004.

18         Q.     The statement you made there

19   that --

20         A.     Let me read this.

21               MR. DODD:  Here is No. 3.

22               (One-page letter, dated March 1,

23   2004, letter from Cynthia Ellison to Guin

24   Nance, marked as Defendant's Exhibit-3)

25               MR. DODD:  Q.  Take a look at

Cynthia Ellison                                    April 27, 2006

Page 202

1         that and see if you can identify it.

2              A.     Okay.

3              Q.     Can you identify that document?

4              A.     I wrote it.

5              Q.     It's your letter?

6              A.     Yes.

7              Q.     Look in the first paragraph, if

8         you would, at the last sentence.  Which

9         reads, "Until now, however, none have involved

10        name calling, personal verbal attacks, and the

11        development of a potential hostile working

12        environment."

13             A.     Uh-huh.

14             Q.     Is this your statement that March

15        1, 2004, is the beginning of a hostile

16        working environment?

17             A.     My reference until now is to the

18        incident when it occurred in December '03.

19             Q.     December 3rd, 2003, is the

20        beginning of the hostile working environment

21        for you?

22             A.     And the racial slur.  That was the

23        first time that I had ever encountered

24        something like that.

25             Q.     I understand that.  What you wrote

Cynthia Ellison                                    April 27, 2006

Page 203

1        here is the truth, right?

2            A.    Yes.

3            Q.    If you look at December the 3rd,

4        2003 letter, it's the beginning of what you

5        consider to be a hostile working environment?

6            A.    In relation to this incident that

7        I was referring to.

8            Q.    Well, the first paragraph refers to

9        your tenure at Auburn University Montgomery

10       for the last 20 years, doesn't it?

11           A.    Right.

12           Q.    December 3, 2003, is the beginning

13       of what you consider to be a hostile working

14       environment, right?

15                 MS. RODGERS:  Object to form.

16                 THE WITNESS:  No, sir.  That's not

17       what my intent was.

18                 MR. DODD:  Q.  What was your

19       intent?

20           A.    My intent was to communicate to

21       Dr. Nance, as I said earlier, that I was not

22       the author of the anonymous letter.  And that

23       it was me who the slur was directed at. And

24       that, like it says, I was subjected to a

25       hostile work environment.

Cynthia Ellison                                    April 27, 2006

                                                        Page 204

1            Q.    The sentence preceding the last one

2       says, "Over the years, there have been

3       misunderstandings and personality conflicts

4       with each of these groups.  Until now,

5       however, none have involved name calling,

6       personal verbal attacks, and the development

7       of a potential hostile working environment,"

8       right?  Is that the truth?

9            MS. RODGERS:  Object.  Asked and

10      answered.

11           THE WITNESS:  This recap events

12      that I was trying to relate to Dr. Nance

13      that occurred in December '03.

14           MR. DODD:  Q.  December '03 is

15      when the development of a potential hostile

16      working environment began, right?

17           MS. RODGERS:  Object again.

18           THE WITNESS:  I should have

19      probably put it in writing when it was

20      continued.

21           MR. DODD:  Q.  This letter is not

22      true then, right?

23           MS. RODGERS:  Object to form.

24           THE WITNESS:  Yes, it's true.

25           MR. DODD:  You can't have it both

Cynthia Ellison                                    April 27, 2006

                                                        Page 205

1           ways.

2                      THE WITNESS:  It is true.

3                      MS. RODGERS:  Stop.  On the

4           record, I would like the record to reflect

5           that it seems like opposing Counsel has

6           become argumentative and also attempting to be

7           intimidating to my client.  If he wants to

8           ask her a question, which I will say was in

9           a unprofessional manner, he can do that.  If

10          he cannot do that at this point, then we can

11          just close the deposition and let the judge

12          take it up on this matter on what we should

13          do in the midst of these depositions.

14                     MR. DODD:  It's cross-examination,

15          Counsel.

16                     MS. RODGERS:  Well, whatever you

17          call it.  You call it whatever.  Whatever

18          you may want to call it.  You call it cross,

19          I call it intimidation.

20                     MR. DODD:  It's a search for the

21          truth.

22                     MS. RODGERS:  This search for your

23          truth.  This is Ms. Ellison's case.  You are

24          the lawyer.  You have not been the victim.

25                     MR. DODD:  Search for the truth.

Cynthia Ellison                                    April 27, 2006

Page 206

1          MS. RODGERS:  Search for your

2      truth.

3          MR. DODD:  We are going to stay

4      on it until I get it.

5          MS. RODGERS:  I am going to stay

6      on it until I get it.  No reaper shall

7      prosper, and every tone that rises up in

8      judgment shall be condemned.  And for the

9      record --

10          MR. DODD:  Don't preach to me.

11          MS. RODGERS:  I don't preach.  I

12      am not preaching to you.  But I am putting

13      it on the record so that it can be perfectly

14      clear.  That it can be perfectly clear that

15      you are not going to intimidate me either.

16          Now, I am trying to have my client

17      here to answer your questions.  You are

18      taking it as a personal vendetta for a search

19      for your truth.  I have her here available

20      to answer your questions according to what

21      she has provided in her complaint.  That's

22      what we are trying to attempt to do.  But

23      you are trying to search for truth.

24          MR. DODD:  She is noticed to be

25      here.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

1            MS. RODGERS:  She may be noticed

2      to be here. And by law, the only reason is

3      because she has to be here, and because she

4      has filed a complaint.

5            MR. DODD:  That's true.  That's

6      her obligation of filing a lawsuit.

7            MS. RODGERS:  It's our obligation

8      to for having her here.  You can ask

9      questions.  If you want to be put into an

10     argument, let the games begin.  And we can

11     let the judge decide that.

12            MR. DODD:  Q.  Mrs. Ellison, is

13     the document that's been identified as

14     Defendant's No. 3 truthful?

15            MS. RODGERS:  Object to form.

16            THE WITNESS:  Yes, sir.  It is

17     truthful.

18            MR. DODD:  Thank you.

19            (One-page letter, dated March 2,

20     2004, from Guin A. Nance to Ms. Cynthia

21     Ellison, marked as Defendant's Exhibit-4)

22            MR. DODD:  Q.  Ms. Ellison, here

23     is No. 4.  See if you can identify that.

24     A.     Yes.

25     Q.     What is it?

Cynthia Ellison                                    April 27, 2006

Page 208

1          A.    It's a letter that I wrote to Dr.

2    Nance.

3          Q.    That's the letter you received from

4    Dr. Nance?

5          A.    Uh-huh.

6          Q.    Is it in response to the letter

7    that was marked as Defendant's No. 3?

8          A.    The letter you had, yes.

9          Q.    Look at the last paragraph, would

10   you, please. Chancellor Nance writes, "My

11   understanding from Ms. Foster is that you

12   have been reluctant to provide a written

13   statement."  Do you see her remark there?

14         A.    Yes.

15         Q.    Is that an accurate statement?

16         A.    Yes.

17         Q.    She goes on to say that she hopes

18   you will share all relevant information on

19   this issue with her, right?

20         A.    That's correct.

21         Q.    You did that after you received

22   this letter, did you not?

23         A.    Right.  This was after our meeting

24   by sitting down in her office telling her

25   that Debra starts fires and not puts them

Cynthia Ellison                                    April 27, 2006

Page 209

1    out.

2               (One-page letter, dated March 22,

3    2004, from Debra S. Foster to Ms. Cynthia

4    Ellison and Allison Stevens, marked as

5    Defendant's Exhibit-5)

6               MR. DODD:  Q.  Here is No. 5.

7    See if you can identify that.

8        A.    Yes.

9        Q.    What is it?

10       A.    A letter to me and Allison Stevens

11   from Debra Foster.

12       Q.    Did you receive this letter?

13       A.    I did.

14       Q.    Now, you see where Debra Foster

15   writes that she didn't find evidence to

16   substantiate if the racial slur was used by

17   Ms. Stevens, right?

18       A.    Yes.

19       Q.    But she does go on to say that if

20   Allison Stevens uses the word again she is

21   going to be fired.  Do you see that?

22       A.    Yes.

23       Q.    She also said that if Ms. Stevens

24   uses abusive and threatening language she is

25   going to be fired.  Do you see that in the

Cynthia Ellison                                April 27, 2006

Page 210

1       second numbered paragraph?

2           A.      Yes.

3           Q.      What was your reaction to what

4       Debra Foster wrote with respect to

5       expectations for Allison Stevens, if you had

6       one?

7           A.      Well, I think it's written here in

8       Number Two that she asked her not to use

9       abusive and threatening language any more.

10      And if she called me a nigger again she

11      would be terminated.

12          Q.      Were you satisfied with this

13      result?

14          A.      I was satisfied to the point that

15      I knew nothing else would be done.  The next

16      day I received her e-mail inviting me to

17      apply for a job at Hyundai, or the day

18      after.

19          Q.      Do you have that e-mail, by the

20      way?

21          A.      I believe I gave it to my

22      attorney.

23          Q.      Now, you've stated in other --

24      strike that, please.

25                  Your desire was not to get Allison

Cynthia Ellison                                April 27, 2006

Page 211

1    Stevens fired over the incident you had with

2    her, was it?

3        A.    No.

4        Q.    Do you know of anything that Debra

5    Foster could have done short -- strike that,

6    please.

7            In your opinion, what could Debra

8    Foster have done short of firing Allison

9    Stevens that the warnings in Defendant's No.

10   5 do?

11       A.    Well, it took her two times to do

12   the investigation.

13       Q.    I understand that it took some

14   time.  In terms of the conclusion that she

15   reached?

16       A.    I don't know.  I may have written

17   a memo to her about this.  I'm not sure.

18       Q.    In your mind, short of firing Ms.

19   Stevens, is there anything she could have

20   done other than say, if you do it, you will

21   be fired?

22       A.    She is an EEO and HR person.

23   That would have been her call.

24            (Five-page document, dated March

25   31, 2004, from Cynthia Ellison to Dr. Guin

Cynthia Ellison                                    April 27, 2006

Page 212

1        Nance, marked as Defendant's Exhibit-6)

2              MR. DODD:   Q.   Here is No. 6.

3     Take a look at that, please, and tell me

4     what it is.

5        A.     This is what I wrote to Dr. Nance.

6        Q.     Did you write to -- strike that.

7              What prompted you to write this

8     letter to Dr. Nance?

9        A.     I didn't believe that I had been

10    given due process in the investigation part

11    of my complaint.

12       Q.     Explain to me what you mean by

13    that, please?

14       A.     First of all, when I gave Debra my

15    initial statement and she sent it to me, I

16    had to pretty much redo it because she didn't

17    recap what I had told her. She didn't want

18    to do an investigation, and that's when I

19    went to Dr. Nance and told Dr. Nance that I

20    was reluctant.  And then Dr. Nance instructed

21    her to go ahead and talk to the people.

22    That is what I was writing in here.  That's

23    the reason that I felt the EEO person and

24    the EEO personnel and the HR Director should

25    be separate. It says it in this memo.

Cynthia Ellison                              April 27, 2006

Page 213

1    Q.    You said that Debra Foster didn't

2    want to do an investigation, right?

3    A.    She had never had this before she

4    said, he said, she said.

5    Q.    Is that the same as saying she

6    didn't want to do it?

7    A.    When she didn't, that told me she

8    didn't want to do it.  I had to go back to

9    Dr. Nance to ask her to go ahead and do it.

10   Q.    Isn't it true that actually Dr.

11   Nance instructed to you give a written

12   statement because you had refused to it?

13              MS. RODGERS:  Object to form.

14              THE WITNESS:  She instructed me to

15   talk to Debra Foster.

16              MR. DODD:  Q.  Did she say put

17   it in writing?

18              Guin Nance writes on Defendant's

19   Exhibit 7 that Ms. Ellison is reluctant to

20   provide a written statement and share all

21   relevant issues.

22   A.    I went over to Debra and shared

23   with her, and Debra typed up the statement

24   while I was there.

25   Q.    Isn't it true that you had refused

Cynthia Ellison                                April 27, 2006

Page 214

1      to give a written statement, and it took Guin

2      Nance to convince you to do it?

3                   MS. RODGERS:  Object to form.

4                   THE WITNESS:  Because I knew

5      nothing would be done.  It took Guin Nance

6      to do it.

7                   MR. DODD:  Q.  It took Guin Nance

8      to get you to give a written statement,

9      right?

10                  MS. RODGERS:  Object to form.

11                  THE WITNESS:  It took Guin Nance

12     to get me to go see Debra, that's correct,

13     and file my complaint.            `

14                  (One-page letter, dated April 5,

15     2004, from Guin A. Nance to Ms. Cynthia

16     Ellison, marked as Defendant's Exhibit-7)

17                  MR. DODD:  Q.  Ms. Ellison, here

18     is No. 7.  See if you can identify that.

19     A.      Yes, I wrote it.

20     Q.      What is it?

21     A.      It's a letter from Dr. Nance

22     saying that she received the previous exhibit

23     you showed me.

24     Q.      In your estimation, is she

25     addressing the primary issues you raised in

Cynthia Ellison                                April 27, 2006

Page 215

1        your letter?

2            A.     She is addressing the issue and

3        directing Debra to interview Nikki Gibson.

4            Q.     That was one of your concerns, was

5        it not?

6            A.     (Witness nods head)

7            Q.     Has Guin Nance ever been

8        unresponsive to any of your concerns?

9            A.     No.

10               (One-page letter, dated April 29,

11       2004, from Debra S. Foster to Cynthia

12       Ellison, marked as Defendant's Exhibit-8)

13               MR. DODD:  Q.  Here is No. 8.

14       Let me know if you can identify that.

15           A.     Yes.  This is a letter to me from

16       Debra after, I guess, she did the additional

17       investigation with the witness.

18           Q.     At this point, April 29, 2004,

19       were you satisfied that all potential

20       witnesses had been interviewed in connection

21       with the Allison Stevens incident?

22           A.     All witnesses, yes.

23           Q.     Did that satisfy one of your major

24       concerns about the investigation?

25           A.     It did.

Cynthia Ellison                                    April 27, 2006

Page 216

1          (One-page memorandum, dated December

2     2, 2004, from Debra S. Foster to Cynthia

3     Ellison, marked as Defendant's Exhibit-9)

4          MR. DODD:  Q.  Here is No. 9.

5     See if you recognize that, please.

6          A.    Yes.  This is a letter Debra sent

7     me after she met with me and Dr. Lawal.

8          Q.    Does it accurately reflect what you

9     and she discussed and agreed to?

10         A.    It reflected what was discussed and

11    agreed to without my knowing what the

12    complaint was.

13         Q.    But being mindful of your feelings

14    when conversing with her, and her agreeing to

15    treat you with respect and dignity, are just

16    common decency, wouldn't you say?

17         MS. RODGERS:  Object to form.

18         THE WITNESS:  It's common decency,

19    but she and Dr. Lawal assured me that the

20    complaint was frivolous and not to worry

21    about it.  They said this is what they were

22    going to do.  I didn't worry about it.  This

23    is what I received after I complained that I

24    didn't get a letter. And Barbara got a

25    letter.  This letter came after this letter.

Cynthia Ellison                                    April 27, 2006

Page 217

1          MR. DODD:  Q.  Do you think that

2     Barbara Ware got a copy of this letter to

3     you, No. 9?

4          A.    I have no idea.

5          Q.    Do you suspect that she did?

6          MS. RODGERS:  Object to form.

7          THE WITNESS:  I just know that she

8     and Dr. Lawal got a letter and I didn't, and

9     I asked for one.

10         MR. DODD:  This is No. 10.

11         (One-page memorandum, dated December

12     7, 2004, from Cynthia Ellison to Dr. Bayo

13     Lawal, marked as Defendant's Exhibit-10)

14         MR. DODD:  Q.  Can you tell me

15     what that is?

16         A.    This is -- yes.  This is a letter

17     I wrote to Dr. Lawal, and I would have

18     copied it to Debra Foster concerning the

19     Barbara Ware incident.

20         Q.    Is your primary concern the fact

21     that you didn't get a copy of what Barbara

22     received?

23         A.    Well, that and the fact that I say

24     in here that I was surprised that any

25     correspondence was written since, as I stated

Cynthia Ellison                                    April 27, 2006

                                                        Page 218

1          to you earlier, they told me that nothing

2          would be done.  Essentially that was the end

3          of it.

4               Q.    Was that your preferred course of

5          action that no conclusion or confirmation be

6          sent?

7                    MS. RODGERS:  Object to form.  You

8          can answer.

9                    THE WITNESS:  I can just tell you

10         that I was called into a meeting with Barbara

11         and Lawal.  They told me Barbara filed a

12         complaint.  They felt like it was embellished

13         by Chris and not to worry about it.

14                   MR. DODD:  Q.  Now, did receiving

15         Defendant's Exhibit No. 9 make you worry

16         about it?

17              A.    Make me worry about it?

18              Q.    Yes.

19              A.    Worry what what?

20              Q.    The Ware complaint.

21              A.    Worry that I didn't get to see the

22         complaint or worry in what respect?

23              Q.    In any respect about the resolution

24         of the complaint she filed?

25              A.    I thought the resolution ended in

Cynthia Ellison                                    April 27, 2006

1    the conference room when we finished the

2    meeting.

3         Q.    Is what's contained in Defendant's

4    No. 9 any different than what was discussed

5    in the conference room in terms of

6    resolution?

7              MS. RODGERS:  Object to form.

8              THE WITNESS:  No.

9              MR. DODD:  Q.  Do you know if

10   Dr. Lawal sought assistance or suggested from

11   the School of Sciences faculty about what the

12   school can do on account of the death of

13   your father?

14             MS. RODGERS:  Object to form.

15             THE WITNESS:  I wasn't there, so I

16   wouldn't know.

17             MR. DODD:  Q.  Has anyone told

18   you that he sought school-wide suggestions

19   about what could be done?

20        A.    Nobody told me that.

21        Q.    Do you know what he did?

22        A.    When my father died?

23        Q.    Yes.

24        A.    He sent a flower arrangement.  I

25   believe he sent a flower arrangement.

Cynthia Ellison                                    April 27, 2006

Page 220

1          Q.     And the funeral was January 29th?

2          A.     No.  Was it the 29th?  I was

3     back at work on the 31st.  He died on the

4     21st or 22nd.  It would have been -- it was

5     towards the end of January.

6          Q.     When had your mother died?

7          A.     She died four months earlier.

8          Q.     What did Dr. Lawal do on that

9     occasion?

10         A.     Dr. Lawal came to my home with

11    Ruby Jenkins, and Ruby handed me an envelope

12    that had some money if it. I'm not certain,

13    but I think she said it was from Dr. Lawal

14    or the people in School of Sciences.

15         Q.     Did he also send flowers?

16         A.     He did.

17         Q.     How much money was in the

18    envelope?

19         A.     I really don't recall.

20         Q.     Now, you also lost a sibling, did

21    you not?

22         A.     My sister died six days before my

23    mother.

24         Q.     What did Dr. Lawal do then?

25         A.     Okay.  I have got to remember.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 221

1    Because there were two funerals.  One in

2    Indiana and one in Alabama. If I'm not

3    mistaken, I think they either took up money

4    and sent flowers or they did both.

5                    (One-page letter, dated February 4,

6    2005, from Debra S. Foster to Ms. Cynthia

7    Ellison, marked as Defendant's Exhibit-11)

8                    MR. DODD:  Q.  Ms. Ellison, here

9    is No. 11.  If you can identify that,

10   please.

11       A.    Yes.  This is a letter Debra sent

12   me regarding Chris' investigation.

13       Q.    What was your reaction when you

14   received that?

15       A.    I felt like again the investigation

16   was geared more towards resolving the

17   situation for the person who had inflicted

18   harm and ill upon me.

19       Q.    What led you to that conclusion?

20       A.    Because Dr. Lawal had shared the

21   summary letter that was sent to Chris and

22   Chris was given the opportunity to have a

23   month to decide what he wanted to do and

24   then until the end of the summer to do it.

25   I had asked for a summary of my proceedings

Cynthia Ellison                                        April 27, 2006

Page 222

1      of the meeting that I had with Lawal, Ritvo

2      and Faye and was denied.

3              And again, the security issue.

4      She says nothing in here about providing

5      security.

6         Q.    Take a look at No. 1 again, if

7      you would, please, at your Exhibit B.

8         A.    Yes.

9         Q.    Is this the summary he said you

10     should have received?

11        A.    No.  I asked for a summary of the

12     meeting that took place with me, Faye, Ritvo

13     and Lawal.  Because in that meeting Ritvo

14     stated that he would not give me security.

15     That I was to call them if Chris arrived in

16     that meeting.  Bayo Lawal stated that he

17     would file civil litigation if nothing was

18     done to Chris in that meeting. That's the

19     summary I wanted.  I wanted a summary.

20        Q.    Please finish.

21        A.    I wanted a summary of what was

22     being said because I wasn't being provided

23     security and I wanted him to write that for

24     me, and he said he would not.

25        Q.    Does such a summary exist anywhere?

Cynthia Ellison                                April 27, 2006

Page 223

1          A.    I have no idea.  I didn't get a
2     copy if it does exist.  I asked for a copy.
3          Q.    Do you know if anybody got a copy
4     of any such summary?
5          A.    Chris received a summary of his
6     meeting.
7          Q.    Is that what you are referring to?
8          A.    Exhibit B.
9          Q.    That's your Exhibit B.
10          A.    Well, B, Chris received a summary
11     of what happened in their meeting.  I was
12     simply asking for a summary of what happened
13     in my meeting.
14          Q.    Nobody took any adverse action
15     against you in that meeting, did they?
16               MS. RODGERS:  Object to form.
17               THE WITNESS:  I wanted on record
18     that I was refused security.  I wanted on
19     record that Bayo threatened to file civil
20     litigation.
21               MR. DODD:  Q.  Look at Exhibit B
22     to Defendant's Exhibit 1 there.
23          A.    Okay.
24          Q.    That's where sanctions are imposed
25     against Chris Mahaffy by AUM, correct?

Cynthia Ellison                                    April 27, 2006

Page 224

1          A.    Yes.  This has nothing to do with

2    what I wanted from them.

3          Q.    It's completely different, isn't

4    it?

5          A.    I told them what I wanted was a

6    summary of my meeting.

7          Q.    They simply refused to do it,

8    right?

9          A.    Absolutely.

10         Q.    Did they give a summary to anybody

11   else?

12               MS. RODGERS:  Object to form.

13               THE WITNESS:  They were only

14   concerned with me and Chris.  So as far as

15   I'm concerned, the summaries would go to

16   Chris and to me because I filed the

17   complaint.

18               MR. DODD:  Q.  Neither Chris nor

19   you got a summary?

20               MS. RODGERS:  Object to form.

21               THE WITNESS:  Chris got this

22   summary.  I did not get one.

23               MR. DODD:  Q.  This is a summary

24   where he loses his Department Chair, right?

25         A.    Yes.

Cynthia Ellison                                    April 27, 2006

Page 225

1      Q.    And he loses three months of an
2   annual 12-month contract?
3      A.    Right.
4      Q.    Diversity training, right?
5      A.    I don't know if he went.  That's
6   what this says.
7      Q.    There are seven provisions,
8   punitive provisions in this summary, correct?
9           MS. RODGERS:  Object to form.
10          THE WITNESS:  I'm not talking
11   about the content for the summary.  I wasn't
12   concerned with Chris' summary. I was concerned
13   with my summary.
14          MR. DODD:  Q.  Did anybody get a
15   summary of the kind that you wanted?
16          MS. RODGERS:  Object to form.
17          THE WITNESS:  Chris Mahaffy.
18          MR. DODD:  Q.  You are referring
19   to Exhibit 1?
20      A.    I am referring to a written
21   statement of what happened in a document.
22      Q.    You just wanted a document, is
23   that right?
24          MS. RODGERS:  Object to form.
25          THE WITNESS:  I wanted a summary

Cynthia Ellison                                    April 27, 2006

Page 226

1        document of my meeting.

2                    MR. DODD:  Q.  You didn't want to

3        be punished, did you?

4                    MS. RODGERS:  Object to form.

5                    THE WITNESS:  Punished for what?

6                    MR. DODD:  Exactly.

7                    MS. RODGERS:  Object to form.  You

8        don't have to answer that.

9                    MR. DODD:  Q.  Chris Mahaffy is

10       being punished, isn't he?

11                   MS. RODGERS:  Object to form.

12                   THE WITNESS:  By the University

13       because of his behavior.        `

14                   MR. DODD:  That is correct.

15            Q.     That is the behavior that you

16       complained about?

17            A.     Partially.

18                   (Two-page letter, dated February 9,

19       2005, Roger A. Ritvo, Ph.D. to Ms. Cynthia

20       Ellison, marked as Defendant's Exhibit-12)

21                   MR. DODD:  Ms. Ellison, here is

22       No. 12.  See if you can identify that,

23       please.

24            A.     Yes.

25            Q.     What is it?

Cynthia Ellison                                    April 27, 2006

Page 227

1          A.     It's a letter to me from Dr. Roger

2     Ritvo.

3          Q.     Do you recall receiving this?

4          A.     Yes, I do.

5          Q.     What was your reaction to it?

6          A.     I thought that, again, I was the

7     person that was being mistreated.  In my

8     letter -- and I go back to the same thing.

9     I asked for a summary.  In this letter he

10    says, I believe that -- let me look here for

11    just a minute.  It recaps some of the issues

12    I had raised in my letter about no security,

13    my being sent off Campus because they knew

14    Chris was going to be upset after they talked

15    with him.  Well, do you want me to read the

16    letter?

17         Q.     You don't need to read it.  I am

18    asking what your reaction was.

19         A.     Well, my reaction was that I was

20    still subjected to retaliation and an unsafe

21    environment.

22         Q.     You considered this letter to be

23    retaliatory?

24         A.     Not this -- well, let me see.

25    This letter, I believe and I felt, was sent

Cynthia Ellison                                    April 27, 2006

1        to me because, if I'm not mistaken, things

2        crossed in the mail.  My information that I

3        had seen an attorney or Bayo had told them

4        something and Ritvo wrote this letter saying

5        that Campus Police goes through Goodwyn Hall

6        three times a day, or something like that.

7        If that's in this one, I know that they

8        don't.  They come when we call them for a

9        situation. I felt like this was another

10       attempt to appease me.

11           Q.    That was written in your response

12       to your February 11th letter, wasn't it?

13           A.    It was.

14           Q.    Were you not interested in having

15       an escort to your vehicle?

16               MS. RODGERS:  Object to form.

17               THE WITNESS:  I was interested in

18       an escort to my vehicle.  Let me read this.

19       Can I just make my points as I go down

20       through this letter?

21               MR. DODD:  Q.  Sure.

22           A.    I still believed that Chris Mahaffy

23       posed a physical threat.

24           Q.    Do you recognize the possibility of

25       a disagreement on that issue?

Cynthia Ellison                                    April 27, 2006

Page 229

1      A.     Certainly there is a possibility of
2  disagreement on any issue.  While it may be
3  my word against the University's word, or
4  Debra Foster, it is not customary to have a
5  Campus Police Officer stand outside a door
6  when you are having a meeting when they are
7  having Disciplinary Committee Meetings with
8  students who might act out.  When you are
9  just asking about a regular meeting, that's
10 not customary.
11     Q.     Are you saying that Mahaffy was
12 not a physical threat?
13          MS. RODGERS:  Object to form.
14          THE WITNESS:  I am saying he is
15 -- I am saying because they put Campus Police
16 outside of Ritvo's office for a supposed get
17 together meeting to talk to Chris,  it was
18 not customary.  They wanted to make me
19 believe that every meeting they had it was
20 customary for the Campus Police to be outside
21 the offices and that was not the case.
22          MR. DODD:  Q.  Let me ask you
23 what the source of your knowledge is?
24     A.     I have been there for 20 years.
25 I have talked to different people.  I know

Cynthia Ellison                                    April 27, 2006

Page 230

1    that.  Like I said, Officer Cox told me that

2    he was the one that asked to be stationed

3    outside that door that day.

4         Q.     How long has Ritvo been in that

5    position?

6         A.     I couldn't tell you the exact

7    number of years.

8         Q.     Do you know how many disciplinary

9    meetings he has had an officer outside?

10             MS. RODGERS:  Object to form.

11             THE WITNESS:  Usually, the

12    disciplinary meetings are in Chancellor's

13    Office.  If they changed that, then they

14    changed it.

15             MR. DODD:  Q.  Wherever the

16    location.

17         A.     I have no idea about it, but we

18    are not talking about Ritvo's area.  We were

19    talking about security from my area.  He was

20    saying that Campus Police patrolled Goodwyn

21    Hall three times, and they did not.

22         Q.     You have knowledge of that as

23    well?

24         A.     Well, I was at work over those

25    years.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

                                                    Page 231

1          Q.     You were on the 3rd floor, right?

2          A.     Right.  They were patrolling.

3          Q.     You weren't on the second floor,

4      were you?

5          A.     No.

6          MS. RODGERS:  Object to form.

7          THE WITNESS:  No.

8          MR. DODD:  Q.  You weren't on the

9      first floor?

10         A.     I was on the third floor.  I

11     might add this was also the time that Debra

12     handed me -- during this period Debra had

13     handed me a letter saying talk to Ritvo.

14         Q.     Okay.  Had you made any demands at

15     that point?

16         MS. RODGERS:  Object to form.

17         THE WITNESS:  As I said, at the

18     same time that Debra said that the attorneys

19     wanted to know what I wanted, and I told her

20     at the time that I wanted mental anguish and

21     $250,000.  That's when she got up and left.

22     She came back and said, "I don't have

23     anything else to say to you."

24         MR. DODD:  Q.  Do you have any

25     further comments about this letter?

Cynthia Ellison                                    April 27, 2006

1          A.      Should I have?

2          Q.      You said you were going to go down

3    through.  I am just wondering if you had

4    finished or not.

5          A.      I think my earlier comments cover

6    it.

7          Q.      I'm sorry.

8          A.      I think my earlier comments covers

9    it.

10              (One-page letter, dated February 9,

11    2005, from Bayo H. Lawal, Ph.D. to Ms.

12    Cynthia Ellison, marked as Defendant's Exhibit-

13    13)

14              MR. DODD:  This is Exhibit 13.

15          Q.      Ms. Ellison, look at Exhibit D to

16    your affidavit, please.

17          A.      Yes, sir.

18          Q.      You say, "I am no longer willing

19    to subject myself to an environment that is

20    potentially unsafe to me and others around

21    me."

22          A.      Yes.

23          Q.      Who are the "others" you are

24    referring?

25          A.      My student workers and other people

Cynthia Ellison                                    April 27, 2006

Page 233

1       who came in and out of the Dean's office.

2              Q.     To your knowledge, had any of them

3       been threatened by Mahaffy?

4              A.     I really think they had.

5              Q.     Do you know that for a fact?

6              A.     I think a couple of them said

7       something a couple of times.  I don't

8       remember exactly what they said.

9              Q.     You said, "I would also like to

10      discuss my plans concerning leave."  What is

11      that referring to?

12             A.     Yes.  I put my retirement date

13      April 1st, 2005.

14             Q.     Right.

15             A.     Because I looked in the system and

16      I had enough vacation leave to take it to

17      April 1st.

18             Q.     You just get a paycheck until

19      April 1st?

20             A.     Uh-huh.

21             MR. DODD:  Q.  Here is No. 13.

22             A.     I received this from Dr. Lawal.

23             Q.     You see in the first paragraph he

24      writes, "I know you have discussed your

25      intention to retire from AUM with me several

Cynthia Ellison                              April 27, 2006

Page 234

1    times within the last five months, but each

2    time, I have tried to talk you out of it."

3         A.    Yes, I do.

4         Q.    I assume from your previous

5    testimony you feel that is not an accurate

6    statement?

7         A.    It is not an accurate statement.

8         Q.    Ms. Ellison, did you plan to give

9    Lawal -- strike that, please.

10             When did you decide that you were

11   going to retire effective April 1st?

12        A.    Well, I mean, like I told you

13   earlier, it was a combination of everything

14   that was going on.

15        Q.    When?

16        A.    When?

17        Q.    When.

18        A.    I think my letter is in here.

19        Q.    The notice is dated February 9th.

20   My question is, when did you decide to give

21   him that notice on February 9th?

22        A.    When he received the correspondence

23   from Julian McPhillips and he was beating on

24   his chest.  He said that I had done this to

25   him.  That I had destroyed his plans for

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                        April 27, 2006

Page 235

1    filing a suit in the summer.  And I should

2    wait.  He started to change and retaliated

3    against me.  It was everything that was going

4    on.

5        Q.    If I were to tell you, or suggest

6    to you that he did not receive any

7    correspondence from Julian McPhillips until

8    after February the 10th, would that make you

9    want to rethink that answer?

10       A.    Well, I have said to you that my

11   dates were not exact.  I'm not sure.

12       Q.    I am trying to straighten it out

13   now, is what I am trying --

14       A.    Well, could you show me the

15   correspondence that he received from Julian

16   McPhillips and then I can answer the

17   question?

18       Q.    I don't have the letter, but I

19   have got what was in it.

20       A.    Well, I think I told you earlier

21   that when I spoke to Mr. McPhillips and

22   explained to him what was going on, he

23   advised me to leave AUM.  Now, I did what he

24   told me to do.  And if it were the 9th, I

25   took his advice.

Cynthia Ellison                                  April 27, 2006

Page 236

1          Q.      When did you get that advice?

2                  MS. RODGERS:  Object to form.

3                  MR. DODD:  Q.  The first meeting

4          you had with him?

5          A.      I think it was -- well, I tell

6          you it was -- it wasn't the first meeting

7          because the first meeting is when I explained

8          to him what was happening to me.  It had to

9          be the second meeting.

10          Q.      Which was the day after you

11          resigned, right?

12                  MS. RODGERS:  Object to form.

13                  THE WITNESS:  I have no idea.

14                  MR. DODD:  Q.  Would it be

15          accurate to say that you had decided to

16          retire, made up your mind to retire sometime

17          prior to February 9th when you returned and

18          gave Bayo Lawal the notice?

19                  MS. RODGERS:  Object to form.

20                  THE WITNESS:  It's fair to say

21          that after I sought Counsel and I sought

22          their advice, that's when I decided to

23          retire.

24                  MR. DODD:  Q.  Was that before

25          February 9th?

Cynthia Ellison                                    April 27, 2006

Page 237

1              MS. RODGERS:  Object to form.

2              THE WITNESS:  I don't have a

3     calendar to refer to.  I really don't know.

4              MR. DODD:  Okay.

5              (Two-page e-mail, dated February

6     11, 2005, from Cynthia Ellison to Bayo Lawal,

7     marked as Defendant's Exhibit-14)

8              THE WITNESS:  Yes, sir.

9              MR. DODD:  Q.  What is that?

10         A.    This is my e-mail to Dr. Lawal, as

11    we discussed earlier, saying that I would

12    work through the 25th if I got -- if I was

13    provided Campus Police security.

14         Q.    You say if Campus security

15    patrolled at least once a day?

16         A.    Right.

17         Q.    Now, did you receive any

18    confirmation that the Campus Police would do

19    that?

20         A.    There were e-mails from Bayo to

21    Ritvo.  I believe they requested that they

22    walk-through.

23             MR. DODD:  Exhibit 15.

24             (Two-page document, dated February

25    7, 2005, entitled Application for Retirement,

Cynthia Ellison                                  April 27, 2006

Page 238

1          marked as Defendant's Exhibit-15)

2                     MR. DODD:  Q.  Can you tell me

3          what that is?

4          A.     Application for Retirement.  It's

5          my Application for Retirement.

6          Q.     Do you remember when you completed

7          that?

8          A.     It's dated on 2-7-05.

9          Q.     That's your direct deposit

10         authorization for the Retirement Systems of

11         Alabama?

12         A.     Uh-huh.

13         Q.     Does that refresh your recollection

14         at all as to when you decided to go ahead

15         and retire?

16         A.     Not completely.  Because I was in

17         contact with HR because I really didn't know

18         what to do about paperwork or anything.  I

19         would have to know when I talked to Mr.

20         McPhillips.  If I talked to Mr. McPhillips

21         around that time, I don't know.

22         Q.     Do you know of any reason why you

23         would authorize a direct deposit for your

24         retirement income as of February 7th if you

25         hadn't decided to retire?

Cynthia Ellison                                April 27, 2006

Page 239

1          A.     I was acting off of the advice of
2     my Counsel. He is the one that told me.
3          Q.     To retire?
4          A.     Yes.
5                 MR. DODD:  Here is No. 16.
6                 (One-page e-mail, dated February
7     12, 2005, from Bayo Lawal to Cynthia Ellison,
8     marked as Defendant's Exhibit-16)
9                 MR. DODD:  Q.  Take a look,
10    please.
11         A.     Yes.
12         Q.     What is that?
13         A.     This is the e-mail from Dr. Lawal
14    concerning the shredding.
15         Q.     He sent it to you on Saturday
16    morning, February 12th, right?
17         A.     Yes.
18         Q.     Okay.  You see his last sentence
19    where he says, "I hope you kept a list of
20    all the shredded documents and that this list
21    was approved prior to shredding by the
22    University Archivist Jason Kneip."
23         A.     Kneip, yes.
24         Q.     Do you know Jason Kneip?
25         A.     No, but I e-mailed him that Monday

Cynthia Ellison                                    April 27, 2006

Page 240

1     morning.

2          Q.     Have you ever had any communication

3     with him?

4          A.     No.

5          Q.     Have you ever inventoried items you

6     shredded?

7          A.     I have not.

8          Q.     And you had never sought his prior

9     approval before shredding, have you?

10         A.     No, I had not.

11         Q.     You responded to this e-mail, did

12    you not?

13         A.     I did.

14                MR. DODD:  Here is 17.

15                (Two-page e-mail, dated February

16    14, 2005, from Cynthia Ellison to Bayo Lawal,

17    marked as Defendant's Exhibit-17)

18                MR. DODD:  Q.  See if you can

19    identify that.

20         A.     Yes, I recognize this.  It's an

21    e-mail I sent to Dr. Lawal in response to

22    his e-mail to me about the shredding.

23         Q.     You sent it Monday morning at 8:07

24    a.m.?

25         A.     Yes.  That's what's on there.

Cynthia Ellison                                    April 27, 2006

Page 241

1          Q.     You seem to question whether he
2     thinks you are trustworthy or not, is that
3     right?
4          A.     Yes.
5          Q.     Why do you raise that issue?
6          A.     Because he had never questioned
7     anything that I had done.
8          Q.     Had he ever been confronted with
9     the quantity of shredding that you and your
10    helpers had done the previous Friday?
11         A.     Had I been confronted by him?
12         Q.     Did he --
13         A.     Had he, Dr. Lawal; been confronted
14    by whom?
15         Q.     Had he ever observed shredding of
16    the magnitude that you and the student
17    workers had done the previous Friday?
18                MS. RODGERS:  Object to form.
19                MR. DODD:  Q.  To your knowledge.
20         A.     I don't know.  There was quite a
21    few time sheets and payroll files that were
22    shredded.
23         Q.     Did you know that you were
24    supposed to seek prior approval and make
25    inventories of that stuff?

Cynthia Ellison                                        April 27, 2006

Page 242

1      A.    We probably received that.  I know

2  I did probably receive that, but I had never

3  done it before.

4      Q.    Why did you suggest that Monday,

5  February 14th should be your last day?

6               MS. RODGERS:  Object to form

7  again.

8               THE WITNESS:  I think we have

9  already gone over what happened on the 14th.

10  Dr. Lawal's behavior and I was being

11  continually subjected to an unsafe environment.

12               MR. DODD:  Q.  In this e-mail you

13  refer to lack of trust, right, as a reason

14  why you shouldn't stay any longer?

15               MS. RODGERS:  Object to form.

16               THE WITNESS:  That was part of the

17  reason.

18               MR. DODD:  Q.  Is there any other

19  reason expressed in No. 17?

20      A.    Not in this letter e-mail.

21               MR. DODD:  Here is No. 18.

22               (One-page e-mail, dated February

23  14, 2004, from Cynthia Ellison to Jason Kneip

24  and Bayo Lawal, marked as Defendant's Exhibit-

25  18)

Cynthia Ellison                                    April 27, 2006

Page 243

1        MR. DODD:  Q.  Tell me what that

2   is, if you can, please.

3        A.      This is an e-mail to Jason Kneip

4   about the shredding that I had done.  Dr.

5   Lawal requested that I send him an e-mail and

6   let him know what I had shredded.

7        Q.      Did Dr. Lawal tell you that

8   orally?

9        A.      Yes.

10       Q.      Is this the same day where he said

11   that he only wanted to communicate with you

12   by e-mail?

13       A.      Right.                    `

14       MR. DODD:  Here is 19.

15       (One-page e-mail, dated February

16   14, 2005, from Jason Kneip to Cynthia Ellison

17   and Bayo Lawal, marked as Defendant's Exhibit-

18   19)

19       MR. DODD:  Q.  Tell me what that

20   is, please.

21       A.      Yes.  This is from Jason Kneip

22   telling me that if I shred anything to submit

23   a list.

24       Q.      Did you understand that was the

25   policy of the University once you received

Cynthia Ellison                                          April 27, 2006

Page 244

1          this e-mail?

2              A.     Yes.  I do think I will stand for

3          a minute.

4                    MR. DODD:  Q.  Here is No. 20.

5                    (One-page document, dated February

6          14, 2005, from Roger A. Ritvo, Ph.D. to

7          Cynthia Ellison, with carbon copies, marked as

8          Defendant's Exhibit-20)

9                    MR. DODD:  Q.  Ms. Ellison, do

10         you recognize that?

11             A.     Yes, I received the request about

12         Campus Police. He said that "They do indeed

13         go through Goodwyn Hall on a regular basis,

14         hopefully three times a day."  And I received

15         that on the 14th.

16             Q.     Had you sought confirmation from

17         Bayo Lawal or Roger Ritvo about the frequency

18         with which the police go through Goodwyn

19         Hall?

20             A.     I just asked for security.  I

21         didn't get into that.

22             Q.     You did say, though, that would

23         stay on and they would go through once a

24         day?

25             A.     I think that was in an e-mail.  I

Cynthia Ellison                                    April 27, 2006

Page 245

1    would like to say that it took them from the

2    time I requested it through February 14th to

3    comply.

4                (One-page memorandum, dated February

5    14, 2005, from Cynthia Ellison to Bayo Lawal,

6    marked as Defendant's Exhibit-21)

7                MR. DODD:  Q.  Exhibit 21.

8         A.    Yes.  This is an e-mail I left

9    with the attachment for Bayo for my leave

10   that would pay me up through the end of

11   March.

12        Q.    The leave slips and time sheets

13   referred to are yours going forward, right?

14        A.    That's correct.

15        Q.    You concluded by saying, "I can no

16   longer handle the retaliation that I am under

17   from Chris, others, and now you."

18        A.    Right.

19        Q.    Who are the "others"?

20        A.    I was referring to Debra Foster,

21   Chris Mahaffy, Ritvo.  The ones I felt had

22   retaliated against me.

23        Q.    For filing a complaint?

24        A.    Yes.

25                (One-page document, dated February

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 246

1       15, 2005, from Ms. Cynthia Ellison to Bayo

2       Lawal, marked as Defendant's Exhibit-22)

3                  MR. DODD:  Here is 22.

4           Q.     Can you identify that?

5           A.     Yes.

6           Q.     Did you receive that?

7           A.     I did.

8           Q.     Did you ever return the three tape

9       recorded Chair meetings -- strike that,

10      please.

11                 Did you ever submit the tapes of

12      the three Chairs meetings?

13          A.     I never -- it never left the

14      office.

15          Q.     It's still there?

16          A.     As far as I know.

17          Q.     Has Auburn University Montgomery

18      discriminated against you in any fashion other

19      than what we have discussed today?

20          A.     No.

21          Q.     Have you understood all of my

22      questions today that you have answered?

23          A.     Yes.  I think to the best of my

24      knowledge.

25          Q.     And to the best of your ability,

Cynthia Ellison                                    April 27, 2006

Page 247

1          you answered my questions fully?

2              A.      To the best of my ability.

3              Q.      Do you wish to change anything?

4              A.      I can't remember back to 8:00

5          o'clock or 9:00 o'clock this morning.  Right

6          now at this time, no.

7              Q.      Do you wish to add anything, or

8          tell me anything you think I should know

9          about this case?

10             A.      No.  I can't think of anything

11         else right now.

12                     MR. DODD:  Thank you for your

13         time.                          `

14                     THE WITNESS:  Thank you.

15                     (Whereupon, the proceedings

16         adjourned at 4:45 o'clock p.m.)

17                     .

18                     .

19                     .

20                     .

21                     .

22                     .

23                     .

24                     .

25                     .

Cynthia Ellison                                    April 27, 2006

Page 248

1                    DESCRIPTION OF DEFENDANTS EXHIBITS

2            EXHIBIT DESCRIPTION

3            1        Multi-page document, first page undated,
4                     entitled Charge of Discrimination

5            2        Three-page document, dated February 25,
6                     2004, e-mail from Cynthia Ellison to
7                     Joe Hill

8            3        One-page letter, dated March 1, 2004,
9                     letter from Cynthia Ellison to Guin
10                    Nance

11           4        One-page letter, dated March 2, 2004,
12                    from Guin A. Nance to Ms. Cynthia
13                    Ellison

14           5        One-page letter, dated March 22, 2004,
15                    from Debra S. Foster to Ms. Cynthia
16                    Ellison and Allison Stevens

17           6        Five-page document, dated March 31,
18                    2004, from Cynthia Ellison to Dr. Guin
19                    Nance

20           7        One-page letter, dated April 5, 2004,
21                    from Guin A. Nance to Ms. Cynthia
22                    Ellison

23           8        One-page letter, dated April 29, 2004,
24                    from Debra S. Foster to Cynthia Ellison

25            .

Cynthia Ellison                                    April 27, 2006

Page 249

1              DESCRIPTION OF DEFENDANTS EXHIBITS (CONT.)

2        EXHIBIT DESCRIPTION

3         9       One-page memorandum, dated December 2,

4                 2004, from Debra S. Foster to Cynthia

5                 Ellison

6         10      One-page memorandum, dated December 7,

7                 2004, from Cynthia Ellison to Dr. Bayo

8                 Lawal

9         11      One-page letter, dated February 4, 2005,

10                from Debra S. Foster to Ms. Cynthia

11                Ellison

12        12      Two-page letter, dated February 9, 2005,

13                Roger A. Ritvo, Ph.D. to Ms. Cynthia

14                Ellison

15        13      One-page letter, dated February 9, 2005,

16                from Bayo H. Lawal, Ph.D. to Ms.

17                Cynthia Ellison

18        14      Two-page e-mail, dated February 11,

19                2005, from Cynthia Ellison to Bayo

20                Lawal

21        15      Two-page document, dated February 7,

22                2005, entitled Application for

23                Retirement

24             .

25             .

Cynthia Ellison                                      April 27, 2006

                                                        Page 250

1              DESCRIPTION OF DEFENDANTS EXHIBITS (CONT.)

2        EXHIBIT DESCRIPTION

3        16      One-page e-mail, dated February 12,

4                2005, from Bayo Lawal to Cynthia

5                Ellison

6        17      Two-page e-mail, dated February 14,

7                2005, from Cynthia Ellison to Bayo

8                Lawal

9        18      One-page e-mail, dated February 14,

10               2004, from Cynthia Ellison to Jason

11               Kneip and Bayo Lawal

12       19      One-page e-mail, dated February 14,

13               2005, from Jason Kneip to Cynthia

14               Ellison and Bayo Lawal

15       20      One-page document, dated February 14,

16               2005, from Roger A. Ritvo, Ph.D. to

17               Cynthia Ellison, with carbon copies

18       21      One-page memorandum, dated February 14,

19               2005, from Cynthia Ellison to Bayo

20               Lawal

21       22      One-page document, dated February 15,

22               2005, from Ms. Cynthia Ellison to Bayo

23               Lawal

24               .

25               .

Cynthia Ellison                                    April 27, 2006

Page 251

1                    CERTIFICATE OF COURT REPORTER.

2                    I, DAWN A. GOODMAN, do hereby

3          certify;

4                    That I am a Certified Shorthand

5          Reporter of the State of Alabama;

6                    That the foregoing pages are a

7          true and correct transcript of the Deposition

8          of Cynthia Ellison;

9                    I further certify that I am not

10         interested in the outcome of said matter nor

11         connected with or related to any of the

12         parties of said matter or to their respective

13         Counsel.                              `

14                   Dated this 8th day of May, 2006,

15         at Prattville, Alabama.

16                   .

17                   _____

18                   DAWN A. GOODMAN, CSR

19                   State of Alabama

20         .

21         .

22         .

23         .

24         .

25         .

Cynthia Ellison                                    April 27, 2006

Page 252

1                              CAPTION

2              The Deposition of Cynthia Ellison,

3         taken in the matter, on the date, and at the

4         time and place set out on the title page

5         hereof.

6                   It was requested that the deposition

7         be taken by the reporter and that same be

8         reduced to typewritten form.

9                   It was agreed by and between counsel

10        and the parties that the Deponent will read

11        and sign the transcript of said deposition.

12                        .

13                        .

14                        .

15                        .

16                        .

17                        .

18                        .

19                        .

20                        .

21                        .

22                        .

23                        .

24                        .

25                        .

Cynthia Ellison                                    April 27, 2006

                                                        Page 253

1                           CERTIFICATE

2          STATE OF                          :

3          COUNTY/CITY OF                        :

4               Before me, this day, personally

5          appeared, Cynthia Ellison, who, being duly

6          sworn, states that the foregoing transcript

7          of his/her Deposition, taken in the matter,

8          on the date, and at the time and place set

9          out on the title page hereof, constitutes a

10         true and accurate transcript of said

11         deposition.

12

13                            Cynthia Ellison

14              .

15           SUBSCRIBED and SWORN to before me this

16              day of            , 2006 in the

17         jurisdiction aforesaid.

18

19         My Commission Expires    Notary Public

20              .

21         No changes made to the Errata Sheet;

22         therefore, I am returning only this signed,

23         notarized certificate.

24         I am returning this signed, notarized

25         certificate and Errata Sheet with changes noted.

Cynthia Ellison                                    April 27, 2006

Page 254

 1                DEPOSITION ERRATA SHEET

 2            .

 3        RE:        Alexander Gallo & Associates

 4        File No.    13898

 5        Case Caption:   Cynthia Ellison vs. Auburn

 6                University Montgomery

 7

 8        Deponent:  Cynthia Ellison

 9        Deposition Date: April 27, 2006

10            .

11        To the Reporter:

12        I have read the entire transcript of my

13        Deposition taken in the captioned matter or

14        the same has been read to me.  I request

15        that the following changes be entered upon

16        the record for the reasons indicated.  I

17        have signed my name to the Errata Sheet and

18        the appropriate Certificate and authorize you

19        to attach both to the original transcript.

20            .

21        Page No.     Line No.    Change to:

22

23        Reason for change:

24        Page No.     Line No.    Change to:

25

Cynthia Ellison                                    April 27, 2006

Page 255

1              Reason for change:

2              Page No.     Line No.     Change to:

3

4              Reason for change

5              Page No.     Line No.     Change to:

6

7              Reason for change:

8              Page No.     Line No.     Change to:

9

10             Reason for change:

11             Deposition of Cynthia Ellison

12             .

13             Page No.     Line No.     Change to:

14

15             Reason for change:

16             Page No.     Line No.     Change to:

17

18             Reason for change:

19             Page No.     Line No.     Change to:

20

21             Reason for change:

22             Page No.     Line No.     Change to:

23

24             Reason for change:

25             Page No.     Line No.     Change to:

Cynthia Ellison                                      April 27, 2006

Page 256

1

2          Reason for change:

3          Page No.     Line No.     Change to:

4

5          Reason for change:

6             .

7             .

8          SIGNATURE:_____DATE:_____

9                    Cynthia Ellison