UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


CYNTHIA ELLISON,

      Plaintiff,

                  Civil Action No:
vs.                 2:05CV902-MHT-DRB


AUBURN UNIVERSITY MONTGOMERY,



      Defendant.

~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF
FAYE WARD


June 14, 2006

9:38 a.m.



Auburn University
Human Resources Building
7430 East Drive
Montgomery, Alabama



Bonnie L. Smith, RPR, CCR-B-2432

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                                          June 14, 2006

Page 2

1                        APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiff:

4    KAREN SAMPSON RODGERS, ATTORNEY AT LAW

5    McPhillips, Shinbaum & Gill, LLP

6         516 South Perry Street

7         Montgomery, Alabama 36104

8         (334) 262-1911

9         (334) 263-2321 (facsimile)

10

11

12   On behalf of the Defendant:

13   BURTON F. DODD, ESQUIRE                    `

14   Fisher & Phillips, LLP

15        1500 Resurgens Plaza

16        945 East Paces Ferry Road

17        Atlanta, Georgia 30326

18        (404) 231-1400

19        (404) 240-4249 (facsimile)

20        bdodd@laborlawyers.com

21

22   ALSO PRESENT:  Cynthia Ellison, Plaintiff

23                  Debra Foster, HR Director

24

25

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

1                Deposition of Faye Ward
2                    June 14, 2006
3
4         MR. DODD:  This is the deposition of
5     Faye Ward taken by subpoena and notice
6     pursuant to Rules 45 and 30 of the
7     Federal Rules of Civil Procedure for all
8     purposes permitted by those rules.
9
10        FAYE WARD, having first been duly sworn,
11    was examined and testified as follows:
12    EXAMINATION
13    BY-MR.DODD:
14        Q.   Ms. Ward, we met briefly.  I'm
15    Burton Dodd.  I represent Auburn University at
16    Montgomery.  The purpose of this deposition is
17    to ask you some questions about your
18    involvement in the lawsuit that Cynthia
19    Ellison has brought against AUM.
20        A.   Okay.
21        Q.   You've been sworn and do you
22    understand that you're under oath to tell the
23    truth during this deposition?
24        A.   Absolutely.
25        Q.   If you don't understand a question

Faye Ward                                    June 14, 2006

1    that I ask you, will you let me know so I can

2    try to make it understandable for you?

3          A.    I certainly will, sir.

4          Q.    And if you don't hear the entire

5    question that I ask also, please let me know

6    so I can repeat it --

7          A.    Okay.

8          Q.    -- so you can hear it.  If you need

9    to take a break or have a recess of some kind,

10   just let me know and we'll accommodate you.

11   Do you have any medical condition that might

12   interfere with your ability to answer my

13   questions today?

14         A.    No, I don't.

15         Q.    Did you review anything to prepare

16   for this deposition?

17         A.    Just my affidavit that I signed.  I

18   looked over it.

19         Q.    You've only given one affidavit in

20   this case?

21         A.    Right.

22         Q.    Did you talk with anyone to prepare

23   for this deposition?

24         A.    No, I did not.

25         Q.    Okay.  Where do you live?

Faye Ward                                          June 14, 2006

1          A.    I live -- I reside at 5307 Roland
2     Drive, Montgomery, Alabama.
3          Q.    You've lived there for some time,
4     have you not?
5          A.    I have.
6          Q.    How many years?
7          A.    Oh, I guess maybe about 30 years.
8     I've retired.  I worked here for 18 and I've
9     been at that address.
10         Q.    And you are divorced, are you not?
11         A.    I am.  That's correct.
12         Q.    What is -- what is your former
13    husband's name?
14         A.    Anthony R. Ward.
15         Q.    Does he live in --
16         A.    He lives in Cincinnati, Ohio.
17    Uh-huh.
18         Q.    All right.  And you have three
19    children, do you not?
20         A.    I do.  Three sons.  Absolutely.
21         Q.    And do they live in this area, the
22    Montgomery area?
23         A.    One does.  The other one lives in --
24    he just took a job with a company out of
25    Louisville, Kentucky, and he's there.  He's a

Faye Ward                                    June 14, 2006

Page 6

1    pilot there.  My son in Houston, he is a
2    nurse.
3        Q.    And what is the name of the son who
4    lives in Montgomery?
5        A.    His name is Kory, with a K.
6        Q.    Okay.  And what does Kory do?
7        A.    Kory works at Maxwell Air Force Base
8    in the fitness center and he also works at ASU
9    as a part-time radio announcer.
10       Q.    Is he married?
11       A.    No, he's not.
12       Q.    Okay.
13       A.    None of them are.
14       Q.    How old is Kory?
15       A.    Kory is 31.
16       Q.    Other than your -- other than Kory,
17   do you have any other family in the Montgomery
18   area?
19       A.    Certainly.  My parents, thank God.
20   They're still living, both my mother and my
21   father.
22       Q.    And what is your mother's name?
23       A.    Her name is Lucy Johnson Jenkins.
24       Q.    And your father?
25       A.    My father is Ganzell, G-A-N-Z-E-L-L,

Faye Ward                                    June 14, 2006

1    Jenkins.

2         Q.    Do either of them work?

3         A.    They're retired.

4         Q.    Do you have any brothers and sisters

5    in the Montgomery area?

6         A.    I do.  No, not in the Montgomery

7    area.  I have one brother.

8         Q.    And where does he live?

9         A.    He lives -- resides in Cincinnati,

10   Ohio.

11        Q.    Other than your parents, do you have

12   any other family in the Montgomery area?

13        A.    Well, you know, cousins, you know,

14   aunts and uncles, but no one close other than

15   that.  Why is that necessary?

16        Q.    It has to do with jury selection if

17   we ever get to that.

18        A.    Oh, I see.  Okay.  Thank you.

19        Q.    I want to know if you have any

20   family members or a witness has family members

21   that might appear on the --

22        A.    Thank you for clarifying it.

23        Q.    Certainly.  What are the -- if you

24   know, what are the last names of your aunts

25   and uncles?

Faye Ward                                            June 14, 2006

Page 8

1       A.    My uncle's name is Johnson, Julius
2  Johnson and Marie Johnson.  Cousins are
3  Bruces.  Samuel Bruce and Wilma German.
4       Q.    Okay.  Any other?
5       A.    Jenkins, which would be my maiden
6  name.
7       Q.    Right.
8       A.    Uh-huh.
9       Q.    And I assume you have nieces and
10 nephews?
11      A.    Well, I have nephews that live in
12 Cincinnati, Ohio.  I have one in Cincinnati
13 and one in Columbus.
14      Q.    Okay.  Any other family members in
15 the Montgomery area?
16      A.    Huh-uh.
17      Q.    You've got to say no.
18      A.    Oh.  No.  I'm sorry.
19      Q.    She can't pick up -- you have to
20 audiblize your --
21      A.    Well, no.
22      Q.    Thank you.  Do you go to church?
23      A.    I do.
24      Q.    What church do you attend?
25      A.    I'm Catholic.  I go to Saint Jude's.

Faye Ward                                          June 14, 2006

Page 9

1          Q.    Does Saint Jude run the school you
2    attended as a child?
3          A.    They do.
4          Q.    Are you involved in any community
5    activities?
6          A.    I am.  I belong to South Lawn
7    Community Organization.
8          Q.    What does that do?
9          A.    We are very viable in our community
10   and making sure that if there are complaints
11   we report them to the proper authorities for
12   that.  We have cleanups out there.  We have
13   activities in the park for the children.  I
14   also have coordinated and coordinate a tennis
15   program that I wrote a grant for about four
16   years ago and through bonds, they -- and the
17   mayor's office, they contributed money to me
18   to finance some children to take tennis
19   lessons.  Every child can't play football or
20   basketball.  I saw the need for that and we
21   have a course out there.  So I'm involved in
22   that.  My church, I'm involved in
23   organizations there also.
24         Q.    Do you hold any positions in the
25   church?

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

1      A.   I am the correspondence secretary
2  for the Ladies of Charity organization.
3      Q.   Now, you said you -- you process
4  complaints with respect to your community?
5      A.   Right.  Say, for example, if there
6  are cars parked in driveways that are not
7  being used, we call the proper authorities and
8  they will come out and remove those cars, that
9  kind of thing.
10     Q.   I gotcha.
11     A.   Okay.
12     Q.   Other than your church and that
13 community activity, are you involved in any
14 other organizations in Montgomery?
15     A.   No, not really.  I did some
16 campaigning.  I worked for the legislature
17 part time this year and I also did some
18 campaigning for one of the elected officials.
19     Q.   Which official?
20     A.   Representative Evan Holms.
21     Q.   Do you have any relatives who are
22 currently employed at AUM?
23     A.   No.  Well, Ruby Jenkins.  Ruby
24 Jenkins is a distant relative of mine.
25     Q.   What is the relationship between you

Faye Ward                                                June 14, 2006

1    and Ruby?

2         A.    Well, I mean, we don't have a

3    non-favorable relationship.  We just don't get

4    to see each other that often.  But she's fine.

5    What do you mean?

6         Q.    Are you cousins?

7         A.    Yeah, we're cousins.

8         Q.    Okay.  Other than Ruby, do you have

9    any relatives who are employed or who were

10   formerly employed --

11        A.    At AUM?  No, I do not.

12        Q.    Have you talked to Ruby about

13   Ms. Ellison's lawsuit?

14        A.    Absolutely not.

15        Q.    Now, you gave an affidavit to --

16   strike that, please.  To whom did you give the

17   affidavit that you referred to earlier?

18        A.    I gave an affidavit to Mrs. Rodgers,

19   Mrs. Ellison's attorney.

20        Q.    Does Ms. Rodgers represent you in

21   any capacity?

22        A.    No, she doesn't.

23        Q.    How did it -- how did you learn of

24   the opportunity to provide an affidavit?

25        A.    Mrs. Ellison asked me if I would

Faye Ward                                          June 14, 2006

Page 12

1    give one and I told her I would.

2        Q.   And then did you go visit

3    Ms. Rodgers --

4        A.   I did.

5        Q.   -- in her office?

6        A.   I did.  I gave her the information

7    and she typed it.

8        Q.   And then you signed it?

9        A.   I signed it.

10       Q.   Have you had any further involvement

11   with Ms. Rodgers or her law firm --

12       A.   No, I have not.

13       Q.   -- since giving that affidavit?

14       A.   No, I have not.

15       Q.   Did you provide Ms. Ellison or

16   Ms. Rodgers with any documents from AUM?

17       A.   No, I did not.  There was

18   information from -- that I wrote to Mr. Tom

19   Rebel and I have that in my possession.

20       Q.   Now, tell me about how you wrote

21   that.

22       A.   Okay.  I talked with him.  I was

23   about to go out for surgery.  And he called me

24   one day shortly before then.  In fact, it was

25   the last day before I left to go.  And he

Faye Ward                                    June 14, 2006

Page 13

1    asked me if I would put information in

2    writing.  And I told him sure.  I had no

3    problem with that because I knew I would not

4    be there.  I would not be here at the

5    university.  In fact, in that last sentence, I

6    told him if he had any questions or any

7    follow-up to that, I would be more than happy

8    to supply him with it.  He told me to get that

9    information to Dr. Roger Ritvoe and I told him

10   that I would.

11        Q.   And did you do that?

12        A.   I gave it to my clerk to do because

13   the next day I was supposed to be leaving

14   going to the hospital.  So I gave it to her.

15   She emphatically -- and I believe she did --

16   took it and gave it to Roger.

17        Q.   And you maintained a copy in your

18   possession; correct?

19        A.   I did.  I did.  Because I didn't

20   know if he might call me or he might need to

21   talk with me about it and I wanted to make

22   sure that I had the information in front of me

23   that I had supplied to him.  Sure, I kept a

24   copy.

25        Q.   Is that the only reason you kept a

Faye Ward                                                June 14, 2006

Page 14

1   copy?

2       A.    That's the only reason I kept a

3   copy.

4       Q.    When he asked you to provide him

5   with this document --

6       A.    Uh-huh.

7       Q.    -- you were employed by AUM as the

8   assistant director of human resources?

9       A.    Absolutely.  Absolutely.

10      Q.    And did you know that Tom Rebel was

11  involved in any sort of investigation at AUM

12  concerning any faculty member or employees

13  here?

14      A.    Well, he did not -- I mean, I

15  understood that because Debra Foster had been

16  in touch with him.  So I knew.  And, of

17  course, I know Mr. Rebel from the past and

18  working with the university.  Sure.

19      Q.    And you knew he was representing the

20  university in its investigation; right?

21      A.    Right.  Right.

22      Q.    Okay.  How did you come to give that

23  document to Ms. Ellison or her lawyer?

24      A.    Because when I went to do my

25  affidavit, I showed that to her.

Faye Ward                                          June 14, 2006

Page 15

1      Q.   And gave her a copy of it at that

2   point?

3      A.   I did.

4           MR. DODD:  Can you mark this one?

5           (Defendant's Exhibit-1 was marked

6      for identification.)

7      Q.   (By Mr. Dodd) Ms. Ward, here's

8   what's been marked as defendant's exhibit one.

9   I hand it to you and see if you can recognize

10  it, please.

11     A.   I do.

12     Q.   What is it?

13     A.   This is the letter that I sent to

14  Mr. Rebel -- that Mr. Rebel requested and I

15  sent it to Dr. Ritvoe.

16     Q.   Did you know that Dr. Ritvoe would

17  forward this to Tom Rebel?

18     A.   I didn't have any reason to believe

19  he wouldn't.

20     Q.   All right.  Was February 18th, 2005,

21  your last day of employment -- last day of

22  full work at AUM?

23     A.   It was.  I went to the hospital the

24  next day.  I was preparing to go to the

25  hospital.

Faye Ward                                          June 14, 2006

Page 16

1        Q.   So you remained an employee for some
2   time after that, but you never returned to
3   work after that; right?
4        A.   Say what?  I'm sorry.  See, I went
5   on leave and then I came back in July.
6        Q.   Okay.  And then you left --
7        A.   I had a knee replacement.
8        Q.   And you left when?
9        A.   My last day was August 31st.  I
10   retired effective September 1st.
11        Q.   To be able to retire on September
12   1st, you had to give notice, did you not, of
13   at least 30 days prior to that time?
14        A.   At least 30 to 60 days.  Right.
15        Q.   So your decision to retire was made
16   at least by July 31st?
17        A.   It was.
18        Q.   Okay.  Ms. Ward, when you left on
19   February 18th for your surgery --
20        A.   28th.
21        Q.   I'm sorry?
22        A.   I left the 28th.  I dated this on
23   the 28th of February.
24        Q.   I'm just reading this as February
25   18th.  Is that incorrect?

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                          June 14, 2006

1      A.   It should have been -- I thought it
2  was the -- anyway, the last day -- the last
3  day I was here.  Maybe it was the 18th.  I
4  don't know.
5      Q.   Okay.
6      A.   But I went to the hospital.  I was
7  supposed to go in the hospital later that
8  month, by the end of the first of March.
9      Q.   Is this the only document you took
10 with you when you left?
11     A.   That's the only document that I took
12 when I left here.
13     Q.   Okay.  Now -- and you returned in
14 July?
15     A.   Uh-huh.  I returned the Monday after
16 the 4th -- after we came back from the
17 holiday.
18     Q.   Now, between the time you came back
19 and the time you retired on September 1st, did
20 you take any documents?
21     A.   No, I did not.
22     Q.   So defendant's exhibit one is the
23 only document you took with you?
24     A.   That's the only document.  And as I
25 stated in my last paragraph, that's the reason

Faye Ward                                    June 14, 2006

Page 18

¹ I told him that if he needed to know anything,

² although I would be hospitalized, he could

³ call me.

⁴     Q.   Did you feel that you were

⁵ authorized to share outside of AUM a document

⁶ you prepared for AUM's lawyer at his request

⁷ that you prepared in your capacity as the

⁸ director of human resources?

⁹     A.   I was no longer employed here and I

¹⁰ certainly didn't see where that was any

¹¹ problem.  I gave my affidavit in September.

¹²     Q.   Have you worked since you retired

¹³ from AUM?

¹⁴     A.   I did.  I did that past year.  I

¹⁵ worked for the Alabama State Legislature part

¹⁶ time.

¹⁷     Q.   You told me that.

¹⁸     A.   From January until April.

¹⁹     Q.   Is that their legislative session?

²⁰     A.   Yes, sir.  Uh-huh.

²¹     Q.   Have you had any other employment?

²²     A.   No.

²³     MR. DODD:  Mark this one, please,

²⁴ Bonnie.

²⁵     (Defendant's Exhibit-2 was marked

Faye Ward                                    June 14, 2006

1           for identification.)

2           Q.    (By Mr. Dodd) Ms. Ward, here's

3    defendant's exhibit two.  See if you can

4    identify that, please.

5           A.    Okay.  I can.

6           Q.    What is it?

7           A.    In item three --

8           Q.    Tell me what it is first.  Let's get

9    it identified first.

10          A.    Oh.  Okay.  Sure.  I do.

11          Q.    Tell us what it is.

12          A.    I do.  It's an affidavit that's

13   signed by me, Faye E. Ward.  I signed it on

14   September 20th, 2005.

15          Q.    Okay.  Now, this is the affidavit

16   you referred to earlier?

17          A.    Yes, sir.

18          Q.    I want to ask you a few questions

19   about it.

20          A.    Sure.

21          Q.    At the time you gave this affidavit,

22   did you know that Cynthia Ellison had filed an

23   EEOC charge against AUM?

24          A.    Yes, I did.

25          Q.    What was the source of that

Faye Ward                                          June 14, 2006

Page 20

1    knowledge?

2         A.    Well, I just knew she had filed one.

3         Q.    How did you know that?

4         A.    Because I worked in the office of

5    human resources.  Debra Foster had told me she

6    had filed one.

7         Q.    Do you know if at that time she had

8    filed a complaint in Federal Court?

9         A.    No, I did not.

10        Q.    Do you know if she or her lawyers

11   had threatened to file a complaint in Federal

12   Court?

13        A.    No, I did not.

14        Q.    Did you know that --

15        A.    In fact --

16        Q.    I'm sorry?

17        A.    That's okay.

18        Q.    Did you give your affidavit in order

19   to assist Cynthia Ellison and her claims

20   against AUM?

21        A.    I did.  Because I felt that she had

22   been discriminated against.

23        Q.    Is the affidavit complete with

24   respect to your knowledge of Cynthia Ellison's

25   difficulties at AUM?

Faye Ward                                    June 14, 2006

1      A.   Well, I'm certain there was some
2 other factors involved, but I gave it in as
3 narrative of a form that I could in order to
4 make sure that the points were brought out.  I
5 don't know if that's what you mean.
6      Q.   Well, you mentioned all the major
7 points that you considered important --
8      A.   Yes, sir.  Uh-huh.
9      Q.   -- with respect to Cynthia Ellison's
10 difficulties at AUM, did you not?
11      A.   Right.  I did.
12      Q.   And if you felt that anything else
13 was equally as important, you would have
14 included this in your affidavit, would you
15 not?
16      A.   Possibly.
17      Q.   I'm sorry?
18      A.   Yes.
19      Q.   Okay.  Let's go through it.
20 Paragraph two, you say you were the assistant
21 director of human resources?
22      A.   Slash employment manager.  Because
23 before I left, titles changed and, of course,
24 the title that I was assigned then was
25 employment manager, which I think no longer is

Faye Ward                                        June 14, 2006

1    the assistant director of human resource to my

2    knowledge.

3         Q.   You go on to say you were in that

4    role from 1988 to August 31st, 2005.

5         A.   Well, I came to work at AUM in 1988.

6    However, when I came here, I was a secretary.

7    I applied for a secretarial position.  My

8    boss, she promoted me within a year's time.

9    And I was assistant director of human

10   resources.

11        Q.   After a year as a secretary?

12        A.   Uh-huh.

13        Q.   Okay.  You've got to say yes.

14        A.   Yes.

15        Q.   And you were the assistant director

16   of human resources for 17 years.  Is that

17   about right?

18        A.   Right.  That's correct.

19             (Defendant's Exhibit-3 was marked

20        for identification.)

21        Q.   (By Mr. Dodd) Ms. Ward, here's

22   what's been marked as defendant's exhibit

23   number three.  See if you can identify that

24   for me, please.

25        A.   Yes.  It's an application when I

Faye Ward                                          June 14, 2006

1    first came here to apply for a position.

2         Q.   Is that your signature on the third

3    page?

4         A.   Yes, it is.

5         Q.   Now, you said you applied to be a

6    secretary; right?

7         A.   Uh-huh.

8         Q.   You've got to say yes.

9         A.   But that was the position that was

10   available.  Secretary.  Yes.

11        Q.   Was that a posted position?

12        A.   Yes, it was.

13        Q.   Is that how you found out about it?

14        A.   Well, I really was not looking for a

15   position over here.  I was recommended.  And I

16   came over and, of course, I was working when I

17   came here.  So when I saw the position, I

18   applied for it as a secretary.  I felt that I

19   could move on up into an area of expertise

20   where I had worked and had previous

21   experience.  So --

22        Q.   What previous experience qualified

23   you to move up as you say?

24        A.   I worked for the Department of Human

25   Resources in Cincinnati, Ohio, for about 11

Faye Ward                                    June 14, 2006

1    years prior to coming here to Alabama.

2          Q.    Is that the Hamilton County Welfare

3    Department?

4          A.    That's true.

5          Q.    And you call that the human

6    resources department?

7          A.    Well, it was human resources

8    included in that.

9          Q.    Was that your job as a human

10   resource manager?

11         A.    No.  I was a social caseworker

12   there.  But, I mean, we dealt with cases and

13   situations similar.  I mean, it all goes

14   together.  Human resources, working with

15   people, all of that aligns itself together.

16   So I guess the director thought that my

17   experience there would help me to qualify to

18   apply for this job, yes.

19         Q.    Now, which director?

20         A.    The previous director.  The lady

21   that hired me.

22         Q.    You guess that she thought your

23   experience --

24         A.    Well, she did.  I mean, she went

25   through this apparently.

Faye Ward                                           June 14, 2006

1          Q.   Well, that's a guess on your part,
2     is it not?  I mean, that's what you said.
3          A.   Well, it's a fact that she hired me
4     because of my experience.
5          Q.   But you had many other
6     experiences -- employment experiences rather
7     than -- other than with the Hamilton County
8     Welfare Department, did you not?
9          A.   I did.  I did.
10         Q.   Let's go through them.
11         A.   All right.
12              MS. RODGERS:  Question.  The resume
13         that you're -- is this still part of the
14         application for employment packet or is
15         it a different exhibit?
16              MR. DODD:  It's one document.
17              MS. RODGERS:  Okay.
18         Q.   (By Mr. Dodd) Let me ask you a
19     little bit about your schooling first,
20     Ms. Ward.
21         A.   Sure.
22         Q.   And you received your undergraduate
23     degree from Alabama University --
24         A.   I did.
25         Q.   -- in 1967 --

1    A.    I did.

2    Q.    -- with a bachelor of science degree

3 in business administration?

4    A.    In economics.   Exactly.

5    Q.    And a minor in economics; right?

6    A.    Right.

7    Q.    Now at Alabama State, did you take

8 any courses in human resources management?

9    A.    I had some social work classes,

10 sure.

11    Q.    Well, did you take any courses in

12 human resource management?

13    A.    No, I didn't.

14    Q.    By the time you graduated from

15 Alabama State, did you have any experience

16 whatsoever in human resources management?

17    A.    No, I didn't.

18    Q.    Did you have any training in equal

19 employment opportunity?

20    A.    No, I didn't.   That's why I didn't

21 apply for the position when it was posted.

22    Q.    Now, which position are you

23 referring to now?

24    A.    The one that Ms. Foster applied for

25 and received.

Faye Ward                                    June 14, 2006

1      Q.    In 2001?

2      A.    Because I was asked if I wanted to

3   apply for the position.  And I said no.

4      Q.    And you said no because you didn't

5   consider yourself qualified?

6      A.    No.  It wasn't because I wasn't

7   qualified.  When the interim -- I served as

8   interim director when the director left.  It

9   wasn't because I doubted my capabilities of

10   doing the job that I was doing.  Not at all.

11        I just -- I was going to look at

12   retiring in a few years, maybe four or five

13   years up the road.  I thought maybe bringing

14   someone new in that would help to bring better

15   and newer -- well, newer ideas to the table

16   would also help me to work with Ms. Foster in

17   bringing about some changes and doing some

18   things here that I wanted to do.

19        No, I don't think for a minute that

20   I was not unqualified to do the job that I was

21   doing.  No, I do not.

22      Q.    But, nonetheless, you elected not to

23   apply for that job?

24      A.    I didn't.  No, I didn't.

25      Q.    And you said earlier that your lack

Faye Ward                                          June 14, 2006

Page 28

1    of training in equal employment opportunity

2    was one reason you did not apply?

3         A.    The position is a dual position.

4    It's a director of human resources/EEO

5    affirmative action person.  And at that time,

6    the chancellor said that she could not afford

7    to divide the position and that it would have

8    to be -- it would have to go as director and

9    EEO.  I don't have any experience at EEO,

10   affirmative action.  So that was my main

11   reason why I didn't apply for the job, not

12   because I didn't think I was capable to do it.

13   I'd had some very good training since I've

14   been here and think I did a pretty good job.

15        Q.    Okay.  All right.  Let's look at

16   your work history.

17        A.    Sure.

18        Q.    It looks like you worked from 1968

19   to 1977 at the Hamilton County Welfare

20   Department.

21        A.    I did.

22        Q.    Right.

23        A.    In Cincinnati, Ohio.

24        Q.    And what was your primary duty

25   there?

Faye Ward                                    June 14, 2006

Page 29

1      A.    I was a social caseworker.  I went
2  out.  I visited families.  Sometimes I had
3  to -- I worked with ADC mothers.  I had to
4  abide by the laws and the rules and
5  regulations that the state of Ohio had
6  interjected.  I had to go out and make people
7  eligible for food stamps, if they were
8  eligible for that.  I had meetings to go to,
9  sometimes we had to get judgments where we had
10  to go into homes and take people's children.
11  So there were a multitude of things that we
12  did.
13      Q.    Did you have any human resources
14  responsibilities with respect to other
15  employees in the Hamilton County Welfare
16  Department?
17      A.    No, I did not.
18      Q.    All right.  Now, after that job, you
19  worked from 1979 to --
20      A.    I moved to Alabama and I worked for
21  the Montgomery Police Department.
22      Q.    And what was your job there?
23      A.    I was a complaint clerk.  I worked
24  on the desk.
25      Q.    And what were your primary

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                          June 14, 2006

1    responsibilities?

2         A.    If anyone called in with a

3    complaint, I had to code a card, send it to

4    the dispatcher, be very diplomatic about it,

5    be very calm about it.  Because there was

6    oftentimes a robbery or something in process.

7    So that gave me a lot of experience.  In fact,

8    they wanted me to stay there because I was

9    able to deal with the public.

10        Q.    Did you have any human resources

11   responsibilities with respect to employees of

12   the Montgomery Police Department in that job?

13        A.    No, I didn't.

14        Q.    The job after that was with W.J.

15   Rhodes Construction Company?

16        A.    Right.

17        Q.    From April 1980 to February 1981?

18        A.    Yes.  I was an office manager there.

19        Q.    What did you do as an office

20   manager?

21        A.    I maintained the office.  I answered

22   the phone.  I did payroll.  I did -- I went to

23   attend business lettings for him in the

24   office-type manager.  They were held once a

25   month.  People from all over the state, we

Faye Ward                                          June 14, 2006

Page 31

1    met.  And, of course, they talked about the

2    different concerns and opportunities and

3    biddings for his company.

4         Q.   Did you have any human resources

5    responsibilities as the office manager in that

6    job?

7         A.   No, I didn't.

8         Q.   Now, after that, it looks like you

9    worked for the house of representatives --

10        A.   I did.

11        Q.   -- in Montgomery?

12        A.   I did.

13        Q.   Is it fair to say off and on for

14   several sessions?

15        A.   Several.  Yeah, I did.  For about

16   five or six years.

17        Q.   What was your job there?

18        A.   My job was to assist the

19   representatives by pulling bills, going out to

20   the house, making sure that information that

21   was going to be discussed on a calendar for

22   that day was put in place, to help the

23   children that came to work for us as clerks,

24   to go out there and to make sure that they

25   were following the guidelines for what they

Faye Ward                                          June 14, 2006

1    were supposed to do as far as assisting

2    representatives upon their request.

3         Q.    And your resume describes your job

4    title as a clerk/typist receptionist?

5         A.    Right.

6         Q.    Is that accurate?

7         A.    That's accurate.

8         Q.    In your job in the house of

9    representatives, did you have any human

10   resources responsibilities?

11        A.    No, I didn't.

12        Q.    Okay.  Now, your job after that was

13   with --

14        A.    Was Striping Construction.

15        Q.    From 1984 to 1985 with Quality

16   Striping and Construction?

17        A.    Uh-huh.  It was still

18   construction-type office manager there.

19        Q.    Your job title and your resume shows

20   secretary/office manager?

21        A.    That's right.

22        Q.    What did you do in that position?

23        A.    Basically the same thing.  Kept the

24   office, did payroll, answered the phone, took

25   messages, went to meetings in the absence of

Faye Ward                                           June 14, 2006

Page 33

1    the manager.

2         Q.    Did you have any human resources

3    responsibilities?

4         A.    No, I didn't.

5         Q.    And after that job, you worked for

6    about a year at --

7         A.    Alabama State.

8         Q.    -- Alabama State as a secretary?

9         A.    I did.  To the dean in the College

10   of Education.

11        Q.    And then after that, you worked for

12   the Montgomery --

13        A.    Montgomery County Commission.  Then

14   I came here.

15        Q.    Now, what was your job --

16        A.    Probate -- I was a clerk there.  I

17   worked there in the probate office.

18        Q.    Did you have any human resources

19   responsibilities there?

20        A.    I didn't.

21        Q.    Now, attached to your application

22   for employment in defendant's exhibit three is

23   what appears to be your resume.  Is that

24   accurate?

25        A.    At that time, yes.  It's changed

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

Page 34

1    since then, but this is it.
2         Q.   All right.  The resume you submitted
3    to AUM in 1987?
4         A.   Right.
5         Q.   And everything on that resume is
6    correct, is it not?
7         A.   It is.  What's the big difference in
8    human resources experience and the experience
9    that I've had here?  Human resources is
10   knowing how to deal with people.  You read
11   guidelines and you try to abide by them.
12   What's the difference?
13        Q.   Is there anything else -- is there
14   anything else involved in human resources
15   other than reaching out to people?
16        A.   Sure, it is.  It's to make sure that
17   things are properly -- situations are properly
18   handled and carried out.
19        Q.   Is there anything else involved?
20        A.   There's a lot more involved.
21   Ms. Foster can tell you that.
22        Q.   Let's talk about the job duties that
23   are identified in your affidavit.
24        A.   Okay.
25        Q.   You got five subparts in paragraph

Faye Ward                                    June 14, 2006

1    two that talk about your job duties; right?

2         A.    Right.

3         Q.    Are those your main -- the main

4    duties you had in your job as assistant

5    director?

6         A.    They were.

7         Q.    And was that as of --

8         A.    The time I left.

9         Q.    All right.  In your affidavit, have

10   you left out any significant job duties for

11   which you had responsibility?

12        A.    Well, no, I think this just about

13   covers everything that I did.    `

14        Q.    The reason I ask that is because in

15   paragraph two you say part of my job duties

16   included, but is not limited to, the

17   following.  And I'm concerned -- or, I'm

18   interested in what job duties you may not have

19   included there.

20        A.    Well, you can strike the part of.

21   Those were my job duties.

22        Q.    Okay.

23        A.    And others as assigned.  But, of

24   course, mine was just basically what I've got

25   listed here is what I did.

Faye Ward                                    June 14, 2006

Page 36

1      Q.   What you've got listed in paragraph
2  two is an accurate and complete category of --
3  categorization of your job duties?
4      A.   Of what I did, yes.
5      Q.   All right.  Let's look at
6  subparagraph A.  You say your job duties
7  included to manage the recruitment and
8  employment process for AUM.  All right.  What
9  does that mean?
10     A.   That means that I was in charge of
11 interviewing applicants for positions after
12 there were postings for a job.  We had to post
13 the position when it became available.  My
14 clerk would post it.  It would be open for a
15 number of days.  After that, we referred
16 applicants to the respective department.
17          And, of course, I had an applicant
18 flow tracking which gave a breakdown and that
19 was basically done for the EEO officer.  I had
20 to send a breakdown of the people that applied
21 for a position by sex and race.  And that
22 was -- that was part of that process.
23          And after the position was filled,
24 after we made the referrals, then I met with
25 the person or individual that was hired and I

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                              June 14, 2006

1    did a benefit interview with them.

2         Q.    Okay.  We're down in subparagraph B

3    now, aren't we?

4         A.    Yeah.  Uh-huh.  Uh-huh.

5         Q.    Okay.  So subparagraph A talks about

6    the --

7         A.    The screening.

8         Q.    -- filling of positions at AUM?

9         A.    And interviewing if there was an

10   applicant that came in.  Most of the time I

11   tried to always talk to applicants who were

12   applying.  But, of course, there was just so

13   many sometimes because of the vast number of

14   applicants who applied, I just did not have

15   the time to go into that.  But I tried to do

16   that as often as I could.  And then we would

17   refer them to the respective department that

18   was hiring.

19        Q.    It sounds to me like you're talking

20   about there are certain procedures in place

21   here that you have to follow in terms of

22   posting positions, bringing people in, filling

23   positions, getting them interviewed and that

24   sort of thing.

25        A.    There was always a process that we

Faye Ward                                        June 14, 2006

Page 38

1    used, sir.

2          Q.    Okay.

3          A.    It was hard not to.

4          Q.    And you tried to follow that process

5    as best you can; right?

6          A.    I do.  I did.

7          Q.    All right.  Let's look at B.

8          A.    Okay.

9          Q.    Subparagraph B.

10         A.    Okay.

11         Q.    Met individually with all new hires

12   for explanation of payroll and benefit

13   information.

14         A.    Okay.

15         Q.    Tell me what that means.

16         A.    Okay.  When anyone was hired, they

17   had to come to my office and I would do a

18   process of benefits.  I made a packet of

19   information for them.  I explained the

20   benefits to them.  They signed up for those

21   they wished to have, those that they didn't

22   want to, like the health insurance, the dental

23   insurance.  We all had to participate in

24   teachers' retirement.  There was no option to

25   that.  We had to do that.  And they would take

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

Page 39

1   out five percent, of course, of our gross
2   income that went into the retirement system of
3   Alabama.  We had other -- like a voluntary
4   retirement that they could join which was
5   optional.  The mandatory retirement was not.
6   So that took every bit of 30 to 45 minutes for
7   me to complete an interview with the
8   individuals.
9        Q.   For each person?
10       A.   For each person, yes.  And I also
11  did for faculty and staff.
12       Q.   I imagine you had to explain a lot
13  of that to them, did you not?
14       A.   I did.  I did.  Absolutely.  I could
15  not afford to push a packet in front of them
16  and tell them to go for it.  I had to sit
17  there and go through it with them because that
18  helped me to get them on.  Because it gave
19  them a better understanding.
20       Q.   Now, is this the opportunity where
21  they had to make their income tax withholding
22  elections and that sort of thing as well?
23       A.   They did.  They did.  They did that.
24  That was handled before it got to me.  They
25  did the I-9 and the taxes and that was -- then

Faye Ward                                    June 14, 2006

Page 40

1    the clerk would bring that in to me for me to
2    actually have my interview with the person.
3         Q.   Okay.  Now, did you have primary
4    responsibility for meeting with the new
5    employees and going over this with them?
6         A.   I did.  I did.  That was almost
7    always my job since I was in that position.
8         Q.   And you had the primary
9    responsibility for managing the recruitment
10   employment process, too, as well?
11        A.   Well, yes, because every time we
12   posted a job, we had to get it out to the
13   proper places.  We had to list it with the
14   State employment service.  We put it on the
15   job line.  And it was my responsibility, but,
16   of course, I could delegate that to my clerk
17   to make sure that she did that and it was done
18   in a timely manner.
19        Q.   Look at subparagraph three.
20        A.   Okay.
21        Q.   It looks like this talks about
22   explaining the various policies that AUM had
23   in place for its employees beyond payroll and
24   benefits; right?
25        A.   Uh-huh.

Faye Ward                                          June 14, 2006

Page 41

1       Q.   You've got to say yes.

2       A.   Yes.  Yes.  Yes.

3       Q.   Okay.  Would you have -- how would

4    you fulfill that obligation?  You say you

5    provided information and assistance.  Did you

6    give them a packet of information?

7       A.   Okay.  On-the-job injuries, we

8    had -- we had -- we had a program.  And, of

9    course, if people called and they wanted

10   information, we just gave them the forms.

11          And, of course, before I left, they

12   started a new procedure that -- there was a

13   procedure for like on-the-job injuries.  They

14   would call.  We now give them a number to call

15   and they talk to the person there to report an

16   on-the-job injury.

17      Q.   Okay.  What I'm trying to find out,

18   though, is this something that you did at the

19   beginning of somebody's employment?

20      A.   No, no.

21      Q.   Or was this your responsibility

22   throughout their employment whenever they had

23   a question?

24      A.   No.  If someone -- I mean, we told

25   them about it.  If you have, you know, an

Faye Ward                                    June 14, 2006

Page 42

1    on-the-job injury, you need to let HR know
2    about that.
3         Q.    Right.
4         A.    That was discussed in the initial
5    interview --
6         Q.    Did you --
7         A.    -- where we signed them up for
8    benefits.
9         Q.    Okay.  But throughout an employee's
10   term of employment at AUM, were you primarily
11   responsible for answering questions they might
12   have about FMLA, sick leave, vacation, that
13   sort of thing?
14        A.    Yeah.  Debra Foster, as the
15   director, could or I could.  She had a list of
16   guidelines that we -- of names that -- we had
17   different jobs to do, so that was one of my
18   duties to do.
19        Q.    Okay.  Were you -- would you say you
20   were primarily responsible for that -- for
21   that obligation?
22        A.    Well -- well, I guess I could have
23   been.  But primarily -- I would say yes, along
24   with Debra.
25        Q.    Okay.  Look at subparagraph D,

Faye Ward                                    June 14, 2006

Page 43

1    planned and conducted/coordinated various

2    employee programs ranging from --

3         A.    New employee orientation.

4         Q.    -- to driver education training.

5    Tell me a little bit about what that means.

6         A.    Okay.  The driver education means

7    that everyone that drove a State vehicle had

8    to go through a driver education program.

9    Which I would get in touch with the public

10   safety department.  They would send out a

11   representative from that office, basically

12   someone in education that would teach.  I

13   would send out an e-mail campus-wide and

14   employees who had any need to drive the State

15   vehicles would have to go through that

16   training.  I maintained a log of that and I

17   had to send it over to risk management at

18   Auburn University once it went through

19   Ms. Wanda Blake's office.  She was the one

20   that looked at it.  So we kind of coordinated

21   that together.

22        Q.    And you also mentioned the annual

23   retirees' reunion.

24        A.    Right.

25        Q.    What is that?

Faye Ward                                           June 14, 2006

                                                    Page 44

1        A.    Okay.  The retirees' reunion, that
2   was a service that I provided to employees in
3   talking to Mr. Don Yancey from the State
4   retirement system to come out and talk with
5   employees, not those who were about to retire,
6   but anyone who wanted to know about retirement
7   and how it worked.  So I had those -- I tried
8   to have those about twice a year.
9        Q.    Okay.
10       A.    So I coordinated that.
11       Q.    Now, look at subparagraph E.
12       A.    Uh-huh.
13       Q.    Let me back up.  You were primarily
14  responsible for the various employee programs?
15       A.    I was.
16       Q.    You put them together?
17       A.    I put them together.
18       Q.    And coordinated them?
19       A.    Coordinated them.  I did.
20       Q.    Look at subparagraph E were you say
21  you assisted and handled employee relations
22  situations.  What does that mean?
23       A.    Okay.  If an employee would call, a
24  disgruntled employee or someone who had a
25  problem, then I would either talk to that

Faye Ward                                    June 14, 2006

Page 45

1    person or send them to Debra Foster.  It all
2    depended on the magnitude of it.
3         Q.   When you say it all depended on the
4    magnitude --
5         A.   Well, if it was something that was a
6    discrimination case or hostile environment or
7    whatever that was.  That was an EEO situation.
8         Q.   And what was --
9         A.   Some supervisors would call me and
10   ask me, well, I need to discipline this
11   employee.  Then there was a process for that
12   that they had to follow and they could do a
13   first or second or third warning.
14        Q.   Are you saying that if the problem
15   that somebody called you about sounded more
16   like an EEO-type problem, you would send it to
17   Debra Foster?
18        A.   In fact, most of them I informed her
19   about them or referred her -- referred them to
20   her.  I'm not an EEO officer.
21        Q.   Okay.  You don't have any EEO
22   training; right?
23        A.   No, I don't.
24        Q.   Okay.  So you would normally refer
25   those type of issues to Debra Foster?

Faye Ward                                                    June 14, 2006

                                                                Page 46

1          A.    Absolutely.   Absolutely.

2          Q.    But you knew enough about the

3     disciplinary --

4          A.    Process.

5          Q.    -- process that you could handle

6     those type of --

7          A.    Right.   I could tell them what they

8     needed to do.

9          Q.    Okay.   And would that include what

10    process they needed to follow if they had a

11    complaint of discrimination?

12         A.    Yes.

13         Q.    Okay.   Or what they needed to do

14    under the disciplinary policy?

15         A.    Right.

16         Q.    But you weren't primarily

17    responsible for those activities, were you?

18         A.    No, I wasn't.

19         Q.    You were an assistant in that role,

20    were you not?

21         A.    Right.   Right.

22         Q.    An assistant to Debra Foster?

23         A.    Right.

24         Q.    Let's look at paragraph three.

25         A.    Okay.   And before we go further in

Faye Ward                                    June 14, 2006

Page 47

1    that paragraph three, that January 2005 should

2    have been 2004.

3         Q.   Well, is it 2005 or 2004?

4         A.   I just said it should have been

5    2004.

6         Q.   Oh, it should have been?

7         A.   Yes.

8         Q.   I thought you said it could have

9    been.

10        A.   No.

11        Q.   So that's probably a typist error?

12        A.   Yes, sir.

13        Q.   Okay.

14        A.   That was really when we met with

15   Mr. --

16        Q.   Do you want to make any other

17   corrections to your affidavit?

18        A.   No, sir.  That's the only one.

19        Q.   Okay.  So in January 2004, Cynthia

20   Ellison came to the human resources office to

21   report concerns she had with Chris Mahaffy?

22        A.   Yes, sir.

23        Q.   Did Cynthia Ellison come to your

24   office?

25        A.   She did.  In fact, she had called me

Faye Ward                                    June 14, 2006

Page 48

1    because she was very upset.  And this started

2    around 2003, 2004.  Because she thought that

3    she was put in a hostile environment because

4    of the way Chris Mahaffy was acting toward

5    her.

6         Q.   All right.  What -- she called you

7    and then you met with her; right?

8         A.   Yes.  Yes, sir.

9         Q.   What detail did she give you when

10   she called you?

11        A.   She just said I am just so nervous.

12   Chris is frightening me with his behavior.

13   And I asked her then -- I said have you spoken

14   with your superior.  My recommendation always

15   when anyone came, not only Cynthia, but if

16   anyone would come, I would send them back to

17   their supervisor to talk with their supervisor

18   before --

19        Q.   That's what the policy says, isn't

20   it?

21        A.   Uh-huh.  And, you know, then she

22   came over and she talked with me.  And, you

23   know, I said, well, go back and talk with

24   them.  She went back and talked with them as

25   far as I know.

Faye Ward                                    June 14, 2006

Page 49

1      Q.   With who?

2      A.   With at that time Dr. Bob Elliott.

3      Q.   Okay.  Let's back up.  When you

4  talked to her on the telephone, you told her

5  to go talk to her supervisor because that's

6  what the policy requires; right?

7      A.   Uh-huh.  Right.

8      Q.   Do you know if she did that after

9  you and she talked on the telephone?

10     A.   She did.  She did.  Because she said

11 to no avail.

12     Q.   She talked to Bob Elliott?

13     A.   At that time.  At that time it was

14 to no avail.  And she came over later maybe in

15 about another week or so and we talked about

16 it.

17     Q.   Now, if an employee such as Cynthia

18 Ellison does not get any satisfaction in

19 complaining to her immediate supervisor, at

20 that point she's free to come to HR and

21 complain?

22     A.   Yes, sir.

23     Q.   Is that how you interpreted her

24 conduct at that point?

25     A.   I would.  And I would have referred

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                          June 14, 2006

Page 50

1   her to the director of human resources --

2        Q.   And did you do that?

3        A.   -- since she's the EEO officer.

4        Q.   You referred her to Debra Foster?

5        A.   I told her she was going to need to

6   talk to Debra Foster.

7        Q.   Okay.  Was that the end of your

8   involvement in that reporting of her

9   behaviors?

10       A.   Well, no.  Because nothing had

11  happened.  So she came back to me again and

12  she called me.  And she came back to me

13  several times.

14       Q.   Several times?

15       A.   Uh-huh.

16       Q.   Did you keep a record of these

17  visits?

18       A.   Not necessarily.  I didn't.  Huh-uh.

19  I just know that she was upset.  She was a

20  nervous wreck.  She appeared to be.  I said,

21  well, you're going to have to do something.

22  At that time, I think, in a conversation later

23  with Dr. Glen Ray who they were also -- this

24  was during a search for the dean's position.

25  We had a search for the Dean in 2003, 2004,

Faye Ward                                              June 14, 2006

Page 51

1    dean of sciences.  At that time, I think

2    Dr. Mahaffy was apparently exhibiting these

3    attitudes toward Ms. Ellison because she was

4    on the search committee.

5             I also during a meeting that

6    Mrs. Foster and I later had with Dr. Glen Ray,

7    Dr. Moody -- and, of course, there were some

8    other people in the department she talked to,

9    but I was not involved in that -- they said --

10   they noticed his behavior was of such a

11   magnitude that they referred him to a

12   psychologist -- psychiatrist.

13            So, you know, she was back and forth

14   and feeling she was in a hostile environment

15   because nobody was doing anything.  Then later

16   in around November/December 2004, she came

17   back to our office and that's -- I said you've

18   got to talk to Debra.

19        Q.   Let's stay in January 2004 for right

20   now.

21        A.   Okay.  Okay.  All right.  That's

22   fine.

23        Q.   We'll get to that.  Don't worry

24   about it.

25        A.   Okay.  Okay.

Page 52

1    Q.   She said she called you.  Do you
2  remember what date she called you the first
3  time?
4    A.   Well, it was probably -- it was in
5  January.  Sometime in January.  I don't know.
6  Early January, December/January.
7    Q.   Okay.
8    A.   I don't remember exactly to be
9  honest.
10   Q.   Well -- so when you say January 2004
11 in your affidavit, it could very well be
12 December 2003?
13   A.   No, it could have been -- it was
14 January 2004.
15   Q.   Now, she called you in January?
16   A.   But, now, she had complaints about
17 this from 2003.
18   Q.   That she mentioned to you when she
19 called you?
20   A.   Uh-huh.
21   Q.   Okay.  We are going to get to that.
22   A.   She said this has been going on for
23 a long time.
24   Q.   When she called you in
25 January 2004 --

Faye Ward                                June 14, 2006

Page 53

1          A.    Uh-huh.  Yes.

2          Q.    -- now, this is the first complaint

3     she made to you -- Cynthia Ellison has made to

4     you about Chris Mahaffy?

5          A.    Right.

6          Q.    Okay.  List for me the things that

7     she complained about.

8          A.    She said that he would come and

9     stare in her office.  He would stare at her.

10    He wouldn't say anything to her.  He would

11    stand in her doorway and stare at her.  She

12    went to work one morning.  I guess she would

13    go into the office early, maybe seven o'clock,

14    to catch up on some work.  She said he would

15    sit there.  He was sitting there one morning

16    crying --

17         Q.    Okay.

18         A.    -- and dressed in an overcoat, had a

19    backpack that she had no idea what was in it.

20    And those are some of the things I remember

21    she mentioned to me.

22         Q.    Do you recall any other events or

23    behaviors that Cynthia Ellison mentioned to

24    you in January 2004 about Chris Mahaffy's

25    behavior that she found offensive?

Faye Ward                                          June 14, 2006

Page 54

1      A.   No.

2      Q.   When she mentioned these behaviors

3  to you, did she tell you when each of the --

4  each of them occurred?

5      A.   No.  We didn't go into that.

6      Q.   Did you ask her?

7      A.   I didn't.

8      Q.   Okay.  And these are the events that

9  you say made her nervous and were frightening

10 her?

11     A.   Right.  Because he would just stare

12 at her.  She said he would just sit there,

13 stand up and just stare at her. `And, I mean,

14 it would make me uncomfortable.

15     Q.   Did Cynthia Ellison ever tell you

16 that Mahaffy touched her?

17     A.   No.

18     Q.   Did Cynthia Ellison ever tell you

19 that Mahaffy said anything threatening or

20 intimidating to her?

21     A.   He said that blacks should not be in

22 responsible positions.

23     Q.   Okay.  That's another event.  You

24 didn't mentioned that to me a minute ago.  You

25 just recalled that?

Faye Ward                                      June 14, 2006

1      A.   Well, I recalled it when you put it
2  the way you did.
3      Q.   Okay.  When did that occur?
4      A.   That occurred I believe in 2004.
5  2004, 2005.  I don't know.
6      Q.   Sometime in those two years?
7      A.   I don't remember.  Right.  I
8  don't -- I don't want to get into specific
9  dates with you because I really don't remember
10  them.
11      Q.   Is that something you heard or is
12  that something that Cynthia Ellison told you?
13      A.   Well, that's what I heard from one
14  of the -- the managers in her department say.
15  And Cynthia Ellison told me he said it also.
16  And one of the faculty members said he said
17  that.
18      Q.   All right.  Which manager told you?
19      A.   Dr. -- Dr. Glen Ray in an interview
20  that Ms. Foster and I had with him.
21      Q.   When was that?
22      A.   That was in December 2004.
23      Q.   All right.  And when did -- strike
24  that.  Who else told you that Mahaffy made
25  that remark?

Faye Ward                                          June 14, 2006

Page 56

1        A.    Well, Ms. Ellison said that he made
2    that remark to her.  In fact, Debra Foster
3    said that Mahaffy said in a meeting that
4    Ms. Ellison and I had with Ms. Foster, she
5    said that Chris Mahaffy said that blacks
6    should not be in responsible positions.
7    Ms. Ellison said, well, then, Ms. Foster, you
8    should feel offended.  I know I was as an
9    African American.
10       Q.    When did Cynthia Ellison tell you
11   that Mahaffy made the remarks about blacks
12   being in power?
13       A.    That was in December. `
14       Q.    Of?
15       A.    '04.
16       Q.    '04.  Okay.  So if you refer back to
17   your affidavit, you're talking about
18   January 2004.  That remark did not come up at
19   that time; right?
20       A.    No, it didn't.
21       Q.    That's what I was trying to get at.
22       A.    Oh.  Okay.  No, it didn't.
23       Q.    I'm just trying to put things in
24   order here.
25       A.    Okay.  That's fine.

Faye Ward                                June 14, 2006

Page 57

1      Q.    Now, when she called you in
2 January 2004, you told her to go talk to her
3 supervisor?
4      A.    I did always.
5      Q.    Which was Dean Bob Elliott?
6      A.    Bob Elliott at the time.  Then after
7 Bob Elliott left -- I don't remember exactly
8 when he retired, but it was shortly thereafter
9 I believe.  And then Brad Moody was the
10 interim dean before Lawal got there.
11      Q.    Now, do you know if Cynthia Ellison
12 went to talk to Bob Elliott about the behavior
13 she complained to you about it?
14      A.    I don't know it, but I firmly
15 believe that she did.
16      Q.    Did she tell you she did?
17      A.    She did.
18      Q.    All right.  And she told you that --
19 I think your words were it was to no avail.
20      A.    Right.
21      Q.    What else did she tell you about her
22 meeting with Bob Elliott?
23      A.    She said nobody was doing anything
24 at that particular time.  But later I found
25 out that Bob -- that he had -- Mahaffy had

Faye Ward                                        June 14, 2006

1    been referred for psychiatric training.

2         Q.    Okay.

3         A.    And I know that he also had -- he

4    had made a statement, I think, saying that a

5    student was too young to be admitted to

6    pharmacy school and that, of course -- we

7    brought some training from one of the local

8    law firms that came out and did some training

9    that was supposed to be a help factor, I

10   guess, with him then.  I don't really know.

11        Q.    Now, when Cynthia Ellison reported

12   to you that her meeting or conversation with

13   Bob Elliott did not produce any results, what

14   was your reaction, your response?

15        A.    Well, my response to her is but

16   surely they're going to help you.

17        Q.    Who is they?

18        A.    The dean.

19        Q.    You're talking about Bob Elliott?

20        A.    Dean Bob Elliott.  Right.  Bob

21   Elliott and Glen Ray who was the associate

22   director I believe.

23        Q.    Wasn't Glen Ray Brad Moody's

24   associate dean?

25        A.    Right.  Right.

Faye Ward                                            June 14, 2006

Page 59

1        Q.    Was he also Bob Elliott's associate

2   dean?

3        A.    I think he was.

4        Q.    Now, did Cynthia Elliott tell you in

5   person or on the telephone that her meeting

6   with Bob Elliott was to no avail?

7        A.    No.  In person.  She came over to

8   the HR office.

9        Q.    Okay.  And then you referred her to

10  Debra Foster; is that correct?

11       A.    And I told her if she did not have

12  any response from her department head, her

13  next step would be to go to Debra Foster, the

14  EEO officer, and lodge a complaint.

15       Q.    And when you say department head,

16  you're referring to Dean Elliott?

17       A.    Right.

18       Q.    And your referral of Cynthia Ellison

19  to Debra Foster was consistent with --

20       A.    The policy and procedure.

21       Q.    -- right -- for reporting this type

22  of --

23       A.    Exactly.  She was reluctant about

24  going to Mrs. Foster and I said why.  And she

25  said because she hasn't done anything for me

Faye Ward                                        June 14, 2006

Page 60

1    in the past.  There was an Allison Stevenson's

2    case when Ms. Stevenson called her a nigger.

3    And, of course, it was -- at that time,

4    Ms. Foster said she didn't have -- she had

5    never had a case like that before.  She wasn't

6    quite sure how she should handle it.  So I

7    think in between that time, that's probably

8    why she was even reluctant about going to

9    Ms. Foster.  But I knew that I was not the EEO

10   officer and I could not handle the situation.

11        Q.   In your affidavit in paragraph

12   three, the events you're referring to there

13   occurred after the Allison Stevenson --

14   Allison Stevens incident; is that right?

15        A.   I don't remember when that Allison

16   Stevenson situation happened.  I know it

17   happened, but as far as the timeframe on it, I

18   would just be remiss from giving you a date

19   that I'm not sure of.

20        Q.   I understand, but what you're

21   talking about in paragraph three is Cynthia

22   Ellison coming to you about Mahaffy's -- about

23   Mahaffy?

24        A.   Yes, sir.

25        Q.   And not about Allison Stevens?

Faye Ward                                    June 14, 2006

                                                    Page 61

1        A.    No.  But I'm just telling you why

2    maybe.  Because I don't think at that

3    particular time she went straight to

4    Ms. Foster about the situation.

5        Q.    You don't think she did?

6        A.    Not at that particular time, no.

7    Because I think she -- her feeling was that

8    she wasn't going to do anything for her any

9    way.

10        Q.    As a result of what happened with

11    Allison Stevens?

12        A.    Yes, sir.  Or whatever had happened.

13    Plus there was another situation that had

14    happened with a student -- an employee in the

15    sciences -- in the sciences department who had

16    applied for a position.  And his name was

17    Jesse Clayton.  And I know that he was -- he

18    came with a complaint to us and he said that

19    Ms. Foster told him go back over there and

20    don't make waves; they weren't going to do

21    anything for him.  So that was a situation

22    that Ms. Ellison was very well aware of.  And

23    I guess because of that, she did not go to

24    Ms. Foster.

25        Q.    If Cynthia Ellison or any employee

Faye Ward                                          June 14, 2006

Page 62

1    refused to go to, you know, the director of

2    human resources, what other recourse do they

3    have under the policies that exist here?

4         A.   Well, they could always go to the

5    chancellor and, you know, I think in one

6    situation she did.  But she eventually went to

7    Ms. Foster.

8         Q.   Okay.

9         A.   She eventually went to her.

10        Q.   Okay.  With reluctance; right?

11        A.   I would say so, because she -- she

12   didn't think she was going to do anything to

13   help her I guess.

14        Q.   And is it your testimony that you

15   didn't take any notes about any of these

16   meetings or conversations with Cynthia

17   Ellison?

18        A.   I didn't with Cynthia.  I did --

19   well, when she met with Debra -- when she met

20   with Debra, we met together.  Because we

21   had -- once the investigation was launched,

22   there were several meetings.

23        Q.   Okay.  Well, I'm not there yet.

24        A.   Okay.

25        Q.   We'll get there.  Would you agree

Faye Ward                                      June 14, 2006

Page 63

1    with me that that was the end of 2004 and

2    beginning of 2005?

3         A.    Uh-huh.   Yes, sir.

4         Q.    Let's stick with 2004 for a few

5    minutes.

6         A.    Okay.

7         Q.    I know you didn't mention in your

8    affidavit, but let's talk about the Allison

9    Stevens event for a moment.

10        A.    Okay.

11        Q.    And, first, tell me what your

12   involvement in that was.

13        A.    I really had little involvement.

14   Debra told me about the situation.   Cynthia

15   told me about it.   She said I've had this

16   confrontation.   I didn't make any notes to

17   this either.   I am a lot of times a sounding

18   board and was for a lot of employees, although

19   I know how important it is to document.

20             But I said what happened.   She said,

21   well, she called me a nigger.   And I said oh,

22   well, that's another thing she needed to do

23   was talk to Debra about that.   You know, that

24   was important enough to bring to the immediate

25   attention of the EEO officer.

Faye Ward                                    June 14, 2006

Page 64

1          So I really don't know.  I remember
2     Debra telling me about it.  She said that
3     Cynthia -- that Allison had called Cynthia, so
4     she heard, a nigger.  But it would probably be
5     a he-said-she-said case.  She had never had a
6     case like that before.  She didn't know how to
7     deal with it.  So that was about the end of my
8     involvement with that.
9          Q.   Okay.  You did sit in on one
10    meeting, though, involving the investigation
11    concerning the Allison Stevens incidents, did
12    you not?
13         A.   I think maybe I did.  I really don't
14    remember.  I really don't remember.
15         Q.   Do you recall --
16         A.   Because Debra and I talked about it.
17    But as far as a formal meeting, I don't
18    remember.  If Allison walked in right now, I
19    don't think I'd recognize her.
20         Q.   Do you recall if you sat in any
21    meeting because Cynthia Ellison wanted a third
22    person?
23         A.   Me to be there, yes.
24         Q.   That's your recollection?
25         A.   Some of her meetings she did.  In

Faye Ward                                          June 14, 2006

1  fact, most of them.

2      Q.   But you don't have any firsthand

3  knowledge about the Allison Stevens incident,

4  do you?

5      A.   No, I don't.  I wasn't there.

6      Q.   Okay.  Now, in paragraph four of

7  your affidavit --

8      A.   Yes, sir.

9      Q.   -- at the bottom, you say that

10 Mahaffy, through his conduct, placed her in a

11 hostile environment.

12     A.   Uh-huh.

13     Q.   Is that -- is that what she reported

14 to you or is that the conclusion you reached

15 based on what she said?

16     A.   Well, that was the conclusion that I

17 reached.

18     Q.   Did she -- did Cynthia Ellison use

19 those words hostile environment?

20     A.   Yes, she did.  She did.

21     Q.   Did she tell you what she meant by

22 that phrase?

23     A.   Well, I knew what it meant.  It

24 meant that she was frightened and that it was

25 an uncomfortable setting for her.

Faye Ward                                    June 14, 2006

Page 66

1      Q.   Does it mean anything else to you?

2      A.   I don't think so.

3      Q.   Okay.  And you go on to say,

4  unfortunately, she was a nervous wreck.

5      A.   She was.  I could just tell it in

6  her voice.  I mean, I've known Cynthia since I

7  came to work at AUM in 1988.  She has had

8  composure.  She has been a professional.  She

9  has done her job.  And she has been very

10 cognizant about her surroundings and things of

11 that nature.  And for her to come to me -- I

12 mean, there are things you know when you know

13 employees and I would -- I'm not perfect, but

14 human resources meant knowing and working with

15 people.  And, of course, the guidelines and

16 the laws, we knew we had to know those too.

17      But I knew when I spoke with her

18 that she was not a person that was not feeling

19 that she was without -- or out of harm's way.

20 I could feel that.  I could certainly feel it

21 and tell it in her voice.

22      When I saw her, she was like this.

23 I said what is wrong with you.  She said I'm

24 about to go out of my mind.  She said he just

25 comes and sits in my office, Faye; somebody

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

1    has got to do something to help me with this

2    person.  I can't do my work.  So, I mean, all

3    I had to go on was her -- what I saw and what

4    I heard.

5        Q.   Okay.  Other than the behaviors you

6    told me about -- and you've got them in

7    paragraph four here, too -- did Cynthia

8    Ellison tell you why she thought Mahaffy was

9    behaving in that fashion?

10       A.   Because she thought he thought she

11   had some pull in the search committee.  She

12   was on the search committee for the dean's

13   position.

14       Q.   Right.

15       A.   He thought that she could pull a

16   string, I guess, to get him into that position

17   or to make it so that he would have been a

18   viable candidate for that position.  And my

19   knowledge and understanding is that he wasn't,

20   was never.  But he held that over her and I

21   think the demeanor -- his entire demeanor

22   towards her changed during that time.

23       Q.   And do you think that he conducted

24   himself the way you describe because he blamed

25   her for not assisting him in the dean search?

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                            June 14, 2006

Page 68

1      A.    Yes, sir.  I absolutely,

2    unequivocally do.

3      Q.    Okay.  Do you know of any other

4    reason why he would have behaved in that

5    fashion?

6      A.    I wouldn't know any other reason.

7      Q.    All right.  Let me ask you a little

8    bit about your working relationship and

9    knowledge of Debra Foster.

10     A.    Okay.  Debra came to work in the HR

11   office in 2000, 2001 I believe --

12     Q.    Okay.

13     A.    -- when she first came to campus.

14   And I wanted to stay on because once she was

15   hired, I really felt we're going to do wonders

16   for this campus.  I wanted to get an employee

17   assistance program going.  She came from a

18   university.  I thought she could bring new

19   knowledge into the area and we could work

20   together.

21         When she came to work with us, I

22   took her to her office and I told her that I

23   would be the best assistant director to her

24   that I could possibly be.  I don't know what

25   happened down the line.  Because, you know,

Faye Ward                                          June 14, 2006

Page 69

1    there were times when I -- you know, when I

2    would have thought she would have come to me

3    to talk to me about some things.  She went to

4    a clerk that I had at that time, which was --

5    subsequently she was fired the day before I

6    came back to work.  But --

7        Q.    What's the clerk's name?

8        A.    Susan McNeal.  She worked and

9    reported to me.  And, of course, you know,

10   there were some good things that Debra has

11   done for the HR office.  But I left the HR

12   office because I could not stand the lack of

13   integrity there nor the nonprofessionalism.

14   That's why I left.

15       Q.    Okay.  Let's talk about --

16       A.    I have nothing personal against

17   Ms. Foster, but I just -- some of the

18   things -- talking about employees.  They're

19   stupid.  Cynthia Ellison would call.  What

20   does she want now; when is she going to

21   retire.  Those were unprofessional -- to me

22   that was very unprofessional behavior.

23       Q.    Can you give me some examples of

24   what you considered to be the lack of

25   integrity in the human resources office?

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

1     A.    Well, when you -- when you're
2  talking loud, if there's a case -- and I
3  remember I worked very closely and wanted to
4  learn the EEO that I was not formerly trained
5  for.  There were times I had to get up and
6  close the office door because Ms. Foster was
7  talking so loud about things I called and
8  thought were personal in nature when an
9  employee would come to complain about
10 something.  That was unprofessional.
11           The integrity, if you go and talk
12 about that to your employees -- there were
13 things that I didn't need to know in that
14 office as assistant director when it came to
15 certain things.  With her being the
16 affirmative action EEO officer, there were
17 things that I didn't need to know.  But, yet,
18 still there were things that were talked about
19 that certainly should not -- they were
20 inappropriate.
21           When I left this campus, sir, I sent
22 out an e-mail telling people that I was
23 retiring.  I've got e-mails that people sent
24 to me saying the lack of integrity.  And it's
25 nothing personal against Ms. Foster.  When she

Faye Ward                                June 14, 2006

Page 71

1    came, I welcomed her.  I told her that I would

2    be the best assistant director to her that I

3    could be.  And I don't know.  And then she

4    said, well, what am I supposed to do.  I said,

5    well, you can start by reading this

6    information that your predecessor left for

7    you.

8              I mean, I'm not perfect, but I

9    believe in professionalism.  And I've tried

10   to -- I love this university and would have

11   been here until I reached full retirement.

12   I'll be 65 years old next year and I could

13   easily have stayed and it hurt me to leave.

14   I'm sorry.  Maybe I got away from you.  What

15   else do you want to know?

16        Q.   Well, I mean, I don't -- are those

17   the reasons you retired?

18        A.   Yes.

19        Q.   Are there any other reasons?

20        A.   No, sir.

21        Q.   And it had mainly to do with the way

22   Debra Foster conducted herself in the office?

23        A.   I could not -- exactly.  A second --

24   my clerk -- which that was okay.  She

25   wasn't -- there were some issues that Debra

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                          June 14, 2006

Page 72

1    had that she really needed to do what she did

2    to a point.  But it's the way we do anything.

3    I was coming back to work that next day.  She

4    could have at least given me the opportunity

5    to come and talk about it.

6            I didn't have anything -- when she

7    said she had terminated her, fine.  You know,

8    you did that.  But why didn't you wait until I

9    got back?  But then I heard that she said I

10   was too protective.  Well, my goodness, if I

11   can't respect and be protective to people who

12   are loyal to me, who can I be?

13       Q.   Well, are you saying Susan McNeal

14   was loyal to you?

15       A.   She was loyal to the whole office,

16   this university.  She was my --

17       Q.   Debra Foster certainly had the

18   authority to discharge her, did she not?

19       A.   Yes, she did.

20       Q.   And your concern is that she did not

21   consult with you prior to doing that?

22       A.   No, she didn't.  She fired her.  She

23   called me at home.  I was still on leave.  She

24   said I had to let Susie go.  I said okay.

25   Couldn't you have waited until I got back;

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                          June 14, 2006

Page 73

1    I'll be back on Tuesday.  And she said no.
2    She was told that she had to do it, so I don't
3    know.
4         Q.   Do you know the details behind all
5    that?
6         A.   Well, Susan was -- Susan had ways
7    where she really didn't show Debra the
8    respect.  And to me, neither one of them did.
9    Because when we would have meetings, I would
10   say, Debra, you've created a monster out here
11   because the secretary -- Debra's secretary and
12   my clerk, they were pitted against each other.
13   Susie didn't like her, but there were things
14   as a manager that we can do.

15            And to me, human resources is more
16   than just doing affirmative action and EEOs.
17   There were things that we could have done to
18   make those employees -- try to help them, not
19   start fires, but put them out.  And that's
20   what I wanted to see happen.

21            But Susie had -- she had a mouth.
22   She would talk.  She would talk back to Debra
23   sometimes.  So I'm not denying that.  She was
24   not perfect.  But she did her job and she and
25   Debra stayed into it all the time about one

Faye Ward                                    June 14, 2006

Page 74

1  thing or the other.

2       Q.   Do you know the reason for her

3  dismissal?

4       A.   Let me see.  They said an employee

5  had called -- an applicant had called about a

6  position.  Susie thinks it was a setup.  This

7  applicant had called about a position.  He

8  said that Susan did not speak to him in a

9  professional manner.  And he went through the

10  chancellor's office and reported, although

11  Dr. Nance wasn't here at the time.  He talked

12  with the secretary down there.  And he called

13  upstairs and talked to Ms. Foster, said that

14  Susie was not professional with him.  She was

15  trying to help him.  Because he said that his

16  application was there on time.  We had

17  deadlines for applicants to apply for

18  positions, sir.  If they didn't make that

19  deadline, so be it.  I did not refer them.  I

20  said we have guidelines and I went by the book

21  as much as I could.

22            And she said that she told him your

23  application isn't here.  He said, yes, it is.

24  But later found out that that application came

25  in after the deadline date.  And he was -- he

Faye Ward                                          June 14, 2006

Page 75

1    was then referred for a position.

2           But, anyway, they had

3    confrontations.  Debra came in, employed

4    Susan.  Susan and Debra had some words and I

5    guess that was -- I don't know.  I wasn't

6    there.  But that's what I'm told.

7           There was an investigation.  There

8    was a grievance filed behind that, though.

9    And the grievance procedure was followed and I

10   think there was -- and I came out for that

11   because I was called in as a witness.  I gave

12   testimony.  I don't know what happened.  I

13   later found out it was tape-recorded, not like

14   she's doing.  But then I heard the tapes came

15   up missing.  So I don't know.

16          But, anyway, you know, she -- she

17   didn't -- she threatened to sue and she did

18   not sue, but she -- and my concern for her,

19   she had worked here in the system for 22 years

20   in the retirement system of Alabama.  So I was

21   helping her to try to find a job so she could

22   stay in the system and not lose her time.  So

23   thank God, she has a job now.  She's working

24   with the DOT.  But that was -- that was just

25   awful.

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                          June 14, 2006

Page 76

1    Q.   But you don't know how her
2  grievance -- the result of her grievance?
3    A.   Well, it went all the way up and
4  they decided that they would not bring her
5  back.  You know, that was concluded.
6  Dr. Nance made that final decision, which it
7  had to go to her.
8    Q.   Ms. Ward, have you ever said any
9  negative things about Debra Foster to Cynthia
10 Ellison?
11   A.   No, I have not.
12   Q.   Have you ever said any negative
13 things about Debra Foster to Ms. Rodgers?
14   A.   No, I haven't.
15   Q.   Have you ever said any negative
16 things about Debra Foster to Courtnei Ellison?
17   A.   No, I have not.
18   Q.   Have you ever said any negative
19 things about Debra Foster to anybody?
20   A.   No, I haven't.
21   Q.   Okay.
22   A.   I mean, most people knew, I think,
23 why I left.  I'm too professional for that and
24 I would hope Ms. Ellison -- Ms. Foster would
25 be also.

Faye Ward                                    June 14, 2006

Page 77

1        Q.    Let's look down -- go back to your
2    affidavit if you would, please.
3        A.    Okay.
4        Q.    And let's look at paragraph number
5    five.
6        A.    Yes, sir.
7        Q.    We're in January 2005 now; right?
8        A.    Uh-huh.   Uh-huh.
9        Q.    It says that Debra Foster scheduled
10   a meeting with Mahaffy.
11       A.    Right.
12       Q.    And you attended that meeting?
13       A.    Yes, sir.
14       Q.    Was it just you, Debra Foster and
15   Mahaffy in that meeting?
16       A.    Yes, sir.
17       Q.    And it was on January 10th; correct?
18       A.    Uh-huh.   Yes.
19       Q.    You say that was after Cynthia
20   Ellison reported the discrimination; right?
21   What are you referring to there?
22       A.    Well, see -- well, see, this was
23   after.  Well, she had reported discrimination
24   back in 2004 as I told you.  All right?  And
25   then later when she came and talked with

Faye Ward                                    June 14, 2006

Page 78

1    Debra -- or, no, Debra got a letter from

2    Dr. Ritvoe, because Cynthia had written a

3    letter.  He told her to put it in writing.

4              She had sent the letter to

5    Dr. Ritvoe and because of the nature of the

6    letter and Debra being the EEO officer, he

7    sent that letter up to HR.  Okay.  At that

8    time, I'm not sure if Cynthia had talked with

9    Debra by then -- if she had spoken with Debra

10   by then, but I know that Debra started the

11   investigation.

12        Q.    Okay.  When did your involvement in

13   that investigation begin?

14        A.    In December.

15        Q.    What did you do?

16        A.    And I don't know why because I kept

17   telling Dr. Ritvoe and those I'm not the EEO

18   officer; why should I have to go to these

19   meetings.  It was never that way in the past.

20   But, anyway, he wanted me to go to the

21   meeting.

22              But, anyway, in December of '04, we

23   talked to Glen Ray, Brad Moody.  And I was

24   asked to sit in on all those meetings and I

25   asked him why.  And he said, well, because we

Faye Ward                                          June 14, 2006

Page 79

1    trust you.  And I looked at him and I said,

2    well, I'm not the EEO officer.  But Dr. Ritvoe

3    and Debra also wanted me to attend those

4    meetings.

5         Q.   Do you feel like Cynthia Ellison

6    followed the correct procedure in reporting

7    the discrimination that you're referring to in

8    paragraph five?

9         A.   I think she did.

10         Q.   It got to HR, didn't it?

11         A.   It did.  It did.

12         Q.   Do you know if she also complained

13    to the dean, who would be her immediate

14    supervisor?

15         A.   You mean the last dean, Dr. Lawal?

16         Q.   Yes.  Dr. Lawal.

17         A.   Yes.  Because he had the same

18    complaint that Mrs. Ellison had.  He thought

19    that Mahaffy was being discriminatory toward

20    him.  In fact, when he came to see Ms. Foster

21    and myself, he said that he wanted his case

22    aligned with Ms. Ellison's case.  And

23    Ms. Foster said, well, you're faculty.  You

24    know, we don't need to do your case.  I'm not

25    doing your case.  And I said, well, after all,

Faye Ward                                    June 14, 2006

Page 80

1    you're the EEO officer for the whole campus,

2    be it the faculty or staff.  So Dr. Lawal

3    knew.  Oh, yeah, he knew Cynthia's complaint.

4        Q.   Okay.  So in terms of getting the

5    complaint to the right people, you feel like

6    the procedures were followed.

7        A.   I do.

8        Q.   Right?

9        A.   I do in the final analysis.

10       Q.   And that was in December 2004.

11       A.   Uh-huh.

12       Q.   Right?

13       A.   That's right.  Because we had our

14   first -- our first interview, I think, was in

15   December with -- because before Chris was

16   called in, there was an interview with Glen

17   Ray -- Dr. Glen Ray, Dr. Brad Moody and

18   Ms. Foster talked by phone to Dr. Elliott.  I

19   was not involved in that one.  And she spoke

20   with Mr. Judd -- Dr. Judd Katz in his office.

21   I was not involved in those.

22       Q.   Okay.  Do you feel like the correct

23   people were interviewed in a part of this --

24   as part of this investigation?

25       A.   Yes, sir.  I do.

Faye Ward                                          June 14, 2006

                                                        Page 81

1        Q.   Do you believe that there was anyone
2    who was not interviewed who should have been
3    interviewed?
4        A.    No.   I think because Dr. Glen Ray --
5    he was in the position where, you know, he
6    worked closely with Dr. Mahaffy.   Of course,
7    Dr. Moody was the interim dean at that time.
8    Dr. Bayo, who came -- Lawal, who came later,
9    he was ultimately the dean of the School of
10   Sciences.   And I don't know.
11       Q.    Okay.   Do you know what Cynthia
12   Ellison's complaints of discrimination were at
13   that time?
14       A.    Well, that she was just being
15   treated differently, maybe because she was
16   African American.   I don't know.   But her real
17   concern was she was being placed in a hostile
18   environment because of Dr. Mahaffy's behavior.
19       Q.    Did you stay involved -- I'm sorry.
20       A.    And that's why I didn't understand
21   about Dr. Lawal.   Because -- well, maybe you
22   haven't gotten to that point yet.   But I'll
23   wait.
24       Q.    Did you stay involved in the
25   investigation that originated with Cynthia

Faye Ward                                          June 14, 2006

Page 82

1    Ellison's complaint to the end?

2         A.   I did.  I did.  As far as to the end

3    of the meetings and until I left, you know.

4    And then up until -- in fact, I came back in

5    July, yes, and then Ms. Ellison left in

6    February.  Uh-huh.

7         Q.   Let's go through the investigation.

8    I think you told me that you had meetings in

9    December --

10        A.   Yes, sir.

11        Q.   -- 2004 and you were in some and not

12   in others.

13        A.   Right.

14        Q.   Right?

15        A.   Yes, sir.

16        Q.   Okay.  Now, you're referring in

17   paragraph five to a meeting on January 10th.

18        A.   January 10th.  Uh-huh.

19        Q.   With --

20        A.   With Mahaffy.

21        Q.   Chris Mahaffy?

22        A.   Yes, sir.

23        Q.   Tell me about that meeting.  Tell me

24   what went on.

25        A.   Okay.  He came to our office and, of

Faye Ward                                        June 14, 2006

Page 83

1    course, as I said, Debra had asked me to sit

2    in and Dr. Ritvoe wanted me to sit in also.

3    So when he came to the office of human

4    resources, we escorted him down the hall to --

5    the special services department have a

6    conference room.  We did not have one in HR.

7            So as we went down, he asked -- he

8    said is this about Allison Stevenson.  And so

9    Debra said no.  And he said, well, I thought

10   that had been over -- taken care of.  So I

11   said, yes, you know, as far as I know, that's

12   been taken care of.

13           So he said what is this about.  So

14   as we entered into the conference room, Debra

15   said to him, well, come on in, Chris; this

16   isn't about anything too much.  Cynthia

17   Ellison just placed -- filed a complaint to

18   Roger Ritvoe and he sent it up to me.  And

19   because of the nature of it, I have to

20   investigate.

21           And Debra started asking him

22   questions about whether or not he, you know,

23   was discriminatory toward Cynthia and he

24   talked about that and, no, he didn't do this,

25   that or the other for whatever she was asking.

Faye Ward                                              June 14, 2006

Page 84

1    I asked him one question.  I said on a scale
2    of one to ten, how do you work with Dr. Lawal
3    and Cynthia.  He said I don't.
4            So -- and he said that he would be
5    taking over and people were not going to -- to
6    follow his direction.  So, you know, Dr. Lawal
7    had the same concern that Ms. Ellison had
8    about him being discriminatory toward him.
9    And he said that blacks -- he said he did not
10   say that blacks are in power.
11       Q.   Did you follow up your question to
12   him about why he didn't work with the dean's
13   office?
14       A.   No, I didn't.  I didn't follow that
15   up because Debra -- at that time, she was
16   interviewing him.  I just wanted to know.
17       Q.   Was it your conclusion that he still
18   felt bitter over the selection process and
19   that's why he didn't react well with that
20   office or react at all with the office?
21       A.   I do.  I do.  In fact, it was
22   later -- and we'll probably get to that -- it
23   was later also discussed in the conversation
24   with Dr. Ray and Dr. Moody that he did show
25   and change his attitude toward Ms. Ellison

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                            June 14, 2006

Page 85

1    during those search committees.  There were

2    two search committees, you know.  There were

3    two searches.

4         Q.   After the meeting with -- strike

5    that, please.  Was it consistent, do you

6    think, with AUM's policies to meet with

7    Mahaffy as a person who was being accused of

8    making these -- having these difficulties?

9         A.   Absolutely, sir.  Anytime an

10   investigation would come about, we would get

11   on an investigation within -- if it's the

12   sexual harassment or if it was something of

13   that -- discriminatory, that would be handled

14   immediately by calling in the person and the

15   person who was being accused of.  That was

16   done immediately.  And then, if not, at least

17   within 24 to 48 hours.  You call in those

18   individuals and you start getting --

19   collecting your information.  And then you

20   move.  It was nothing that ever sat around for

21   any definite period.

22        Q.   Okay.

23        A.   I remember that because, of course,

24   I may not have been that directly involved in

25   those investigations, but if I had

Faye Ward                                    June 14, 2006

Page 86

1    information, I was asked from the director,

2    well, give me what information you have about

3    the situation.  I would present it to her and

4    that was it because, as I said, I'm not an EEO

5    affirmative action officer.

6        Q.    Right.  And, of course, during the

7    time of these meetings regarding Mahaffy, AUM

8    was on holiday break and in between semesters,

9    was it not?

10       A.    Well, no.  What happened was the

11   meetings we had in December were prior to

12   holiday.

13       Q.    Okay.

14       A.    And that was with the ones -- the

15   people that I told you about, Moody and Ray.

16   And we could have called him in probably, but

17   Debra said, well, I'm not going to mess up my

18   holiday.  We'll call him in later.  So that's

19   how he got kicked over into January.

20       Q.    Okay.  What was the time period when

21   the university was -- it was a university

22   holiday for everybody who worked here, for

23   staff as opposed to students?

24       A.    Well, the students always get out a

25   little bit before we get out.  And we got

Faye Ward                                          June 14, 2006

Page 87

1    out -- we normally have a two-week period.  So

2    I guess anywhere from December whatever to

3    after the holiday, after January 1st was our

4    normal holiday.

5         Q.   And in 2005, didn't Ed Richardson

6    also add a couple of days to the break?

7         A.   Yeah.  And that would happen

8    oftentimes.

9         Q.   That's because LSU -- that's because

10   Auburn was in the Sugar Bowl; right?

11        A.   That's right.  Always.  I'm not sure

12   they won that year, but he would generally

13   give us an extra day if they did, whoever

14   was --

15        Q.   They won.

16        A.   -- chancellor.

17        Q.   They won.

18        A.   Okay.  Good.

19        Q.   Okay.  So you had the meeting with

20   Mahaffy on January the 10th?

21        A.   Yes, sir.

22        Q.   And if you refer to paragraph six of

23   your affidavit, you said that you were present

24   at another meeting when Roger Ritvoe was

25   involved?

Faye Ward                                    June 14, 2006

Page 88

1       A.   Right.

2       Q.   Do you remember when that meeting

3  occurred?

4       A.   This meeting was later in January,

5  maybe -- let me see -- the 25th we met with

6  Dr. Nance.  It had to be maybe around the 18th

7  or 19th.  I'm not sure.  Because after that

8  meeting, he wanted Dr. Ritvoe to go in to talk

9  to Dr. Nance and plead his case.

10      Q.   Mahaffy wanted Ritvoe?

11      A.   Yes, sir.  Because he had been

12  stripped of his position.

13      Q.   You say he was stripped of his

14  position.  You mean his -- as a deputy chair?

15      A.   Yes, sir.

16      Q.   And he lost that title?

17      A.   Uh-huh.

18      Q.   You've got to say yes.

19      A.   Oh, I'm sorry.  Yes.

20      Q.   Okay.  What else -- what other

21  punishment did Mahaffy receive?

22      A.   He was supposed to attend some

23  training sessions.  Now, whether or not that

24  ever came to be, I have no idea.

25      Q.   Okay.

Faye Ward                                          June 14, 2006

Page 89

1      A.    Personally I don't think he did.

2      Q.    You were gone by that time on your

3  medical leave, weren't you?

4      A.    I was -- I left shortly after that.

5  But I don't know.  He was supposed to go, but

6  then when I came back, Debra had said to me

7  that he had taken a lot of time off using his

8  sick leave.  And then I know he came and he --

9  ultimately he retired.  I'm not sure.  It had

10  nothing to do with Cynthia Ellison's case,

11  though.

12      Q.    Do you know what else the

13  university -- what other conditions the

14  university imposed on Chris Mahaffy?

15      A.    I think his salary was changed.

16      Q.    Lowered?

17      A.    Uh-huh.  Yes.

18      Q.    Do you know of anything else that

19  the university imposed on him?

20      A.    Not to my knowledge.

21      Q.    Okay.  Now, you mentioned a meeting,

22  I believe, with Guin Nance before the meeting

23  between -- among Ritvoe and yourself and

24  Mahaffy; right?

25      A.    We had a meeting on the -- I think

Faye Ward                                    June 14, 2006

Page 90

1  it was on the 25th.  That was after we met

2  with him.

3      Q.   Okay.  What was the topic of that

4  meeting?

5      A.   Endowment.  That meeting was --

6  Debra Foster was there.  I was there.  Roger

7  was there.  That was sort of to bring

8  Dr. Nance up to what was going on with the

9  case, to apprise her of what was going on.

10     Q.   Wasn't that -- in that meeting

11 wasn't it decided what the university was

12 going to do to Mahaffy as a result of the

13 complaints?

14     A.   No.  That was decided prior to that

15 I believe.

16          And then after we went back to

17 Dr. Nance, at that time she said legal counsel

18 would be brought in at that time.

19          Of course, we had a meeting with

20 Ms. Ellison also and Dr. Lawal.  And he said

21 that -- at that time, of course, we had also

22 met with the staff from physical sciences.

23 Dr. Ritvoe apprised them of what had happened

24 to Dr. Mahaffy.

25          And, of course, we met with

Faye Ward                                          June 14, 2006

Page 91

1    Ms. Ellison and Dr. Lawal who -- he was under

2    the impression, I think, Dr. Ritvoe was going

3    to allow him to speak to the staff to tell

4    them what was going on.  But he said no.  He

5    would be the one to do it.  And he said if

6    they didn't do something, if they continued to

7    do that, that he was going to file civil

8    litigation.

9         Q.   Is that what he told you?

10        A.   That's what he told us in that

11   meeting.  Dr. Ritvoe was there and I was there

12   also.  And after that, we went back to see

13   Dr. Nance and we discussed with her some of

14   the findings and some of the things that had

15   happened.  That's my memory of it now.

16        Q.   Okay.  And Dr. Nance is Guin Nance,

17   the chancellor of AUM?

18        A.   Right.  Right.

19        Q.   So these complaints rose to the

20   highest level at -- highest administrative

21   level at AUM; right?

22        A.   Yeah.  Well, we had to keep her

23   apprised of what was going on.  It was only

24   the right thing to do.

25        Q.   Do you feel that AUM followed the

Faye Ward                                          June 14, 2006

Page 92

1    correct procedure with Mahaffy and the

2    complaints that Cynthia Ellison raised?

3         A.   I feel that they did as far as

4    disciplining him.  I don't think that they did

5    enough to take Ms. Ellison out of her

6    environment she was in.  They didn't give her

7    security.

8              I asked in a meeting -- I asked -- I

9    said what happens if he retaliates.  Because

10   he knew that she was the person that had

11   lodged the complaint.

12             So my thing is -- which oftentimes

13   since I've been at this university, if there

14   is a -- if there's a belief that a person may

15   be in jeopardy of being, you know, jumped on,

16   bothered with in going to a car, we would call

17   security.  We would either go out as a group.

18   They didn't even provide security for her.

19   And I asked why don't -- why don't y'all

20   provide some security for Dr. Lawal and for

21   her at the time.

22        Q.   Let's talk about that.  What do you

23   mean by provide security?

24        A.   Call campus police and have someone

25   escort them to the car.

Faye Ward                                    June 14, 2006

Page 93

1    Q.   Did anyone do that?

2    A.   No.

3    Q.   Did Cynthia Ellison call the campus

4  police?

5    A.   Cynthia Ellison told her boss.  Most

6  times it went through your supervisor.

7    Q.   No, no.  Did Cynthia Ellison call

8  the campus police?

9    A.   I don't know.  I believe she did.

10    Q.   Do you know if the campus police

11  ever said to Cynthia Ellison, no, we are not

12  going to escort you to your car?

13    A.   I don't know.  You'd have to ask

14  Ms. Ellison that.

15    Q.   Okay.

16    A.   I know that I --

17    Q.   Do you know -- I'm sorry?

18    A.   I know that I requested it.  And I

19  said suppose Mahaffy retaliates against

20  Dr. Lawal and Cynthia.  We'll get security.

21  And I told that to Dr. Ritvoe.

22         The only time that I'm aware that

23  they provided some security for her was later

24  in February when they thought she was messing

25  with university documents.

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

Page 94

1      Q.    Did -- are you saying, Ms. Ward,

2   that you called campus security -- the campus

3   police in order to get security for Cynthia

4   Ellison and they refused?

5      A.    I talked to -- I talked to Chief

6   Robinson.  I said, you know, Ms. Ellison and

7   Dr. Lawal need some security over there.  She

8   said I'll have to call Dr. Ritvoe.  I said

9   call Dr. Ritvoe and ask him if that's what you

10  have to do.

11           Because Debra called and got

12  security.  They had security in the hallway

13  when we were down there with Chris

14  interviewing him.  So why couldn't they,

15  especially when they knew that she was the

16  complainant?

17     Q.    Do you know if AUM has ever had

18  security present during a disciplinary

19  session?

20     A.    I certainly do.  Absolutely.  They

21  have.

22     Q.    Now, what kind of security did you

23  have in mind for Dean Lawal and Cynthia

24  Ellison?

25     A.    Sir, the only security that any of

Faye Ward                                          June 14, 2006

1    us could get is a police escort to escort us

2    to our car.

3         Q.   And I believe you told me that you

4    don't know if Cynthia Ellison ever requested

5    that.

6         A.   I don't know.

7         Q.   And you also don't know whether

8    campus police ever declined to escort her to

9    her car; right?

10        A.   I don't know if they did or not.

11   But I believe that she asked them.  I asked.

12   So certainly she should have asked for

13   herself.

14        Q.   Ms. Ward, did you ever ask for

15   security going to your car?

16        A.   No, I didn't.

17        Q.   In your 18 years here, you never

18   asked for that?

19        A.   We have.  The director and I have.

20   There was a case where we needed security

21   because this lady was going all over campus,

22   even to the post office, putting up

23   distasteful things about the human resources

24   office.  So, in fact, she thought that we all

25   should have had it.  It was basically against

Faye Ward                                          June 14, 2006

Page 96

1    her, but we all went out together as a group.

2         Q.   Did you have security escort you?

3         A.   Uh-huh.  We did.  We did.

4         Q.   On that occasion, when you asked for

5    it, you received it?

6         A.   Well, she asked for it, the

7    director.

8         Q.   Okay.

9         A.   She asked for it.  Even when I was

10   out and needed to come back and needed a

11   handicapped sticker in my car because I

12   couldn't walk, she would call campus police

13   and get that for me.

14        Q.   Who is she?

15        A.   Rose Shook, my previous director.

16        Q.   Okay.

17        A.   So it wasn't uncustomary that the

18   supervisor -- and I know she told her

19   supervisor she needed it.  She told me that.

20        Q.   There's nothing that prevented

21   Cynthia Ellison from calling Chief Robinson

22   either, is there?

23        A.   Maybe she did.  I don't know.

24        Q.   Do you know of any policy that makes

25   it a requirement that a supervisor call --

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                          June 14, 2006

Page 97

1        A.    No.

2        Q.    -- campus police?

3        A.    There's not a policy.  But there's

4    procedure.

5        Q.    There's procedure for that?

6        A.    As far as I know out of human

7    resources.

8        Q.    Is it in writing?

9        A.    No, it's not, not to my knowledge.

10       Q.    And at least the procedure in human

11   resources is that the supervisor calls campus

12   security for escorts; right?

13       A.    Well, I don't know.  Debra called.

14   I've never called for security to my car.

15   I've called them to help me with other things.

16       Q.    When did Debra Foster call for an

17   escort to her car?

18       A.    I believe that was during the same

19   time we had -- Chris was stripped.

20       Q.    You mean of his title?

21       A.    Yes.

22       Q.    Now, did you hear Debra Foster call

23   over there?

24       A.    Debra said she was going to call,

25   yes.

Faye Ward                                    June 14, 2006

Page 98

1     Q.    So you heard her make the call --
2     A.    Yeah.
3     Q.    -- to the police?
4     A.    I heard she was going to call over
5  there.
6     Q.    Which officer did she talk to over
7  there?
8     A.    I don't know who she talked to.  But
9  Nellie Robinson -- she could have picked up
10 the phone and talked to anyone and they
11 probably said let me talk to the chief.
12    Q.    I just want to make sure you
13 listened to the telephone call she made to
14 campus police.
15    A.    She told me she was going to call.
16    Q.    So you don't know if she did or not?
17    A.    No, I don't.  But I assume she did.
18 She got it.
19    Q.    Did you see the campus police escort
20 Debra Foster to her car?
21    A.    Yes, yes, yes.
22    Q.    And where did they pick her up?
23    A.    She walked downstairs out of the
24 library tower and most of the time they would
25 meet her down there.

Faye Ward                                    June 14, 2006

1      Q.    Is that where they met her on this
2   occasion?
3      A.    I don't know if they came up to the
4   office or if they met her downstairs.
5      Q.    Okay.  Where did you first see them
6   escorting her?
7      A.    Going across the campus down the --
8   down the sidewalk.
9      Q.    And where were you?
10      A.    I was upstairs in the office.
11      Q.    Were you looking out the window at
12   her to see if she was getting escorted?
13      A.    I was looking out the window.
14      Q.    And did you follow them all the way
15   to her car?
16      A.    No, I did not.
17      Q.    How far did you follow them?
18      A.    I just looked halfway down.  I
19   didn't have time to stand up and watch her
20   being escorted or anybody else being escorted
21   to their car.
22      Q.    How long do you think you watched?
23      A.    Maybe about two or three seconds.
24      Q.    Okay.  Did you recognize the officer
25   who was with Debra Foster?

Faye Ward                                    June 14, 2006

Page 100

1      A.   No, I didn't.

2      Q.   Did you recognize whether the

3  officer was male or female?

4      A.   I think it was a male.

5      Q.   Did you recognize whether the

6  officer was black or white?

7      A.   Black.

8      Q.   Now, you refer in paragraph six to a

9  remark that Mahaffy made after the meeting in

10 which he lost his title when he said he was

11 going to go home and get drunk.

12     A.   Right.

13     Q.   What's the significance of quoting

14 him in your affidavit?

15     A.   Well, you know, he was not described

16 as a very stable person anyway.  And, of

17 course, when they stripped him of his title

18 and, of course, he said -- well, Dr. --

19 Dr. Ritvoe said I hope this is over soon.  And

20 he said, well, it may be over sooner than you

21 think.

22          But he also said that he would not

23 be fired from the university.  In fact, he

24 said that in a meeting with Dr. Lawal and

25 Ms. Ellison.  But the only reason I mention

Faye Ward                                    June 14, 2006

Page 101

1    that is that he said he was going home and he

2    was going to get drunk.

3         Q.    Did you attach any significance to

4    that remark?

5         A.    Not really, that he might -- yeah,

6    he may go home and hurt himself.

7         Q.    By getting drunk?

8         A.    Or doing something else could lead

9    from getting drunk.

10        Q.    Ms. Ward, look in paragraph six

11   again.

12        A.    Okay.

13        Q.    And you talk about during the

14   meeting Ritvoe addressed the allegations

15   that -- I assume you're referring to Cynthia

16   Ellison's allegations?

17        A.    Yes.

18        Q.    And the investigation that had been

19   completed and the university's

20   recommendations.  What do you mean by the

21   university's recommendations?

22        A.    The university had recommended that

23   he go for some training.  He had to tell them

24   what he was going to do.  And he was going to

25   go for some training in order to help him deal

Faye Ward                                      June 14, 2006

1    with some issues which would be, I guess

2    discrimination.

3         Q.   So they weren't recommendations,

4    were they?  They were orders?

5         A.   Right.  More or less.

6         Q.   Well, they were orders, weren't

7    they?

8         A.   Uh-huh.

9         Q.   Were they not?

10        A.   Uh-huh.

11        Q.   Yes?

12        A.   Yes.

13        Q.   Mahaffy had to fulfill the terms

14   of --

15        A.   He was supposed to.

16        Q.   Did you see the letter that Roger

17   Ritvoe provided to him after the meeting which

18   set out the obligations that Mahaffy had to

19   fulfill?

20        A.   I think I did.  I don't remember.

21        Q.   There was more to it than simply

22   getting some training.

23        A.   Oh, yeah.  Oh, yes.  But I don't

24   remember.  This was a lengthy letter.

25        Q.   Okay.

Faye Ward                                    June 14, 2006

Page 103

1    A.    I don't know if he ever got them --
2    if he ever complied, though.  I doubt it.
3    Q.    Why do you doubt it?
4    A.    Because when he was -- when I came
5    back to work, Ms. Foster said he wasn't here
6    at the office.  He was taking leave most of
7    the time.  And I think he was retaliating.  He
8    didn't -- he probably didn't think he needed
9    to.
10   Q.    Do you know why he was on leave?
11   A.    Well, just being -- just going
12   against policy to want to do.  He didn't want
13   to come back and work since he was no longer
14   head of that department, the chair of that.
15   Q.    Are you suggesting that his medical
16   leave was bogus?
17   A.    Somewhat.
18   Q.    Do you have any factual
19   substantiation of that?
20   A.    No, I don't.  I don't.
21   Q.    All right.  Now, in paragraph seven,
22   you refer to the complaints that Cynthia
23   Ellison had made previously against
24   Dr. Mahaffy in 2003 and 2004.  Do you see
25   that?

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                June 14, 2006

Page 104

1          A.    Uh-huh.  I do.  Yes.

2          Q.    Are those the complaints we talked

3     about earlier having to do with paragraph

4     four?

5          A.    About describing Chris Mahaffy and

6     what he was -- the complaints regarding him.

7          Q.    Well, I'm trying to figure out what

8     you're referring to in paragraph seven.  Are

9     those complaints that you and I have already

10    discussed in this deposition or are they

11    different ones?

12         A.    They are.  They basically -- they

13    are the ones that we discussed. `

14         Q.    That we talked about earlier?

15         A.    But there was another situation,

16    too, that included a Barbara Ware.

17         Q.    Okay.

18         A.    There was some discussion with

19    Barbara Ware which, you know, she was a

20    secretary to Mahaffy, as Allison Stevens was.

21    Well, there was a rift between Ms. Ellison and

22    her.  And even Debra and them think that

23    Mahaffy instigated that.  And she said that

24    Ms. Ellison was just trying to do her job.

25    That's what Ms. Ellison told me.  And that was

Faye Ward                                          June 14, 2006

Page 105

1    another factor.  But I think it was soon

2    solved.

3         Q.    Were you involved at all in that

4    tempest?

5         A.    No.  Thank God.

6         Q.    You don't have any personal

7    knowledge about that, do you?

8         A.    Just what Debra told me.

9         Q.    Okay.  Other than the Barbara Ware

10   incident, are there any other difficulties or

11   complaints that you're referring to in

12   paragraph seven that we haven't already spoken

13   about?

14        A.    No.

15        Q.    Okay.  Did you know Barbara Ware?

16        A.    No more than just --

17        Q.    You knew who she was?

18        A.    Yes.  Uh-huh.

19        Q.    She was Cynthia Ellison's co-worker,

20   was she not?

21        A.    Right.  She worked in the School of

22   Sciences and she was the secretary to

23   Mr. Mahaffy -- Dr. Mahaffy and Cynthia worked

24   with all of them.

25        Q.    And Allison Stevens also had been

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

Page 106

1    Mahaffy's secretary?

2         A.   Also had.  Yes, sir.  Yes, sir.

3         Q.   So Allison Stevens and --

4         A.   Barbara Ware.

5         Q.   -- Cynthia Ellison were, again,

6    co-workers?

7         A.   Yes.

8         Q.   In other words, Allison Stevens

9    didn't supervise Cynthia Ellison?

10        A.   No.  No.  Cynthia was the dean's

11   secretary.  So all the other secretaries sort

12   of had a reporting structure, you know --

13        Q.   To her?

14        A.   -- up the line.  Yes, sir.  In fact,

15   she did most of their payroll information and

16   helped them as she did with others throughout

17   the campus.

18        Q.   What's the difference between a

19   formal complaint as you refer to it in your

20   affidavit and any other complaint?

21        A.   Well, a complaint just might be

22   someone coming in to say, well, I'm just

23   lodging a complaint and it's without real

24   cause or something.  I don't know.  But I

25   think when it's formal it's more that, you

Faye Ward                                    June 14, 2006

Page 107

1    know, this is the way it is.  This is all --
2    this -- I mean, there's got to be a
3    difference, informal and formal.  And the
4    formal means that this is a formal complaint
5    that I'm lodging.  This isn't just something
6    that I'm just saying.
7        Q.   Do you think it has more to do with
8    just the apparent seriousness of --
9        A.   I do.  I do.  I do.
10       Q.   You mean griping on one hand, you
11   wouldn't consider that to be a formal
12   complaint?
13       A.   No.  And especially if you get
14   people that you know are always running to the
15   office.  But you can't take anything lightly.
16   But by the same token, you've got to be able
17   to differentiate, you know, if this is someone
18   who's just wanting to come over.
19            I used to have employees just come
20   tell me, Ms. Ward, I just want you to listen
21   to me.  I'd close the door.  They'd sit and
22   they'd gripe for about 30 minutes.  And then
23   they'd get up and say thank you for listening.
24       Q.   That's not a formal complaint?
25       A.   No, sir.

Faye Ward                                    June 14, 2006

1      Q.    Okay.  And you treat them
2   differently, do you not?
3      A.    Well, I don't treat anybody
4   differently.  I listen to everyone.
5      Q.    No, no.  I'm sorry.
6      A.    What do you mean?
7      Q.    The complaint itself.
8      A.    Yes, sir.
9      Q.    You wouldn't necessarily trigger the
10  procedures for investigating griping, would
11  you?
12     A.    I wouldn't.
13     Q.    To a certain extent, you have to use
14  your discretion to determine --
15     A.    Yes, sir.
16     Q.    -- differentiate among the types of
17  complaints people are making?
18     A.    Yes, sir.  I would.
19     Q.    Okay.
20     A.    I know there were some people that
21  would come in and they would just want to talk
22  in confidentiality and they said I just want
23  you to listen to this.  And, of course, the
24  former director, she would say, well, what did
25  that person talk about.  I would say they came

Faye Ward                                    June 14, 2006

Page 109

1  to me in confidence.  I can't disclose it.  We

2  respected each other to that point that I

3  didn't.

4       Q.    Look at paragraph eight of your

5  affidavit, please.

6       A.    Yes, sir.

7       Q.    You say that Ms. Ellison retired

8  with a wonderful work record and honor.

9       A.    Yes, sir.

10       Q.    Can you tell me what you mean by

11  that?

12       A.    You know, her work record was

13  impeccable on this campus because other

14  secretaries looked up to her so much.  I would

15  talk with some of them and they'd say, well,

16  wait a minute -- especially when -- and I

17  didn't get a lot into a lot of the HR payroll

18  entry and all of that.  To be honest, I didn't

19  deal with that.

20       Q.    Right.

21       A.    But they would call and say I'm

22  going to call Cynthia Ellison because I trust

23  her and I want to know what she's doing if

24  they had a new system or something.  And as

25  far as I know, her reputation has been

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                          June 14, 2006

Page 110

1    impeccable.

2         Q.   Okay.  So when you say that she had

3    a wonderful work record and honor, are you

4    basing that on what you think other

5    secretaries thought of her and what they told

6    you and that sort of thing?

7         A.   Well, some of what I know.  Because

8    I worked -- in my position, there were -- I

9    had to monitor faculty positions.  I kept

10   information as far as EEO that I could pass on

11   to Debra when she would have to do her

12   affirmative action report.

13             I would have to call Ms. Ellison as

14   I would in the normal course of my job.  I

15   would have to call other secretaries and ask

16   them things and if deans had to sign off on

17   information.  So sometimes she would follow

18   that up for me.

19        Q.   Okay.

20        A.   Those kind of things.

21        Q.   Can you identify the secretaries who

22   you're referring to?

23        A.   Okay.  Jan Hargrove would be one.

24   She is over the School of Science.

25        Q.   Anybody else?

Faye Ward                                          June 14, 2006

Page 111

1       A.    Adrianne Giles.

2       Q.    I'm sorry?

3       A.    Adrianne Giles.

4       Q.    And where does she work?

5       A.    She works over in Liberal Arts, I

6  believe.  She's the dean over -- the second to

7  the dean over there.  And let me see.  I don't

8  know.  But a lot of the secretaries.

9       Q.    Can you think of any other

10 identities other than those two?

11      A.    Let me see.  Janice Strane is gone

12 now.  Janice -- Janice, she retired, too.

13 So -- those two I know would speak highly of

14 Cynthia.

15      Q.    Okay.  Look at paragraph nine --

16      A.    Uh-huh.

17      Q.    -- talking about her -- that she was

18 subjected to a racially hostile environment.

19 What do you mean by that?

20      A.    I believe that because of the

21 fact -- by that I mean she was placed over

22 there.  She was over there and Chris Mahaffy

23 was doing all these things and it went on for

24 at least a year, year and a half.  And nothing

25 was done about that.

Faye Ward                                          June 14, 2006

Page 112

1          So in all this time, she had to be

2     under duress.  She -- I mean, from what she

3     explained to me.  It wasn't that she wasn't

4     performing her job, but it was under stress.

5          And she had to be because she was in

6     that hostile environment with him walking

7     around, not knowing what he was going to do,

8     if he was going to go off, if he was going to

9     attack her.

10         To me, that's what a hostile

11    environment situation would be.

12         Q.   I understand that.  Do you call it a

13    racially hostile environment because he's

14    white and she's black?

15         A.   He's white and she's black plus his

16    secretary called her a nigger.

17         Q.   Do you think he had anything to do

18    with that?

19         A.   Yes.

20         Q.   Why?

21         A.   Because of the way he would act

22    toward Cynthia.  I think, in fact, he had

23    something to do with the fallout between the

24    both of them, Barbara Ware and Allison

25    Stevenson.

Faye Ward                                    June 14, 2006

Page 113

1      Q.    Let's stick with Allison for a
2  second.
3      A.    Okay.
4      Q.    Do you think that Chris Mahaffy
5  instructed Allison Stevens --
6      A.    Oh, no.  I don't think he instructed
7  her, no.  I don't think he instructed her to
8  call her a nigger.  I think that was maybe
9  just her demeanor.
10          But I don't think Chris Mahaffy --
11  once he found out that there was some
12  bickering between the two of them, I don't
13  think he did anything to help deter it.
14      Q.    Okay.  Do you know what the -- in HR
15  terms, do you know what the standard is for --
16  for establishing that a hostile environment
17  exists?
18      A.    Well, whether it's HR terms or not,
19  I think the hostile environment would be any
20  situation that someone is put in that they are
21  feared, that they are being ridiculed against,
22  and to me, that would create a hostile
23  environment, whether it's in HR terms or not,
24  sir.
25      Q.    Okay.  I asked you that earlier and

Faye Ward                                          June 14, 2006

Page 114

1    I apologize for repeating myself.

2         A.    That's all right.

3         Q.    I have that infirmity sometimes.

4    And you say in paragraph nine that hostile

5    environment resulted in her early retirement.

6         A.    Well, yes.  It did.  Because at that

7    point, by that time, Ms. Ellison had also

8    shared with me that Dr. Lawal had did a

9    380-degree turn on her and they were -- when

10   he first came to talk to Ms. Foster and I, he

11   wanted his complaint aligned with

12   Ms. Ellison's.

13              Then after our meeting with

14   Dr. Ritvoe, he, Ms. Ellison and Dr. Ritvoe and

15   I, we met.  And after, I guess, they had

16   worked with this solution with Dr. Mahaffy --

17   because he had planned to retire -- I mean, to

18   leave.  I'm surprised he's still here if he

19   is.  Because when he spoke with us, he was so

20   emphatic about their going together.

21              And I know when he came and was

22   hired, sir, in 2004, that Ms. Ellison said

23   that she was going to stay with him.  She

24   drove he and his wife around looking for a

25   home.  She was very loyal to him.

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                              June 14, 2006

Page 115

1           And she wanted to stay with him for

2    another two years before she retired.  Because

3    I would ask her.  I would say, well, when are

4    you retiring.  You've been here for a long

5    time now.  Are you thinking about it?  She

6    said not now, but I want to maybe in about a

7    couple of years.  I don't want to leave

8    Dr. Lawal, you know, alone.  I want to stay

9    until he gets settled in.

10          Well, I don't know what happened

11   there.  But what I knew the next thing, sir,

12   it was a phone -- Debra came into my office.

13   It was around the 14th of February.  And she

14   said to me that Dr. -- that they had accused

15   Cynthia, I believe, of shredding information.

16   And I said that's not true.  I said she would

17   not stoop so low.

18          So then after that -- I mean, I was

19   busy at my desk.  And Debra had sent me an

20   e-mail to the effect -- well, she knew I

21   didn't read my e-mail a lot of times right

22   away because I was busy doing other things

23   when I entered my office.  But I did.  You

24   know, we talked about it.

25          So the next thing I knew, that was

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

Page 116

1    when Cynthia -- that was the first time they
2    provided, sir, some security for her.  Because
3    the chief of police came by my office that
4    same day.  And I said did y'all -- ever get
5    security for Cynthia and she said no.  She
6    said but we were called today.  And I said
7    really.  She said I kept asking why, but
8    nobody ever told me why.  I said, well, why do
9    you need to know it, just -- you know, just
10   because a person needs security.  We've always
11   called, said I need security and in the past,
12   y'all have given it to us.  She said because
13   we have to do a statement to say what it's
14   for.  And I said, oh, when did that start
15   happening.

16           So, anyway, I left it alone.  And
17   she said but we gave -- we went over there
18   today.  And by then, word was out that Dr.
19   Bayo Lawal had accused Ms. Ellison of
20   shredding documents.  Well, you know, I shred
21   my applications after a year or two, but there
22   is information within the schools that I'm
23   sure they can shred.

24           So then at that point, Dr. Lawal had
25   started.  She had told me about him.  He had

Faye Ward                                    June 14, 2006

Page 117

1    started treating her differently, told her not

2    to come in his office, not to read his mail.

3    So I don't know what happened there.  But the

4    final analysis to that was that he didn't want

5    her around.  And, of course, after they

6    accused her of shredding the documents, I

7    guess she felt that she had no other -- she

8    left.

9         Q.   So --

10        A.   So she was still in a hostile

11   environment.

12        Q.   And that hostile environment was

13   created by Bayo Lawal?

14        A.   Well, he just added to it.

15        Q.   And that environment was hostile

16   because he had accused her of shredding the

17   documents?

18        A.   Well, I think that there are other

19   factors, sir, that I'm not at all sure what

20   they were, but I know she started having some

21   problems with him too after that meeting that

22   we had with Dr. Ritvoe.  And he was apparently

23   somewhat satisfied because of what had

24   happened to Dr. Mahaffy at that point.

25   Because he was no longer head of that -- chair

Faye Ward                                        June 14, 2006

Page 118

1    of that department.  And I guess he had --

2    his -- he was satisfied and that maybe had

3    been his resolve for that.  I don't know.

4         Q.   Did Cynthia Ellison ever criticize

5    you for asking her when she intended to

6    retire?

7         A.   No.  No.  That wasn't -- I mean, I

8    asked a lot of people that.  We were all -- of

9    course, I didn't have the years, but I had the

10   age.  Cynthia had the years.  And, you know,

11   like I said, I would have stayed a little bit

12   longer myself.  I would have loved to have

13   stayed until I reached full retirement age,

14   but, you know, so be it.

15        Q.   It's not an uncommon question around

16   here to ask when are you going to retire?

17        A.   Oh, no, sir.  No, sir.  Well, it

18   would be if people would just -- you know, I

19   mean, we didn't do it all the time, you know,

20   like Ms. Foster would say sometimes when

21   somebody would call and she felt that they

22   were going to be a headache, well, when are

23   they leaving, when are they going to retire,

24   you know, something like that.

25             But it was just when I would have

Faye Ward                                              June 14, 2006

Page 119

1    seminars and people would come out and, you

2    know, I would say are you thinking about

3    retiring now.   Sometimes I would; sometimes I

4    wouldn't.

5          Q.    Okay.

6          A.    It's only uncommon if you use it in

7    certain ways.

8          Q.    And you wouldn't take -- you didn't

9    take offense at those kind of questions to

10   you, did you?

11         A.    It all depends on the circumstances.

12         Q.    I mean the ones you just referred to

13   when people would ask you.

14         A.    No, when someone just asked me if I

15   had a problem and I thought it was going to be

16   a problem and they said, well, when are you

17   retiring, yeah, that would be offensive.

18         Q.    So I guess it depends on how you

19   interpret the question, right, as to whether

20   it's offensive or not?

21         A.    It all depends on the circumstances

22   around the question.

23         Q.    Now, Ms. Ward, is it your testimony

24   that from fall of 2004 --

25         A.    Yes, sir.

Faye Ward                                          June 14, 2006

Page 120

1      Q.    -- when Cynthia Ellison started

2  escorting Bayo Lawal and his wife around and

3  helping him get situated, from that date until

4  February 14th, you didn't have any discussions

5  with Cynthia Ellison about retirement or when

6  she intended to retire?

7      A.    No.

8      Q.    That's not your testimony?

9      A.    No.  Why would it be?

10     Q.    I'm trying to clarify.  That's what

11 I understood it to be.

12     A.    About her retiring?  She didn't have

13 any -- no, she said to me -- because she was

14 thinking about retiring at a later date.  And

15 she said, but I'm not going to retire anytime

16 soon, Faye, because I want to stay here and

17 work with Dr. Lawal.

18     Q.    That's what she told you in the fall

19 of 2004; right?

20     A.    She told me that from the time he

21 came.

22     Q.    When did he come?

23     A.    I think he came in in August of

24 2004, I believe.  I don't know.  Debra

25 probably knows.

Faye Ward                                    June 14, 2006

Page 121

1      Q.    From August 2004, that's what
2  Cynthia Ellison was telling you about her
3  retirement time?
4      A.    Well, she didn't -- it wasn't just
5  an in-depth conversation about it.
6      Q.    I understand.
7      A.    She just said that she wanted to
8  stay with him until he became acclimated to
9  the School of Sciences and the duties and
10 everything so she as a secretary to him could
11 perform in the manner to help him.
12     Q.    Okay.  And from that time until she
13 came to you on February 14th, you believed
14 that she still intended to remain a couple of
15 years --
16     A.    Yes.
17     Q.    -- until --
18     A.    Absolutely.  Absolutely.
19     Q.    Okay.  You know Don Yancey, don't
20 you?
21     A.    I do.
22     Q.    How long have you known him?
23     A.    Well, I met him in about 1989 when I
24 came to work.
25     Q.    What is his job?

Faye Ward                                          June 14, 2006

Page 122

1      A.   He's a retiree.  Alabama teacher's
2   retiree rep.  I know he is.  He's a big name
3   down there.
4      Q.   And you've contacted him on
5   different occasions to have him calculate
6   retirement benefits for employees if they --
7   beginning on a certain date based on their
8   years of service and age, haven't you?
9      A.   Okay.  Sir, what I've done as far as
10  my contact with Mr. Yancey about other
11  employees, I refer them to him.
12           Now, when I was ready to retire, I
13  went down personally to talk with him.  I
14  would recommend to employees if you need to
15  know, go talk to Mr. Yancey.
16           The process, they go talk to him
17  first.  They come back to HR.  I give them --
18  I do a two-part interview.  I give them a
19  sheet to take to their bank and they have
20  to -- need to do that processing within 60
21  days because we need to get information to
22  Auburn University payroll office in a timely
23  manner.
24           So, therefore, I would conduct
25  two -- a two-part interview.  Give them the

Faye Ward                                    June 14, 2006

Page 123

1   form, take down to their bank, come back, do

2   the application, and I would notarize it and

3   send it with the payroll information.

4        Q.   Okay.  And that's what you did with

5   Cynthia Ellison when she retired?

6        A.   Retired, yes, sir.

7        Q.   Now, did you contact Don Yancey in

8   September 2004 to find out what Cynthia

9   Ellison's retirement benefits would be if she

10  retired on December 1st, 2004, and what they

11  would be if she retired on July 1st, 2005?

12       A.   Why I would do that?  That wasn't my

13  business.

14       Q.   Well, I'm just asking you if you did

15  it.

16       A.   No, sir.  No.  I didn't do anybody

17  that way.  I would refer them to take care of

18  their own business.

19       Q.   Did you contact Don Yancey on

20  January 4th, 2005, to see what Cynthia

21  Ellison's retirement benefits would be if she

22  retired on April 1st, 2005?

23       A.   No, sir.  No, sir.

24       Q.   So, if Don Yancey testified to that,

25  he would be incorrect?

Faye Ward                                              June 14, 2006

Page 124

1    A.   Well, I didn't.  I didn't contact
2  Don Yancey about anyone.  In most cases, I
3  would refer the person to Don Yancey and they
4  would do what they have to do.
5    Q.   Okay.
6    A.   And if they had leave time, they
7  would use their leave time to take them
8  through.
9    Q.   So you had no contact with -- you've
10 never had any contact with Don Yancey about
11 Cynthia Ellison's retirement benefits?
12   A.   Not to my recollection.  No, indeed.
13 Not to my recollection.  I don't know why I
14 would have had to.
15   Q.   Do you recall when you signed off on
16 Cynthia Ellison's retirement papers?
17   A.   No, I don't remember the specific
18 date, but I know I did.
19   Q.   Do you remember if it was before
20 February 14th or after?
21   A.   Well, if she left -- it might have
22 been before.  Like I said, I don't want to get
23 into giving you a specific date because I
24 don't remember.  I know I gave her the form to
25 take to her bank and she brought that back and

Faye Ward                                    June 14, 2006

Page 125

1    I know that I did the application.  And I had
2    to sign off on it.
3         Q.    Let me show you a document that's
4    been introduced in this case --
5         A.    Okay.
6         Q.    -- identified in this case already
7    called the Teachers's Retirement System of
8    Alabama application for retirement?
9         A.    Uh-huh.
10        Q.    And is this your signature on it?
11        A.    Yes, it is.
12        Q.    Is this Cynthia Ellison's
13   application for retirement?
14        A.    It is.
15        Q.    And did you notarize that document?
16        A.    I did.  My name is on it.
17        Q.    What's the date of your notary
18   public?
19        A.    March 7th.  That's -- my commission
20   expires on this date and I notarized it on the
21   11th day of February.
22        Q.    So did Cynthia Ellison come to you
23   on February 11th to complete this paperwork?
24        A.    She had to.  We don't notarize it
25   unless the person is present.

Faye Ward                                          June 14, 2006

Page 126

1    Q.   Do you know if Cynthia Ellison had
2    given notice of her retirement any earlier
3    than February 11th to her dean?
4    A.   I don't know.
5    Q.   I know you told me that you weren't
6    directly involved with the Allison Stevens
7    incident.
8    A.   Yes, sir.
9    Q.   But do you know if Allison Stevens
10   had ever been accused of using racially
11   insensitive language or exhibiting racially
12   insensitive behavior at AUM before that point?
13   A.   No, I don't.
14   Q.   Do you know if anyone other than
15   Cynthia Ellison has accused Chris Mahaffy of
16   engaging in any type of racially insensitive
17   behavior or using racially insensitive
18   language?
19   A.   Well, Dr. Lawal.  He had the same
20   complaint as Cynthia had.
21   Q.   That's your understanding?
22   A.   Uh-huh.  He had a complaint.  When
23   it started out, he said he wanted his
24   complaint to be aligned with Cynthia for
25   whatever it was.

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

Page 127

1      Q.    Did he tell you what his complaint

2  was?

3      A.    Well, he did -- Lawal wasn't --

4  Chris was not giving him respect.  I don't

5  know if he was threatening him, but I know

6  that he had very little control.  He was going

7  around I believe talking about Dr. Lawal, that

8  he would not be a good leader, that he didn't

9  believe in him, and that the faculty was not

10 going to follow him.  And that was said by

11 Dr. Glen Ray in a statement he made.  In fact,

12 he was described by Dr. Moody as being a

13 bigot.

14     Q.    Other than the complaints you may be

15 aware of from Cynthia Ellison and Bayo Lawal

16 --

17     A.    Yes, sir.

18     Q.    -- do you know of any complaints

19 from anyone at AUM concerning Chris Mahaffy

20 threatening to strike anyone?

21     A.    No, sir.  I don't.

22     Q.    Do you know of any complaints from

23 anyone at AUM about Chris Mahaffy threatening

24 physical violence?

25     A.    No, sir.  I don't.

Faye Ward                                             June 14, 2006

Page 128

1        Q.    How about intimidating anyone?

2        A.    I don't.

3        Q.    Do you know if there are any

4    complaints other than -- strike that, please.

5    Do you know of any complaints about Chris

6    Mahaffy verbally threatening anyone?

7        A.    No, I don't.

8        Q.    Do you know if Chris Mahaffy has a

9    history of any physical violence?

10       A.    No, I'm not aware.

11       Q.    Do you know if he's ever been

12   accused of any sort of inappropriate touching?

13       A.    I don't know, but when he was let

14   go, it wasn't because of -- from my

15   understanding, it had nothing to do with

16   Cynthia Ellison's allegation.  I think it had

17   something to do with improper conduct on Chris

18   Mahaffy's part that even reached the heights

19   to Auburn University.  That's my

20   understanding.  I don't know now.

21       Q.    That was after Cynthia Ellison had

22   retired, was it not?

23       A.    Right.  Right.

24       Q.    Has anyone ever asked you to provide

25   them with any sort of security because of fear

Faye Ward                                          June 14, 2006

Page 129

1     of Chris Mahaffy?

2          A.    Mrs. Ellison.

3          Q.    Other than Cynthia Ellison.  We've

4     talked about that.

5          A.    No.  No.

6          Q.    Have you been involved in any other

7     internal claims of harassment at AUM during

8     the time you were in the human resources

9     office?

10          A.    No.  Like I said, that was -- the

11     director always handled those.  In fact, we

12     didn't have a lot of cases during that time

13     anyway.  We put fires out.

14          Q.    I'm sorry?

15          A.    We didn't have a lot of cases during

16     that -- during that reign because we put fires

17     out as much as we could.

18          Q.    Instead of starting them?

19          A.    Yes, sir.

20          Q.    Is that your saying?

21          A.    That's my belief.  That's what I

22     know.

23          Q.    I've heard that several times in

24     this lawsuit.

25          A.    It costs the university money.

Faye Ward                                    June 14, 2006

Page 130

1        Q.    Do you have any complaints about the
2   manner in which AUM investigated Cynthia
3   Ellison's complaints against Mahaffy beginning
4   in December 2004?
5        A.    Do I have what, sir?
6        Q.    Any complaints about the manner in
7   which the university investigated her
8   complaints.
9        A.    Well, I looked at the time factor
10  when Ms. Ellison first started complaining,
11  sir, and I thought that that timeframe was
12  extensive, when it could have been -- now,
13  that's what I'm saying to you.  That's my
14  personal observation.  It could have been
15  handled a little bit quicker.  I think they
16  could have gotten to the investigation a
17  little bit faster.
18       Q.    Are you talking about in December
19  2004?
20       A.    In December and January.  Yes, sir.
21       Q.    Other than the duration of the
22  investigation, do you have any complaints
23  about it?
24       A.    Well, I think that she -- you know,
25  you mean the investigation itself and how it

Faye Ward                                    June 14, 2006

Page 131

1    went?

2         Q.    Yeah.

3         A.    Well, I think that if things would

4    have been handled in some ways -- like, she

5    only wanted to know the status of her

6    investigation.  They were letting Chris

7    Mahaffy at a point know.

8              And, of course, at the time -- and I

9    think she came to our office in January, and

10   she wanted to know where we were with it.  And

11   we had a meeting with Ms. Foster and she in my

12   office.  And she said she wanted to know from

13   Ms. Foster if she believed that she was

14   telling the truth.  She wanted to know.

15             Ms. Foster came in and told her she

16   wasn't going to get the attorney, who I guess

17   was Tom Rebel -- that she was not going to get

18   any constructive discharge pay and all that.

19   And I thought -- because Mr. Rebel had said

20   for Cynthia to call over to the office.

21   Ms. Foster said she wasn't calling over there.

22   She said I don't want to talk to her.

23             So I said, well, you've got to do

24   what the attorneys say for you to do.  You

25   need to call over and talk to her.  She said

Faye Ward                                June 14, 2006

Page 132

1    I'm going to send her two paragraphs and let
2    her know.  Well, she came over and met in my
3    office and when she asked her what -- did she
4    believe her, Ms. Foster got up and walked out
5    of the room, said you can call the attorney
6    and ask him whatever you want to know.  She
7    gave her Tom Rebel's phone number.  That was
8    inappropriate to me.  At that time, she wasn't
9    even going to seek an attorney.
10        Q.   The investigation wasn't over at
11   that point, was it?
12        A.   The investigation had started
13   because we had talked to several people.
14        Q.   Right.  But it wasn't over?
15        A.   And at that point -- no, it was not
16   over, but there was enough information.
17             Sometimes when you -- I feel --
18   well, that's not important what I feel.  But
19   in handling HR cases or any kind of cases when
20   you're dealing with the people, you have to
21   find a happy medium to pacify people before
22   they take it to the max degree.
23             And in this -- at this point, I
24   think if we had just been able to supply her
25   with something to tell her -- I could have

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                          June 14, 2006

Page 133

1   very easily said to her, you know, maybe I

2   believe you, maybe I don't, but we're doing

3   what we can to rectify this situation.

4        Q.   You wouldn't -- in an investigation,

5   you typically wouldn't want to make a

6   credibility determination until the

7   investigation was over, would you?

8        A.   Well, you might not want to do that

9   too, but you'd find some comfort zone that you

10  can put that employee in.  Because I think if

11  that had been provided to her, she would

12  not -- we wouldn't be here today.

13       Q.   Is that the only criticism you have

14  in the manner in which the investigation was

15  conducted?

16       A.   That's all I have.

17       Q.   And so the only thing you would have

18  done differently was to try to respond to that

19  inquiry?

20       A.   I would have tried to handle it a

21  different way in order to try to work with the

22  employee to let them do -- I would have

23  investigated.  I would have done it in a much

24  faster manner and I wouldn't have said, well,

25  she makes me sick, what's she want now, when

Faye Ward                                    June 14, 2006

Page 134

1    is she retiring.

2         Q.    Have you ever been involved in any

3    lawsuits?

4         A.    No, I haven't.

5         Q.    You've never been to jail, have you?

6         A.    Huh-uh.

7         Q.    Ever been arrested?

8         A.    No, I haven't.

9               MR. DODD:  Bonnie, can we mark this?

10              (Defendant's Exhibit-4 was marked

11        for identification.)

12        Q.    (By Mr. Dodd) Ms. Ward, here's

13   defendant's exhibit four.  See if you can

14   identify that for me, please.

15        A.    Oh.  It's a job description.

16        Q.    For your position?

17        A.    Yes.

18        Q.    And that's your signature at the

19   bottom dated May 17th, 2001?

20        A.    It is.

21        Q.    Are you pretty familiar with this

22   job description, fairly familiar with it?

23        A.    I am.

24        Q.    Do you know of anything that's

25   inconsistent between this job description and

Faye Ward                                    June 14, 2006

Page 135

1    the duties contained in it and the duties that

2    you outline for us in your affidavit?  I mean,

3    anything that jumps off the page at you?

4         A.    In what way?

5         Q.    In any way.  I think they're

6    consistent.

7         A.    No.  Huh-uh.  It's accurate.

8              MR. DODD:  Ms. Ward, I have no

9         further questions for you and I thank you

10        for your time today.

11             THE WITNESS:  Okay.  Thank you, sir.

12             MS. RODGERS:  I have no questions.

13             (Whereupon, the deposition was

14        concluded at 11:55 a.m.)

15

16

17

18

19

20

21

22

23

24

25

Faye Ward                                          June 14, 2006

1              DESCRIPTION OF EXHIBITS

2

3      EXHIBIT      IDENTIFICATION

4      1            Letter to Dr. Ritvoe

5      2            Affidavit

6      3            Employment Application

7      4            Job Description

8

9

10             (Original exhibits attached to the

11        Original transcript.)

12

13                                          `

14

15

16

17

18

19

20

21

22

23

24

25

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                              June 14, 2006

Page 137

1    STATE OF GEORGIA:

2    COUNTY OF FULTON:

3         I hereby certify that the foregoing

4    transcript was reported, as stated in the

5    caption, and the questions and answers

6    thereto were reduced to typewriting under my

7    direction; that the foregoing pages represent

8    a true, complete, and correct transcript of

9    the evidence given upon said hearing, and I

10   further certify that I am not of kin or

11   counsel to the parties in the case; am not

12   in the employ of counsel for any of said

13   parties; nor am I in any way interested in

14   the result of said case.

15

16

17

18

19

20

21

22

23

24

25

Faye Ward                                          June 14, 2006

Page 138

1         Disclosure Pursuant to Article

2    8(B) of the Rules and Regulations of the

3    Board of Court Reporting of the Judicial

4    Council of Georgia, I make the following

5    disclosure:

6         I am a Georgia Certified Court

7    Reporter, here as a representative of

8    Alexander Gallo & Associates, L.L.C.,

9    to report the foregoing matter.  Alexander

10   Gallo & Associates, L.L.C., is not taking

11   this deposition under any contract that is

12   prohibited by O.C.G.A. 5-14-37 (a) and

13   (b).

14        Alexander Gallo & Associates,

15   L.L.C., will be charging its usual and

16   customary rates for this transcript.

17

18

19

20

21        BONNIE L. SMITH, RPR CCR-B-2432

22

23

24

25

Faye Ward                                                    June 14, 2006

Page 139

1                         CAPTION

2          The Deposition of FAYE WARD, taken

3     in the matter, on the date, and at the time and

4     place set out on the title page hereof.

5          It was requested that the deposition be taken

6     by the reporter and that same be reduced to

7     typewritten form.

8          It was agreed by and between counsel and the

9     parties that the Deponent will read and sign the

10    transcript of said deposition.

11

12

13                                    `

14

15

16

17

18

19

20

21

22

23

24

25

Faye Ward                                              June 14, 2006

Page 140

1                        CERTIFICATE

2    STATE OF                          :

3    COUNTY/CITY OF                    :

4            Before me, this day, personally appeared,

5    FAYE WARD, who, being duly sworn, states that the

6    foregoing transcript of his/her Deposition, taken in the

7    matter, on the date, and at the time and place set out

8    on the title page hereof, constitutes a true and accurate

9    transcript of said deposition.

10        _____

11                      FAYE WARD

12

13        SUBSCRIBED and SWORN to before me this

14    _____day of_____, 2006 in the

15    jurisdiction aforesaid.

16

17    _____    _____

18    My Commission Expires    Notary Public

19

20    *If no changes need to be made on the following two pages,

21    place a check here _____, and return only this signed page.*

22

23

24

25

Faye Ward                                                June 14, 2006

                                                          Page 141

1                    DEPOSITION ERRATA SHEET

2     RE:         Alexander Gallo & Associates, L.L.C.

3     File No.    13898

4     Case Caption:  CYNTHIA ELLISON

5     vs.   AUBURN UNIVERSITY MONTGOMERY

6     Deponent:  FAYE WARD

7     Deposition Date: June 14, 2006

8     To the Reporter:

9     I have read the entire transcript of my Deposition taken

10    in the captioned matter or the same has been read to me.

11    I request that the following changes be entered upon the

12    record for the reasons indicated.  I have signed my name to

13    the Errata Sheet and the appropriate Certificate and

14    authorize you to attach both to the original transcript.

15

16    Page No._____Line No._____Change to:_____

17    _____

18    Reason for change:_____

19    Page No._____Line No._____Change to:_____

20    _____

21    Reason for change:_____

22    Page No._____Line No._____Change to:_____

23    _____

24    Reason for change:_____

25

3fc0b067-b1ea-4978-ac8d-fff8fe596876

Faye Ward                                    June 14, 2006

Page 142

1    Deposition of FAYE WARD

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21

22

23

24   SIGNATURE:_____DATE:_____

25                    FAYE WARD

3fc0b067-b1ea-4978-ac8d-fff8fe596876