**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| CYNTHIA ELLISON, | |
|     **Plaintiff** | |
| **v.** | **Civil Action No.** |
| | **2:05 CV902-MHT-DRB** |
| **AUBURN UNIVERSITY** | |
| **MONTGOMERY,** | |
|     **Defendant** | |

## PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff Cynthia Ellison in the above-styled case and submits this Memorandum of Law in Support of Plaintiff's Response to Defendant's Second Motion for Summary Judgment.

## PROCEDURAL BACKGROUND

On or about February 11, 2005, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Defendant, Auburn University Montgomery. The EEOC issued Plaintiff Ellison a "right to sue" letter on July 7, 2005, which was received by Plaintiff Ellison on July 9, 2005. Plaintiff satisfied the requirement to initiate this suit within ninety days of her receipt of that "right to sue" letter. 42 U.S.C. § 2000e-5(f)(1).

Plaintiff filed a Complaint in federal court claiming:

1.          Race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981;

1

2.          Retaliation in violation of Title VII of the Civil Rights Act of

1964, as amended;

3.          Hostile Work Environment in Violation of Title VII of the Civil

Rights Act of 1964, as amended; and

4.          Constructive Discharge in Violation of Title VII of the Civil

Right Act of 1964.

Defendant AUM answered the Complaint as well as filed an Amended

Answer to the Plaintiff's Complaint. Defendant filed its First Motion for Summary

Judgment and Memorandum, which Plaintiff filed Plaintiff's Response and

Memorandum of Law to Defendant's First Motion for Summary Judgment.

Currently before this Court is Defendant's Second Motion for Summary Judgment

and Memorandum of Law, which Plaintiff now files Plaintifff's Response to

Defendant's Second Motion for Summary Judgment.

## STATEMENT OF FACTS

### A. Plaintiff Cynthia Ellison (Exhibit 1 – Deposition of Cynthia Ellison

Plaintiff Ellison, an African American female, and a former employee of

Defendant AUM, was the Dean of the School of Science's secretary. Dep. 37.

Ellison's job duties included, answering the phones, doing the mail, doing payroll,

giving assignments to the other secretaries, receiving assignments from the other

secretaries, making sure that they were correct. Dep. 37. Also, Plaintiff Ellison

supervised anywhere from five to six work study students, wrote draft memos for

the Deans, and normal secretarial duties. Id. The Dean was Plaintiff Ellison's

boss and supervisor. Dep. 38.

According to Ellison, she received an additional assignments and was an advisor to students. Dep. 56.  Later, Plaintiff's title changed to Senior Administrative Associate Advisor, which was created by Dr. Moody to advise students and the recommendation for Plaintiff Ellison to receive said title was carried through by Dr. Lawal.  Dep. 57.

## RETIREMENT

While working at AUM, Plaintiff Ellison testified that she did not plan to retire that retirement seminars would come to the Campus and those who were in striking distance of retirement, (a twenty-five year mark), attended the seminars to find out what was being said.  Dep. 20.  Plaintiff Ellison combined with her other state jobs, such as, the Board of Education in Mobile, University of South Alabama, and University of Alabama in Huntsville for two years was entitled to retirement. Dep. 21.

Plaintiff Ellison spoke to Dr. Lawal in April of 2004, and told him that she had enough years to retire, but was going to stay two to three years to get him transitioned into his new position.  Dep. 22.  Plaintiff Ellison did not discussed retirement again with Dr. Lawal until February, when she left.  Dep.  23.

In an email on January 25, 2005, Dr. Bayo Lawal wrote to the School of Sciences that there was a rumor that was circulating that Plaintiff Ellison was retiring in two weeks time.  (Exhibit 2 - Email from Bayo Lawal).  Bayo furthered stated that he did not know where this information was coming from but these are not true as far as he knew.  Id. In addition, Bayo Lawal stated that Plaintiff Ellison had not informed him in writing or otherwise that she was retiring.  (Exhibit 2),

3

Plaintiff Ellison told Dr. Elliot when he was retiring, you're lucky, I wished that I could retire, but that she was a single parent and her daughter was in school. Dep. 23. Ellison testified at that time she wasn't thinking about retiring. Dep. 23. However, Plaintiff Ellison had discussed retirement with Brad Moody after she filed her complaint against Allison Stevens because Debra Foster, the Human Resource Manager, said, "you have enough time to retire, so why don't you retire." Dep. 23-24.

Plaintiff notified the University of her intent to retire in a memo to Dr. Lawal on February 9, 2005 and had agreed to stay until February 25, 2006 with the stipulation that Plaintiff received security from the University, but Dr. Lawal stated that it was not up to him to provide security, but, Dr. Ritvo. Dep 183-184. (Exhibit 3 - 2/9/2005 Memo to Lawal)[1] However, Plaintiff testified that she was forced to leave, on February 14, 2005 because Dr. Lawal had acted so indignant about the shredding of documents, which were old time sheets, pay schedules, and grade sheets. Dep. 187. Dr. Lawal told Plaintiff Ellison to leave out of his office. Dep. 187. Dr. Lawal had said earlier that he didn't trust Plaintiff, he didn't want her to do anything in the office. Dep. 187. Plaintiff was just to sit their in the office. Dep. Plaintiff said that this was retaliatory to her because Dr. Lawal wanted to file a complaint that summer, and he told Plaintiff that now he wouldn't

---

[1] Plaintiff Ellison emailed Dr. Lawal and stated in a an email the following: As we DISCUSSED, I will plan to assist you in the office provided campus police can make a walk through of Goodwyn at least once a day through February 25, 2005. If this is not possible, then I shall start my leave. (Exhibit 4 - Email Friday, February 11, 2005).

be able to. Dep. 188. The hostile work environment Plaintiff Ellison was now in, worsened. Dep. 188.

In a memo dated February 14, 2005, Plaintiff Ellison informed Dr. Lawal that since he told her, Plaintiff, that she had compromised the integrity of the Dean's office by sharing the memo about Chris Mahaffy with her attorney. (Exhibit 5 – 2/14/2005 Memo). Initially, Lawal encouraged Plaintiff to do what was right to Chris and that he Lawal, would also file civil litigation, if things were not changed. (Exhibit 5- 2/14/2005 Memo to Lawal from Plaintiff Ellison).

In addition to retaliation, not getting security and by Plaintiff being subjected to an unsafe environment, Plaintiff was forced to leave. Dep. 189.

**Plaintiff Ellison and Chris Mahaffy**

Plaintiff Ellison said that she was discriminated against at AUM by Dr. Chris Mahaffy, who was white. Dep. 60. Plaintiff Ellison testified that Chris Mahaffy was at AUM, when she came to the University in 1984, but Plaintiff didn't have much to do with Mahaffy until he became Acting Department Head, or Chair of the Physical Science Department. Dep. 28. Prior to the Dean search in 2003, Plaintiff Ellison, complained about Mahaffy, who would come to the office, just look and stare and make inappropriate comments. Dep. 30-31.

Plaintiff Ellison also observed Chris Mahaffy after Department Head meetings come out upset, if things didn't go his way. Dep 39. Ellison's office was located on third floor of Goodwyn Hall, which was the Dean's Suite. Dep. 41. Plaintiff worked in a cubicle, which was a cubicle with a four or five feet high partition, and would have to stand up and lean out to to see out of it. Dep. 42.

5

Plaintiff Ellis could see the door open, but could not see who was coming in until they actually entered. Dep. 42. There was no close parking to Goodwyn Hall, where Plaintiff Ellison worked and she had to park by the gym until she parked in the handicap parking behind Goodwyn Hall the last twelve months of her employment. Id.

Plaintiff Ellison testified that Chris Mahaffy said that he had never seen a **black person** before he came to the United States, when Bob Elliot was Dean.[2] Dep. 143. (Emphasis added). Also, Plaintiff testified that Chris Mahaffy held up a magazine, far away and asked, "What is this on here?" 143-144. Plaintiff said a **monkey,** Mahaffy walked over to Plaintiff's desk and laid the magazine down and it was a picture of a **black man**, which was offensive. Id. In addition, Dr. Mahaffy made the comment that **some blacks didn't seem as smart as whites**. Dep. 145

Plaintiff reported Chris Mahaffy to Bob Elliott, who said, "Chris is crazy." There was no action taken. Dep. 145.

After Bayo Lawal was hired in August 2004,[3] Chris Mahaffy came to Plaintiff Ellison several times and said that Bayo would have a tough time being Dean **because he was Black** and no one will be able to understand him. (Exhibit 6–12/3/2004 – letter to Ritvo). He also said **that we (referring to**

---

[2] Plaintiff reported this to Roger Ritvo in an internal complaint. (Exhibit – 6 12/3/2004 Memo to Ritvo) Also, in the complaint, Plaintiff reported that Chris Mahaffy had created a hostile work environment.

[3] In Dr. Bayo Lawal's Declaration, Bayo became the Dean of the School of Sciences at Auburn University in August 2004. (Attached Declaration of Bayo Lawal – Exhibit 22)

6

Plaintiff Ellison and Dr. Lawal) both being black would not get the cooperation of the faculty. Id.

In January 2005, Chris Mahaffy came to Plaintiff Ellison's office, stood in front of Plaintiff Ellison, and said, "I want you to read my shirt." Dep. 161. Plaintiff looked up and the shirt, said, **"I am a redneck**." Dep. 161. Mahaffy said, "what do you think about that?" Plaintiff Ellison said, "I am offended." Mahaffy laughed and left. Id. Plaintiff Ellison reported the incident to Dr. Lawal, who didn't say anything really. Dep. 161. Plaintiff Ellison said that she feels like "redneck" means you are looking down on the minority. Dep. 161. That's the person who feels like minorities are lower class. Dep. 161.

When questioned about AUM's harassment policy, Plaintiff Ellison testified that the reporting procedures at AUM relating to harassment should be reported to the supervisor and they were to take the complaint to the HR (Human Resources) or the EEOC (Equal Employment Opportunity Commission) person. Dep. 52.

The last Dean, Plaintiff Ellison worked for at AUM was Dr. Lawal, who started in August 2004. Dep. 52-53. Ellison stated that in his role as a Dean, Dr. Lawal had the authority to discharge her, reprimand her, and the authority to assign her work. Dep. 53-54. In addition, Ellison stated that Dr. Chris Mahaffy also assigned worked to her, such as, arrangements for the hiring of extra student workers to work on the Jason Project. Dep. 54.

Plaintiff Ellison testified that even though Dr. Mahaffy did not make any racial remarks after December 3, 2004, he intimidated her by coming to her office.  Dep. 178

### Other Discriminators

Plaintiff Ellison also believed that she was discriminated against by Debra Foster, who is black, Allison Stevens, who is white, and Dr. Ritvo, who is white, as well as, Dr. Lawal, who is black.  Dep. 60-61

### Plaintiff Ellison and Debra Foster

Plaintiff Ellison testified that Debra Foster discriminated against Plaintiff, when she filed her Complaint in the Human Resources Office, she did not receive the same treatment that others received.  Dep. 61.  In particular, Chris Mahaffy, a white male, was allowed a summary report, and although Plaintiff Ellison asked for a summary report, she did not receive it.  Dep 61.[4]  The complaint in which Ms. Ellison was talking about was the complaint with Allison Stevens, where Allison Stevens called Plaintiff Ellison, the "N" word, Nigger, and said why don't you retire? Everybody wants you to retire any way."  Dep. 61- 62, 89, 92. Plaintiff reported this to both Chris MaHaffy and Debra Foster.  Dep. 61-62, 89, 92,  (See also, Plaintiff Ellison and Allison Stevens facts below).  This incident occurred in December 2003.  Dep. 89.

---

[4] See February 7, 2005 letter, where Chris was given a month to decide what to do, and Plaintiff Ellison continued to be subjected to hostile environement. (Exhibit 7)  In this same letter, Plaintiff shows where Dr. Lawal's complaint was not included and that Debra Foster told Plaintiff that Chris Mahaffy, said, **Blacks should not be in responsible positions.**  (Exh. ).

Later, Plaintiff filed a complaint against Allison Stevens sometimes in March 2004, after she contacted Dr. Guin Nance, she was told to allow Debra Foster to investigate the incident.[5] Dep. 99-100. Plaintiff Ellison met with Dr. Nance personally and told her that it was known around campus that Debora Foster, the Human Resources Director, started fires, but did not put them out, meaning that people who had gone to Debra Foster did not see or get results. Dep. 100. Plaintiff cited some examples to Dr. Nance. Dep. 100-101.

Plaintiff Ellison had worked at the University for twenty (20) years and never had to encounter the type of behavior that she was subjected to because she was a black female. Dep. 64. Therefore, Plaintiff Ellison requested that Debra Foster come over to the area to see what kind of atmosphere, she was working in. Dep. 64. Plaintiff Ellison said to Debra Foster, "I am working in a hostile work environment." Id. Debora Foster did not give any consideration to Plaintiff Ellison's request and never came over or anything. Dep. 65. Thus, Plaintiff stated that she was discriminated against and treated differently than other cases Debora Foster investigated. Dep. 67.

Plaintiff Ellison also contends that Debra Foster discriminated against her during the second investigation, where she complained that Dr. Mahaffy's personality had changed towards Plaintiff Ellison to the point, where she was fearful for being in the office. Dep. 67. During the first Dean search in 2003, after Dr. Mahaffy had not made the short list to become Dean, Dr. Mahaffy would be

---

[5] Plaintiff also reported the Allison Stevens incident to Brad Moody, and she felt like nothing would be done because they were running interference between Plaintiff and Allison Stevens. Dep. 103-104.

sitting at Plaintiff Ellison's desk crying or just sitting there, which happened seven

days in a row.  Dep. 70.  Dr. Mahaffy would be making comments about what he

could do if he were Dean, and appeared to be unstable.  Dep. 70.  As a result,

Plaintiff Ellison reported it in writing, after speaking to Faye Ward in HR.  Dep.

70-71.  Dr. Mahaffy came to Plaintiff Ellison and told Ellison that he, Dr. Mahaffy

thought that Plaintiff Ellison had something to do with him not being selected as

Dean.  Dep. 72.  Dr. Mahaffy's countenance was different, his hygiene was not

intact, he was unshaven.  Dep. 72-73.  Dr. Mahaffy said he couldn't sleep at

night and that he had to come to the office at 4:00 o'clock in the morning, which

he did and was sitting in Plaintiff Ellison's chair waiting on her.  Dep. 73.

Ellison said this occurred twice, the first time was in the dark, Plaintiff

Ellison unlocked her office, flipped on the light and Dr. Mahaffy was sitting in her

seat.  Dep. 73.

Plaintiff Ellison reported this incident to Brad Moody and to Glen Ray, who

was the Associate Dean and to HR (Human Resources).  Dep. 74.  When

Plaintiff Ellison reported the incident to Brad Moody and Glen Ray,[6] at first they

didn't do anything until she told them, that she was no longer willing to work there

unless something was done to Dr. Mahaffy.  Dep. 75-76.

At least a couple of weeks later, Brad Moody and Glen Ray met with Dr.

Mahaffy.  Dep. 76.  About four weeks later, Plaintiff Ellison was called into the

meeting with Dr. Mahaffy, Glen Ray and Brad Moody, and they told Plaintiff that

Dr. Mahaffy had agreed that he needed to see a psychiatrist or psychologist.

---

[6] Plaintiff did not report it to Debra Foster because she didn't think anything
would be done.  Dep. 74.

Dep. 76-77.   During this time, Dean Moody was the Dean from December 2002 through August 2004, and the first Dean search ended in 2003.  Dep. 70.

Plaintiff Ellison believed that Debora Foster mistreated her because of the Jessie Clayton incident in 2003.  Dep. 80-81.  Plaintiff testified that Jessie Clayton a black, more qualified male, applied for the School of Sciences Computer Center Director's position, was denied and the position was given to a white male, Bo Holt, whereas the job description was changed to fit his credentials and no degree was required at the request of Debra Foster.  Dep. 80-81.  Plaintiff Ellison testified that because of her conversation with Debra about how she, Plaintiff Ellison, thought Jessie Clayton was treated affected Debra's attitude toward Ms. Ellison. Dep. 81.

Also, Plaintiff Ellison believed that Debora Foster discriminated against her during the Barbara Ware incident.  Dep. 84.  Dr. Lawal called Plaintiff Ellison into his office, and told her that Barbara Ware had filed a complaint about Plaintiff Ellison calling her office.  Dep. 84. Plaintiff Ellison, who does the payroll contacted Ms. Ware, who had left Friday on her time sheet blank, to see whether she wanted to take leave or was working. Dep. 84   Dr. Lawal stated that he had talked to Debra Foster, and that they believed that the complaint by Barbara Ware had been embellished by Dr. Mahaffy.  Dep. 85.  Plaintiff Ellison said that she never saw the complaint, and that Dr. Lawal and Debra Foster told Plaintiff not to worry about the complaint because it was frivolous. Dep. 85. Plaintiff Ellison asked to see the complaint and was refused, and never received a letter

from Debra Foster, although, Dr. Lawal and Barbara Ware had received a letter from Ms. Foster regarding the complaint lodged against Plaintiff. Dep. 86.

Plaintiff Ellison was mistreated because Debra Foster told her that the complaint lodged by Barbara Ware was nothing and don't worry about it. Dep. 88. Then, all of sudden it became a big deal. Id.

Plaintiff Ellison testified that Debra Foster retaliated against her after the Allison Stevens incident in the Spring 2004. Dep. 166.

**Plaintiff Ellison and Allison Stevens**

In December 2003, Plaintiff Ellison filed a complaint against Allison Stevens, with Debra Foster. Dep. 62. Plaintiff testified that Debra Foster investigated and interviewed all of the white witnesses and did not interview the black witnesses until Dr. Nance and Plaintiff Ellison called it to her attention. Dep. 63. ***Plaintiff Ellison testified that Debra Foster called Plaintiff Ellison over and spoke to her in the presence of Faye Ward, and said, " I have never had a complaint like this before. I really don' know what to do. You know these people on this Campus are just crazy." Dep. 63.*** Plaintiff Ellison was harmed by this because when other things began to happen, Plaintiff Ellison said she did not have the confidence to report it to HR (Human Resources) because she knew nothing would be done, therefore, she was affected. Dep. 64.

**Job Detriment**

Plaintiff testified that after she filed her complaint in December 2004, she couldn't do her job, it was almost impossible to do work. Dep. 156. Plaintiff Ellison also stated that she was being forced to retire. Dep. 155-156. Then,

12

Plaintiff Ellison testified that she adversely affected because she was not given

any security. Dep. 157.   Plaintiff also testified that after she reported the

discrimination and attended the meeting of January 31, 2005 prior to her leaving

AUM, that Dr. Lawal would not let her perform her job duties, he would not let her

do routine things in the office, couldn't open the mail, it was virtually shut down.

Dep. 176. Lawal said that he didn't want Plaintiff Ellis to do anything.  Dep. 176.

So in Plaintiff Ellison opinion, Plaintiff was forced to leave.  Dep. 176.

### SECURITY

Plaintiff Ellison asked Dr. Ritvo for security during the January 31, 2005

meeting with Dr. Ritvo, Dr. Lawal, Faye Ward, and herself.  Dep. 118-119.  She

asked for campus police to secure her area in Goodwyn Hall on the third floor.

Id.  (See also, Exhibit 7, February 7, 2005 letter). [7]

On December 3, 2004, after Plaintiff Ellison filed the complaint by Dr.

Ritvo's request in December 2004, Plaintiff met with Debra Foster and Faye

Ward. Dep. 121. During this meeting, Debora Foster said that the only thing

Chris Mahaffy had admitted to saying was that **blacks shouldn't hold**

**responsible positions.**

On January 18, 2005, Plaintiff Ellison while sitting at her desk, felt a sense

of presence in the office, she looked up and *Chris Mahaffy had on an overcoat, a*

---

[7] Plaintiff Ellison addresses the fact in her letter that Debra Foster had campus
police escort her to her car and had campus police stationed outside of the
Chancellor and Vice Chancellor offices indicated that Mahaffy posed a threat.
Exhibit 7 "At no time did anyone from campus security or your office offer any
such assistance to Plaintiff. Id. In fact, Dr. Ritvo said it was unfortunate that he
found himself in this position, but there really was nothing that could be done. Id.
I was told if Chris does something to call campus police – calling campus police
after he does something may be too late. Exhibit 7)

*skull cap, his hands was in the pocket of his over coat and was standing over Plaintiff Ellison trying to intimidate her because Plaintiff Ellison had filed a complaint.* Dep. 123. (Exhibit 7 - February 7, 2005 letter to Debra Foster). Chris Mahaffy demeanor was such that how dare you report me? Dep. 121. It was retaliatory, his eyes said it. Dep. 121. Chris Mahaffy came into the office several times and just stood and stared. Dep. 121.

Plaintiff Ellison testified that Nell Robinson was the Chief Law Enforcement Officer at AUM. Dep 49. Plaintiff Ellison asked for Campus Police and Dr. Lawal said that she had to go through Dr. Ritvo.

Plaintiff Ellison testified that if Campus Police had been informed about Chris Mahaffy and his behavior and that it was directed toward Plaintiff Ellison, a good Campus Police would have said, hey, how are you doing? or, Are you there, staring at Cynthia because she filed a complaint. Dep. 125. However, on January 31, 2005, Plaintiff Ellison believed that Debra Foster was provided campus police and escorted to her car by Campus Police, not just for that day, but for the whole week. Dep. 126.

Officer Cox came to Plaintiff Ellison's office Monday prior to her leaving AUM and said that he had been over to secure her area. Dep. 189. He said, Cynthia, if I had known it was you, I would have been here earlier." Plaintiff testified that Cox was the one stationed outside of Dr. Ritvo's office and on January 31, 2005, when all the meetings occurred said that when he, Cox, witnessed Chris Mahaffy come out of the meeting, it looked like he was off his

meds. Dep. 189. Cox said that no one ever told him to come over and secure

Plaintiff Ellison's area. Dep. 189.

Debora Foster called Plaintiff Ellison to her office and said, "The University

attorney called, and they said to tell you that" – and this is the first time I ever

heard of the phrase "constructive discharge." That you are not getting

constructive discharge. Dep. 167. Foster asked Plaintiff what she wanted, and

Plaintiff said, for you to do your job. Dep. 167. Later, Debra Foster stormed out

of the room and came back, handed Plaintiff Ellison a piece of paper and said, "If

you have anything else to say, say it to our attorneys." Dep. 168. The piece of

paper had a type written name on it of the University's attorney. Dep. 168-169.

**Plaintiff Ellison and Dr. Bayo Lawal**

Plaintiff Ellison testified that after Dr Lawal received a letter from Plaintiff

Ellison's attorney, on February 11, 2005, he retaliated against her. Dep. 129-

131. (Exhibit 8 – February 10, 2005 letter with an EEOC charge of

discrimination attached) and Plaintiff Ellison testified that Dr. Lawal called her into

his office, became furious, and said as he was hitting his chest, "you have done

this to me. We should have both waited until summer and filed suits together

and walked away with a fistful of money, and now you have spoiled my plans."

Dep. 129.

Dr. Lawal asked Plaintiff to get out of his office. Dep. 130. Not to speak

with him any more. Id. And if Plaintiff had anything to say to him, send it in an

email. Id. He just became indignant stated Plaintiff. Dep. 130. Every routine

thing that Plaintiff Ellison did in the office became an issue. Dep. 131. Dr. Lawal even searched through Plaintiff Ellison's trash can. Id.

Prior to the letter from Plaintiff Ellison's attorney, Dr. Lawal, was in line with Plaintiff to file a claim against the University. Dep. 132 Dr. Lawal even allowed Plaintiff Ellison to have the opportunity to read the first page of his complaint to Dr. Ritvo. Dep. 132.

On January 31st, Dr. Lawal in a meeting with Faye Ward, Cynthia Ellison, Dr. Ritvo and Plaintiff Ellison, told Dr. Ritvo that if he did not do something with Chris Mahaffy that he was going to file civil litigation. Dep. 133. After this meeting, Dr. Lawal told Plaintiff Ellison in the office, I'm upset with you, Plaintiff Ellison, said, why?. Dep. 133. Dr. Lawal said, "you don't talk back to men." (referring to Dr. Ritvo in the meeting). Dep. 133.

In addition, Plaintiff Ellison testified that Dr. Lawal made a racially insensitive comment, when Lawal said, **"I don't want a woman assistant, black or white."** Dep. 159. Therefore, between the time in which Plaintiff filed her complaint until she left on February 14, 2005, Plaintiff testified that Bayo made negative comments, especially, after the January 31, 2005 meeting, such as, Plaintiff was not getting things done fast enough, don't open the mail anymore, and don't talk to me anymore. Dep, 174.

### Hostile work environment

Although Dr. Bayo Lawal became indignant toward Plaintiff Ellison, he himself filed a complaint on December 3, 2006 to Dr. Roger Ritvo. (Exhibit – From Lawal to Dr. Ritvo, December 3, 2004). Lawal's complaint was similar to

Plaintiff Ellison, whereas. he stated that Dr. Mahaffy was *creating a hostile environment*. (Exhibit 9 - From Dr. Lawal to Dr. Ritvo December 3, 2004).

Also, in a memo dated, January 27, 2005, to, Dr. Guin Nance, Chancellor, from, Debra S. Foster, Director of Human Resources/Affirmative, Ms. Foster concluded that Chris MaHaffy did make inappropriate comments and had created a hostile work environment for Plaintiff Ellison. (Exhibit 10 - January 27, 2005 letter to Nance). In addition, Foster stated that Mahaffy denied or does not remember any of the allegations in the memorandum, Plaintiff submitted to Dr. Ritvo on December 3, 2004, *except a general comment about black people.* Id.

### Plaintiff Ellison and Dr. Ritvo[8]

Plaintiff Ellison believed that Dr. Ritvo retaliated against her by denying her security, he treated her differently then Chris, who had one month to decide what he wanted to do. Dep. 169. Then, he had until the end of summer to complete whatever he decided he wanted to do. Dep. 169. Even though, Plaintiff Ellison was taken off campus because Defendant knew that Chris was a threat to Plaintiff, they refused to provide security. Dep. 169. Also, Dr. Ritvo did not put Plaintiff Ellison's complaint with Dr. Lawal (who also had a complaint against Dr. Mahaffy) and send it to Debra Foster, but it didn't happen. Dep 170.

### Other Facts of Plaintiff Ellison

Plaintiff Ellison testified that Faye Ward was the Assistant Director of Human Resources at Auburn University Montgomery. Dep. 10. Ellison is not related to Faye Ward. Id.

---

[8] Also, incorporate by reference the "Security" issue above.

Plaintiff Ellison also worked a part-time job at Dillard's while she was still employed with AUM, which after she left AUM, her hours decreased due to decrease in hairdressers in the department in which she worked.  Dep. 15.

Plaintiff Ellison mitigated her damages and obtained employment with Colonial Bank as the Executive Assistant to the Director for Training and Development.  Dep. 17.

### Additional facts of Plaintiff Ellison

Plaintiff Ellison testified that Keith Ellison was her pastor, whom she was seeking spiritual guidance in regards to what was happening to Plaintiff Ellison at AUM.  Dep. 115.  Plaintiff Ellison testified  that her Christian belief is to pray, and Pastor Ellison told her to pray, be watchful, report was happening to her, and be safe.  Dep. 116-117.

Plaintiff Ellison testified that Courtnei Ellison, her daughter, could attest to the mental anguish, that she went through.  Dep. 117.

Plaintiff Ellison testified that Debra Carter, her sister-in-law, whom she looks to for spiritual guidance was a woman, and Plaintiff believed Debra Carter would understand the retaliation and uncomfortable position she was in at AUM. Dep. 153.   Plaintiff stated that Debra Carter told her to document everything, and to report everything through the chain of command.  Dep. 153.

### B. Brandy Holmes (Exhibit 11 - Declaration  and Exhibit 12 - Affidavit)

Brandy Holmes in her Declaration declared that she worked in the office with Dr. Lawal and Cynthia Ellison from the Fall of 2004 through May 2005.

Exhibit 11. Dean Bayo Lawal is an African, whereas he understood that females were not treated equally with males. Id.

Holmes declared that on February 14, 2005, Dean Lawal questioned, Cynthia Ellison about papers the student workers had shredded on the preceding Friday. Exhibit 11.

Furthermore, Holmes confirms that Plaintiff Ellison was leaving AUM even though, she had planned to retire sometime later. Id.

On February 14, 2005, Holmes confirmed that Dr. Lawal's attitude toward Plaintiff Ellison had changed a great and he talks to her, as if she is inferior to him just because is a man. Id. Dr. Lawal made a great big deal about the papers that were shredded Friday. Id. Lawal said, he never seen us shred papers before, meaning the student workers, this was an untrue statement from him, he has seen the student workers shredding papers before. Id. Holmes stated that Plaintiff was good to Dr. Lawal and this is how he repaid her. Exhibit 12

### C. Marquita Snow (Exhibit 13 - Declaration and Exhibit 14 – Affidavit and Exhibit 15 - Affidavit)

Marquita Snow, a junior at Auburn University, worked in the Dean's office from Fall 2004 until May 2005. Exhibit 13. Marquita declared that Dr. Lawal was a Nigerian and that on February 14, 2006 had an argument with Plaintiff Ellison regarding some documents that were being shredded. Id.

Dr. Lawal asked Plaintiff Ellison what she was doing and she stated that she was not re-organizing and pointed out exactly to Dr. Lawal what she was doing. (Exhibit 14).

Snow also stated in her affidavit that during time she was a student worker at AUM in the Science Department, Dr. Chris Mahaffy came into the office and asked Ms. Ellison to read his shirt. Exhibit 15. The shirt Dr. Mahaffy was wearing that day, said that **I am a redneck.** Id. Snow furthered by stating that this was offensive to her as an African American female and should have been offensive to Plaintiff Ellison. Exhibit 15.

### D. Amelia J. Benn  (Affidavit 16 and Affidavit 17)

Amelia Benn wrote that she had been working in the Dean's office, shredding and filing papers, which was her part time job duties. Exhibit 16. Benn stated that Dr. Lawal was accusing Ms. Ellison, of doing some dishonest activities in reference to the aforementioned duties. Id. However, in her defense, Benn said, she knew that not to be true. Id. Benn stated that Ms. Ellison has always shown integrity and honesty in her job duties, as well as the student workers, anything to the contrary is just a lie. Exhibit 16.

Benn also testified that Dr. Chris Mahaffy had a weird personality, especially, in the way he reacted in different ways on different days. Exhibit 17. Benn believed that Dr. Mahaffy was *life threatening and could actually hurt someone physically.* Id. Dr. Mahaffy kept walking around Ms. Ellison's desk with a backpack on his back, which was scary and a weird situation. Id.

Benn concluded that the University, more specifically, Debora Foster, began to treat Ms. Ellison differently after she filed reported discrimination with the Human Resources office, whereas they became uncooperative thereafter.

Exhibit 17.  Benn also stated that Caucasian employees spoke negatively about Ms. Ellison.  Id.

### E.  Darolyn (Nikki) Gibson  (Exhibit 18 – Affidavit and  Exhibit 19)

Darolyn Gibson, another student worker, testified that on Friday, February 11, 2005, she helped Plaintiff Ellison file some documents.  Exhibit 18. While helping Plaintiff Ellison file, Dr. Lawal came out of his office and asked Plaintiff Ellison what she was doing, Plaintiff Ellison stated to him that she was filing some papers with the help of Darolyn and Marquita Snow, and asked him, if he would like to see any of it.  Id.  Dr. Lawal said, NO, and went back into his office.  Id.

Gibson witnessed the changes in the way Dr. Lawal began to treat and evaluate Ms. Ellison.  Id. On Monday, February 14, 2005, Dr. Lawal walked by Ms. Ellison desk, she called his name, Lawal answered, yes, and continued walking into his office and shut the door without stopping to see what Ms. Ellison had for him.  Id.  Ms. Ellison then had to get up and knock on the door to give him what she had to give him.  Id.  Normally, when Ms. Ellison called Dr. Lawal, he would stop at her desk and see what she had for him, this indeed was a change to the way he is treating her.  Id.

Gibson also stated that she observed Dr. Mahaffy come into the Dean's Office wearing a t-shirt which had redneck on it.  Id.  Mahaffy went to Ms. Ellison's desk and showed it to her. Id.  Gibson said, she was shocked to see a Doctor at AUM actually wearing a t-shirt that can be considered racial.  Id.

21

Also, I heard Allison Stevens, a Caucasian employee screaming in a loud tone at Cynthia Ellison, I knew that Allison really did not like Ms. Ellison. Id.

One day, I was at work, Dr. Bayo Lawal rushed Ms. Ellison out of the office as requested by AUM. Exhibit 19. Later, Dr. Mahaffy came into the office with an angry look on his face and went around to Ms. Ellison's cubicle. Exh. Later, I found out that AUM was investigating Dr. Mahaffy for a report Ms. Ellison had made against him. Id.

Ms. Ellison became so fearful of Dr. Mahaffy and was concerned that he may even come to her house and harm her. Id. Gibson said she remembered Plaintiff Ellison was concerned about not getting security, whereas everyone else was receiving security. After going back and analyzing everything that Gibson could remember, during her work study, she believed that Plaintiff Ellison was discriminated. Id.

### F. Keith Ellison ( Exhibit 20 - Deposition)

Pastor Keith Ellison testified that in 2005, he recalled Plaintiff Ellison retiring from AUM at the beginning of the year. Dep. 5- 6. Keith Ellison testified that Plaintiff reported to him that she had been subjected to harassment, and that she had been called, "Nigger." Id.

Pastor Keith Ellison testified that Plaintiff was afraid of Dr. Mahaffy because he would come into her office at odd times and one time, when she arrived to work one morning, Dr. Mahaffy was sitting in the office, in the dark. Dep. 7. Also, that Mahaffy carried a black bag, which frightened Plaintiff. Dep. 7.

In addition, Pastor Ellison testified that Dr. Mahaffy refused to submit to black leadership because he thought he should have had the position. Id.

Plaintiff had several discussions with Pastor Ellison when she would come to church. Dep. 8-9. Pastor Ellison testified that Bayo Lawal, who was from Nigeria wanted her to be a slave, get my coffee, get my doughnuts, do what I say do and don't ask me any questions. Dep. 9.

Pastor Ellison advised Plaintiff to pray and avoid being alone with him. Dep. 9-10. Pastor Ellison also testified that Plaintiff planned to retire later but she wound up retiring earlier than she planned. Dep. 16. However, Plaintiff was afraid to stay at AUM and thought it was in her best interest to go ahead and retire. Id. Plaintiff told Pastor Ellison, she felt she needed to retire because of Bayo Lawal and Chris MaHaffy. Dep. 17.

### G. Courtnei Ellison (Exhibit -21 Deposition)

Courtnei Ellison testified that her mother, Plaintiff Ellison, began to share with her the difficulties she was having at AUM in 2003 with Allison Stevens. Dep. 7 Courtnei Ellison testified that Plaintiff Ellison said that Allison Stevens had called her a NIGGER. Id. Courtnei testified that Plaintiff Ellison reported the incident to Brad Moody, the Dean at the time, Dep. 8.

The next time Plaintiff Ellison said anything about difficulties was during the search committee for the Dean, which was after Allison Stevens. Dep. 9. Dr. Chris MaHaffy was trying to get Plaintiff Ellison to vote for him as Dean, which was the early part of 2004. Id. The search ultimately resulted in Dr. Lawal becoming Dean. Dep. 10. Dr. Mahaffy was trying to coerce Plaintiff into helping

him become a meaningful candidate. Dep. 10.  Mahaffy was trying to give Plaintiff his email, to find out what was going on with the search committee, which she refused.  Dep. 10-11. Plaintiff Ellison, said,  "Chris, you know that I cannot do that."  Id.  Chris Mahaffy walked out mad.  Id.

Courtnei stated that after Chris Mahaffy did not receive the Deanship, *his mental state changed,* he was angry.  Dep. 13.

Courtnei testified that Plaintiff Ellison would come home and tell her how Chris Mahaffy would stare, and that she started closing up the doors, which ws usually opened.  Dep. 14.  Courtnei testified that was one particular time in the office when Chris Mahaffy had his skull hat on, and it was like 90 degrees outside.  Dep. 14.  There was another time when, Courtnei was present, and Dr. Mahaffy was walking around with a book bag.

Courtnei testified that Plaintiff's demeanor changed and her health was affected, Plaintiff's arthritis flared up and that she, Courtnei, called the Doctor, herself for Plaintiff.  Dep. 17.   Plaintiff has had a hard time walking, and flare-ups of the foot as well.  Dep 22-23.  Plaintiff was nervous, she would jump if the phone rung. Dep 19-20.

Courtnei testified that Plaintiff was being mistreated prior to Dr. Lawal's coming to AUM, but that it enhanced more because two blacks were in the office.  Dep. 18.

In April or May 2004, Dr. Lawal, his wife, Plaintiff and Courtnei went out to eat. Dep. 24.  Plaintiff told Dr. Lawal that she had enough years to retire, but was going to stay, to transition him into the position of Dean of Sciences.  Dep.

24.  Courtnei testified that Plaintiff was forced to retire by Dr. Chris Mahaffy, Dr. Lawal, Debra Foster and Dr. Nance.  Dep. 25.

Courtnei testified that Plaintiff left because of the following:

        a.      Plaintiff did not get the security, Plaintiff requested;

        b.      Plaintiff was fearful of Chris Mahaffy;

        c.      Dr. Lawal begin to turn against Plaintiff Ellison; and that

        d.      Debra Foster told her do what you have to do.  Dep 25-26.

Courtnei testified that she was there during the conversation, when Dr. Mahaffy, said, they could leave with a fistful of money.  Dep. 26.  However, once the internal complaint was filed, Dr. Lawal started retaliating against Plaintiff.  Dep. 26.

### H.  Faye Ward ( Exhibit 23- Deposition of Faye Ward)

Faye Ward was the former Assistant Director of Human Resources and Employment Manager at AUM.  Dep. 21 Ms. Ward received her undergraduate degree from Alabama State University in Business Education and Economics.  Dep 25-26.  Faye Ward was an assistant to Debra Foster, the Director of Human Resources.  Dep. 46.

In January 2004, Cynthia Ellison came to the Human Resources office to report concerns she had with Chris Mahaffy. Dep. 47.  Cynthia Ellison came to the Department of Human Resources and said, she was very upset.  Cynthia Ellison thought that she was put in an hostile environment because of the way Chris Mahaffy was acting toward her.  Dep. 48.

Ward testified that Cynthia Ellison said, she was just so nervous. (Dep. 48) Chris is frightening me with his behavior. Id. Ward asked Plaintiff Ellison, whether she had spoken with her supervisor. Id. Cynthia Ellison was instructed to go back and talk with her supervisors, Bob Elliott. Dep. 48. To no avail, Cynthia Ellison returned to the Human Resources office. Dep. 49. Ward referred Ellison to Debra Foster, the EEO Officer. Dep. 50. Ellison returned to Faye Ward several times because she was a nervous wreck. Id.

During a meeting that Debra Foster, Dr. Glen Ray, Dr. Moody and Ward had together, they noticed that Chris Mahaffy's behavior was of such a magnitude that the University referred, Mahaffy to a psychologist/psychiatrist. Dep. 51. Bob Elliott had Dr. Mahaffy referred for psychiatric training. Dep. 58.

Ward testified that Cynthia Ellison said Chris Mahaffy would come and stare at her in her office. Dep. 53. Mahaffy wouldn't say anything to her, he would stand in the doorway and stare at her. Id. On another occasion, Cynthia Ellison went to work one morning early and Chris Mahaffy was sitting there crying, dressed in an overcoat, had a backpack and that Plaintiff had no idea, what was in the backpack. Dep. 53. Ward testified that Cynthia Ellison said, Mahaffy said that **blacks should not be in responsible positions.** Dep. 54.

Dr. Glen Ray in an interview that Ms. Foster and Ward had with him in December 2004, said Dr. Mahaffy said that blacks should not be in responsible positions. Dep. 55. Debra Foster, the EEO Officer, told Ward and Ellison in a meeting, that Dr. Mahaffy also said, blacks should not in responsible positions.

Dep. 56.  Plaintiff Ellison responded to Ms. Foster(an African American female) by saying, you should feel offended.  Id.

Cynthia Ellison was reluctant to go to Debra Foster with her problems with Mahaffy because during the Allison Stevens incident, where Stevens called Ms..Ellison, a Nigger, Ms Foster said, she never had a case like that before and wasn't sure how to handle it.  Dep. 60.

In regards to Mahaffy, Cynthia Ellison told Ward that she was about to go out of her mind because she was afraid of Mahaffy.  Dep. 66.

Ward testified that the Debra Foster, the Human Resources Director/EEO Officer was unprofessional.  Dep. 69.  According to Ward, Debora Foster would say "What does she want now; when is she going to retire, referring to Plaintiff Ellison, when Plaintiff called the Human Resources Department.  Id.

In December 2004, Dr. Ritvoe asked Ward to send in on some meetings with Glen Ray and Brad Moody, because Ritvoe said he trusted Ward.  Dep. 78 - 79.

Ward testified that she feel that Cynthia Ellison followed the correct procedure in reporting the discrimination.  Dep. 79.  Further Ward testified, that Ellison complained to Dr. Lawal, who had the same complaint as Plaintiff Ellison and thought that Chris Mahaffy was being discriminatory towards him.  Dep. 79.  When Dr. Lawal came to see Debra Foster to see whether he could have aligned his case with Plaintiff Ellison against Mahaffy, Debra Foster, Director of Human Resources said, you're faculty, we don't need to do your case.  Dep. 79   I'm not

doing your case. Id. Ward said to Foster, well, after all, you are the EEO Officer for the whole campus, be it faculty or staff. Dep. 80.

Ward testified that in a meeting with Chris Mahaffy on January 10, that Debra Foster said, when asked by Mahaffy what was the meeting about, that it wasn't about anything too much, Cynthia Ellison just filed a complaint to Roger Ritvoe. Dep. 83  Ritvoe sent the complaint to Foster who had to investigate the complaint. Id.

Ward said that usually an investigation about harassment or discrimination would take place immediately, at least within 24 hours or 48 hours. Dep. 85.

During the investigation of allegations Plaintiff made against Mahaffy, Debra Foster said that she was not going to mess up her holiday. Dep. 86.  We will call him (Mahaffy) in later. Dep. 86.  So that's how it got kicked over into January on the 10th. Dep. 86-87.

Dr. Mahaffy was stripped of his position, salary lowered, and was supposed to attend some training sessions, but Ward did not know whether or not it ever came to be. Dep. 88.   The complaints against Dr. Mahaffy rose to the highest administrative level, Dr. Nance Chancellor. Dep. 91.

Ward testified that she did not believe that the University did enough to take Plaintiff Ellison out of her environment. Dep. 92 They **did not give her security**. (Emphasis added). Dep. 92.  Ward, herself, asked for security for Plaintiff Ellison, but the University did not. Id. Ward testified that she said, suppose Mahaffy retaliates against Dr. Lawal and Cynthia. Dep. 93 We need to get security is what Faye Ward told Ritvoe. Id.

Ward called Chief Robinson and said, you know, Ms. Ellison and Dr. Lawal need some security over there. She said, I'll have to call Ritvoe. Dep 94. Because Debra Foster called and got security in the hallway, when Ward and Foster was interviewing Chris Mahaffy. Dep. 94. Ward continued by saying that AUM has had security present during disciplinary hearings. Id. Ward testified that she saw campus police escort Debra Foster to her car. Dep. 98-99.

Ward testified that Plaintiff was subjected to a racially hostile work environment with Mahaffy that lasted at least a year and a half. Dep. 111. Ward believed it was a racially hostile environment because Mahaffy was white and Plaintiff Ellison was black.

Ward testified that she believe that the hostile work environment resulted in Plaintiff Ellison's early retirement. Dep. 114. Also, according to Plaintiff Ellison, Dr. Lawal did a 360 degree turn. Dep. 114.

Ward testified that in 2004, Plaintiff Ellison was not planning on retiring that she had plan to stay around and assist Dr. Lawal. Dep. 114 Ward even ask Plaintiff whether she was thinking about retiring, and Plaintiff said, no, she was going to stay until Dr. Lawal was settled. Dep. 115.

Dr. Lawal later accused Plaintiff Ellison of shredding documents. Dep. 116. Plaintiff Ellison told Dr. Lawal that he had started treating her differently after she filed her complaint. Dep. 116-117. Dr. Lawal told Plaintiff Ellison not to come into his office, not to read his mail, and later accused Plaintiff of shredding documents. Dep. 117. Ward testified that she believed that Dr. Lawal added to the hostile work environment of Plaintff Ellison. Dep. 117.

Ward testified that she believe that from the time Dr. Lawal got to the AUM up until the time Cynthia Ellison left on February 14, 2005, that Cynthia Ellison was going to remain a couple of years at the University.  Dep. 121.

When Cynthia Ellison asked Ms. Foster, did she believe her allegations, Ms. Foster got up, walked out of the room, came back and told Ms. Ellison, you can call the attorney and ask him, whatever you want to know.  Dep. 132.  Then, Ms. Foster gave Plaintiff Ellison the phone number to the University's attorney. Dep. 132.  At that time, Plaintiff Ellison wasn't even going to seek an attorney. Dep. 132.

## **ARGUMENT**

I.     **Plaintiff's Title VII Claims Are NOT Ripe for Summary Disposition**

Under *Rule 56(c) of the Federal Rules of Civil Procedure*, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law. <u>Celotex Corp., v. Catrett,</u> 477 U.S. 317, 322, 91 L.Ed. 2d 265, 106 S.Ct. 2548 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, 'which it believes demonstrate the absence of a genuine issue of material fact, or by

showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id. at 322-23.*

Once the moving party has met its burden, *Rule 56(e)* "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Id. at 324.*  To avoid summary judgment, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,</u> 475 U.S. 574, 586, 89 L.Ed. 2d 538, 106 S.Ct.1348 (1986).  On the other hand, a court ruling on a motion for summary judgment **must** believe the evidence of the non-movant and **must** draw all justifiable interferences from the evidence in the **non-moving party's favor.** (Emphasis added).  <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 255, 91 L.Ed. 2d 202, 106 S. Ct 2505 (1986).

The summary judgment rule is to be applied in employment discrimination cases as in any other case. <u>Chapman v. AI Transport, 229 F.3d 1012, 1026 (11th Cir. 2000)</u>

As fully outlined in the following arguments and the presentation of above facts, through deposition, affidavits, declarations, and exhibits Plaintiff Ellison is able to prove every element of each Title VII claim, which she has asserted. Thus, Defendant AUM should NOT be granted summary judgment.

I.      **The Title VII Statute of Limitations DOES NOT Bar Plaintiff's Claims Arising Before August 15, 2004.**

In the case at bar, Plaintiff Ellison provides all evidence prior to August 15, 2004, as support evidence to Plaintiff Ellison's claims after August 15, 2004.

II.    **Plaintiff has both direct and circumstantial evidence of disparate treatment based on race to support her Count I claim.**

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. ? 2000e-2(a).   *Bass v. Board of County Commissioners, Orange County, Florida,* 256 F.3d 1095

A plaintiff may establish a Title VII claim through the introduction of **direct evidence** of discrimination or through **circumstantial evidence** that creates an inference of discrimination. To evaluate Title VII claims based on circumstantial evidence, we use the familiar framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir.1997). Under this framework, the plaintiff must first establish a prima facie case of discrimination. *See Combs,* 106 F.3d at 1527-28 (citations omitted).

"[I]n cases of discrimination proven by direct evidence, it is incorrect

to rely on the *McDonnell Douglas* test because, while circumstantial

evidence is used to create an inference of discrimination under

*McDonnell Douglas,* no such inference is required in the case of direct

evidence." *Taylor,* 175 F.3d at 867 n. 2; *Evans v. McClain of Georgia,*

*Inc.,* 131 F.3d 957, 962 (11th Cir.1997) ("[O]nce a plaintiff produces

direct evidence of a discriminatory motive, and the trier of facts

accepts this testimony the ultimate issue of discrimination is proved."

(citation and internal quotation omitted)); *Trotter v. Board of Trustees*

*of the Univ. of Ala.,* 91 F.3d 1449, 1453 (11th Cir.1996) ("When there

is direct evidence that discrimination was a motivating factor in the

challenged employment decision, the appropriate analysis is different

from that employed in a case where only circumstantial evidence is

available."). The defendant's burden when refuting direct evidence of

discrimination is one of persuasion and not merely production. *See Hill*

*v. Metropolitan Atlanta Rapid Transit Auth.,* 841 F.2d 1533, 1539 (11th

Cir.1988). Plaintiff  Ellison attempts to prove his Title VII claim with

both direct and circumstantial evidence of discrimination.

   Plaintiff Ellison, an African American female was qualified for her

position, she was in the protected class, she suffered adverse

employment action (racial remarks and differences of treatment), and

no other Caucasian female, was subjected to same.  Thus, Plaintiff Ellison was treated less favorably.

After Bayo Lawal was hired in August 2004,[9] Chris Mahaffy came to Plaintiff Ellison several times and said that Bayo would have a tough time being Dean **because he was Black** and no one will be able to understand him. (Exhibit 6–12/3/2004 – letter to Ritvo).  He also said **that we (referring to Plaintiff Ellison and Dr. Lawal) both being black would not get the cooperation of the faculty.**  Id.

In January 2005, Chris Mahaffy came to Plaintiff Ellison's office, stood in front of Plaintiff Ellison, and said, "I want you to read my shirt." Dep. 161.  Plaintiff looked up and the shirt, said, **"I am a redneck."**  Dep. 161. Mahaffy said, "what do you think about that?" Plaintiff Ellison said, "I am offended."  Mahaffy laughed and left. Id. Plaintiff Ellison reported the incident to Dr. Lawal, who didn't say anything really.  Dep. 161.  Plaintiff Ellison said that she feels like "redneck" means you are looking down on the minority.  Dep. 161.  That's the person who feels like minorities are lower class.  Dep. 161.

In addition, Plaintiff Ellison testified that Dr. Lawal made a racially insensitive comment, when Lawal said, **"I don't want a woman assistant, black or white."**  Dep. 159.  Therefore, between the time in which Plaintiff filed her complaint until she left on February 14, 2005, Plaintiff testified that Bayo made

---

[9] In Dr. Bayo Lawal's Declaration, Bayo became the Dean of the School of Sciences at Auburn University in August 2004.  (Attached Declaration of Bayo Lawal – Exhibit 22)

negative comments, especially, after the January 31, 2005 meeting, such as, Plaintiff was not getting things done fast enough, don't open the mail anymore, and don't talk to me anymore. Dep, 174.

Plaintiff Ellison was treated differently, whereas she did not receive security, like Ritvo, Foster and others. (See Statement of Facts). Plaintiff was not provided with a summary report like Dr. Mahaffy. Direct evidence of racial remarks were made, but considering the Statement of Facts as a whole, through circumstantial evidence, Plaintiff Ellison through testimony of her witnesses was treated different and thus was discriminate against.

III.     **Plaintiff Engaged in Protected Activity and suffered adverse employment action as a result of retaliation.**

Retaliation is a separate offense under Title VII. *See 42 U.S.C.A. §2000e-3(a); Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491 (11th Cir. 1989).* To recover for retaliation, the Plaintiff "need not prove the underlying claim of discrimination which led to her protest," so long as she had a reasonable good faith belief that the discrimination existed. *Tipton, 872 F.2d at 1494.*

To establish a prima facie case of retaliation, the plaintiff must show (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relation between the two events. *EEOC v. Reichold*

*Chem., Inc., 988 F. 2d 1564, 1571-72 (11th Cir. 1993); Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1524 (11th Cir. 1991); Tipton, 872 F.2d at 1494.*

     In the case at bar, Plaintiff Ellison engaged in statorily protectd expression by filing a claim of discrimination with AUM and the EEOC, as result she suffered an adverse employment action, whereas, she could no longer perform her job duties and after Mahaffy found out that Plaintiff filed a discrimination complaint he came to Plaintiff's desk and stared, also Dr. Mahaffy became upset with Plaintiff for filing a claim of discrimination with her attorneys.

     As we explained in *Reichhold Chem.,* we interpret "the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. *988 F.2d at 1571-72 (citing Simmons v. Camden County Bd. Of Educ., 757 F.2d 1187, 1189 (11th Cir.) cert. denied, 474 U.S. 981, 106 S. Ct. 385, 88 L.Ed. 2d 338 (1985).*

     At a minimum, a plaintiff must generally show that the employer was actually aware of the protected expression at the time it took adverse employment action. *See, e.g. Weaver, 922 F.2d at 1525.*

     Dr. Lawal was provided a letter from Plaintiff's attorney

regarding the filing of the discrimination claim and tried to align his own claim with Plaintiff's claim.  (See statement of Facts).  The defendants awareness of the protected statement, however, may be established by circumstantial evidence.  *Cf. Tyler v. Behtlehem Steel Corp., 958 f.2d 1176, 1183 (2d Cir. 1992) (quoting Visser v. Packer Engineering Asoc., Inc., 924 F.2d 655, 659 (7th Cir.1991) (en banc) (noting that "all knowledge is inferential"), cert. denied, --U.S.-, 113 S.Ct. 82, 121 L.Ed. 2d 46 (1992).*

Once the prima facie case is established, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action.  As with a Title VII discrimination claim, the employer's burden is "exceedingly light."  *Tipton, 872 F.2d at 1495 (internal quotation omitted).*  The Plaintiff must then demonstrate that the employer's proffered explanations are a pretext for retaliation;  the burden of production shifts, but the burden of persuasion remains with the plaintiff."  *Reichold Chem., 988 f. 2d at 1572.*

Plaintiff Ellison reported discrimination to the University Human Resources Department, wrote a letter to Dr. Lawal and Dr. Ritvo, Attaching a charge of discrimination to the letter claiming race discrimination.   (See Statement of Facts)

In a memo dated February 14, 2005, Plaintiff Ellison informed Dr. Lawal that since he told her, Plaintiff, that she had compromised the integrity of the

37

Dean's office by sharing the memo about Chris Mahaffy with her attorney. (Exhibit 5 -2/14/2005 Memo).

Plaintiff testified that after she filed her complaint in December 2004, she couldn't do her job, it was almost impossible to do work. Dep. 156. Plaintiff Ellison also stated that she was being forced to retire. Dep. 155-156. Then, Plaintiff Ellison testified that she adversely affected because she was not given any security. Dep. 157. Plaintiff also testified that after she reported the discrimination and attended the meeting of January 31, 2005 prior to her leaving AUM, that Dr. Lawal would not let her perform her job duties, he would not let her do routine things in the office, couldn't open the mail, it was virtually shut down. Dep. 176. Lawal said that he didn't want Plaintiff Ellis to do anything. Dep. 176.

Plaintiff Ellison testified that even though Dr. Mahaffy did not make any racial remarks after December 3, 2004, he intimidated her by coming to her office. Dep. 178

On January 18, 2005, Plaintiff Ellison while sitting at her desk, felt a sense of presence in the office, she looked up and *Chris Mahaffy had on an overcoat, a skull cap, his hands was in the pocket of his over coat and was standing over Plaintiff Ellison trying to intimidate her because Plaintiff Ellison had filed a complaint.* Dep. 123. (Exhibit 7 - February 7, 2005 letter to Debra Foster). Chris Mahaffy demeanor was such that how dare you report me? Dep. 121. It was retaliatory, his eyes said it. Dep. 121. Chris Mahaffy came into the office several times and just stood and stared. Dep. 121.

By incorporating by reference the facts above and the above arguments, Plaintiff Ellison was retaliated against.

IV.    **Plaintiff was subjected to a hostile work environment as a matter of law and AUM failed to take prompt remedial actions.**

To prove a prima-facie case of **hostile-work-environment** harassment under Title VII, the plaintiff must show that:

(1) she is a member of a protected group;  Plaintiff Ellison is an African American female,

(2) she was subjected to unwelcome conduct;  Dr. Mahaffy subjected Plaintiff to numerous stares, dark room visitations, sitting at her desk, racial comments

(3) the conduct was on the basis of race;  Dr. Mahaffy had plaintiff to read his shirt which said, I am a redneck, and made racial comments.

(4) the conduct affected a term or condition of employment; Plaintiff became very nervous, and afraid  for her life and

(5) imposition of liability on the defendant is appropriate. Dr. Bayo Lawal was Plaintiff's supervisor and Dr. Mahaffy was in a supervisory role. See <u>Henson v. City of Dundee, 682 F.2d 897, 903-05 (11th Cir. 1982).</u>

In the case at bar, it is undisputed that Plaintiff Ellison, an African American female, is a member of a protected group and that the conduct she experienced was unwelcome.  The alleged harassment is based on race and it has affected a term and condition of her employment.

To prove a prima-facie case of harassment, Plaintiff Ellison must also establish that the alleged harassment was "sufficiently pervasive so as to alter

the conditions of employment and create an abusive working environment."

Henson, 682 F.2d at 904; see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370-71, 126 L. Ed. 2d 295 (1993) ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.") (internal citations omitted). "In deciding whether a hostile environment was created, factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work." Edwards v. Wallace Community College, 49 F.3d 1517, 1521-22 (11th Cir. 1995) (citation omitted). "A plaintiff may have a viable hostile-environment claim even if the racial remarks were not directed at her." Id.

To complete her prima-facie case, Underwood must also show that imposition of liability on the defendants is appropriate. The Supreme Court has explicitly held that an employer may not be held "automatically liable" for all sexual harassment inflicted, or suffered, by its employees. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 72, 106 S. Ct. 2399, 2408, 91 L. Ed. 2d 49 (1986). Lower courts must consider the circumstances of each particular case before imposing liability. See id. The standard governing imposition of liability depends on the position of the alleged harasser relative to the plaintiff. Where the harasser is a supervisor with immediate or successively higher authority over the plaintiff, the employer is vicariously liable for the supervisor's harassment, subject to certain

affirmative defenses. See <u>Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).</u> In contrast, where the person who engaged in the unlawful conduct is not the plaintiff's supervisor but rather is one of the plaintiff's co-workers or a supervisor with no authority over the plaintiff, the plaintiff must show under the theory of respondeat superior that the employer "knew or should have known of the harassment in question and failed to take prompt remedial action." <u>Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1557, 1558 n. 4 (11th Cir. 1987)</u> (quoting <u>Henson, 682 F.2d at 905).</u> A plaintiff can prove that the employer knew of the harassment by showing that the harassment was open or pervasive enough to charge the employer with constructive knowledge. See <u>Vance v. Southern Bell Tel. and Tel. Co., 863 F.2d 1503, 1512 (11th Cir. 1989),</u> cert. denied, <u>513 U.S. 1155, 115 S. Ct. 1110, 130 L. Ed. 2d 1075 (1995).</u> A plaintiff may also prove an employer's knowledge by showing that she complained to higher management. See <u>Huddleston v. Roger Dean Chevrolet, Inc., 845 F.2d 900, 904 (11th Cir. 1988).</u>

In the case at bar, Plaintiff was subjected to a hostile environment by Dr. Mahaffy and Dr. Lawal.   Plaintiff work location made her environment even more dangerous.

Plaintiff Ellison also observed Chris Mahaffy after Department Head meetings come out upset, if things didn't go his way. Dep 39.   Ellison's office was located on third floor of Goodwyn Hall, which was the Dean's Suite. Dep. 41. Plaintiff worked in a cubicle, which was a cubicle with a four or five feet high

partition, and would have to stand up and lean out to to see out of it.  Dep. 42.

Plaintiff Ellis could see the door open, but could not see who was coming in until

they actually entered.  Dep. 42.  There was no close parking to Goodwyn Hall,

where Plaintiff Ellison worked and she had to park by the gym until she parked in

the handicap parking behind Goodwyn Hall the last twelve months of her

employment. Id.

After Bayo Lawal was hired in August 2004,[10] Chris Mahaffy came to

Plaintiff Ellison several times and said that Bayo would have a tough time being

Dean **because he was Black** and no one will be able to understand him.

(Exhibit 6–12/3/2004 – letter to Ritvo).   He also said **that we (referring to**

**Plaintiff Ellison and Dr. Lawal) both being black would not get the**

**cooperation of the faculty.**  Id.

In January 2005, Chris Mahaffy came to Plaintiff Ellison's office, stood in

front of Plaintiff Ellison, and said, "I want you to read my shirt." Dep. 161.  Plaintiff

looked up and the shirt, said, **"I am a redneck**." Dep. 161. Mahaffy said, "what

do you think about that?" Plaintiff Ellison said, "I am offended." Mahaffy laughed

and left. Id. Plaintiff Ellison reported the incident to Dr. Lawal, who didn't say

anything really. Dep. 161. Plaintiff Ellison said that she feels like "redneck"

means you are looking down on the minority. Dep. 161.  That's the person who

feels like minorities are lower class. Dep. 161.

---

[10] In Dr. Bayo Lawal's Declaration, Bayo became the Dean of the School of
Sciences at Auburn University in August 2004. (Attached Declaration of Bayo
Lawal – Exhibit 22)

Dr. Mahaffy wore scull hats, coats and carried black bags, and appeared constantly over Plaintiff's desk or doorway.  He was also treated by a psychiatrist.

Thus, Plaintiff was subjected to a hostile environment.

**V.  Plaintiff was constructively discharged from her employment with Defendant because of her race, retaliation, and hostile work environment.**

A plaintiff succeeds in establishing a constructive-discharge claim when the alleged discriminatory conduct "was so intolerable that a reasonable person in [her] position would be compelled to resign." Morgan v. Ford, 6 F.3d 750, 755-56 (11th Cir. 1993), cert. denied, 512 U.S. 1221, 114 S. Ct. 2708, 129 L. Ed. 2d 836 (1994) (citations omitted). See also Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991). Part of the reasonableness requirement is "an obligation not to assume the worst, and not to jump to conclusions too fast." Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987). Therefore, courts generally will not find constructive discharge unless the employer has been given sufficient time to remedy the allegedly intolerable situation. See id.; Bourque v. Powell Electrical Mfg. Co., 617 F.2d 61, 65 (5th Cir. 1980).

Plaintiff Ellison continued to ask for security to protect herself from Dr. Mahaffy, whereas none was given, Dr. Lawal became indignant and did not want Plaintiff Ellison to work, he had done a 360 degree turn and told Plaintiff he did not want her to talk to him, he took away her job duties.  (See Statement of Facts)  There was no reason for plaintiff to continue to work.  Thus, she was forced from her employment with Auburn University.

43

## CONCLUSION

For all of the foregoing reasons, Plaintiff Ellison respectfully request that

this HONORABLE COURT DENY Defendant's Second Motion for Summary

Judgment and grant Plaintiff Ellison all the relief in which she is entitled.

Respectfully Submitted,

_____
Karen Sampson Rodgers, SAM018

OF COUNSEL:
McPhillips Shinbaum, LLP
Post Office Box 64
Montgomery, Alabama 36101
(334) 262-1911 phone
(334)  263-2321 fax
karensrodgers@email.com email or
karensamrodgers@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on the following
counsel of record by placing the same in the United States mail, properly
addressed and first class postage prepaid on this the 18th day of August 2006 to
the following:

Burton F. Dodd, Esq.
Fisher & Phillips, LLP
945 East Paces Ferry Road
Suite 1500
Atlanta, Georgia 30326