Cynthia Ellison                                                    April 27, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA - NORTHERN DIVISION


CYNTHIA ELLISON,


        Plaintiff,


    vs.                        CASE NO. 205CV902MHTDRB


AUBURN UNIVERSITY
MONTGOMERY,


        Defendants.
~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

CYNTHIA ELLISON

April 27, 2006
9:30 a.m.

McPhillips, shinbaum & gill, LLP
516 South Perry Street
Montgomery, Alabama

Dawn A. Goodman, Certified Shorthand Reporter and
Notary Public in and for the State of Alabama at Large

EXHIBIT

1

d1403afb-e7e9-42de-b323-578

Cynthia Ellison

April 27, 2006

Page 2

1

2                                        APPEARANCES

3

4        FOR THE PLAINTIFF:

5        MCPHILLIPS, SHINBAUM & GILL, LLP

6        KAREN S. RODGERS, ESQUIRE

7            516 S. Perry Street

8            Montgomery, Alabama 36101

9

10       FOR THE DEFENDANT:

11       FISHER & PHILLIPS, LLP

12       BURTON F. DODD, ESQUIRE

13           1500 Resurgens Plaza

14           945 East Paces Ferry Road

15           Atlanta, Georgia 30326-1125

16

17       ALSO PRESENT:

18           DEBRA FOSTER

19

20

21

22

23

24

25

Cynthia Ellison

April 27, 2006

Page 3

1          Deposition of Cynthia Ellison

2              April 27, 2006

3          EXAMINATION

4          BY-MR.DODD:

5              MR. DODD:  Q.  What's your name?

6          A.    Cynthia Ellison.

7          Q.    Where do you live, Ms. Ellison?

8          A.    I live at 1598 Sandstone Court

9    here in Montgomery, Alabama.

10         Q.    How long have you lived there?

11         A.    About five years.

12         Q.    I understand you are divorced, is

13   that correct?

14         A.    That's correct.

15         Q.    You have one child?

16         A.    I do.

17         Q.    That's Courtnei?

18         A.    Courtnei.

19         Q.    How old is Courtnei?

20         A.    Courtnei is 22.

21         Q.    What does she do?

22         A.    She's an HR recruiter at Colonial

23   Bank.

24         Q.    Is Colonial Bank here in

25   Montgomery?

Cynthia Ellison

April 27, 2006

Page 4

1      A.      It is.

2      Q.      Is she married?

3      A.      No.  She is not.

4      Q.      Who is your former husband?

5      A.      Terrell Ellison.

6      Q.      What does he do?

7      A.      He is a full-time pastor.

8      Q.      Is that in Montgomery as well?

9      A.      It is.

10     Q.      What church is he with?

11     A.      New Life Church of God and Christ.

12     Q.      Did you and Terrell only have one
child?

13

14     A.      We have one living child.  I had

15   a stillborn child.

16     Q.      Any other family?  Do you have any

17   other family in this part of Alabama?

18     A.      No.  I have no family in

19   Montgomery.

20     Q.      Do you have any family in the

21   surrounding counties of Montgomery?

22     A.      I do not.

23     Q.      We can get a few preliminaries out

24   of the way. This is the Deposition of Cynthia

25   Ellison taken pursuant to Notice and Agreement

Cynthia Ellison

April 27, 2006

Page 5

1          of Counsel in the case of Ellison versus

2     Auburn UUniversity Montgomery.

3               Ms. Ellison, have you been deposed

4     before?

5          A.     I have.

6          Q.     How many times have you been

7     deposed?

8          A.     Once.

9          Q.     Was that in connection with --

10    strike that, please.

11               What was your deposition in

12    connection with?

13         A.     Dillard's Department Store.

14         Q.     Tell me a little bit about that.

15         A.     I worked part time for Dillard's

16    for about seven years as a salon coordinator.

17    I don't really know what the case was all

18    about.  I just know some clients claimed that

19    they were overcharged.  And I had to be

20    deposed because as a salon coordinator, I

21    accepted the money from the clients and

22    billets from the hairdressers.

23         Q.     Did the folks who were claiming

24    they had been overcharged blame you for the

25    overcharge?

Cynthia Ellison

April 27, 2006

Page 6

1      A.      No.

2      Q.      Did Dillard's blame you for the

3  overcharge?

4      A.      No.

5      Q.      Do you still work at Dillard's?

6      A.      No.  I left Dillard's.

7      Q.      Why did you leave?

8      A.      I took a full-time job.

9      Q.      You understand you are under oath

10 to tell the truth in this deposition?

11     A.      I do understand that.

12     Q.      If you don't understand a question

13 that I ask you, will you let me know so I

14 can try to rephrase it so that you will

15 understand it?

16     A.      I will do that.

17     Q.      If you don't hear the entire

18 question that I ask you, would you let me

19 know so that I can repeat it for you?

20     A.      I will.

21     Q.      If you need to take a break or

22 recess, just let me know and we will get to

23 a stopping point as soon as we can.  Is that

24 okay?

25     A.      Okay.

Cynthia Ellison

April 27, 2006

Page 7

1        Q.    During the course of the

2  deposition, which probably will go on for

3  several hours, if you remember something, say,

4  later in the deposition that means you should

5  change an answer that you previously gave in

6  order to make it truthful, will you let me

7  know that?

8        A.    Yes, I will.

9        Q.    Did you review anything to prepare

10 for this deposition?

11       A.    I talked to my attorney and prayed

12 about coming in here.

13       Q.    Did you look at any documents?

14       A.    I looked at the production

15 materials.

16       Q.    Are those the documents that your

17 lawyer sent to me, the ones you gave your

18 lawyer?

19       A.    I have no idea.

20       Q.    Give me an idea of what documents

21 they were.

22       A.    Well, my affidavit.

23       Q.    Okay.

24       A.    And the -- I believe the EEOC

25 charge.

Cynthia Ellison

April 27, 2006

Page 8

Q.    Are these documents that were in your control?

A.    Yes.

Q.    Okay.  These are documents you have given to your lawyer, correct?

A.    Correct.

Q.    Other than your lawyer, did you talk to anyone to prepare for this deposition?

A.    I did not.

Q.    Do you have any medical condition that would prevent you or hinder you in answering any of the questions I ask you today?

A.    No, sir.

Q.    Are you involved in any community activities?

A.    Just church-related activities.

Q.    Church related?

A.    Uh-huh.

Q.    What church do you attend?

A.    Harris Temple Church of God and Christ in Elba, Alabama.

Q.    Are you on the vestry, or do you hold an office in the church?

Cynthia Ellison

April 27, 2006

Page 9

1    A.    I am a member of the Board of
2    Trustees, and I am the Church Secretary.  And
3    I work with the youth and Sunday School.
4    Q.    Are there any other church-related
5    activities that you participate in?
6    A.    From time to time when something
7    comes up I may volunteer for a particular
8    activity.
9    Q.    An example of that would be
10   something like a youth outing?
11   A.    Youth outing, or we have what we
12   call District Conferences.  I would volunteer
13   to do whatever the function called for.  It
14   may be providing food.  It may be
15   transportation.  Whatever I think I can do.
16   Q.    You weren't in the military
17   service, were you?
18   A.    No, I was not.
19   Q.    Do you have any relatives currently
20   working at Auburn University Montgomery?
21   A.    No.
22   Q.    Did you have any relatives
23   previously working there?
24   A.    No.  I'm sorry.  My daughter
25   worked there.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

1    Q.    Courtnei?

2    A.    Before she graduated she worked

3    there, yes.

4    Q.    What did she do there?

5    A.    She was a student assistant for

6    the Center for Business.

7    Q.    Was she a work study student?

8    A.    No.

9    Q.    She had a job?

10    A.    Uh-huh.

11    Q.    Who is Faye Ward?

12    A.    Faye Ward was the Assistant

13    Director of Human Resources.

14    Q.    Are you related to her at all?

15    A.    I am not.

16    Q.    Did Faye Ward give you any

17    information about this case?

18    A.    She did not.

19    Q.    Do you know if Faye Ward gave your

20    lawyer, or anybody else, information about

21    this case?

22    A.    She did give my lawyer an

23    affidavit statement.

24    Q.    Do you know who prepared that

25    affidavit?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 11

1     A.     My attorney and Faye, I guess.

2     Q.     Did you ask Faye to give you any

3 documents --

4     A.     I did not.

5     Q.     -- related to this case?

6     A.     No, sir.

7     Q.     Did Faye Ward volunteer to give

8 you any documents related to this case?

9     A.     She did not give me any documents.

10     Q.     Do you know if she gave anybody

11 any documents, other than the affidavit?

12     A.     I do not know.

13     Q.     Do you have any current medical

14 problems?

15     A.     I do.

16     Q.     What do you have?

17     A.     I have rheumatoid arthritis and

18 osteoarthritis.

19     Q.     Are you getting treatment for those

20 conditions?

21     A.     Yes, I am.

22     Q.     Do you have any current

23 psychological problems?

24     A.     I do not.

25     Q.     Do you have any current emotional

Cynthia Ellison

April 27, 2006

Page 12

1    problems?

2        A.       No.

3        Q.       Other than the rheumatoid arthritis

4    and osteoarthritis, do you have any other

5    medical conditions?

6        A.       Not that I know of.

7        Q.       Do those conditions restrict your

8    activities in any way?

9        A.       Sometimes.

10       Q.       Can you give me an example?

11       A.       Well, the condition -- the

12   rheumatoid is in the shoulders and the

13   wrists.  So sometimes I am not able to pick

14   items up.  It doesn't matter how heavy or

15   how light they are.  The osteo, of course,

16   prevents me sometimes from getting up right

17   away in the mornings.

18       Q.       Forgive my ignorance.  Is

19   osteoarthritis a back --

20       A.       Well, actually it's bones.

21       Q.       Okay.  Do you attribute either of

22   those conditions to work-related issues?

23       A.       I do not.  The doctors think that

24   the rheumatoid was contracted from the many

25   chemotherapy drugs that I was on for my

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 13

1  cancer surgery.  After my cancer surgery

2  because that was one of the side effects.

3      Q.      Your answer is "no"?

4      A.      No.

5      Q.      Have you had any psychological or

6  psychiatric difficulties in the past?

7      A.      I have not.

8      Q.      When did you resign from Dillard's?

9      A.      I believe my effective date was

10  February -- the last day of February because

11  I started my new job March 1st.

12      Q.      Of what year?

13      A.      This year.

14      Q.      Where was the Dillard's location

15  where you worked?

16      A.      Eastdale Mall.

17      Q.      East what?

18      A.      Eastdale, E-a-s-t-d-a-l-e, Mall.

19      Q.      And who was your supervisor there?

20      A.      We -- the last one that was there

21  was Amy Lyda, L-y-d-a.

22      Q.      Do you know the name of the HR

23  representative at Dillard's?

24      A.      I don't.  I don't think they have

25  one on site.

Cynthia Ellison

April 27, 2006

Page 14

1

2     Q.     Do you know who the general

3     manager of that Dillard's was?

4     A.     Chris Decote.

5     Q.     Can you help me with that?

6     A.     Of course, Chris, C-h-r-i-s.

7     Decote, D-e-c-o-t-e.

8     Q.     Did you have a set schedule at

9     Dillard's?

10    A.     Most of the time I did.

11    Q.     Were you working the same number

12    of hours -- strike that, please.

13          You worked at Dillard's while you

14    worked at AUM as well?

15    A.     That's correct.

16    Q.     What hours did you work when you

17    were also employed at AUM?

18    A.     If I recall correctly, it was

19    Monday nights, Wednesday nights, sometimes

20    Thursday, and then all day on Saturdays.

21    Q.     What hours on Monday and Wednesday

22    nights?

23    A.     Usually about 5:30 to close, which

24    would be about 9:00.

25    Q.     If somebody was in the chair,

though, you wait until they are finished,

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 15

1     don't you?

2       A.    I don't have to wait until they

3   are finished.

4       Q.    What about Thursdays when you

5   worked those days, what were your hours?

6       A.    About the same hours.

7       Q.    The same.  Saturday would be?

8       A.    Saturday would be from 7:30 until

9   about 1:00 or 2:00.  Or if I did the

10   afternoon, it would be from 12:00 until about

11   8:00 or 9:00.

12       Q.    Now, after you left Auburn

13   University Montgomery, did your hours at

14   Dillard's change at all?

15       A.    They did.

16       Q.    How did they change?

17       A.    They were reduced.  I reduced my

18   hours.

19       Q.    Why did you do that?

20       A.    Well, because the salon started off

21   with 40 hairdressers and we ended up with

22   about five or six and they didn't need me to

23   give them as many hours.

24       Q.    How many hours were you giving

25   them?

Case 2:05-cv-00902-MHT-DRB    Document 31    Filed 07/21/2006    Page 16 of 256

Cynthia Ellison

April 27, 2006

Page 16

1    A.    Probably about 12.  Anywhere from
2    12 to 15 a week, if that many.  And they
3    would call me in if people were out.
4        Q.    When would you say that the change
5    in the hours occurred at Dillard's?
6        A.    I don't really remember, to be
7    honest.
8        Q.    How many hours a week were you
9    working when -- how many hours a week were
10   you working at Dillard's at the time you went
11   to Colonial?
12       A.    Probably between 11 and 12.
13       Q.    Your job at Colonial, is it full
14   time?
15       A.    It is.
16       Q.    Does that mean 40 hours a week?
17       A.    Yes, sir.
18       Q.    How were you paid at Dillard's?
19   By the hour?
20       A.    Hourly.
21       Q.    What was your rate?
22       A.    When I left it was 8.75.
23       Q.    What was your rate, if you recall,
24   at the time you left Auburn University
25   Montgomery?  Your rate at Dillard's?

Cynthia Ellison

April 27, 2006

Page 17

```
 1        A.      I think it was 8.50.

 2        Q.      What is your job at the bank?

 3        A.      I am the Executive Assistant to

 4   the Director for Training and Development.

 5        Q.      And who is that?

 6        A.      Melinda Mills.

 7        Q.      I'm sorry.  What was the last

 8   name?

 9        A.      M-i-l-l-s.

10        Q.      Mills.  Okay.

11                And what is your salary?

12        A.      30,000 a year.

13        Q.      Congratulations.  Were you happy to

14   find that?

15        A.      I was happy to work.

16        Q.      Does Melinda know you are here

17   today?

18        A.      She does.

19        Q.      Does she know about the lawsuit?

20        A.      I did not go into detail with her.

21        Q.      You just told her you had to give

22   a deposition?

23        A.      That's right.

24        Q.      What's the address of the bank

25   where you work?
```

Cynthia Ellison

April 27, 2006

Page 18

1    A.    All I know is 1 Court Square,

2    Montgomery, Alabama.  Colonial Bank, 1 Court

3    Square, Montgomery, Alabama.

4    Q.    Now, when you retired from AUM,

5    you drew a retirement income from the state

6    fund set up for Auburn University, is that

7    right?

8    A.    Correct.

9    Q.    How much are you getting out of

10   that?

11   A.    $1,888 a month.

12   Q.    Is that about 20,000 a year, give

13   or take?

14   A.    Give or take.

15   Q.    Other than Dillard's and Colonial

16   Bank, have you held any employment since you

17   left AUM?

18   A.    I briefly worked for my

19   rheumatologist for about three or four days.

20   Q.    For a rheumatologist?

21   A.    For my doctor, my rheumatologist.

22   Q.    What did you do there?

23   A.    She hired me to be her

24   receptionist.

25   Q.    All right.  And you didn't like

Cynthia Ellison

April 27, 2006

Page 19

1    that?

2       A.    I couldn't do the work.  The files

3    were too heavy for me to pick up.  I

4    couldn't put them overhead.

5       Q.    I see.  How long did you work

6    there?

7       A.    Probably about three days.

8       Q.    How much did you get paid?

9       A.    I think it was something like

10   $180, or something like that.

11      Q.    Are you still seeing the same

12   doctor?

13      A.    I am.

14      Q.    Have you been continuously employed

15   with either Dillard's, your physician, or the

16   bank, since your retirement from AUM?

17      A.    Just Dillard's.

18      Q.    I don't mean with each employer at

19   the same time.  You have had a job of some

20   of kind ever since you left AUM, right?

21      A.    I have had a job with Dillard's

22   since I left.

23      Q.    Were there any periods of time

24   since you left AUM that you were unable to

25   work for whatever reason?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 20

1      A.      There was some days I couldn't go

2   into Dillard's.

3      Q.      Because of your conditions?

4      A.      Correct.

5      Q.      How many days do you think it

6   amounted to?

7      A.      I honestly don't remember.  They

8   were few because I pushed myself to do what

9   I need to do.

10      Q.      Did you take any vacations during

11   that time?

12      A.      No, I did not.

13      Q.      When you were working at AUM, when

14   did you begin planning on retiring?

15      A.      I didn't plan to retire.

16   Retirement seminars would come to Campus and

17   those of us who were in striking distance of

18   retirement, we attended those seminars to find

19   out what was being said.  And I did attend a

20   couple of retirement seminars, as I recall.

21      Q.      What do you mean by "striking

22   distance"?

23      A.      You have to have 25 years to

24   retire.  And I had made the 25-year mark.

25      Q.      You made the 25 years by combining

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 21

1    previous years of service at another

2    institution?

3         A.      That's correct.

4         Q.      At what institution was that?

5         A.      There were several.  I worked for

6    the Board of Education in Mobile for eight

7    years.  I worked for the University of South

8    Alabama for two years.  I worked for the

9    University of Alabama in Huntsville for two

10   years, maybe two and a half.  And then I

11   came to Auburn, AUM, and I worked there for

12   20 years.

13        Q.      You have had total about 32 years

14   of service?

15        A.      That's correct.

16        Q.      Did the eight years of Mobile, the

17   two years at South Alabama, and the two years

18   at the University of Alabama in Huntsville

19   transfer over to your account so to speak?

20        A.      What transfer?  You mean the

21   monies?

22        Q.      The years of service.

23        A.      Yes.  That was in the same system.

24        Q.      Do you have to pay anything for

25   those years to transfer?

Cynthia Ellison

April 27, 2006

Page 22

1    A.    No.

2    Q.    Did you ever give any thought as

3    to when you would retire?

4    A.    I think we all do, or I did.

5    Q.    Tell me about your thinking about

6    when you would retire?

7    A.    I thought about -- I could retire

8    once I was treated the way I was. And I

9    didn't want to be in that unsafe environment

10   any more.

11

12   Q.    You are talking about -- you claim

13   in this lawsuit that the University forced

14   you to retire, correct?

15   A.    That's correct.

16   Q.    Up until that time, had you given

17   any thought as to when you might retire?

18   A.    I had spoken to Dr. Lawal in April

19   of 2004 when I picked he and his wife up at

20   the airport. And I told him that I had

21   enough years to retire, but I was going to

22   stay two to three years to get him

23   transitioned into his new position.

24   Q.    Is that as definite as you ever

25   considered your plans to be with respect to

     retiring?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 23

1   A.      Absolutely.

2   Q.      How many times did you and Dr.

3   Lawal discuss your retirement?

4   A.      After I initially talked with him

5   in April, we didn't talk about retirement any

6   more until February when I left.

7   Q.      Had you had any discussions with

8   Bob Elliott about when you might retire?

9   A.      Dr. Elliott -- I said to Dr.

10  Elliott when he retired, "You are you lucky.

11  I wish I could."

12  Q.      Were you not eligible at that

13  time?

14  A.      I may have been eligible, but I

15  was a single parent.  My daughter was in

16  school, so I wasn't thinking about retiring.

17  Q.      Did you ever make any remarks to

18  anyone that you were going to retire after

19  Courtnei finished school?

20  A.      I don't recall.

21  Q.      Did you have any discussions about

22  your retirement with Brad Moody?

23  A.      We discussed retirement, yes.  I

24  discussed retirement with Brad Moody because

25  Debra Foster mentioned that I should retire

Cynthia Ellison

April 27, 2006

Page 24

1   after I filed my complaint concerning Allison

2   Stevens.   I came back, and I reported that

3   to him.

4        Q.      You reported what to whom?

5        A.      I reported to Brad Moody that my

6   conversation with Debra Foster was about my

7   -- "you have enough time to retire, so why

8   don't you do that."

9        Q.      Have Debra -- I'm sorry.

10       A.      I'm sorry.   I am finished.

11       Q.      I don't mean to interrupt you.   Go

12  ahead.   I don't want to cut you off.

13       A.      I have completed my thought.

14       Q.      Have you ever discussed retirement

15  with Debra Foster before?

16       A.      I have not discussed retirement

17  with her.   She brought it up to me.

18       Q.      Is that the only time that that

19  subject has been brought up between the two

20  of you?

21       A.      When I was in her office that time

22  is what I recall.

23       Q.      She didn't make any remarks about

24  your retirement before that?

25       A.      I really don't remember.

d1403afb-e7e9-42de-b323-57812dba67e5

Case 2:05-cv-00902-MHT-DRB     Document 31     Filed 07/21/2006     Page 25 of 256

Cynthia Ellison

April 27, 2006

Page 25

1    Q.     Do you recall ever making any

2    comments that you want to retire, but you

3    wanted to have a new job before you did?

4    A.     I don't remember making that

5    comment.

6    Q.     A retiree from AUM is not

7    penalized, is she, if she goes out and gets

8    a full-time job?  Penalized in the sense that

9    the retirement benefits are affected?

10   A.     Well, I don't know.  I know there

11   is a cap if you get a state job.

12   Q.     Let's not talk about state jobs.

13   Let's talk about private sector jobs.

14   A.     And your question was?

15   Q.     You can retire from AUM and get

16   whatever you are entitled to based on your

17   years of service or highest salary, or

18   however the formula works, right?  And go out

19   and get a job in the private sector and your

20   retirement benefits are not affected, right?

21   A.     That's correct.

22   Q.     That's a pretty good deal, isn't

23   it?

24        MS. RODGERS:  I object.

25        MR. DODD:  Q.  Did you ever hear

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 26

1    any of the faculty you worked with, or
2    administrators you worked with, express their
3    desire to retire and get another job?
4         A.      I have heard conversations on
5    occasion.
6         Q.      From a purely monetary standpoint,
7    an income standpoint, you are better off now
8    than when you worked at AUM, are you not?
9              MS. RODGERS:  Object.  You can
10   answer.
11             THE WITNESS:  I am not.  I don't
12   think I am better off.
13             MR. DODD:  Q.  Why aren't you
14   better off?
15        A.      I just started this job.  My
16   salary was cut in half at AUM.
17        Q.      No.  I am just talking about from
18   a purely income perspective right now.  You
19   are making more money from your retirement
20   and from your new job than you were at AUM,
21   are you not?
22             MS. RODGERS:  Objection.
23             THE WITNESS:  Well, if I sit down
24   and add up the figures, I might.  I haven't
25   sat down and added that up.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 27

1    MR. DODD:    Q.    What was your
2    salary when you left AUM?

3        A.    I believe it was 40,900 and
4    something.

5        Q.    Your salary now at the bank is
6    $40,000, is it not?

7        A.    Thirty.

8        Q.    Is it 30?  I thought you told me
9    40 a minute ago.

10       A.    No.  I said 30.

11       MS. RODGERS:    30.

12       MR. DODD:    Q.    I misunderstood
13   you.  Your salary is 30.  Your retirement
14   income annually is approximately $22,650?

15       A.    If that's what you calculated.

16       Q.    Do you know what it is?

17       A.    I know that it's 1,888 a month.

18       Q.    Your current income from those two
19   sources is in excess of $52,000 a year, is
20   that right?

21       A.    If that's what you just added.

22       Q.    Do you disagree with that?

23       A.    I am going by your figures is what
24   I told you.

25       Q.    Has anything happened in the two

Cynthia Ellison

April 27, 2006

Page 28

1    months that you have worked at the bank that

2    suggests to you that your employment might

3    not be permanent there?

4        A.      I am too new in the job.  I

5    really don't know.

6        Q.      As far as you know, there has been

7    no event that makes it unlikely that you

8    would continue in that job?

9        A.      I have been there six weeks.  I

10   am still on probation.  I don't know what

11   the future holds.

12       Q.      How long have you known Chris

13   Mahaffy?

14       A.      He was there when I came to AUM

15   in 1984.

16       Q.      You knew him for about 20 years?

17       A.      About 20 years.

18       Q.      Were you ever on good terms with

19   him?

20       A.      I didn't see Chris much.  He

21   taught his classes and went home until he

22   became Acting Department Head, or Chair of

23   the Physical Science Department.  That's when

24   I started to see him more.

25       Q.      When did he become Acting Chair of

Cynthia Ellison

April 27, 2006

Page 29

1     the Physical Science Department?

2          A.     It had to be -- I have got to

3     think a minute here.  Let's see.

4          Q.     Take your time.

5          A.     It had to be in the late Nineties.

6     Somewhere between, I want to say, '97 and

7     2000.  I'm not real sure.

8          Q.     Somewhere in that time frame, do

9     you think?

10         A.     I think.

11         Q.     Until that time, did you really

12    even know him?

13         A.     Not really, because he never really

14    came into the Dean's office.

15         Q.     After that time that he became the

16    Acting Chair, and then I guess the Chair of

17    Physical Sciences?

18         A.     Right.

19         Q.     Were you ever on good terms with

20    him?

21         A.     We did our jobs.

22         Q.     What does that mean?

23         A.     It means that -- how do you define

24    "good terms"?

25         Q.     Well, when did you become on bad

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 30

1      terms with him?

2          A.      During the first search for the

3    Dean's position.

4          Q.      When was that?

5          A.      The first search I think was

6    winter semester of 2000 -- winter or spring

7    semester of 2002.

8          Q.      Is it fair to say that up until

9    that time, that search for the Dean, that

10   there was nothing about Chris Mahaffy's

11   behavior that you complained about?

12         A.      I did complain about some of his

13   behavior.

14         Q.      Let's talk about that.  What

15   behaviors did you complain about?

16         A.      I complained about -- well, he

17   would come into the office and not say

18   anything.  He would just look and stare.  He

19   would just make inappropriate comments.

20         Q.      This is before the first Dean

21   search, right?

22         A.      Okay.  Let me get my --

23         Q.      Take your time and let's make sure

24   we get the times right.  Okay?

25         A.      Okay.  I am trying to remember

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 31

1    when the first Dean search was.  Well, I
2    never really had any dealings with Chris
3    until he became Department Chair.  And I will
4    say that was -- like I said, somewhere in
5    the late Nineties or something.  And as
6    Department Chair he would come in and drop
7    off reports, or whatever, and there was just
8    really no interaction really.
9         Q.     Between you and he, right?
10        A.     Correct.
11        Q.     Okay.
12        A.     I have got to think about this.
13        Q.     If we were going to construct a
14   time line, and try as best we can to
15   pinpoint when your objections to Mahaffy's
16   conduct began, it would be sometime after he
17   became Chair of Physical Sciences, correct?
18        A.     Yes.  After he became chair.
19        Q.     Whatever that date is.  That's the
20   event you recall, right?
21        A.     Right.
22        Q.     Who was the Dean when he became
23   Chair of Physical Sciences?
24        A.     If I'm not mistaken, his interim
25   appointment as Acting Department Head was made

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 32

1    by Joe Hill just before he retired.

2        Q.    And was the first Dean search that

3    you referred to, the search to find a

4    replacement for Joe Hill?

5        A.    Correct.

6        Q.    Who served as Acting or Interim

7    Dean when Joe Hill left?

8        A.    Dr. Elliott.

9        Q.    Do you recall how long he served

10   in that capacity?

11       A.    I think a little over two years

12   maybe.

13       Q.    He retired, did he not?

14       A.    He did.

15       Q.    Which again left a vacancy in the

16   Dean's office, right?

17       A.    Correct.

18       Q.    Who served after Elliott left?

19       A.    Dr. Moody.

20       Q.    Do you recall when he started

21   as --

22       A.    Dr. Elliott left December of '02.

23   And Brad's appointment started actually

24   December of '02, but he physically came up in

25   January.

Cynthia Ellison

April 27, 2006

Page 33

1    Q.    In January?

2    A.    '03.

3    Q.    How long was Brad Moody Acting

4    Dean?

5    A.    Until Bayo arrived August of '04.

6    Brad was in the office December of '02

7    because Bob left before Christmas. So he

8    would have been there December of '02.

9

10   Q.    When did the search that resulted

11   in Dr. Lawal's hire begin?

12   A.    January or February '03. I'm

13   sorry. January -- let me get this right.

14   The search started -- I'm not sure. But it

15   started shortly after Brad took the position,

16   I believe. At least one of them did.

17   Q.    There were two searches for Deans,

18   correct?

19   A.    Yes.

20   Q.    Okay. The first one was to find

21   a replacement for Joe Hill, is that right?

22   A.    Well, they didn't start that search

23   immediately.

24   Q.    They started that search at a time

25   when Bob Elliott was serving as Dean?

     A.    Right.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 34

1

2      Q.    Do you recall when that searched
       started?

3

4      A.    I'm not sure.  I think it was
       spring of '02.  No.  Yes.  Spring of '02.

5

6      Q.    How did that search end?

7      A.    It was a failed search.  No one
       was selected as Dean.

8

9      Q.    When did the search end?

10     A.    I don't remember the date it
       ended.

11

12     Q.    Do you have any idea of how long
       the search took?

13

14     A.    It took about three -- at least
       three months or more.

15

16     Q.    Now, did the second --

17     A.    I'm sorry.

18     Q.    Did the second search start Brad
       Moody serving as Dean?

19

20     A.    It did.

21     Q.    That was sometime after January
       '03?

22

23     A.    Right.

24     Q.    Do you recall when Dr. Lawal
       accepted the position as the Dean?

25

       A.    I think it was sometime in -- it

Cynthia Ellison

April 27, 2006

Page 35

1
2     was May or June.  I'm not sure.  And it may
3     even be the end of April.  I'm not really
      sure.
4
5         Q.      Do you have any idea of the
6     duration of that search?
7         A.      The second search?
8         Q.      Yes.
9         A.      I was on the Search Committee, so
10    I think it was about -- at least three or
      four months.
11
12        Q.      Is it likely that it started about
13    the first of the year in 2004?
14        A.      Yes, it is.
15        Q.      Ms. Ellison, when we are talking
16    about the Deans here, we are talking about
17    the Dean of the School of Sciences, correct?
18        A.      That's correct.
19        Q.      Your job was what?
20        A.      I was the Senior Administrative
21    Associate to the Dean of the School of
22    Sciences.
23        Q.      What was your previous title in
      that role?
24
25        A.      Dean's secretary.
          Q.      I'm sorry.

Cynthia Ellison

April 27, 2006

Page 36

1      A.     Dean's secretary.

2      Q.     Who did your Deans' report to?

3      A.     The Vice Chancellor for Academic

4  Affairs and Student Affairs.

5      Q.     Who was that?

6      A.     Dr. Roger Ritvo.

7      Q.     Was he the Vice Chancellor at all

8  times while Joe Hill, Bob Elliott and Bayo

9  Lawal were Deans?

10     A.     No, he was not.

11     Q.     When did he assume that role?  If

12  you know.

13     A.     I don't know the exact date he

14  took the job.

15     Q.     Who was his predecessor?

16     A.     Dr. Nance.

17     Q.     Is that Guin Nance?

18     A.     Uh-huh.

19     Q.     You have to say "yes."

20     A.     Yes.  I'm sorry.

21     Q.     Dr. Nance is now the Chancellor,

22  correct?

23     A.     Correct.

24     Q.     Does Roger Ritvo report to Guin

25  Nance?

Cynthia Ellison

April 27, 2006

Page 37

1        A.       He does.

2        Q.       Who did Guin Nance report to when

3    she was the Vice Chancellor?

4        A.       Dr. Saigo.

5        Q.       How many Departments are there in

6    the School of Sciences?

7        A.       Six, seven.  Counting the facility

8    at Maxwell.

9        Q.       Does each Department have a Chair?

10       A.       Yes.

11       Q.       To whom do the Chairs' report?

12       A.       To the Dean.

13       Q.       How would -- strike that, please.

14            Tell me how would you describe

15   your job?

16       A.       As the Dean's secretary?

17       Q.       Yes.

18       A.       My job included making sure the

19   smooth operations of the office flows daily.

20   That included answering the phones, doing the

21   mail, doing payroll, giving assignments to the

22   other secretaries, receiving assignments from

23   the other secretaries, making sure that they

24   were correct.  It included supervising

25   anywhere from five or six work study

Cynthia Ellison

April 27, 2006

Page 38

1    students.  I wrote drafts of memos for the

2    Deans.  Just the normal secretarial duties.

3         Q.      For the Dean, right?

4         A.      For the Dean.

5         Q.      You supported the Dean, right?

6         A.      I supported the Dean.

7         Q.      Is he your boss?

8         A.      Excuse me.  I didn't hear you.

9         Q.      Is he your boss?

10        A.      He was my boss.

11        Q.      And your supervisor?

12        A.      Yes.

13        Q.      A minute ago when you were listing

14   some of your activities, you said receiving

15   assignments from secretaries.  Did you mean

16   receiving work back from them that you had

17   given them to make sure that it's correct?

18        A.      That's correct.

19        Q.      They weren't giving you tasks to

20   do, were they?

21        A.      Right.  I gave them -- well, we

22   had routine tasks that had to be done.

23        Q.      Right.

24        A.      That I had to give out to them

25   and they returned to me to review to see

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 39

1    whether or not it was correct.

2        Q.    That's what you were talking about,

3    right?  I mean the secretaries in the School

4    of Sciences were not telling you to do

5    things, right?

6        A.    Correct.  I didn't think I had

7    said that.

8        Q.    I'm sorry.

9        A.    I didn't know that I had said that

10   they did.

11       Q.    I wanted to make sure.

12       A.    Okay.

13       Q.    Now, until Chris Mahaffy became the

14   Chair, or Acting Chair of the Physical

15   Sciences, had he ever been violent with you?

16       A.    He had not been violent with me,

17   no.

18       Q.    Have you ever observed him being

19   violent with anyone?

20       A.    I observed him being upset.

21       Q.    How was he upset?

22       A.    After Department Head meetings,

23   sometimes if things didn't go his way, he

24   came out upset.

25       Q.    Let's talk about the time up until

Cynthia Ellison

April 27, 2006

Page 40

1    he became Chair.

2        A.      Okay.

3        Q.      Have you ever seen him become

4    violent with anyone until that time?

5        A.      There was one confrontation that

6    was reported to the Dean's office between he

7    and a student in a chemistry lab.

8        Q.      What was that confrontation?

9        A.      I don't know.  It was years ago.

10   I don't remember.  There was a confrontation

11   and the Dean at the time took care of it.

12       Q.      Do you know any details about that

13   confrontation?

14       A.      I don't remember.

15       Q.      Do you have any personal knowledge

16   of that confrontation?

17       A.      I was not in the lab when it took

18   place.

19       Q.      Until the time that Chris Mahaffy

20   became Chair of Physical Sciences, had he

21   ever touched you?

22       A.      No.

23       Q.      Have you ever sued anybody else

24   before?

25       A.      I have not.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 41

1

2      Q.      Have you ever been sued?

       A.      No.
3

4      Q.      Have you been charged with a

crime?
5

6      A.      No.

7      Q.      Where was your office located?

       A.      311 Goodwyn Hall, which was the
8

Dean's suite.
9

       Q.      Is that on the third floor?
10

       A.      Third floor of Goodwyn Hall.
11

       Q.      Can you give me an idea of the
12

layout of the office?
13

14     A.      You would come into the office.

To the left there was a seating area.  To
15

the right a copy machine. Then a desk for
16

the student worker.  I added another desk for
17

a student worker. My cubicle.  If you go to
18

the left, Dr. Owens' office.  And the second
19

left was Dr. Caroline Adams.  And directly in
20

front of my cubicle was the Dean's office.
21

22     Q.      Now, when you say "cubicle," can

you describe what you mean?
23

24     A.      Well, we just had -- it was a

partition between me and the students and the
25

incoming traffic to buffer.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 42

1

2     Q.      And how high was the partition?

3     A.      I think we ordered them either
about four or five feet high.  I can't

4     remember.

5

6     Q.      Did you have to stand up to see
out of it?

7

8     A.      I did.

9     Q.      You mean it's a solid partition,
right?

10

11    A.      There was maybe a 12-inch glass at
the end, but I had to lean to look up out

12    of that glass.

13

14    Q.      What was your line of vision when
you looked through the glass?

15

16    A.      I could see the door opening, but
I couldn't see who was coming in until they

17    actually entered.

18

19    Q.      Could you see into the hallway?

20    A.      If I stood up and leaned forward.

21    Q.      And leaned forward?

22    A.      Well --

23    Q.      I know it's hard to describe a
physical layout.

24

25    A.      You could see the hallway from the
-- you could see the hallway from the glass

Case 2:05-cv-00902-MHT-DRB      Document 31      Filed 07/21/2006      Page 43 of 256

Cynthia Ellison

April 27, 2006

Page 43

1      that's in there.  If you take a look you can
2      see.  And depending on how your desk is
3      turned, and my desk had been in several
4      positions.
5          Q.     So tell me how you would look into
6      the hall?  Would you have to stand up and
7      look around, or look over, or how would you
8      do it?
9          A.     Like that.
10         Q.     You are looking around the edge?
11         A.     No.
12         Q.     You are looking through the glass?
13         A.     Right.
14         Q.     Okay.  Did you spend most of your
15     day at your desk?
16         A.     It depends on what day of the week
17     it was and what I was doing.
18         Q.     What were your typical hours of
19     work there?
20         A.     8:00 to 5:00.
21         Q.     Now, did you ever have any extra
22     employment at AUM?
23         A.     I did.
24         Q.     Tell me about that.
25         A.     I worked for the Center for

Cynthia Ellison

April 27, 2006

Page 44

1
2      Business doing structured interviews with
3      people from the Department of Transportation,
4      police officers in Dekalb County, Georgia.
5      And when they had other projects come up,
6      they would ask me to help.
7          Q.      Are these projects that have a
8      definite starting point and a definite
9      termination point?
10         A.      Yes.
11         Q.      How long did they typically last?
12         A.      Anywhere from two days to a week.
13     Sometimes, I think one time was a two-week
14     period.  I'm not sure.  It's been a while.
15         Q.      How would you modify your schedule,
16     or did you need to modify your schedule if
17     you had one of those assignments?
18         A.      There was a form that we called
19     HR-12.  And you had to put on that form if
20     you were taking vacation time, or if you were
21     going to make it up, or if you were using
22     comp time, and you had to put that on there.
23         Q.      When would you -- say, during a
24     typical work day, when did you perform the
25     work on these assignments? Do you know what I
       mean?  Was it between the hours of 8:00 to

Cynthia Ellison

April 27, 2006

Page 45

1    5:00, or was it some other time?

2        A.    I had to physically be at another

3    location to perform the work.   I was wherever

4    the job was.

5        Q.    Right.  Did these jobs occur

6    outside of your normal working hours?

7        A.    Sometimes they did.  Sometimes they

8    didn't.

9        Q.    How would you -- when they

10   didn't --

11       A.    As I stated, there was an HR-12

12   form that we had to fill out a block on that

13   form stating how we would compensate for the

14   time that I was not at my regular job.

15   Whether it be taking vacation, comp time, or

16   making it up.

17       Q.    They are not going to pay you

18   twice, in other words, right?

19       A.    I don't understand that.

20       Q.    If you had to go to your other

21   assignment during the times that you would

22   typically be working in the Dean's office,

23   you are not going to get your normal salary

24   for working in the Dean's office for that

25   time, plus the income you make on the

Cynthia Ellison

April 27, 2006

Page 46

1    assignment, right?

2         A.     It depends on what you put on your

3    HR-12.

4         Q.     You can take your vacation, right?

5         A.     You could take vacation, or comp

6    time, or you can make it up.  Whatever your

7    supervisor approved.

8         Q.     Did Dr. Lawal ever disapprove

9    whatever you proposed with respect to these

10   other assignments and your time?

11        A.     I never had an assignment while

12   Dr. Lawal was there with the Center for

13   Business.

14        Q.     When was your last assignment for

15   the Center for Business?

16        A.     That ended probably nine to ten

17   months before -- at least a year before I

18   left.

19        Q.     In that year before you left, you

20   didn't have any other outside employment at

21   AUM?

22        A.     Not that I remember.

23        Q.     Where did you park at AUM?

24        A.     I parked in the parking lot by the

25   gym.  The parking lots are numbered.  I have

Cynthia Ellison

April 27, 2006

Page 47

1   no idea what that parking lot number is.

2       Q.      How close to Goodwyn Hall did you

3   park?

4       A.      There was no close parking until

5   -- I parked in the handicap behind Goodwyn

6   Hall for about the last eight or nine months

7   of my employment there.  Maybe not even that

8   long.  Before that I parked in the gym

9   parking lot.

10      Q.      Was your handicap due to your

11  cancer?

12      A.      My rheumatoid arthritis.

13      Q.      Rheumatoid arthritis.  And I assume

14  you have a state authorization for parking in

15  the handicap spaces?

16      A.      I do.

17      Q.      I am just curious as to the way

18  it works in Alabama.

19      A.      Yes, sir.

20      Q.      How far from Goodwyn Hall were the

21  handicap spaces where you parked?

22      A.      It was outside.  This it -- well,

23  it was outside where the loading dock is.

24  It was just outside the loading dock at the

25  back of the building.

d1403afb-e7e9-42de-b323-57812dba67e5

Case 2:05-cv-00902-MHT-DRB    Document 31    Filed 07/21/2006    Page 48 of 256

Cynthia Ellison

April 27, 2006

Page 48

1    Q.    Adjacent to the building right

2    there?

3    A.    Yes.

4    Q.    Are you familiar with the AUM

5    Campus Police Officers?

6    A.    I do know some of them.  I don't

7    know all of them.

8    Q.    Do you know Nel Robinson?

9    A.    I do.

10   Q.    Do you know Craig Sparrow?

11   A.    I don't know him.

12   Q.    Do you know R.C.?  That's his

13   first name.  I have forgotten his last name.

14   A.    If you call his last name out I

15   might know him. But I don't know.

16   Q.    You knew Nel?

17   A.    Yes.

18   Q.    How long have you known her?

19   A.    Since she came to AUM.  I don't

20   know how long that's been.  I don't know how

21   long she has been there.

22   Q.    Would you say you have known her

23   for a number of years?

24   A.    Yes.

25   Q.    Do you know that she is the Chief?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 49

1      A.      Yes.

2      Q.      The Chief Law Enforcement Officer

3   at AUM?

4      A.      Um-hum.

5      Q.      Did you ever have occasion to call

6   Chief Robinson, or any other individual in

7   the Police Department, for assistance of any

8   kind?

9      A.      I called on occasion for student

10  matters sometimes when the need arose.

11     Q.      For student --

12     A.      For student matters when students

13  were not doing what they needed to do.  And

14  I was directed to call Campus Police.  If we

15  had students who were being disruptive in

16  class.

17     Q.      Misbehaving students and that sort

18  of thing?

19     A.      Yes.

20     Q.      Did you ever have to call any of

21  the police officers to come unlock a door, to

22  let you in somewhere, or let anybody else in

23  a room that's locked?

24     A.      I may have over the course of 20

25  years forgotten my key one time and called

Cynthia Ellison

April 27, 2006

Page 50

1   them to let me in.

2       Q.     Do you recall any occasion where

3   the Police Department or the officers didn't

4   respond to a request you made of them?

5       A.     Not in the matters that I called

6   about.

7       Q.     Did you ever ask them to escort

8   you to your car?

9       A.     I asked for Campus Police security,

10  and Dr. Lawal said I had to go through Ritvo

11  to get that.

12      Q.     My question, though is, did you

13  ever ask anybody in the Police Department to

14  escort you to your car?

15      A.     No.

16      Q.     Ms. Ellison, are you familiar with

17  the AUM harassment policy?

18      A.     I have read it over the years.

19      Q.     Do you recall when you first read

20  it?

21      A.     I don't recall when I first read

22  it.

23      Q.     Do you recall when you last read

24  it?

25      A.     Yes.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 51

1      Q.     When did you last read it?

2      A.     I think I read it at the time

3 that Dr. Lawal's behavior changed towards me.

4 And at times that I was reporting these

5 incidents to HR.

6      Q.     Can you give me a time frame,

7 other than connecting it to somebody else's

8 behavior?

9      A.     I wasn't accustomed to just pulling

10 the book out and reading it.  So the best I

11 can tell you would be the fall semester of

12 2004.

13      Q.     Was it closer to the beginning of

14 that semester, or closer to the end of the

15 semester?

16      A.     Probably closer to the end.

17      Q.     To the end.

18      Do you have an understanding of

19 the reporting procedures contained in that

20 policy?

21      A.     I don't remember the policy

22 verbatim.

23      Q.     Do you have any recollection at

24 all of the reporting procedures in that

25 policy?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 52

1        A.     I would have to read it to be

2  refreshed, to be honest.

3        Q.    As we sit here today, you don't

4  know what the reporting procedures are?

5        A.     I do.

6        Q.    What are they?

7        A.     As related to the harassment

8  policy, you report it to your supervisor.

9        Q.    And what is the supervisor supposed

10  to do?

11        A.     They are supposed to take action.

12        Q.    Is it your understanding that the

13  supervisor of a person who feels he or she

14  has been harassed, is the person who is

15  supposed to remedy, or take action to remedy

16  the harassment?

17        A.     Well, when I say "take action,"

18  they set in motion the rest of whatever the

19  policy prescribes. Whether it is take the

20  complaint to the HR or the EEOC person.

21  That's what I am saying.

22        Q.    Okay.  I just want to make sure.

23        And your supervisor, I think you

24  said during this time, was Dr. Lawal, right?

25        A.     The last Dean I worked with was

Cynthia Ellison

April 27, 2006

Page 53

Dr. Lawal.

Q.    He started in August of 2004?

A.    Yes.  Can I take a break?

MR. DODD:  Of course.

(Short recess)

MR. DODD:  Q.  Ms. Ellison, did anyone ever supervise you other than the Dean of the School of Sciences, whoever that may have been?

A.    No.

Q.    In his role as your supervisor, do you think that Dr. Lawal had the authority to discharge you?

A.    I think so.

Q.    Did Chris Mahaffy have the authority to discharge you?

A.    No.

Q.    Dr. Lawal certainly had the authority to assign work to you, did he not?

A.    Correct.

Q.    Did Chris Mahaffy have that authority?

A.    Department Heads did give me work to do.

Q.    What kind of work did Chris

Cynthia Ellison

April 27, 2006

Page 54

1  Mahaffy give you to do?

2      A.      I assisted with what we call the

3  Jason Project. There were things that needed

4  to be done, such as arrangements for the

5  hiring of extra student workers to work

6  during that -- I believe it was a one-week

7  period. And he made the request to the Dean

8  that I find the students for him.

9      Q.      Did the Dean authorize you to do

10  that?

11      A.      Yes.

12      Q.      Do you recall if the students that

13  you found to work on the Jason Project were

14  the same students who worked in the Dean's

15  office?

16      A.      The students in the Dean's office,

17  I think there was one or two each time that

18  would work on the project.

19      Q.      On the Jason Project?

20      A.      Right.  We typically put notes up

21  in classrooms.

22      Q.      Did Dr. Lawal, in your opinion,

23  have the authorization to reprimand you if

24  the need arose?

25      A.      Yes.

Cynthia Ellison

April 27, 2006

Page 55

1
2      Q.      Did Chris Mahaffy have the
3   authority to reprimand you?

       A.      He didn't have the authority.
4
5      Q.      Did Dr. Lawal ever give you a job
   evaluation?  A performance evaluation?
6
7      A.      No.

8      Q.      You have had performance
   evaluations in the past, though, have you
9   not?
10
       A.      For the 20 years I was there, yes.
11
       Q.      Is it true that the Dean is the
12   person who always did those performance
13   evaluations for you?
14
       A.      That's correct.
15
       Q.      How frequently would you say that
16   you received salary increases at AUM?
17
       A.      It depended on what went on in the
18   legislature. Sometimes we got them every year.
19   Sometimes they were every two years.  It was
20   four years one time.
21
       Q.      Did the Dean have the authority to
22   determine how much of a raise you would get
23   within the parameters that the legislature
24   authorized?
25
       A.      Yes, he did.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 56

1        Q.     Nobody else had that authority, did

2   they?

3        A.     He could recommend it.  Someone

4   had the authority to strike it down.

5        Q.     Somebody above him?

6        A.     Correct.

7        Q.     Chris Mahaffy didn't have that

8   authority with respect to your salary, did

9   he?

10       A.     Not my salary, no.

11       Q.     Ms. Ellison, you have been the

12   Dean's secretary the entire time of your

13   employment?

14       A.     Yes.

15       Q.     Strike that, please.

16         You were the Dean's secretary the

17   entire time of your employment at AUM?

18       A.     That's correct.

19       Q.     You were never promoted to another

20   job?

21       A.     Actually, I got an additional

22   assignment with the Dean's secretary's job.

23       Q.     What is that?

24       A.     An advisor to students.

25       Q.     How did that come about?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 57

1    A.    We needed an Advising Office.  I

2  was advising students all along about courses

3  to take.  And while Dr. Moody was Acting

4  Dean, he approved the creation of a School of

5  Sciences Advising Office and he recognized my

6  ability to work with the students.  He gave

7  information to Dr. Lawal and Dr. Lawal

8  carried the recommendation through.  And I

9  was appointed Senior Administrative

10  Associate/Advisor.

11    Q.    It's additional responsibilities?

12    A.    Right.  I actually had to go to

13  the Advising Office to work several hours a

14  day.

15    Q.    And Deans Moody and Lawal are the

16  individuals who facilitated that?  Recognized

17  your skill?

18    A.    Dr. Moody started it and Dr. Lawal

19  didn't change it when he came.

20    Q.    Was anybody else involved in that

21  opportunity for you in terms of approving it?

22    A.    No.

23    Q.    It's fair to say, is it not, that

24  you have never been demoted while you were at

25  AUM?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 58

1    A.    That's correct.

2    Q.    Did the Dean have to authority to
3 demote you to something else?

4    A.    He was Dean.  He had that
5 authority.

6    Q.    You served at the pleasure of the
7 Dean, did you not?

8    A.    Absolutely.

9    Q.    You had no contract of employment,
10 did you?

11    A.    No.

12    Q.    Did you have any co-workers at AUM
13 whom you would consider to be good friends?

14    A.    Ruby Jenkins.

15    Q.    Ruby Jenkins.  Anybody else?

16    A.    Not good friends, no.

17    Q.    Other than the incidents involving
18 Allison Stevens and Barbara Ware, did you
19 ever have any sort of confrontation with any
20 co-workers that you would consider significant?

21    MS. RODGERS:  Object.

22    THE WITNESS:  No.  And I don't
23 consider a -- I did not have a confrontation
24 with Barbara Ware.

25    MR. DODD:  Q.  Let's just call

Cynthia Ellison

April 27, 2006

Page 59

1  them incidents then.  Do you recall any
2  confrontations or objectionable incidents with
3  any other co-workers?
4      A.      Not that I recall.
5      Q.      In your job in the Dean's office,
6  were you aware of the salaries of the other
7  staff people in the School of Sciences?
8      A.      Yes.  I did the payroll.
9      Q.      Were you the highest paid secretary
10  in the School of Sciences?
11      A.      I was.
12      Q.      Do you know what Title VI is?
13      A.      Title VI, I don't think so.
14      Q.      Do you recall any occasion when
15  Brad Moody secured some funds, federal funds,
16  some of which he used to enhance your salary?
17      A.      They -- I don't know where the
18  money came from. But for the advising, the
19  additional advising responsibilities they gave
20  me an additional $2,000.
21      Q.      Is that on top of salary --
22      A.      It was included in the 40,000.
23      Q.      Do you contend, Ms. Ellison, that
24  Chris Mahaffy discriminated against you?
25      A.      I do.

Cynthia Ellison

April 27, 2006

Page 60

1      Q.    Do you contend that any other

2   individual at AUM discriminated against you?

3      A.    I do.

4      Q.    Who else?

5      A.    Debra Foster, Allison Stevens, Dr.

6   Ritvo.

7      Q.    Did anybody else discriminate

8   against you?

9

10     A.    That's what I can recall right

   now.

11

12     Q.    Do you think there were others?

13     A.    I'm sorry.  Chris Mahaffy.  You

14   said Chris Mahaffy.

15     Q.    We have him.  We have Mahaffy,

16   Foster, Stevens, and Ritvo.

17     A.    And Dr. Lawal.

18     Q.    Anybody else at AUM discriminate

19   against you?

20     A.    Not that I can recall at this

21   moment.

22     Q.    Do you think there are others, and

23   you just can't recall them?

24     A.    Lots of incidents happened, and I

25   can't recall every incident.

       Q.    Since you have filed a federal

Cynthia Ellison

April 27, 2006

Page 61

1    discrimination lawsuit, you think it's more or

2    less likely that you would recall who you

3    contend discriminated against you?

4            MS. RODGERS:   Objection.

5            THE WITNESS:   Those are the ones

6    that discriminated against me.

7            MR. DODD:   Q.   Now, Chris Mahaffy

8    is white, correct?

9        A.      Yes.

10       Q.      Debra Foster is black?

11       A.      Correct.

12       Q.      Allison Stevens is white?

13       A.      Yes.

14       Q.      Roger Ritvo is white?

15       A.      Yes.

16       Q.      And Bayo Lawal is black?

17       A.      Correct.

18       Q.      How did Debra Foster discriminate

19   against you?

20       A.      In filing my complaints in the

21   Human Resource Office with Debra Foster, I

22   did not receive the same treatment that

23   others received.  In particular, Chris

24   Mahaffy.  Chris was allowed a summary report.

25   I asked for one, didn't get it.

Cynthia Ellison

April 27, 2006

Page 62

1    Q.    Let's back up one second.  You

2    said when you filed your complaint.  Which

3    complaint are you talking about?

4    A.    Okay.  Let's go with the first

5    complaint.  I filed my complaint about

6    Allison Stevens, who called me a nigger.

7    Q.    When did you file your complaint?

8    A.    That complaint was filed in

9    December 2003.

10    Q.    Was it in writing?

11    A.    Yes.

12    Q.    You filed that with Debra Foster?

13    A.    Yes.

14    Q.    Do you have a copy of that

15    complaint?

16    A.    It should be with my materials.

17    Q.    You do have a copy of it?

18    A.    Yes.

19    Q.    You have got to say "yes."

20    Now, with respect to that complaint

21    about Allison Stevens that you filed in

22    December 2003, how did Debra Foster

23    discriminate against you?

24    A.    During the investigation she

25    interviewed all of the white witnesses.  She

Cynthia Ellison

April 27, 2006

Page 63

1    did not interview the black witness.  And I

2    should say she didn't interview the black

3    witness until I called it to their attention,

4    and Dr. Nance made her go back and do it.

5        Q.    Ultimately she did interview

6    everybody you wanted her to interview?

7        A.    Not that I wanted her to

8    interview.  Everybody that was party to the

9    incident.

10       Q.    Did you want her to interview

11   anybody other than the ones she interviewed?

12       A.    No.

13       Q.    Did Debra Foster discriminate

14   against you in any other way with respect to

15   your complaint about Allison Stevens?

16       A.    I think she did.  In that I don't

17   think the investigation was a thorough one.

18       Q.    Why was it not thorough?

19       A.    Because when she called me over --

20   I'm trying to remember the date.  When she

21   called me over and spoke with me in the

22   presence of Faye Ward, she said, "I have

23   never had a complaint like this before.  I

24   really don't know what to do.  You know

25   these people on this Campus are just crazy."

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 64

1    But there were other investigations or
2    complaints that I'm sure had full attention
3    of HR.  I don't feel like I got due process.
4        Q.    How were you harmed by what you
5    claim Debra Foster didn't do, or were you
6    harmed?
7        A.    Well, actually, I was.  Because
8    when things -- when other things started
9    happening, I didn't have the confidence to
10   report it to HR because I knew nothing would
11   be done.  So I was affected.
12       Q.    How were you harmed, though?  Were
13   you harmed in your job in any way?
14       A.    Yes.  I was harmed because --
15   well, I had worked there for 20 years and
16   never had to encounter the type behavior that
17   was coming at me.  And that behavior was
18   coming at me because I was a black female.
19       Q.    You are talking about Allison
20   Stevens now?
21       A.    That's right.  I even asked Debra
22   to come over to the area to see what kind of
23   atmosphere I was working in.  Because I said
24   to her, "I am working in a hostile
25   environment."  She didn't give any

Cynthia Ellison

April 27, 2006

Page 65

1  consideration to that. She never came over or

2  anything.

3        Q.    What do you consider a hostile

4  environment?

5        A.    I consider a hostile environment

6  one in which you can't successfully do your

7  work.  One that someone has made so

8  impossible to work in that you are paying

9  attention to things around you, people around

10  you rather than the work you can get done.

11        Q.    Did Allison Stevens cause that?

12        A.    Allison and Chris Mahaffy.

13        Q.    We will get to Mahaffy in a

14  minute.  I am concerned right now about your

15  contention with respect to Debra Foster and

16  Allison Stevens.  Okay?

17        A.    Okay.

18        Q.    Now, you say Debra Foster initially

19  interviewed only the white witnesses and that

20  she didn't do a thorough investigation, right?

21        A.    That's right.

22        Q.    Did she discriminate against you in

23  any other fashion concerning the Allison

24  Stevens incident?

25        A.    What do you mean "any other

Cynthia Ellison

April 27, 2006

Page 66

1    fashion"?

2        Q.      Did she discriminate against you by

3    doing, or not doing else in connection with

4    that investigation or that incident?

5        A.      Right.  She did not follow through

6    with the investigation.  She did not do what

7    she was supposed to do.  I was just asking

8    her to do her job.

9        Q.      What did she not do?

10       MS. RODGERS:  Object to form.

11       MR. DODD:  Q.  What do you

12   contend she did not do?

13       A.      She didn't follow through with the

14   process of interviewing the witnesses.  I

15   complained to Dr. Nance.  Dr. Nance redirected

16   her.  And that's when she interviewed the

17   black witnesses.

18       Q.      Ultimately every witness was

19   interviewed, right?

20       MS. RODGERS:  Object.

21       THE WITNESS:  Yes.

22       MR. DODD:  Q.  Now, are you

23   contending that Debra Foster discriminated

24   against you because of your race?

25       A.      I'm contending that she

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 67

1  discriminated against me in treating me
2  differently from other cases that she had
3  investigated.

4      Q.    Do you contend that she treated
5  you differently for any particular reason?

6          MS. RODGERS:  Object to form.

7          THE WITNESS:  I think she treated
8  me differently because she just didn't like
9  me.  Now, I am going to be honest with you.

10         MR. DODD:  Q.  Did Allison Stevens
11  -- strike that, please.

12         Did Debra Foster -- do you contend
13  that Debra Foster discriminated against you at
14  any time after the Allison Stevens incident
15  was completed?

16     A.    During the second investigation
17  with Chris Mahaffy.

18     Q.    Now, which one was that?  Which
19  investigation was that?

20     A.    When I complained that Chris'
21  behavior had changed.  His personality had
22  changed to the point where I was fearful for
23  being in the office.

24     Q.    Is that the -- was that initiated
25  by your conversation with Roger Ritvo on

Cynthia Ellison

April 27, 2006

Page 68

1    November the 30th, 2004, and your subsequent

2    submission of a memorandum to him?

3         A.     That was initiated by his behavior

4    at the end of the first -- at the failing of

5    the first Dean search and I reported it to

6    my supervisors.  And I talked to -- well, I

7    tried to talk to Debra Foster about it, but

8    I ended up talking to Faye Ward about it,

9    who referred me back to my supervisors to

10   follow the right chain-of-command.

11        Q.     Let's back up so I can make sure

12   I am with you here.  This was an incident

13   that occurred before the Allison Stevens

14   incident, correct?

15        A.     Right.

16        Q.     You are talking about the first

17   Dean search, right?

18        A.     The first Dean search.

19        Q.     Spring of 2002, I think you told

20   me earlier.

21        A.     This was the transition between the

22   end of the first Dean search.  It was at the

23   end.  It was either at the end of spring or

24   summer because the Dean search had failed.

25        Q.     In the year 2002?

Cynthia Ellison

April 27, 2006

Page 69

1     A.     Let me think a minute.

2     Q.     Okay.

3     A.     Okay.  The spring search would
4   have started -- I mean the search would have
5   started winter and spring of '03.  The failed
6   -- at the end of that spring and the
7   incident with Allison was in December of '03.

8     Q.     The first Dean search was in 2003?

9     A.     The failed part of it.  I don't
10  remember whether it started in 2003, but I
11  know it ended sometime early in 2003.

12    Q.     The Allison Stevens incident
13  occurred between the first and second Dean
14  searches?

15    A.     Right.

16    Q.     Let's go back to the first Dean
17  search then.

18    A.     Okay.

19    Q.     Tell me what happened where you
20  think that Debra Foster discriminated against
21  you.

22    A.     Okay.  At the end of the first
23  Dean search when Chris didn't make the short
24  list, and ultimately he hadn't become Dean,
25  his behavior changed to the point that I

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 70

1   would come to work in the mornings. He

2   would be sitting at my desk crying or just

3   sitting there. That happened several days in

4   a row saying that I should be Dean. Making

5   comments about what he could do if he were

6   Dean. He appeared to me to be unstable, so

7   I went to the -- okay. I reported it.

8       Q.     You reported it or recorded it?

9       A.     I reported it to the Dean at the

10  time.

11      Q.     Who was?

12      MS. RODGERS: Take your time.

13      THE WITNESS: I'm trying to get my

14  time line right with the Dean searches.

15  That's the important thing.

16      MR. DODD: Q. You told me

17  earlier that Brad Moody was Dean from

18  December '02 through August '04. The first

19  Dean search ended in '03, and Brad Moody was

20  the Dean, correct?

21      A.     That's right. Because Glen Ray

22  and Brad Moody spoke with Chris about his

23  behavior. But in the meantime I had said

24  something to Faye Ward in HR. She told me I

25  needed to talk to Debra Foster and my

Cynthia Ellison

April 27, 2006

Page 71

1    supervisors, but to report it to my
2    supervisors first.
3        Q.    And you did?
4        A.    I did.
5        Q.    Did you make this report in
6    writing?
7        A.    I put everything in writing.
8    Let's see.  At this time I talked to -- I
9    had a meeting with Glen and Brad.  I spoke
10   to Faye.  And I did not talk to Debra during
11   that because I didn't think it would help.
12   I'm getting confused here.
13        MS. RODGERS:  You take your time
14   and answer his questions.  If you can
15   remember, you remember.  But don't get
16   stressed about how much time you are taking.
17        THE WITNESS:  Okay.
18        MR. DODD:  Q.  Let's back up a
19   little bit. Maybe this will help you.
20        A.    Okay.
21        Q.    Mahaffy didn't make the short list
22   for the first Dean search, and obviously he
23   was not selected?
24        A.    Right.
25        Q.    That irritated him, did it not?

Cynthia Ellison

April 27, 2006

Page 72

1    A.    Yes.  It sent him over the top.

2    Q.    He was upset that he was not

3    selected to be Dean, right?

4    A.    He came to me and he told me that

5    he thought I had something to do it with it.

6    Q.    On occasions after that you

7    observed him sitting at your desk?

8    A.    Right.

9    Q.    And sometimes he was crying?

10    A.    Right.

11    Q.    You thought that something was

12    wrong, right?

13    A.    Something was wrong.

14    Q.    What was wrong?

15    A.    He said that he blamed me for not

16    being selected as Dean.  He thought I had

17    some influence over even the first search.

18    And I wasn't even on the Committee.

19    Q.    What other behaviors did he exhibit

20    at that time that disturbed you?

21    A.    His countenance was different.

22    Q.    How so?

23    A.    He looked -- how should I say it?

24    He didn't look like he had -- his hygiene

25    was not intact.

Cynthia Ellison

April 27, 2006

Page 73

1    Q.    His what?

2    A.    Hygiene.  He wasn't shaven.  He

3    said he had come to the office.  He couldn't

4    sleep at night and he had come to the office

5    at 4:00 o'clock that morning and came in.

6    He was sitting there waiting on me.

7    Q.    How many times did that occur that

8    he would be sitting at your desk?

9    A.    Two times.  The first time was in

10   the dark.  I unlocked my office, went in to

11   go to my desk.  Flipped the light on and

12   when I got around to where I was supposed to

13   sit, there was Chris.

14   Q.    All right.  Now, you reported it

15   to Brad Moody?

16   A.    I reported it to Brad Moody and to

17   Glen Ray.

18   Q.    Glen Ray was the Associate Dean,

19   was he not?

20   A.    Right.

21   Q.    He reported to Brad?

22   A.    Right.

23   Q.    You think you put it in writing

24   because you put everything in writing?

25   A.    Well, I didn't say I put

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 74

1    everything in writing. I say what I said

2    earlier.  There was so many incidents that I

3    don't remember all of them.  I do remember

4    that every time an incident happened I

5    reported it to the proper person.

6         Q.      But you also did not report it to

7    Debra Foster, correct?

8         A.      I reported it to HR.  I did talk

9    to Faye Ward.

10        Q.      You didn't talk to Debra Foster --

11        A.      Not at this time.

12        Q.      Because you didn't think it would

13   help, right?

14        A.      I didn't.

15        Q.      At least with respect to that

16   incident, Debra Foster could not have

17   discriminated against you because you didn't

18   report it to her, right?

19             MS. RODGERS:  Object to form.

20             THE WITNESS:  Okay.

21             MR. DODD:  Q.  Do you agree with

22   that?

23        A.      Okay.

24        Q.      Is that a "yes."

25        A.      Yes.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 75

1       Q.     Now, you said you talked to Faye

2 Ward?

3       A.     Right.

4       Q.     And Faye Ward told you you needed

5 to go to Debra Foster?

6       A.     She said I needed to go back to

7 the chain-of-command and come back to Debra

8 Foster, because Debra Foster was the EEOC

9 person there.

10       Q.     And you declined to do that,

11 right?

12       MS. RODGERS:   Object to form.

13       THE WITNESS:   I declined --

14       MR. DODD:   Q.   You declined to go

15 to Debra Foster?

16       A.     I went to my supervisors, yes.

17       Q.     Instead?

18       A.     Uh-huh.

19       Q.     You have got to say "yes."

20       A.     Yes.

21       Q.     What did Brad Moody and Glen Ray

22 do with your report?

23       A.     At first they didn't do anything.

24 And when the behavior continued, I told them

25 that I was no longer willing to work there

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 76

1    unless something was done with Chris.

2         Q.      How long after this incident we

3    have been talking about with Chris, did that

4    conversation take place?

5         A.      At least a couple of weeks.  If

6    not more.

7         Q.      Do you know if Brad Moody or Glen

8    Ray or both of them had any meetings or

9    discussions with Chris Mahaffy about the

10   report you made?

11        A.      They did meet with Chris.

12        Q.      Were you there?

13        A.      I was in one of the meetings.

14        Q.      How many meetings did they have?

15        A.      I can't tell you how many they

16   had.  They had several that I wasn't involved

17   in.

18        Q.      How many meetings did you attend?

19   One?

20        A.      One.

21        Q.      When was that?

22        A.      It was about -- about four weeks

23   later, they called me in the office with

24   Chris.  It was Chris, me -- Dr. Mahaffy, me,

25   Glen and Brad.  And they told me that Chris

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 77

1    had agreed that he needed to see somebody.

2    Glen was going to find somebody for him to

3    see.  And Glen assured me that he would not

4    let him go alone.  That he would go with

5    him.

6        Q.      Do you know Glen's training?

7        A.      He is a psychologist.

8        Q.      Do you know what he meant --

9    strike that.

10       Did he tell you what he meant when

11   he said that Chris would see somebody?

12       A.      Yes, he did.

13       Q.      What did he say?

14       A.      Chris was not present.  After the

15   meeting was over Glen told me that his wife

16   is also in counseling.  I don't know what

17   she does exactly, but that he was going to

18   ask his wife to recommend somebody that Chris

19   could see.  And that he was going to be sure

20   that Chris saw that person.

21       Q.      Did you have any understanding of

22   what Glen was talking about?

23       A.      Yes.

24       Q.      What was your understanding?

25       A.      That he was going to see a

Cynthia Ellison

April 27, 2006

Page 78

1    psychiatrist, or psychologist, or whoever.  I
2    don't know.
3         Q.     Did you believe that Glen thought
4    that Mahaffy had psychiatric or psychological
5    problems?
6         A.     He told me so.  He told me that
7    he thought he had.
8         Q.     Did he tell you what condition he
9    thought Mahaffy suffered from?
10        A.     He did not.
11        Q.     Did you ever have an opinion of
12   what condition Mahaffy suffered from?
13        A.     Ever?
14             MS. RODGERS:  Object to form.
15             THE WITNESS:  I have no idea.  I
16   don't know the names of the conditions.  I
17   just knew he made me afraid.
18             MR. DODD:  Q.  Do you believe
19   that he did have a psychological or
20   psychiatric condition of some kind?
21        A.     Based on what Glen said, yes.
22        Q.     What about based on your own
23   observation?
24        A.     Based on my observation I could
25   tell something was wrong.  I am not a

Cynthia Ellison

April 27, 2006

Page 79

1    doctor, so I don't know that for a fact.

2    But based on what I observed.

3         Q.     Did that conclusion -- did that

4    result satisfy you?

5              MS. RODGERS:   Objection.

6              THE WITNESS:   It satisfied me for

7    the moment that he said he was going to take

8    him to see somebody, but his behavior didn't

9    stop.

10             MR. DODD:   Q.   Do you know if

11   he, in fact, took Chris Mahaffy to see

12   somebody?

13        A.     I do not know that for a fact.

14        Q.     Ms. Ellison, do you contend that

15   Debra Foster discriminated against you with

16   respect to any other investigation or any

17   other complaint you raised?

18        A.     Not that I raised.

19        Q.     Do you contend that she

20   discriminated against you with respect to a

21   complaint that anyone raised?

22        A.     Well, I do actually.

23        Q.     Tell me about it.

24        A.     Jessie Clayton, who was a black

25   student, applied for the -- to be the School

Cynthia Ellison

April 27, 2006

Page 80

1   of Sciences Computing Center Director because

2   the job had become vacant.  And I told him

3   to go over to see Debra to see about

4   applying for the job.  And he did apply for

5   the job, as well as several others, including

6   Bo Holt, H-o-l-t, who now has the job. And

7   Debra -- well, during the course of the

8   applications and everything that you do for

9   the jobs in selecting the person to be

10  interviewed, Jessie was told by Debra not to

11  make waves because he wasn't being interviewed

12  for the job.  To just go back and don't

13  worry about it.  And -- well, I talked to

14  Debra about it.  And I believe -- well, I

15  believe in every subsequent thing that I had

16  to say or do, she didn't want to hear

17  anything else I had to say. Nothing.  Whether

18  it dealt with payroll, or any other personnel

19  matters.  Anything.

20      Q.    You kind of lost me here.  Let's

21  back up and see if I can understand it.

22  Okay.

23          When did Jessie Clayton apply for

24  this job?

25      A.    I don't remember.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 81

1    Q.    Do you remember the year?

2    A.    It had to be 2002, I believe, or

3    '03.

4    Q.    And Bo Holt is a student?

5    A.    2003.  He was a student, yes.  He

6    was a student worker in one of the other

7    schools.

8    Q.    Is he white or black?

9    A.    He is white.

10    Q.    I'm sorry.

11    A.    He is white.

12    Q.    He got the job, right?

13    A.    He did.

14    Q.    Do you think there is something

15    sinister about that?

16    MS. RODGERS:  Object to form.

17    MR. DODD:  Q.  Do you think there

18    is something discriminatory about that?

19    A.    We changed the job description to

20    fit his credentials.  We took off the

21    requirement for a Bachelor's Degree at the

22    request of Debra Foster.

23    Q.    Are you suggesting or contending

24    that Jessie Clayton was more qualified for

25    that job than Bo Holt?

Cynthia Ellison

April 27, 2006

Page 82

1  A.  In my opinion he was.

2  Q.  How did that affect you, though?

3  A.  My conversation with Debra about

4  how I thought Jessie had been treated, I

5  think that affected her attitude towards me.

6  Q.  And that affected the way she

7  dealt with you on issues that came up

8  subsequently?

9

10  A.  That's right.

11  Q.  Do you think Debra Foster's

attitude toward you that you have described

12  has anything to do with the fact that you

13  are black, or is it more likely that, as you

14  said earlier, she just doesn't like you?

15

16  MS. RODGERS:  Object to the form.

THE WITNESS:  I don't know how to

17  answer that. I guess only she can answer

18  that.

19

20  MR. DODD:  Q.  Do you think that

Debra Foster took any action, or refused to

21  take any action that needed to be taken about

22  anything, because you are black?

23

24  MS. RODGERS:  Object to form.

THE WITNESS:  I can't answer that

25  either.

Cynthia Ellison

April 27, 2006

Page 83

1      MR. DODD:  Q.  Why can't you
2  answer that?

3      A.    Because what action she takes
4  depends on what she thinks, not on what I
5  think.

6      Q.    I am just asking if you believe
7  that.

8      A.    Repeat your question.

9      Q.    Yes.  Do you think that Debra
10  Foster took any action, or refused to take
11  any action that she should have taken about
12  anything, because you are black?

13      MS. RODGERS:  Object to form.

14      THE WITNESS:  Not because I am
15  black per se, no.

16      MR. DODD:  Q.  Ms. Ellison, are
17  there any other events, complaints,
18  investigations or incidents involving yourself
19  and Debra Foster where you think she
20  mistreated you, or discriminated against you,
21  other than the ones we have discussed?

22      A.    I think she mistreated me during
23  the Barbara Ware incident.

24      Q.    Okay.  Tell me about the Barbara
25  Ware incident, what you recall?

Cynthia Ellison

April 27, 2006

Page 84

1    A.    Well, I don't know much about it

2  myself.  I do know that it arose because

3  Barbara was -- I didn't know until later.

4  She was off Campus, and I was getting

5  materials together for payroll.  I had to do

6  payroll that next day.  I called her office

7  several times.  Actually, I think I called

8  the first time looking for Chris, and I

9  didn't get an answer.  And I called the

10  second time because I was doing payroll.

11       Barbara had turned in her time

12  sheet, and she had left Friday on that

13  particular time sheet blank.  So I was trying

14  to get in touch with Barbara to find out

15  whether it was going to be leave, or whether

16  she was working, whatever the situation was

17  going to be.  Chris informed me the next day

18  that Barbara had taken leave. He had given

19  Barbara permission to leave that afternoon.  I

20  was just calling to be sure she wasn't going

21  to be docked for a day's work.

22       That next day, if I recall

23  correctly, Bayo called me into his office and

24  said that Barbara had filed a complaint with

25  Debra Foster about my calling her office.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 85

1   And that's all I knew.

2           He says, "All I can tell you is I

3   have gone over, and I have spoken with Debra.

4   I read the complaint.  The complaint is three

5   pages long."

6           He says, "We are going to talk to

7   Barbara, and nothing will come of it."

8           I said, "What do you mean nothing

9   will come of it?"

10          He said, "Debra and I both read

11  the complaint, and we feel like it's been

12  embellished by Chris Mahaffy."

13          Because Barbara had only been there

14  for several months.  I never saw the

15  complaint.  I never fully understood why she

16  complained.  Debra Foster and Bayo Lawal

17  immediately met with me in the conference

18  room in the Dean's office and said -- I had

19  something in writing to give to them to tell

20  them what occurred.  They didn't want it.

21          They said, "Don't worry about this.

22  This is frivolous.  This is something that

23  Chris has done.  She wasn't here long enough

24  to even know what she had written about in

25  the complaint."  I asked them again at that

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 86

1    time if I could see the complaint.  They
2    refused.

3            After that she said, "If you will
4    just tell me that you will be mindful of
5    Barbara's feelings and everything will be
6    fine."

7            I said, "Well, I will be mindful
8    of her feelings, but I don't know what's
9    happening."  And that's the way the meeting
10   ended.

11           Later that afternoon, I believe it
12   was a student worker from Debra's office,
13   delivered a letter to Dr. Lawal.  I asked
14   Dr. Lawal was it concerning our meeting. He
15   said, "Yes."  That Debra had sent him a
16   letter and Barbara a letter.  I complained --
17   or I asked him, "Why did you and Barbara get
18   a letter, and I didn't get a letter?"  I
19   wrote a memo to that effect to Dr. Lawal
20   copying Debra Foster.  That's all I know
21   about Barbara Ware's complaint.  I was
22   involved in it, but I really don't know what
23   the complaint said.

24      Q.    Have you ever seen it?

25      A.    I have never seen it.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 87

1    Q.    Have you had any disagreements with
2    Barbara Ware?

3    A.    I haven't had any disagreements
4    with her.  The only thing that I can recall
5    that we may have discussed was that Barbara
6    wanted to take lunch between 1:00 and 2:00
7    and 2:00 and 3:00.  And because I needed to
8    know where all the secretaries were, because
9    the Deans required that, I told her that when
10   she takes late lunches, she needed to let me
11   know or transfer her calls to my office.
12   She didn't like it, and she complained to
13   Chris.

14   Q.    Do you have any idea why she did
15   not like that?

16   A.    No.

17   Q.    Do you know if Chris Mahaffy had
18   given her any different allowances regarding
19   her lunchtime?

20   A.    Neither Chris nor Barbara
21   communicated anything to me.

22   Q.    And tell me now why this is an
23   issue with Debra Foster because she wouldn't
24   show you a copy of the letter?

25   A.    Because I was mistreated.  I was

Cynthia Ellison

April 27, 2006

Page 88

1    lied to.  She told me that "This was nothing

2    and don't worry about it." Then all of a

3    sudden it became a big deal.

4        Q.    Do you have any other complaint

5    about the manner in which Debra Foster

6    treated you, investigated the complaint, or

7    handled anything official?

8        A.    I don't think she did her job in

9    respect to my complaints, as I observed it.

10   I had to go back, as I said, to Dr. Nance,

11   at least once, maybe twice, to get her to

12   investigate the Allison Stevens situation.

13       Q.    We talked about that already.

14       A.    Right.

15       Q.    I am talking about anything new.

16       A.    Not Debra Foster that I can

17   recall.

18       Q.    Now, Allison Stevens was a

19   co-worker of yours, was she not?

20       A.    That's correct.

21       Q.    She was the secretary for Physical

22   Sciences?

23       A.    Right.

24       Q.    She was not a supervisor, right?

25       A.    No.

Cynthia Ellison

April 27, 2006

Page 89

1     Q.     A part of that controversy -- or

2     the entire controversy had to do with Allison

3     Stevens using a racial slur with you, right?

4     A.     That's what it escalated into, yes.

5     Q.     I believe from some of the

6     documents I have seen that you said she did

7     not really say the "N" word, but she came

8     close to saying it.

9     A.     She said it enough for me to know

10     what she said.

11     Q.     There is really no difference

12     between saying it or saying part of it,

13     right?

14     A.     She said it.  I heard what she

15     said.

16     Q.     I'm not going to argue phonetics

17     with you here.

18     A.     Right.

19     Q.     In your mind, you are certain that

20     she either said it, intended to say it, but

21     the meaning was clear, right?

22     A.     The meaning was clear.

23     Q.     That happened on December the 23rd,

24     right, 2003?

25     A.     It happened in the early part of

Cynthia Ellison

April 27, 2006

Page 90

the first week of December, yes.

Q.    Brad Moody was the Dean?

A.    Yes.

Q.    Your Dean?

A.    Yes.

Q.    Glen Ray was the Associate Dean?

A.    Correct.

Q.    And Chris Mahaffy was Allison Steele's supervisor?

A.    Stevens.

Q.    Stevens, sorry.

And this event happened, did it not, when none of those three was in the office?

A.    Correct.

Q.    Perhaps at lunchtime or thereabouts?

A.    No.  It was -- I'm certain it was around 10:00 or 10:30 that morning.  Randy Richardson and two students came in and asked me why Allison's door was closed with a do not disturb sign on it.

Q.    And you went to see?

A.    Right.

Q.    Tell me what happened.

Cynthia Ellison

April 27, 2006

Page 91

1    A.        I remember that Randy and the two

2  students that were with him stayed in my

3  office.  There was a student worker there for

4  me.  She was at her desk.

5              You can gain entry to Allison's

6  area through our conference room.  So rather

7  than go all of the way down the hallway, I

8  went through the conference room.  I opened

9  the back side of the door to where Allison

10 is seated.

11             And I said, "Randy is in the

12 office with a couple of students and he needs

13 to talk to you, but he said there is a do

14 not disturb sign on the door."  I said, "Can

15 you tell me what's going on?"

16             She says, "Well, I am putting in

17 the banner numbers."  We have a banner system

18 for registration, and each secretary would

19 take their turn entering their numbers for

20 their particular courses.

21             I said, "Well, I don't think we

22 can close the door like this in the middle

23 of the morning."  I said, "If you need time

24 to do it, you need to either let me know

25 what's going on and transfer your calls."

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 92

1    Then she turned around and she stood up, and
2  she just screamed at me.

3      Q.    How long did this last?

4      A.    Not more than two or three
5  minutes.

6      Q.    In addition to the slur, what
7  other things did she say?

8      A.    She was saying, "You make me sick.
9  You make me sick.  Why don't you retire?
10  Everybody wants you to retire anyway."  She
11  said a lot of things.  At the end of those
12  things, she said, "You nigger."

13      And I said, "What did you say?"
14  And that's just the way I said it.  I said,
15  "What did you say?"  And I said, "Allison, I
16  am through with this."

17      So I went back to my office and I
18  told Randy.  I said "She is working in
19  banner."  I said, "But I have taken the sign
20  off the door.  If you need assistance, you
21  can go back to Allison."

22      Shortly thereafter Mahaffy came in
23  the office. And I told him what happened and
24  I told him the things that Allison said and
25  that she called me a nigger.

Cynthia Ellison

April 27, 2006

Page 93

1

2       Q.    Now, what happened that afternoon

with respect to Brad?

3       A.    That afternoon there was a meeting

4   with me, Brad, as I recall Glen and Allison.

5       Q.    Was Chris in the meeting?

6       A.    Yes.  Chris was in the meeting.

7   And Allison admitted to saying mean and ugly

8   things.  Brad took it to mean -- well, and

9   then I said, "You called me" and Brad stopped

10  me in mid sentence and said, "I am not going

11  to let you and Allison turn this meeting into

12  going back and forth at each other."  He

13  said, "Allison, you have to work with

14  Cynthia.  Cynthia, you have to work with

15  Allison.  Chris, you need to let Cynthia know

16  when you have given Allison permission to

17  close her door and do whatever."  That's

18  pretty much the gist of the meeting that I

19  recall.

20      Q.    Who called the meeting?

21      A.    I believe Brad called it.

22      Q.    How did Brad find out about the

23  confrontation?

24      A.    I assume Chris told him.  I didn't

25  tell Brad then.  Or Glen might have told

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 94

1  him.  I really don't remember.  I know we

2  had a meeting about it.

3      Q.      Until the meeting occurred, Mahaffy

4  was the only person you had told, correct?

5      A.      That was her supervisor.

6      Q.      But that's the only person you

7  told, right?

8      A.      That's right.

9      Q.      Were you satisfied with Brad

10  Moody's handling of the meeting?

11      MS. RODGERS:  Object to form.

12      THE WITNESS:  I wasn't satisfied.

13  Brad was trying to make peace.  He wasn't

14  addressing the issue. Because I still raised

15  issue that I had been called a name.  If you

16  believe that she said these other things, why

17  can't you believe she said that.  I not only

18  had issue with Brad with that, I also had

19  issue with Glen with that.  I told them that

20  I wasn't satisfied.

21      MR. DODD:  Q.  Other than the

22  fact that Allison Stevens said ugly things,

23  do you know of any reason why they should

24  believe you that she used the racial slur

25  over her when she said she didn't?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 95

1      MS. RODGERS:  Object to form.

2      THE WITNESS:  Well, I don't know

3  believe me over her.  This wasn't the first

4  time that Allison had to be told that she

5  was supposed to adhere to directives and

6  requests from the Dean's office.

7          We had the same problem with her

8  when Bobby Elliott was Dean.  Bob called a

9  meeting.  At Allison's request, because

10  Allison wanted to know if I was her

11  supervisor.  And Bob told her that "Yes,

12  Cynthia is your supervisor."  In that I don't

13  have to evaluate her.  "But she is your

14  supervisor in that she has directives from

15  me.  When she gives those directives, I

16  expect them to be done."  She said to Bob,

17  "If she is my supervisor, I am going to

18  quit."  She didn't quit.

19          MR. DODD:  Q.  Is it fair to say

20  that after the meeting that afternoon on

21  December the 3rd, 2003, you weren't satisfied

22  with how it had been handled?

23          MS. RODGERS:  Object to form.

24          THE WITNESS:  It's fair to say

25  that I wasn't satisfied.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 96

1            MR. DODD:  Q.  What did you do,

2    or did you follow up on the meeting?  Did

3    you file a complaint about it?  What did you

4    do?

5            A.      I filed a complaint later.

6            Q.      When?

7            A.      I think my complaint was dated

8    either the end of February or the 1st of

9    March.  Sometime the 1st of March.

10           Q.      And to whom did the complaint go?

11   Strike that.

12           To whom did you send the

13   complaint?

14           A.      Well, I initially contacted Guin

15   Nance.

16           Q.      Initially?

17           A.      I think so, but I didn't -- okay.

18   After our meetings.  I'm trying to remember

19   this.  Because the investigation didn't come

20   until later because I know that Guin

21   requested that I ask Debra to investigate.

22   And that was either early March or late

23   February.

24           Q.      Let me see if I understand.  You

25   contacted Guin Nance?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 97

1    A.    I did.

2    Q.    About the Allison Stevens incident?

3    A.    Well, I contacted Guin Nance

4 because -- okay. After the meetings with me,

5 Glen, Chris and Allison and Brad, Glen said

6 to Allison, "I want you to come to me once a

7 week and tell me how Cynthia is treating

8 you." And I thought that was unfair.

9         They also set it up that if I

10 asked for any work to be done, I made a

11 request to Allison, but either another faculty

12 member or Chris would show up and put the

13 work in the Dean's office and leave.

14         I went in, spoke to Brad, told him

15 what was happening. At that time I found

16 out that they, Glen, Brad and Chris had

17 decided that it would be best for Allison not

18 to interact with me and have some member of

19 the faculty, or Chris run interference. And

20 I -- of course, I was upset.

21    Q.    Why did that upset you?

22         MS. RODGERS:  Object to form.

23         THE WITNESS:  Because I saw that

24 as being mistreated. I saw that as them not

25 believing that she had called me a nigger.

Cynthia Ellison

April 27, 2006

Page 98

1    But all of that -- after all of that

2    happened, and I think Allison actually went

3    to see Glen once a week, I really don't

4    know.  I didn't follow up on that.  I just

5    wanted to do my work.

6          There came a day that -- and I

7    have never seen the letter or whatever.

8    There was talk that there was a letter on

9    Campus that went to Dr. Nance that said the

10   Dean's secretary in the School of Sciences,

11   another secretary had used the racial slur

12   toward her.  Dr. Nance had an open door

13   policy.

14         Over the years I have talked to

15   Dr. Nance about many things, not only Dr.

16   Nance, but other Vice Chancellors or whatever.

17   I didn't want my name to be associated with

18   something that I had not written.

19         So I contacted Guin Nance to let

20   her know that I was not the author of

21   whatever this document was.  And that if I

22   had a problem, I would, like I had done in

23   the past, come to her directly.

24         She responded to me in writing and

25   said that she appreciated it, but she thought

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 99

1    that I needed to have Debra investigate.

2         I responded back to her that I

3    didn't really want to talk to Debra because

4    Debra didn't do anything. She asked me to

5    have Debra investigate anyway. That's when I

6    put it in writing, I believe. But those are

7    the sequence of events.

8         Now, the dates would be in that

9    December to March window.

10        MR. DODD:   Q.   Okay.   Up until

11   then, that window, December to March 2004, I

12   think from what you told me before, the only

13   interaction you had had with Debra Foster

14   concerning a complaint of some kind was the

15   one concerning Jessie Clayton. Were there

16   any other others?

17        A.     If I told you that, that was a

18   mistake.

19        Q.     You mentioned the first Dean

20   search.  You told me you didn't go to her

21   because you didn't think it would help.

22        A.     But I did report it to HR.

23        Q.     Why, with respect to the Allison

24   Stevens issue, did you tell Guin Nance that

25   you didn't think it would do any good to

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 100

1    report it to Debra Foster?

2        A.    Because it was known around Campus

3    that Debra started fires.  She didn't put

4    them out.

5        Q.    Can you explain that to me?

6        A.    People who had gone up to Debra,

7    they didn't see or get results.

8        Q.    Are you saying you wrote that

9    message to Guin Nance about, "It won't do any

10   good to go to HR"?

11       A.    I met with her personally.

12       Q.    Did you tell her that in your

13   meeting?

14       A.    I told her exactly that.  I told

15   her that people thought Debra was starting

16   fires instead of putting them out.

17       Q.    Now, did you tell Guin Nance that

18   based on what others at the University had

19   said about starting fires and not putting

20   them out, or did you tell Guin Nance that

21   based on your own experiences with Debra

22   Foster?

23       A.    You know, I really believe it was

24   both.  I think I cited some examples to Guin

25   Nance.  And it was a combination of what

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 101

1    others had said.  All University people talk.

2        Q.    Did you want the Allison Stevens

3    incident investigated, or did Guin Nance want

4    it investigated, or both?

5        A.    It was both.  After I had my

6    meeting with Guin, it was both of us.

7    Because I had been mistreated.

8        Q.    What prompted you to write to Guin

9    and meet with her?  Was it your feeling that

10   you had been mistreated, or was it the fact

11   that this anonymous letter had appeared?

12       A.    It was both.

13       Q.    Why did you wait so long before

14   going to her?

15            MS. RODGERS:  Object to form.

16   Sorry.

17            MR. DODD:  Q.  Why did you wait

18   close to three months before you went to Guin

19   Nance?

20       A.    I don't know that it was three

21   months, but I took immediate action on what

22   had happened to me.

23       Q.    How did you take immediate action?

24       A.    I told her supervisor.  We met

25   with the Dean, the Associate Dean.

Cynthia Ellison                                    April 27, 2006

Page 102

1      Q.      That was that day, right?

2      A.      It was that day or the day after.

3  It was within -- yes.

4      Q.      You didn't tell your supervisor

5  that Allison Stevens had used a racial slur,

6  did you?

7              MS. RODGERS:  Object to form.

8              THE WITNESS:  Not that day.  No,

9  not at that time.

10             MR. DODD:  Q.  Did you ever tell

11 Brad Moody that Allison Stevens had used a

12 racial slur?

13     A.      I did.

14     Q.      When?

15     A.      It might have been a couple of

16 weeks later.  I'm not sure.

17     Q.      What was the context of that

18 conversation?

19     A.      That was when -- well, he found

20 out that day because we had that meeting.

21 He knew she had called me a nigger.

22     Q.      How do you know that Brad Moody

23 knew that?

24             MS. RODGERS:  Object to form.

25             THE WITNESS:  Well, I told him in

Cynthia Ellison

April 27, 2006

Page 103

1    the meeting.

2            MR. DODD:   Q.   Let me get this

3    straight.   In the meeting on December 3rd,

4    you told Brad Moody that Allison Stevens had

5    used the racial slur?

6        A.      Okay.   I told Chris.

7        Q.      I understand that.   Okay.

8        A.      And it may have been a couple of

9    weeks later when I told Brad.   Because, as I

10   stated earlier, Brad would not listen to

11   everything that had been said.   He said he

12   didn't want to hear it.

13       Q.      Because he wanted to make peace,

14   as you said?

15       A.      Right.

16       Q.      Tell me when you told him that

17   Allison Stevens had used the racial slur?

18       A.      I really don't remember.

19       Q.      Did you tell him orally, or did

20   you put it in writing?

21       A.      I told him orally.   I did not put

22   it in writing.

23       Q.      Was anybody else present when you

24   told him?

25       A.      I don't remember.

Cynthia Ellison

April 27, 2006

Page 104

1    Q.    Where did you tell him?

2    A.    I'm sure it was in the Dean's

3  suite.  We very rarely met outside of the

4  Dean's suite.

5    Q.    What did he say in response?

6    A.    I really don't recall.  I think

7  that's probably why I felt like nothing would

8  be done.  Because they were running

9  interference between me and Allison.

10    Q.    Did you object to that?

11    MS. RODGERS:  Object to form.

12    THE WITNESS:  I said I did.

13    MR. DODD:  Q.  Because you felt

14  you were being mistreated?

15    A.    Right.  And not believed.

16    Q.    Isn't it also true that that

17  prevented Allison from verbally attacking you

18  again?

19    A.    Allison had free course to do

20  whatever she wanted to do.

21    Q.    Did she ever verbally attack you

22  again?

23    A.    I don't recall us having any

24  incident after that.

25    Q.    Ms. Ellison, did you contact Guin

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 105

1  Nance because you got wind of this anonymous

2  letter or because you wanted an investigation

3  performed?

4          MS. RODGERS:  Object.  Asked and

5  answered.

6          THE WITNESS:  I have already

7  answered that.

8          MR. DODD:  Q.  Help me out.  I

9  am just feeble. Did you say both?

10         A.    I did.

11         Q.    Why after the passage of that much

12  time, did you want an investigation at that

13  time?

14         MS. RODGERS:  Object to form.

15         THE WITNESS:  Because nothing had

16  been done.

17         MR. DODD:  Q.  What did you want

18  done?

19         MS. RODGERS:  Object.

20         MR. DODD:  Do you want to take a

21  break?

22         A.    My leg.  I can stand here.  I

23  just need to stand up a minute.

24         Q.    What did you want done?

25         A.    I wanted the University to know

d1403afb-e7e9-42de-b323-57812dba67e5

Case 2:05-cv-00902-MHT-DRB    Document 31    Filed 07/21/2006    Page 106 of 256

Cynthia Ellison                                    April 27, 2006

Page 106

1    that I had been mistreated, and I wanted them

2    to investigate it.  I had no preconceived

3    idea of what the end of the investigation

4    would be.

5         Q.    Now, Brad Moody did investigate the

6    incident, did he not?

7         A.    Yes.

8         Q.    And Debra Foster also investigated

9    the incident, did she not?

10        A.    Yes.

11        Q.    Do you know what Brad Moody's

12   conclusions were?

13            MS. RODGERS:  Object to form.

14            THE WITNESS:  Do I know what his

15   conclusions were?

16            MR. DODD:  Q.  Yes.

17        A.    I think his conclusions were the

18   same as to what they thought in the

19   beginning.  That I didn't call her her a

20   nigger.

21            THE COURT REPORTER:  You just said

22   that you didn't call her.

23            THE WITNESS:  I mean, she didn't

24   call me a nigger.  I'm sorry.  Thank you.

25            MR. DODD:  Q.  What were Debra

Cynthia Ellison

April 27, 2006

Page 107

1    Foster's conclusions?

2              MS. RODGERS:  Object to form.

3              MR. DODD:  Q.  If you know.

4        A.      Well, when I talked to her and she

5    took my statement.  She pretty much told me

6    what her conclusion would be.

7        Q.      Do you know what her ultimate

8    conclusions were?

9              MS. RODGERS:  Object to form.

10              THE WITNESS:  She sent me a letter

11    and Allison a a letter saying that we should

12    respect each other. Basically, that's what it

13    said.  It was a two or three sentence

14    letter.

15              MR. DODD:  Q.  Were you aware if

16    anybody investigating the Allison Stevens

17    incident was able to corroborate what you

18    said about Allison calling you --

19        A.      I wasn't in any other meeting, so

20    I don't know.

21        Q.      I am just saying if you were

22    aware.  If you are not aware, you are not

23    aware.

24        A.      I am not aware.

25        Q.      Do you know if all of the

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 108

1    potential witnesses to the incident were

2    interviewed?

3        A.    Well, as I stated earlier, Nikki

4    was not.  She was my student worker.

5        Q.    Do you know if she was ultimately

6    interviewed?

7        A.    Ultimately.

8        Q.    That's what I mean.  By the end

9    of the investigation, do you know if there

10   was any witness who had not gone

11   uninterviewed?

12       A.    Well, actually the investigation

13   had ended as she interviewed Nikki after the

14   investigation.

15       Q.    Do you know if Nikki's interview

16   changed the result?

17       A.    It did not.

18       Q.    How did Roger Ritvo discriminate

19   against you?

20             Do you want to take a break?

21             THE WITNESS:  I think I need to.

22             MR. DODD:  Let's take a break.

23             (Whereupon, the luncheon recess was

24   taken from 12:05 o'clock p.m. to 1:00 o'clock

25   p.m.)

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 109

1                    AFTERNOON SESSION

2                    MR. DODD:  Q.  Ms. Ellison, who

3      is Mack Jenkins?

4         A.      He is Ruby Jenkins' husband.

5         Q.      His name and Ruby Jenkins' name

6      appear on a list of individuals as part of

7      the initial disclosures that we have to file

8      with the court.

9         A.      Okay.

10        Q.      Do you know why -- strike that.

11               What information do you think Ms.

12     Jenkins has concerning your case?

13        A.      Well, the day after I was escorted

14     off Campus, Mack came to Campus that next day

15     because of what was happening in the office

16     and he took me to lunch.  And I discussed

17     with him what was happening with me and Dr.

18     Lawal.  With me and Chris.  And he gave me

19     some advice. He is a minister.

20        Q.      What advice did he give you?

21        A.      He told me to be sure that I had

22     documented everything.  All of the treatments,

23     the mistreatment that I thought I had

24     received.  He told me to pray about it. He,

25     in fact, also said to be sure you get

Cynthia Ellison                                    April 27, 2006

Page 110

1    security.

2        Q.    You get what?  I'm sorry.

3        A.    Security.

4        Q.    Security where?

5        A.    For my work area.

6        Q.    Tell me again what day this was?

7    You lost me there.

8        A.    Our meeting with Mr. Ritvo was

9    January 31st.  So this was the day after,

10   which would have been February 1st.  It had

11   to be the 1st or 2nd.

12       Q.    When you said that you were

13   escorted off Campus, what did you mean by

14   that?

15       A.    Dr. Lawal informed me when I

16   arrived to work on January 31st that Dr.

17   Ritvo thought it was advisable for him to

18   take me off Campus while they were meeting

19   with Chris.

20       Q.    Dr. Lawal is the person you say

21   was the person who escorted you off Campus?

22       A.    Right.

23       Q.    Did y'all go to lunch?

24       A.    Yes.

25       Q.    Was it Ritvo or Lawal who said you

Cynthia Ellison                                    April 27, 2006

Page 111

1    guys need to leave Campus and go to lunch

2    together?

3         A.       He told me that the request had

4    come from Dr. Lawal.  Dr. Lawal told me that

5    Dr. Ritvo had made the request for him to

6    take me off Campus.

7         Q.       Did he say why?

8         A.       His terminology was that it was

9    advisable for me to leave Campus.

10        Q.       You met with Mack Jenkins the next

11   day?

12        A.       The next day, or the day after.

13   It was shortly after that.

14        Q.       And you went to lunch with him?

15        A.       I went to lunch with he and his

16   wife.

17        Q.       Ruby?

18        A.       Uh-huh.

19        Q.       I assume that you told Mack

20   Jenkins about your circumstances at AUM?

21        A.       I told him as much as I could

22   tell him at the lunch hour.

23        Q.       Do you believe that the extent of

24   his knowledge about your circumstances at AUM

25   is limited to what you told him?

Cynthia Ellison                                              April 27, 2006

                                                              Page 112

1              A.      Yes.

2              Q.      Do you know if he has any

3       firsthand knowledge of anything that was going

4       on at AUM?

5              A.      He is not an employee at AUM, so

6       he would not have firsthand knowledge.

7              Q.      Did he suggest that you seek any

8       sort of assistance, whether it be spiritual,

9       legal, medical, psychological?

10             A.      He was providing the spiritual

11      assistance.

12             Q.      How many times did you see him for

13      spiritual assistance?

14             A.      Well, I saw him that day.

15             Q.      Did you see him any other times

16      for spiritual assistance?

17             A.      What do you mean?

18             Q.      About your circumstances at AUM.

19             A.      No.

20             Q.      Just that one time?

21             A.      Uh-huh.

22             Q.      You have got to say "yes."

23             A.      Yes.  I'm sorry.

24             Q.      Now, why is Ruby Jenkins on your

25      list?

Cynthia Ellison                                    April 27, 2006

Page 113

1      A.      Ruby is on my list because every

2   single incident after it happened I shared it

3   with her.  I didn't share it with her in

4   writing.  I was upset, and I needed to talk.

5   And I was afraid and I didn't know what to

6   do.  She had been there for 20 years.  I

7   told her.

8      Q.      Do you believe that she has any

9   firsthand knowledge of any of the

10  circumstances you are complaining about?

11     A.      She has firsthand knowledge of

12  Chris' behavior.

13     Q.      Which particular behaviors, do you

14  know?

15     A.      The behaviors of coming into the

16  office before day in the morning waiting for

17  me.

18     Q.      Where is Ruby's office?

19     A.      She is on the second floor.

20     Q.      How would she know if Chris

21  Mahaffy was sitting at your desk on the third

22  floor in the wee hours of the morning?

23     A.      Okay.  I thought the question was

24  the behavior pattern.  He actually had Campus

25  security open her office before morning when

Cynthia Ellison                                    April 27, 2006

Page 114

1    she was on the Search Committee and he left

2    flowers on her desk.  So when I told her

3    about what happened to me, there is no way

4    she should question what happened.

5    Because --

6         Q.     Something similar had happened to

7    her?

8         A.     That's right.

9         Q.     Her knowledge of the incident you

10   just described with him sitting at your desk,

11   comes from what you told her?

12        A.     Right.

13        Q.     What other conduct of Mahaffy do

14   you think she has firsthand knowledge of?

15        A.     You would have to ask her.  I'm

16   really sure she could tell you fully herself.

17   Because I would be telling you what she told

18   me.

19        Q.     Is that the extent of -- what we

20   have just described, the extent your knowledge

21   about what she knows?

22        A.     It's not the extent of my

23   knowledge.  But what I know would be hearsay,

24   I guess.  I don't know.

25        Q.     Now, Keith Ellison was on your

Cynthia Ellison                                    April 27, 2006

Page 115

1      list?

2          A.    Yes.

3          Q.    Why is he on your list?

4          A.    He is my pastor.

5          Q.    What information do you think he

6      has about this case?

7          A.    I have discussed in depth with him

8      on Sundays after service what's been happening

9      to me at AUM.

10         Q.    Were you seeking some sort of

11     assistance from him?

12         A.    Spiritual guidance.

13         Q.    Are you still seeking that from

14     him?

15         A.    Every Sunday I go to church.

16         Q.    Are you still seeking spiritual

17     guidance from him concerning this lawsuit?

18         A.    I have talked to him about it,

19     yes.

20         Q.    How many times have you talked to

21     him about it?

22         A.    Numerous times.  I don't have a

23     number.

24         Q.    You don't keep records of stuff

25     like that?

Cynthia Ellison                                    April 27, 2006

Page 116

1      A.     No.   I'm not sitting there taking

2   notes when I talk to him about my situation.

3      Q.     Where is his church located?

4      A.     Elba, Alabama.

5      Q.     Is there a street address?

6      A.     There is, but we use the P.O. Box

7   159, 36323.

8      Q.     That's your church, right?

9      A.     36323.

10      Q.     That's your church, right?

11      A.     Yes, it is.

12      Q.     You told me what it was earlier in

13   the deposition, didn't you?

14      A.     Yes, I did.

15      Q.     What advice did he give you?  What

16   guidance did he give you?

17           MS. RODGERS:  Object to form.

18           MR. DODD:  Q.  What guidance did

19   he give you?

20      A.     Our Christian belief is to pray.

21   He told me to be watchful.  Report what was

22   happening to me.  And he knew I couldn't

23   quit my job because I needed to work.  So we

24   discussed having to remain in an environment

25   that had become conducive to every time my

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 117

1    door opened I thought it was Chris.  When I

2    went to the restroom, I am looking around

3    because I am looking for Chris.  So he

4    basically told me to pray and be safe.

5        Q.    When did you first talk to him

6    about your circumstances?

7        A.    Probably the first -- I don't

8    remember exactly the first time.  But the

9    first time that really concerned me to the

10   point where I need to be talking to somebody

11   about this is when I arrived to work, and

12   this man is in the dark behind my desk

13   crying.

14       Q.    Have you spoken to Keith Ellison

15   about the circumstances of your case since

16   your departure from AUM?

17       A.    "Circumstances" meaning what?

18       Q.    Anything about your lawsuit.

19       A.    Well, certainly he asked me what I

20   did and I told him I did file.  Periodically

21   he has asked me what's going on and we talk.

22       Q.    Why is Courtnei on your list?

23       A.    Courtnei is my daughter.  She can

24   attest to the mental anguish that I went

25   through at home in the evenings.  In fact,

Cynthia Ellison                                   April 27, 2006

                                                      Page 118

1     the night of January 31st after the meeting

2     with Ritvo, Lawal, Faye Ward and myself, when

3     I asked for security and was refused

4     security, I went home that afternoon.  My

5     lights went out at home and I was afraid to

6     the point where I called Courtnei, and her

7     boyfriend, to come home because I was afraid

8     it was Chris.  There was no storm.  There

9     was nothing.  The lights went out.

10         Q.     Why did the lights go cut?

11         A.     I have no idea.  There was no

12    accident on the street.  All I could think

13    of was Chris, because earlier that day he had

14    come to my cubicle looking for me.

15         Q.     You didn't see Chris outside your

16    house?

17         A.     Of course I didn't.  I didn't go

18    outside my house.

19         Q.     Now, you said you asked for

20    security and your request was denied?

21         A.     Yes.

22         Q.     Who did you ask for security?

23         A.     I asked for security in the

24    meeting on the 31st.

25         Q.     Who did you ask to provide the

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 119

1    security?

2        A.    I asked Dr. Ritvo.

3        Q.    What kind of security did you ask

4    for?

5        A.    I asked for Campus Police to

6    secure my area in Goodwyn Hall on the third

7    floor where I worked.

8        Q.    What does that mean?  What does to

9    "secure your area" mean?

10       A.    I wanted them to be in the area.

11       Q.    Constantly?

12       A.    I didn't say constantly.  My

13   request was for Campus security to secure the

14   area.  That's the term we use on Campus.

15   Campus Police knows their business.  They

16   know what to do.

17       Q.    I don't know what that means.

18   Tell me what it means to secure your area?

19            MS. RODGERS:  Object the form.

20   Whatever it means to you.

21            THE WITNESS:  It means that Dr.

22   Ritvo would have alerted Campus Police that

23   Chris' behavior that day was of such that

24   they needed to come to my area, 311 Goodwyn

25   Hall, to make sure that this man was not

Cynthia Ellison                                    April 27, 2006

Page 120

1    there to do me harm.  And for several days,

2    or however it took thereafter, until something

3    happened to resolve the situation.

4              MR. DODD:  Q.  What, in your

5    mind, does it mean to "secure the area"?

6    Does that mean to have an officer stationed

7    there with you or what?

8         A.    It means that someone at some

9    interval, whatever they determined was

10   necessary, because they knew the capabilities

11   of Chris.  They were to determine.  Do you

12   patrol every 15 minutes, or do you patrol

13   every two hours, four hours; five hours.  It

14   really doesn't matter at this point because I

15   didn't get it.

16        Q.    And nothing happened either, did

17   it?

18              MS. RODGERS:  Object to form.

19   Argumentative.

20              THE WITNESS:  Yes.  Something

21   happened.  Chris came back staring at me.

22              MR. DODD:  Q.  Is that all he

23   did, stare at you?

24        A.    Well, you had to see his face.

25        Q.    Describe it?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 121

1    A.    His misdemeanor was such that how

2    dare you report me?  How dare you?  It was

3    that kind of -- it was retaliatory.  That's

4    the word I am looking for.  It was a

5    retaliatory situation.

6    Q.    Did he say anything?

7    A.    He didn't have to.  His eyes said

8    it.

9    Q.    He said nothing, right?

10    A.    He said nothing.

11    Q.    This happened one time?

12    A.    There was several times that he

13    came into the office and just stood and

14    stared at me.

15    Q.    Give me some dates?

16    A.    On January the 18th after I had

17    filed the complaint by Dr. Ritvo's request in

18    December, I met with Debra Foster, Faye Ward

19    and myself.  Debra informed me that Ritvo

20    asked her to talk to me about the complaint.

21    I immediately said, "Is Bayo's complaint going

22    to be considered?"

23        She says, "Ritvo and I have

24    talked.  We are not going to consider his

25    complaint."  Bayo had said to me and to

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison

April 27, 2006

Page 122

1    Debra Foster that because of the things that

2    were going on he wanted both our complaints

3    considered together.

4            Give me a minute.  All right.

5    During that meeting Debra asked about the

6    complaint I had written to Dr. Ritvo.  She

7    asked whatever questions, and I answered them.

8    After they met with me, and in that meeting

9    she told me that the only thing Chris had

10   admitted to saying was that blacks shouldn't

11   hold responsible positions.  And I told her --

12   and she seemed to me, she seemed to think

13   that that was all right to say.  I expressed

14   to her that she should be offended because

15   she was holding a very responsible position.

16           After that meeting she met with

17   others in the school and that meeting with me

18   was, I think, either December the 16th or

19   December the 14th.  In that meeting she told

20   me she would be meeting with Chris.  She

21   would be meeting with Brad, Bob Elliott and

22   Judd Katz to ask them about Chris' behavior

23   and whether or not they -- well, just what

24   they thought about Chris.  I don't know what

25   all she was going to ask.

Cynthia Ellison

April 27, 2006

Page 123

1      I think I got off track.  What

2  was your question?

3      Q.    We were talking about the dates

4  when Chris Mahaffy showed up in your office

5  and have harmed you.  You started out by

6  saying January the 18th?

7      A.    Right.  Previous to that all these

8  meeting had taken place and on January the

9  18th I'm sitting at my desk.  I feel or

10 sense a presence in the office.  I look up,

11 Chris has on an overcoat, a skull cap and he

12 has his hands in the pocket of his overcoat

13 and he is standing over me.  I asked him

14 could I help you.  He asked for Dr. Lawal

15 and he just -- it appears to me that he

16 wasn't there.  I don't know how else to say

17 it.  Then he left my office.

18     Q.    Who wasn't there?

19     A.    Chris Mahaffy.  I mean he was just

20 -- that's the kind of demeanor he had.  He

21 was just standing trying to intimidate me

22 because I had filed a complaint.

23     Q.    He asked for the Dean, didn't he?

24     A.    He asked for the Dean, but he

25 walked out.  Why would you walk up on

Cynthia Ellison                                    April 27, 2006

Page 124

1    somebody with your hands in your overcoat, a

2    skull cap on, and not say anything.  It was

3    intimidation.  It was retaliation because I

4    had filed a complaint, and he knew I had

5    filed a complaint.

6            Now, how he knows -- how would he

7    know that it was me unless Debra Foster or

8    somebody told him.

9        Q.    What other dates did he appear and

10   stare at you?

11       A.    After February the 23rd when Dr.

12   Lawal showed me a letter that he had received

13   from Dr. Ritvo.  He says, "Chris is not to

14   bother you any more."  Chris came by the

15   office.  Then he came in, and he just stood.

16   He stared again.  He didn't ask for anybody.

17   He didn't do anything.  But it was

18   intimidating to me.  It was in my office.

19       Q.    On February the 3rd?

20       A.    That was February the 3rd or 4th.

21   After Dr. Lawal had the meeting with Ritvo,

22   and I believe Debra.  I'm not sure who he had

23   the meeting with.  It might have been Faye

24   Ward.

25       Q.    How long was he in the office?

Cynthia Ellison

April 27, 2006

Page 125

1     A.    He wasn't in there more than a

2    couple of minutes.  It's the appearance.

3    It's the appearance. It's a cliche, but you

4    had to be there.

5         Q.    Did he say anything?

6         A.    He didn't have to say anything.

7         Q.    Now, what in your estimation would

8    securing the area have done to deal with

9    those incidents?

10        A.    Campus Police, had they been

11   informed about Chris and his behavior, and

12   the fact that it was directed toward me.  A

13   good Campus Policeman would have just said,

14   "Hey, how are you doing?"  Just to see what

15   was going on. Because he would have been

16   informed, look out for Chris in the Dean's

17   office.  I'm assuming they would have been

18   professional.  I'm assuming they wouldn't just

19   approach them and say, "Are you standing

20   there staring at Cynthia because she filed a

21   complaint."

22        Q.    Did you want them to confront

23   them?

24             MS. RODGERS:  Object to form.

25             THE WITNESS:  I have said time and

Cynthia Ellison                                    April 27, 2006

Page 126

1      time again I had wanted them to secure my

2      area.

3                  MR. DODD:   Q.   Is three

4      walk-throughs a day securing your area?

5                  MS. RODGERS:   Object to form.

6                  THE WITNESS:   As I stated earlier,

7      that would have been up to Campus Police and

8      Dr. Ritvo and Dr. Lawal because they knew the

9      nature of what was going on with Chris.   I

10     didn't know completely what was going on.

11                 MR. DODD:   Q.   Do you even know,

12     Ms. Ellison, whether they considered the

13     police walk-through of Goodwyn Hall to be

14     adequate for your concerns?

15                 MS. RODGERS:   Object.

16                 THE WITNESS:   I think I have

17     answered that.   I mean, if they didn't talk

18     to them, I don't know what they could have

19     considered if they didn't even talk to them.

20                 However, they did give Debra

21     security the same day of the meeting.   She

22     was escorted to her car by Campus Police, not

23     for just that day, but for the whole week.

24                 MR. DODD:   Q.   How do you know

25     that?

Cynthia Ellison                                        April 27, 2006

Page 127

1              A.      Well, again, I'm in a University

2       environment and people talk.

3              Q.      You don't know of that your

4       personal knowledge?

5              A.      I don't know that they did.

6              Q.      Who told you that?

7                      MS. RODGERS:  Object to form.

8                      THE WITNESS:  People were talking.

9       I don't remember exactly who.

10                     MR. DODD:  Q.  Do you have an

11      idea who?

12                     MS. RODGERS:  Object to form.

13                     THE WITNESS:  People were talking.

14      I'm trying to remember.  I don't have an

15      idea.  Not right now.  I'm sure Campus

16      Police has a record.  I don't know of who

17      all knew.  I had no idea.

18                     MR. DODD:  Q.  Isn't it just as

19      likely that Debra Foster bumped into one of

20      the police officers on her way to her car

21      and they walked together?

22                     MS. RODGERS:  Object to form.

23                     THE WITNESS:  I don't think that

24      that was likely, sir.

25                     MR. DODD:  Q.  You don't have any

Cynthia Ellison                                    April 27, 2006

Page 128

1    personal knowledge to refute that, do you?

2              MS. RODGERS:  Object to form.

3    That's argumentative.  If you know, whether

4    the hypothetical situation he just gave you

5    about what could have happened.

6              THE WITNESS:  I mean, there is no

7    real answer to that.  I mean, I have no

8    idea.

9              MR. DODD:  Q.  I just want to

10   make sure that you don't show up later in

11   this case and say, "I have personal knowledge

12   that security escorted Debra Foster to her

13   car."  If you don't know of your own

14   knowledge, your own observation, that that's

15   the case.  That's all I want you to tell me.

16        A.    I was not there when she was being

17   escorted.

18        Q.    Your knowledge is based on what

19   somebody else told you?

20        A.    I was not there when she was being

21   escorted.

22        Q.    Is your lack of knowledge based on

23   what somebody else -- strike that, please.

24              Is your belief that she was

25   escorted based on what somebody else has told

Cynthia Ellison                                    April 27, 2006

Page 129

1   you?

2   A.    My belief is based on what someone

3   else -- what others were saying.

4   Q.    As we sit here today, you don't

5   recall who told you that?

6   A.    I really don't.

7   Q.    That's fine.

8   Why is Kay Johnson on your list?

9   A.    Kay Johnson is on my list because

10  after I filed my complaint, Dr. Lawal's

11  treatment became retaliatory towards me.

12  Q.    After you filed your complaint, are

13  you talking about the one on December the

14  3rd?

15  A.    My lawsuit.  What happened --

16  Q.    Do you mean your EEOC charge?

17  A.    Yes.  Well, when I came to see an

18  attorney, that's the way I know to put it.

19  I came to see an attorney.  They sent

20  correspondence to Dr. Lawal.  Dr. Lawal

21  called me in his office, became furious and

22  said as he was hitting his chest, "You have

23  done this to me.  We should have both waited

24  until summer and filed suits together and

25  walked away with a fistful of money, and now

Cynthia Ellison                                    April 27, 2006

Page 130

1    you have spoiled my plans."

2              He asked me to get out of his

3    office.  Not to speak with him any more.

4    And if I had anything to say to him, send it

5    in an e-mail.  He just became indignant.

6              I am the only person other than

7    work study students in the office.  At that

8    point I was fearful of what he was going to

9    do.  So I view it, and it was retaliating

10   against me, because I filed charges or I had

11   gone to see an attorney.

12        Q.    When were your charges filed?

13        A.    I came to this office on or about

14   -- it had to be the end of the first week

15   or the beginning of the first week of

16   February.  And that next day -- or it seems

17   the day after, he received a letter.  That's

18   when he became very angry.

19        Q.    Was that the letter from Julian

20   McPhillips?

21        A.    Yes.  Julian, yes.

22        Q.    Do you know what day he received

23   it?

24        A.    It was either the 9th, 10th or the

25   11th, something like that.

d1403afb-e7e9-42de-b323-57812dba67e5