Cynthia Ellison                                      April 27, 2006

Page 131

1           Q.      And Dr. Lawal retaliated against

2    you in what fashion?

3                   MS. RODGERS:   Object to form.

4                   THE WITNESS:   As I just said, he

5    became very angry.   He hit his chest and

6    said that this action had been taken not just

7    against AUM, but against him.   I had spoiled

8    his plans of filing suit that summer.   Every

9    routine thing I do in the office became an

10   issue.

11          I saw him going through my trash

12   can.   The shredding that I did that Friday,

13   I normally do shredding on Fridays, either

14   once, twice, sometimes even once a month.

15   Every document just about that came in that

16   office had Social Security numbers on it.

17   Time sheets, payrolls, grade sheets.   We were

18   the hub for that. Periodically, I would shred

19   those to make room for more documents.   Him

20   seeing me shredding was nothing new since he

21   had been in there since August, I was

22   shredding the same kinds of documents many

23   times.

24                  MR. DODD:   Q.   Did he become

25   angry with you before or after the shredding

Cynthia Ellison                          April 27, 2006

                                                    Page 132

1        incident?

2             A.      Before and after.

3             Q.      Okay.

4             A.      He became angry with me when he

5        received the correspondence, as I said, from

6        Julian McPhillips.

7             Q.      Had he been angry with you before

8        that?

9             A.      No, sir.  He had been in line

10       with me.  In fact, he let me read the first

11       page of his complaint to Dr. Ritvo and he

12       told me to be sure that I got mine over to

13       Dr. Ritvo that day.  That he was going to

14       let Dr. Ritvo know his would be coming in

15       the next few days because he had so much to

16       add about how we were being treated by Chris.

17            Q.      That was back in December, right?

18            A.      Yes.  That was in December.

19            Q.      So Lawal was angry with you -- it

20       first became apparent when he received a

21       letter from Julian McPhillips?

22            A.      It first became apparent after the

23       meeting with Dr. Ritvo, Faye Ward, myself and

24       Dr. Lawal.  At that meeting Dr. Ritvo

25       informed Dr. Lawal.  In that meeting, Dr.

Cynthia Ellison                                    April 27, 2006

Page 133

1       Ritvo informed Dr. Lawal that he would not be

2       the person taking action against Chris, rather

3       that he was not going to allow Dr. Lawal to

4       take any action against Chris.  That he Dr.

5       Ritvo would be the one taking action. Dr.

6       Ritvo stated at that time, "If you don't do

7       something, I will file civil litigation

8       myself."

9           Q.    Dr. Ritvo said that?

10          A.    I'm sorry.  Dr. Lawal said that to

11      Dr. Ritvo while we were in that meeting.

12      When we returned to the office -- because in

13      the meeting, I asked questions.  I asked

14      about my security.  I asked to get a summary

15      of the meeting proceedings that I was in.

16      Dr. Ritvo refused. He said the only thing I

17      could know is that they would do something to

18      Chris and not to worry about it.

19              Dr. Lawal took exception to that

20      in the meeting.  But when we got back to the

21      office, Dr. Lawal said to me, "I'm upset with

22      you."  And I asked him, "Why?"  He said,

23      "You don't talk back to men."  I said, "We

24      are living in the 21st century."

25              I was afraid.  I needed to know

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                              April 27, 2006

Page 134

1    what was going to happen me.  I could care

2    less what was going to happen to Chris.

3    That was the beginning of my seeing a change

4    in his behavior.

5         Q.    When he became angry with you

6    because you talked back to men --

7         A.    He said I talked back to Dr.

8    Ritvo.

9         Q.    Did that have anything to do with

10   your race?

11        A.    It has everything to do with being

12   retaliated against for reporting what they

13   asked me to report.

14        Q.    We are talking about Lawal now

15   retaliating against you, right?

16        A.    That's what you asked, right?

17        Q.    Yes.

18        A.    Okay.  That's what I am trying to

19   deliver.

20        Q.    Lawal also complained about

21   Mahaffy, right?

22        A.    Yes, sir, he did, until he got the

23   lawsuit. Until he got the paperwork from

24   McPhillips' office.

25        Q.    That's what I am trying to

Cynthia Ellison                                    April 27, 2006

Page 135

1    determine when his displeasure with you began.

2    It started about this meeting.

3         A.    It started after that meeting.  I

4    did not know it was going to be so direct

5    until he received the paperwork from Julian

6    McPhillips towards me.  I thought he was just

7    angry because Ritvo wasn't letting him use

8    his authority.  Because Ritvo said he was

9    going to take care of Chris and not let

10   Lawal do it.  He was angry.

11            Now, whether he was taking his

12   anger out on me because he was angry at

13   Ritvo, you have to ask him that. I don't

14   know.  All I know is, I, again, became the

15   victim.

16       Q.    Because he said you talked back to

17   Ritvo?

18            MS. RODGERS:  Object to form.

19   Asked and answered over and over again.

20            MR. DODD:  I am just following up

21   on her answers.

22            MS. RODGERS:  Over and over again

23   following up. Keep on going, Cynthia.

24            MR. DODD:  Q.  When was that

25   meeting?  Was that February 3rd or 4th?

Cynthia Ellison                                    April 27, 2006

                                                        Page 136

1           A.      The meeting with Dr. Ritvo was on

2    January 31st.

3           Q.      Sometime between January 31st and

4    the day you left, February 14th, is when Dr.

5    Lawal began retaliating against you?

6                   MS. RODGERS:  Objection.

7                   THE WITNESS:  Yes.

8                   MR. DODD:  Q.  Can you point to

9    any event between the meeting and Dr. Lawal's

10   receipt of the letter from the lawyers --

11                  MS. RODGERS:  Object to form.

12                  MR. DODD:  Q.  -- that prompted

13   any danger toward you by Lawal?

14          A.      Anger concerning what?

15          Q.      Anything.

16          A.      He just changed.

17          Q.      How did he change?

18                  MS. RODGERS:  Object to form.

19   Just keep on answering.  Again, he is asking

20   you the same thing. State exactly what

21   happened.  That's what you give him.

22                  THE WITNESS:  Well, then after the

23   meeting he made that comment that I told you

24   he made.

25                  MR. DODD:  Q.  After he made that

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

1    comment, did anything occur between his

2    receipt of the letter from the lawyers that

3    prompted any anger on his part toward you?

4        A.    He was angry that he was having to

5    go through this, and it was directed at me.

6    I asked him why.  I don't know why.

7        Q.    When you say "go through this,"

8    are you talking about Mahaffy?

9        A.    The Mahaffy complaints or rights.

10    The whole situation with the complaints.

11        Q.    You are saying he blamed you

12    because the procedure was underway?

13        A.    I didn't say that:

14        Q.    He was angry at you because of

15    procedure?

16        MS. RODGERS:  Object to form.

17    Let's take a break.  Object to form.  Can

18    you hold this question?

19        MR. DODD:  Let me finish my

20    question.  We are going to finish the

21    question before you take a break.

22        MS. RODGERS:  Ask the question.

23    You don't have to do an answer.

24        MR. DODD:  I am going to ask you

25    when you come back about conversations you

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 138

1    have had during the break. You may want to

2    reconsider whether you want to go consult

3    with your lawyer before you answer a question

4    that's pending.

5              MS. RODGERS:  Let the record

6    reflect I don't want no one to assume that I

7    am going to talk to my client about a

8    question he is going to ask.

9              MR. DODD:  No assumption.

10             MS. RODGERS:  Also, I don't want

11   you to threaten.  It seems as though he is

12   trying to intimidate my client in this

13   deposition.  I am taking a break for her

14   sake.  Because as it appears to me, I feel

15   as though she is getting frustrated.  She

16   needs to take a break.  I don't know how she

17   is doing.  I am telling her to take a break.

18   Not to try to go outside to try to discuss a

19   potential answer for her.  Because I have not

20   done that during lunch time, nor have I done

21   it for any statement where counsel is getting

22   a record.  Nor am I trying to assist her

23   during any part of this deposition how she

24   answers her questions.

25             Let the record also reflect that I

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 139

1    have not written any notes, I have not bumped

2    her, I have not done any type of couching

3    whatsoever to assist my client in any type of

4    questioning or way she should answer her

5    question.   The only thing I told her is tell

6    the truth.

7                    THE WITNESS:   May I take a break,

8    please?

9                    MR. DODD:   Go ahead.

10                   (Multi-page document, first page

11   undated, entitled Charge of Discrimination,

12   marked as Defendant's Exhibit-1)

13                   MR. DODD:   Q.   Ms: Ellison, here

14   is Defendant's Exhibit 1.   If you can take a

15   look at that and see if you can identify it

16   for me, please.

17        A.      Yes.   Let me finish and make sure.

18   Yes, I recognize it.

19        Q.      What is it?

20        A.      It's my affidavit statement that I

21   gave to my attorney.   It's my memo from me

22   to Dr. Ritvo on December the 3rd supplying

23   his requested statement.   A letter to Dr.

24   Mahaffy from Dr. Ritvo.   A letter from me to

25   Debra Foster with copies to Dr. Lawal, Ms.

Cynthia Ellison                                      April 27, 2006

Page 140

1          Ward, Dr. Ritvo, Dr. Nance and Lee Armstrong.

2     And my memo about my retirement.

3          Q.      Together these documents you have

4     identified constitute your EEOC charge, do

5     they not?

6          A.      That's the cover sheet, yes.

7          Q.      The EEOC charge is dated February

8     10th, 2005, down at the bottom left corner?

9          A.      Where?  Bottom left, yes.

10    February the 10th.

11         Q.      Now, do you know when Mr.

12    McPhillips mailed this to Bayo Lawal?

13              MS. RODGERS:  Object to form.

14              THE WITNESS:  I don't know if he

15    mailed this to Bayo Lawal.  I know that Dr.

16    Lawal got a letter from him. I don't know

17    about this.

18              MR. DODD:  Q.  Look at your

19    affidavit for a second.  Who wrote the

20    affidavit?

21         A.      Who wrote it?

22         Q.      Yes.

23         A.      It's information that I gave my

24    attorney.

25         Q.      Your lawyer composed the affidavit?

Cynthia Ellison                                April 27, 2006

Page 141

1                      MS. RODGERS:   Object to form.

2                      MR. DODD:   Q.   Let me ask you

3          this.   Did you write the affidavit?

4              A.      When you say "composed," that means

5          did he write it?

6              Q.      Yes.

7              A.      I gave the information as it is

8          here.   I guess I gave him the information.

9              Q.      They put it together and you

10         signed it, right?

11             A.      They put it together and I signed

12         it.   Are you asking me if I typed this

13         document?

14             Q.      No.   I am asking you if you

15         prepared it.

16             A.      I provided the information that is

17         within this document.

18             Q.      When did you provide that

19         information to your lawyers?

20             A.      It says on the 10th day of

21         February, 2005.

22             Q.      Did your lawyers prepare this

23         affidavit on the same day that you gave them

24         the information?

25                     MS. RODGERS:   Object to form.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                              April 27, 2006

Page 142

1                    THE WITNESS:  It was prepared on

2        the day I signed it.

3                    MR. DODD:  Q.  When did you give

4        them the information that appears in the form

5        in the affidavit?

6            A.      This was during my visit.  Let's

7        see.  I had an initial visit here, and this

8        was done on my second visit.

9            Q.      When was your initial visit?

10           A.      It had to be early --

11                   MS. RODGERS:  Object to form.  Go

12       ahead and answer.

13                   THE WITNESS:  It had to be early

14       February.  It was like the week before this

15       week.

16                   MR. DODD:  Q.  Approximately

17       February the 3rd?

18           A.      No.  I don't know.  They have

19       their calendars, you can ask them.  I have

20       no idea.

21                   MS. RODGERS:  Object to form.

22                   MR. DODD:  Q.  You had two

23       meetings with your lawyer before this was

24       completed, the EEOC charge?

25           A.      Correct.  I met with them twice.

Cynthia Ellison                                        April 27, 2006

Page 143

1      Q.      Look at Paragraph 3, please.

2      A.      Okay.  On the first page?

3      Q.      Yes.  You are referring to Chris

4   Mahaffy saying that he had never seen a black

5   person before he came to the United States of

6   America?

7      A.      Yes.

8      Q.      Did he make that statement to you?

9      A.      He did.

10      Q.      When was that statement?

11      A.      This was during the time that Bob

12   Elliott was Dean.

13      Q.      Is that statement offensive to you?

14      A.      It was offensive to me because of

15   what he had done earlier.  He had come into

16   my office and he had -- it looked like a

17   magazine.  And he was far enough away that I

18   couldn't really tell what it was, but close

19   enough that I could see the image.  He says,

20   "What is this on here?"  And I said, "A

21   monkey."  And he walked over to my desk and

22   laid it down and it was a black man.  So,

23   yes, this was offensive to me.

24      Q.      Let me make sure I understand what

25   you just said, because I don't think I did.

Cynthia Ellison                                    April 27, 2006

Page 144

1      I think I must have missed something.

2           A.      Okay.

3           Q.      He held up a magazine and asked

4      you what it was?

5           A.      Yes.  Say, he was from --

6           Q.      Right.  You said "it looks like a

7      monkey."

8           A.      That's what I said.

9           Q.      He brought it over and put it on

10     your desk, and it was a picture of a black

11     man?

12          A.      Yes.  He laughed, and he left.

13          Q.      Is that all he said?

14          A.      He laughed and he left.

15          Q.      He said nothing else?

16          A.      (Witness nods head)

17          Q.      How long before this comment in

18     your affidavit did he do that?

19          A.      As I said, this was during the

20     time when Dr. Elliott was Dean.  That's all

21     I could tell you.  In fact, as I said, Dr.

22     Elliott was there.  In this same time we

23     were talking about student enrollment trends.

24     The population of black versus white census

25     on Campus had changed to a greater number of

Cynthia Ellison                                    April 27, 2006

Page 145

1    blacks.  We were -- well, not we.  I was

2    sitting at my desk and they were discussing

3    the trends, he and Dr. Elliott.  He made the

4    comment that some blacks didn't seem as smart

5    as whites. I took offense to that.  After he

6    left, I went into Bob's office and I

7    discussed it with him.  He said, "Chris is

8    crazy."  Nothing was done beyond that.

9    "Every Dean has had a problem with Chris."

10        Q.     Did you ask Elliott to take any

11   particular action?

12        A.     He just said, "Chris is crazy."

13   That's all I remember him saying.  There was

14   no action taken.  I guess he didn't think

15   there was any action needed.

16        Q.     My question is, did you ask him to

17   take any action?

18        A.     I did not ask him to take action.

19   But I did voice my concern about the

20   statements.

21        Q.     When he was having that

22   conversation with Elliott, was he talking

23   about citizens or students?

24        A.     Well, I think I said they were

25   talking about the difference in the student

Cynthia Ellison                                        April 27, 2006

Page 146

1    population.

2         Q.     Right.

3         A.     Then it turned to blacks didn't

4    seem as smart as whites, which I felt he

5    thought because the population had changed,

6    the content of their conversation whatever it

7    was, meant it was because of the blacks.

8    The number of blacks rising instead of

9    falling or whatever.

10        Q.     Have you ever seen an Irishman

11   before?

12        A.     No.  Are you telling me Chris

13   isn't Irish?

14        Q.     No.

15        A.     Okay.

16        Q.     Look at Paragraph 6, please.  You

17   are referring to Glen Ray.

18        A.     Yes, sir.

19        Q.     Did you ever determine what remarks

20   Glen Ray referred to?

21        A.     I asked him and his comment to me

22   -- he said, "They were so bad he couldn't

23   repeat them."  That's all I can tell you.

24        Q.     Look at Paragraph 9, please.  Is

25   that the incident we have already talked

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                      April 27, 2006

Page 147

1          about?

2                   A.      That's correct.

3                   Q.      Now, look at 10.  The memorandum

4          instructs Mahaffy to avoid retaliatory behavior

5          toward you?

6                   A.      Uh-huh.

7                   Q.      You say he has not done so?

8                   A.      Uh-huh.

9                   Q.      What conduct is that referring to?

10                  A.      Going back to No. 9.

11                  Q.      Same thing?

12                  A.      Uh-huh.  And the fact that he was

13         standing with me with his overcoat on with

14         his hands in his pocket on January 18th.

15         That was after the complaint had been filed.

16                  Q.      But that was before AUM issued the

17         February 3rd memorandum, correct?

18                  A.      Okay.

19                  Q.      Yes?

20                  A.      Yes.

21                  Q.      Look at Exhibit B, if you would,

22         please.  Okay.

23                          Now, you weren't an original

24         recipient of this memorandum, were you?

25                  A.      No.  My name is not on there.

Cynthia Ellison                                     April 27, 2006

Page 148

1    Q.    How did you get a copy of this?

2    A.    Dr. Lawal gave it to me.

3    Q.    Did you tell him you were going to

4    make a copy it?

5    A.    He said to do what I had to do

6    concerning Chris.

7    Q.    Did you interpret that to mean I

8    can take this document and copy it and go

9    outside with it?

10    A.    Yes, sir.  That's what he told me

11    to do at that time.

12    Q.    Well, he didn't literally tell you

13    to copy this document and take it outside?

14    A.    I am telling you what I

15    interpreted it to mean.

16    Q.    Did you tell him you had made a

17    copy of it?

18    A.    Yes.  And he said that he didn't

19    -- what did he say?  He said, "I didn't

20    intend for you to do that because we need to

21    save the documentation if we file suit in the

22    summer."  I told him that I couldn't wait

23    until the summer because I was being

24    retaliated against and in a workplace where I

25    just really couldn't stay.

Cynthia Ellison                               April 27, 2006

Page 149

1    Q.    When did you first see what's

2    marked as Exhibit B to your affidavit?

3    A.    We were in -- Dr. Lawal and I

4    were in the lobby of Goodwyn Hall.  He asked

5    me to go down there with him. He opened the

6    letter.  He read it, and he gave it to me.

7    He didn't keep it to put it in a

8    confidential file in his office.  He gave me

9    the letter.  We walked back up to the

10   office.  And I had the letter in my hand

11   when we went back to the office.

12   Q.    Did you and he discuss it?

13   A.    Well, we did because I told him I

14   was going to use it.

15   Q.    You hadn't seen it before being

16   with him in the lobby?

17   A.    Dr. Lawal showed it me.

18   Q.    You had not seen it before then?

19   A.    Uh-huh.  In fact, I pointed out to

20   him that the very first statement on this

21   letter, in my meeting with Dr. Ritvo I asked

22   for a summary of my meeting.  He said there

23   were no summaries going to be given out.

24   Yet, this memo starts, "It serves as a

25   summary."  Chris got a summary of his

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 150

1    meeting, but I didn't get a summary.

2         Q.    Nobody was seeking to discipline

3    you, were they?

4              MS. RODGERS:  Object to form.

5              THE WITNESS:  Well, I was

6    retaliated against.  I was subjected to a

7    hostile environment.

8              MR. DODD:  Q.  Had anybody filed

9    a complaint against you in which you ended up

10   being disciplined?

11        A.    Well, Barbara Ware.

12        Q.    With respect to the Mahaffy

13   incident?

14        A.    No.

15        Q.    In fact, you were somebody who was

16   complaining against Mahaffy, were you not?

17        A.    I wasn't complaining.  I was

18   letting the University know that I was in a

19   situation that needed attention.  That's

20   different from complaining.

21        Q.    Would you consider your December

22   the 3rd memorandum a complaint or not?

23        A.    It says that it's a complaint, I

24   believe.

25        Q.    I am asking you what it is.  You

Cynthia Ellison                                    April 27, 2006

1      wrote it.

2                    MS. RODGERS:  Object.

3      Argumentative.  Just look at it.

4                    THE WITNESS:  It's the complaint

5      that Dr. Ritvo asked me to write.

6                    MR. DODD:  Q.  Are you the

7      complaining party in this complaint?

8                    MS. RODGERS:  Object to form.

9                    THE WITNESS:  I am the author of

10     that memo.

11                   MR. DODD:  Q.  Now, Ms. Ellison,

12     by the time you signed your affidavit and

13     signed your EEOC charge, you had already

14     given the University notice of your

15     retirement, correct?  In fact, that's the

16     fourth exhibit to your EEOC charge, isn't it?

17          A.     And if I'm not mistaken, that's

18     probably the date that Dr. Lawal received the

19     communication from Julian McPhillips.

20          Q.     What date?

21          A.     February the 9th, 2005.

22          Q.     Do you believe that to be the

23     case?

24          A.     I don't know.  I don't have it

25     with me to look at it.

Cynthia Ellison                                        April 27, 2006

Page 152

1      Q.    My question is, by the time you

2   had signed your affidavit and signed your

3   EEOC charge, you had already given the

4   University notice of your retirement, right?

5      A.    I was in such a state that I had

6   no recourse.  I had nothing else to do.

7      Q.    I am only asking you if you had

8   given notice of your retirement before you

9   signed the affidavit and before you signed

10  the EEOC charge?

11     A.    I don't remember.

12     Q.    Well, let's look.  What is the

13  date on your notice to Bayo Lawal of your

14  retirement?

15     A.    February the 9th, 2005.

16     Q.    What is the date of your signature

17  on your affidavit?

18     A.    February 10th.

19     Q.    And on your EEOC charge?

20     A.    February the 10th.

21     Q.    Your resignation did precede the

22  completion of your EEOC charge?

23     A.    Because I explained to my attorneys

24  what was happening to me and they advised me

25  to leave.

Cynthia Ellison                                   April 27, 2006

Page 153

1          MS. RODGERS:  Object to form.

2          MR. DODD:  That's fine.  I'm just

3     trying to establish a sequence.  I didn't ask

4     you why.

5          MS. RODGERS:  You don't have to

6     argue or even comment on that.  Let him

7     argue.  You answer the questions.  When you

8     finish answering your questions, you are

9     finished until the next question is asked and

10    not argued.

11         MR. DODD:  Q.  Who is Debra

12    Carter?

13         A.     She is my ex sister-in-law.

14         Q.     Why is she on your list?

15         A.     Because she comes to the church

16    that I go at least twice a month and I

17    shared with her some of the events that were

18    happening to me on the job.

19         Q.     Do you know if she has any

20    firsthand knowledge of what was happening to

21    you on the job?

22         A.     Only what I told you.

23         Q.     Is she a parishioner at your

24    church, or does she have any other function

25    there?

Cynthia Ellison

April 27, 2006

Page 154

1          A.      She is a member at the church.

2     Is that the same as a parishioner?

3          Q.      I intended it in that fashion.

4          A.      Okay.

5          Q.      Did you look to her for any sort

6     of spiritual guidance?

7          A.      I looked to her really for advice.

8     Because she was a woman.  I was being

9     retaliated against.  I was in an

10    uncomfortable situation, and I needed to talk.

11         Q.      What advice did she give you?

12         A.      She advised me to document

13    everything and to report everything to my

14    supervisors and the chain-of-command.

15         Q.      Did she give you any other advice?

16         A.      Such as what?

17         Q.      I'm sorry.

18         A.      Such as what?  What other advice?

19         Q.      Any other advice.

20         A.      She was a listening ear.

21         Q.      Is that a "no"?

22         A.      Was there a question?

23         Q.      Yes.

24         A.      What was the question?

25         Q.      I asked you what other advice, if

Cynthia Ellison                                         April 27, 2006

Page 155

1     she gave you any other advice?

2          A.      She didn't give me any other

3     advice.

4                  Do you mind if I get some water?

5          Q.      Go ahead.  Ms. Ellison, I want to

6     ask you some questions about the complaint

7     you filed in Federal Court, right?

8          A.      Okay.

9          Q.      That's different than the EEOC

10    charge.  Are you with me?

11         A.      Okay.

12         Q.      In your complaint you refer to

13    four distinct claims.  One is for race

14    discrimination; one is for retaliation; one is

15    for harassment; one is for a constructive

16    discharge.  I want to ask you a little bit

17    about those claims.

18         A.      Okay.

19         Q.      You say that you were forced to

20    retire, right?

21         A.      Right.

22         Q.      Now, was that forced retirement a

23    result of the race discrimination, the

24    retaliation and the harassment?

25         A.      And the hostile work environment.

Cynthia Ellison                                    April 27, 2006

Page 156

1    Q.    Hostile work environment.  When I

2    say "harassment," I will try to remember to

3    include hostile work environment, but I am

4    referring to both.

5    A.    Okay.

6    Q.    Did you suffer any tangible job

7    detriment, other than being forced to retire

8    on account of any of the kinds of

9    discrimination you are claiming?

10    A.    Job detriment at AUM?

11    Q.    Yes.

12    A.    I couldn't do my job.  After the

13    complaint was filed, it was almost impossible

14    to do work.

15    Q.    The complaint you are referring to

16    is December 3rd?

17    A.    December 3rd, 2004.

18    Q.    Right.  Well, did you suffer a

19    loss in salary as a result of that?

20    A.    No.

21    Q.    Did the University deny you any

22    leave as a result of that?

23    A.    No.

24    Q.    Do you know if the University took

25    any sort of tangible action that affected

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 157

1    your job adversely?

2         A.    I was affected adversely because I

3    was not given security.

4         Q.    We talked about that already.

5         A.    Right.

6         Q.    Okay.  Did you feel compelled to

7    retire because of the race discrimination you

8    felt?

9         A.    I felt compelled to retire because

10   of all of it. Race, all of it.  In fact,

11   even after the conclusion of the first

12   investigation with the Allison Stevens

13   incident, Debra Foster sent me her letter and

14   Allison her letter.  Both our names was on

15   the letter.  The day after that she sent me

16   an e-mail to the Hyundai site and called me

17   and said she sent it to me because I was

18   eligible to retire, and she thought she would

19   send that to me.

20        Q.    Did you ever talk with anyone

21   about applying for a job out there?

22        A.    No, I did not.

23        Q.    You didn't talk to Bob Elliott

24   about that?

25        A.    I didn't.  I talked to him about

Cynthia Ellison                              April 27, 2006

Page 158

1        my daughter applying for a job out there.

2            Q.      Other than the remarks you refer

3    to in the third paragraph of your affidavit

4    that Chris Mahaffy made --

5            A.      Yes, sir.

6            Q.      -- did he make any other racially

7    insensitive remarks to you?

8            A.      Well, as I told them as I was

9    doing this, there were so many I couldn't

10   remember them all.  I gave you the one about

11   the magazine with the man and the monkey.

12   This was just something that Chris did.  I

13   mean, I didn't know to write down every

14   single one.

15           Q.      Can you recall any others other

16   than those three?

17           A.      Not at this time.

18           Q.      Is there anywhere you would go to

19   refresh your recollection as to how many

20   times he made comments that you found

21   insensitive?

22           A.      What you say where I would go, do

23   you mean to AUM, to my house, to what?

24           Q.      You said you can't recall.  I'm

25   just trying to see if there was some way we

Cynthia Ellison                                                April 27, 2006

Page 159

1    can assist your recollection.

2         A.    I don't know how you can assist

3    me.

4         Q.    You don't have a written record

5    somewhere of bad things that Chris Mahaffy

6    said?

7         A.    No.  I don't have that.

8         Q.    You have given all the records

9    about your allegations to your lawyer, right?

10        A.    I have.

11        Q.    Did Roger Ritvo ever make any

12   racially insensitive remarks to you?

13        A.    He did not.

14        Q.    Did Bayo Lawal make any racially

15   insensitive remarks to you?

16        A.    Well, he did.

17        Q.    What were they?

18        A.    He said that -- well, he didn't

19   particularly care for Glen Ray as the

20   Associate Dean because he said he didn't keep

21   any of the matters they discussed

22   confidential.  He wanted me to suggest to him

23   who he could have take his place at the end

24   of his tenure as Associate Dean that coming

25   summer.  Because it was a two-year

Cynthia Ellison                                        April 27, 2006

Page 160

1    appointment.  I suggested Rosine Hall.  He

2    says, "No, I don't want her."  I said, "What

3    about me?  I know the school."  He says, "I

4    don't want a woman assistant, black or

5    white."  That was the only racial thing that

6    I can remember right now.

7        Q.    We have talked about Mahaffy's

8    remarks, right.  We have talked about his

9    conduct.  Showing up in your office and that

10   sort of thing.  We talked about Allison

11   Stevens.

12       A.    Yes.

13       Q.    Are there any other incidents of

14   racial discrimination or harassment that you

15   are aware of?

16       A.    Towards me?

17       Q.    Yes.  Toward you.

18       A.    I can't recall right now.  There

19   is one more that I thought of.

20       Q.    All right.

21       A.    I'm sorry.

22       Q.    It's all right.

23       A.    I am hesitating because I am

24   thinking about the date.

25       Q.    You know I am going to ask you

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                              April 27, 2006

Page 161

1    that.

2        A.    Yes.   I am more than certain that

3    it was after the overcoat incident, which was

4    on or about January the 18th or 19th.

5    Several days later Chris came into my office

6    and there was a student worker at the other

7    desk. He came into my office and stood in

8    front of me.   I was busy doing something.

9    He got my attention.   He says, "I want you

10   to read my shirt."   And I looked up and the

11   shirt said something like, "I am a redneck."

12   He said, "What do you think about that?"   I

13   said, "I am offended." He laughed and left.

14   I went into Dr. Lawal's office and reported

15   it.

16       Q.    What did Lawal say?

17       A.    He didn't say anything really.   I

18   just wanted to be sure I reported it.

19       Q.    Who was the student worker?

20       A.    Nikki Gibson.   And this was the

21   time when I had hired five student workers.

22   So I think Nikki -- because I had to staff

23   the Advising Office and the Dean's office and

24   their schedules -- I believe it was Nikki

25   Gibson and Marquita Snow.

Cynthia Ellison                                    April 27, 2006

Page 162

1      Q.      They were both in there?

2      A.      Yes, sir.

3      Q.      Tell me why you were offended by a

4   T-shirt that says, "I am a redneck"?

5      A.      Because I feel like "redneck" means

6   you are looking down on the minority.  That's

7   the person who feels like minorities are

8   lower class.

9      Q.      Have you ever heard any other

10  definition of "redneck"?

11     A.      I can't say that I have, sir.

12     Q.      Would you be surprised to know

13  there are others?

14     A.      I wouldn't be surprised.

15     Q.      If you think of other incidents,

16  just interrupt me and let me know.  Okay.

17     A.      I will.

18     Q.      I asked some questions earlier

19  about Mahaffy before he became Chair of

20  Physical Sciences.

21     A.      Okay.

22     Q.      I am going to ask you some

23  questions about him after he became Chair.

24     A.      Okay.

25     Q.      Okay.  Did he ever touch you?

Cynthia Ellison                                    April 27, 2006

Page 163

1      A.    You asked me that, and I said
2    "no."
3      Q.    I thought I was referring to the
4    previous time. He has never touched you then?
5      A.    No.
6      Q.    He has never made any physical
7    oral threats to you, has he?
8      A.    You said "physical" and "oral."
9    Which one did you --
10     Q.    Oral threats of physical -- strike
11   that.
12           Has he ever made a statement to
13   you that you found threatening?
14     A.    Yes, sir.
15     Q.    What did he say?
16     A.    He said that he was going to get
17   me because I was on the second Dean search,
18   and he was not selected to the short list to
19   be interviewed.
20     Q.    When did he say that?
21     A.    It was -- I can tell you exactly
22   because he was interviewing for the position
23   that Barbara now has.  So it was about mid
24   July, 2005.  Because I think Barbara was
25   hired in July.  It was around the time she

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                        April 27, 2006

Page 164

1        was hired.

2                Q.      Who are you referring to?

3                A.      Chris Mahaffy.

4                Q.      Barbara?

5                A.      Barbara Ware.  I'm sorry.

6                Q.      2004 maybe.

7                A.      No.  Okay.  I was on the second

8        Dean search which ended about April or May of

9        2005.  I'm sorry.  Yes, I am behind.  2004.

10               Q.      Okay.  It was approximately mid

11       2004 that he made that statement

12               A.      In July.  It was whenever Barbara

13       Ware was hired.

14               Q.      He said he was going to get you?

15               A.      That's what he said.

16               Q.      Did he say anything else?

17               A.      That's pretty much what he said at

18       that time.

19               Q.      You interpreted that as a threat?

20               A.      I did.

21               Q.      Who did you report it to?

22               A.      Brad Moody.

23               Q.      What did Brad do?

24               A.      I believe Brad, if I'm not

25       mistaken, talked to Chris.

Cynthia Ellison                                April 27, 2006

Page 165

1          Q.    Why do you think he talked to
2     Chris?
3          A.    Because we were going through some
4     more issues with Chris.  I mean, I can't
5     tell you every single thing because they
6     didn't tell me.  Glen would share with me
7     that Chris was a problem.  He would share
8     that almost every single day of the week.
9     He really went over the edge when he did not
10    get to be Dean.  He continued to harass me
11    because he thought for some reason, and I am
12    sure the reason was because he thought I
13    could influence the Committee because I was
14    the only black on the Committee, and maybe he
15    thought I knew him and I was going to say
16    things good about him.  In fact, he came to
17    me with an e-mail address and said, "No one
18    will know if you send me information about
19    the Committee's work, Search Committee's work
20    to this e-mail address."  I reported that to
21    Brad.  I reported it to Glen, and I also
22    reported that to Judd Katz.  And at that
23    time I told Chris it was inappropriate and I
24    would not do it.
25         Q.    Do you think that Mahaffy was mad

Cynthia Ellison                                      April 27, 2006

Page 166

1          at you because you didn't support him to be

2          Dean?

3               A.      He said he was.

4               Q.      Do you believe that?

5               A.      He was convincing to me.

6               Q.      I believe you told me that Dr.

7          Lawal is the individual you contend retaliated

8          against you?

9               A.      He wasn't the only one.

10              Q.      Who else?

11              A.      I believe Debra Foster retaliated.

12              Q.      When did Debra Foster retaliate?

13              A.      In sending me that e-mail and

14         saying, "You know, you have got enough time

15         to retire.  Here is a site, Hyundai.  Why

16         don't you look into getting a job."  That

17         was at the end of the complaint with Allison.

18              Q.      That was back in spring of 2004?

19              A.      If that's the date on her report,

20         yes.  I think it was about then.

21              Q.      Did Debra Foster retaliate against

22         you in any other way?

23              A.      Yes.

24              Q.      How?

25              A.      She called me to her office after

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                          April 27, 2006

1     -- and forgive me if I don't know which one,

2     EEOC, affidavit whatever. Whatever had been

3     filed she had been in contact with, she told

4     me the University attorneys.  That they had

5     given her some information to give me.  She

6     needed to see me. Actually, there were two

7     occasions that this happened.

8            The first occasion she just said,

9     "We are working on it.  We are looking into

10    it."

11           The second time she called me over

12    there she said, "The University attorney

13    called, and they said to tell you that" --

14    and this is the first time I ever heard of

15    the phrase "constructive discharge."  That you

16    are not getting constructive discharge.  They

17    want to know what you want."

18           I said Debra, "I simply want you

19    to do your job."  We were sitting in Faye

20    Ward's office.  Debra and I were sitting at

21    the table.  Faye was sitting behind her desk.

22    She said, "What do you want?"  And I said,

23    "I really want you to do your job."  And I

24    asked a simple question.  I said, "Debra, do

25    you believe that I have been mistreated?  I'm

Cynthia Ellison                                April 27, 2006

Page 168

1    not asking you to take sides." I said, "But

2    you know what has happened to me." Well,

3    whatever the periods of times before that I

4    had been here. "I am simply asking you do

5    you believe I have been mistreated?" Debra

6    stormed out of the room. Came back. No, she

7    sent a student back. Handed me a piece of

8    paper. No, it was Debra. Debra came back,

9    handed me a piece of paper and she said, "If

10   you have anything else to say, say it to our

11   attorneys." When I looked at the paper it

12   said Tom Rebel, whatever his information is.

13   That's when I came to Julian McPhillips.

14        I had no intention of coming here,

15   but when I saw that the University wasn't

16   going to do anything because she told me she

17   was representing the attorneys. So she ended

18   it with, "Do what you have to do." So I

19   did what I had to do given that she handed

20   me the information to do it with and said,

21   "The next conversation, let it be through the

22   attorneys."

23        Q.      What did she hand you?

24        A.      A piece of paper that had a

25   typewritten name and address of somebody named

Cynthia Ellison                                    April 27, 2006

Page 169

1       Rebel, and I gave that information to Mr.

2       McPhillips.

3           Q.     Early February you think?

4           A.     It had to be.

5           Q.     How did the topic of constructive

6       discharge come up?

7           A.     Debra brought it up.

8           Q.     Had you said or written before

9       that time that you felt like the University

10      was forcing you out?

11          A.     Absolutely.

12          Q.     Other than Debra Foster and Dr.

13      Lawal, did anybody else retaliate against you?

14          A.     I have said I think Dr. Ritvo

15      retaliated.

16          Q.     Tell me how he did that.

17          A.     The no security issue.  I think he

18      treated Chris differently than he treated me.

19      The letter that Bayo shared with me that was

20      written to Chris states that Chris had a

21      month to decide what he wanted to do.  Then

22      he had until the end of the summer to

23      complete whatever he decided he wanted to do.

24      Yet, they had taken me off Campus that day

25      because they knew he was a threat.

Cynthia Ellison

April 27, 2006

Page 170

1     Q.    Now, what makes you think that

2    Ritvo did those things because you had

3    complained at his request?

4     A.    I think I viewed it as

5    retaliation. Now, I don't know how else to

6    explain it.

7     Q.    Okay. Let's try it this way.

8    What is your definition of retaliation?

9     A.    Getting back at someone or --

10    well, let me just leave it like that.

11    Getting back at someone or something like

12    that.

13     Q.    You felt that Roger Ritvo was

14    getting back at you for doing what?

15     A.    I felt in general Ritvo, the

16    University, everybody's name that I gave on

17    that list was retaliating against me because

18    I filed these complaints.

19     Q.    Now, Roger Ritvo, though, solicited

20    that complaint from you, did he not?

21     A.    He did. But he didn't do what he

22    said he was going to do. He said he was

23    going to put it with Bayo and send it to

24    Debra. That's the first thing that didn't

25    happen.

Cynthia Ellison                                    April 27, 2006

Page 171

1        Q.      Why is that significant?

2        A.      Because I feel like if you tell me

3     something that you are going to do, and I am

4     saying that I am being mistreated and

5     retaliated against, and you are being

6     mistreated and retaliated against, you take

7     one and put it in the file and you take the

8     other, send it up and then you tell the

9     person, "Cynthia filed a complaint."  I

10    become the target.  That's the way I felt.

11       Q.      How do you know that Roger Ritvo

12    ignored Bayo's complaint?

13       A.      Because Bayo told me.  He didn't

14    say he ignored it.  He said that he, Bayo,

15    and Debra Foster and Ritvo had talked.  They

16    said they were going to view his complaint as

17    a management style problem.  But he, Bayo,

18    told me that he said to Debra Foster and to

19    Dr. Ritvo, "This is not management."  This is

20    harassment."  And he wanted his complaint

21    considered with mine.

22       Q.      You haven't seen his complaint,

23    have you?

24       A.      I have not seen his complaint.

25       Q.      Other than the conduct we talked

Cynthia Ellison                                    April 27, 2006

Page 172

```
 1          about at some length --
 2               A.     What conduct?
 3               Q.     -- concerning Chris Mahaffy.
 4               A.     Yes.
 5               Q.     -- is there anything else you want
 6          to add about how he retaliated against you?
 7               A.     Chris?
 8               Q.     Yes.  We talked about coming to
 9          your office and looking in the window and
10          standing at your desk. Anything else?
11               A.     Well, I think the remark that he
12          is going to get me.  That was retaliation
13          for not being selected for the short list on
14          the Dean's search.
15               Q.     I understand that.  Is that all
16          you can think of?
17               A.     I think that the incident with
18          the, "I am a redneck" T-shirt.
19               Q.     We talked about that.
20               A.     Uh-huh.  I am going to stand for
21          a moment.
22               Q.     Do you want to walk down the hall?
23               A.     I'm fine.  I just need to stretch
24          my leg.
25               Q.     Ms. Ellison, do you think that the
```

Cynthia Ellison                                         April 27, 2006

                                                              Page 173

1        folks we have talked about, Ritvo, Mahaffy,

2        Bayo, did the things they did after you filed

3        your complaint in order to force you out?

4              A.      That's my belief.

5              Q.      Do you believe that that was -- I

6        mean, that was their goal, right?

7              A.      I can't speak for them.

8              Q.      What would you point to, if

9        anything, to show that they took action

10       deliberately to force you out?

11                     MS. RODGERS:  Object to form.

12                     THE WITNESS:  In particular, the

13       treatment the last week and a half that I

14       received from Bayo, and the treatment I

15       received all along from Chris, and again the

16       e-mail from Debra.  I think she wanted to

17       see me go.

18                     MR. DODD:  Q.  That was the year

19       before, wasn't it?

20             A.      It still happened.

21             Q.      Let's talk about your environment

22       from the time you filed the complaint on

23       December 3rd until you left on February 14th.

24             A.      Okay.

25             Q.      Your office was the same, wasn't

Cynthia Ellison                                    April 27, 2006

Page 174

1      it?

2          A.      Did you say "office"?

3          Q.      Yes.

4          A.      Yes, sir.

5          Q.      The same office.  Your hours of

6      work were the same?

7          A.      That's correct.

8          Q.      You had the same student help,

9      didn't you?

10         A.      I did.

11         Q.      Did you receive any negative

12     evaluations of any kind concerning your work?

13         A.      It wasn't time for evaluations.

14         Q.      Did you receive any negative

15     comments at all concerning your job

16     competency?

17         A.      Well, Bayo commented that he didn't

18     seem to think I was getting things done fast

19     enough.

20         Q.      When was that comment made?

21         A.      This was after our meeting on the

22     31st of January with Ritvo.

23         Q.      What was he referring to?

24         A.      I don't remember exactly what I

25     was working on.  But he just -- as I said

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 175

1    earlier, he just changed. Nothing I did

2    pleased him. I couldn't do it right, and I

3    had been doing the same things before.

4        Q.    Well, were you behind on whatever

5    you were working on?

6        A.    I wasn't behind. As I stated

7    earlier, he told me, "Don't open the mail any

8    more. Don't talk to me any more. If you

9    want to talk to me, send me an e-mail." When

10   two people are working in the office it is

11   not feasible to send e-mails to get the job.

12       Q.    He told you that as a result of

13   the shredding incident, didn't he?

14       A.    You asked me what changed between

15   December and the time I left. That was in

16   that period.

17       Q.    Now, I am trying to pinpoint.

18   That was after the shredding incident, wasn't

19   it?

20       A.    Yes.

21       Q.    Did any of your job duties change?

22       A.    I think they changed because he

23   wouldn't let me do them.

24       Q.    What wouldn't they let you do?

25       A.    He wouldn't let me do the routine

Cynthia Ellison                                        April 27, 2006

Page 176

1          things in the office.

2                  Q.      Open the mail?

3                  A.      Open the mail, communicate with him

4          about who is on the phone, who needed to see

5          him.  It was virtually shut down.  So, in my

6          opinion, I felt like he forced me to leave.

7          I'm not going to sit there and work for

8          nobody when he is saying -- and he said to

9          me, "You have done this to me because of

10         that suit."  He just completely changed.

11                 Q.      This was after, I guess, he had

12         gotten the letter then?

13                 A.      After the letter?·

14                 Q.      From the lawyer.

15                 A.      From the lawyer and after I used

16         Chris' letter. He told me that I had

17         compromised the integrity of the office.  He

18         didn't trust me any more.  He didn't want me

19         to do anything.  And I reminded him that he

20         gave me the letter and told me to do with it

21         what I thought I needed to do.

22                 Q.      He learned that you had given the

23         letter to the lawyer how?  Strike that,

24         please.

25                         How do you think he learned that

Cynthia Ellison                                    April 27, 2006

Page 177

1      you had given the letter to the lawyer?

2          A.     I guess in the correspondence from

3      the lawyer. I really don't know.

4          Q.     During that time you didn't take

5      any leave of absence, did you?

6          A.     During what time?

7          Q.     December the 3rd through February

8      14th.

9          A.     I took funeral leave.

10         Q.     Funeral leave?

11         A.     Uh-huh.

12         Q.     That was for your father?

13         A.     Yes.  And I also took -- I may

14     have had two or three vacation days in there

15     because I was going to the Cancer Center for

16     treatment for my condition.

17         Q.     Those were voluntary things on your

18     part?

19         A.     Right.

20         Q.     Other than those treatments, you

21     didn't seek any kind of medical or

22     psychological assistance during that time?

23         A.     Just with my pastor.

24         Q.     You didn't receive any reprimands,

25     did you?

Cynthia Ellison                                    April 27, 2006

Page 178

1        A.        From Dr. Lawal or at all?

2        Q.        From anyone.

3        A.        Not that I recall.

4        Q.        Your pay didn't change, right?

5        A.        That's correct.

6        Q.        Chris Mahaffy didn't make any

7    racially-related remarks to you after December

8    3rd, did he?

9        A.        Not any racial remarks, but he

10   intimidated me by coming to my office.

11       Q.        I think you wrote somewhere that

12   other staff members or faculty stopped talking

13   to you.

14       A.        Yes.

15       Q.        Do you recall that?

16       A.        I do.

17       Q.        When did that occur?

18       A.        It occurred after the -- I think

19   that was after the incident with Allison.

20       Q.        That was back in 2004?

21       A.        Right.

22       Q.        Did that ever change?

23       A.        Dr. Thomas and Ms. Findley pretty

24   much spoke to me and talked to me, but the

25   rest of them didn't.

Cynthia Ellison

April 27, 2006

Page 179

1   Q.    How many others were there?

2   A.    Dr. Arnold, Mr. Russell, Jill

3   Rollins.  It's been some time, so bear with

4   me.

5   Q.    I understand.

6   A.    Arnold, Russell, Jill Rollins and

7   there was Thomas and Findley.  That was the

8   staff.

9   Q.    Do you believe that somebody

10  encouraged them to stop communicating with

11  you?

12  A.    Well, I know that they had a

13  Departmental meeting because Bayo told me, and

14  they discussed me in the meeting.  That's

15  when I noticed the change in the behavior of

16  some of them.

17  Q.    What did Bayo tell them?

18  A.    Bayo didn't tell them anything.

19  He said that Chris had a meeting with them.

20  Q.    What did Chris tell them?

21  A.    I wasn't in the meeting.

22  Q.    You don't know?

23  A.    No.  I wasn't in the meeting.

24  Q.    Do you know if anyone else --

25  A.    I'm sorry.  I made a mistake.

Cynthia Ellison                                    April 27, 2006

Page 180

1     That wasn't Bayo. That was Brad because that

2     was after.

3         Q.    Brad told you that Mahaffy had had

4     a meeting?

5         A.    It was either Brad or Bob.  After

6     the Allison incident and Brad was in the

7     Dean's chair.  It was Brad and not Bayo.

8         Q.    Did anyone else in the School of

9     Sciences have complaints about Mahaffy?

10        A.    Just about everybody in the School

11    of Sciences.

12        Q.    What kind of complaints did the

13    other folks have about him?

14        A.    I can only tell you what they

15    expressed to me.

16        Q.    That's fine.

17        A.    Rosine Hall called me, or she was

18    in the office making copies and she said that

19    Chris had come to her office and spent an

20    hour venting about what had happened. When I

21    say, "what had happened," I am talking with

22    the situation with him being taken down as

23    Department head. She said for me to be

24    careful because he was really upset, and he

25    was nuts.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 181

1              Dr. Elliott referred to -- they

2       basically all made the comment that he was

3       crazy.  Something was wrong with him.  The

4       Department heads had a problem with him in

5       the Department head's meeting.  It was just a

6       combination of student complaints, faculty

7       complaints.  Everybody just about.

8           Q.      Do you know if anyone ever

9       complained about the types of -- strike that.

10              Do you know if anybody complained

11      about any sort of physical activity of

12      Mahaffy?

13          A.      Just that one incident that I

14      remember that I told you about earlier.  He

15      and a student got into it in one of the

16      labs.

17          Q.      Do you know if anyone else

18      complained about Mahaffy?

19          A.      I thought we just answered that.

20      What was the question previous to this?

21          Q.      Well, maybe it was my misuse of

22      language.  I asked you if anybody had

23      complaints about him.  The second question

24      was, did anyone actually complain about him

25      to Debra, to the Dean?

Cynthia Ellison                                                    April 27, 2006

Page 182

1          A.      Debra will have to answer that

2      question.  We did have complaints to each

3      Dean.  We had complaints to Brad.  We had

4      complaints to Bob.  We even had complaints to

5      Joe Hill about Chris Mahaffy.

6          Q.      Coming from all different people?

7          A.      Different people, yes.  In

8      particular, I can give you an example.

9          Q.      Okay.

10         A.      I think this is when Brad was the

11     Dean.  Chris told a student that he was too

12     old to get into pharmacy school and the

13     student complained to us.  It went all the

14     way to the Vice Chancellor's office.  I don't

15     know what the follow up was.  I do know that

16     several times they had to go downtown

17     somewhere.

18         Q.      Do you know if anything was ever

19     done by the University in response to the

20     complaints about Mahaffy up until 2005, of

21     course?

22         A.      Define "done."  What do you mean

23     by "done."

24         Q.      Any action taken against him for

25     his behavior?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 183

1          A.      Nobody really wanted to take

2     action.  They just let him keep going.  In

3     fact, it was a joke.  He was being passed

4     from one Dean to the other.

5          Q.      Do you know if anyone else

6     resigned because of Mahaffy's behavior?

7          A.      I have no firsthand knowledge of

8     that.

9          Q.      Have you heard of anyone resigning

10    because of Mahaffy's behavior?

11         A.      Give me a minute.  I'm going back

12    over 20 years.  Not that I recall.

13         Q.      Now, you resigned or retired on

14    February the 9th, 2005, right?

15         A.      I turned that memo into Dr. Lawal

16    then, yes.

17         Q.      Then you agreed to stay on until

18    February 25, right?

19         A.      Right.  In that agreement, I said

20    with the stipulation that I get security.

21         Q.      You had planned to stay on until

22    February 25, had you not, until the shredding

23    incident came along?

24         A.      I had planned to stay another two

25    or three years.  I had committed to Dr.

Cynthia Ellison                                    April 27, 2006

Page 184

1       Lawal that I would be there.

2           Q.     I am referring now to the

3       retirement notice you handed in on February

4       9th?

5           A.     Okay.

6           Q.     And you committed to staying on

7       through February 25th and then that changed

8       on February the 14th, right?

9           A.     It did change on February the

10      14th.  February the 25th.

11          Q.     Isn't it true that you did tell

12      Lawal that you would stay on through the 25th

13      if security would assure you they would do a

14      walk-through at least once a day?

15          A.     Yes.  He asked me to stay, and I

16      said "with security."

17          Q.     If they did a walk-through once a

18      day?

19          A.     I didn't say that.

20          Q.     You did agree to stay through the

21      25th if there was security?

22          A.     Right.  And he told me that that

23      wasn't up to him.  It was up to Dr. Ritvo.

24          Q.     Until the fall out from the

25      shredding incident, you had planned to stay

Cynthia Ellison                                    April 27, 2006

Page 185

1      through February 25th, had you not?

2          A.      Well, I had gone to him, and

3      that's what I put in writing.  When I asked

4      him about security nothing was done.

5          Q.      I'm sorry.  I didn't hear you.

6          A.      Nothing was done when I asked

7      about getting security.

8          Q.      Is that why you left on the 14th?

9          A.      I left because it was an

10     impossible situation to work.

11         Q.      You had a big fight with Lawal on

12     the 14th, didn't you?

13         A.      I did not.

14             MS. RODGERS:  Object to form.

15             THE WITNESS:  No, sir, I did not.

16             MR. DODD:  Q.  Would you have

17     stayed through the 25th if the shredding

18     incident had not occurred?

19             MS. RODGERS:  Object to form.

20             THE WITNESS:  Given the fact that

21     he had given me the letter concerning Chris,

22     I had planned to keep my two-year commitment

23     not to just February the 25th.

24             MR. DODD:  Q.  I understand that.

25     I am asking you now about your retirement

Cynthia Ellison                                    April 27, 2006

Page 186

1      notice you handed in on February the 9th,

2      right?

3          A.    Right.

4          Q.    After you did that you told him

5      you would stay through the 25th if you had

6      security?

7          A.    Right.

8          Q.    Right?

9          A.    Uh-huh.

10         Q.    But you didn't, did you?

11         A.    Because events changed and it

12     wasn't just the shredding.

13         Q.    Didn't you make up your mind to

14     leave on Monday February 14th?

15             MS. RODGERS:  Object to form.

16             THE WITNESS:  I was forced to

17     leave on February the 14th.

18             MR. DODD:  Q.  For whatever reason

19     you decided to leave on February 14th, right?

20         A.    Yes.  I left because I was forced

21     to leave.

22         Q.    What happened on February 14th that

23     forced you to leave?

24         A.    Dr. Lawal was indignant.  He

25     called me in his office and said that he had

Cynthia Ellison                                    April 27, 2006

Page 187

1    been working out there on Saturday, and he

2    saw the shredding bags where I normally put

3    shredding bags.  And that I had not gotten

4    his permission to shred.  And that he had

5    called Ritvo at home that Saturday and asked

6    him what he should do.  He said that Ritvo

7    told him to collect the shredding bags and

8    bring them to his office.  I don't know who

9    took them over there.  That's what he told

10   me.  But when I got ready to go out of Dr.

11   Lawal's office, the shredding bags were

12   stuffed up under the couch in his office.  I

13   said, "Is this some of the shredding?  Do

14   you want to look in it to make sure that

15   it's what I told you it was?"  It was the

16   time -- they were old time sheets, pay

17   schedules, you know, grade sheets and so

18   forth.  He said "no."  And then again he

19   asked me to leave his office and I did.

20        Q.    Then you sent him a note and said

21   you are leaving at 1:00 o'clock that

22   afternoon, right?

23        A.    Right.  I did not sit down

24   immediately and say, "I am leaving at 1:00

25   o'clock."

Cynthia Ellison                                    April 27, 2006

Page 188

1          Q.      Is it true that the confrontation

2    you had with Lawal that morning, February

3    14th, is what led you to leave AUM at 1:00

4    o'clock that afternoon?

5              MS. RODGERS:  Object to form.

6              THE WITNESS:  As I stated earlier,

7    there was no confrontation.  He stated to me

8    how he felt.  I think I also told you

9    earlier that he said he did not trust me.  He

10   didn't want me to do anything in the office.

11   I was just to sit there really.  Don't open

12   anything.  Don't do anything.  And that was

13   retaliatory because of my complaint I had

14   filed.

15             It was also retaliatory in nature

16   to me because he wanted to file a complaint

17   that summer, and he told me that now he

18   would not be able to do it.  The environment

19   I was in, that just worsened the environment.

20   I was sitting in a hostile environment.

21             MR. DODD:  Q.  What you just

22   described occurred that Monday morning, did it

23   not?

24        A.      Yes.  But it was not a

25   confrontation.  I didn't raise my voice.  He

Cynthia Ellison                                    April 27, 2006

Page 189

1    didn't raise his voice.

2        Q.    We will call it a conversation.

3    Okay?

4        A.    You can call it a conversation.

5        Q.    As a result of the conversation on

6    Monday morning, you left at 1:00 o'clock that

7    afternoon?

8        A.    As a result of that and my not

9    getting security and my being subjected to an

10   unsafe environment, I was forced to leave.

11       Q.    What security issues did you have

12   that Monday morning?

13       A.    Actually, that Monday morning

14   security showed up.  Officer Cox came in my

15   office and said he had been sent over to

16   secure my area.  He said, "Cynthia, if I had

17   known it was you, I would have been here

18   earlier."  He told me that he was the one

19   stationed outside of Ritvo's office and -- on

20   the 31st when all of these meetings occurred,

21   and that he witnessed that when Chris came

22   out of the meeting that -- and these are his

23   words, not mine. He looked like he was off

24   of his meds.  He said no one ever told him

25   to come over and secure my area.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                     April 27, 2006

1        Q.    When you left work on Friday the

2    11th of February --

3        A.    Uh-huh.

4        Q.    You didn't intend to leave work on

5    Monday afternoon, did you?

6        A.    Leave work?

7        Q.    Leave AUM.

8        A.    I spoke to my attorney, and I was

9    advised to leave an unsafe environment where

10   nothing was being done for me.

11       Q.    I understand that.  I am asking

12   you when you went home from work on that

13   Friday, February 11th, you still intended to

14   work through February 25th, did you not?

15       A.    If I arrived and conditions were

16   conducive to my being able to work until the

17   25th.

18       Q.    The condition you had specified was

19   security, wasn't it?

20       A.    That's right.

21       Q.    Monday there was security, was

22   there not?

23       A.    There was security.

24       Q.    Okay.  What changed between the

25   time you went home on Friday afternoon and

Cynthia Ellison                                    April 27, 2006

Page 191

1       the time you left Monday afternoon never to

2       return?

3            A.    Dr. Lawal told me essentially there

4       wasn't anything for me to do in the office

5       any more.

6            Q.    It was the conversation that Monday

7       morning, right?

8            A.    It was a combination of everything.

9       There is no other way I can tell you.  I

10      mean, it was a combination of everything.

11           Q.    Why didn't that combination of

12      everything force you to leave on Friday and

13      never return?

14               MS. RODGERS:  Object to form.

15               THE WITNESS:  Because Dr. Lawal,

16      even in his being ugly to me, I was trying

17      to get some work done.  I was working.  I

18      mean, I wasn't working thinking I am going to

19      leave at 1:00 o'clock on Monday.  I didn't

20      come in Monday morning saying, "I am going to

21      leave at 1:00 o'clock."  It was a combination

22      of everything.

23               MR. DODD:  Q.  Is it fair to say

24      that what Lawal said to you that Monday

25      morning was the catalyst that made you leave

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                      April 27, 2006

Page 192

1          Monday afternoon?

2                    MS. RODGERS:  Object to form.

3                    THE WITNESS:  Not having security

4          was the key issue and what I had been

5          subjected to.

6                    MR. DODD:  Q.  Had Lawal

7          previously ever tried to talk you out of

8          retiring?

9          A.    No, sir.  Because he knew I wasn't

10         going to retire.

11         Q.    I'm sorry.

12         A.    He knew I wasn't planning to

13         retire.

14         Q.    How did he know that?

15         A.    Because several people in the

16         school asked me if I was going to retire and

17         I said, "No."  They asked me if Dr. Lawal

18         was planning to leave.  And this I understand

19         started, and I can't tell you who started it,

20         but I can tell you who they say started it.

21         Chris was going around on the third and

22         second floor saying that I was going to

23         retire, and Dr. Lawal was leaving taking

24         another job.  Dr. Lawal sent an e-mail to the

25         entire school saying Ms. Ellison has not

Cynthia Ellison                                        April 27, 2006

Page 193

1    discussed any plans with me to retire, nor am

2    I looking for another job.  Yet, he decided

3    after I left to put in his letter that I had

4    said I was, but I did not tell him that

5    because he sent the e-mail saying we had not

6    discussed it.

7         Q.    Did you ask the four work study

8    students to prepare statements about what went

9    on February 14th?

10        A.    I did.

11        Q.    Why did you do that?

12        A.    Because it was my pattern.  I

13   think every situation I have written something

14   down.  I have documented what happened.  And

15   I knew, especially at that point,

16   documentation was key.

17        Q.    Ms. Ellison, do you know any white

18   employees at AUM who were not fired after

19   complaining about discrimination?

20        A.    White employees who were not fired

21   after complaining about discrimination.  I

22   don't know that I would have privileges to

23   that kind of information.  I don't know.

24        Q.    Do you know of any white employees

25   who were fired after complaining about

Cynthia Ellison                                      April 27, 2006

Page 194

1          discrimination?

2               A.     I do not know.

3               (Short recess)

4               MR. DODD:  Q.  Ms. Ellison, do

5     you know if Faye Ward has any unhappiness

6     with Auburn University Montgomery?

7               A.     I wouldn't know that.

8               Q.     Have you talked to her about

9     assisting you in this case?

10              A.     I asked her if she would talk to

11    my attorney.

12              Q.     And she did, right?

13              A.     As far as I know, yes.

14              Q.     Have you seen the affidavit that

15    she gave?

16              A.     No.  I haven't seen her affidavit.

17              Q.     When did you apply for disability

18    insurance or disability benefits?

19              A.     I don't remember the exact date.

20    But it was pretty much around the time when

21    I tried to work for my rheumatologist and I

22    couldn't do it.

23              Q.     Were those SSI disability benefits?

24    Social Security Disability benefits?

25              A.     Yes.

Cynthia Ellison                                    April 27, 2006

Page 195

```
 1              Q.      What was the outcome of your
 2        application?
 3              A.      I have got to request for a
 4        hearing.  I have got to send back information
 5        to request for a hearing date.
 6              Q.      Who is representing you in that
 7        case?
 8              A.      I don't have a representative.
 9              Q.      You represent yourself?
10              A.      Yes.
11              Q.      Have you been denied Social
12        Security benefits and is this an appeal?
13              A.      Right.
14              Q.      Did you claim in your application
15        for disability benefits that you were unable
16        to work?
17              A.      As I recall, there were 100
18        questions that asked you what you can and
19        cannot do and to what extent you can or
20        cannot do that.
21              Q.      Do you have -- strike that.
22                      Do you keep all of those records?
23              A.      I should have those records.
24              Q.      Donna Paul is your rheumatologist?
25              A.      Yes.  Dr. Paul.
```

Cynthia Ellison                                    April 27, 2006

Page 196

1        Q.      Let me show you a document that

2     your lawyer gave to me and just ask you if

3     you ever seen that before.

4        A.      No.  May I read it?  I haven't

5     seen it before.

6        Q.      If you are curious, you can read

7     it.  Your lawyer has a copy.  She can show

8     it to you.

9        A.      What is it?

10       Q.      It looks like some notes from Faye

11    Ward to my partner that somehow left AUM.

12       A.      Okay.

13               (Three-page document, dated February

14    25, 2004, e-mail from Cynthia Ellison to Joe

15    Hill, marked as Defendant's Exhibit-2)

16               MR. DODD:  Q.  Ms. Ellison, here

17    is Defendant's Exhibit 2.  Take a look at

18    that and see if you can identify it for me,

19    please.

20       A.      This is an e-mail I sent Joe Hill.

21       Q.      Do you recognize that?

22       A.      Yes.

23       Q.      You see about halfway down the

24    message on the first page you refer to the

25    anonymous letter?

Cynthia Ellison                                    April 27, 2006

Page 197

1        A.      I do.

2        Q.      Have you seen that letter to date?

3        A.      I have not.

4        Q.      Who was one of the individuals you

5    spoke to who apparently composed that letter?

6        A.      I don't know who composed the

7    letter.

8        Q.      Who in the letter are you

9    referring to where you say, "the ladies heard

10   about the incident and I spoke with one of

11   them, not knowing she had in mind doing what

12   she did."

13       A.      Let me get to that point.

14       Q.      Okay.

15       A.      Where is it?  Okay.  Let me just

16   read it.  These were the women in Upward

17   Bound.

18       Q.      Who did you speak to, though?

19       A.      I spoke to -- actually, I spoke to

20   all of three of them there together.

21       Q.      What are their names?

22       A.      It was Lucy.  We called her Ms.

23   Lucy.  Lucy. Debra may know their names.

24   Lucy.  It was Alice Boggs. Alice Boggs, Abena

25   and Lucy.  That's all I know.

Cynthia Ellison                                    April 27, 2006

Page 198

1        Q.      How did you learn that an
2    anonymous letter existed and that it referred
3    to you?
4        A.      How did I learn about what?
5        Q.      That an anonymous letter existed
6    and that the letter referred to you.
7        A.      They were talking about it in the
8    School of Sciences.  They said it referred to
9    the Dean's secretary in the School of
10   Sciences.
11       Q.      Who is "they?"  These three women?
12       A.      Yes.
13       Q.      Were they involved in the School
14   of Sciences?
15       A.      They were housed in the School of
16   Sciences.
17       Q.      Read down about ten more lines
18.  from there.  It says, "The HR director wasn't
19   willing to speak with me at the time."
20       A.      Right.
21       Q.      What are you referring to there?
22       A.      Debra.
23       Q.      When was she not willing to speak
24   with you?
25       A.      Wait a minute.  Let me come to

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                    April 27, 2006

Page 199

1      where you were and read it.

2          Q.    Okay.

3          A.    I have to say it was referring to

4      Debra.  And I think I said at one time it

5      was Debra.  Then I changed it.  So I guess

6      it was Debra.  Because this would have been

7      more up to date than what I remember now,

8      since it's been so long.

9          Q.    Isn't it true that you called

10     Debra Foster about a week before you sent

11     this e-mail and asked her how to file a

12     complaint about the Allison Stevens incident?

13         A.    Asked her how to file a complaint?

14         Q.    Yes.

15         A.    I may have called Debra.  I don't

16     remember.

17         Q.    Isn't it true that you also told

18     Debra that you did not want to put anything

19     in writing?

20         A.    I did.  And that's when Guin

21     insisted that she wanted me to.

22         Q.    That happened later, didn't it?

23         A.    I wrote the memo to Guin, yes.

24     When I informed Guin about the situation.

25         Q.    Why were you unwilling to put

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 200

1        anything in writing to Debra Foster about the

2        Allison Stevens incident?

3            A.      Because Debra was known not to

4        help anybody. When I went to her, her first

5        statement was, "I don't know what to do with

6        this.  It's going to be he said, she said."

7            Q.      That's what happened later.  I am

8        asking you now why you weren't willing to

9        follow the procedures that were in place?

10           A.      I don't view that as not my being

11       not willing to follow procedures.  As I said

12       earlier, I really felt like I was going to

13       be retaliated against because of the situation

14       with Jessie Clayton.

15           Q.      You expected Debra to retaliate

16       against you?

17           A.      I had no idea what to expect

18       because of what I had heard.

19           Q.      Look over at the bottom of the

20       next page, please.  The last four lines.

21       You say, "I said earlier in an e-mail to you

22       that I'm looking at retiring if I can find

23       something else, but I don't want to leave

24       with a cloud over my head."  Do you see

25       that?

Cynthia Ellison                                    April 27, 2006

Page 201

1          A.      I see it.

2          Q.      Were you looking at retiring as of

3   February 2004?

4          A.      We were always looking at

5   retirement.  I told you that we had seminars

6   that we went to.

7          Q.      This doesn't talk about a seminar.

8   It talks about you.

9          A.      I know what it talks about.  I am

10  telling you now that discussion of retirement

11  came up periodically, not just with me, but

12  with everybody.  Especially when they invoked

13  the DROP situation.

14         Q.      In 2004, were you looking to find

15  another job so you could retire?

16         A.      I was not looking for a job in

17  2004.

18         Q.      The statement you made there

19  that --

20         A.      Let me read this.

21                 MR. DODD:  Here is No. 3.

22                 (One-page letter, dated March 1,

23  2004, letter from Cynthia Ellison to Guin

24  Nance, marked as Defendant's Exhibit-3)

25                 MR. DODD:  Q.  Take a look at

Cynthia Ellison                                    April 27, 2006

Page 202

1          that and see if you can identify it.

2              A.      Okay.

3              Q.      Can you identify that document?

4              A.      I wrote it.

5              Q.      It's your letter?

6              A.      Yes.

7              Q.      Look in the first paragraph, if

8          you would, at the last sentence.  Which

9          reads, "Until now, however, none have involved

10         name calling, personal verbal attacks, and the

11         development of a potential hostile working

12         environment."

13             A.      Uh-huh.

14             Q.      Is this your statement that March

15         1, 2004, is the beginning of a hostile

16         working environment?

17             A.      My reference until now is to the

18         incident when it occurred in December '03.

19             Q.      December 3rd, 2003, is the

20         beginning of the hostile working environment

21         for you?

22             A.      And the racial slur.  That was the

23         first time that I had ever encountered

24         something like that.

25             Q.      I understand that.  What you wrote

Cynthia Ellison                                    April 27, 2006

Page 203

1          here is the truth, right?

2          A.      Yes.

3          Q.      If you look at December the 3rd,

4      2003 letter, it's the beginning of what you

5      consider to be a hostile working environment?

6          A.      In relation to this incident that

7      I was referring to.

8          Q.      Well, the first paragraph refers to

9      your tenure at Auburn University Montgomery

10     for the last 20 years, doesn't it?

11         A.      Right.

12         Q.      December 3, 2003, is the beginning

13     of what you consider to be a hostile working

14     environment, right?

15             MS. RODGERS:  Object to form.

16             THE WITNESS:  No, sir.  That's not

17     what my intent was.

18             MR. DODD:  Q.  What was your

19     intent?

20         A.      My intent was to communicate to

21     Dr. Nance, as I said earlier, that I was not

22     the author of the anonymous letter.  And that

23     it was me who the slur was directed at. And

24     that, like it says, I was subjected to a

25     hostile work environment.

Cynthia Ellison                                    April 27, 2006

Page 204

1        Q.    The sentence preceding the last one

2    says, "Over the years, there have been

3    misunderstandings and personality conflicts

4    with each of these groups.  Until now,

5    however, none have involved name calling,

6    personal verbal attacks, and the development

7    of a potential hostile working environment,"

8    right?  Is that the truth?

9            MS. RODGERS:  Object.  Asked and

10   answered.

11           THE WITNESS:  This recap events

12   that I was trying to relate to Dr. Nance

13   that occurred in December '03.

14           MR. DODD:  Q.  December '03 is

15   when the development of a potential hostile

16   working environment began, right?

17           MS. RODGERS:  Object again.

18           THE WITNESS:  I should have

19   probably put it in writing when it was

20   continued.

21           MR. DODD:  Q.  This letter is not

22   true then, right?

23           MS. RODGERS:  Object to form.

24           THE WITNESS:  Yes, it's true.

25           MR. DODD:  You can't have it both

Cynthia Ellison                                    April 27, 2006

Page 205

1          ways.

2                    THE WITNESS:  It is true.

3                    MS. RODGERS:  Stop.  On the

4          record, I would like the record to reflect

5          that it seems like opposing Counsel has

6          become argumentative and also attempting to be

7          intimidating to my client.  If he wants to

8          ask her a question, which I will say was in

9          a unprofessional manner, he can do that.  If

10         he cannot do that at this point, then we can

11         just close the deposition and let the judge

12         take it up on this matter on what we should

13         do in the midst of these depositions.

14                   MR. DODD:  It's cross-examination,

15         Counsel.

16                   MS. RODGERS:  Well, whatever you

17         call it.  You call it whatever.  Whatever

18         you may want to call it.  You call it cross,

19         I call it intimidation.

20                   MR. DODD:  It's a search for the

21         truth.

22                   MS. RODGERS:  This search for your

23         truth.  This is Ms. Ellison's case.  You are

24         the lawyer.  You have not been the victim.

25                   MR. DODD:  Search for the truth.

Cynthia Ellison                              April 27, 2006

Page 206

```
 1              MS. RODGERS:  Search for your
 2       truth.
 3              MR. DODD:  We are going to stay
 4       on it until I get it.
 5              MS. RODGERS:  I am going to stay
 6       on it until I get it.  No reaper shall
 7       prosper, and every tone that rises up in
 8       judgment shall be condemned.  And for the
 9       record --
10              MR. DODD:  Don't preach to me.
11              MS. RODGERS:  I don't preach.  I
12       am not preaching to you.  But I am putting
13       it on the record so that it can be perfectly
14       clear.  That it can be perfectly clear that
15       you are not going to intimidate me either.
16              Now, I am trying to have my client
17       here to answer your questions.  You are
18       taking it as a personal vendetta for a search
19       for your truth.  I have her here available
20       to answer your questions according to what
21       she has provided in her complaint.  That's
22       what we are trying to attempt to do.  But
23       you are trying to search for truth.
24              MR. DODD:  She is noticed to be
25       here.
```

Cynthia Ellison                                    April 27, 2006

Page 207

1            MS. RODGERS:  She may be noticed

2       to be here. And by law, the only reason is

3       because she has to be here, and because she

4       has filed a complaint.

5            MR. DODD:  That's true.  That's

6       her obligation of filing a lawsuit.

7            MS. RODGERS:  It's our obligation

8       to for having her here.  You can ask

9       questions.  If you want to be put into an

10      argument, let the games begin.  And we can

11      let the judge decide that.

12           MR. DODD:  Q.  Mrs. Ellison, is

13      the document that's been identified as

14      Defendant's No. 3 truthful?

15           MS. RODGERS:  Object to form.

16           THE WITNESS:  Yes, sir.  It is

17      truthful.

18           MR. DODD:  Thank you.

19           (One-page letter, dated March 2,

20      2004, from Guin A. Nance to Ms. Cynthia

21      Ellison, marked as Defendant's Exhibit-4)

22           MR. DODD:  Q.  Ms. Ellison, here

23      is No. 4.  See if you can identify that.

24           A.    Yes.

25           Q.    What is it?

Cynthia Ellison                                    April 27, 2006

Page 208

1          A.      It's a letter that I wrote to Dr.

2     Nance.

3          Q.      That's the letter you received from

4     Dr. Nance?

5          A.      Uh-huh.

6          Q.      Is it in response to the letter

7     that was marked as Defendant's No. 3?

8          A.      The letter you had, yes.

9          Q.      Look at the last paragraph, would

10    you, please. Chancellor Nance writes, "My

11    understanding from Ms. Foster is that you

12    have been reluctant to provide a written

13    statement." Do you see her remark there?

14         A.      Yes.

15         Q.      Is that an accurate statement?

16         A.      Yes.

17         Q.      She goes on to say that she hopes

18    you will share all relevant information on

19    this issue with her, right?

20         A.      That's correct.

21         Q.      You did that after you received

22    this letter, did you not?

23         A.      Right.  This was after our meeting

24    by sitting down in her office telling her

25    that Debra starts fires and not puts them

Cynthia Ellison                                    April 27, 2006

Page 209

```
1      out.
2                   (One-page letter, dated March 22,
3      2004, from Debra S. Foster to Ms. Cynthia
4      Ellison and Allison Stevens, marked as
5      Defendant's Exhibit-5)
6                   MR. DODD:  Q.  Here is No. 5.
7      See if you can identify that.
8            A.     Yes.
9            Q.     What is it?
10           A.     A letter to me and Allison Stevens
11     from Debra Foster.
12           Q.     Did you receive this letter?
13           A.     I did.
14           Q.     Now, you see where Debra Foster
15     writes that she didn't find evidence to
16     substantiate if the racial slur was used by
17     Ms. Stevens, right?
18           A.     Yes.
19           Q.     But she does go on to say that if
20     Allison Stevens uses the word again she is
21     going to be fired.  Do you see that?
22           A.     Yes.
23           Q.     She also said that if Ms. Stevens
24     uses abusive and threatening language she is
25     going to be fired.  Do you see that in the
```

Cynthia Ellison                                    April 27, 2006

Page 210

1    second numbered paragraph?

2         A.    Yes.

3         Q.    What was your reaction to what

4    Debra Foster wrote with respect to

5    expectations for Allison Stevens, if you had

6    one?

7         A.    Well, I think it's written here in

8    Number Two that she asked her not to use

9    abusive and threatening language any more.

10   And if she called me a nigger again she

11   would be terminated.

12        Q.    Were you satisfied with this

13   result?

14        A.    I was satisfied to the point that

15   I knew nothing else would be done.  The next

16   day I received her e-mail inviting me to

17   apply for a job at Hyundai, or the day

18   after.

19        Q.    Do you have that e-mail, by the

20   way?

21        A.    I believe I gave it to my

22   attorney.

23        Q.    Now, you've stated in other --

24   strike that, please.

25              Your desire was not to get Allison

Cynthia Ellison                                    April 27, 2006

Page 211

1      Stevens fired over the incident you had with

2      her, was it?

3          A.      No.

4          Q.      Do you know of anything that Debra

5      Foster could have done short -- strike that,

6      please.

7                  In your opinion, what could Debra

8      Foster have done short of firing Allison

9      Stevens that the warnings in Defendant's No.

10     5 do?

11         A.      Well, it took her two times to do

12     the investigation.

13         Q.      I understand that it took some

14     time.  In terms of the conclusion that she

15     reached?

16         A.      I don't know.  I may have written

17     a memo to her about this.  I'm not sure.

18         Q.      In your mind, short of firing Ms.

19     Stevens, is there anything she could have

20     done other than say, if you do it, you will

21     be fired?

22         A.      She is an EEO and HR person.

23     That would have been her call.

24                 (Five-page document, dated March

25     31, 2004, from Cynthia Ellison to Dr. Guin

Cynthia Ellison                                          April 27, 2006

Page 212

1    Nance, marked as Defendant's Exhibit-6)

2        MR. DODD:   Q.   Here is No. 6.

3  Take a look at that, please, and tell me

4  what it is.

5    A.  This is what I wrote to Dr. Nance.

6    Q.  Did you write to -- strike that.

7      What prompted you to write this

8  letter to Dr. Nance?

9    A.  I didn't believe that I had been

10  given due process in the investigation part

11  of my complaint.

12    Q.  Explain to me what you mean by

13  that, please?

14    A.  First of all, when I gave Debra my

15  initial statement and she sent it to me, I

16  had to pretty much redo it because she didn't

17  recap what I had told her. She didn't want

18  to do an investigation, and that's when I

19  went to Dr. Nance and told Dr. Nance that I

20  was reluctant.  And then Dr. Nance instructed

21  her to go ahead and talk to the people.

22  That is what I was writing in here.  That's

23  the reason that I felt the EEO person and

24  the EEO personnel and the HR Director should

25  be separate. It says it in this memo.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                      April 27, 2006

Page 213

1          Q.     You said that Debra Foster didn't

2     want to do an investigation, right?

3          A.     She had never had this before she

4     said, he said, she said.

5          Q.     Is that the same as saying she

6     didn't want to do it?

7          A.     When she didn't, that told me she

8     didn't want to do it.  I had to go back to

9     Dr. Nance to ask her to go ahead and do it.

10         Q.     Isn't it true that actually Dr.

11    Nance instructed to you give a written

12    statement because you had refused to it?

13              MS. RODGERS:  Object to form.

14              THE WITNESS:  She instructed me to

15    talk to Debra Foster.

16              MR. DODD:  Q.  Did she say put

17    it in writing?

18              Guin Nance writes on Defendant's

19    Exhibit 7 that Ms. Ellison is reluctant to

20    provide a written statement and share all

21    relevant issues.

22         A.     I went over to Debra and shared

23    with her, and Debra typed up the statement

24    while I was there.

25         Q.     Isn't it true that you had refused

Cynthia Ellison                              April 27, 2006

Page 214

1           to give a written statement, and it took Guin

2           Nance to convince you to do it?

3                      MS. RODGERS:  Object to form.

4                      THE WITNESS:  Because I knew

5           nothing would be done.  It took Guin Nance

6           to do it.

7                      MR. DODD:  Q.  It took Guin Nance

8           to get you to give a written statement,

9           right?

10                      MS. RODGERS:  Object to form.

11                      THE WITNESS:  It took Guin Nance

12           to get me to go see Debra, that's correct,

13           and file my complaint.

14                      (One-page letter, dated April 5,

15           2004, from Guin A. Nance to Ms. Cynthia

16           Ellison, marked as Defendant's Exhibit-7)

17                      MR. DODD:  Q.  Ms. Ellison, here

18           is No. 7.  See if you can identify that.

19           A.      Yes, I wrote it.

20           Q.      What is it?

21           A.      It's a letter from Dr. Nance

22           saying that she received the previous exhibit

23           you showed me.

24           Q.      In your estimation, is she

25           addressing the primary issues you raised in

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 215

1          your letter?

2          A.    She is addressing the issue and

3     directing Debra to interview Nikki Gibson.

4          Q.    That was one of your concerns, was

5     it not?

6          A.    (Witness nods head)

7          Q.    Has Guin Nance ever been

8     unresponsive to any of your concerns?

9          A.    No.

10              (One-page letter, dated April 29,

11     2004, from Debra S. Foster to Cynthia

12     Ellison, marked as Defendant's Exhibit-8)

13              MR. DODD:  Q.  Here is No. 8.

14     Let me know if you can identify that.

15          A.    Yes.  This is a letter to me from

16     Debra after, I guess, she did the additional

17     investigation with the witness.

18          Q.    At this point, April 29, 2004,

19     were you satisfied that all potential

20     witnesses had been interviewed in connection

21     with the Allison Stevens incident?

22          A.    All witnesses, yes.

23          Q.    Did that satisfy one of your major

24     concerns about the investigation?

25          A.    It did.

Cynthia Ellison                                April 27, 2006

Page 216

1            (One-page memorandum, dated December

2       2, 2004, from Debra S. Foster to Cynthia

3       Ellison, marked as Defendant's Exhibit-9)

4            MR. DODD:  Q.  Here is No. 9.

5       See if you recognize that, please.

6            A.    Yes.  This is a letter Debra sent

7       me after she met with me and Dr. Lawal.

8            Q.    Does it accurately reflect what you

9       and she discussed and agreed to?

10           A.    It reflected what was discussed and

11      agreed to without my knowing what the

12      complaint was.

13           Q.    But being mindful of your feelings

14      when conversing with her, and her agreeing to

15      treat you with respect and dignity, are just

16      common decency, wouldn't you say?

17           MS. RODGERS:  Object to form.

18           THE WITNESS:  It's common decency,

19      but she and Dr. Lawal assured me that the

20      complaint was frivolous and not to worry

21      about it.  They said this is what they were

22      going to do.  I didn't worry about it.  This

23      is what I received after I complained that I

24      didn't get a letter. And Barbara got a

25      letter.  This letter came after this letter.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                          April 27, 2006

Page 217

1              MR. DODD:  Q.  Do you think that

2      Barbara Ware got a copy of this letter to

3      you, No. 9?

4          A.     I have no idea.

5          Q.     Do you suspect that she did?

6              MS. RODGERS:  Object to form.

7              THE WITNESS:  I just know that she

8      and Dr. Lawal got a letter and I didn't, and

9      I asked for one.

10             MR. DODD:  This is No. 10.

11             (One-page memorandum, dated December

12     7, 2004, from Cynthia Ellison to Dr. Bayo

13     Lawal, marked as Defendant's Exhibit-10)

14             MR. DODD:  Q.  Can you tell me

15     what that is?

16         A.     This is -- yes.  This is a letter

17     I wrote to Dr. Lawal, and I would have

18     copied it to Debra Foster concerning the

19     Barbara Ware incident.

20         Q.     Is your primary concern the fact

21     that you didn't get a copy of what Barbara

22     received?

23         A.     Well, that and the fact that I say

24     in here that I was surprised that any

25     correspondence was written since, as I stated

Cynthia Ellison                                    April 27, 2006

Page 218

1          to you earlier, they told me that nothing

2          would be done.  Essentially that was the end

3          of it.

4               Q.    Was that your preferred course of

5          action that no conclusion or confirmation be

6          sent?

7                    MS. RODGERS:  Object to form.  You

8          can answer.

9                    THE WITNESS:  I can just tell you

10         that I was called into a meeting with Barbara

11         and Lawal.  They told me Barbara filed a

12         complaint.  They felt like it was embellished

13         by Chris and not to worry about it.

14                   MR. DODD:  Q.  Now, did receiving

15         Defendant's Exhibit No. 9 make you worry

16         about it?

17              A.    Make me worry about it?

18              Q.    Yes.

19              A.    Worry what what?

20              Q.    The Ware complaint.

21              A.    Worry that I didn't get to see the

22         complaint or worry in what respect?

23              Q.    In any respect about the resolution

24         of the complaint she filed?

25              A.    I thought the resolution ended in

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 219

1    the conference room when we finished the

2    meeting.

3        Q.    Is what's contained in Defendant's

4    No. 9 any different than what was discussed

5    in the conference room in terms of

6    resolution?

7                MS. RODGERS:  Object to form.

8                THE WITNESS:  No.

9                MR. DODD:  Q.  Do you know if

10   Dr. Lawal sought assistance or suggested from

11   the School of Sciences faculty about what the

12   school can do on account of the death of

13   your father?

14               MS. RODGERS:  Object to form.

15               THE WITNESS:  I wasn't there, so I

16   wouldn't know.

17               MR. DODD:  Q.  Has anyone told

18   you that he sought school-wide suggestions

19   about what could be done?

20       A.    Nobody told me that.

21       Q.    Do you know what he did?

22       A.    When my father died?

23       Q.    Yes.

24       A.    He sent a flower arrangement.  I

25   believe he sent a flower arrangement.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 220

1      Q.     And the funeral was January 29th?

2      A.     No.  Was it the 29th?  I was

3  back at work on the 31st.  He died on the

4  21st or 22nd.  It would have been -- it was

5  towards the end of January.

6      Q.     When had your mother died?

7      A.     She died four months earlier.

8      Q.     What did Dr. Lawal do on that

9  occasion?

10     A.     Dr. Lawal came to my home with

11  Ruby Jenkins, and Ruby handed me an envelope

12  that had some money if it. I'm not certain,

13  but I think she said it was from Dr. Lawal

14  or the people in School of Sciences.

15     Q.     Did he also send flowers?

16     A.     He did.

17     Q.     How much money was in the

18  envelope?

19     A.     I really don't recall.

20     Q.     Now, you also lost a sibling, did

21  you not?

22     A.     My sister died six days before my

23  mother.

24     Q.     What did Dr. Lawal do then?

25     A.     Okay.  I have got to remember.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 221

1       Because there were two funerals.  One in
2       Indiana and one in Alabama. If I'm not
3       mistaken, I think they either took up money
4       and sent flowers or they did both.
5                   (One-page letter, dated February 4,
6       2005, from Debra S. Foster to Ms. Cynthia
7       Ellison, marked as Defendant's Exhibit-11)
8                   MR. DODD:   Q.   Ms. Ellison, here
9       is No. 11.  If you can identify that,
10      please.
11          A.     Yes.  This is a letter Debra sent
12      me regarding Chris' investigation.
13          Q.     What was your reaction when you
14      received that?
15          A.     I felt like again the investigation
16      was geared more towards resolving the
17      situation for the person who had inflicted
18      harm and ill upon me.
19          Q.     What led you to that conclusion?
20          A.     Because Dr. Lawal had shared the
21      summary letter that was sent to Chris and
22      Chris was given the opportunity to have a
23      month to decide what he wanted to do and
24      then until the end of the summer to do it.
25      I had asked for a summary of my proceedings

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                          April 27, 2006

Page 222

1          of the meeting that I had with Lawal, Ritvo

2          and Faye and was denied.

3                    And again, the security issue.

4          She says nothing in here about providing

5          security.

6              Q.    Take a look at No. 1 again, if

7          you would, please, at your Exhibit B.

8              A.    Yes.

9              Q.    Is this the summary he said you

10         should have received?

11             A.    No.  I asked for a summary of the

12         meeting that took place with me, Faye, Ritvo

13         and Lawal.  Because in that meeting Ritvo

14         stated that he would not give me security.

15         That I was to call them if Chris arrived in

16         that meeting.  Bayo Lawal stated that he

17         would file civil litigation if nothing was

18         done to Chris in that meeting. That's the

19         summary I wanted.  I wanted a summary.

20             Q.    Please finish.

21             A.    I wanted a summary of what was

22         being said because I wasn't being provided

23         security and I wanted him to write that for

24         me, and he said he would not.

25             Q.    Does such a summary exist anywhere?

Cynthia Ellison                                    April 27, 2006

                                                    Page 223

1              A.     I have no idea.  I didn't get a
2         copy if it does exist.  I asked for a copy.
3              Q.     Do you know if anybody got a copy
4         of any such summary?
5              A.     Chris received a summary of his
6         meeting.
7              Q.     Is that what you are referring to?
8              A.     Exhibit B.
9              Q.     That's your Exhibit B.
10             A.     Well, B, Chris received a summary
11        of what happened in their meeting.  I was
12        simply asking for a summary of what happened
13        in my meeting.
14             Q.     Nobody took any adverse action
15        against you in that meeting, did they?
16                  MS. RODGERS:  Object to form.
17                  THE WITNESS:  I wanted on record
18        that I was refused security.  I wanted on
19        record that Bayo threatened to file civil
20        litigation.
21                  MR. DODD:  Q.  Look at Exhibit B
22        to Defendant's Exhibit 1 there.
23             A.     Okay.
24             Q.     That's where sanctions are imposed
25        against Chris Mahaffy by AUM, correct?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 224

1          A.     Yes.  This has nothing to do with

2     what I wanted from them.

3          Q.     It's completely different, isn't

4     it?

5          A.     I told them what I wanted was a

6     summary of my meeting.

7          Q.     They simply refused to do it,

8     right?

9          A.     Absolutely.

10         Q.     Did they give a summary to anybody

11    else?

12                MS. RODGERS:  Object to form.

13                THE WITNESS:  They were only

14    concerned with me and Chris.  So as far as

15    I'm concerned, the summaries would go to

16    Chris and to me because I filed the

17    complaint.

18                MR. DODD:  Q.  Neither Chris nor

19    you got a summary?

20                MS. RODGERS:  Object to form.

21                THE WITNESS:  Chris got this

22    summary.  I did not get one.

23                MR. DODD:  Q.  This is a summary

24    where he loses his Department Chair, right?

25         A.     Yes.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 225

1      Q.      And he loses three months of an

2   annual 12-month contract?

3      A.      Right.

4      Q.      Diversity training, right?

5      A.      I don't know if he went.  That's

6   what this says.

7      Q.      There are seven provisions,

8   punitive provisions in this summary, correct?

9              MS. RODGERS:  Object to form.

10             THE WITNESS:  I'm not talking

11  about the content for the summary.  I wasn't

12  concerned with Chris' summary. I was concerned

13  with my summary.

14             MR. DODD:  Q.  Did anybody get a

15  summary of the kind that you wanted?

16             MS. RODGERS:  Object to form.

17             THE WITNESS:  Chris Mahaffy.

18             MR. DODD:  Q.  You are referring

19  to Exhibit 1?

20      A.     I am referring to a written

21  statement of what happened in a document.

22      Q.     You just wanted a document, is

23  that right?

24             MS. RODGERS:  Object to form.

25             THE WITNESS:  I wanted a summary

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 226

1       document of my meeting.

2                   MR. DODD:  Q.  You didn't want to

3       be punished, did you?

4                   MS. RODGERS:  Object to form.

5                   THE WITNESS:  Punished for what?

6                   MR. DODD:  Exactly.

7                   MS. RODGERS:  Object to form.  You

8       don't have to answer that.

9                   MR. DODD:  Q.  Chris Mahaffy is

10      being punished, isn't he?

11                  MS. RODGERS:  Object to form.

12                  THE WITNESS:  By the University

13      because of his behavior.

14                  MR. DODD:  That is correct.

15          Q.      That is the behavior that you

16      complained about?

17          A.      Partially.

18                  (Two-page letter, dated February 9,

19      2005, Roger A. Ritvo, Ph.D. to Ms. Cynthia

20      Ellison, marked as Defendant's Exhibit-12)

21                  MR. DODD:  Ms. Ellison, here is

22      No. 12.  See if you can identify that,

23      please.

24          A.      Yes.

25          Q.      What is it?

Cynthia Ellison                                    April 27, 2006

Page 227

1          A.      It's a letter to me from Dr. Roger

2    Ritvo.

3          Q.      Do you recall receiving this?

4          A.      Yes, I do.

5          Q.      What was your reaction to it?

6          A.      I thought that, again, I was the

7    person that was being mistreated.  In my

8    letter -- and I go back to the same thing.

9    I asked for a summary.  In this letter he

10   says, I believe that -- let me look here for

11   just a minute.  It recaps some of the issues

12   I had raised in my letter about no security,

13   my being sent off Campus because they knew

14   Chris was going to be upset after they talked

15   with him.  Well, do you want me to read the

16   letter?

17         Q.      You don't need to read it.  I am

18   asking what your reaction was.

19         A.      Well, my reaction was that I was

20   still subjected to retaliation and an unsafe

21   environment.

22         Q.      You considered this letter to be

23   retaliatory?

24         A.      Not this -- well, let me see.

25   This letter, I believe and I felt, was sent

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 228

1       to me because, if I'm not mistaken, things

2       crossed in the mail.  My information that I

3       had seen an attorney or Bayo had told them

4       something and Ritvo wrote this letter saying

5       that Campus Police goes through Goodwyn Hall

6       three times a day, or something like that.

7       If that's in this one, I know that they

8       don't.  They come when we call them for a

9       situation. I felt like this was another

10      attempt to appease me.

11          Q.      That was written in your response

12      to your February 11th letter, wasn't it?

13          A.      It was.

14          Q.      Were you not interested in having

15      an escort to your vehicle?

16              MS. RODGERS:  Object to form.

17              THE WITNESS:  I was interested in

18      an escort to my vehicle.  Let me read this.

19      Can I just make my points as I go down

20      through this letter?

21              MR. DODD:  Q.  Sure.

22          A.      I still believed that Chris Mahaffy

23      posed a physical threat.

24          Q.      Do you recognize the possibility of

25      a disagreement on that issue?

Cynthia Ellison                                    April 27, 2006

Page 229

1          A.     Certainly there is a possibility of

2     disagreement on any issue.  While it may be

3     my word against the University's word, or

4     Debra Foster, it is not customary to have a

5     Campus Police Officer stand outside a door

6     when you are having a meeting when they are

7     having Disciplinary Committee Meetings with

8     students who might act out.  When you are

9     just asking about a regular meeting, that's

10    not customary.

11         Q.     Are you saying that Mahaffy was

12    not a physical threat?

13              MS. RODGERS:  Object to form.

14              THE WITNESS:  I am saying he is

15    -- I am saying because they put Campus Police

16    outside of Ritvo's office for a supposed get

17    together meeting to talk to Chris,  it was

18    not customary.  They wanted to make me

19    believe that every meeting they had it was

20    customary for the Campus Police to be outside

21    the offices and that was not the case.

22              MR. DODD:  Q.  Let me ask you

23    what the source of your knowledge is?

24         A.     I have been there for 20 years.

25    I have talked to different people.  I know

Cynthia Ellison                                April 27, 2006

Page 230

1    that.  Like I said, Officer Cox told me that

2    he was the one that asked to be stationed

3    outside that door that day.

4        Q.    How long has Ritvo been in that

5    position?

6        A.    I couldn't tell you the exact

7    number of years.

8        Q.    Do you know how many disciplinary

9    meetings he has had an officer outside?

10            MS. RODGERS:  Object to form.

11            THE WITNESS:  Usually, the

12   disciplinary meetings are in Chancellor's

13   Office.  If they changed that, then they

14   changed it.

15            MR. DODD:  Q.  Wherever the

16   location.

17       A.    I have no idea about it, but we

18   are not talking about Ritvo's area.  We were

19   talking about security from my area.  He was

20   saying that Campus Police patrolled Goodwyn

21   Hall three times, and they did not.

22       Q.    You have knowledge of that as

23   well?

24       A.    Well, I was at work over those

25   years.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 231

1        Q.      You were on the 3rd floor, right?

2        A.      Right.  They were patrolling.

3        Q.      You weren't on the second floor,

4    were you?

5        A.      No.

6                MS. RODGERS:  Object to form.

7                THE WITNESS:  No.

8                MR. DODD:  Q.  You weren't on the

9    first floor?

10       A.      I was on the third floor.  I

11   might add this was also the time that Debra

12   handed me -- during this period Debra had

13   handed me a letter saying talk to Ritvo.

14       Q.      Okay.  Had you made any demands at

15   that point?

16               MS. RODGERS:  Object to form.

17               THE WITNESS:  As I said, at the

18   same time that Debra said that the attorneys

19   wanted to know what I wanted, and I told her

20   at the time that I wanted mental anguish and

21   $250,000.  That's when she got up and left.

22   She came back and said, "I don't have

23   anything else to say to you."

24               MR. DODD:  Q.  Do you have any

25   further comments about this letter?

Cynthia Ellison                                    April 27, 2006

Page 232

1              A.     Should I have?

2              Q.     You said you were going to go down

3       through.   I am just wondering if you had

4       finished or not.

5              A.     I think my earlier comments cover

6       it.

7              Q.     I'm sorry.

8              A.     I think my earlier comments covers

9       it.

10             (One-page letter, dated February 9,

11      2005, from Bayo H. Lawal, Ph.D. to Ms.

12      Cynthia Ellison, marked as Defendant's Exhibit-

13      13)

14             MR. DODD:   This is Exhibit 13.

15             Q.     Ms. Ellison, look at Exhibit D to

16      your affidavit, please.

17             A.     Yes, sir.

18             Q.     You say, "I am no longer willing

19      to subject myself to an environment that is

20      potentially unsafe to me and others around

21      me."

22             A.     Yes.

23             Q.     Who are the "others" you are

24      referring?

25             A.     My student workers and other people

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                          April 27, 2006

                                              Page 233

1       who came in and out of the Dean's office.

2              Q.     To your knowledge, had any of them

3       been threatened by Mahaffy?

4              A.     I really think they had.

5              Q.     Do you know that for a fact?

6              A.     I think a couple of them said

7       something a couple of times.  I don't

8       remember exactly what they said.

9              Q.     You said, "I would also like to

10      discuss my plans concerning leave."  What is

11      that referring to?

12             A.     Yes.  I put my retirement date

13      April 1st, 2005.

14             Q.     Right.

15             A.     Because I looked in the system and

16      I had enough vacation leave to take it to

17      April 1st.

18             Q.     You just get a paycheck until

19      April 1st?

20             A.     Uh-huh.

21             MR. DODD:  Q.  Here is No. 13.

22             A.     I received this from Dr. Lawal.

23             Q.     You see in the first paragraph he

24      writes, "I know you have discussed your

25      intention to retire from AUM with me several

Cynthia Ellison                                    April 27, 2006

Page 234

1      times within the last five months, but each

2      time, I have tried to talk you out of it."

3          A.      Yes, I do.

4          Q.      I assume from your previous

5      testimony you feel that is not an accurate

6      statement?

7          A.      It is not an accurate statement.

8          Q.      Ms. Ellison, did you plan to give

9      Lawal -- strike that, please.

10              When did you decide that you were

11     going to retire effective April 1st?

12         A.      Well, I mean, like I told you

13     earlier, it was a combination of everything

14     that was going on.

15         Q.      When?

16         A.      When?

17         Q.      When.

18         A.      I think my letter is in here.

19         Q.      The notice is dated February 9th.

20     My question is, when did you decide to give

21     him that notice on February 9th?

22         A.      When he received the correspondence

23     from Julian McPhillips and he was beating on

24     his chest.  He said that I had done this to

25     him.  That I had destroyed his plans for

Cynthia Ellison                                      April 27, 2006

Page 235

1   filing a suit in the summer.  And I should

2   wait.  He started to change and retaliated

3   against me.  It was everything that was going

4   on.

5       Q.     If I were to tell you, or suggest

6   to you that he did not receive any

7   correspondence from Julian McPhillips until

8   after February the 10th, would that make you

9   want to rethink that answer?

10      A.     Well, I have said to you that my

11  dates were not exact.  I'm not sure.

12      Q.     I am trying to straighten it out

13  now, is what I am trying --

14      A.     Well, could you show me the

15  correspondence that he received from Julian

16  McPhillips and then I can answer the

17  question?

18      Q.     I don't have the letter, but I

19  have got what was in it.

20      A.     Well, I think I told you earlier

21  that when I spoke to Mr. McPhillips and

22  explained to him what was going on, he

23  advised me to leave AUM.  Now, I did what he

24  told me to do.  And if it were the 9th, I

25  took his advice.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                April 27, 2006

Page 236

1      Q.      When did you get that advice?

2              MS. RODGERS:  Object to form.

3              MR. DODD:  Q.  The first meeting

4      you had with him?

5      A.      I think it was -- well, I tell

6      you it was -- it wasn't the first meeting

7      because the first meeting is when I explained

8      to him what was happening to me.  It had to

9      be the second meeting.

10     Q.      Which was the day after you

11     resigned, right?

12             MS. RODGERS:  Object to form.

13             THE WITNESS:  I have no idea.

14             MR. DODD:  Q.  Would it be

15     accurate to say that you had decided to

16     retire, made up your mind to retire sometime

17     prior to February 9th when you returned and

18     gave Bayo Lawal the notice?

19             MS. RODGERS:  Object to form.

20             THE WITNESS:  It's fair to say

21     that after I sought Counsel and I sought

22     their advice, that's when I decided to

23     retire.

24             MR. DODD:  Q.  Was that before

25     February 9th?

Cynthia Ellison                                    April 27, 2006

Page 237

1          MS. RODGERS:  Object to form.

2          THE WITNESS:  I don't have a

3    calendar to refer to.  I really don't know.

4          MR. DODD:  Okay.

5          (Two-page e-mail, dated February

6    11, 2005, from Cynthia Ellison to Bayo Lawal,

7    marked as Defendant's Exhibit-14)

8          THE WITNESS:  Yes, sir.

9          MR. DODD:  Q.  What is that?

10   A.      This is my e-mail to Dr. Lawal, as

11   we discussed earlier, saying that I would

12   work through the 25th if I got -- if I was

13   provided Campus Police security.

14        Q.      You say if Campus security

15   patrolled at least once a day?

16        A.      Right.

17        Q.      Now, did you receive any

18   confirmation that the Campus Police would do

19   that?

20        A.      There were e-mails from Bayo to

21   Ritvo.  I believe they requested that they

22   walk-through.

23          MR. DODD:  Exhibit 15.

24          (Two-page document, dated February

25   7, 2005, entitled Application for Retirement,

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                        April 27, 2006

Page 238

1              marked as Defendant's Exhibit-15)

2                      MR. DODD:   Q.   Can you tell me

3      what that is?

4              A.      Application for Retirement.  It's

5      my Application for Retirement.

6              Q.      Do you remember when you completed

7      that?

8              A.      It's dated on 2-7-05.

9              Q.      That's your direct deposit

10     authorization for the Retirement Systems of

11     Alabama?

12             A.      Uh-huh.

13             Q.      Does that refresh your recollection

14     at all as to when you decided to go ahead

15     and retire?

16             A.      Not completely.  Because I was in

17     contact with HR because I really didn't know

18     what to do about paperwork or anything.   I

19     would have to know when I talked to Mr.

20     McPhillips.   If I talked to Mr. McPhillips

21     around that time, I don't know.

22             Q.      Do you know of any reason why you

23     would authorize a direct deposit for your

24     retirement income as of February 7th if you

25     hadn't decided to retire?

Cynthia Ellison                                    April 27, 2006

Page 239

1          A.    I was acting off of the advice of

2    my Counsel. He is the one that told me.

3          Q.    To retire?

4          A.    Yes.

5                MR. DODD:  Here is No. 16.

6                (One-page e-mail, dated February

7    12, 2005, from Bayo Lawal to Cynthia Ellison,

8    marked as Defendant's Exhibit-16)

9                MR. DODD:  Q.  Take a look,

10   please.

11         A.    Yes.

12         Q.    What is that?

13         A.    This is the e-mail from Dr. Lawal

14   concerning the shredding.

15         Q.    He sent it to you on Saturday

16   morning, February 12th, right?

17         A.    Yes.

18         Q.    Okay.  You see his last sentence

19   where he says, "I hope you kept a list of

20   all the shredded documents and that this list

21   was approved prior to shredding by the

22   University Archivist Jason Kneip."

23         A.    Kneip, yes.

24         Q.    Do you know Jason Kneip?

25         A.    No, but I e-mailed him that Monday

Cynthia Ellison                                        April 27, 2006

Page 240

1       morning.

2           Q.      Have you ever had any communication

3       with him?

4           A.      No.

5           Q.      Have you ever inventoried items you

6       shredded?

7           A.      I have not.

8           Q.      And you had never sought his prior

9       approval before shredding, have you?

10          A.      No, I had not.

11          Q.      You responded to this e-mail, did

12      you not?

13          A.      I did.

14                  MR. DODD:  Here is 17.

15                  (Two-page e-mail, dated February

16      14, 2005, from Cynthia Ellison to Bayo Lawal,

17      marked as Defendant's Exhibit-17)

18                  MR. DODD:  Q.  See if you can

19      identify that.

20          A.      Yes, I recognize this.  It's an

21      e-mail I sent to Dr. Lawal in response to

22      his e-mail to me about the shredding.

23          Q.      You sent it Monday morning at 8:07

24      a.m.?

25          A.      Yes.  That's what's on there.

Cynthia Ellison                                    April 27, 2006

Page 241

1          Q.      You seem to question whether he

2    thinks you are trustworthy or not, is that

3    right?

4          A.      Yes.

5          Q.      Why do you raise that issue?

6          A.      Because he had never questioned

7    anything that I had done.

8          Q.      Had he ever been confronted with

9    the quantity of shredding that you and your

10   helpers had done the previous Friday?

11         A.      Had I been confronted by him?

12         Q.      Did he --

13         A.      Had he, Dr. Lawal; been confronted

14   by whom?

15         Q.      Had he ever observed shredding of

16   the magnitude that you and the student

17   workers had done the previous Friday?

18                 MS. RODGERS:  Object to form.

19                 MR. DODD:  Q.  To your knowledge.

20         A.      I don't know.  There was quite a

21   few time sheets and payroll files that were

22   shredded.

23         Q.      Did you know that you were

24   supposed to seek prior approval and make

25   inventories of that stuff?

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 242

1          A.      We probably received that.  I know

2     I did probably receive that, but I had never

3     done it before.

4          Q.      Why did you suggest that Monday,

5     February 14th should be your last day?

6               MS. RODGERS:  Object to form

7     again.

8               THE WITNESS:  I think we have

9     already gone over what happened on the 14th.

10    Dr. Lawal's behavior and I was being

11    continually subjected to an unsafe environment.

12              MR. DODD:  Q.  In this e-mail you

13    refer to lack of trust, right, as a reason

14    why you shouldn't stay any longer?

15              MS. RODGERS:  Object to form.

16              THE WITNESS:  That was part of the

17    reason.

18              MR. DODD:  Q.  Is there any other

19    reason expressed in No. 17?

20         A.      Not in this letter e-mail.

21              MR. DODD:  Here is No. 18.

22              (One-page e-mail, dated February

23    14, 2004, from Cynthia Ellison to Jason Kneip

24    and Bayo Lawal, marked as Defendant's Exhibit-

25    18)

Cynthia Ellison                                    April 27, 2006

Page 243

1                    MR. DODD:   Q.   Tell me what that

2          is, if you can, please.

3                    A.      This is an e-mail to Jason Kneip

4          about the shredding that I had done.   Dr.

5          Lawal requested that I send him an e-mail and

6          let him know what I had shredded.

7                    Q.      Did Dr. Lawal tell you that

8          orally?

9                    A.      Yes.

10                   Q.      Is this the same day where he said

11         that he only wanted to communicate with you

12         by e-mail?

13                   A.      Right.

14                   MR. DODD:   Here is 19.

15                   (One-page e-mail, dated February

16         14, 2005, from Jason Kneip to Cynthia Ellison

17         and Bayo Lawal, marked as Defendant's Exhibit-

18         19)

19                   MR. DODD:   Q.   Tell me what that

20         is, please.

21                   A.      Yes.  This is from Jason Kneip

22         telling me that if I shred anything to submit

23         a list.

24                   Q.      Did you understand that was the

25         policy of the University once you received

Cynthia Ellison                                    April 27, 2006

Page 244

1    this e-mail?

2         A.    Yes.  I do think I will stand for

3    a minute.

4              MR. DODD:  Q.  Here is No. 20.

5              (One-page document, dated February

6    14, 2005, from Roger A. Ritvo, Ph.D. to

7    Cynthia Ellison, with carbon copies, marked as

8    Defendant's Exhibit-20)

9              MR. DODD:  Q.  Ms. Ellison, do

10   you recognize that?

11        A.    Yes, I received the request about

12   Campus Police. He said that "They do indeed

13   go through Goodwyn Hall on a regular basis,

14   hopefully three times a day." And I received

15   that on the 14th.

16        Q.    Had you sought confirmation from

17   Bayo Lawal or Roger Ritvo about the frequency

18   with which the police go through Goodwyn

19   Hall?

20        A.    I just asked for security.  I

21   didn't get into that.

22        Q.    You did say, though, that would

23   stay on and they would go through once a

24   day?

25        A.    I think that was in an e-mail.  I

Cynthia Ellison                                    April 27, 2006

Page 245

1          would like to say that it took them from the

2          time I requested it through February 14th to

3          comply.

4                    (One-page memorandum, dated February

5          14, 2005, from Cynthia Ellison to Bayo Lawal,

6          marked as Defendant's Exhibit-21)

7                    MR. DODD:  Q.  Exhibit 21.

8          A.    Yes.  This is an e-mail I left

9          with the attachment for Bayo for my leave

10         that would pay me up through the end of

11         March.

12         Q.    The leave slips and time sheets

13         referred to are yours going forward, right?

14         A.    That's correct.

15         Q.    You concluded by saying, "I can no

16         longer handle the retaliation that I am under

17         from Chris, others, and now you."

18         A.    Right.

19         Q.    Who are the "others"?

20         A.    I was referring to Debra Foster,

21         Chris Mahaffy, Ritvo.  The ones I felt had

22         retaliated against me.

23         Q.    For filing a complaint?

24         A.    Yes.

25                    (One-page document, dated February

Cynthia Ellison                                    April 27, 2006

Page 246

1    15, 2005, from Ms. Cynthia Ellison to Bayo

2    Lawal, marked as Defendant's Exhibit-22)

3                    MR. DODD:  Here is 22.

4        Q.    Can you identify that?

5        A.    Yes.

6        Q.    Did you receive that?

7        A.    I did.

8        Q.    Did you ever return the three tape

9    recorded Chair meetings -- strike that,

10   please.

11                   Did you ever submit the tapes of

12   the three Chairs meetings?

13       A.    I never -- it never left the

14   office.

15       Q.    It's still there?

16       A.    As far as I know.

17       Q.    Has Auburn University Montgomery

18   discriminated against you in any fashion other

19   than what we have discussed today?

20       A.    No.

21       Q.    Have you understood all of my

22   questions today that you have answered?

23       A.     Yes.  I think to the best of my

24   knowledge.

25       Q.    And to the best of your ability,

Cynthia Ellison                                April 27, 2006

Page 247

1          you answered my questions fully?

2               A.      To the best of my ability.

3               Q.      Do you wish to change anything?

4               A.      I can't remember back to 8:00

5          o'clock or 9:00 o'clock this morning.  Right

6          now at this time, no.

7               Q.      Do you wish to add anything, or

8          tell me anything you think I should know

9          about this case?

10              A.      No.  I can't think of anything

11         else right now.

12                      MR. DODD:  Thank you for your

13         time.

14                      THE WITNESS:  Thank you.

15                      (Whereupon, the proceedings

16         adjourned at 4:45 o'clock p.m.)

17                      .

18                      .

19                      .

20                      .

21                      .

22                      .

23                      .

24                      .

25                      .

Cynthia Ellison                                          April 27, 2006

Page 248

1                        DESCRIPTION OF DEFENDANTS EXHIBITS

2              EXHIBIT DESCRIPTION

3          1        Multi-page document, first page undated,

4                   entitled Charge of Discrimination

5          2        Three-page document, dated February 25,

6                   2004, e-mail from Cynthia Ellison to

7                   Joe Hill

8          3        One-page letter, dated March 1, 2004,

9                   letter from Cynthia Ellison to Guin

10                  Nance

11         4        One-page letter, dated March 2, 2004,

12                  from Guin A. Nance to Ms. Cynthia

13                  Ellison

14         5        One-page letter, dated March 22, 2004,

15                  from Debra S. Foster to Ms. Cynthia

16                  Ellison and Allison Stevens

17         6        Five-page document, dated March 31,

18                  2004, from Cynthia Ellison to Dr. Guin

19                  Nance

20         7        One-page letter, dated April 5, 2004,

21                  from Guin A. Nance to Ms. Cynthia

22                  Ellison

23         8        One-page letter, dated April 29, 2004,

24                  from Debra S. Foster to Cynthia Ellison

25

Cynthia Ellison                                    April 27, 2006

Page 249

1              DESCRIPTION OF DEFENDANTS EXHIBITS (CONT.)

2         EXHIBIT DESCRIPTION

3         9        One-page memorandum, dated December 2,

4                  2004, from Debra S. Foster to Cynthia

5                  Ellison

6         10       One-page memorandum, dated December 7,

7                  2004, from Cynthia Ellison to Dr. Bayo

8                  Lawal

9         11       One-page letter, dated February 4, 2005,

10                 from Debra S. Foster to Ms. Cynthia

11                 Ellison

12        12       Two-page letter, dated February 9, 2005,

13                 Roger A. Ritvo, Ph.D. to Ms. Cynthia

14                 Ellison

15        13       One-page letter, dated February 9, 2005,

16                 from Bayo H. Lawal, Ph.D. to Ms.

17                 Cynthia Ellison

18        14       Two-page e-mail, dated February 11,

19                 2005, from Cynthia Ellison to Bayo

20                 Lawal

21        15       Two-page document, dated February 7,

22                 2005, entitled Application for

23                 Retirement

24            .

25            .

Cynthia Ellison                                    April 27, 2006

Page 250

1                      DESCRIPTION OF DEFENDANTS EXHIBITS (CONT.)

2              EXHIBIT DESCRIPTION

3         16        One-page e-mail, dated February 12,
4                   2005, from Bayo Lawal to Cynthia
5                   Ellison

6         17        Two-page e-mail, dated February 14,
7                   2005, from Cynthia Ellison to Bayo
8                   Lawal

9         18        One-page e-mail, dated February 14,
10                  2004, from Cynthia Ellison to Jason
11                  Kneip and Bayo Lawal

12        19        One-page e-mail, dated February 14,
13                  2005, from Jason Kneip to Cynthia
14                  Ellison and Bayo Lawal

15        20        One-page document, dated February 14,
16                  2005, from Roger A. Ritvo, Ph.D. to
17                  Cynthia Ellison, with carbon copies

18        21        One-page memorandum, dated February 14,
19                  2005, from Cynthia Ellison to Bayo
20                  Lawal

21        22        One-page document, dated February 15,
22                  2005, from Ms. Cynthia Ellison to Bayo
23                  Lawal

24            .

25            .

Cynthia Ellison                                    April 27, 2006

Page 251

1                    CERTIFICATE OF COURT REPORTER.

2                    I, DAWN A. GOODMAN, do hereby

3        certify;

4                    That I am a Certified Shorthand

5        Reporter of the State of Alabama;

6                    That the foregoing pages are a

7        true and correct transcript of the Deposition

8        of Cynthia Ellison;

9                    I further certify that I am not

10       interested in the outcome of said matter nor

11       connected with or related to any of the

12       parties of said matter or to their respective

13       Counsel.

14                   Dated this 8th day of May, 2006,

15       at Prattville, Alabama.

16                   .

17                   _____

18                   DAWN A. GOODMAN, CSR

19                   State of Alabama

20                   .

21                   .

22                   .

23                   .

24                   .

25                   .

Cynthia Ellison                                          April 27, 2006

Page 252

1                          CAPTION

2              The Deposition of Cynthia Ellison,

3      taken in the matter, on the date, and at the

4      time and place set out on the title page

5      hereof.

6              It was requested that the deposition

7      be taken by the reporter and that same be

8      reduced to typewritten form.

9              It was agreed by and between counsel

10     and the parties that the Deponent will read

11     and sign the transcript of said deposition.

12                 .

13                 .

14                 .

15                 .

16                 .

17                 .

18                 .

19                 .

20                 .

21                 .

22                 .

23                 .

24                 .

25                 .

Cynthia Ellison                                    April 27, 2006

Page 253

1                          CERTIFICATE

2            STATE OF                        :

3            COUNTY/CITY OF                      :

4                  Before me, this day, personally

5            appeared, Cynthia Ellison, who, being duly

6            sworn, states that the foregoing transcript

7            of his/her Deposition, taken in the matter,

8            on the date, and at the time and place set

9            out on the title page hereof, constitutes a

10           true and accurate transcript of said

11           deposition.

12

13                          Cynthia Ellison

14                .

15             SUBSCRIBED and SWORN to before me this

16                day of              , 2006 in the

17           jurisdiction aforesaid.

18

19           My Commission Expires    Notary Public

20                .

21           No changes made to the Errata Sheet;

22           therefore, I am returning only this signed,

23           notarized certificate.

24           I am returning this signed, notarized

25           certificate and Errata Sheet with changes noted.

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                                    April 27, 2006

Page 254

1                      DEPOSITION ERRATA SHEET

2              .

3         RE:        Alexander Gallo & Associates

4         File No.    13898

5         Case Caption:    Cynthia Ellison vs. Auburn

6                         University Montgomery

7

8         Deponent:    Cynthia Ellison

9         Deposition Date: April 27, 2006

10              .

11        To the Reporter:

12        I have read the entire transcript of my

13        Deposition taken in the captioned matter or

14        the same has been read to me.  I request

15        that the following changes be entered upon

16        the record for the reasons indicated.  I

17        have signed my name to the Errata Sheet and

18        the appropriate Certificate and authorize you

19        to attach both to the original transcript.

20              .

21        Page No.    Line No.    Change to:

22

23        Reason for change:

24        Page No.    Line No.    Change to:

25

Cynthia Ellison                                          April 27, 2006

                                                        Page 255

1          Reason for change:

2          Page No.        Line No.        Change to:

3

4          Reason for change:

5          Page No.        Line No.        Change to:

6

7          Reason for change:

8          Page No.        Line No.        Change to:

9

10         Reason for change:

11         Deposition of Cynthia Ellison

12              .

13         Page No.        Line No.        Change to:

14

15         Reason for change:

16         Page No.        Line No.        Change to:

17

18         Reason for change:

19         Page No.        Line No.        Change to:

20

21         Reason for change:

22         Page No.        Line No.        Change to:

23

24         Reason for change:

25         Page No.        Line No.        Change to:

d1403afb-e7e9-42de-b323-57812dba67e5

Cynthia Ellison                          April 27, 2006

Page 256

1

2            Reason for change:

3        Page No.    Line No.    Change to:

4

5            Reason for change:

6            .

7            .

8        SIGNATURE:_____DATE:_____

9              Cynthia Ellison