UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

| | | |
|---|---|---|
| CYNTHIA ELLISON, | ) | |
| | ) | |
|    Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 2:05-CV-00902-MHT-DRB |
| AUBURN UNIVERSITY MONTGOMERY, | ) | |
| | ) | |
|    Defendant | ) | |

### DEFENDANT'S REPLY MEMORANDUM OF LAW
### IN SUPPORT OF SECOND MOTION FOR SUMMARY JUDGMENT

Defendant Auburn University Montgomery (AUM) submits its Reply Memorandum of Law further demonstrating its entitlement to judgment on Plaintiff's Title VII claims. As shown below, through her Response Brief, Plaintiff admits the accuracy and legitimacy of AUM's arguments made in its opening Memorandum of Law for its Second Motion for Summary Judgment, thereby negating any reasonable inference of discrimination in violation of Title VII and confirming AUM's entitlement to judgment.

Atlanta 1040910.1

## ARGUMENT

I.  The alleged racially offensive acts Plaintiff complains of were neither severe nor pervasive as a matter of law.

Plaintiff's brief focuses primarily on distinct and temporally distant alleged racially offensive incidents, returning to them again and again and again in an attempt to show through a repetitive and cumulative argument that she was subjected to a hostile work environment. But these incidents occurred years apart and years preceding her voluntary resignation from employment, and as a matter of law, they do not constitute a hostile work environment either by any objective standard or by any stretch of imagination. They include:

- The allegation that, sometime before December 2002, Professor Chris Mahaffy told her he had never seen a black person before coming to the U.S., and also showed her a photograph in a magazine from a distance, asked her what it was, and then laughed when she said "a monkey," showing her that the photograph was in fact a black man.

- The allegation that, in December 2003, a secretary, Allison Stevens, began to say the "N word" during an argument with Plaintiff; and

- The allegation that, at some unidentified time, Dr. Mahaffy wore a shirt that proclaimed self-disparagingly, "I'm a redneck."[1]

These allegations substantively fall far short of actionable environmental workplace hostility, and they are nullified by other circumstances, as well. The first and second allegations are time-barred under Title VII; the second allegation has nothing to do with Chris Mahaffy (it involves a coworker); and the third allegation concerns an innocuous, self-deprecating message no more racially insensitive than "I'm a grit," or "I'm a hick."

"Not every unpleasant workplace is a hostile environment. The occasional vulgar banter . . . of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is hellish." Dees v. Bob Evans Farms, Inc., No. 03-CV-850-DRH, 2005 U.S. Dist. LEXIS 14082 at *13 (S.D. Ill., July 5, 2005) (citing Baskerville v. Cullingan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)).

The frequency of the conduct is one of the most important considerations in the analysis of a hostile work environment. See, e.g., McCray v. DPC Indus., Inc., 942 F. Supp. 288, 292 (E.D. Tex. 1996)(summary judgment granted where the plaintiff alleged that, over the course of a year, a co-worker once called him

---

[1] "Redneck," of course, is a slang expression for disparaging white rural laborers or

"nigger," that his supervisor several times referred to him as "son," once told a racist joke, and made disparaging remarks about Malcolm X and Martin Luther King, Jr.); Collier v. City of Opelika, 374 F. Supp. 2d 1098 (M.D. Ala. 2004)(two instances of alleged misconduct over the course of a year insufficient to create a hostile environment).  Where conduct is boorish and offensive, but occurs sporadically, summary judgment is appropriate.  See Shepherd v. Comptroller of Public Accounts of the State of Texas, 168 F.3d 871, 874 (5th Cir. 1999) (a handful of incidents spanning two years did not allege conduct sufficiently severe to support a Title VII claim); Arroyo v. Westlab Admin., Inc., No. 99-7942, 2000 U.S. App. LEXIS 9528 at *6 (2d Cir. May 9, 2000)("essentially three incidents of racial animosity by a co-worker spanning over 25 months" did not raise a triable issue of hostile work environment harassment).

These incidents, which occurred over the course of at least two (and perhaps three) years, cannot form the basis of a hostile work environment claim. Plaintiff points the Court to no authority (because there is none) finding a hostile work environment based on such isolated, unrelated, and flimsy accusations and events.  As a matter of law, they do not meet the objective standard for severity and pervasiveness that will impute liability to the employer.

---

farmers.

II.    Mahaffy's offensive conduct was not because of Plaintiff's race.

Plaintiff contends that, toward the end of her employment, Dr. Mahaffy began engaging in more troublesome behavior. Gratuitously assuming that this odd behavior had been severe enough to create a hostile work environment in the first place, Plaintiff's own words show that any hostility was not based on race, which is a prerequisite for a claim of racial harassment. Her own Brief establishes that Dr. Mahaffy's changed behavior originated in the decision by the selection committee that he would not be Dean of the School of Sciences:

> During the first Dean search in 2003, after Dr. Mahaffy had not made the short list to become Dean, Dr. Mahaffy would be sitting at Plaintiff's desk crying or just sitting there, which happened seven days in a row. Dep. 70. Dr. Mahaffy would be making comments about what he could do if he were Dean, and appeared to be unstabled. [sic] Dep. 70. As a result, Plaintiff Ellison reported it in writing, after speaking to Faye Ward in HR. Dep. 70-71. Dr. Mahaffy came to Plaintiff Ellison and told Ellison that he, Dr. Mahaffy thought Plaintiff Ellison had something to do with him not being selected as Dean. Dep. 72. Dr. Mahaffy's countenance was different, his hygiene was not intact, he was unshaved. Dep. 72-73. Dr. Mahaffy said he couldn't sleep at night and that he had to come to the office at 4:00 o'clock in the morning, which he did and was sitting in Plaintiff Ellison's chair waiting on her. Dep. 73.
>
> Ellison said this occurred twice, the first time was in the dark, Plaintiff Ellison unlocked her office, flipped on the light and Dr. Mahaffy was sitting in her seat. Dep. 73. Plaintiff Ellison reported this incident to Brad Moody and to Glen Ray, who was the Associate Dean and to HR (Human Resources). Dep. 74.

(Dkt. 37, Pages 9-10).

5

Plaintiff continues to insist that AUM retaliated against her because she complained about Dr. Mahaffy's inappropriate conduct. The above-quoted selection from her own Brief, however, establishes that her written complaint (given on December 3, 2004 at the request of Roger Ritvo, Vice Chancellor for Academic and Student Affairs) was about Dr. Mahaffy's strange behavior following the selection of another candidate as Dean.

Although the opinions of Plaintiff's daughter, Courtnei Ellison, found on Page 24 of her Brief, are inadmissible hearsay,[2] they also demonstrate and confirm the fundamental flaw of Plaintiff's claim: Courtnei "stated that after Chris Mahaffy did not receive the Deanship, his mental state changed, he was angry." (Dkt. 37, Page 24). Clearly, the impetus for the "change" in Dr. Mahaffy's "mental state" was not Plaintiff's race – which had been the same for the two decades she worked with Dr. Mahaffy. The catalyst for his anger was Plaintiff's role on the selection committee that chose Dr. Bayo Lawal for the deanship Dr. Mahaffy sought.

---

[2] It appears that, with one exception when she claims to have been present while Dr. Mahaffy was in her mother's work area, Courtnei Ellison merely recites what "Plaintiff Ellison would come home and tell her. . . ." Inadmissible hearsay cannot be considered on a motion for summary judgment. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999). For the same reason, the substance of many of the other depositions and affidavits attached to Plaintiff's brief are also admissible. In particular, her pastor, Keith

"[H]arassment is not a free-standing tort; instead, it becomes actionable only if the harassment is motivated by the [race] of the victim." Hudson v. Norfolk Southern Ry. Co., 209 F. Supp. 2d 1301, 1317 (N.D. Ga. 2001). Personal animosity is not the equivalent of race discrimination and is not proscribed by Title VII. See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984). Plaintiff "cannot turn a personal feud into a [race] discrimination case by accusation." McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir. 1986).

If Plaintiff's allegations are taken as true, it appears that Dr. Mahaffy resented her because he believed she did not support his application for the deanship. A "personal vendetta . . . because of events that transpired in the past," however, has no bearing on "whether [race] was a determining factor" in Dr. Mahaffy's treatment of Plaintiff. Dale v. Chicago Tribune Co., 797 F.2d 458, 465 (7th Cir. 1986).

III. Even if everything Plaintiff claimed about Stevens and Mahaffy were true, AUM's prompt remedial action stopped any inappropriate conduct.

As noted above, Plaintiff alleges that Ms. Stevens began to say (but did not complete) the "N word" during an argument with Plaintiff in December 2003. Stevens denied using the word, and not one of the three witnesses present

---

Ellison, was not present for any event at issue here; he merely heard of the events as

7

during the confrontation supported Plaintiff's allegation. AUM's Human Resources Department interviewed student workers Dale Wynne and Nikki Gibson and math professor Yafang Song. The witnesses confirmed that there was a heated confrontation between Plaintiff and Ms. Stevens, but not one witness stated that Ms. Stevens used the "N word," or even began to say it.

Nevertheless, AUM gave Ms. Stevens a stern warning, telling her that any future similar conduct would result in discipline up to and including termination. Plaintiff never complained about Ms. Stevens again. Plaintiff continues to focus on the allegation that Ms. Stevens began to use the "N word," without acknowledging that AUM effectively stopped any improper conduct that may have occurred. AUM's success in terminating all undesirable interactions between Plaintiff and Allison Stevens is irrefutable proof that its actions were prompt, remedial, and effective.

It is not even clear what Plaintiff's continuing complaint is. To the extent that she believes AUM should have taken more extreme measures against Ms. Stevens, Title VII requires only that the employer "take steps reasonably likely to stop the harassment." Saxton v. American Telephone & Telegraph Co., 10 F.3d 526, 535 (7th Cir. 1992). That is precisely what AUM did. "Title VII does not require

---

they were told to him by Plaintiff.

that an employer use the most serious sanction available to punish an offender . . . ." Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992). In determining whether the employer took prompt, remedial action, the analysis focuses on whether the employer took action that would safeguard against any recurrence of harassment. Here, it is undisputed that the alleged harassment stopped once Plaintiff reported Ms. Stevens to the Human Resources Department, and there was no recurrence. See Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1315 (11th Cir. 1989). There can be no genuine dispute that AUM's remedial actions were prompt and effective. There is no evidence to the contrary.

Similarly, AUM acted swiftly to correct Dr. Mahaffy's conduct as soon as Plaintiff reported it. Although Plaintiff's complaints focused on Dr. Mahaffy's disappointment at not being selected Dean (not on any race-based animus), AUM nonetheless took her complaints seriously. As Plaintiff states on Page 10 of her Brief, Dr. Mahaffy was urged to see a psychiatrist or psychologist. He was stripped of his Department Head status and ordered to attend training sessions. Plaintiff admits on Page 8 of her Brief that he "did not make any racial remarks after December 3, 2004."

Plaintiff's Complaint that she was "treated differently than Chris, who had one month to decide what he wanted to do" is frivolous. AUM disciplined him,

not her; they are not similarly situated under Title VII. She does not and cannot contend that part of AUM's disciplinary response, in requiring Dr. Mahaffy to attend a training program of his selection (subject to approval by Dr. Ritvo), was ineffective in stopping any improper conduct. AUM investigated Plaintiff's complaints, and the only thing she claims Dr. Mahaffy did after December 3, 2004 was "intimidat[e] her by coming to her office." (Plaintiff's Brief, Page 38). Dr. Mahaffy, however, could scarcely avoid coming into his Dean's Office in the School of Sciences so long as AUM employed him as a professor in the School of Sciences; Title VII does not require that an employer fire a harasser. Davis v. Tri-State Mack Distribs., Inc., 981 F.2d 340, 343 (8th Cir. 1992). Plaintiff's partisan dissatisfaction with AUM's chosen remedy does not establish that the remedy was ineffective. The law does not require the imprimatur of the complainant before a remedy can be found appropriate, and a remedy is necessarily appropriate if, like here, it stops the conduct complained of.

IV.  Plaintiff's belated complaints about gender issues are untimely and irrelevant.

At this late date in the proceedings, Plaintiff has elected to pepper her Brief with what appear to be claims of gender discrimination. She states, for example, that Dr. Lawal told her he was "upset" because "you don't talk back to men." (Plaintiff's Brief, Page 16). She further contends that Dr. Lawal said he didn't

10

Atlanta 1040910.1

want "a woman assistant, black or white." (Id.)  She quotes the rank hearsay of her pastor, Keith Ellison, who "testified that Bayo Lawal, who was from Nigeria, wanted her to be a slave, get my coffee, get my coffee, get my doughnuts, do what I say do and don't ask me any questions." (Id. at 23).

The law prohibits Plaintiff from maintaining claims of sex bias.  She filed no EEOC charge against AUM alleging sex discrimination;  she filed no complaint alleging sex bias;  she did not mention it in her deposition or in any other discovery response;  and Plaintiff did not raise the issue at all in this lawsuit until she filed her Brief.  Title VII prohibits this practice.

"A Title VII lawsuit following the EEOC charge is limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations[,] and at a minimum, the Title VII claim must arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination."  Marshall v. James, 276 F. Supp. 2d 41, 52-53 (D.D.C. 2003).  "The administrative charge requirement is not intended to impose a heavy, technical burden on complainants, but it provides the employer with notice of the claim and narrows the issues."  Id. at 49.

Allegations outside the scope of the EEOC charge circumscribe the EEOC's investigatory and conciliatory role, and for that reason are not allowed. Kells v.

11

Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 836 (8th Cir. 2000).  Accordingly, gender claims not raised in the EEOC charge but brought in a subsequent lawsuit should be disallowed, because gender discrimination is "in no way like or reasonably related to the race discrimination allegations contained in [Plaintiff's] administrative charge."  Mathews v. St. Louis Univ., No. 4:05CV1488 JCH, 2006 U.S. Dist. LEXIS 3790 at *6 (E.D. Mo., Feb. 1, 2006).

Plaintiff's allegations regarding any alleged gender discrimination are untimely and irrelevant, and they should not be considered in evaluating her claims of race discrimination.  The only significance this type of behavior has in this lawsuit is in showing that Plaintiff and her witnesses truly believe that Bayo Lawal allegedly treated Plaintiff with a lack of respect in February 2005 not out of retaliation, but because of cultural differences between an African man and an American woman.  Although that substantive claim now is fatally tardy and legally foreclosed, the facts that Plaintiff asserts nonetheless demonstrate the lack of merit in Plaintiff's retaliation claim.

V.   Plaintiff departed precipitously in a snit because Dr. Lawal was understandably angry about her shredding of documents in violation of University policy, for which she had no rational explanation or excuse.

Plaintiff alleges on Page 4 of her Brief she was "forced to leave, on February 14, 2005 because her supervisor, Dean Bayo Lawal, had acted so

12

indignant about the shredding of documents, which were old time sheets, pay schedules, and grade sheets." While AUM does not agree that Plaintiff was "forced to leave" at any time, it agrees that Plaintiff precipitated the dispute on February 14 by shredding University documents in violation of AUM policy and Alabama state law.[3] The affidavits submitted by Plaintiff only bolster AUM's contention that any frustration Dr. Lawal expressed toward Plaintiff was because she broke the University's rules and perhaps state law regarding document shredding. Her own witnesses focus, not on the alleged security issues she raised with regard to Dr. Mahaffy, but on Dr. Lawal's alarm that Plaintiff had shredded documents without the permission of the University archivist.

Plaintiff, by her own admission, did not leave[4] because of concerns about her security or because she believed AUM did not adequately protect her. AUM made proper security arrangements and assured Plaintiff it was taking her complaints about Chris Mahaffy seriously. Plaintiff left not because of security,

---

[3] See Exhibit CC to AUM's Memorandum of Law in Support of its Second Motion for Summary Judgment, in which University archivist Jason Kneip informed Plaintiff in an e-mail that the University is "required by the state of Alabama to maintain records of what is destroyed, and to ensure that the records are not disposed before they are supposed to be."

[4] Plaintiff also repeatedly pleads that AUM forced her to give notice of retirement on February 9, 2005, but it is clear that this contention is just a gloss put on a calculated decision, having nothing to do with any supposed harassment or retaliation. The fact remains that AUM did everything the law requires after receiving notice that Plaintiff felt bothered. No reasonable person would resign or retire under these circumstances.

13

but because she perceived Dr. Lawal as being "indignant about the shredding of documents," and she departed in huff about that.

VI.  Plaintiff has not contested AUM's Statement of Material Facts as to Which There is No Genuine Issue to be Tried.

In support of its Second Motion for Summary Judgment, AUM submitted its Statement of Material Facts as to Which There is No Genuine Issue to be Tried. (Dkt. 30).  AUM included 45 material facts, supporting each with a citation to record evidence.  Plaintiff has completely failed to address them, including such dispositive facts as Number 3 ("Plaintiff had known Professor Chris Mahaffy (who is Irish and white) for about 20 years, and she had never had a problem with him until he was not selected as Dean of the School of Sciences").

Plaintiff's brief merely repeats the allegations of her Complaint, and that is insufficient to resist summary judgment.  AUM has shown that, taking all her allegations as true, the alleged harassment she complained of was not severe and pervasive, was not based on race, and was promptly and effectively addressed when she brought it to the attention of University officials.  As the hostile environment claim fails, so fail Plaintiff's derivative claims of retaliation and "constructive retirement," which also fail independently for the reasons AUM previously presented.   AUM is entitled to summary judgment.

## CONCLUSION

For the preceding reasons, AUM requests that the Court grant its motion for summary judgment as to all of Plaintiff's claims.

AUBURN UNIVERSITY MONTGOMERY

s/Burton F. Dodd
Burton F. Dodd

Georgia Bar No. 223880
bdodd@laborlawyers.com

FISHER & PHILLIPS LLP
945 East Paces Ferry Road
Suite 1500
Atlanta, Georgia 30326
(404) 231-1400 (Voice)
(404) 240-4249 (Facsimile)

16

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

| | |
|---|---|
| CYNTHIA ELLISON, ) | |
| ) | |
|    Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 2:05-CV-00902-MHT-DRB |
| AUBURN UNIVERSITY ) | |
| MONTGOMERY, ) | |
| ) | |
|    Defendant ) | |

## CERTIFICATE OF SERVICE

I certify that, on September 22, 2006, I electronically filed Defendant's Reply Memorandum of Law in Support of Second Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

    Karen Sampson Rodgers
    karensrodgers@email.com

                                    s/ Burton F. Dodd
                                    Burton F. Dodd

Atlanta 1040910.1