IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| CYNTHIA ELLISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:05cv902-MHT |
| | ) | |
| AUBURN UNIVERSITY | ) | |
| MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON PRETRIAL

A pretrial hearing was held in this case on October 19, 2006, wherein the following proceedings were held and actions taken:

### 1. PARTIES AND TRIAL COUNSEL:

**Karen Sampson Rodgers, Esq.**     Attorney for Plaintiff
459 South McDonough Street
Montgomery, Alabama 30326
(334) 262-6481 (telephone)
(334) 262-6482 (facsimile)
karensrodgers@email.com

**Burton F. Dodd, Esq.**     Attorney for Defendant
FISHER & PHILLIPS, LLP
945 East Paces Ferry Road, Suite 1500
Atlanta, Georgia 30326
(404) 231-1400 (Voice)
(404) 240-4249 (Facsimile)
bdodd@laborlawyers.com

**COUNSEL APPEARING AT PRETRIAL HEARING:**   Same as trial counsel listed   above.

## 2. JURISDICTION & VENUE

Plaintiff, Cynthia Ellison, (hereinafter referred to as "Plaintiff"), and by and through her counsel, institutes these proceedings, and invokes the jurisdiction of this Court pursuant to applicable laws under 28 U.S.C. § 1331 and 1334 (a)(4), as an action arising under the Act of Congress known as Title VII of the **Civil Rights Act of 1964,** as amended, 42 U.S.C. § 2000(e) et seq.), as amended by  the 1991 Civil Rights Act, 42 U.S.C. § 1981a, 42 U.S.C. §1981; to provide injunctive relief,  the costs of suit, including reasonable attorneys fees, back pay, compensatory and punitive damages, and all other or different relief the Court may deem appropriate and necessary for the Plaintiff's suffering due to her race and retaliation, which led to a hostile work environment and constructive discharge.   The unlawful employment practices which are alleged herein were committed in the county of Montgomery in the Middle District of Alabama.  Since Defendant's place of business is located in Montgomery, Alabama, venue is also appropriate in the Middle District of Alabama, Northern Division.

2

**PLEADINGS:   The following pleadings and amendments were allowed:**

3.  On or about February 11, 2005, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Defendant, Auburn University Montgomery.   The EEOC issued Plaintiff a "Notice of Right  to Sue" on July 7, 2005, which was received by Plaintiff Ellison on or about July 9, 2005.   Plaintiff satisfied the requirements to initiate the lawsuit within ninety (90) days of her receipt of that "Notice of Right to Sue" letter.   42 U.S.C. § 2000e-5(f)(1).   A complaint was filed in federal court on September 21, 2005.   An Answer was filed by Defendants on October 20, 2005 and an Amended Answer filed on February 28, 2006.

4.  Contentions of the Parties:

**PLAINTIFF'S CONTENTIONS**

1.     Plaintiff Ellison was discriminated against due to her African American race in violation of Title VII of the Civil Rights Act of 1964, as amended Section 2000(e), et, seq. And the1991Civil Rights Act, 42, U.S. C. §1981a, 42 U.S.C. §1981. Plaintiff Ellison, an African American female was qualified for her position, she was in the protected class,

**3**

she suffered adverse employment action (racial remarks and differences of treatment – **Plaintiff Ellison and Dr. Bayo Lawal of African descent would not get the cooperation of faculty because they were Black, "I am a redneck", t-shirt, Dr. Lawal saying, he did not want a woman assistant,BLACK or WHITE)**, and no other Caucasian female, was subjected to the same. Thus, Plaintiff Ellison was treated differently because of her race. The Supreme Court has held that reference to the states' immunity from suit as Eleventh Amendment immunity is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited y the Eleventh Amendment. <u>Alden v. Maine,</u> 527 U.S. 706, 713 (1999). The limits on this sovereign immunity include:

a. Claims for which the states have consented to suit.

b.      Possibly, situation in which states manipulate their immunity in a systemic fashion to discriminate against federal causes of action. <u>Aldem</u>

Defendants waived its consent, whereas the Defendants Answered the Complaint and filed an Amended Complaint, performed discovery in the form of depositions, interrogatories, admissions, and

**4**

production of documents.  The Defendants AUM attempts to hide under Section 1981 in order to manipulate their immunity and discriminate against federal causes of actions, such as, race. Therefore, additional protections against unlawful discrimination in employment is needed by the court to safeguard Plaintiff Ellison.

2.    Plaintiff Ellison was retaliated against in violation of Title VII of the Civil Rights At of 1964, as amended.  Plaintiff Ellison engaged in statutorily protected expression by filing a claim of discrimination with AUM and the EEOC, as a result she suffered an adverse employment action, whereas she could no longer perform her job duties, her worked was heavily scrutinized, her job duties taken from her, Dr. Mahaffy came to her desk and stared at Plaintiff intimidating and frightening her, she was not provided security, and given a frivolous reprimand for shredding documents that had been shredded for years at AUM, etc.    The University was aware because of Plaintiff's in-house discrimination filing and her filing with the EEOC. Also, a letter was provided to Dr. Lawal from Plaintiff's attorney.

3. Plaintiff Ellison was subjected to a hostile work environment in violation of Title VII  of  the Civil Rights Act of 1964, as amended.

Plaintiff Ellison, a member of a protected group African American female was subjected to numerous frightening stares, from Dr. Mahaffy, who wore scull hats,coats and carried a  black bag,  subjected  to surprise dark room visitations by Dr. Mahaffy, who had been seen by a psychiatrist, sitting at her desk, racial comments, and denied security. Plaintiff became afraid and nervous for her life, which affected her term or condition of employment and Dr. Lawal and the University is liable.  "When the workplace is permeated with "discriminatory intimidation, ridicule, and insult' that is sufficiently severe or evasive to alter the conditions of the victim's employment and create an abusive working environment, 'Title VII is violated.") <u>Harris v. Forklift,</u> and <u>Edwards v.Wallace.</u>  Also, Plaintiff's work environment made even more danagerous, whereas Plaintiff was sitting in a cubicle and could not see,who was coming in without standing up.  Plaintiff Ellison also suffered from rheumatoid arthritis, which limited her physical movement. There was no parking lot for parking near Goodwyn Hall and Plaintiff had to park at the gym until the last twelve months of her employment.  Thus, Plaintiff was subjected to a hostile work environment.   AUM did not provide prompt remedial action, as noted in Faye Ward's deposition, whereas Ward testified that the Human Resources Director, stated that Cynthia Ellison wan not going to mess up her

**6**

holiday.

> 4. Plaintiff Ellison was subjected to a constructive discharge in violation of Title VI
>
> of the Civil Rights Act of 1964. Plaintiff Ellison continued to ask for security to protect herself from Dr. Mahaffy, whereas none was give, Dr. Lawal became indignant and did not want Plaintiff Ellison to work, he had done a 360 degree turn and told Plaintiff he did not want her to talk to him, which is a crucial part in a work environment, where she was the Dean's assistant. Her job duties were taken from her and she was forced from her employment with Defendant. Testimony from others included Dr. Lawal, himself, clearly showed that Plaintiff was not planning on retiring at the time.

## PLAINTIFF'S LIST OF DOUMENTSAND TRIAL EXHIBITS FOR STIPULATION AS TO <u>ADMISSIBILITY WITHOUT FURTHER PROOF</u>

Plaintiff Ellison submits the following list of documentas and trial exhibits for pretrial submission of admissibility without further proof:

1. Deposition of Cynthia Ellison

2. January 25, 2005, Memorandum from Bayo Lawal to School of Sceinces

3.  February 9, 2005, Memorandum from Cynthia Ellison to Bayo Lawal

4.  February 11, 2005 Memo  from Cynthia Ellison to Baya Lawal

5.  February 14, 2005, Memorandum from Cynthia Ellison to Bayo Lawal

6.  December 3, 2004, Memorandum to Dr. Roger Ritvo, Vice Chancellor for Academic and Student Affairs, from Cynthia Ellison

7.  February 7, 2005 Letter from Cynthia Ellison to Debra Foster

8.  February 10, 2005 letter from Julian McPhillips to Dean Lawal and Dr. Ritvo

9.  February 10. 2005 Letter to Donald Burris, EEO

10.     Plaintiff Ellison's Charge of Discrimination and attachments thereto

11.     December 3, 2004, Letter from Dr. Lawal to Dr.Roger Ritvo

12.     January 27, 2005, Memorandum to Dr. Guin Nance from Debra Foster

13.     Declaration of Brandy Holmes

14.     Affidavit of Brandy Holmes, February 14, 2005

15.     Declaration of Marquita Snow

16.     Affidavit of Marquita Snow, February 14, 2005

17.     Affidavit of Marquita Snow,April 21, 2006

18.     Affidavit of Amelia Benn, February 14, 2005

8

19.     Affidavit of Amelia Benn, April 24, 2006

20.     Affidavit of Darolyn Gibson, February 14, 2005

21.     Affidavit of Darolyn (Nikki) Gibson, April 21, 2006

22.     Deposition of Courtnei Ellison, June 14, 2006

23.     Deposition of Keith Ellison

24.     Declaration of Bayo Lawal

25.     February 9, 2005 from Dr. Lawal to Cynthia Ellison

26.     Deposition of Faye Ward

27.     Affidavit of Faye Ward

28.     Changes of Current Assignment

29.     Earnings and Benefits Statements

30.     Order of Discharge

31.     June14, 2005 – Annual Leave and time sheet

32.     Dismissal and Notice of Rights

33.     Letter from Faye Ward

34.     AUM EEO Policy

35.     AUM No Harassment Policy

36.     E-mail, Cynthia Ellison to Joe Hill Nance and back 2/24-25/04

37.     E-mail, Cynthia Ellison to Guin Nance, 3/1/04

38.     Letter, Guin Nacneto Cynthia Ellison,3/2/2004

39.     Application for Retirement, Teachers' Retirement Systems of Alabama, Cynthia Ellison 2/11/2005

## DEFENDANT'S CONTENTIONS

Plaintiff Cynthia Ellison brings employment related claims against Defendant Auburn University Montgomery (AUM) under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  AUM has moved the Court for summary judgment on all claims.

## Section 1981

As to Plaintiff's claims under § 1981, Plaintiff cannot prevail as a matter of law because AUM enjoys sovereign immunity under the eleventh amendment to the Constitution.  Because AUM is a constitutionally-created instrumentality of the State of Alabama, and because as a matter of state constitutional law AUM cannot consent to this lawsuit, the eleventh amendment grants AUM immunity from private actions in federal courts seeking relief under § 1981.

## Title VII

Plaintiff's myriad Title VII claims fail for various factual and legal shortcomings, which all translate into the common reason for failure that Plaintiff cannot prove one or more required elements of each claim.  The encounters at AUM which Plaintiff either points to as evidence of racial bias or otherwise asserts constitute unlawful employment practices under Title VII either occurred far beyond the temporal reach

of Title VII, or are factually or legally inadequate to be actionable.

## Factual Summary

Plaintiff, a secretary to the Dean of the School of Sciences at AUM, complained internally on December 3, 2004 that a Department Chairman, Chris Mahaffy, had behaved inappropriately toward her after AUM did not select him as Dean. Plaintiff had served on the selection committee that recommended another candidate, Dr. Bayo Lawal, for Dean. Although Plaintiff and Mahaffy had worked together for almost two decades, his behavior toward her changed after the selection committee did not interview him for the position. AUM investigated Plaintiff's complaint in December 2004 and January 2005, determined that Mahaffy had engaged in inappropriate behavior, and acted promptly on January 31 to strip Mahaffy of his department chairmanship and to impose other disciplinary measures on him. On February 9, Plaintiff gave notice of her retirement from AUM, and on February 11 she filed the EEOC Charge that prompted this case.

Also on February 11, Plaintiff shredded several bags' worth of student documents. The Dean of the School of Sciences wrote to her in an e-mail, saying he was "shocked" at this breach of AUM's protocol, which, in accordance with Alabama law, requires approval from the University archivist before shredding. Plaintiff, asserting that the Dean no longer trusted her, decided to make her departure via retirement from AUM immediate, and she left on Monday, February 14 and never returned.

### Statute Of Limitations

Title VII bars forever Plaintiff's claims and assertions existing before August 15, 2004, which is 180 days preceding February 11, 2005, when she filed her charge.

### No Disparate Treatment

Plaintiff cannot establish a single situation in which she was treated differently than another person based on her race.

Plaintiff complains that, when the University investigated Barbara Ware's complaint against her, and her own complaint against Mahaffy, she did not receive the same letters that Ware and Mahaffy received at the conclusion of those investigations.  She asserts no factual or legal basis for claiming entitlement to AUM's communications with other employees, and in fact Plaintiff was not entitled to these documents.  Moreover, Plaintiff cannot show that any similarly-situated white employee was treated preferentially or differently under similar circumstances.  Thus, no inference of bias arises.

Indeed, Plaintiff was not even similarly situated to these persons.  Ware complained about Plaintiff, and Plaintiff complained about Mahaffy.  In each situation Plaintiff was, by definition, *not* similarly situated to the other person involved.  In neither the Ware complaint nor Plaintiff's complaint against Mahaffy did AUM give the respective parties copies of the disciplinary or other documents provided to the other.  That is identical--not dissimilar--treatment.  And Plaintiff, as the complaining

party with respect to Mahaffy, received no less than Ware received as the complaining employee with respect to her.

## No Retaliation

Plaintiff did not file her EEOC Charge until February 11, after the various events occurred that she has identified as retaliatory, as well as after deciding to retire and giving notice of her retirement on February 9. She cannot state a case for retaliation under the Participation Clause for anything that happened prior to February 11, 2005, which was a Friday.  The only thing of significance that happened after February 11 was Dean Lawal's discovery on Saturday that Plaintiff had shredded documents, and it turned out that she had shredded them improperly. Thus, Dean Lawal's reaction as Plaintiff's supervisor to her unauthorized conduct was justified. She then claimed that he did not trust her, and she left in a huff at about noon on Monday, February 14, never to return.

Plaintiff's current race claims are both objectively unreasonable and subjectively untrue. Plaintiff cannot show that she was engaged in protected activity for purposes of establishing a *prima facie* claim of retaliation.  No reasonable person would believe that Plaintiff was complaining to AUM officials about *racial* harassment, as opposed to harassment because Mahaffy was not selected as Dean. Plaintiff's own words establish even if she could prove Mahaffy "targeted her," his motive was the missed deanship opportunity, not her race.  Plaintiff's current race retaliation claims are not objectively reasonable.

**13**

## No Adverse Employment Action

Plaintiff has not shown that she suffered any adverse employment action, and therefore she necessarily cannot establish the causation prong of any Title VII claim. AUM never demoted Plaintiff, and she never suffered a loss in pay. To the contrary, AUM promoted her from time to time, and she regularly earned raises in pay. She retired from her job, and the conditions under which she resigned do not constitute constructive discharge under any analysis.

The things Plaintiff claims constitute retaliation are vague and petty. She claims that Lawal "changed" after the meeting with Mahaffy on January 31, 2005, but she does not state what Lawal did or said that could possibly have constituted retaliation.

It is obvious that Plaintiff believes Mahaffy should not have been allowed to decide what diversity programs he wanted to enroll in, and that he should not have been given a few months in which to complete them. But this is not retaliation against Plaintiff. It is merely AUM management's way of choosing how to deal with Mahaffy, and the fact that Plaintiff did not believe it was severe enough does not mean it was designed to retaliate against her. Simply put, she merely disapproved of the way AUM chose to discipline Mahaffy.

As for Mahaffy himself, Plaintiff contended that he came to her office and stood in front of her desk for a moment, and that he wore a t-shirt that read, "I am a redneck." There is simply no way to twist one moment of standing at a person's

desk and one wearing of a t-shirt into a retaliation claim.  Plaintiff's contentions in this regard are frivolous.

Finally, Plaintiff claims that the Director of Human Resources, Debra Foster, retaliated against her.  Foster did not "retaliate" against Plaintiff.  She simply took the most prudent course of action, which was to decline to speak with a represented party who was clearly no longer just asking Foster about the progress of her complaint and the University's investigation of it.  Plaintiff was making legal demands for compensation, and Foster elected to have AUM's attorneys continue that conversation.

## No Hostile Work Environment

To establish a hostile work environment, Plaintiff must demonstrate that (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on the protected characteristic, here race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and thus create a discriminatorily abusive work environment; and (5) the employer is responsible for that environment under a theory of either direct or vicarious liability.  Plaintiff cannot meet the third, fourth or fifth prima facie elements.

In a race-based case, harassing statements and conduct must be of a racial nature before they can be considered in determining whether the severe or

pervasive requirement is met; an employee must demonstrate that the allegedly harassing conduct was motivated by a bias towards the employee's protected class.

As to Mahaffy, there is no evidence that any alleged conduct was undertaken "because" of Plaintiff's race.  She herself stated in her deposition that she believed Mahaffy "retaliated" against her because he was not "selected for the short list on the Dean's search."

As to Foster, although Plaintiff and Foster may have had a personality conflict, numerous courts have held that even harassing behavior, if based merely on "inter-departmental politics and personality conflicts," is not actionable.  This establishes merely that Plaintiff and Foster did not get along.  Their personality conflict was utterly unrelated to race;  both are African-American.

Plaintiff must show that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive environment.  This is based on the totality of the circumstances, including the alleged conduct's frequency and severity; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with the plaintiff's work performance.

Going back four years,  which is far beyond the statute of limitations, Plaintiff alleges only six incidents that she believes were based on race.  All are clearly time-barred.  Plaintiff alleges that Mahaffy (who is a native Irishman) told her that black

**16**

citizens do not seem to be as smart as white citizens in the United States, and that with two blacks in the office it was going to be an "uphill battle."  She alleges that he once wore a t-shirt which read, "I'm a redneck" and asked her what she thought about the shirt.

Only three remarks or incidents may arguably have happened within even a year prior to Plaintiff retiring from her position.  As a matter of law, these remarks were not severe or pervasive enough to state a hostile work environment claim. Plaintiff's allegations fall well short of actionable harassment.

## **Prompt Remedial Action**

AUM did exactly what an employer in its position is supposed to do--it acted immediately to stop complained-of behavior.  Foster's memo indicates just how seriously AUM took Plaintiff's complaints.  The memo reflects a lay person's conclusion that Mahaffy's behavior must improve immediately.  This was a wise course of action.  It did not, however, establish the elements of a hostile work environment as a matter of law.

Under the affirmative defense the Supreme Court has established to hostile work environment claims, an employer can avoid liability by showing two things.  The first prong requires the employer to show that it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior."  The second prong requires that the employer show the employee failed to "take advantage of any preventive or corrective opportunities provided by the employer."

Plaintiff first refused to report any problems to Foster, the Senior Director of Human Resources. After Plaintiff finally initiated the investigative process, the HR Department, in both cases, promptly interviewed witnesses, treating the incidents with the appropriate degree of seriousness and confidentiality. In each case where Plaintiff complained, the alleged offender was counseled sternly to avoid further inappropriate behavior. Plaintiff's complaint now is simply that she didn't like the results. By definition, AUM's remedial actions with respect to all of Plaintiff's complaints were effective, because the conduct never recurred.

AUM took considerably stronger action against Mahaffy, because it determined that Plaintiff's complaints could be substantiated. With respect to element (4) of a hostile environment claim, the basis for imposing liability is that, after having acquired actual or constructive knowledge of the allegedly harassing conduct, the employer took no remedial action to correct it.

AUM did exactly what the law requires and what was necessary to address Plaintiff's complaints. Plaintiff cannot prove prong (4) of a hostile environment claim, and AUM cannot be held liable.

### No Constructive Discharge

Plaintiff must prove that her "working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign. Plaintiff claims to feel quite strongly that her working conditions at AUM were unbearable, in part because AUM did not provide her with constant personal security, and in part

**18**

because it appeared that Dr. Lawal no longer trusted her.  But the Court must solely determine whether a *reasonable person* in the plaintiff's position would be compelled to resign.  The only conclusion to be made is Plaintiff had been planning to retire long before she made her announcement in February 2005.

The question then becomes whether a reasonable person in her position would be compelled to resign.  The facts indicate not that Plaintiff believed the situation with Mahaffy was uncontrolled,  but that she did not approve of the way AUM chose to discipline Mahaffy.  Ritvo and Ward met with Mahaffy on January 31, 2005, and stripped him of his department chairmanship.  They also directed him to complete at least two diversity programs within six months, and informed him that if he again engaged in inappropriate behavior, the University would take further action.

While the situation with Mahaffy may have been stressful to Plaintiff, there is no indication that she in fact was in danger, or had reasonable belief that Mahaffy would harm her.  He did not have the power to affect the terms and conditions of her employment, and therefore she did not have good cause to resign.  Plaintiff apparently believes Mahaffy should have been fired or she should have been provided round-the-clock security.  The facts did not warrant these extreme measures, and a reasonable person in her position would not have resigned simply because she did not get her way.

To the extent that Lawal was "indignant," Plaintiff plainly acknowledged that it was because of his discovery of the shredding bags. While Plaintiff attempted to downplay this incident, she acknowledged that she had "probably" received instructions from the University to seek approval before shredding and to make inventories of what was shredded.

Finally and perhaps most important, even if Plaintiff could show the existence of conditions so intolerable that any reasonable person would feel compelled to resign, those conditions must have a nexus with Title VII. In other words, AUM must have subjected Plaintiff to these conditions because of her race or in retaliation for protected activity. As with the underlying obligation of factual proof, that legal connection fails to exist here.

> Plaintiff fails to demonstrate as a factual matter that AUM employed her after December 3, 2004 in conditions so intolerable any reasonable person would resign, and Plaintiff additionally fails to link her supposed intolerable conditions with any criterion protected by Title VII. Her constructive discharge claim fails for either or both reasons.

## DEFENDANT'S LIST OF DOCUMENTS AND TRIAL EXHIBITS FOR STIPULATION AS TO ADMISSIBILITY WITHOUT FURTHER PROOF

Defendant Auburn University Montgomery ("AUM") submits this list of documents and trial exhibits for pretrial stipulation of admissibility without further

proof.

AUM EEO Policy

AUM No Harassment Policy

Letter, Anonymous to EEOC, 1/26/04 (w/copy to Guin Nance rec'd 2/2)

E-mail, Cynthia Ellison to Guin Nance and back, 2/24-25/04

E-mail, Cynthia Ellison to Joe Hill, 2/25/04

Letter, Cynthia Ellison to Guin Nance, 3/1/04

Letter, Guin Nance to Cynthia Ellison, 3/2/04

Handwritten messages, Bradley Moody to Chris Mahaffy and back, 3/2/04

Memorandum, Bradley Moody to Debra Foster, 3/4/04

Investigation Notes (Ellison), Debra Foster, 3/2/04

Investigation Notes (Mahaffy), Debra Foster, 3/3/04

E-mails Brad Moody to Debra Foster, 3/2 and 3/04

Memorandum, Debra Foster to Guin Nance, 3/5/04

Letter, Debra Foster to Cynthia Ellison and Allison Stevens, 3/22/04

Letter, Cynthia Ellison to Guin Nance, 3/31/04

Letter, Guin Nance to Cynthia Ellison, 4/5/04

Handwritten Notes, Guin Nance, 4/12/04

Memorandum, Guin Nance to Debra Foster, 4/14/04

Memorandum, Debra Foster to Guin Nance, 4/26/04 (w/interview notes)

Letter, Debra Foster to Cynthia Ellison, 4/29/04

Letter, Barbara Ware to Debra Foster, 11/30/04

Memorandum, Debra Foster to Barbara Ware, 12/2/04

Memorandum, Debra Foster to Cynthia Ellison, 12/2/04

Memorandum, Cynthia Ellison to Roger Ritvo, 12/3/04

Memorandum, Bayo Lawal to Roger Ritvo, 12/3/04

Memorandum, Cynthia Ellison to Bayo Lawal, 12/7/04

E-mail, Bayo Lawal to Sciences, 1/26/05

Investigation Notes, Debra Foster:  Ellison, 12/14/04

Investigation Notes, Debra Foster:  Lawal, 12/14/04

Investigation Notes, Debra Foster:  Ray, undated

Investigation Notes, Debra Foster:  Mahaffy, 1/10/05

Investigation Notes, Debra Foster:  Moody, 1/30/05

Investigation Notes, Debra Foster:  Elliott, undated

Memo for Record, Roger Ritvo, 1/26/05

Memorandum, Debra Foster to Guin Nance, 1/27/05

Memorandum, Roger Ritvo to Chris Mahaffy, 2/3/05

Letter, Debra Foster to Cynthia Ellison, 2/4/05

Letter, Cynthia Ellison to Debra Foster, 2/7/05

Letter, Roger Ritvo to Cynthia Ellison, 2/9/05

Memorandum, Cynthia Ellison to Bayo Lawal, 2/9/05

Letter, Bayo Lawal to Cynthia Ellison, 2/9/05

E-mail, Cynthia Ellison to Bayo Lawal, 2/11/05

Application for Retirement, Teachers' Retirement System of Alabama, Cynthia Ellison, 2/11/05

E-mail, Bayo Lawal to Cynthia Ellison, 2/12/05

22

E-mail, Cynthia Ellison to Bayo Lawal, 2/14/05

E-mail, Cynthia Ellison to Jason Kneip, 2/14/05

E-mail, Jason Kneip to Cynthia Ellison, 2/14/05

E-mail, Roger Ritvo to Cynthia Ellison, 2/14/05

E-mail, Bayo Lawal to Cynthia Ellison, 2/14/05

Memorandum, Cynthia Ellison to Bayo Lawal, 2/14/05

Memorandum, Bayo Lawal to Cynthia Ellison, 2/15/05

Memorandum, Bradley Moody to Title VI Committee, 10/9/03

Auburn University Biweekly Payroll Time Sheet, Cynthia Ellison, 11/28/04 – 12/11/04

Auburn University Biweekly Payroll Time Sheet, Cynthia Ellison, 12/12/04 – 12/25/04

Auburn University Biweekly Payroll Time Sheet, Cynthia Ellison, 12/26/04 – 1/8/05

Auburn University Biweekly Payroll Time Sheet, Cynthia Ellison, 1/9/05 – 1/22/05

Auburn University Biweekly Payroll Time Sheet, Cynthia Ellison, 1/23/05 – 2/5/05

Auburn University Biweekly Payroll Time Sheet, Cynthia Ellison, 2/6/05 – 2/19/05

Personnel file for Cynthia Ellison, Dillard's Inc., including payroll records

Personnel file for Cynthia Ellison, Colonial Bank, including employment application and payroll records

Retirement benefit file for Cynthia Ellison, Teacher's Retirement System, State of Alabama

Social Security disability benefits file for Cynthia Ellison

NOTE:    Plaintifff objects to Defendant's Social Security Disability benefits file for

Cynthia Ellison.

## DEFENDANT'S PROPOSED STIPULATED ADMISSIONS OF FACT

Defendant Auburn University Montgomery (AUM) states that the following facts are uncontested, and that they should be admitted as stipulated factual admissions.

1.    Plaintiff worked for AUM for 20 years.

2.    Plaintiff worked as the secretary to the Dean of the School of Sciences, and her job included answering phones, opening mail, giving assignments to other secretaries, and supervising five or six work-study students.

3.    Plaintiff had known Professor Chris Mahaffy (who is Irish and white) for about 20 years, and she never had a problem with him until he was not selected as Dean of the School of Sciences.

4.    In December 2003, Plaintiff reported to her supervisor, Dr. Brad Moody, Acting Dean of the School of Sciences, and later in 2004 to AUM's Chancellor, Guin Nance, that Allison Stevens, a secretary in the School of Sciences had used a racial slur against her.

5.    Ms. Stevens admitted yelling at Plaintiff, but she denied using a racial slur.

6.    Debra Foster, the Senior Director of Human Resources, investigated Plaintiff's report.  She interviewed Plaintiff, Ms. Stevens, Dr. Mahaffy and all other witnesses, but she was unable to determine who was telling the truth because there

were no corroborating witnesses.

7.    Ms. Foster concluded the investigation on April 29, 2004, reporting that additional witnesses provided no new information; that she found no corroboration of Plaintiff's assertion, and that Ms. Stevens has been put on notice that the use of a racial slur will result in dismissal.

8.    Following the conclusion of Ms. Foster's investigation, Plaintiff did not complain again about any conduct of Ms. Stevens.

9.    Ms. Foster's letter to Plaintiff dated April 29, 2004, was the last communication among those involved with this matter, and it concluded the investigation.  Plaintiff did not file an EEOC charge related to the Stevens incident or its investigation within 180 days of April 29, 2004.

10.    On November 30, 2004, Barbara Ware, a minority secretary in the Department of Physical Sciences, complained to Ms. Foster that Plaintiff had talked to her "with a harsh voice" about her varying lunch schedule and her various errands which took her around campus.

11.    Ms. Foster met with Ms. Ware, Dr. Bayo Lawal, Dean of the School of Sciences, and Plaintiff in early December 2004.  After the meetings, Ms. Foster wrote separate letters to Ms. Ware and to Plaintiff concluding the investigation and asking them to be civil and nice to each other.

12.    On December 7, 2004, Plaintiff complained to Ms. Foster that she believed she should have received the same correspondence as Ms. Ware.

13.    Plaintiff was not disciplined as a result of Ms. Ware's complaint, and she was assured that it was "nothing and don't worry about it."

14.    AUM began the first of two Dean searches for the School of Sciences when Dean Joe Hill retired.  Dr. Bob Elliott served as Acting Dean for approximately two years.  He retired in December of 2002.  Dr. Brad Moody then served as Acting Dean from January 2003 until August 2004.  Dr. Bayo Lawal was selected as Dean and began work in August of 2004.

15.    Dr. Elliott and Dr. Moody both served as interim Deans because AUM had undertaken two searches for a Dean for the School of Sciences, and the first was unsuccessful.  The second search began sometime after January 2003, and Plaintiff served on the Search Committee.

16.    At the time, Dr. Mahaffy was Department Chair for Physical Sciences. Mahaffy was not Plaintiff's supervisor.  She reported directly to the Dean of the School of Sciences, who had sole authority to control her salary, performance reviews, and other terms and conditions of employment.

17.    The second search committee, on which Plaintiff served, ultimately selected Dr. Bayo Lawal as Dean.

18.    Mahaffy was very disappointed, sometimes crying when he talked to Plaintiff, and telling her that "he blamed me for not being selected as Dean.  He thought I had some influence over even the first search."

26

19.    On two occasions Plaintiff went to her office in the morning to find Mahaffy sitting at her desk.  He was "saying that [he] should be Dean.  Making comments about what he could do if he were Dean."

20.    Plaintiff went to Faye Ward, Assistant Director of Human Resources for AUM.  Ms. Ward "told me I needed to talk to Debra Foster and my supervisors," Plaintiff said.  Plaintiff initially refused to talk with Ms. Foster.

21.    Dr. Glen Ray and Dr. Moody both spoke with Dr. Mahaffy about his conduct, including Plaintiff in one of their meetings.  They also had several meetings with Dr. Mahaffy where Plaintiff was not present.

22.    On December 3, 2004, at the request of Roger Ritvo, Vice Chancellor for Academic and Student Affairs, Plaintiff gave a written statement about Dr. Mahaffy.  Plaintiff said after the second dean search ended in August of 2004 with Dr. Lawal's selection, Dr. Mahaffy was "very upset that he was not interviewed" and "told me repeatedly that he was unhappy. . . . During this time there was a drastic change in his behavior.  He repeatedly told me he could not sleep at night and would arrive to the office at 3:00 a.m. and wait for me to get in to talk about his not being dean."

23.    Plaintiff wrote to Dr. Ritvo,  that Dr. Mahaffy "made it very clear that I would pay for not helping him.  I told him he really needed to get over his not being selected as dean – he then said he would get the others who had served on the committee."

27

24.     Ms. Foster interviewed all identified witnesses and concluded that Dr. Mahaffy made inappropriate comments to Plaintiff.  Ms. Foster recommended to Chancellor Nance that Dr. Mahaffy attend sensitivity training, and that Dr. Ritvo speak to Dr. Mahaffy regarding his inappropriate behavior.

25.     Ms. Ward, who also participated in witness interviews and meetings, concluded that Dr. Mahaffy felt bitter about the selection process, and "he did show and change his attitude toward Ms. Ellison during those search committees."

26.     AUM followed all applicable procedures in investigating Plaintiff's complaints of harassment.

27.     Acting on Chancellor Nance's authority, Dr. Ritvo stripped Dr. Mahaffy of his Department Chair status.  In a letter to Dr. Mahaffy dated February 3, 2005 (confirming a January 31 meeting), Dr. Ritvo instructed Mahaffy to "submit to Human Resources and to me a plan (by the end of February) to complete at least two diversity program activities."  Once approved by the University, he said, Dr. Mahaffy would be required to complete the two programs by the end of summer session 2005.  Failure to complete the programs or further violations of the University's policies would result in further action, he wrote.  Dr. Ritvo admonished Dr. Mahaffy that he should not retaliate against "those you know or suspect may have been involved in this complaint," and directed him to "refrain from any negative or stereotypical comments related to an individual's race, color, age, national origin, religion, veteran's status, disability or other legally protected characteristic."

28.    Ms. Foster wrote to Plaintiff to tell her that "We have concluded our investigation and have taken appropriate and effective remedial action. Please let me know should you experience any perceived retaliation or violation of University policy in the future in connection with this matter."

29.    Plaintiff complained to Ms. Foster on February 7, 2005 that Mahaffy had "received a summary of his meeting," but that she had not received a copy of the letter to him. She said she had done her part "in reporting problems when there was a need to do so – with no results," and said she was being "forced into retirement."

30.    AUM has consistently applied its policy to advise employees such as Plaintiff only that prompt remedial action has been taken regarding their complaints.

31.    Dr. Ritvo wrote to Plaintiff on February 9, 2005, stating that the University did not believe "that Chris Mahaffy represents a physical threat to you, Dean Bayo Lawal or others at the university." He noted that "in our meeting with you on January 31st, Faye Ward suggested that if you were concerned about your safety, you could at any time ask the campus police to escort you to your vehicle. My recollection is that you rejected that option at that time."

32.    Dr. Ritvo's letter pointed out that the "disciplinary action we took in stripping Dr. Mahaffy of his administrative position as Department Chair was an action that was not to be taken lightly. It was a serious measure intended to ensure that the problem would be properly handled." Dr. Ritvo concluded by saying that he "strongly disagree[d] with your conclusion that you are being 'forced' into retirement.

**29**

The university stands ready to work with you to ensure that you have a workplace free from harassment and retaliation and to eliminate any reasonable concerns that you may have about your safety."

33.     Plaintiff submitted her notice of retirement to Dr. Lawal on Wednesday, February 9, 2005.  She stated that the effective date of her retirement would be April 1, 2005, and she agreed to work through February 25 and use her accrued leave to bridge the time from then until April 1.

34.     Plaintiff filed her EEOC charge on Friday, February 11, 2005.

35.     Ms. Ward notarized Plaintiff's retirement application on Friday, February 11, 2005.

36.     On Friday, February 11, 2005, Plaintiff wrote to Dr. Lawal, stating that she would "assist you in the office provided campus police can make a walk through of Goodwyn at least once a day through February 25, 2005.  If this is not possible, then I shall start my leave."

37.     Dr. Ritvo wrote to Plaintiff on Monday, February 14, saying, "I received your request about Campus Police.  They do indeed go through Goodwyn Hall on a regular basis, hopefully three times a day."

38.     The AUM Campus Police was available and willing to assist Plaintiff with personal escorts to her car, or to respond to any situations that made Plaintiff uncomfortable.  The Campus Police responds to every request.  Plaintiff never asked for any assistance, although it is clear that she knew how to request

assistance, and that she was personally acquainted with the Police Chief and various officers.

39.    After the disciplining conference between AUM and Chris Mahaffy, AUM ensured that the Campus Police had an immediate visible and regular presence in Goodwyn Hall (the location of the office of the School of Sciences), and that they patrol Goodwyn Hall regularly thereafter.  No one complained about Chris Mahaffy's behavior after January 31, 2005, including Cynthia Ellison, and the AUM Police did not believe that Dr. Mahaffy posed a physical threat to Ms. Ellison.

40.    On Saturday, February 12, 2005, Dr. Lawal arrived in the office to discover several bags of shredded documents in Plaintiff's office.  He sent her an e-mail saying he was "shocked this morning to find three bags containing shredded documents of the school.  These documents were shredded without a written or verbal permission from me.  I hope you kept a list of all the shredded documents and that this list was approved prior to shredding by the university archivist Jason Kneip."

41.    Plaintiff wrote back to Dr. Lawal on Monday, February 14 that she was "shocked as well," and that "no information of any sort relative to the smooth operation of the Dean's Office was shredded.  If you have a question about whether I am being trustworthy, perhaps I shouldn't stay any longer than today."

42.    Plaintiff also e-mailed Mr. Kneip, telling him that the documents were

**31**

time sheets and grade sheets of former students, and that they were "shredded because they had social security numbers on them."

43.    Mr. Kneip wrote back to Plaintiff that, in the future, she should "complete a Records Disposition Form *before* shredding or destroying any University-related documents."  He also requested that she give him a "rough estimate of how much (*i.e.*, half a box, full box) was destroyed and what the dates were."

44.    According to Plaintiff, Dr. Lawal was "indignant" about the shredding. She said she asked him, "'Do you want to look in it to make sure that it's what I told you it was?'"  He replied, "'No.'  And then again he asked me to leave his office and I did."

45.    Plaintiff left Dr. Lawal's office and drafted a memo stating that she felt it "best that I leave immediately."

46.    At the time of her retirement, Plaintiff earned $40,976.00 per year from AUM.

47.    Plaintiff's monthly retirement payment is $2,184.15, which is $26,209.80 per year.

48.    In 2005, Plaintiff received $17,473.20 in retirement benefits.

49.    Plaintiff earned $5,291.52 from Dillard's in 2005, or $440.95 per month.

50.    Following her retirement on April 1, 2005, Plaintiff earned $3,968.64 from Dillard's in 2005.

51.    In 2006, Plaintiff will receive $26,209.80 in retirement benefits.

52.    Plaintiff earned $1,374.90 from Dillard's in 2006, before she resigned on February 27, 2006.

54.    On October 6, 2005, Plaintiff filed an application with the U.S. Department of Health and Human Services in which she represented that she was disabled and completely unable to work, and that she had been disabled and completely unable to work since April 1, 2005.

1.   55. On January 31, 2006, Plaintiff completed an employment application with Colonial Bank and represented to the Bank that she had never been asked to resign and had never been discharged from employment.  Plaintiff certified that her representation was true, and she understood that misrepresentations, omissions of fact, or incomplete information could result in her dismissal from employment with Colonial Bank.

56.    Colonial Bank hired Plaintiff, and she began work on March 1, 2006 at a salary of $30,000 per year.

### PLAINTIFF'S PROPOSED STIPULATED ADMISSIONS OF FACT

Plaintiff Ellison OBJECTS and DISAGREES with Defendant's Proposed Stipulated Admissions of Fact and therefore CONTEST the Proposed facts as to all portions, except, the following paragraphs, 1, 14, 15, 17, 46, 49, 50, 52, and 53:

1.   Plaintiff worked for AUM for 20 years.

14. AUM began the first of two Dean searches for the School of Sciences when Dean Joe Hill retired.  Dr. Bob Elliott served as Acting Dean for

**33**

approximately two years.   He retired in December of 2002.  Dr. Brad Moody then served as Acting Dean from January 2003 until August 2004.  Dr. Bayo Lawal was selected as Dean and began work in August of 2004.

15.    Dr. Elliott and Dr. Moody both served as interim Deans because AUM had undertaken two searches for a Dean for the School of Sciences, and the first was unsuccessful.  The second search began sometime after January 2003, and Plaintiff served on the Search Committee.

17.    The second search committee, on which Plaintiff served, ultimately selected Dr. Bayo Lawal as Dean.

46.    At the time of her retirement, Plaintiff earned $40,976.00 per year from AUM.

49.    Plaintiff earned $5,291.52 from Dillard's in 2005, or $440.95 per month.

50.    Following her retirement on April 1, 2005, Plaintiff earned $3,968.64 from Dillard's in 2005.

52.    Plaintiff earned $1,374.90 from Dillard's in 2006, before she resigned on February 27, 2006.

56.    Colonial Bank hired Plaintiff, and she began work on March 1, 2006 at a salary of $30,000 per year.

**It is ORDERED that:**

**(1) The jury selection and trial of this cause, which is to last three (3) days, are set for**

**34**

December 11, 2006, at 10:00 a.m., at the
Frank M. Johnson, Jr. United States
Courthouse Complex, Courtroom 2FMJ, One
Church Street, Montgomery, Alabama 36104.

(1) The parties are to file their pre-trial
briefs by December 6, 2006;

(2) Each party shall have available at the time
of trial, for use by the court (the judge,
the courtroom deputy clerk, and the law
clerk), three copies of the list of his or
her exhibits;

(3) At least three days before trial, counsel
are to contact the courtroom deputy clerk
about the procedures for pre-marking all
trial exhibits;

(4) Each party shall have available a sufficient
number of copies of each photostatically
reproducible exhibit for each of the jurors,

35

opposing counsel, the courtroom deputy
clerk, the law clerk, and the judge; and

(5) All understandings, agreements, and
stipulations contained in this pretrial
order shall be binding on all parties unless
an objection is noted and filed with the
court within seven (7) days from the date of
this order.

DONE, this the 20th day of October, 2006.

        /s/ Myron H. Thompson
      UNITED STATES DISTRICT JUDGE