UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

| | | |
|---|---|---|
| CYNTHIA ELLISON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 2:05-CV-00902-MHT-DRB |
| AUBURN UNIVERSITY | ) | |
| MONTGOMERY, | ) | |
| | ) | |
| Defendant | ) | |

## <u>ORDER</u>

Plaintiff Cynthia Ellison, an African-American woman, filed this lawsuit against defendant Auburn University Montgomery, charging that AUM discriminated against her and forced her to retire because of her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and 42 U.S.C. §1981.[1]  This case is currently before the court on AUM's motion for summary judgment.  For the reasons detailed below, the motion will be granted.

---

[1] The court dismissed Plaintiff's claim under Section 1981 on October 19, 2006 based on AUM's sovereign immunity under the eleventh amendment.

I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56).  The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings.  Fed. R. Civ. P. 56(e).

The court's role at the summary judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

II.    <u>FACTUAL BACKGROUND</u>

Plaintiff worked for Auburn University Montgomery for 20 years, most of them as the secretary for the Dean of the School of Sciences.  Her job included answering phones, opening mail, giving assignments to other secretaries, and supervising five or six work-study students.  Among the faculty members in the School of Sciences was Chris Mahaffy, a white male.

A.    Plaintiff's confrontation with Allison Stevens

In December 2003, Plaintiff reported to Dr. Brad Moody, Acting Dean of the School of Sciences, that a secretary in the School of Sciences had used a racial slur against her.  Plaintiff contended that the secretary, Allison Stevens, said, "You make me sick, you make me sick.  You n ---."  Plaintiff maintained Stevens did not use the complete word, but "clearly began to use this slur word and that saying part of the word is the same as saying the entire word."  Stevens admitted yelling at Plaintiff, but denied using a racial slur.

Dr. Moody and two other professors met with Plaintiff and Ms. Stevens. Ms. Stevens still appeared to be angry at Plaintiff and tried to make derogatory remarks against her in the meeting, but Dr. Moody told her "he would have none of that."  From December 2003 until March 2004, Plaintiff wrote to AUM Chancellor Guin Nance three times, complaining about Ms. Stevens' alleged

racial slur. Dr. Nance wrote back to Plaintiff twice, assuring her that the University would investigate her claims.

Dr. Moody was instructed by Human Resources Director Debra Foster to investigate Plaintiff's claims again. In late February and early March 2004, Dr. Moody and Associate Dean Glen Ray interviewed Plaintiff, Ms. Stevens, and Dr. Mahaffy (Ms. Stevens' direct supervisor). Plaintiff still maintained that Ms. Stevens had used a racial slur, and Ms. Stevens maintained that she had not. Dr. Moody and Dr. Ray also interviewed Dale Wynne, a student employee who was in the office during the confrontation between Plaintiff and Ms. Stevens. Mr. Wynne said that Ms. Stevens was "extremely angry and agitated," but he "did not hear anything that could be characterized as a 'racial slur.'"

At the request of Chancellor Nance, Ms. Foster began her own investigation on March 2, 2004. After interviewing Plaintiff, Ms. Stevens, Dr. Mahaffy and Dr. Wynne, Ms. Foster concluded that she was "unable to determine who is telling the truth in this matter. There is no witness to the allegation Cynthia is making." Ms. Foster wrote a letter addressed to both Plaintiff and Stevens on March 22, stating that she could not find "evidence to substantiate if the word 'nigger' was used by Ms. Stevens toward Ms. Ellison on December 3, 2005." Nevertheless, she wrote, "If it occurred, this type of behavior is inconsistent with University guidelines and will not be tolerated. Any future

4

use of this word will result in immediate termination." Ms. Foster also told Ms. Stevens that by her own admission she had "used some abusive and threatening language. This type of behavior will not be tolerated and any further occurrences will result in termination of employment of Ms. Stevens."

Plaintiff complained to Chancellor Nance that there were two more witnesses who had not been interviewed in the course of the investigation: student worker Nikki Gibson and a professor who was in her office a few feet away from where Ms. Stevens had yelled at Plaintiff. Dr. Nance instructed Ms. Foster to interview these additional witnesses, and Ms. Foster did so. Ms. Gibson said that she "did not hear any racial slurs used," and Ms. Foster concluded that there was "no additional light to shed on the matter that was the subject of my investigation."

Ms. Foster confirmed this in a letter to Plaintiff dated April 29, reporting that the "additional witnesses provided no new information. None of the witnesses interviewed during this process corroborated that the word 'nigger' was used during the incident." Nevertheless, she pointed out, "Miss Stevens has been warned that such behavior on her part will not be tolerated in the future." Ms. Foster's letter to Plaintiff dated April 29, 2004, was the last communication among those involved with this matter.

B.    Barbara Ware's 2004 complaint about Plaintiff

On November 30, 2004, Barbara Ware, an administrative assistant in the Department of Physical Sciences, complained to Ms. Foster that Plaintiff had talked to her "with a harsh voice" about her varying lunch schedule and her various errands which took her around campus.  Ms. Foster met with Ms. Ware, Dr. Bayo Lawal, Dean of the School of Sciences, and Plaintiff in early December, 2004.  After the meetings, Ms. Ware wrote separate letters to Ms. Ware and to Plaintiff.

On December 7, 2004, Plaintiff complained to Ms. Foster that she believed she should have received the same correspondence as Ms. Ware.  Plaintiff was not disciplined as a result of Ms. Ware's complaint, and was assured that it was "nothing and don't worry about it."  Plaintiff's December 7, 2004 letter to Ms. Foster was the last correspondence among those involved in the Ware matter.

C.    Searches for new Deans

AUM began the first of two Dean searches for the School of Sciences when Dean Joe Hill retired.  Dr. Bob Elliott served as Acting Dean for approximately two years, before he retired in December of 2002.  Dr. Brad Moody then served as Acting Dean from January of 2003 until August of 2004.  Dr. Bayo Lawal was selected as Dean and began work in August of 2004.

Dr. Elliott and Dr. Moody both served as interim Deans because AUM had undertaken two searches for a Dean for the School of Sciences, and the first was unsuccessful. After approximately three months, the first search was deemed a failure. The second search began sometime after January of 2003, and Plaintiff served on the search committee.

The second search committee, on which Plaintiff served, ultimately selected Dr. Bayo Lawal (who is African-American) for the deanship. At the time, Dr. Mahaffy was Department Chair for Physical Sciences. Dr. Mahaffy had also sought the deanship, and was disappointed not to be selected for the post. Although Plaintiff interacted with Dr. Mahaffy, he was not her supervisor. She reported directly to the Dean of the School of Sciences, who had sole authority to control her salary, performance reviews, and other terms and conditions of employment. After Dr. Lawal's selection as Dean, Dr. Mahaffy sometimes cried when he talked to Plaintiff, telling her that he blamed her for not being selected as Dean. Dr. Mahaffy believed that Plaintiff had some influence over even the first search, and he told Plaintiff that he should be Dean. He commented on the things he could do if he were Dean.

Plaintiff complained to Faye Ward, Assistant Director of Human Resources for AUM. Ms. Ward told Plaintiff she should talk to Debra Foster and to her supervisors. Plaintiff, still irritated at Ms. Foster because of her handling of the

Stevens incident, initially refused to talk with her.  Although Plaintiff initially refused to report her concerns to Ms. Foster, Dr. Ray and Dr. Moody both spoke with Dr. Mahaffy about his conduct, including Plaintiff in one of their meetings. They also had several meetings with Dr. Mahaffy where Plaintiff was not present.

On December 3, 2004, at the request of Roger Ritvo, Vice Chancellor for Academic and Student Affairs, Plaintiff gave a written statement about Dr. Mahaffy.  Plaintiff said that, after the second dean search ended in August of 2004 with Dr. Lawal's selection, Dr. Mahaffy was "very upset that he was not interviewed" and "told me repeatedly that he was unhappy. . . .  During this time there was a drastic change in his behavior.  He repeatedly told me he could not sleep at night and would arrive to the office at 3:00 a.m. and wait for me to get in to talk about his not being dean."  Dr. Mahaffy, Plaintiff wrote to Dr. Ritvo, "made it very clear that I would pay for not helping him.  I told him he really needed to get over his not being selected as dean – he then said he would get the others who had served on the committee."

Ms. Foster interviewed several witnesses and concluded that Dr. Mahaffy made inappropriate comments to Plaintiff.  Ms. Foster recommended to Chancellor Nance that Dr. Mahaffy attend sensitivity training, and that Dr. Ritvo speak to Dr. Mahaffy regarding his inappropriate behavior.  Dr. Ritvo went

further, stripping Dr. Mahaffy of his Department Chair status. In a letter to Dr. Mahaffy dated February 3, 2005, Dr. Ritvo instructed Mahaffy to "submit to Human Resources and to me a plan (by the end of February) to complete at least two diversity program activities." Once approved by the University, he said, Dr. Mahaffy would be required to complete the two programs by the end of summer session 2005. Failure to complete the programs or further violations of the University's policies would result in further action, he wrote. Dr. Ritvo admonished Dr. Mahaffy that he should not retaliate against "those you know or suspect may have been involved in this complaint," and directed him to "refrain from any negative or stereotypical comments related to an individual's race, color, age, national origin, religion, veteran's status, disability or other legally protected characteristic."

Ms. Foster wrote to Plaintiff to tell her that "We have concluded our investigation and have taken appropriate and effective remedial action. Please let me know should you experience any perceived retaliation or violation of University policy in the future in connection with this matter." Plaintiff complained to Ms. Foster on February 7, 2005 that Mahaffy had "received a summary of his meeting," but that she had not. She said she had done her part "in reporting problems when there was a need to do so – with no results," and said she was being "forced into retirement."

Dr. Ritvo wrote to Plaintiff on February 9, 2005, stating that the University did not believe "that Chris Mahaffy represents a physical threat to you, Dean Bayo Lawal or others at the university." He noted that "in our meeting with you on January 31st, Faye Ward suggested that if you were concerned about your safety, you could at any time ask the campus police to escort you to your vehicle. My recollection is that you rejected that option at that time." Dr. Ritvo's letter pointed out that the "disciplinary action we took in stripping Dr. Mahaffy of his administrative position as Department Chair was an action that was not to be taken lightly. It was a serious measure intended to ensure that the problem would be properly handled." Dr. Ritvo concluded by saying that he "strongly disagree[d] with your conclusion that you are being 'forced' into retirement. The university stands ready to work with you to ensure that you have a workplace free from harassment and retaliation and to eliminate any reasonable concerns that you may have about your safety."

D.    Plaintiff's other problems with Dr. Mahaffy

Although Dr. Mahaffy's conduct became increasingly more bizarre after he was passed over for the deanship, he had, at least three years earlier, told Plaintiff that he had never seen a black person before he came to the United

States of America.[2]  Dr. Mahaffy once came to Plaintiff's office with a magazine and, holding it some distance away, pointed to a picture and asked her what it was.  When Plaintiff said the photo was of a monkey, Dr. Mahaffey laid the magazine down on her desk, where she could see that the picture was of a black man.  Plaintiff was offended by this exchange.  Dr. Mahaffy also once wore a t-shirt that said, "I'm a redneck."  Plaintiff found the shirt offensive.

E.      Plaintiff's notice of retirement and shredding of documents

Plaintiff submitted her notice of retirement to Dr. Lawal on Wednesday, February 9, 2005, before she filed her EEOC charge.  She stated that the effective date of her retirement would be April 1, 2005.   On Friday, February 11, Plaintiff wrote to Dr. Lawal, stating that she would "assist you in the office provided campus police can make a walk through of Goodwyn at least once a day through February 25.  If this is not possible, then I shall start my leave."

Dr. Ritvo wrote to Plaintiff on Monday, February 14, saying, "I received your request about Campus Police.  They do indeed go through Goodwyn Hall on a regular basis, hopefully three times a day."   On Saturday, February 12, Dr. Lawal arrived in the office to discover three bags of shredded documents in Plaintiff's office.  He sent her an e-mail saying he was "shocked this morning to

---

[2] Dr. Mahaffy is from Ireland.

find three bags containing shredded documents of the school.  These documents were shredded without a written or verbal permission from me.  I hope you kept a list of all the shredded documents and that this list was approved prior to shredding by the university archivist Jason Kneip."

Plaintiff wrote back to Dr. Lawal on February 14 that she was "shocked as well" and that "no information of any sort relative to the smooth operation of the Dean's Office was shredded.  If you have a question about whether I am being trustworthy, perhaps I shouldn't stay any longer than today."  Plaintiff also e-mailed Mr. Kneip, telling him that the documents were time sheets and grade sheets of former students, and that they were "shredded because they had social security numbers on them."  Mr. Kneip wrote back to Plaintiff that in the future, she should "complete a Records Disposition Form before shredding or destroying any University-related documents."  He also requested that she give him a "rough estimate of how much (i.e., half a box, full box) was destroyed and what the dates were."

Plaintiff stated in her deposition that Dr. Lawal was "indignant" about the shredding.  Plaintiff asked Dr. Lawal, "Do you want to look in it to make sure that it's what I told you it was?"  He replied, "No," and asked Plaintiff to leave his office.  Upon leaving Dr. Lawal's office, Plaintiff  drafted a memo stating that she felt it "best that I leave immediately."

III.   <u>DISCUSSION</u>

    A.   The incident with Ms. Stevens and most of the complaints about Dr. Mahaffy are time-barred.

Plaintiff's encounter with secretary Allison Stevens occurred in December of 2003.  Plaintiff alleges that, following a dispute between the two women,  Ms. Stevens "came close" to saying "the 'N' word."  Plaintiff avers that Ms. Stevens "said it enough for me to know what she said."  Plaintiff, however, did not file a timely EEOC Charge as to this incident.  42 U.S.C. § 2000e-5(e) (1) specifies the prerequisites that a plaintiff must satisfy before filing a private civil action under Title VII.  Sanders v. City of Montgomery, 319 F. Supp. 2d 1296, 1309 (M.D. Ala. 2004).  According to this provision, a charge "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."  Plaintiff filed her EEOC charge no earlier than February 11, 2005, fourteen months after this alleged remark by Ms. Stevens, and therefore the alleged remark is not appropriately considered for purposes of this lawsuit.

Plaintiff alleges that Dr. Mahaffy made the statement about not seeing a black person until he came to the U.S. "during the time that Bob Elliott was Dean."  Id.  Elliott left AUM in December of 2002.  The incident with the magazine happened even before Mahaffy's alleged remark about not seeing a black person until he came to the U.S., which means it occurred more than two years before she filed her EEOC Charge.

The United States Supreme Court has held that the 180-day period for filing a charge of discrimination is intended to operate as a statute of limitations. Zipes v. Trans World Airlines, 455 U.S. 385, 393-94 (1982). The Court has explained that "strict adherence" to this procedural requirement "is the best guarantee of evenhanded administration of the law." Mohasco Corp. v. Silver, 447 U.S. 807, 825 (1980). By choosing this relatively short deadline, "Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." Id. Indeed, this procedural rule is not a mere technicality, but an integral part of Congress' statutory scheme that should not "be disregarded by courts out of a vague sympathy for particular litigants." Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152 (1994). Thus, if a plaintiff fails to file an EEOC charge before the 180-day limitations period, the plaintiff's subsequent lawsuit is barred and must be dismissed for failure to exhaust administrative remedies.

To the extent Plaintiff's Complaint alleges harassment based on her confrontation with Stevens (and AUM's investigation of the incident), the remark by Mahaffy that he had never seen a black person before coming to the U.S., and the exchange with Mahaffy about the magazine photo, her claim is not timely. The alleged incidents occurred years prior to the filing of her Charge, and therefore these claims must be dismissed for failure to fulfill a condition

precedent to filing a lawsuit.  Fouche v. Jekyll Island State Park Authority, 713 F.2d 1518, 1524 (11th Cir. 1983).

B.    Plaintiff has not established a disparate treatment case.

To establish disparate treatment on the basis of race a plaintiff must show the following:  (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse-employment action; and (4) she was treated less favorably than a similarly situated individual outside of her protected class. Maynard v. Board of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003).

Plaintiff has not established that she was treated differently than another person based on her race.  She complained that the University's handling of her confrontation with Stevens, but has not established that any white person ever made a similar complaint and was treated differently.  There was a fact dispute as to what actually happened, with Plaintiff contending that Stevens said "the N-word," and Stevens adamantly contending that she did not.  Three witnesses agreed that Stevens had been loud and disrespectful, but all said they did not hear her use a racial slur.  Confronted with these facts, AUM gave Stevens a stern warning that she would be fired if anything similar happened again.

Plaintiff complains that when the University investigated Barbara Ware's complaint against her, and her own complaint against Dr. Mahaffy, she did not

receive the same letters that Ms. Ware and Dr. Mahaffy received at the conclusion of those investigations. The University determined that Plaintiff should not be allowed to review what was written to other employees, in the interests of their privacy. Plaintiff was assured that the issues raised had been appropriately resolved, and she has not shown that a white person was treated differently under similar circumstances.

Plaintiff argues that Ms. Ware and Dr. Mahaffy received documents that she did not receive in the course of AUM's investigations. In each instance, though, Plaintiff was not similarly situated to these persons. Ms. Ware complained about Plaintiff, and Plaintiff complained about Dr. Mahaffy. In each situation Plaintiff was, by definition, not similarly situated to the other person involved. In order for an employee to be similarly situated to Plaintiff, the employee must be "similarly situated in all relevant respects." Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003). Additionally, the comparator employee must have "very similar job-related characteristics" to Plaintiff, and be "in a similar situation" to Plaintiff. MacPherson v. Univ. of Montevallo, 922 F.2d 766, 774 (11th Cir. 1991). Plaintiff has established no situation in which a white person was treated differently in the course of an investigation than she was treated. Her claim of discrimination fails as a matter of law.

C.    Plaintiff's retaliation claim fails as a matter of law.

1.    Plaintiff did not engage in statutorily protected activity prior to the time she filed her EEOC Charge on February 11, 2005.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race."   42 U.S.C. § 2000e-2(a) (1). Under the Participation Clause of Title VII's anti-retaliation provision, an employee is protected from discrimination if she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

The Participation Clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."   EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000).   "At a minimum, some employee must file a charge with the EEOC (or its designated representative) or otherwise instigate proceedings under the statute for the conduct to come under the Participation Clause."   Id. at 1174 n.2.   Activities invoking the jurisdiction of the federal government through the EEOC are entitled to expansive protection.   Id. at 1175-76.

Plaintiff, however, did not file her EEOC Charge until at least February 11, after (sometimes long after) the various events below that she has identified as retaliatory. She cannot state a case for retaliation under the Participation Clause for anything that happened prior to February 11. The only thing of significance that happened after February 11 was Dean Lawal's discovery that Plaintiff had shredded documents, which occurred the next day, Saturday, February 12.

Under the Opposition Clause of Title VII's anti-retaliation provision, an employee is protected from discrimination if she "opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff can establish a prima facie case of retaliation under the Opposition Clause if she shows that she had a "good faith, reasonable belief that the employer was engaged in unlawful employment practices." Little v. United Technologies, Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). In order to satisfy this standard:

> A plaintiff must not only show that [she] subjectively (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was objectively reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that [her] belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

> Id.

Accordingly, Plaintiff's belief that she was subjected to unlawful harassment must be both subjectively and objectively reasonable. Put another way, Plaintiff must not only show that she subjectively (that is, in good faith) believed that her employer was engaged in an unlawful employment practice, but also that her belief was objectively reasonable in light of the facts and record presented.

The critical inquiry in this case is whether Plaintiff in fact believed that any harassment directed at her was because of race, and whether a reasonable person would so believe. Plaintiff's own testimony, however, made clear that she did not complaint to AUM officials about racial harassment, bur rather about Mahaffy's conduct and statements related to the Deanship selection. Plaintiff herself wrote in her EEOC Affidavit, "Unfortunately, due to Mr. Mahaffy's initial belief that I did not support him for the deanship, and in response to the complaint I filed on December 3, 2004, Mr. Mahaffy targeted me for intense retaliation." Plaintiff's own words establish even if she could prove Mahaffy "targeted her," his motive was the missed deanship opportunity, not her race.

Other observers also believed this to be true. Faye Ward, the Assistant Human Resources Director who assisted with the investigation into Plaintiff's Complaint, testified in her deposition that Dr. Mahaffy's "entire demeanor towards [Plaintiff] changed" after he was not selected as Dean. Ward was asked,

"And do you think that he conducted himself the way you describe because he blamed her for not assisting him in the dean search?" She replied, "Yes, sir. I absolutely, unequivocally do." Id.

The evidence demonstrates that Plaintiff failed to meet either the subjective or objective requirements for a race retaliation claim, and accordingly AUM should be granted summary judgment on that claim.

2.    Plaintiff did not suffer an adverse employment action.

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998). Even if Plaintiff had engaged in statutorily protected expression, she has not shown that she suffered any adverse employment action, and therefore she cannot establish the causation prong.

Plaintiff was never demoted and never suffered a loss in pay. To the contrary, she was promoted from time to time and earned raises in pay. She resigned on February 9 before she filed an EEOC charge on February 11, and she left her job on February 14 after her supervisor questioned her about the shredding of documents. Plaintiff contends that Vice Chancellor Roger Ritvo

treated her differently from Dr. Mahaffy, because AUM gave Dr. Mahaffy a month to select two diversity programs, and additional time to complete them. While Plaintiff apparently believes Dr. Mahaffy was treated too leniently, this is not retaliation against Plaintiff. It is merely AUM management's way of choosing how to deal with Mahaffy, and the fact that Plaintiff did not believe it was severe enough does not mean it was designed to retaliate against her.

Plaintiff also claims that the Director of Human Resources, Debra Foster, retaliated against her, and bases this claim on a conversation she had with Foster after Plaintiff filed her EEOC charge. Ms. Foster asked Plaintiff what she wanted, and Plaintiff told her $250,000. Ms. Foster left the room, then returned with a business card for one of the University's attorneys, telling Plaintiff, "I don't have anything else to say to you." Again, this is not retaliation. It appears from Plaintiff's own testimony that Ms. Foster was willing to talk to Plaintiff until Plaintiff made legal demands for compensation. Ms. Foster then declined to speak further, choosing to let AUM's attorneys continue the conversation. The choice to be represented by counsel in such a circumstance is not retaliation, and Plaintiff's claim fails as a matter of law.

D.    Plaintiff was not the victim of a hostile work environment.

To establish a hostile work environment, Plaintiff must demonstrate that (1) she belongs to a protected group; (2) she has been subjected to unwelcome

21

harassment; (3) the harassment was based on the protected characteristic, here race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and thus create a discriminatorily abusive work environment; and (5) the employer is responsible for that environment under a theory of either direct or vicarious liability. Miller v. Kenworth of Dothan, 277 F.3d 1269, 1275 (11th Cir. 2002). Plaintiff cannot meet the third, fourth or fifth prima facie elements.

       1.    The conduct Plaintiff complained of was not, by her own acknowledgement, because of her race.

In a race-based case, harassing statements and conduct must be of a racial nature before they can be considered in determining whether the severe or pervasive requirement is met. Gupta v. Florida Bd. of Regents, 212 F.3d 571, 586 (11th Cir. 2000) (sexual harassment decision). Accordingly, "innocuous or boorish statements or other behavior that does not relate to the race of the actor or the employee do not count." Laosebikan v. Coca-Cola Co., 167 Fed. Appx. 758, 765 (11th Cir. 2006). In evaluating a harassment case, the Court must distinguish between harassment and discriminatory harassment. See Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000). Thus, an employee must demonstrate that the allegedly harassing conduct was motivated by a bias

towards the employee's protected class.  Bryant v. Martinez, 46 Fed. Appx. 293, 296 (6th Cir. 2002).

Victims of racial harassment "must always prove that the conduct at issue was not merely tinged with offensive [racial] connotations, but actually constituted discrimination because of [race]."  Ashmore v. J.P. Thayer Co., 303 F. Supp. 2d 1359, 1368 (M.D. Ga., 2004).  This requires a plaintiff to demonstrate that "but for the fact of her [race], she would not have been the object of harassment."  Colon v. Environmental Technologies, Inc., 184 F. Supp. 2d 1210, 1216 (M.D. Fla. 2001).

Here, there is no evidence that the alleged conduct was undertaken "because" of Plaintiff's race.  She herself stated in her deposition that she believed Mahaffy "retaliated" against her because he was not "selected for the short list on the Dean's search."

Moreover, Plaintiff testified that Mahaffy's offbeat behavior was not directed solely at her.  She testified that faculty members and students – "[e]verybody just about" -- had complained that Dr. Mahaffy was "crazy."  If "everybody just about" had complaints about Mahaffy, it is axiomatic that any offensive behavior he exhibited toward Plaintiff was not "because of" her race.

Similarly, Plaintiff was asked, "Do you think that Debra Foster took any action, or refused to take any action that should have taken about anything,

because you are black?"[3]  Plaintiff responded, "Not because I am black per se, no.
. . .  I think she treated me differently because she just didn't like me."  Plaintiff
and Foster had a personality conflict.  Numerous courts have held that even
harassing behavior, if based merely on "inter-departmental politics and
personality conflicts," is not actionable.  Tademe v. St. Cloud State Univ., 328 F.3d
982, 991 (8th Cir. 2003); see Hounton v. Gallup Indep. Co., 113 Fed. Appx. 329, 333
(10th Cir. 2004) ("employee personality conflicts are not business of federal
courts"); Crawford v. Medina Gen. Hosp., 96 F.3d 830, 836 (6th Cir. 1996) (holding
that the plaintiff's evidence of hostility and abusiveness in the workplace was
not related to age-based animus but rather to a "simple clash of personalities"
where only two comments objectively indicated age-based bias); McCollum v.
Bolger, 794 F.2d 602, 610 (11th Cir. 1986) ("[P]ersonal animosity is not the
equivalent of [racial] discrimination and is not proscribed by Title VII.  The
plaintiff cannot turn a personal feud into a [race] discrimination case.")

    Plaintiff's complaints about Ms. Foster establish merely that Plaintiff and
Ms. Foster did not get along.  Their personality conflict was utterly unrelated to
race.

---

[3] Foster is also African-American.

2.    The conduct Plaintiff alleges was neither severe nor pervasive.

To prove that the alleged harassment affected a "term, condition or privilege" of her employment, Plaintiff must show that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive environment.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Whether an environment is hostile or abusive depends on a "totality of circumstances."  Gupta, 212 F.3d at 586.  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

"In order to be actionable . . . a [racially] objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher, 524 U.S. at 787.  To determine whether an allegedly hostile work environment satisfies the objective component, courts examine the totality of the circumstances, including the alleged conduct's frequency and severity; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with the plaintiff's work performance.  Mendoza, 195 F.3d at 1246.

The standards the Supreme Court has set forth for evaluating a hostile work environment claim are "intended to be sufficiently demanding to ensure that Title VII does not become a general civility code." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). Properly applied, this standard should filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing." Id. Courts of this Circuit have specifically recognized that "an employer's mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not fall within the proscription of Title VII." Robertson v. Georgia Dep't of Corrections, 725 F. Supp. 533, 538 (S.D. Ga. 1989). "The Eleventh Circuit has held that racial slurs must be so commonplace, overt and denigrating that they create an atmosphere charged with racial hostility." Mitchell v. Carrier Corp., 954 F. Supp. 1568, 1578 (M.D. Ga. 1995).

Going back four years, Plaintiff alleges only six incidents that she believes were based on race. The confrontation with Ms. Stevens, Dr. Mahaffy's remark that he had never seen a black person before he came to the U.S., and Plaintiff's conversation with Dr. Mahaffy about the magazine photo are all time-barred.

Thus it appears that three remarks or incidents may arguably have happened within even a year prior to Plaintiff quitting her job – Mahaffy allegedly told Plaintiff that black citizens do not seem to be as smart as white

26

citizens in the United States; he allegedly said that, with two African-Americans in the office (Plaintiff and Dr. Lawal), it was going to be an "uphill battle"; and he wore the t-shirt which read, "I'm a redneck."

As a matter of law, these remarks were not severe or pervasive enough to state a hostile work environment claim. One incident, Mahaffy's wearing of the t-shirt that said, "I'm a redneck," is actually innocuous. It even falls short of the kind of "sporadic use of abusive language, [race]-related jokes, and occasional teasing" that the Supreme Court has determined are "ordinary tribulations of the workplace." Plaintiff's allegations, even taken as true, fall well short of actionable racial harassment. See Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759-80 (8th Cir. 2004) (affirming summary judgment for the employer although its managers had used terms like "spic," "wetback," "monkey," and "nigger"); Hartsall v. Duplex Prods., 123 F.3d 766, 771, 773 (4th Cir. 1997) (defendant's statement that "we've made every female in this office cry like a baby" and isolated references to plaintiff as a slave and comments about buxom magazine pictures were "mildly offensive (and unactionable) utterances"); Taylor v. Virginia Dep't of Corrections, 177 F. Supp. 2d 497, 502-03 (E.D. Va. 2001) (supervisor's "base" behavior during the course of a year, including a handful of derogatory remarks about African Americans and comments that "blacks have

too many special rights" and could not be fired, was not sufficiently frequent or severe to create a hostile work environment).

       3.     AUM took prompt, effective remedial action to end the complained-of conduct.

"The mere existence of a hostile work environment is not dispositive of employer liability."  Rutledge v. Macy 's East, Inc., No. 01-12-P-H, 2001 U.S. Dist. LEXIS 18684 at * 29 (D. Maine, Sept. 17, 2001).  Under the affirmative defense the Supreme Court has established to hostile work environment claims, an employer can avoid liability by showing two things.  The first prong requires the employer to show that it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior."  Faragher, 524 U.S. at 807.  The second prong requires that the employer show the employee failed to "take advantage of any preventive or corrective opportunities provided by the employer."  Id.

AUM has a policy on reporting employee complaints, but Plaintiff ignored it, going directly to the Chancellor of the University (in the Stevens incident), and to the Vice Chancellor (in the Mahaffy incident).  The HR Department, in both cases, promptly interviewed witnesses, treating both incidents with the appropriate degree of seriousness and confidentiality.   In both cases where Plaintiff complained, the alleged offender (first Ms. Stevens and then Dr. Mahaffy) was counseled sternly to avoid further inappropriate behavior.

Plaintiff's complaint now is simply that she didn't like the results. She does not allege that Stevens ever did or said anything else that she considered harassing. She admits that, after she made her complaint on December 3, Dr. Mahaffy never made any racial remarks to her again. By definition, AUM's remedial actions were effective. Plaintiff apparently believes AUM's treatment of Ms. Stevens and Dr. Mahaffy was not sufficiently harsh.

With respect to element (4) of a hostile environment claim, the basis for imposing liability is that, after having acquired actual or constructive knowledge of the allegedly harassing conduct, the employer took no remedial action to correct it. Mikels v. City of Durham, 183 F.3d 323, 329 (4th Cir. 1999). "[W]hen presented with the existence of illegal conduct, employers can be required to respond promptly and effectively, but when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well." Spicer v. Virginia, 66 F.3d 705, 711 (4th Cir. 1995).

The employer need not discharge an offender in order to act promptly and effectively. In Lee v. North Carolina Dep't of Transp., 2000 U.S. Dist. LEXIS 7170 (E.D.N.C. 2000), the court determined that an employer was not liable for sexual harassment because its response eliminated the complained-of conduct. The plaintiff there was not satisfied because she believed the offender had not be "penalized in any meaningful way," but the court wrote, "the fact remains that

her supervisor spoke with the offender and the harassment stopped." Id. at *16. Under those circumstances, the court wrote, there was no basis for imputing liability to the employer. This same analysis applies here.

"Under the framework established by the Court in Faragher and Burlington Industries, a prompt response by an authorized agent to halt reported harassment is sufficient to relieve the employer of liability under Title VII in cases where the harassment has not culminated in a tangible employment action." Brown v. Henderson, 155 F. Supp. 2d 502, 512 (M.D.N.C. 2000) (citation omitted). AUM did exactly what the law requires and what was necessary to address Plaintiff's complaints. Plaintiff cannot prove prong (4) of a hostile environment claim, and AUM cannot be held liable.

E.    Plaintiff was not constructively discharged.

"To establish constructive discharge Plaintiff must prove that her "working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign." Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996); Cross v. Southwest Recreational Indus., 17 F. Supp.2d 1362, 1376 (N.D. Ga. 1998). "The plaintiff must do more than merely show that she was subjected to actionable  harassment," and merely offensive behavior does not support a constructive discharge claim. Walton v. Johnson &

Johnson Servs., No. 02-12520, 2003 U.S. App. LEXIS 21208 at *25 (11th Cir. Oct. 20, 2003).   The "standard for proving constructive discharge is higher than the standard for proving a hostile work environment."   Hipp v. Liberty Nat'l Life Ins., 252 F.3d 1208, 1231 (11th Cir. 2001).

"It is well established that, "[b]efore finding constructive discharge, [the Eleventh Circuit] has traditionally required a high degree of deterioration in an employee's working conditions. . . ."   Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1519, 1527 (11th Cir. 1991).   An employee "has the responsibility to act reasonably before choosing to resign, and then labeling that resignation as a constructive discharge."   1309, 1317 (M.D. Fla. 2000) (citing Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987)); see Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316-18 (11th Cir. 1989) (affirming district court's conclusion that Title VII plaintiffs were subjected to hostile work environment, but were not constructively discharged); Huddleston v. Roger Dean Chevrolet, Inc., 845 F.2d 900, 905-06 (11th Cir. 1998) (same).   "[H]urt feelings are insufficient as proof of constructive discharge."   Hellums v. Webster Indus., 97 F. Supp. 2d 1287, 1297 (M.D. Ala. 2000).

The Court will assume that Plaintiff does in fact feel quite strongly that her working conditions at AUM were unbearable.   But in assessing constructive

discharge claims, the Court is not to consider a plaintiff's subjective feelings about her employer's actions. Rather, the Court must solely determine whether a reasonable person in the plaintiff's position would be compelled to resign. Brantley v. City of Macon, 390 F. Supp. 2d 1314 (M.D. Ga. 2005) (citing Doe v. DeKalb County Sch. Dist., 145 F.3d 1441, 1450 (11th Cir. 1998)).

Defendant put on some evidence tending to show that Plaintiff had been planning to retire before the events at issue here.  This Court, however, must accept Plaintiff's contentions as true for purposes of summary judgment, and Plaintiff contends that she did not intend to retire.  The question then becomes whether a reasonable person in her position would be compelled to resign and retire.  Plaintiff contends that she feared for her safety after AUM investigated her complaints against Mahaffy and stripped him of his department chairmanship.  Mahaffy, however, had never touched Plaintiff.  He did not have the power to adjust her salary, give her assignments, reprimand her, or change the terms and conditions of her employment in any way.

The facts indicate that Plaintiff simply did not approve of the way AUM chose to discipline Dr. Mahaffy.  Dr. Ritvo and Ms. Ward met with Dr. Mahaffy on January 31, 2005, and stripped him of his department chairmanship.  They also directed him to complete at least two diversity programs within six months, and informed him that if he again engaged in inappropriate behavior, the

University would take further action.  After this meeting, Plaintiff had no further contact with Dr. Mahaffy.

As the court observed in Brantley, "Every job has its frustrations, challenges and disappointments; these inhere in the nature of work.  An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers.  He is not, however, guaranteed a working environment free of stress."  390 F. Supp. 2d 1314.  While the situation with Dr. Mahaffy may have been stressful to Plaintiff, there is no indication that she in fact was in danger, or that she had reasonable belief that Dr. Mahaffy would harm her.  He did not have the power to affect the terms and conditions of her employment, and therefore she did not have good cause to resign.  Plaintiff apparently believes Dr. Mahaffy should have been fired or she should have been provided round-the-clock security.  The facts did not warrant these extreme measures.

Plaintiff, asked why she left on February 14 never to return, said that Dr. Lawal was "indignant.  He called me into his office and said that he had been working out there on Saturday, and he saw the shredding bags where I normally put shredding bags.  And that I had not gotten his permission to shred."  Plaintiff acknowledged, however, that there was no confrontation, and neither she nor

Dr. Lawal raised their voices.  She was merely frustrated because Dr. Lawal did not trust her.

To the extent that Lawal was "indignant," Plaintiff plainly acknowledged that it was because of his discovery of the shredding bags.  The University's archivist, Jason Kneip, informed Plaintiff in an e-mail that the University is "required by the state of Alabama to maintain records of what is destroyed, and to ensure that the records are not disposed before they are supposed to be."  To the extent that Dr. Lawal's alleged indignation and distrust made Plaintiff uncomfortable, they were based on concerns about the unauthorized shredding, not race or retaliation.

"Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  Williams v. Russell Corp., 218 F. Supp. 2d 1283, 1299 (M.D. Ala. 2002).  Title VII is not implicated here, and AUM is entitled to summary judgment on Plaintiff's constructive discharge claim.

IV.    CONCLUSION

For the foregoing reasons, the court concludes that summary judgment should be granted to AUM on Plaintiff Ellison's Title VII and 42 U.S.C. § 1981 claims.

An appropriate judgment will be entered.

DONE, this the _____ day of _____, 2006.

_____

Myron H. Thompson
UNITED STATES DISTRICT JUDGE

JUDGMENT

In accordance with the memorandum opinion entered today, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) The motion for summary judgment, filed by defendant Auburn University Montgomery, is granted.

(2) Judgment is entered in favor of defendant Auburn University Montgomery and against Plaintiff Cynthia Ellison, with Plaintiff Ellison taking nothing by her complaint.

It is further ORDERED that costs are taxed against Plaintiff, for which execution may issue.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

DONE, this the ___ day of _____, 2006.

_____

Myron H. Thompson
UNITED STATES DISTRICT JUDGE