IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| CYNTHIA ELLISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:05cv902-MHT |
| | ) | (WO) |
| AUBURN UNIVERSITY | ) | |
| MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |


OPINION

Plaintiff Cynthia Ellison, an American of African descent, has brought this lawsuit against her former employer, defendant Auburn University Montgomery ("AUM"). Relying on Title VII of the Civil Rights Act, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e-17, she charges AUM with race discrimination, hostile work environment, and retaliation. Jurisdiction is proper pursuant to 42 U.S.C. § 2000e-5(f)(3). This lawsuit is before the court on AUM's motions for summary judgment. As explained below, the motions will be granted.

## I.  SUMMARY-JUDGEMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing how the responsibilities on the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Thus, at the summary-judgment stage, the court assumes that the facts

2

are as Ellison alleges and makes all reasonable inferences in favor of her as the nonmoving party.

## II.  FACTS

Ellison was the secretary to the dean of the School of Sciences at AUM for 20 years.  In the two-to-three years before she retired from AUM, she complained about racially offensive incidents within her department.  Most of her complaints related to Physical Sciences Department Chair Chris Mahaffy, with whom Ellison worked for over 20 years but who was not her supervisor.  Ellison, instead, reported directly to the Dean of the School of Sciences, who had the sole authority to control her salary, performance reviews, and other terms and conditions of employment.  The facts leading up to Ellison's retirement are as follows:

Early 2003 - AUM completed its first search for a new Dean of the School of Sciences.  Mahaffy was upset because he was not chosen for the position.  Because he believed that Ellison had had some influence with the committee, he complained to her about the committee members and about how

good he would have been as dean. Shortly afterwards, Mahaffy told Ellison that he had never seen a black person before coming to the United States from Ireland. On another occasion he showed her a photograph in a magazine from a distance, asked her what it was, and then laughed when she said "a monkey"; he showed her that the photograph was in fact a black man.

December 2003 - Ellison reported that a secretary in the School of Sciences had used a racial slur against her. The secretary admitted yelling at Ellison, but denied using a racial slur. Ellison felt that no one believed her and that she was being mistreated as a result of her complaint. Ultimately, after investigating the matter by interviewing several witnesses, Human Resources Senior Director Debra Foster could not find anyone to corroborate Ellison's allegations; she warned the secretary, however, that any use of a racial slur would result in dismissal. Foster informed Ellison of the results of her investigation in a letter dated April 29, 2004, which, as the last

communication among those involved with this matter, concluded the investigation.

<u>Early 2004</u> - Ellison served on the committee for AUM's second search to find a new Dean of the School of Sciences. Again, Mahaffy was one of the applicants for the position.


<u>November 2004</u> - The search committee ultimately selected Dr. Bayo Lawal (who is African) as dean. After Lawal was appointed, Mahaffy told Ellison that no one would respect him because he is black and that some blacks do not seem as smart as whites. Mahaffy would also wait for Elliosn in her office (sometimes in the dark) and tell her that he blamed her for not being selecting as dean. These sometimes tearful confrontations frightened Ellison to the point where she requested personal security from the university. Human Resources Assistant Director Faye Ward and two other AUM administrators spoke with Mahaffy about his conduct and included Ellison in one of these meetings.

<u>December 3</u> - At the request of Academic and Student Affairs Vice-Chancellor Roger Ritvo, Ellison gave a written

statement about Mahaffy.  In the statement, she explained
that Mahaffy was "very upset that he was not interviewed"
and told her "repeatedly that he was unhappy, ... and that
he could not sleep at night and would arrive to the office
at 3:00 a.m. and wait for [her] to get in to talk about his
not being dean."  According to Ellison, "Mahaffy made it
very clear that [she] would pay for not helping him" and
that "he would get the others who had served on the
committee."

    January 2005 - Mahaffy wore a shirt to work that read
"I'm a redneck."

    January 18 - While Ellison was sitting at her desk,
Mahaffy appeared behind her in an overcoat and skull cap
and just stared at her until she spoke to him.  He then
told her he was looking for Lawal, but left the office
before she could contact the dean.

    January 30 - After investigating Ellison's complaint,
AUM determined that Mahaffy had engaged in inappropriate
behavior, and immediately stripped him of his role as chair
of his department.  The university gave him until the end

6

of the 2005 summer session to complete at least two 'diversity program' activities.

   January 31 - AUM officials met with Mahaffy to inform him of their decision.  In the meantime, a vice chancellor escorted Ellison to lunch off campus.  Afterwards, Ellison met with AUM officials, who informed her of the action they had taken against Mahaffy.  In response, Ellison requested personal security from Mahaffy.

   February 3 - Mahaffy came into Ellison's office and stared at her without saying anything or asking for anyone.

   Monday, February 7 - Ellison complained that she had not received a copy of the letter to Mahaffy.  Again she expressed concerns about her personal safety, particularly since AUM officials had visible security during their meeting with Mahaffy.  She further stated that she was dissatisfied with the results of the investigation and that the university was forcing her into retirement.

   Wednesday, February 9 - Vice-Chancellor Ritvo wrote to Ellison, stating that she was not being forced into retirement and that the university "stands ready to work

with [her] to ensure that [she has] a workplace free from harassment and retaliation and to eliminate any reasonable concerns that [she might] have about [her] safety." He explained that the security presence during Mahaffy's disciplinary proceeding was routine and that she was asked to lunch during the meeting so that she would not have to interact with Mahaffy after he learned that he would be demoted. Ellison, however, submitted her notice of retirement to Lawal that same day, effective April 1, 2005.

Thursday, February 10 - Ellison filed a charge with the Equal Employment Opportunity Commission ("EEOC").

Friday, February 11 - AUM received a copy of Ellison's EEOC charge attached to a letter from her attorney. Ellison wrote to Lawal that she would stay until her retirement only if campus police would patrol her building once a day, and the university agreed. The university also responded that campus police were available and willing to assist Ellison with personal escorts to her car, or to respond to any situations that made her uncomfortable.

<u>Saturday, February 12</u> - Dean Lawal discovered several bags of shredded documents in Ellison's office. He sent her an email informing her that, unless she kept an approved list of all the shredded documents, she was in violation of AUM's protocol, which, in accordance with Alabama law, requires approval from the university archivist before shredding.

<u>Monday, February 14</u> - Ellison and Lawal argued about the shredding of the documents. Ellison asserted that she did not shred any important information, only routine materials. Lawal asked her to leave his office, stating that he did not trust her; he also instructed her to just sit at her desk and not do anything else. Ellison then decided to make her retirement from AUM immediate and concluded her employment on that day.

### III.  DISCUSSION

Under Title VII, it is illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such individual's ... race." 42 U.S.C. § 2000e-2(a)(1). Ellison claims that AUM violated Title VII when it discriminated against her because of her race, subjected her to a hostile work environment, and retaliated against her after she complained about Mahaffy and filed her EEOC charge.

### i. Race Discrimination

Ellison's race discrimination claim is governed by the familiar burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas approach, a plaintiff has the initial burden of establishing a prima-facie case. Id. at 802; Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). The burden then shifts to the defendant to rebut the presumption by articulating legitimate, non-discriminatory reasons for its employment action. Chapman, 229 F.3d at 10274. The defendant has the burden of production, not of persuasion, and thus does not have to persuade a court that

10

it was actually motivated by the reason advanced.  <u>Id</u>.
Once the defendant satisfies its burden, the presumption of
discrimination is eliminated and the plaintiff must present
evidence demonstrating that a discriminatory reason more
than likely motivated the defendant.  <u>Id</u>.

To establish a prima-facie case of race discrimination,
Ellison must show: (1) she is a member of a protected
class; (2) she was qualified for the position; (3) she
suffered an adverse-employment action; and (4) she was
replaced by a person outside her protected class or was
treated less favorably than a similarly situated individual
outside her protected class.  <u>Maynard v. Bd. of Regents</u>,
342 F.3d 1281, 1289 (11th Cir. 2003).  However, because she
has not suffered an adverse-employment action, Ellison
cannot make out a prima-facie case of race discrimination.

Ellison argues that she suffered an adverse-employment
action when she was subjected to racial remarks and when
AUM officials received personal security that she did not.
Ellison misunderstands the definition of adverse-employment
action.  "To prove adverse-employment action in a case

under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." <u>Davis v. Town of Lake Park</u>, 245 F.3d 1232, 1239 (11th Cir. 2001). Based on Ellison's allegations, there was no objective change in the condition of her employment as a result of these actions or inactions. Racial remarks and lack of personal security do not affect her "compensation, terms, conditions, or privileges of employment," as defined by Title VII. 42 U.S.C. § 2000e-2(1)(1); <u>see also</u> <u>Davis</u>, 245 F.3d at 1239.

Ellison also attempts to demonstrate an adverse-employment action by arguing that AUM constructively discharged her. "Constructive discharge qualifies as an adverse-employment decision." <u>Poole v. Country Club</u>, 129 F.3d 551, 553 (11th Cir. 1997). A plaintiff succeeds in establishing a constructive discharge claim when the allegedly discriminatory conduct "was so intolerable that a reasonable person in [her] position would be compelled to resign." <u>Morgan v. Ford</u>, 6 F.3d 750, 755-56 (11th Cir. 1993) (citations omitted), <u>cert. denied</u>, 512 U.S. 1221

(1994); see also Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991).  In assessing constructive discharge claims, the court is not to consider a plaintiff's subjective feelings about her employer's actions; rather, the court must determine solely whether a reasonable person in the plaintiff's position would be compelled to resign.  Doe v. DeKalb County Sch. Dist., 145 F.3d 1441, 1450 (11th Cir. 1998).

"Before finding constructive discharge, [the Eleventh Circuit] has traditionally required a high degree of deterioration in an employee's working conditions." Hill, 934 F.2d at 1527.  Moreover, the plaintiff "has the responsibility to act reasonably before choosing to resign, and then labeling that resignation as a constructive discharge." Mason v. City of Tampa, 134 F. Supp. 2d 1309, 1317 (M.D. Fla. 2000) (Kovachevich, J.) (citing Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987)).  Therefore, before there can be constructive discharge, the employer must first have been given sufficient time to remedy the allegedly intolerable

13

situation and then failed to do so.  Garner, 807 F.2d at 1539.

Despite Ellison's allegations to the contrary, the evidence is insufficient for a factfinder to conclude that AUM constructively discharged her.  Ellison contends that her working conditions at the university were unbearable for two reasons:  in part because AUM did not provide her with personal security and in part because it appeared that Dean Lawal no longer trusted her when he told her not to talk to him anymore.  First, after Ellison informed Lawal that she would stay until her designated date of retirement only if she were provided with personal security, the university provided such, and she stayed.  There is simply no evidence that lack of personal security could have forced Ellison to leave the university.

Second, Ellison's contention that she was forced to leave her employment at AUM because of the way Dean Lawal treated her on her last day (that is, he orally reprimanded her for shredding documents, told her not to speak to him anymore, and to sit at her desk and do nothing) is

14

meritless too.  The law required her to "act reasonably before choosing to resign, and then labeling that resignation as a constructive discharge."  <u>Mason</u>, 134 F. Supp. 2d at 1317.  Ellison did not give the university an opportunity to address her concerns about Lawal; instead, she simply and immediately quit.  Her quitting before giving the university notice of Lawal's conduct is particularly unreasonable because the university, when confronted with her other concerns, addressed them.

### ii.  Hostile Work Environment

Ellison also claims that AUM subjected her to a hostile work environment.  In order to establish a hostile work environment, Ellison must show that (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic, such as her sex or race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) imposition of liability

15

on the defendant is appropriate.  <u>Walton v. Johnson &
Johnson Servs.</u>, 347 F.3d 1272, 1279-1280 (11th Cir. 2003).

Ellison, as an African-American, is a member of a
protected group, and she was subjected to unwelcome
harassment by Mahaffy after he was not selected as Dean of
the School of Sciences.  However, Mahaffy's harassment was
not based Ellison's race; instead, Ellison herself says
that the sole reason for his behavior is that he blamed her
for not being selected as dean.  Mahaffy believed that she
possessed some influence over the first selection committee
when the university did not pick him as dean, and, when the
university ultimately selected Lawal after a second search,
Mahaffy blamed her again because she sat on the selection
committee.

Ellison also alleges that Mahaffy made several racial
remarks towards her over the course of several years.
However, his conduct, while offensive, does not rise to the
level of the hostile and pervasive environment required by
law.  See <u>Collier v. City of Opelika</u>, 374 F. Supp. 2d 1098
(M.D. Ala. 2004) (Thompson, J.) (two instances of alleged

misconduct over the course of a year insufficient to create a hostile environment); see also Shepherd v. Comptroller of Public Accounts of the State of Texas, 168 F.3d 871, 874 (5th Cir. 1999) (a handful of incidents spanning two years did not allege conduct sufficiently severe to support a Title VII claim); Arroyo v. Westlab Admin., Inc., 213 F.3d 625, 2000 (2d. Cir. 2000) ("essentially three incidents of racial animosity by a co-worker spanning over 25 months" did not raise a triable issue of hostile work environment harassment).

Moreover, Ellison has not shown that AUM failed to take corrective action after she complained about Mahaffy's behavior. See Watson v. Blue Circle, Inc., 324 F.3d 1252, 1257 (11th Cir. 2003) ("in order to establish a basis for holding the employer liable for a hostile work environment, the plaintiff must show that the employer had notice of the alleged harassment and failed to take immediate and appropriate corrective action"). When Ellison informed the university about Mahaffy's conduct, it asked her to write a memorandum detailing his inappropriate behavior. After

17

investigating her complaint, AUM ultimately stripped Mahaffy of his title as department chair and required him to complete at least two diversity programs. Ellison did not complain that Mahaffy made any more racial remarks to her after that time. Because AUM took immediate corrective action after receiving notice of Mahaffy's behavior, the university is not liable for his conduct. <u>Watson</u>, 324 F.3d at 1261.

### iii. Retaliation

Finally, Ellison claims that AUM retaliated against her after she filed her complaint against Mahaffy and after she filed her EEOC charge. Under Title VII, an employee is protected from retaliation if she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To demonstrate a prima-facie case of retaliation, Ellison must show that: (1) she was engaged in statutorily protected activity under Title VII; (2) she suffered an adverse-employment action;

18

and (3) there is a causal connection between the protected conduct and the adverse-employment action. Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 (11th Cir. 2000). Ellison's retaliation claim is without merit because she cannot satisfy this three-part test.

Ellison's complaint about Mahaffy's behavior is not a statutorily protected activity under Title VII. She did not allege that Mahaffy targeted her because of her "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), statutorily protected conduct under Title VII. Instead, she has admitted that his actions were based solely on the fact that he was not selected as dean. Therefore, Ellison cannot make out a retaliation claim from this complaint.

To the extent her retaliation claim is based on her EEOC charge, Ellison meets the first, but not the second, step of establishing a prima-facie case. Ellison contends that she suffered an adverse-employment action in that she was constructively discharged. However, as explained

19

above, the evidence is insufficient to support the conclusion that Ellison was constructively discharge.

\* \* \*

In conclusion, AUM's motions for summary judgment will be granted.  An appropriate summary judgment in favor of AUM and against Ellison will be entered.

DONE, this the 13th day of November, 2006.


 /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE